**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| IN RE: GENERIC PHARMACEUTICALS PRICING ANTITRUST LITIGATION | MDL 2724<br>16-MD-2724<br>HON. CYNTHIA M. RUFE |
| RELIABLE PHARMACY;<br>HALLIDAY'S & KOIVISTO'S PHARMACY;<br>RUSSELL'S MR. DISCOUNT DRUGS;<br>FALCONER PHARMACY;<br>CHET JOHNSON DRUG;<br>NORTH SUNFLOWER MEDICAL CENTER;<br>on behalf of themselves and all others similarly situated,<br>         *Plaintiffs*,<br>   v. | CIVIL ACTION NO.<br><br>19-cv-6044<br><br><br><br>JURY TRIAL DEMANDED<br><br>CLASS ACTION |
| ACTAVIS HOLDCO US, INC.;<br>ACTAVIS PHARMA, INC.;<br>ACTAVIS ELIZABETH LLC;<br>AKORN INC.;<br>AKORN SALES, INC.;<br>ALVOGEN, INC.;<br>AMERISOURCEBERGEN DRUG CORP.;<br>AMNEAL PHARMACEUTICALS, INC.;<br>AMNEAL PHARMACEUTICALS LLC;<br>APOTEX CORP.;<br>ARA APRAHAMIAN;<br>AUROBINDO PHARMA USA, INC.;<br>BAUSCH HEALTH AMERICAS, INC.;<br>BAUSCH HEALTH US, LLC;<br>BARR PHARMACEUTICALS, LLC;<br>DAVID BERTHOLD;<br>BRECKENRIDGE PHARMACEUTICAL, INC.<br>JAMES BROWN;<br>CAMBER PHARMACEUTICALS, INC.<br>CARDINAL HEALTH, INC.;<br>CARACO PHARMACEUTICAL LABORATORIES LTD.;<br>MAUREEN CAVANAUGH;<br>CITRON PHARMA, LLC;<br>TRACY SULLIVAN DIVALERIO;<br>DR. REDDY'S LABORATORIES, INC.;<br>ENDO INTERNATIONAL PLC;<br>MARC FALKIN;<br>GLENMARK PHARMACEUTICALS, INC.;<br>HI-TECH PHARMACAL CO. INC.<br>KAVOD PHARMACEUTICALS LLC.;<br>KEVIN GREEN;<br>GREEENSTONE LLC; | **PHARMACY and HOSPITAL PLAINTIFFS' ("IRPs")**<br><br>**DECEMBER 2019 COMPLAINT**<br><br>[Corrected] |

**FILED WITH REDACTIONS – PUBLIC VERSION**

GENERICS BIDCO I, LLC;
ROBIN HATOSY;
THE HARVARD DRUG GROUP, LLC;
H.D. SMITH, LLC;
HERITAGE PHARMACEUTICALS INC.;
ARMANDO KELLUM;
LANNETT COMPANY, INC.;
LUPIN PHARMACEUTICALS, INC.;
MAYNE PHARMA INC.;
MCKESSON CORP.;
MORRIS & DICKSON CO., LLC;
MUTUAL PHARMACEUTICAL CO., INC.;
MYLAN INC.;
MYLAN PHARMACEUTICALS, INC.;
MYLAN N.V.;
JILL NAILOR;
JAMES NESTA;
KONSTANTIN OSTAFICIUK;
PAR PHARMACEUTICAL INC.;
NISHA PATEL;
OCEANSIDE PHARMACEUTICALS, INC.
PERRIGO NEW YORK, INC.;
PFIZER, INC.;
PLIVA, INC.;
RED OAK SOURCING, LLC;
DAVID REKENTHALER;
RICHARD ROGERSON;
SANDOZ, INC.;
SUN PHARMACEUTICAL INDUSTRIES,
INC.;
TARO PHARMACEUTICALS U.S.A., INC.;
TEVA PHARMACEUTICALS USA, INC.;
UPSHER-SMITH LABORATORIES, LLC;
URL PHARMA, INC.;
VERSAPHARM, INC.;
WALGREENS BOOTS ALLICANCE, INC.;
WALGREENS BOOTS ALLIANCE
DEVELOPMENT GMBH;
WEST-WARD PHARMACEUTICALS CORP.;
WOCKHARDT USA LLC; and
ZYDUS PHARMACEUTICALS (USA), INC.,

*Defendants*.

- 2 -

**FILED WITH REDACTIONS – PUBLIC VERSION**

**FILED WITH REDACTIONS – PUBLIC VERSION**

**TABLE OF CONTENTS**

I.      INTRODUCTION ..................................................................................................13

II.     JURISDICTION AND VENUE ...........................................................................14

III.    PARTIES ...............................................................................................................15

        A.      Plaintiff Pharmacies and Hospitals .......................................................15

        B.      Manufacturer Defendants.......................................................................20

                •       Actavis ........................................................................................20

                •       Akorn ...........................................................................................21

                •       Alvogen ........................................................................................22

                •       Amneal .........................................................................................22

                •       Apotex ..........................................................................................23

                •       Aurobindo ....................................................................................23

                •       Bausch / Valeant ........................................................................23

                •       Breckenridge ...............................................................................24

                •       Camber .........................................................................................24

                •       Citron ...........................................................................................24

                •       Dr. Reddy's ..................................................................................25

                •       Glenmark......................................................................................25

                •       Heritage........................................................................................25

                •       Lannett .........................................................................................26

                •       Lupin ............................................................................................26

                •       Mayne ...........................................................................................26

                •       Par ................................................................................................27

                •       Perrigo ..........................................................................................28

**FILED WITH REDACTIONS – PUBLIC VERSION**

- Pfizer/Greenstone .............................................................................28
- Kavod / Rising ...............................................................................29
- Sandoz / Fougera............................................................................29
- Sun  / Mutual / Caraco ...................................................................30
- Taro ...............................................................................................31
- Teva...............................................................................................31
- Upsher-Smith .................................................................................32
- West-Ward .....................................................................................33
- Wockhardt......................................................................................33
- Zydus.............................................................................................33

C.  Distributor Defendants..............................................................................33
- AmerisourceBergen Corp. ("ABC").............................................33
- Cardinal .........................................................................................34
- Harvard ..........................................................................................34
- Red Oak .........................................................................................35
- McKesson .......................................................................................35
- Morris & Dickson ..........................................................................36
- Walgreens Boots Alliance ("WBAD") ..........................................36

D.  Individual Defendants................................................................................37
- Ara Aprahamian (Taro)..................................................................37
- David Berthold (Lupin)..................................................................38
- James Brown (Glenmark) ..............................................................38
- Maureen Cavanaugh (Teva)...........................................................38
- Tracy Sullivan DiValerio (Lannett) ...............................................38

**FILED WITH REDACTIONS – PUBLIC VERSION**

- Marc Falkin (Actavis) .................................................................................38
- James Grauso (Aurobindo and Glenmark) ...............................................39
- Kevin Green (Teva and Zydus) .................................................................39
- Robin Hatosy (Greenstone) .......................................................................39
- Armando Kellum (Sandoz) ........................................................................40
- Jill Nailor (Greenstone) .............................................................................40
- James Nesta (Mylan) ..................................................................................40
- Konstantin Ostaficiuk (Camber) ...............................................................40
- Nisha Patel (Teva) ......................................................................................40
- David Rekenthaler (Teva) ..........................................................................41
- Richard Rogerson (Actavis) .......................................................................41

E.    Co-Conspirators ................................................................................41

IV.    FACTUAL ALLEGATIONS ...............................................................................42

A.    The generic drug industry's overarching "fair share" conspiracy .........................42

B.    The rules of the fair share conspiracy .....................................................................45

C.    The logic of the fair share conspiracy .....................................................................48

D.    The origins of the fair share conspiracy ..................................................................50

E.    The terminology of the fair share conspiracy .........................................................53

F.    Defendants' methods for concealing the conspiracy ...............................................56

G.    Major distributors joined the manufacturers' fair share conspiracy .....................58

H.    Distributor Defendants often benefit from higher market-wide drug prices .........61

I.    Events illustrating the role of Distributor Defendants in the fair share conspiracy ..................................................................................................................64
- H.D. Smith knowingly participated in the fair share conspiracy ..............64
- Valganciclovir (H.D. Smith, Dr. Reddy's, Camber, Aurobindo) .............65

FILED WITH REDACTIONS – PUBLIC VERSION

- Acyclovir (H.D. Smith, Heritage, Zydus)...................................................67
- Harvard knowingly participated in the manufacturers' fair share conspiracy ...................................................................................................69
- Metoprolol succinate ER (Harvard, Actavis, Dr. Reddy's, Par)...............70
- Eplerenone (Harvard, Dr. Reddy's, Par, M&D) ........................................71
- ABC knowingly participated in the fair share conspiracy .........................72
- Pioglitazone-Metformin IR (ABC, Teva, Sandoz) ....................................73
- Dextroamphetamine-Amphetamine IR (ABC, Teva, Actavis).................74
- Modafinil (ABC, Teva, Par, Mylan)..........................................................75
- Loperamide (ABC, Teva, Mylan) ..............................................................78
- Buprenorphine (ABC, Teva, Sun) .............................................................79
- Walgreens and later WBAD knowingly participated in the fair share conspiracy ...................................................................................................80
- Progesterone, Vancomycin, and Lidocaine (WBAD, Akorn, Actavis) .....81
- Temozolomide (WBAD, Teva, Sandoz)......................................................83
- Isosorbide mononitrate IR (WBAD, Par) ..................................................85
- Disulfiram (WBAD, Breckenridge, Teva)..................................................86
- Cabergoline (WBAD, ABC, Teva, Greenstone)........................................86
- Clomipramine (WBAD, Sandoz, Mylan, Taro)..........................................87
- Celecoxib (WBAD, ABC, Teva, Actavis, Apotex) ...................................88
- Isotretinoin (WBAD, ABC, Teva, Dr. Reddy's) .......................................90
- Sumatriptan autoinjector (WBAD, Dr. Reddy's, Teva) ............................91
- Omeprazole-sodium bicarbonate (WBAD, Dr. Reddy's, Valeant) ..........92
- McKesson knowingly participated in the fair share conspiracy ...............93
- Capecitabine (McKesson, Mylan, Teva, Reddy's) ....................................94

**FILED WITH REDACTIONS – PUBLIC VERSION**

- Amikacin (McKesson, Teva, Heritage) .....................................................96

- Tizanidine (McKesson, Sandoz, Mylan, Dr. Reddy's)............................98

- Morris & Dickson knowingly participated in the fair share conspiracy..100

- Eszopiclone (M&D, Cardinal, Dr. Reddy's, Sun) ...................................102

- Cardinal knowingly participated in the fair share conspiracy ................103

- Nystatin and Doxycycline DR (Cardinal, Heritage, Sun/Mutual, Teva, Mylan).......................................................................................................105

- Tolterodine ER (Cardinal, Teva, Mylan).................................................107

- Tobramycin inhalation ("Tobi") (Akorn, Teva, Sandoz, Cardinal, WBAD, ABC) ........................................................................................................109

- Lamotrigine ER (WBAD, McKesson, Reddy's, Wilshire, Par) .............112

- Paricalcitol (WBAD, McKesson, Teva, Zydus, Dr. Reddy's)................115

J.    Episodes illustrating market allocation in action ....................................120

- Fenofibrate (Teva, Mylan, Lupin, Zydus, Dr. Reddy's, Cardinal) ..........120

- Clonidine (Teva, Mylan, Actavis) ...........................................................123

- Levonorgestrel-Ethinylestradiol  (Teva, Sandoz) ...................................127

- Valsartan-HCTZ (Sandoz, Mylan)...........................................................128

- Dexmethylphenidate ER (Teva, Sandoz, Par) .........................................130

- Lamivudine-Zidovudine a/k/a Combivir (Teva, Lupin, Aurobindo).......132

- Irbesartan (Teva, Lupin) ..........................................................................133

- Drospirenone-Ethinylestradiol (Teva, Lupin, Actavis) ...........................134

- Norethindrone-Ethinylestradiol (Teva, Lupin) ........................................136

- Oxaprozin (Teva, Greenstone, Dr. Reddy's) ...........................................136

- Tolterodine tartrate (Teva, Greenstone)...................................................139

- Piroxicam (Teva, Greenstone) .................................................................140

**FILED WITH REDACTIONS – PUBLIC VERSION**

- Dextroamphetamine-Amphetamine ER (Adderall XR)..........................142
- Dextroamphetamine sulfate ER (Teva, Actavis) ....................................142
- Budesonide inhalation (Teva, Actavis)..................................................143
- Omega-3-Acid Ethyl Esters (Teva, Par) ................................................144
- Entecavir (Teva, Par) .............................................................................145
- Budesonide DR (Teva, Par, Mylan)........................................................146
- Enalapril maleate (Teva, Mylan, Wockhardt, Taro) ...............................147
- Nortriptyline hydrochloride (Actavis, Teva) ..........................................150
- Niacin ER (Teva, Lupin, Zydus).............................................................151
- Moexipril hcl tablets (Teva, Glenmark).................................................152
- Desogestrel-Ethinylestradiol (Teva, Glenmark) .....................................153
- Gabapentin (Teva, Glenmark) ................................................................153
- Norethindrone acetate (Teva, Amneal, Glenmark) and Bethanechol cl (Teva, Amneal) .......................................................................................154

K.   The overarching fair share agreement leads to collusive price increases ............156

- July 31, 2012 price increase coordination...............................................157
- Nadolol (Teva, Mylan, Sandoz)..............................................................158
- Labetalol hcl (Teva, Sandoz, Par)...........................................................159
- Nitrofurantoin macrocrystal (Teva, Alvogen) ........................................160
- Nisha Patel's "Quality" rankings and price increase lists.......................161
- Raloxifene hcl,  Lidovudine-Zidovudine (Teva, Camber)......................162
- Ketoprofen, Ketorolac, and Methotrexate (Mylan, Teva) ......................165
- Increase lists and July 2013 coordinated price increases........................166
- Etodolac and Etodolac ER (Sandoz, Taro, Teva, Zydus) .......................169
- "Round 2" – August 2013 multi-drug coordinated price increases .........172

FILED WITH REDACTIONS – PUBLIC VERSION

- Haloperidol, Trifluoperazine hcl (Sandoz, Mylan) .................................173

- April 4, 2014 multi-drug coordinated price increases ...........................174

- Azithromycin, Medroxyprogesterone (Teva, Greenstone/Pfizer) ...........176

- Clarithromycin ER tabs, Tamoxifen Citrate, and Estazolam (Teva, Actavis) .................................................................................................178

- Ketoconazole cream and tablets. (Teva, Taro, Sandoz, Mylan, Apotex) 179

- Cyproheptadine, Norethindrone-Ethinylestradiol (Mimvey) tabs (Teva, Breckenridge) ........................................................................................181

- Diflunisal (Teva / Rising) .....................................................................182

- Pentoxifylline (Teva / Apotex) .............................................................183

- Nystatin (Teva, Heritage, Sun) .............................................................183

- Amiloride-HCTZ, Cimetidine, Diclofenac, Enalapril maleate, Fluvastatin caps, Flurbiprofen, Loperamide hcl, Prazosin hcl, Prochlorperazine, Sotalol hcl (Teva / Mylan) .....................................................................185

- Fluocinonide, Carbamazepine, Clotrimazole, Warfarin (Teva, Taro) .....186

- Warfarin (Teva, Taro, Zydus) and Topiramate sprinkle (Teva, Zydus) ..187

- August 28, 2014 multi-drug coordinated price increases .......................188

- January 28, 2015 multi-drug coordinated price increases ......................189

- Ciprofloxacin hcl, Glimepiride (Teva, Dr. Reddy's) ..............................193

- Griseofulvin microsize oral suspension (Teva, Reddy's) .......................193

L.   Price increases discussed in previously-filed complaints ....................................194

- Clomipramine (Sandoz, Mylan, Taro) ...................................................194

- Divalproex ER (Mylan, Par, Dr. Reddy's, Zydus) .................................197

- Pravastatin (Teva, Glenmark, Apotex, Zydus, Lupin) ............................198

- Baclofen (Teva, Lannett, Par, Upsher-Smith) ........................................199

- Benazepril-HCTZ (Sandoz, Mylan, Rising) ...........................................202

**FILED WITH REDACTIONS – PUBLIC VERSION**

- Desonide (Actavis, Perrigo, Sandoz, Taro) ..............................................203

- Fluocinonide (Teva, Taro, Sandoz, Actavis) ...........................................203

- Levothyroxine (Sandoz, Lannett) ..........................................................205

- Propranolol (Teva, Actavis, Breckenridge, Heritage, Mylan, Par)..........208

V.   THE STATUTES OF LIMITATIONS DO NOT BAR PLAINTIFFS' CLAIMS ..........208

A.   The Statutes of Limitations Did Not Begin to Run Because Plaintiffs Did Not and Could Not Discover Defendants' Unlawful Conspiracy .....................................208

B.   Fraudulent Concealment Tolled the Statutes of Limitations. .............................209

1.   Active Concealment of the Conspiracy. ..................................................210

2.   Plaintiffs Exercised Reasonable Diligence. ............................................211

VII.   CONTINUING VIOLATIONS ........................................................................212

VIII.   DEFENDANTS' ANTITRUST VIOLATIONS.................................................212

IX.   CLASS ACTION ALLEGATIONS .................................................................214

X.   CAUSES OF ACTION ...................................................................................219

- COUNT 1 Violation of Sections 1 and 3 of the Sherman Act—Injunctive Relief (against all Defendants on behalf of Plaintiffs and the Injunctive Class)..................................................................................................219

- COUNT 2 Violation of Sections 1 and 3 of the Sherman Act—Damages (on behalf of Plaintiffs and the Federal Damages Class against distributor Defendants AmerisourceBergen Corp., Cardinal, Red Oak, Harvard, H.D. Smith, McKesson, Morris & Dickson, and WBAD for purchases made directly from these Defendants).............................................................221

- COUNT 3 Violation of Sections 1 and 3 of the Sherman Act—Damages (against ABC on behalf of Plaintiffs and the Federal Damages Class for purchases made directly from ABC and H.D. Smith) ............................222

- COUNT 4 Violation of Sections 1 and 3 of the Sherman Act—Damages (against H.D. Smith on behalf of Plaintiffs and the Federal Damages Class for purchases made directly from H.D. Smith and ABC).......................223

- COUNT 5 Violation of Sections 1 and 3 of the Sherman Act—Damages (against Cardinal and Red Oak on behalf of Plaintiffs and the Federal

**FILED WITH REDACTIONS – PUBLIC VERSION**

Damages Class for purchases made directly from Cardinal, Harvard, and Red Oak) ................................................................................................224

- COUNT 6 Violation of Sections 1 and 3 of the Sherman Act—Damages (against Harvard on behalf of Plaintiffs and the Federal Damages Class for purchases made directly from Cardinal, Harvard, and Red Oak) ............225

- COUNT 7 Violation of Sections 1 and 3 of the Sherman Act—Damages (against McKesson on behalf of Plaintiffs and the Federal Damages Class for purchases made directly from McKesson) ........................................226

COUNT 8 Violation of Sections 1 and 3 of the Sherman Act—Damages (against Morris & Dickson on behalf of Plaintiffs and the Federal Damages Class for purchases made directly from Morris & Dickson) ............................227

- COUNT 9 Violation of Sections 1 and 3 of the Sherman Act—Damages (against WBAD on behalf of Plaintiffs and the Federal Damages Class for purchases made directly from Defendant WBAD or ABC) ...................228

- COUNT 10 Violation of State Antitrust Statutes (against all Defendants, on behalf of Plaintiffs and the State Damages Class, for purchases from any source other than Defendants) .........................................................230

- COUNT 11 Violation of State Consumer Protection Statutes  (on behalf of Plaintiffs and the Damages Class) ........................................................237

- COUNT 12 Unjust Enrichment ..........................................................241

VI.    REQUEST FOR RELIEF ...............................................................243

VII.   JURY DEMAND ..........................................................................244

VIII.  APPENDIX: DRUGS AT ISSUE..................................................245

FILED WITH REDACTIONS – PUBLIC VERSION

## I. **INTRODUCTION**

1.      Defendants, generic drug manufacturers and distributors, have participated in an overarching "fair share" conspiracy to maintain and raise prices of more than a hundred generic drugs and to allocate customers and drug markets between manufacturers in order to assign each Defendant manufacturer its "fair share" of business while keeping prices high.

2.      Plaintiffs are independent pharmacies and hospitals that purchased and later dispensed these drugs, and, due to Defendants' antitrust violations, paid illegally inflated prices for these drugs. Plaintiffs have previously filed actions in MDL 2724 alleging that the Defendants in those actions, many of which are named here, caused Plaintiffs economic harm when they conspired to allocate markets and fix prices and thereby violated Section 1 of the Sherman Act as well as the antitrust, consumer protection, and unjust enrichment laws of various states.

3.      The anticompetitive conduct alleged in those previously-filed actions[1] and the conduct described herein were all acts in furtherance of an overarching conspiracy among

---

[1] The actions previously filed by Plaintiffs in MDL 2724 include: **Albuterol** (16-AL-27243-CMR, Dkt. 2); **Amitriptyline** (16-AM-27243-CMR, Dkt. 2); **Baclofen** (16-BC-27243-CMR, Doc. 9); **Benazepril** (16-BZ-27243-CMR, Dkt. 2); **Clobetasol** (16-CB-27243-CMR, Dkt. 13); **Clomipramine** (16-CM-27243-CMR, Dkt. 2); **Desonide** (16-DS-27243-CMR, Dkt. 12); **Digoxin** (16-DG-27243-CMR, Dkt. 34); **Divalproex** (16-DV-27243-CMR, Dkt. 6); **Doxycycline** (16-DX-27243-CMR, Dkt. 39); **Econazole** (16-EC-27243-CMR, Dkt. 2); **Fluocinonide** (16-FL-27243-CMR, Dkt. 10); **Levothyroxine** (16-LV-27243-CMR, Dkt. 8); **Lidocaine-Prilocaine** (16-LD-27243-CMR, Dkt. 12); **Pravastatin** (16-PV-27243-CMR, Dkt. 9); **Propranolol** (16-PP-27243-CMR, Dkt. 5); and **Ursodiol** (16-FL-27243-CMR, Dkt. 8), as well as a **multi-drug "Overarching" complaint** (18-cv-2533-CMR, Dkt. 1) that sought relief for overcharges on the following drugs: Acetazolamide tablets ("tabs") and extended release ("ER") capsules ("caps"), Doxycycline hyclate tabs, caps, and delayed release ("DR") tabs, Doxycycline monohydrate tabs, Fosinopril-Hydrochlorothiazide ("Fosi-HCTZ") tabs, Glipizide-Metformin tabs, Glyburide tabs, Glyburide-Metformin tabs, Leflunomide tabs, Meprobamate tabs, Nimodipine caps, Nystatin cream, ointment and tabs; Paromomycin caps, Theophylline ER tabs, Verapamil hydrochloride ("hcl") tabs, ER tabs, and DR caps, and Zoledronic Acid injection.

- 13 -

**FILED WITH REDACTIONS – PUBLIC VERSION**

Defendants. When faced with competition, Defendants' employees met in person and called, emailed, and texted one another in order to coordinate the tactical details of their overarching anticompetitive strategy. These tactics included exchanging confidential pricing and marketing plans, targeting or ceding certain accounts in order to allocate customers, agreeing to follow list price increases or effective price increases, and submitting false bids. This "fair share" conspiracy affected the prices of the drugs already identified in Plaintiffs' previously-filed MDL 2724 actions as well as the Drugs at Issue identified here.

4.      Plaintiffs' allegations are based on information obtained from individuals with knowledge of the acts alleged herein and on information made public during ongoing government investigations of Defendants, but the bulk of the specific facts alleged herein were not known to Plaintiffs until, at the earliest, May 10, 2019, when the Plaintiff States filed a complaint based primarily on the computer files of two Teva sales executives.

5.      Having investigated the anticompetitive communications in those files, Plaintiffs in this Complaint allege that additional Defendants—including certain major generic drug distributors—participated in the conspiracy, and that markets for at least 130 additional drugs were collusively allocated or price-fixed by the Defendants. Plaintiffs intend to seek the Court's permission to amend this Complaint in order to consolidate Plaintiffs' previously-filed actions into a single comprehensive document so long as the procedural posture of each claim is maintained.

## II.        JURISDICTION AND VENUE

6.      This Court has jurisdiction over the subject matter of this action as it arises under Section 1 of the Sherman Act, 15 U.S.C. § 1, and Section 4 of the Clayton Act, 15 U.S.C. § 15. Further, this Court has jurisdiction under 28 U.S.C. §§ 1331, 1337(a).

**FILED WITH REDACTIONS – PUBLIC VERSION**

7.      Venue is proper in this District pursuant to 15 U.S.C. §§ 15 and 22, and 28 U.S.C.

§ 1391(b), (c) and (d), because during the Class Period Defendants transacted business

throughout the United States, including in this District; Defendants resided, transacted business,

were found, or had agents within this District, and a portion of the affected interstate trade and

commerce discussed below was carried out in this District.

8.      This Court has personal jurisdiction over each Defendant because each

Defendant: (a) transacted business throughout the United States, including in this District;

(b) participated in the selling and distribution of Drugs at Issue throughout the United States,

including in this District; (c) had and maintained substantial contacts within the United States,

including in this District; and/or (d) was engaged in an unlawful conspiracy to inflate the prices

for Drugs at Issue that was directed at and had the intended effect of causing injury to persons

residing in, located in, or doing business throughout the United States, including in this District.

## III.                    PARTIES

### A.      Plaintiff Pharmacies and Hospitals

9.      Plaintiff **Reliable Pharmacy** ("Reliable") is a privately-held independent

pharmacy located in Northridge, California. During the Class Period, Reliable purchased drugs

affected by the anticompetitive conduct at issue in this complaint at supracompetitive prices and

was thereby injured and suffered damages as a result of Defendants' unlawful conduct. These

purchases include purchases made directly from distributor Defendants McKesson, H.D. Smith,

and AmerisourceBergen Corp. and indirectly from sources other than the Defendants.[2]

---

[2] Reliable purchased at least these drugs from distributor Defendants McKesson and/or from
H.D. Smith, and AmerisourceBergen Corp.: Acetazolamide tablets, Acetazolamide ER capsules,
Acyclovir tablets, Adapalene gel, Albuterol tablets, Amiloride HCL-HCTZ tablets, Amikacin
injection, Amitriptyline tablets, Amoxicillin-Clavulanate chewable tablets,
Amphetamine/Dextroamphetamine ER and IR tablets, Azithromycin oral suspension, Baclofen

FILED WITH REDACTIONS – PUBLIC VERSION

10.     Plaintiff **Falconer Pharmacy, Inc**. ("Falconer") is a privately held independent pharmacy located in Falconer, New York. During the Class Period, Falconer purchased drugs affected by the anticompetitive conduct at issue in this complaint at supracompetitive prices and

---

tablets, Benazepril-HCTZ tablets, Bethanechol chloride tablets, Budesonide DR capsules, Budesonide inhalation, Bumetanide tablets, Buprenorphine, Buprenorphine-Naloxone tablets, Buspirone hcl tablets, Cabergoline tablets, Calcipotriene topical solution, Calcitriol capsules, Capecitabine tablets, Carbamazepine chewable tablets, Carbamazepine tablets, Cefdinir capsules, oral suspension, and tablets, Cefixime, Celecoxib capsules, Cephalexin suspension, Cimetidine tablets, Ciprofloxacin hcl tablets, Clarithromycin ER tablets, Clemastine fumarate tablets, Clobetasol emollient cream, cream, gel, ointment, and topical solution, Clonidine-TTS patch, Clomipramine capsules, Clotrimazole topical solution, Colistimethate, Combivir tablets, Cyproheptadine hcl tablets, Desmopressin acetate tablets, Desogestrel-Ethinyl Estradiol tablets, Dexmethylphenidate hcl ER, Desonide cream, ointment, Dexmethylphenidate hcl ER, Dextroamphetamine sulfate ER, Diclofenac potassium tablets, Dicloxacillin sodium capsules, Diflunisal tablets, Digoxin tablets, Diltiazem HCL tablets, Disopyramide phosphate capsules, Disulfiram, Divalproex ER tablets, Doxazosin Mesylate tablets, Doxycycline monohydrate tablets, Doxycycline hyclate capsules, Doxycycline hyclate DR tablets, Drospirenone-Ethinylestradiol tablets, Econazole cream, Enalapril maleate tablets, Entecavir tablets, Epitol tablets, Eplerenone tablets, Estazolam tablets, Estradiol tablets, Ethinylestradiol-Levonorgestrel tablets, Ethinylestradiol-Norethindrone acetate tablets, Ethosuximide capsules, oral solution, Etodolac ER tablets, Etodolac tablets, Fenofibrate tablets, Fluconazole tablets, Fluocinonide cream, ointment, gel, and emollient cream, Fluoxetine hcl tablets, Flurbiprofen tablets, Flutamide capsules, Gabapentin tablets, Glimepiride tablets, Glipizide-Metformin tablets, Glyburide tablets, Glyburide-Metformin tablets, Griseofulvin suspension, Haloperidol tablets, Hydroxyurea capsules, Hydroxyzine capsules, Imiquimod, Irbesartan tablets, Isoniazid tablets, Ketoconazole cream, Ketoconazole tablets, Ketoprofen capsules, Ketorolac tromethamine tablets, Labetalol hcl tablets, Lamotrigine ER, Leflunomide tablets, Levothyroxine tablets, Lidocaine-Prilocaine cream, Loperamide hcl capsules, Medroxyprogesterone tablets, Meprobamate tablets, Metronidazole gel, Metoprolol ER, Methotrexate tablets, Modafinil tabs, Montelukast oral granules, Nabumetone tablets, Nadolol tablets, Niacin ER, Nimodipine capsules, Nitrofurantoin macrocrystal capsules, Norethindrone acetate tablets, Nortriptyline hcl capsules, Nystatin tablets, ointment and cream, Omega-3-Acid Ethyl Esters capsules, Omeprazole-Sodium bicarbonate capsules, Oxaprozin tablets, Oxybutynin Cl tablets, Paricalcitol capsules, Penicillin VK tablets, Pentoxifylline tablets, Pioglitazone-Metformin, Piroxicam capsules, Pravastatin tablets, Prazosin hcl capsules, Prochlorperazine tablets, Propranolol capsules, Propranolol tablets, Raloxifene hcl tablets, Ranitidine hcl tablets, Tamoxifen citrate tablets, Temozolomide capsules, Theophylline ER tablets, Tizanidine hcl tablets, Tobramycin inhalation and ophthalmic solution, Tolterodine tartrate tablets, Topiramate sprinkle capsules, Trifluoperazine hcl tablets, Ursodiol capsules, Valganciclovir tablets, Valsartan-HCTZ, Verapamil tablets, ER capsules, and DR capsules, Warfarin sodium tablets, and Zoledronic Acid injection.

**FILED WITH REDACTIONS – PUBLIC VERSION**

was thereby injured and suffered damages as a result of Defendants' unlawful conduct. These purchases include purchases made indirectly (from sources other than the Defendants) and directly from distributor Anda, a wholly-owned subsidiary of Defendant Teva since 2016 and before then, a wholly-owned subsidiary of Defendant Actavis).[3]

11.    Plaintiff **Halliday's & Koivisto's Pharmacy** ("**Halliday's**") is an independent pharmacy located at 4133 University Boulevard in Jacksonville, Florida. Halliday's has served the Jacksonville community for over 50 years. During the Class Period, Halliday's purchased drugs affected by the anticompetitive conduct at issue in this complaint at supracompetitive prices and was thereby injured and suffered damages as a result of Defendants' unlawful conduct. These purchases include purchases made directly from distributor Defendant McKesson and indirectly from sources other than the Defendants.[4]

--------------------

[3] Falconer purchased at least these drugs: Acetazolamide, Adapalene, Albuterol tablets, Amitriptyline, Azithromycin, Baclofen, Benazepril – HCTZ ,Bethanechol Chloride, Budesonide DR, Budesonide inhalation, Buspirone hcl, Ciprofloxacin hcl, Clarithromycin ER, Clobetasol, Clomipramine, Clotrimazole, Cyproheptadine hcl, Desmopressin Acetate, Desonide, Dextroamphetamine sulfate ER, Diclofenac potassium, Digoxin, Diltiazem hcl, Doxazosin mesylate, Divalproex ER, Doxycycline hyclate, Doxycycline monohydrate, Econazole, Enalapril maleate, Estradiol, Etodolac, Etodolac ER, Fenofibrate, Fluocinonide, Fluoxetine hcl, Fosinopril-HCTZ Gabapentin, Glimepiride, Glipizide-Metformin, Glyburide, Glyburide-Metformin, Ketorolac Tromethamine, Labetalol hcl, Leflunomide, Levothyroxine, Lidocaine-Prilocaine tablets Loperamide hcl, Nitrofurantoin microcrystal, Norethindrone Acetate, Nortriptyline hcl, Penicillin VK, Pravastatin, Prazosin hcl, Propranolol, Ranitidine hcl, Theophylline ER, Tolterodine ER, Tolterodine Tartrate, Ursodiol, Verapamil, Warfarin sodium tablets.

[4] Halliday's purchased at least these drugs, mostly from Defendant McKesson: Acyclovir tablets, Adapalene gel, Amphetamine IR, Amphetamine/Dextroamphetamine ER/IR, Azithromycin oral suspension, Baclofen tablets, Bethanechol Chloride tablets, Busiprone, Cabergoline, Carbamazepine, Cefdinir, Celecoxib, Cephalexin suspension, Ciprofloxacin hcl tablets, Clarithromycin ER tablets, Clonidine -TTS Patch, Clomipramine, Clotrimazole topical solution, Cyproheptadine hcl tablets, Desmopressin Acetate tablets, Desogestrel-Ethinylestradiol tablets, Dexmethylphenidate hcl ER, Diclofenac potassium tablets, Dicloxacillin sodium capsules, Diflunisal tablets, Diltiazem hcl tablets, Doxazosin Mesylate tablets, Doxycycline hyclate DR tablets, Drospirenone-Ethinylestradiol tablets, Enalapril Maleate tablets, Eplerenone tablets, Estazolam tablets, Estradiol tablets, Eszopiclone tablets, Levonorgestrel, Ethinylestradiol-Norethindrone, Ethosuximide, Etodolac ER tablets, Etodolac, Fenofibrate tablets, Fluconazole

**FILED WITH REDACTIONS – PUBLIC VERSION**

12.     Plaintiff **North Sunflower Medical Center** ("**North Sunflower**") is a hospital located at 840 N. Oak Avenue in Ruleville, Mississippi. First established in 1950 as North Sunflower County Hospital, the hospital has grown to a staff of approximately 500 employees and includes a pharmacy that dispenses drugs to patients at North Sunflower. During the Class Period North Sunflower purchased drugs affected by the anticompetitive conduct at issue in this complaint at supracompetitive prices and was thereby injured and suffered damages as a result of Defendants' unlawful conduct. These purchases include purchases made directly, from distributor Defendants Cardinal and Morris & Dickson, and indirectly, from sources other than the Defendants. [5]

---

tablets, Fluocinonide, Fluoxetine hcl tablets, Flurbiprofen tablets, Gabapentin tablets, Glimepiride tablets, Griseofulvin suspension, Haloperidol tablets, Hydroxyzine capsules, Irbesartan tablets, Isoniazid tablets, Ketoconazole, Ketoprofen capsules, Ketorolac, Tromethamine tablets, Labetalol hcl tablets, Levothyroxine tablets, Loperamide hcl capsules, Medroxyprogesterone tablets, Methotrexate tablets, Metronidozole, Modafinil tablets, Nabumetone tablets, Nadolol tablets, Niacin ER, Nitrofurantoin MAC capsules, Norethindrone, Norethindrone-Ethynilestradiol, Nortriptyline hydrochloride capsules, Omega-3-Acid Ethyl Esters capsules, Oxybutynin Chloride tablets, Penicillin VK tablets, Pentoxifylline tablets, Piroxicam capsules, Prazosin hcl capsules, Prochlorperazine tablets, Raloxifene hcl tablets, Ranitidine hcl tablets, Sotalol, Tamoxifen Citrate tablets, Tizanidine hcl tablets, Tobramycin, Tolterodine ER, Tolterodine Tartrate tablets, Topiramate Sprinkle capsules, Trifluorperazine hcl tablets, Ursodiol capsules, Valsartan-HCTZ, Valganciclovir tablets, Warfarin sodium tablets

[5] North Sunflower purchased at least these drugs from distributor Defendants Cardinal and/or Morris & Dickson: Acetazolamide tablets, Acyclovir tablets, Amiloride hcl/HCTZ tablets, Amikacin injection, Amitriptyline tablets, Amoxicillin-Clavulanate tablets, Azithromycin oral suspension, Baclofen tablets, Bethanechol Chloride tablets, Budesonide inhalation, Bumetanide tablets, Buspirone hydrochloride tablets, Calcitriol capsules, Carbamazepine tablet, Cefdinir, Celecoxib capsules, Cephalexin suspension, Cimetidine tablets, Ciprofloxacin hcl tablets, Clobetasol, Clonidine TTS Patch, Clotrimazole topical solution, Combivir tablets, Cyproheptadine hcl tablets, Diclofenac, potassium tablets, Digoxin tablets, Diltiazem hcl tablets, Divalproex ER tablets, Doxazosin Mesylate tablets, Doxycycline Monohydrate tablets, Doxycycline hyclate RR capsules, Econazole cream, Enalapril Maleate tablets, Entecavir tablets, Eplerenone tablets, Estradiol tablets, Etodolac tablets, Fenofibrate tablets, Fluconazole tablets, Fluoxetine hcl tablets, Glimepiride tablets, Glyburide tablets, Glyburide-Metformin tablets, Griseofulvin suspension, Haloperidol tablets, Hydroxyurea capsules, Hydroxyzine capsules, Irbesartan tablets, Isoniazid tablets, Ketoconazole tablets, Ketorolac, Tromethamine tablets, Labetalol hcl tablets, Labetalol tablets, Lamivudine/ Zidovudine tablets, Leflunomide tablets,

**FILED WITH REDACTIONS – PUBLIC VERSION**

13.      Plaintiff **Russell's Mr. Discount Drugs** ("**Russell's**") was a privately held independent pharmacy located at 334 Depot Street, in Lexington, Mississippi from the time of its opening in February 1986 until it sold the prescription drugs portion of its business to a pharmacy chain on July 14, 2016. During the Class Period, Russell's purchased drugs affected by the anticompetitive conduct at issue in this complaint at supracompetitive prices and was thereby injured and suffered damages as a result of Defendants' unlawful conduct. These purchases include purchases made directly, from distributor Defendant Harvard, and indirectly, from sources other than the Defendants.[6]

---

Levothyroxine tablets, Lidocaine-Prilocaine cream, Loperamide hcl capsules, Medroxyprogesterone tablets, Metronidozole, Metroprolol, Methotrexate tablets, Modafinil tabs, Montelukast Oral Granules, Nabumetone tablets, Nadolol tablets, Niacin ER, Nitrofurantoin MAC capsules, Nortriptyline hydrochloride capsules, Nystatin ointment, Nystatin cream, Omega-3-Acid Ethyl Esters capsules, Oxaprozin tablets, Oxybutynin Chloride tablets, Paricalcitol capsules, Penicillin VK tablets, Pentoxifylline tablets, Pravastatin tablets, Prazosin hcl capsules, Prochlorperazine tablets, Propranolol capsules, Propranolol tablets, Raloxifene hcl tablets, Ranitidine hcl tablets, Tamoxifen Citrate tablets, Theophylline ER tablets, Tizanidine hcl tablets, Tobramycin inhalation solution, Tolterodine ER, Tolterodine Tartrate tablets, Trifluorperazine hcl tablets, Ursodiol capsules, Verapamil, Warfarin sodium tablets, Zoledronic Acid injection.

[6] Russell's purchased at least the following drugs, including purchases from Defendant Harvard: Amoxicillin-Clavulanate, Azithromycin oral suspension, Bumetanide tablets, Cephalexin suspension, Ciprofloxacin hcl tablets, Clarithromycin ER tablets, Clonidine-TTS Patch, Clotrimazole topical solution, Cyproheptadine hcl tablets, Dexmethylphenidate hcl ER, Diclofenac potassium tablets, Dicloxacillin sodium capsules, Diltiazem hcl tablets, Doxazosin Mesylate tablets, Enalapril Maleate tablets, Estradiol tablets, Etodolac tablets, Fenofibrate tablets, Fluconazole tablets, Gabapentin tablets, Glimepiride tablets, Griseofulvin suspension, Haloperidol tablets, Irbesartan tablets, Ketoconazole, Ketorolac, Tromethamine tablets, Labetalol hcl tablets, Labetalol tablets, Loperamide hcl capsules, Medroxyprogesterone tablets, Moexipril Nabumetone tablets, Niacin ER, Nitrofurantoin MAC ,Nortriptyline hydrochloride capsules ,Omega-3-Acid Ethyl Esters capsule, Oxaprozin tablets, Glimepiride tablets, Oxybutynin Chloride, Pentoxifylline tablets, Prazosin hcl capsules, Prochlorperazine tablets, Raloxifene hcl tablets, Tizanidine hcl tablets, Tolterodine Tartrate tablets, Trifluorperazine hcl tablets, Valsartan HCTZ, Warfarin sodium tablets

**FILED WITH REDACTIONS – PUBLIC VERSION**

14.    **Plaintiff Chet Johnson Drug** ("**Chet Johnson**") is a privately held independent pharmacy in Amery, Wisconsin. During the Class Period Chet Johnson purchased drugs affected by the anticompetitive conduct at issue in this complaint at supracompetitive prices and was thereby injured and suffered damages as a result of Defendants' unlawful conduct. These purchases include purchases made directly, from distributor Defendant McKesson, and indirectly, from sources other than the Defendants.[7]

**B.    Manufacturer Defendants**

- **Actavis**

15.    Defendant **Actavis Holdco U.S., Inc.** ("**Actavis**") is a Delaware corporation with its principal place of business in Parsippany, New Jersey. In August 2016, Teva Pharmaceutical USA, Inc. acquired the generics business of Allergan plc, including Actavis, Inc. Upon the acquisition, Actavis, Inc.—the acquired Allergan plc generics operating company (formerly known as Watson Pharmaceuticals)—was renamed Allergan Finance, LLC, which in turn

---

[7] Chet Johnson purchased at least the following drugs, mostly from the defendant Distributor McKesson: Adapalene gel, Amphetamine/Dextroamphetamine ER/IR, Azithromycin oral suspension, Baclofen tablets, Budesonide DR capsules, Budesonide inhalation, Buspirone hydrochloride tablets, Cabergoline tablets, Celecoxib capsules, Cephalexin suspension, Cimetidine tablets, Clemastine Fumarate tablets, Clonidine-TTS Patch, Clomipramine capsules, Cyproheptadine hcl tablets, Desogestrel-Ethinylestradiol tablets, Diclofenac potassium tablets, Dicloxacillin sodium capsules, Diflunisal tablets, Diltiazem hcl tablets, Disopyramide Phosphate capsules, Doxazosin Mesylate tablets, Drospirenone-Ethinylestradiol tablets, Enalapril Maleate tablets, Epitol tablets, Estradiol tablets, Etodolac tablets, Fenofibrate tablets, Fluconazole tablets, Fluocinonide, Fluoxetine hcl tablets, Flurbiprofen tablets, Fluvastatin sodium capsules, Glimepiride tablets, Haloperidol tablets, Hydroxyzine capsules, Hydroxyurea capsules, Irbesartan tablets, Ketoconazole, Ketorolac, Tromethamine tablets, Loperamide hcl capsules, Medroxyprogesterone tablets, Methotrexate tablets, Nabumetone tablets, Nitrofurantoin MAC capsules, Norethindrone Acetate tablets, Nortriptyline hydrochloride capsules, Omega-3-Acid Ethyl Esters capsule, Oxaprozin tablets, Prazosin hcl capsules, Raloxifene hcl tablets, Sotalol, Tamoxifen Citrate tablets, Tizanidine hcl tablets, Tolterodine Tartrate tablets, Topiramate Sprinkle capsules, Warfarin sodium tablets

**FILED WITH REDACTIONS – PUBLIC VERSION**

assigned all of the assets and liabilities of the former Allergan plc generic business to the newly formed Actavis Holdco, including subsidiaries Defendant Actavis Pharma, Inc. and Defendant Actavis Elizabeth LLC among others. Actavis Holdco is a wholly-owned subsidiary of Defendant Teva Pharmaceuticals USA, Inc., which is a Delaware corporation with its principal place of business in North Wales, Pennsylvania. Teva Pharmaceuticals USA, Inc. is a wholly-owned subsidiary of Teva Pharmaceutical Industries Ltd., an Israeli entity.

16.      Defendant **Actavis Pharma, Inc.** ("Actavis Pharma") is a Delaware corporation with its principal place of business in Parsippany, New Jersey. It is a wholly-owned subsidiary of Actavis Holdco and is a principal operating company in the U.S. for Teva's generic products acquired from Allergan plc. It manufactures, markets, and/or distributes generic drugs. Actavis Pharma, Inc. is registered with the Pennsylvania Department of State as a foreign corporation and maintains a registered agent in Pennsylvania.

17.      Defendant **Actavis Elizabeth LLC** ("Actavis Elizabeth") is a Delaware company with its principal place of business in Elizabeth, New Jersey.  It is a wholly-owned subsidiary of Actavis Holdco.

18.      Unless addressed individually, Actavis Holdco, Actavis Pharma, and Actavis Elizabeth are collectively referred to herein as "Actavis." During the Class Period, Actavis marketed and sold generic pharmaceuticals in this District and throughout the United States.

- **Akorn**

19.      Defendant **Akorn, Inc**. is a Louisiana company with its principal place of business in Lake Forest, Illinois.   It is the parent company of Hi-Tech Pharmacal Co., Inc. and Akorn Sales, Inc.

20.     Defendant **Akorn Sales, Inc**. is a Delaware corporation. It is a wholly-owned subsidiary of Akorn Inc. It is registered with the Pennsylvania Department of State as a foreign corporation and maintains a registered agent in Pennsylvania.

21.     Defendant **Hi-Tech Pharmacal Co., Inc.** ("Hi-Tech") is a Delaware corporation with its principal place of business in Amityville, New York. It is a wholly-owned subsidiary of Akorn, Inc. Akorn Inc. acquired and integrated Hi-Tech into its operations in April 2014

22.     Defendant **Versapharm, Inc.** is a Georgia corporation with its principal place of business in Marietta, GA. It is a wholly-owned subsidiary of Akorn, Inc. Versapharm was acquired by Akorn, Inc. in August 2014.

23.     Unless addressed individually, Akorn Inc., Akorn Sales, Inc., Hi-Tech and Versapharm are collectively referred to herein as "Akorn." During the Class Period, Akorn marketed and sold generic pharmaceuticals in this District and throughout the United States

- **Alvogen**

24.     Defendant Alvogen Inc. is a Delaware corporation with its principal place of business in Pine Brook, New Jersey. It is a privately held company that was founded in 2009 by a former CEO of Defendant Actavis. During the Class Period, Alvogen marketed and sold generic pharmaceuticals in this District and throughout the United States.

- **Amneal**

25.     Defendant **Amneal Pharmaceuticals LLC** ("Amneal LLC") is a Delaware company with its principal place of business in Bridgewater, New Jersey.

26.     Defendant **Amneal Pharmaceuticals Inc.** ("Amneal Inc.") is a Delaware corporation with its principal place of business in Bridgewater, New Jersey.  Amneal Inc. owns a

**FILED WITH REDACTIONS – PUBLIC VERSION**

portion of Amneal LLC and, as the managing member of Amneal LLC, conducts and exercises full control over all activities of Amneal LLC.

27.     Unless addressed individually, Amneal LLC and Amneal Inc. are collectively referred to herein as "Amneal."  During the Class Period, Amneal marketed and sold generic pharmaceuticals in this District and throughout the United States.

- **Apotex**

28.     Defendant **Apotex Corp.** ("Apotex") is a Delaware corporation with its principal place of business in Weston, Florida.  During the Class Period, Apotex marketed and sold generic pharmaceuticals in this District and throughout the United States.

- **Aurobindo**

29.     Defendant **Aurobindo Pharma USA, Inc.** ("Aurobindo") is a Delaware corporation with its principal place of business in Dayton, New Jersey. Aurobindo is a subsidiary of Aurobindo Pharma Limited, a corporation based in Hyderabad, India. During the Class Period, Aurobindo marketed and sold generic pharmaceuticals in this District and throughout the United States.

- **Bausch / Valeant**

30.     Defendant **Bausch Health Americas, Inc.** (formerly **Valeant** Pharmaceuticals International, Inc.) is a Delaware corporation with its US headquarters located in Bridgewater, New Jersey. Defendant **Bausch Health US, LLC** (formerly Valeant Pharmaceuticals North America LLC) is a Delaware limited liability company with its principal place of business in Bridgewater, New Jersey. Bausch Health US is registered with the Pennsylvania Department of State as a foreign corporation and maintains a registered agent in Pennsylvania.

**FILED WITH REDACTIONS – PUBLIC VERSION**

31.     Defendant **Oceanside Pharmaceuticals**, Inc. ("Oceanside") is a wholly-owned subsidiary of Bausch Health Americas, Inc. It is a Delaware corporation with its principal place of business in Bridgewater, New Jersey Unless addressed individually, Bausch Health Americas, Bausch Health USA, Oceanside and Valeant are collectively referred to as "Valeant." During the Class Period, Valeant marketed and sold generic pharmaceuticals in this District and throughout the United States.

- **Breckenridge**

32.     Defendant **Breckenridge Pharmaceutical, Inc.** ("Breckenridge") is a Florida corporation with its principal place of business in Berlin, Connecticut. During the Class Period, Breckenridge marketed and sold generic pharmaceuticals in this District and throughout the United States.

- **Camber**

33.     Defendant Camber Pharmaceuticals, Inc. ("Camber") is a Delaware corporation with its principal place of business in Piscataway, New Jersey. Camber is a wholly-owned subsidiary of Hetero Drugs, an Indian pharmaceutical company. During the Class Period, Camber marketed and sold generic pharmaceuticals in this District and throughout the United States.

- **Citron**

34.     Defendant **Citron Pharma, LLC** ("Citron") is a New Jersey corporation with its principal place of business in East Brunswick, New Jersey. During the Class Period, Citron marketed and sold generic pharmaceuticals in this District and throughout the United States.

35.     Aceto Corporation (which purchased Citron's generic drugs assets) has disclosed that the DOJ executed a search warrant at Aceto's offices in Port Washington, New York.

- **Dr. Reddy's**

36.     Defendant **Dr. Reddy's Laboratories, Inc.** ("Dr. Reddy's") is a New Jersey corporation with its principal place of business in Princeton, New Jersey. It is a wholly-owned subsidiary of Dr. Reddy's Laboratories Ltd., which is an Indian company with its principal place of business in Hyderabad, in the state of Telangana, India. Dr. Reddy's is registered with the Pennsylvania Department of State as a foreign corporation and maintains a registered agent in Pennsylvania. During the Class Period, Dr. Reddy's marketed and sold generic pharmaceuticals in this District and throughout the United States.

- **Glenmark**

37.     Defendant **Glenmark Pharmaceuticals, Inc.** ("Glenmark") is a Delaware corporation with its principal place of business in Mahwah, NJ. It is a wholly-owned subsidiary of Glenmark Pharmaceuticals Ltd., headquartered in Mumbai, in the state of Maharashtra, India. During the Class Period, Glenmark marketed and sold generic pharmaceuticals in this District and throughout the United States.

- **Heritage**

38.     Defendant **Heritage Pharmaceuticals, Inc.** ("Heritage") is a Delaware corporation with its principal place of business in Eatontown, New Jersey. It is the exclusive United States commercial operation for Defendant Emcure Pharmaceuticals Private Ltd., an Indian company headquartered in Pune, in the state of Maharashtra, India. During the Class Period, Heritage marketed and sold generic pharmaceuticals in this District and throughout the United States.

39.     The former CEO and former President of Heritage, Jeffrey "Jeff" Glazer and Jason Malek, have both pleaded guilty to criminal price-fixing charges. The company has stated

confirmed that it is fully cooperating with DOJ, and press reports indicate that Heritage has

applied to DOJ's leniency program seeking amnesty for cartel violations.

- **Lannett**

40.      Defendant **Lannett Company, Inc.** ("Lannett") is a Delaware corporation with its

principal place of business in Philadelphia, Pennsylvania. Lannett is registered with the

Pennsylvania Department of State as a foreign corporation. During the Class Period, Lannett

marketed and sold generic pharmaceuticals in this District and throughout the United States.

- **Lupin**

41.      Defendant **Lupin Pharmaceuticals, Inc.** ("Lupin") is a Delaware corporation

that has its principal place of business in Baltimore, Maryland. Lupin is a wholly-owned

subsidiary of Lupin Limited, an Indian company with its principal place of business in Mumbai,

India.  During the Class Period, Lupin marketed and sold generic pharmaceuticals in this District

and throughout the United States.

- **Mayne**

42.      Defendant **Mayne Pharma Inc.** is a Delaware corporation that has its principal

place of business in Raleigh, North Carolina. Mayne is registered with the Pennsylvania

Department of State as a foreign corporation and maintains a registered agent in Pennsylvania. In

2012, Mayne acquired Metrics, Inc. and its division, Midlothian Laboratories and has also

operated under the name Midlothian since that time. In 2013, Mayne acquired Libertas Pharma.

Unless addressed individually, Metrics, Inc. Midlothian Laboratories, Libertas Pharma and

Mayne Pharma Inc. are collectively referred to herein as "Mayne." During the Class Period,

Mayne marketed and sold generic pharmaceuticals in this District and throughout the United

States.

**FILED WITH REDACTIONS – PUBLIC VERSION**

43.     Defendant **Mylan Inc.** is a Pennsylvania corporation with its principal place of business in Canonsburg, Pennsylvania.

44.     Defendant **Mylan Pharmaceuticals, Inc.** is a West Virginia corporation with its principal place of business in Morgantown, West Virginia. It is a subsidiary of Mylan Inc. Mylan Pharmaceuticals, Inc. is registered with the Pennsylvania Department of State as a foreign corporation and maintains a registered agent in Pennsylvania.

45.     Mylan Inc. and Mylan Pharmaceuticals, Inc. are wholly-owned subsidiaries of Defendant **Mylan N.V.**, a Dutch pharmaceutical company. Unless addressed individually, Mylan Inc., Mylan Pharmaceuticals, Inc., and Mylan N.V. are collectively referred to herein as "Mylan." During the Class Period, Mylan marketed and sold generic pharmaceuticals in this District and throughout the United States.

46.     DOJ subpoenas have been served on certain Mylan employees and senior management, as well as on the company itself, seeking information about communications with competitors regarding certain drugs, and, in September 2016, the FBI raided Mylan's offices pursuant to a search warrant issued in connection with the DOJ's price-fixing investigation.

- **Par**

47.     Defendant **Par Pharmaceutical Inc.** ("Par") is a New York corporation with its principal place of business in Chestnut Ridge, New York. Par is registered with the Pennsylvania Department of State as a foreign corporation and maintains a registered agent in Pennsylvania.

48.     Defendant **Generics Bidco I, LLC** ("Generics Bidco") is a Delaware company with its principal place of business in Huntsville, Alabama.  Generics Bidco formerly conducted business as Qualitest Pharmaceuticals ("Qualitest").

**FILED WITH REDACTIONS – PUBLIC VERSION**

49.     Defendant **DAVA Pharmaceuticals, LLC** ("DAVA") is a Delaware company with its principal place of business in Fort Lee, New Jersey.

50.     Par, Generics Bidco, and DAVA are wholly-owned subsidiaries of Defendant **Endo International plc** ("Endo"), an Irish corporation with its principal place of business located in Dublin, Ireland and its U.S. headquarters located in Malvern, Pennsylvania. In August 2014, Endo acquired DAVA. In September 2015, Endo acquired Par. At the time of that acquisition, Endo had a separate subsidiary, Qualitest, that it had acquired in 2010. Par is thus the successor in interest to both DAVA and Qualitest. Unless addressed individually, Endo, Par, Qualitest, and DAVA are collectively referred to henceforth as "Par." During the Class Period, Par marketed and sold generic pharmaceuticals in this District and throughout the United States.

- **Perrigo**

51.     Defendant **Perrigo New York, Inc.** ("Perrigo") is a Delaware corporation with its executive offices in Allegan, Michigan and its primary business location in the Bronx, New York. It is a subsidiary of Perrigo Company plc, an Irish company with its principal place of business in Dublin, Ireland. Perrigo is registered with the Pennsylvania Department of State as a foreign corporation and maintains a registered agent in Pennsylvania. During the Class Period, Perrigo marketed and sold generic pharmaceuticals to customers in this District and other locations in the United States.

52.     In May 2017, Perrigo revealed that its corporate offices had been raided by federal authorities seeking evidence related to generic drug pricing.

- **Pfizer/Greenstone**

53.     Defendant **Greenstone LLC** ("Greenstone") is a limited liability company with its principal place of business in North Peapack, New Jersey.

**FILED WITH REDACTIONS – PUBLIC VERSION**

54.     Greenstone is a wholly-owned subsidiary of Defendant **Pfizer Inc.** ("Pfizer"), a Delaware corporation with its principal place of business in New York, New York.  At all relevant times Greenstone has operated as the generic drug division of Pfizer.  Greenstone operates out of Pfizer's Peapack, New Jersey campus, and a majority of Greenstone's employees are also employees of Pfizer's Essential Health Division, including Greenstone's President. Greenstone employees also use Pfizer for financial analysis, human resources, and employee benefit purposes, making the two companies essentially indistinguishable.  During the Class Period, Greenstone and Pfizer marketed and sold generic pharmaceuticals in this District and throughout the United States.

- **Kavod / Rising**

55.     Defendant **Kavod Pharmaceuticals LLC**, formerly known as **Rising Pharmaceuticals**, LLC and Rising Pharmaceuticals, Inc. (collectively referred to as "Rising"), is a Delaware corporation with, upon information and belief, its principal place of business in Saddle Brook, New Jersey. On December 3, 2019, Rising admitted to fixing prices and allocating customers for Benazepril-HCTZ. It has been charged with one count of a felony conspiracy in restraint of trade, and agreed to a deferred prosecution agreement with the Department of Justice. Rising sold and conspired regarding drugs other than Benazepril-HCTZ and marketed and sold generic pharmaceuticals in this District and throughout the United States during the Class Period.

- **Sandoz / Fougera**

56.     Defendant **Sandoz, Inc.** is a Colorado corporation with its principal place of business in Princeton, New Jersey. Sandoz is a subsidiary of Novartis AG, a global pharmaceutical company based in Basel, Switzerland. Sandoz is registered with the Pennsylvania Department of State as a foreign corporation and maintains a registered agent in Pennsylvania.

**FILED WITH REDACTIONS – PUBLIC VERSION**

57.     Defendant **Fougera Pharmaceuticals Inc.** ("Fougera") is a New York corporation with its principal place of business in Melville, New York. Fougera is a wholly-owned subsidiary of Defendant Sandoz, Inc. In 2012, Sandoz acquired and integrated Fougera into its US-based generic pharmaceutical business.

58.     Unless addressed individually, Fougera and Sandoz are collectively referred to henceforth as "Sandoz." During the Class Period, Sandoz marketed and sold generic pharmaceuticals in this District and throughout the United States.

- **Sun  / Mutual / Caraco**

59.     Defendant **Sun Pharmaceutical Industries, Inc.** ("SPII") is a Michigan corporation with its principal place of business in Cranbury, New Jersey. SPII is a wholly-owned subsidiary of Sun Pharmaceutical Industries Ltd. ("Sun Pharma"), an Indian corporation, which also owns a majority stake in Taro Pharmaceutical Industries, Ltd., and Taro's U.S. subsidiary, Taro Pharmaceuticals USA, Inc. Beginning in 1997, Sun Pharma began a series of investments in Defendant **Caraco Pharmaceutical Laboratories Ltd.** ("Caraco") and in 2013 acquired 100% of Caraco and merged it into SPII to become Sun Pharma's US operations for generic pharmaceutical products. In late 2012, SPII acquired Defendant **URL Pharma, Inc.** ("URL") and its subsidiary, Defendant **Mutual Pharmaceutical Company, Inc.** ("Mutual"), both of which have their principal place of business in Philadelphia, PA. Until at least June 2016, URL and Mutual operated a pharmaceutical manufacturing facility in Philadelphia. URL was registered with the Pennsylvania Department of State as a foreign corporation and maintained a registered agent in Pennsylvania during the Class Period until April 28, 2015, at which time it was merged with Mutual.

FILED WITH REDACTIONS – PUBLIC VERSION

60.     Defendant Mutual is a Delaware corporation with its principal place of business located in Philadelphia, PA. It is a wholly-owned subsidiary of SPII. Since April 29, 2015 (the day after Mutual and URL merged), Mutual has been registered with the Pennsylvania Department of State as a foreign corporation and maintains a registered agent in Pennsylvania. Many of the pharmaceutical products sold and distributed throughout the United States during the Class Period by SPII, URL and Mutual were marked with the trade name "MUTUAL" on the pill or capsule.

61.     Unless addressed individually, Defendants SPII, URL, Mutual and Caraco are collectively referred to herein as "Sun." During the Class Period, Sun marketed and sold generic pharmaceuticals in this District and throughout the United States.

- **Taro**

62.     Defendant **Taro Pharmaceuticals U.S.A., Inc.** ("Taro") is a New York corporation with its principal place of business in Hawthorne, New York. Taro is a wholly-owned subsidiary of Taro Pharmaceutical Industries, Ltd., an Israeli entity, which in turn is majority owned by Defendant Sun Pharmaceutical Industries, Inc. During the Class Period, Taro marketed and sold generic pharmaceuticals in this District and throughout the United States.

- **Teva**

63.     Defendant **Teva Pharmaceuticals USA, Inc.** ("Teva USA") is a Delaware corporation with its principal place of business in North Wales, Pennsylvania. It is a subsidiary of Teva Pharmaceutical Industries Ltd. (Teva Industries), an Israeli entity. Teva is registered with the Pennsylvania Department of State as a foreign corporation. On October 3 2016, Teva Pharmaceutical Industries Ltd. announced that it had completed its acquisition of the wholesaler Anda, Inc. ("Anda") and that "Anda, Inc., one of the leading distributors of generic medicines in the U.S., is now part of Teva."  As announced at the time, Anda has "become part of Teva's

**FILED WITH REDACTIONS – PUBLIC VERSION**

distribution network," creating a functional economic unity between Teva and Anda such that, as of October 2016, Teva has sold its generic Drugs at Issue, as well as the Drugs at Issue of Teva's co-conspirators, to independent pharmacies throughout the United States, including to Plaintiff Falconer Pharmacy.

64.     Defendant **Barr Pharmaceuticals, LLC** ("Barr") is a Delaware company with its principal place of business North Wales, Pennsylvania.  Barr is a wholly-owned subsidiary of Teva Industries, which acquired Barr (then called Barr Pharmaceuticals, Inc.) in 2008. Prior to its acquisition by Teva Industries, Barr was a holding company that operated through its principal subsidiaries: Barr Laboratories, Inc., Duramed Pharmaceuticals, Inc., and PLIVA, d.d. (a Croatian corporation with its headquarters in Zagreb, Croatia).

65.     Defendant **PLIVA, Inc.** ("PLIVA") is a New Jersey corporation with its principal place of business in East Hanover, New Jersey.  PLIVA is a wholly-owned subsidiary of Teva Industries, which acquired the PLIVA assets as part of the Barr acquisition.

66.     Unless addressed individually, Teva USA, Anda, Barr, and PLIVA are collectively referred to henceforth as "Teva." During the Class Period, Teva sold generic pharmaceuticals in this District and throughout the United States.

- **Upsher-Smith**

67.     Defendant **Upsher-Smith Laboratories, LLC** (formerly known as Upsher-Smith Laboratories, Inc.) ("Upsher-Smith"), is a Minnesota limited liability company, with its principal place of business in Maple Grove, Minnesota.  It is a subsidiary of Sawaii Pharmaceutical Co., Ltd., a large generics company in Japan.  During the Class Period, Upsher-Smith has marketed and sold generic pharmaceuticals in this District and throughout the United States.

FILED WITH REDACTIONS – PUBLIC VERSION

●     **West-Ward**

68.     Defendant **West-Ward Pharmaceuticals Corp.** ("West-Ward") is a Delaware corporation with its principal place of business in Eatontown, New Jersey. West-Ward is the United States agent and subsidiary of Hikma Pharmaceuticals PLC ("Hikma"), a London-based global pharmaceutical company. During the Class Period, West-Ward sold generic pharmaceuticals in this District and other locations in the United States.

69.     In January 2017, Hikma disclosed that West-Ward had received a subpoena from a state Attorney General, requesting certain information about generic drug pricing.

●     **Wockhardt**

70.     Defendant **Wockhardt USA LLC** ("Wockhardt") is a Delaware limited liability company, with its principal place of business in Parisppany, New Jersey.  During the Class Period, Wockhardt marketed and sold generic pharmaceuticals in this District and throughout the United States.

●     **Zydus**

71.     Defendant **Zydus Pharmaceuticals (USA), Inc.** ("Zydus") is a New Jersey corporation with its principal place of business in Pennington, NJ. It is a subsidiary of Cadila HealthCare, an Indian company headquartered in Mumbai. Zydus is registered with the Pennsylvania Department of State as a foreign corporation and maintains a registered agent in Pennsylvania. During the Class Period, Zydus marketed and sold generic pharmaceuticals in this District and throughout the United States.

**C.     Distributor Defendants**

●     **AmerisourceBergen Corp. ("ABC")**

72.     Defendant **AmerisourceBergen Drug Corporation** ("ABC") is a wholesaler of pharmaceutical drugs that distributes generic drugs throughout the country, including to one or

**FILED WITH REDACTIONS – PUBLIC VERSION**

more Plaintiffs.  It is incorporated in Delaware, with its principal place of business in

Chesterbrook, Pennsylvania. According to its 2018 Annual Report, AmerisourceBergen Drug

Company received $160 billion in annual revenue. It is ranked #10 on the Fortune 500 list.

73.     On January 3, 2018, Defendant ABC fully acquired Defendant **H.D. Smith, LLC**

("H.D. Smith").  Formerly known as H.D. Smith Wholesale Drug Co., H.D. Smith, LLC was a

privately held wholesaler of pharmaceutical drugs and medical products. It was incorporated in

Delaware, with its principal place of business in Springfield, Illinois. At the time of its

acquisition, it was the largest wholesaler to independent pharmacies in the United States.

74.     Many of the individual conspirators named in this action were colleagues at

AmerisourceBergen and remained in contact with their former co-workers. For example, Patel

had a longstanding relationship with Defendant Robin Hatosy, a national account executive at

Defendant Greenstone, due to their being former co-workers at ABC.

75.     During the Class Period, ABC and H.D. Smith marketed and sold generic

pharmaceuticals in this District and throughout the United States.

•       **Cardinal**

76.     Defendant **Cardinal Health Inc.** ("Cardinal") is a wholesaler of pharmaceutical

drugs and medical products that distributes generic drugs throughout the country, including to one

or more Plaintiffs. It is incorporated in Ohio, with its principal place of business in Dublin, Ohio.

According to its 2019 Annual Report, Cardinal Health, Inc. received $145.5 billion in annual

revenue. It is ranked #16 on the Fortune 500 list.

•       **Harvard**

77.     Defendant **The Harvard Drug Group, LLC** ("Harvard") is a wholly-owned

subsidiary of Cardinal Health.  It is not affiliated with Harvard University. Cardinal fully acquired

Harvard on July 6, 2015. At the time of its acquisition, Harvard had reported annual revenues of approximately $450 million.

78.     Unless addressed individually, Cardinal Health and Harvard are collectively referred to henceforth as "Cardinal."  During the Class Period, Cardinal marketed and sold generic pharmaceuticals in this District and throughout the United States.

- **Red Oak**

79.     Defendant **Red Oak Sourcing, LLC** ("Red Oak") is a joint venture established by Defendant Cardinal and CVS Health Corporation to source and supply both companies' generic pharmaceutical products.  The joint venture was announced in December 2013, and began operations in mid-2014.  Its principal place of business is in Foxborough, Massachusetts.  CVS Health Corporation and Cardinal each own fifty percent of the company.  According to the Drug Channels Institute, Red Oak controlled a 32% share of U.S. generic purchasing volume in 2017, making it the largest buyer of generic drugs in the country.  During the Class Period, Red Oak marketed and sold generic pharmaceuticals in this District and throughout the United States.

- **McKesson**

80.     Defendant **McKesson Corporation** ("McKesson") is a wholesaler of pharmaceutical drugs and medical products that distributes generic drugs throughout the country, including to one or more Plaintiffs. It is incorporated in Delaware, with its principal place of business in Irving, Texas. According to its 2019 Annual Report, McKesson Corporation received $214.3 billion in annual revenue.  It is ranked #7 on the Fortune 500 list.  During the Class Period, McKesson marketed and sold generic pharmaceuticals in this District and throughout the United States.

**FILED WITH REDACTIONS – PUBLIC VERSION**

- **Morris & Dickson**

81.     Defendant **Morris & Dickson Co., LLC** ("Morris & Dickson") is a privately held wholesaler of pharmaceutical drugs that distributes generic drugs throughout the country, including to one or more Plaintiffs. It is incorporated in Louisiana, with its principal place of business in Shreveport, Louisiana.  It is reported to be the largest privately-owned wholesale pharmaceutical distributor in the United States, receiving $4 billion in annual revenue in 2018. During the Class Period, Morris & Dickson marketed and sold generic pharmaceuticals in this District and throughout the United States.

- **Walgreens Boots Alliance ("WBAD")**

82.     Defendant **Walgreens Boots Alliance, Inc.** ("WBA") is the largest retail pharmacy and health conglomerate currently operating in the U.S. and Europe. It is incorporated in Delaware, with its principal place of business in Deerfield, Illinois.  According to its 2018 Annual Report, Walgreens Boots Alliance, Inc. received $131.5 billion in sales.

83.     Defendant **Walgreens Boots Alliance Development GmbH** is Walgreens Boots Alliance, Inc.'s drug purchasing arm.  It is incorporated in Switzerland, with its principal place of business in Bern, Switzerland. It was formed in 2012 as a joint venture between Alliance Boots and Walgreens Co. and later became a subsidiary of Defendant Walgreens Boots Alliance, Inc. Since 2013, Walgreens Boots Alliance Development GmbH has negotiated and purchased generic drugs on behalf of Defendants ABC and WBA under the terms of an agreement that extends until 2026. (As of August 2019, WBA has an approximate 27% stake in ABC and one seat on ABC's Board of Directors).

84.     In communications relevant to the price-fixing conspiracy, conspirators tend to refer to the individuals who work for these entities as "WBAD." In sections of this complaint

describing the earlier days of the conspiracy (circa 2011), the individuals are often collectively called "Walgreens," "WAG" or "Wags" by their co-conspirators because WBA and WBAD had not yet been formed and WAG was the stock ticker of the business formerly known as Walgreens. Around the end of 2013 the co-conspirators began to refer to these same individuals as 'WBAD' if they are involved in purchasing for Walgreens Boots Alliance, Inc. or Walgreens Boots Alliance Development GmbH, and even when they are engaging in negotiations for drugs that were then transferred to ABC and sold to Plaintiffs and the Class members. Unless addressed individually, Defendants Walgreens Boots Alliance, Inc. and Walgreens Boots Alliance Development GmbH are collectively referred to henceforth as "Walgreens" or "WBAD."

**D.    Individual Defendants**

- **Ara Aprahamian (Taro)**

85.    Defendant **Ara Aprahamian** is an individual residing at 14 Catalpa Court, Bardonia, New York.  At all times relevant to this Complaint, Defendant Aprahamian was the Vice President of Sales and Marketing at Defendant Taro Pharmaceuticals USA, Inc.

86.    Defendant Nisha Patel (Teva) has known Aprahamian for many years, ever since Patel started her professional career as an intern at ABC.  Even though she knew Aprahamian well, they rarely ever spoke or texted by phone until Patel started at Teva.  From April 22, 2013 through March 2016, however, Defendants Patel and Aprahamian spoke or texted at least 100 times, including calls or text messages at or around the time of every significant price increase affecting the companies during those years.

**FILED WITH REDACTIONS – PUBLIC VERSION**

- **David Berthold (Lupin)**

87.     Defendant **David Berthold** is an individual residing at 21 Hillcrest Road,

Towaco, New Jersey.  At all times relevant to this Complaint, Defendant Berthold was the Vice

President of Sales at Defendant Lupin Pharmaceuticals, Inc.

- **James Brown (Glenmark)**

88.     Defendant **James "Jim" Brown** is an individual residing at 4521 Christensen

Circle in Littleton, Colorado. At all times relevant to this Complaint, Defendant Brown was the

Vice President of Sales at Defendant Glenmark Pharmaceuticals, Inc.

- **Maureen Cavanaugh (Teva)**

89.     Defendant **Maureen Cavanaugh** is an individual residing at 529 North York

Road, Hatboro, Pennsylvania.  At all times relevant to this Complaint, Cavanaugh was the Senior

Vice President, Commercial Officer, North America, for Defendant Teva Pharmaceuticals USA,

Inc. Cavanaugh spoke frequently with the conspirators at Teva and with Defendant Marc Falkin

who she spoke to or texted at least 410 times from August 2013 through May 2016.

- **Tracy Sullivan DiValerio (Lannett)**

90.     Defendant **Tracy Sullivan DiValerio** is an individual residing at 2 Pierre Court,

Marlton, New Jersey.  At all times relevant to this Complaint, Defendant Sullivan DiValerio was

a Director of National Accounts at Defendant Lannett Company, Inc.

- **Marc Falkin (Actavis)**

91.     Defendant **Marc Falkin** is an individual residing at 2915 Weston Road, Westin,

Florida.  At all times relevant to this Complaint, Defendant Falkin was the Vice President,

Marketing, Pricing and Contracts at Defendant Actavis. From August 7, 2013 through the date

**FILED WITH REDACTIONS – PUBLIC VERSION**

that Defendant Rekenthaler left Teva in April, 2015, Defendants David Rekenthaler and Marc

Falkin communicated by phone or text at least 433 times.

- **James Grauso (Aurobindo and Glenmark)**

92.      Defendant **James (Jim) Grauso** is an individual residing at 113 Windsor Lane,

Ramsey, New Jersey.  Defendant Grauso worked at Defendant Aurobindo as a Senior Vice

President, Commercial Operations from December 2011 through January 2014.  Since February

2014, Grauso has been employed as the Executive Vice President, N.A. Commercial Operations

at Defendant Glenmark.

- **Kevin Green (Teva and Zydus)**

93.      Defendant **Kevin Green** is an individual residing at 110 Coachlight Circle,

Chalfont, Pennsylvania.  Defendant Green was Director of National Accounts at Director Teva

from January 2006 through late October 2013.  Since November 2013, Green is the Vice

President of Sales at Defendant Zydus.

94.      Defendant Green communicated with Defendant Jim Nesta (Mylan) by telephone

from at least February 21, 2012 until the time Green left Teva in late October, 2013.  During that

period, Defendants Green and Nesta spoke by phone at least 392 times, including calls at or

around the time of every significant price increase taken by either company.

- **Robin Hatosy (Greenstone)**

95.      Defendant **Robin Hatosy** is an individual residing at 155 Providence Forge Road,

Royersford, Pennsylvania.  At all times relevant to this Complaint, Defendant Hatosy was

employed as a Director of National Accounts at Defendant Greenstone.

**FILED WITH REDACTIONS – PUBLIC VERSION**

- **Armando Kellum (Sandoz)**

96.     Defendant **Armando Kellum** is an individual residing at 56 Gravel Hill Road, Huntingdon Valley, Pennsylvania.  At all times relevant to this Complaint, Kellum was the Vice President, Contracting and Business Analytics at Defendant Sandoz, Inc.

- **Jill Nailor (Greenstone)**

97.     Defendant **Jill Nailor** is an individual residing at 1918 McRae Lane, Mundelein, Illinois.  At all times relevant to this Complaint, Nailor was the Senior Director of Sales and National Accounts at Defendant Greenstone.

- **James Nesta (Mylan)**

98.     Defendant **James (Jim) Nesta** is an individual residing at 9715 Devonshire Drive, Huntersville, North Carolina.  At all times relevant to this Complaint, Nesta was the Vice President of Sales at Defendant Mylan.

- **Konstantin Ostaficiuk (Camber)**

99.     Defendant **Konstantin Ostaficiuk** is an individual residing at 29 Horizon Drive, Mendham, New Jersey.  At all times relevant to this Complaint, Ostaficiuk was the President of Defendant Camber Pharmaceuticals, Inc.

- **Nisha Patel (Teva)**

100.    Defendant **Nisha Patel** is an individual residing at 103 Chinaberry Lane, Collegeville, Pennsylvania.  At all times relevant to this Complaint, Patel worked as a Director of Strategic Customer Marketing and as a Director of National Accounts at Defendant Teva.

**FILED WITH REDACTIONS – PUBLIC VERSION**

- **David Rekenthaler (Teva)**

101.     Defendant **David Rekenthaler** is an individual residing at 2626 Lulworth Lane, Marietta, Georgia.  At all times relevant to this Complaint, Rekenthaler was the Vice President, Sales US Generics at Defendant Teva.

- **Richard Rogerson (Actavis)**

102.     Defendant **Richard "Rick" Rogerson** is an individual residing at 32 Chestnut Trail, Flemington, New Jersey.  At all times relevant to this Complaint, Rogerson was the Executive Director of Pricing and Business Analytics at Defendant Actavis.

103.     From May 2, 2013 through November 9, 2015, Defendant Patel spoke and/or texted with Defendant Rogerson 157 times, including calls at or around every significant price increase taken by their respective companies.

**E.     Co-Conspirators**

104.     Various other individuals and corporations, not named as defendants in this Complaint, have participated as co-conspirators with Defendants in the violations alleged herein, and have performed acts and made statements in furtherance of the conspiracy. The names of all additional co-conspirators are presently unknown to Plaintiffs. Plaintiffs may amend this Complaint to include the names of additional co-conspirators or to name these co-conspirators as Defendants as they are discovered.

105.     The wrongful acts alleged to have been done by any one Defendant or co-conspirator were authorized, ordered, or done by its directors, officers, managers, agents, employees, or representatives while actively engaged in the management, direction, or control of such Defendant's or co-conspirator's affairs.

**FILED WITH REDACTIONS – PUBLIC VERSION**

IV.            **FACTUAL ALLEGATIONS**

A.    **The generic drug industry's overarching "fair share" conspiracy**

106.    Defendants have each participated in a mutually-established code of conduct that was intentionally developed to allow generic drug manufacturers to curtail or eliminate free and fair competition and thus artificially maintain and inflate generic drug prices. Plaintiffs, pharmacies and hospitals that purchase and dispense these drugs, seek relief in this action because they have been forced to pay and continue to pay supracompetitive prices for the drugs at issue and also suffer actual losses when they dispense the drugs without being reimbursed for the artificially-high cost.

107.    The foundational premise of the Defendants' illegal agreement is the idea of "fair share." "Fair share" is an understanding that each manufacturer of a given drug is entitled to a proportional market share—a certain percentage of the sales—of that drug market. Defendants agree it is greedy and irresponsible to compete beyond one's "fair share," because competition drives drug prices downwards by forcing manufacturers to lower their prices to retain the same supply contracts.

108.    This type of market allocation agreement is a classic "conspiracy in restraint of trade" forbidden by the federal Sherman Act, 15 U.S.C. § 1, and the antitrust statutes of every state and territory. Defendants have no reasonable pro-competitive justification for discussions of market share targets between generic drug manufacturers, for encouraging competitors to follow price increases, or for confirming ahead of time that they will follow an increase.

109.    The Defendants reinforced their overarching understanding at industry conferences, private dinners, cocktail nights, baseball games and golf outings, and via calls, emails, texts, and private app messages when they could not speak in person.  Conversations

between competitors discussing customer allocation, cover bids, specific nonpublic prices, and future price increases are so pervasive in the industry that some conspirators did not even question whether their arrangements were legal despite being warned to conceal their communications.

110.    Plaintiffs have direct evidence of dozens of acts in furtherance of the fair share conspiracy. Many of these conspiratorial episodes were recounted in earlier complaints and many more are detailed herein, because this complaint seeks relief for conduct relating to over a hundred drugs not identified in Plaintiffs' earlier complaints.

111.    This Court has already recognized that "Plaintiffs have sufficiently alleged the existence of an overarching conspiracy" by generic drug manufacturers, including most of the Defendants named in this action, based on the principles of fair share. *See In re Generic Pharmaceuticals Pricing Antitrust Litigation*, 16-md-2724, Dkt. 1070 (E.D. Pa. Aug. 15, 2019). This Court held that Plaintiffs' earlier complaints sufficiently alleged "a single conspiracy with a common goal, facilitated by multiple schemes specific to various individual generic drugs." *Id.* This Court also held that Plaintiffs' factual allegations made plausible the "claim that Defendants' actions regarding the prices of individual generic drugs in their portfolios were beneficial to and reinforced a broader scheme regarding generic drug prices." *Id.* Finally, this Court held that Plaintiffs' "allegations of significant overlap among Defendants and the alleged individual drug conspiracies" were independently sufficient to allege an overarching conspiracy as a matter of law. *Id.*

112.    This complaint alleges that more Defendants participated in the conspiracy than was previously known, including several distributors as well as manufacturers. Plaintiffs have thus far filed eighteen open actions:  seventeen actions that focus on single drugs, and an

eighteenth multi-drug action alleging an overarching conspiracy as to a separate set of drugs.[8] This complaint adds claims relating to over a hundred additional generic drugs, and Plaintiffs again allege that subsidiary schemes were part of an overarching conspiracy based on the principles of fair share and are therefore legally cognizable as a single overarching conspiracy in which all Defendants participated (in the alternative, Plaintiffs allege that each of these drug-specific subsidiary schemes are actionable as individual conspiracies).  The drugs for which Plaintiffs seek relief are identified in the Appendix to the Complaint as the Drugs at Issue.  With the Court's permission, Plaintiffs intend to seek leave to consolidate their separate complaints into this single comprehensive complaint that would gather together all of Plaintiffs' claims and explain their varying procedural posture, and will amend this complaint accordingly.

113.    Plaintiffs' allegations rely heavily on computer files produced to the States in their investigation which have now been produced to Plaintiffs. Because Defendant Teva produced to the States the largest volume of documents, the episodes of the conspiracy alleged herein are mostly told from Teva's perspective. This complaint depicts the Teva tip of the overarching iceberg.

---

[8] Just as this complaint is primarily built from documents found at Defendant Teva, the earlier multi-drug "overarching" action, 18-cv-2533, is based on evidence from Defendant Heritage. Heritage has admitted to price-fixing in a parallel criminal action brought by the Antitrust Division of the Department of Justice.

**FILED WITH REDACTIONS – PUBLIC VERSION**

B.     **The rules of the fair share conspiracy**

114.     The foundational principle of the Defendants' fair share agreement is that each manufacturer is entitled to an equal slice of the market share pie of a given drug. The formula is fair share $= \frac{1}{n}$ where $n$ is the number of "players" (i.e., manufacturers) in the market. In a "two-player" market, fair share is ½ or 50%; with three players it is ⅓ (33%); with four it is ¼ (25%).[9]

115.     There are also several corollary principles that the participants in the conspiracy understand and agree with. First, and most important, competing beyond fair share is irresponsible, irrational, and greedy. Second, when seeking market share, new entrants or "under-indexed" competitors are supposed to take share from the biggest player (the one with the most share), although it is considered acceptable to take share from any manufacturer that has more than its fair share.[10] Third, incumbent manufacturers are supposed to concede a handful of accounts to new entrants so that newcomers can get to fair share without aggressive prices and without risking a cascade of bids and counterbids that could rapidly erode prices. Fourth, no one should target the customers of a manufacturer who is below fair share unless they are willing to concede some other accounts to that manufacturer.  Fifth, when any manufacturer increases prices, manufacturers who already have their fair share are not to use the opportunity to win additional share. Instead, when customers seek new bids in response to price increases,

---

[9] The Defendants sometimes discuss whether and how much leeway should be given to a formerly exclusive manufacturer when a second manufacturer enters in the market. E.g., on January 22, 2013, John Adams (Dr. Reddy's) called Neal O'Mara (Heritage). Dr. Reddy's thought that if it were the first to launch Zoledronic Acid, it deserved around a 60% share of the market. If Heritage launched at the same time as Dr. Reddy's, the expectation was a 50-50 split.

[10] E.g., an October 2012 Dr. Reddy's presentation regarding its "key molecules" stated that for the drug Tacrolimus, ███████████████████████████████████████████
████████████████████████████████████████████████████████████████
███████████████████████████████████████

**FILED WITH REDACTIONS – PUBLIC VERSION**

Defendants in each sub-agreement are supposed to refuse to bid ("walk away") or provide inflated cover bids. Sixth, if a competitor suffers only a temporary supply disruption, poaching its customers is considered unfair, but it is permissible to take more than fair share in the case of a long-term supply problem.[11]

116.    Defendants frequently discuss and mostly adhere to these rules, but there are moments of betrayal and occasional bad blood.   On occasions when Defendants are tempted to cheat the fair share rules, they are typically policed by superiors or by employees in closer contact with competitors. For example, when manufacturer Defendant Mylan increased prices of the drug Allopurinol in March 2015, manufacturer Defendant Dr. Reddy's considered poaching a Mylan customer that was interested in avoiding the Mylan price increase. The Dr. Reddy's plant operations team said it could supply the additional volume. The Director of Prescription Marketing for North America Generics noted that he wanted to "███████████" and "███████████████" and was hesitant to take much business from Mylan.  "███████" he wrote, "███████████████████████████" because Reddy's "████████████████████████" He concluded that "██████████████████████████████████████████" Reddy's Director of National Accounts then left him a voicemail to the effect that it was a bad idea to "███████████" and upset existing relationships with Mylan. Having heard this message, the Director of Prescription Marketing instructed his Reddy's team not to pursue the Mylan customers at all.

---

[11] E.g., as expressed by an individual at Defendant Camber Pharmaceuticals, "Fair share only applies when there is not supply constraints."

FILED WITH REDACTIONS – PUBLIC VERSION

117.     Despite occasional grumblings about having to concede share, not a single one of the dozens of individuals who had knowledge of the fair share conspiracy ever took affirmative steps to withdraw from the conspiracy. Some did the opposite—they promised to keep quiet.

118.     Because the Defendants understood the basic tenets of fair share and knew that other Defendants agreed, they did not need to communicate each and every time they wanted to put the agreement into action. For example, on December 20, 2012, an individual at what was then Walgreens (now distributor Defendant Walgreens Boots Alliance) gave Dr. Reddy's the name of a drug (Montelukast granules, a widely-prescribed asthma treatment) and the message "I hear they are launching in two weeks." Dr. Reddy's knew the next steps by heart:



In this instance, having received the signal from Walgreens, Mylan and Dr. Reddy's did not need to directly communicate regarding the specific drug in order to implement a market allocation as per the rules of the overarching fair share agreement. The Reddy's team knew from prior discussions with Mylan that Mylan would want Walgreens, they knew that the overall agreement meant they had to "███████████████████████" and they knew the estimated share value of Walgreens plus one other account, so they could calculate on their own whether Mylan had won its fair share. It also helped that earlier that year distributor Defendant Cardinal had coordinated between Dr. Reddy's and the other manufacturer of Montelukast granules, Defendant Teva. Internal Teva emails from July 2012 note:

████████████████████████████████
████████████████████████████████

FILED WITH REDACTIONS – PUBLIC VERSION

█████████████████████████████████████████████████

████████████████████

119.     Some implementation actions required more detailed discussions. For example, Defendants at times had differing information on the share represented by a certain customer or had information that was out of date. With so many products to track, the Defendants created fair share calculation spreadsheets but they sometimes entered the wrong numbers into their formulas or accidentally used data for a similarly named drug or a different formulation. These miscalculations and inconsistencies in perception of share status were a source of friction among the conspirators. Much of the evidence comes from these moments of friction when Defendants had to troubleshoot their conspiracy and get each other back on track towards fair share. When the fair share conspiracy was operating smoothly, fewer conversation were needed.

**C.        The logic of the fair share conspiracy**

120.     Generic drugs are commodity products. In a competitive commodity market, a new manufacturer or one with little share must offer prices lower than the competition in order to win customers. Defendants realize this. "[I]f you look at generics, we're all the same product," testified Michael Perfetto, Defendant Actavis's VP of Sales and Marketing, in an unrelated case. By making room for new entrants and "under-indexed" manufacturers, the Defendants ensure that the newcomers will not attempt to win market share by offering lower prices, which Defendants call "trashing the market." The newcomers are therefore able to enter the market at artificially elevated prices, and, thereafter, all of the conspirators are able to raise their prices, customer by customer, with knowledge that their share is mostly safe from competition.

121.     Defendants' internal documents indicate that the market allocation and price increase aspects of the fair share scheme are linked because Defendants begin to consider

**FILED WITH REDACTIONS – PUBLIC VERSION**

coordinated price increases once they have established a fair share balance with their competitors. For example, a Dr. Reddy's presentation from November 2016 shows a plan to increase the price of a drug fourfold based on the fact that Reddy's ███████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████

122.    The overarching conspiracy works because, to manufacture a generic drug and sell it in the United States, a manufacturer must have a Food and Drug Administration approval known as an ANDA (Abbreviated New Drug Application). Completing an ANDA takes time, but because Defendants can buy, trade, or license already-approved ANDAs, and because many of the manufacturer Defendants do not make all the drugs they sell but instead subcontract to third party factories (including to each other), they are always industry competitors of one another even if they are not product competitors at a certain moment. Prior to the fair share agreement, the observed tendency in generic drug markets was for prices to decrease rapidly with each new entrant, which is consistent with the standard equilibrium model of supply and demand.[12]

123.    From documents and interviews with former employees of Defendants, Plaintiffs have learned that many conspirators believe that, if price competition were to occur, each manufacturer would "naturally" end up with roughly its fair share, except at much lower prices (manufacturers would undercut one another until prices were close to cost). Fair share is a shortcut that arrives at the final "natural" balance of share by circumventing true competition and its concomitant negative pressure on prices. The shared goal is to short-circuit the market so that

---

[12] Generic drug markets with multiple competitors where Defendants are in the minority still exhibit rapid price erosion when the Defendants are not successful in getting these other "irresponsible" manufacturers to play fair.

the same "natural" balance of share can be established a higher price than would occur without collusion.

124.    The Defendants' continued and repeated adherence to the rules of fair share created an interdependent framework of trust that enabled and encouraged further anticompetitive activity. For example, customers in one generic drug market were sometimes traded for customers in a different generic drug market. In other instances, competitors would support a price increase for one drug with the understanding that their competitors would support a price increase for a different drug. In the conspiratorial episodes discussed below, which comprise subsidiary schemes within the overarching conspiracy, the reader will see discussions of fair share involving multiple drugs and trading business on one drug for business on another.

**D.    The origins of the fair share conspiracy**

125.    Arranging fair share is a longstanding practice among the Defendants. As early as July 19, 2011, internal discussions at manufacturer Defendant Sandoz show the overarching agreement in action. A Sandoz national account executive reported that a potential customer had asked for pricing "████████████████" He asked his Sandoz superiors whether Sandoz would "████████  given that "█████████████████████████████ █████," another manufacturer Defendant. Sandoz's Vice President of National Accounts replied simply "█████" Ten days later, Sandoz received yet another customer request due to Perrigo's price increase. The superiors at Sandoz once again told him "████████████████" and told him not to "████████████" the Sandoz supply operations team whether Sandoz could supply the customer. Around the same time, an email from the Vice President of National Accounts at a Sandoz/Fougera predecessor company encapsulated the rules and logic of fair share:

████████████████████████████████████████
████████████████████████████████████

**FILED WITH REDACTIONS – PUBLIC VERSION**



126.     Although Defendants took care to conceal their communications, excited

utterances provide a glimpse into the Defendants' attitudes towards "irresponsible" actions. These

attitudes are the wellspring of the conspiracy and are reinforced at the frequent social events

where Defendants' executives gather. For example, in 2011 Defendant Fougera (a predecessor to

Defendant Sandoz) complained to an executive at what was then Walgreens (now WBAD) that

employees at another manufacturer were "███████████" because "███████████

███████████████" The Walgreens executive replied that "███████████

███████" but "███████████████" Fougera then asked Walgreens to "███

███████████████" and suggested that Walgreens retaliate

in order to punish the "███████████" of not following a price increase. "███████████

███████████████████████"

Walgreens shared the sentiment that declining to follow a price increase was ███████ "███████

███████████████████" The Fougera employee then summed

up the Defendants' attitude:

███████████████████████
███████████

127.     The Defendants' own documents confirm that the fair share understanding has a

long history and is firmly entrenched in the minds of the conspirators. A management consultancy

**FILED WITH REDACTIONS – PUBLIC VERSION**

hired by Sandoz to write a bird's-eye strategic report noted in December 2013 that Sandoz employees were "███████████████" given "███████████████" Specifically, the consultants observed that Sandoz was reluctant to "████████████████" or "██████████████ ███████████████████████████████████████████████████████████ ██████" The report recommended that Sandoz set up an official process to discuss products and make a "████████████████████████████████████" The report also mentioned in its "██████████████" that ████████████████████████████████████ ████████████████████████████████"

128.     Because all Defendants shared in the fair share understanding, similar overview reports from other Defendants make the same points. A highly confidential April 2014 Teva presentation entitled "███████████████" stated █████████████████████████ ████████████████████████████████" A highly confidential Upsher-Smith 2016 leadership presentation noted that fair share is the "████████████" of the industry and described it succinctly: "██████████████████████████████████████████." When a junior employee at Defendant Taro was introduced to the concept of fair share in 2013, his superiors explained:

████████████████████████████████████
████████████████████████████████████
████████████████████

129.     While Defendants historically used their overarching agreement to allocate customers to prevent prices from decreasing, around 2012 they began to use their system more aggressively—to impose enormous price increases on pharmacies, hospitals, patients and taxpayers throughout the United States. Many of these price increases are discussed in section **J**.

**E.**     **The terminology of the fair share conspiracy**

130.     In their communications with one another, particularly in emails and texts, the Defendants use seemingly innocuous terms of art that allow them to conceal and more efficiently carry out the conspiracy. These terms are vague enough business jargon to allow a measure of deniability, but have specific connotations understood by all those who participate in the fair share agreement.[13]   Several examples are worth mentioning, as they are used frequently and found in the communications cited as evidence in this complaint.

131.     **"Playing fair."** Following the rules of the fair share understanding is considered "playing fair." In August 2013, in response to a Dr. Reddy's employee advising internally that they should "█████████████████████████████████████████ █████████████████," a colleague at Dr. Reddy's wrote:

████████████████████████████
████████████████████████
████████████████████████
██████████████████████████
████████████████████████

132.     **"Acting responsibly in the market."** A responsible competitor is one that avoids price erosion by refraining from bidding aggressively, seeks only its fair share, follows through with coordinated price increases, or generally abides by the fair share understanding. For example, in August 2014, Defendant Upsher-Smith discussed potential competition for one of its products and under the heading "██████" it noted "████████████████████████████

---

[13] The generic drug industry has a separate, unrelated term of art called "fair share allocation" which refers to rationing of existing inventory during times of drug shortages based on previous purchases. This use of "fair share" or "on allocation," which applies only during shortages, cannot be confused with the conspiratorial fair share which involves divvying up markets by ceding accounts to competitors regardless of any shortage.

**FILED WITH REDACTIONS – PUBLIC VERSION**

████████████████████ In October 2013, Sandoz's Associate Director of Pricing used the term when he wrote internally that Sandoz had "████████████████" one of Mylan's customers.

> We have been running up against Mylan a lot lately (Nadolol, BenazHctz), and fear blowback if we take on any more products at this moment.
>
> Trying to be responsible in the Sandbox
>
> I recommend you blame supply.

The term "**sandbox**" is used to refer to the generic drug industry as a whole and also deliberately alludes to the importance of "playing" well with others in a certain space. "Mature" competitors act "responsibly" in the "sandbox."

133.    **"Rational"** and **"irrational"** have the same meaning as "responsible" when referring to the willingness of competitors to play fair. A rational competitor does not erode the market, seeks only its "fair share," and follows price increases. For example, this slide from a Dr. Reddy's ("DRL") presentation lists the key conditions for price increases as part of a "███



**FILED WITH REDACTIONS – PUBLIC VERSION**

"**Irrational**" means that the conspirators perceive a manufacturer to be acting out of retaliation or cheating the fair share agreement by lowering prices on certain drugs in order to take share. For example, in September 2015 Defendant Taro was worried about a bid for Desonide cream:

134.    **"Disrupting the market" and "rocking the boat."** Responsible/rational competitors do not rock the boat; irresponsible/irrational competitors rock the boat by pursuing too much share or taking other actions to "disrupt" the trust in a fairly shared market. Defendants want to avoid being perceived as rocking the boat.  An internal email from Defendant Sandoz illustrates the term in the context of fair share:



135.    **"Under-indexed."** When manufacturers need other manufacturer or distributor Defendants to know that they are under their fair share (and are therefore entitled to more business), they use the term "under-indexed" as a shorthand that connotes both the concept of fair share and the manufacturers' current status.

136.    **"Due to Market Dynamics**." This capacious term of art is used by the conspirators as a vague rationale that obscures whether a decision or event was related to a coordinated price increase, the debut of a new entrant, or an attempt to give up share to an under-indexed competitor. Defendants attribute the cause of an event or the reason for a decision to "market dynamics" when

the event or decision is unrelated to a manufacturer's inability to supply that drug.[14] Notes found at Defendant Taro regarding the drug Carbamazepine ER state that:



Defendants prick up their ears when they hear talk of unspecified "market dynamics." When distributor Defendant ABC cited market dynamics as the reason for requesting a bid on the antibiotic Ciprofloxacin, an employee at manufacturer Defendant Aurobindo wrote internally:

137.     **Being "done."** When a manufacturer is satisfied with its share on a drug and does not intend to compete any further, it is often said to be "done." For example, in August 2015, Dr. Reddy's VP of Sales and Marketing wrote ▮▮▮▮▮▮▮▮▮▮▮▮" about bidding on two customers. "▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮," meaning new business might be outweighed by retaliatory prices if Par perceived Reddy's as seeking more than its fair share. Another executive agreed: "▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮" Reddy's Senior Director for North America responded:

**F.     Defendants' methods for concealing the conspiracy**

138.     Individuals at each of the Defendant manufacturers and distributors had different degrees of awareness of the unlawful nature of their anticompetitive conduct. Some appear

---

[14] There is also evidence that Defendants disguised decisions not to compete by falsely claiming supply problems, but decisions were more frequently attributed to "market dynamics."

**FILED WITH REDACTIONS – PUBLIC VERSION**

oblivious. They spoke freely about the fair share understanding with competitors, and took notes. Others underwent antitrust training and learned—or already knew—that they needed to conceal the fact that they had discussed price increases and market share targets with competitors. Individuals often made halfhearted gestures of compliance intended to reinforce the consensus that they did not really need to be so careful with their information-sharing (for example, ██

███████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████ because the idea of not divulging the source of a bid is viewed as inherently ridiculous (despite being recommended or required in many of the distributor Defendants' own internal policies). Those individuals who became aware that they needed to conceal their conduct took up tactics to avoid detection and destroy evidence.

139.     Private emails and message apps: In order to avoid detection, certain Defendants communicated via alternative messaging systems not linked to their corporate email accounts or cell phone numbers. These included personal email, Linkedin Messenger, Facebook Messenger, Apple's iMessage, and the end-to-end encryption messenger WhatsApp.  Because these messaging systems are not preserved in the way that corporate email is archived and preserved on backup tapes, often the only way of recovering the message is to seize the physical device from the individual and then enlist a forensic data technician to bypass security features and extract images and text. Even then, only the messages stored locally on the device may be retrievable.

140.     Plaintiffs cannot know the total number of messages that have been deleted but Plaintiffs do know that Defendants used these means to communicate details about the conspiracy.  For example, Defendant Nisha Patel, one of the key conspirators at Defendant Teva, used non-SMS messaging on her phone to communicate with one of Teva's competitors,

Defendant Amneal, and to confirm that Amneal would concede a specific customer so long as it could retain another.

141.    Scrubbing and misattributing reports: On several occasions, Defendants left evidence of their own attempts to edit documents to avoid use of the term "fair share" or to delete references to knowledge of upcoming price increases by competitors. Defendants also falsely attributed or anonymized sources of information to camouflage anticompetitive communications.

142.    Going offline: Unsurprisingly, individuals who had some inkling that it was unwise to leave a paper trail when discussing fair share asked to end email conversations and to speak over the phone or in person. In May 2014, an employee at Taro saw a confidential internal spreadsheet with fair share calculations and sent the author an email asking "Hi Alex, please explain FS, (Fair Share)?"  Although the email was sent in the evening, Defendant Ara Apahamian (Taro's Vice President of Sales and Marketing) wrote back within six minutes "No emails please. Phone call. Alex let's discuss."  For the same reason, in August 2014, Defendants Nisha Patel and David Rekenthaler wrote "will call" and "I'll catch up with you today" in response to emails because they wanted to discuss their backchannel communications with manufacturer Defendant Mylan without leaving evidence in the form of an email.

**G.    Major distributors joined the manufacturers' fair share conspiracy**

143.    Thus far, this multidistrict litigation has focused on the role of generic drug manufacturers in the years-long scheme to fix the prices of generic drugs. But certain major drug distributors (namely Defendants Cardinal, AmerisourceBergen Corp. ("ABC"), McKesson, Walgreens/WBAD, and Morris & Dickson) understood, agreed with, and did their part to achieve the common goals of the fair share conspiracy: to prevent price erosion by "stabilizing" and "settling" the market, and to encourage coordinated price increases. These distributor Defendants

**FILED WITH REDACTIONS – PUBLIC VERSION**

are drug wholesalers that purchase from the manufacturer Defendants. In 2017, they controlled over 81% of the total purchasing volume of generic drugs in the United States.

144.    The distributor Defendants knowingly participated in the overarching agreement and in subsidiary schemes in restraint of trade by orchestrating coordinated price increases, by passing anticompetitive messages at the behest of their manufacturer co-conspirators, and by brokering the allocation of customers in order to establish fair share. They arranged the manufacturers' collusive price increases by confirming that the manufacturers would not undercut one another's price increases and would work in concert to drive prices up.  Additionally, the distributors served a crucial policing function in the tight-knit industry by criticizing employees at manufacturers who sought to lower prices to compete legitimately, because actual competition on the basis of price is seen as "irresponsible" "irrational," "aggressive," and "not playing fair."

145.    The Defendant distributors and the Defendant manufacturers agreed with one another that the smart people in the industry operated on a fair share basis in order to control prices. For example,



"Fair share" was consistently used as a conspiratorial term of art in the discussions between Defendant distributors and manufacturers.  For example,

on November 3, 2014, Dr. Reddy's executives discussed a

**FILED WITH REDACTIONS – PUBLIC VERSION**

on July 10, 2014, WBAD asked Taro for a call to discuss a ████████████
████████████████████████████████████████████████████████████
Because Walgreens so frequently involved itself in market allocation
schemes, Defendant Heritage noted that Walgreens ███████████████████
████████████]" and that "████████████████████████████████████████

in January 2015, a WBAD category manager told Teva that Teva was
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
██████████████████████

in October 2015, Teva told Cardinal that it was "█████████████████" of
an opioid addiction treatment and "██████████████████████████"

in April 2016, Taro sent offers to McKesson along with a note that the Taro
salespeople were ████████████████████████████████████████████
██████████████████

146.    Discussions and decisions based on fair share were effective because the
Defendant distributors and the Defendant manufacturers all understood the meaning of the term
and its corollary rules. The manufacturers knew that certain distributors were in the know and
required no further explanation in order to carry out their common goals.

147.    Distributor Defendants often requested from the manufacturers a summary of the
current fair share arrangement. On more than one occasion, Teva's emails to distributors included
spreadsheet attachments showing each manufacturer's current accounts and the corresponding
market share so that distributors would understand the balance of share of that drug, handle bids
in accordance with the fair share arrangement, and pass updates to other manufacturers about the
intentions of their competitors.

148.    These distributor Defendants went beyond the normal course of business in their
communications with their suppliers, the manufacturer defendants.  A distributor must necessarily
discuss its own purchases with its suppliers, the manufacturers. But the distributor Defendants did
more: they arranged anticompetitive communications that affected the market as a whole.

**H.**     **Distributor Defendants often benefit from higher market-wide drug prices**

149.     The distributor and manufacturer defendants called, texted, emailed, app-messaged, and met with one another regarding their common interest in higher prices market-wide. For example, in May 2012, at a widely-attended trade show organized by distributor Defendant H.D. Smith, manufacturers and wholesaler distributors discussed price increases for topical creams and ointments. Over email, a Fougera national accounts executive reported "█████ ███████████████████████████████████████████████████████████ ███████████████████" because they can ████████████████████████████████████ ███████

150.     Defendant McKesson's SEC 10-K filings during every year of the conspiracy confirm that it benefits from higher prices and may lose profits when the manufacturer-level price increases decrease in frequency or decrease in magnitude:

> A significant portion of our distribution arrangements with the manufacturers provides us compensation based on a percentage of our purchases. In addition, we have certain distribution arrangements with pharmaceutical manufacturers that include an inflation-based compensation component whereby we benefit when the manufacturers increase their prices as we sell our existing inventory at the new higher prices. For these manufacturers, a reduction in the frequency and magnitude of price increases, as well as restrictions in the amount of inventory available to us, could have a material adverse impact on our gross profit margin.

151.     Defendant ABC also admits that it has reason to benefit from higher prices in its 2014 10-K, and in filings in subsequent years.

> [ABC's] gross profit from brand-name and generic manufacturers continues to be subject to fluctuation based upon the timing and extent of manufacturer price increases. If the frequency or rate of branded and generic pharmaceutical price increases slows, our results of operations could be adversely affected. In addition, generic pharmaceuticals are also subject to price deflation. If the

frequency or rate of generic pharmaceutical price deflation accelerates, our results of operations could be adversely affected.

152.    From 2013 to 2016—the key years during which the market allocation and price-increase schemes took full effect—the revenue of distributor Defendants Cardinal, ABC, and McKesson increased by 20%, 67%, and 55%, respectively.

153.    In another example of a distributor's desire to pay higher prices, when Defendant Heritage listed injections of the bone cancer drug Zoledronic Acid for sale at around $500, the oncology supply division of Defendant AmerisourceBergen Corp. ("ABC") told Defendant Heritage that the distributor "▮▮▮▮▮▮▮▮▮▮▮▮▮▮."

154.    The Defendant distributors encouraged the manufacturers to increase prices. For example, in spring 2014, distributor Defendant Harvard called Defendant Heritage and "▮▮▮▮▮▮ ▮▮▮▮▮" how much Heritage should increase its prices given competing bids of competitors. Harvard and Heritage reviewed ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮. The price increases ranged from ▮▮▮▮▮ higher than Heritage's price at the time. Internal Heritage emails confirm that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮.

155.    Cardinal had several discussions with Defendant Sandoz concerning a way to ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮s. At the time, Cardinal knew it should conceal such efforts. Sandoz reported Cardinal's stance as follows:



156.    Ultimately, because of Cardinal's fears that the plan might become public, the plan was canceled at that time. But Cardinal did agree that it was a "▮▮▮▮▮▮▮▮▮▮▮"

and ultimately Sandoz took other steps with Cardinal ████████████████████

██████████████." In June 2013, Sandoz noted that ██████████████████████ with

Defendant McKesson.

157.    Likewise, in April 2014 Defendant Morris & Dickson ("M&D") wanted an

████████████████████████ of the opioid drug Oxycodone. According to one of her

documents, Defendant Sun's Susan Knoblauch was left with the impression that Morris &

Dickson preferred ██████████████████████████████████

████████████████████████████████████████████

█████████████████████████████████████████████"

meaning all the distributors would pay higher prices.

158.    The following section illustrates how the distributor Defendants actively

participated in the fair share conspiracy in order to coordinate prices and price increases and

arrange allocation of fair share between the manufacturer Defendants.

FILED WITH REDACTIONS – PUBLIC VERSION

I.    <u>**Events illustrating the role of Distributor Defendants in the fair share conspiracy**</u>

●    **H.D. Smith knowingly participated in the fair share conspiracy**

160.    Defendant H.D. Smith was a pharmaceutical distributor that sold to dispensers of prescription drugs including independent pharmacies and hospitals like the Plaintiffs. H.D. Smith was wholly acquired by Defendant AmerisourceBergen Corp. ("ABC") in January 2018.

161.    Because the individuals responsible for arranging supply contracts for H.D. Smith were in constant contact with the manufacturer Defendants, they understood that, according to the rules of fair share, manufacturers agreed they should act "responsibly" by conceding share to new entrants and refusing to steal share when another competitor increased prices. For example, on multiple occasions in the spring and summer of 2015, manufacturer Defendant Teva told H.D. Smith that Teva would not lower prices and would concede business to other manufacturers "█████████████████████████████████"

162.    H.D. Smith's employees were aware of the fair share rules and the pricing consequences of not following them. For example, on March 4, 2014, Dr. Reddy's complained to H.D. Smith that another manufacturer not named in this complaint was not playing fair:



H.D. Smith replied that it would have "████████████████████████████████████████████████. A few days later, on March 7, 2014, Dr. Reddy's reiterated the message for H.D. Smith to relay to other manufacturers. "██████████████████████████████████████████████████████"

As illustrated below, H.D. Smith participated in the fair share conspiracy and then sold drugs to Plaintiffs at supracompetitive prices that were inflated due to its anticompetitive conduct.

FILED WITH REDACTIONS – PUBLIC VERSION

- **Valganciclovir (H.D. Smith, Dr. Reddy's, Camber, Aurobindo)**

163.     On September 21, 2015, distributor H.D. Smith asked manufacturer Dr. Reddy's for a new price for Valganciclovir (an HIV/AIDS drug) due to a competing bid from another manufacturer, Defendant Camber.  Dr. Reddy's decided to concede the H.D. Smith account to the new entrant. Conceding accounts to new entrants is one of the key principles of the Defendants' overarching fair share agreement. Dr. Reddy's Director of Marketing Christine Walton wrote:

Dr. Reddy's Senior Director & Head of National Accounts Victor Borelli added:

164.     H.D. Smith had told the Dr. Reddy's team that the bid from Camber would be ▮▮▮▮▮ They then learned from H.D. Smith that the price ▮▮▮▮▮ ▮▮▮▮▮. Victor Borelli (Dr. Reddy's) wrote:

165.     On September 22, 2015, Kate Neely (Dr. Reddy's Senior Director of National Accounts) emailed Dena Mando (H.D. Smith) in order to make clear that the reason for the concession was to avoid competition between manufacturers. ▮▮▮▮▮ ▮▮" Neely wrote to Mando:



**FILED WITH REDACTIONS – PUBLIC VERSION**

166.    But, the next day, September 23, 2015, Neely asked her Reddy's colleagues to



167.    The Dr. Reddy's team changed its mind and decided to keep the H.D. Smith

business, but they worried that ████████████████████████████████████████

████████████████████. Camber would see Reddy's defending its current contracts and

would be inclined to ████████████████," thereby eroding price, to the detriment of all. Reddy's

might then become known as an irrational or irresponsible competitor.

168.    Neely had a solution. She asked Dena Mando at H.D. Smith to tell the

competition directly:

In this context, "████████████" is meant to indicate that the price is the "████' price and

should be maintained. Neely knew that both H.D. Smith and Camber the manufacturer

competitor would understand this meaning of the term "████████████" and Camber would

then know to keep prices ████████████████████.

169.    Dena Mando agreed to pass the price-fixing message to Camber ████████████

████████████████████. "

████" she wrote. Neely replied "████" and then wrote to her team at Dr. Reddy's:

170.    Dr. Reddy's Senior Director & Head of National Accounts Victor Borelli wanted

to double-check that H.D. Smith would get the message through to Camber. He asked Neely:

████████████████████████████████████████████
████████████████

That evening, Dena Mando and Kate Neely met for drinks at Neely's home before dining together at a restaurant at the W Hotel in Hoboken. Neely confirmed once again that the ████

████████████████████████████████████████████████████

Neely replied to Borelli at 6:13 pm:

████████████████████████████████████████████
████████████████████████████████████████████
██████████████████

171.     H.D. Smith remained in contact a few days later as manufacturer Defendant Aurobindo entered the market. On September 28, 2015, Neely wrote:

████████████████████████████████████████████
████████████████████████████████████████████
██████████████

Mando replied "█████████████." As a result of the H.D Smith's participation in this subsidiary scheme, Camber, Dr. Reddy's and Aurobindo were able to keep prices high for Valganciclovir.

- **Acyclovir (H.D. Smith, Heritage, Zydus)**

172.     The Valganciclovir episode was not the first time H.D. Smith had worked with the manufacturer Defendants to further the fair share conspiracy. In November 2014, H.D. Smith coordinated between Defendant Heritage and Defendant Zydus in order to allocate fair share without price erosion for the drug Acyclovir.

173.     Developed in the 1970s, Acyclovir is antiviral drug that treats herpes, chickenpox, shingles, and post-transplant viral infections by preventing the viruses from using human host cells to replicate their DNA. It is also known as Aciclovir or by the brand name Zovirax.

174.     On November 10, 2014 when Defendant Zydus had recently entered the market for Acyclovir, Defendant Heritage's Associate Director for Pricing and Contracts recommended

that Heritage "████" from certain accounts ████████████. Vice President of

Marketing Operations Lew Soars disagreed that the fair share rules required Heritage to give up

business at H.D. Smith:

████████████████████████████
████████████████████████
████████████████████████████
████████████████

175.    The Heritage team had the same dilemma as the Reddy's team in the

Valganciclovir episode described above. They wanted to retain the business and they thought it

was fair to do so, but they did not want Zydus to consider them irrational for refusing to give up

share. National Account Manager Anne Sather then agreed with H.D. Smith's Dena Mando that

Mando would ████████████████████████████

████████████. Sather was the Heritage contact person for H.D. Smith.  On

Nov 10, 2014, Soars recommended to Anne Sather:

████████████████████████████
████████████████████████
████████████████████████
████████████████████████
████████████████████
████████████

Soars knew that his colleague Anne Sather would "████████████████████████

████via Dena Mando at H.D. Smith because Soars was the former Director of Generic

Pharmaceuticals Business Development at H.D. Smith. He had worked closely with Mando.

Sather replied "████████" and specifically confirmed that she would "████████████."

176.    At an in-person meeting on November 17, 2014, Sather communicated "██

████" to H.D. Smith so that Zydus would know Heritage was ████████████████

████████████████ in order to avoid price erosion.

**FILED WITH REDACTIONS – PUBLIC VERSION**

177.    In an internal Heritage email on November 19, 2014 Soars (Heritage) mentioned the price stability rationale behind their discussions with H.D. Smith:

████████████████████████████████████

███████████████████████████████████

██████████

Soars (Heritage) added that Anne Sather would follow up with Dena Mando from H.D. Smith

██████████████████████████████████████████

██████████████████." In another email, Soars confirmed that "████████████████████████

█████████████."

- **Harvard knowingly participated in the manufacturers' fair share conspiracy**

178.    Defendant Harvard Drug Co-Op is a formerly independent drug distributor that was wholly acquired by distributor Defendant Cardinal in 2016. Both before and after the acquisition, multiple Harvard employees knowingly participated in the overarching fair share scheme. The acquisition did not disrupt the channels of collusive communication between the Defendants.  At a meeting in 2016, distributor Defendant ABC told manufacturer Defendant Sandoz that Cardinal's acquisition of Harvard would ██████████████████████████████

█████████   ████████████████████."

179.    Generic drug manufacturers have two main ways of making sales to distributors such as Harvard. The simplest is when a customer requests a "one-time buy" or "spot purchase" of a specific number of units. The manufacturer responds with a price—which is often the list price (the Wholesale Acquisition Cost or "WAC" price) or very close to it— and if the customer accepts, the drugs are shipped. The second and far more prevalent means of selling generic drugs is through ongoing supply contracts, typically renegotiated at least once a year. The customer

sends a request for proposal ("RFP") either for a single drug or for a list of drugs and then receives bids from the manufacturers. Incumbent manufacturers are usually given a chance to counterbid the lowest bid, and the process may involve multiple rounds of bidding.[15]   The manufacturer with the lowest net price typically wins the bid and sometimes the runner-up is also awarded a "secondary" contract, to be used as a backup or for a certain percentage of purchases. From them on, until the next RFP or renegotiation, the customer can place orders for drugs and pay the RFP contract price rather than the published list price.

180.    During rounds of RFP bidding for multiple generic drugs at other distributors, Harvard ████████████████████████████████████████████

████████  For example, at least one Harvard employee used a private email account to send RFP details to the private email accounts of individuals at two or more of the manufacturer Defendants. The use of private emails was designed to avoid detection because the conspirators knew that exchanging confidential details during RFPs was not an acceptable business practice.

- **Metoprolol succinate ER (Harvard, Actavis, Dr. Reddy's, Par)**

181.    Harvard voluntarily worked as a go-between to gather agreement from the manufacturers regarding their pricing intentions. For example, by January 2014, two Harvard employees had each liaised with Dr. Reddy's, Actavis, and Par to secure an agreement to maintain or increase the price of Metoprolol succinate ER (brand name: Toprol XL), a beta-blocker drug that treats chest pain and high blood pressure. Contemporaneous notes taken by a member of the Par sales team state that:

---

[15] Evidence indicates that from 2010 to 2017, as the fair share understanding became more and more effective as the manufacturer and distributor conspirators built trust with one another, the distributor Defendants deliberately limited the number of rounds of bidding in order to avoid competition and prevent price erosion.



182.     By the time these notes were circulated in January 2014, Harvard had confirmed with each of the manufacturers (Dr. Reddy's, Actavis, and Par) that each would follow a price increase by its competitors. Later in 2014, Harvard once again confirmed and then individually reiterated to Dr. Reddy's, Actavis, and Par ███████████████████████████ ████████████████ Harvard's shuttle diplomacy between the manufacturers as part of the overarching conspiracy eliminated the possibility of free and fair competition for Metoprolol ER.

- **Eplerenone (Harvard, Dr. Reddy's, Par, M&D)**

183.     In another example, Harvard arranged a concerted concession of share between Defendant Upsher-Smith Labs and Defendant Greenstone as part of a scheme to allocate the market for the drug Eplerenone (brand name: Inspra).

184.     Eplerenone is an antihypertensive drug which is prescribed to increase the chances of surviving congestive heart failure after a heart attack and also to treat high blood pressure. Upsher-Smith did not actually produce this drug and instead purchased it from a third manufacturer, Defendant Sandoz. Harvard coordinated between manufacturers Upsher-Smith and Greenstone in order to allow Upsher-Smith to reach fair share without targeting Sandoz's customers.

185.     On or about May 7, 2015, Upsher-Smith's Senior National Account Manager communicated with Harvard's Director of Sourcing/Supplier Relations ██████████████ ██████████████████████████. Upsher-Smith had also sent a nearly identical message via the distributor Defendant Morris & Dickson ████████████████ ███████

186.     Harvard's Director of Sourcing/Supplier relations or another individual at Harvard passed the message to Defendant Greenstone. By May 12, 2015, Harvard confirmed to Upsher-Smith that Greenstone would concede the business to Upsher-Smith, as requested, consistent with the rules of the fair share understanding.

187.     A few weeks later, at an HDMA trade association meeting on June 6, 2015, Sandoz representatives told Harvard representatives that Sandoz greatly appreciated Harvard's

- **ABC knowingly participated in the fair share conspiracy**

188.     Along with distributor Defendants H.D. Smith and Harvard, Defendant AmerisourceBergen Corp. ("ABC") also knowingly participated in the overarching fair share conspiracy. Sandoz employee notes from a 2015 trade association meeting list "market share" as the first criterion of ABC's philosophy on pricing. A Mylan internal presentation identified ABC as a distributor that followed the "fair share" model.

189.     Many of the fair share agreement's most active conspirators worked for ABC at some point in their careers. Nisha Patel, whose computer files and dozens of acts of price-fixing are the main corpus of evidence for this complaint, began her pharmaceutical career at ABC. Marc Kikuchi arranged fair share deals as a Senior Vice President at ABC before he became a CEO at Defendant Zydus. He is presently a CEO at Defendant Dr. Reddy's.

190.     In March 2013, Defendant ABC and Defendant Walgreens Boots Alliance entered into a long-term agreement (now extended until 2026) to collaborate on the purchase of drugs, including all purchases from the manufacturer Defendants. In practice, this meant that distributor

conspirators who had formerly worked separately to allocate fair share and coordinate price increases among the manufacturers were now officially working together. ABC and WBAD employees often joined one another's email threads and discussed allocations and price increases with the manufacturers as a group. For example, ████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████

191.    By 2017, the WBAD and ABC conspirators were in charge of a combined 26% of the volume of all generic drugs purchased in the United States.

- **Pioglitazone-Metformin IR (ABC, Teva, Sandoz)**

192.    Pioglitazone-Metformin (brand name: Actoplus Met) is a combination drug: a single tablet that contains both Pioglitazone, which interacts with insulin, and Metformin, which decreases glucose production in the liver. Taken together, these molecules help people with Type 2 diabetes control their blood glucose levels.

193.    In April 2013, Defendant ABC participated in the overarching conspiracy by ensuring a market allocation between Teva and Sandoz. This was an instance when the standard fair share formula was voluntarily amended, requiring more explicit communication than was typical of the conspiracy.

194.    On April 23, 2013, ABC contacted Teva executives Kevin Green and Dave Rekenthaler, who are both Defendants in this action. ABC's anticompetitive message was simple. Sandoz had entered the market for Pioglitazone-Metformin and wanted Teva, the biggest player, to give Sandoz the ABC business. ABC made clear that Teva's decision on whether to concede to

Sandoz would affect the overall competition in the Pioglitazone-Metformin market because Sandoz would be sated and would not compete further. ABC wrote to Teva:



195.    Within minutes, Kevin Green emailed his Teva team ███████████████████ ███████████" A Teva Senior Director replied "█████████████████████████ ███████████████████████████████████████████████ ███████████. In accordance with fair share, Teva conceded the account to Sandoz.

196.    A week later, a Sandoz employee who did not have a pricing or sales role wondered whether Sandoz might pursue Rite-Aid's business for Pioglitazone-Metformin. A Sandoz Associate Director of Pricing said ███████████████████████████ ███████████" [16] ██████████████████████████████████ ████████████████████████████████████████████.

- **Dextroamphetamine-Amphetamine IR (ABC, Teva, Actavis)**

197.    In the first quarter of 2014, following the same pattern as the Pioglitazone-Metformin episode discussed above, ABC arranged a market allocation for Dextroamphetamine-Amphetamine Immediate Release. A combination drug consisting of multiple amphetamine salts in a single capsule, it is also known as Mixed Amphetamine Salts or MAS-IR or by the brand name Adderall. The drug is used to treat attention deficit hyperactivity disorder.

---

[16] An apparent error in the same Sandoz email implies additional communications between Sandoz and Teva regarding Pioglitazone-Metformin. The Sandoz Associate Director wrote that he thought Teva had relinquished the Pioglitazone-Metformin business at Cardinal to Defendant Aurobindo. This was incorrect, but internal Teva emails from February 2013 show that certain Teva employees were under the same misimpression.

198.    By March 18, 2014, ABC had communicated with Aurobindo and then communicated to Teva that Aurobindo wanted ████████████████████ ██████████████████████████████████████████████ ████████████████████████████ That same day, Defendant Rekenthaler had a thirty-minute call with a senior executive at Aurobindo where they discussed the allocation for Dextroamphetamine-Amphetamine IR.

199.    ABC's communications enabled Teva to make fair share arrangements to divide the market with a third manufacturer, Defendant Actavis.  On March 17, 2014, Defendant Patel (Teva) had multiple calls with Defendant Richard Rogerson (Actavis's Director of Pricing), and Rekenthaler spoke with Defendant Marc Falkin (Actavis). Rekenthaler and Falkin spoke again seven times on March 20, 2014 to discuss allocation of the market for Dextroamphetamine-Amphetamine IR.

200.    On April 16, 2014, Teva learned of a challenger at one of its accounts but not its identity. Defendant Patel informed her superiors that the challenger was Actavis and recommended that Teva concede the account to Actavis. At 1:43pm, she communicated to another colleague that the decision had been made to concede. Apparently closing the loop, she called Defendant Rogerson at Actavis at 1:55pm to tell him that Teva would play fair.

- **Modafinil (ABC, Teva, Par, Mylan)**

201.    Modafinil, known by the brand name Provigil, is a generic drug that treats sleep disorders including narcolepsy and obstructive sleep apnea (halted breathing during sleep).  As of the date of this complaint, the average price for a 200mg tablet of Modafinil is around 63 cents. In early 2014, when ABC had coordinated a fair share market allocation scheme between Teva and Aurobindo, the average price was over $12.00 per tablet.

202.     On May 22, 2014, Teva learned that a new market entrant—a co-conspirator manufacturer not named as a defendant in this complaint—had challenged Teva's share of Modafinil sales at ABC.  Internally, Teva employees wondered whether ███████████ ████████████████████████████████████. They decided they needed to █████████████████████████████████████. On a call the next day, two individuals from ABC informed Teva that the new entrant would ██████████████████████████ ██████████████████████. Defendant Nisha Patel (Teva), who had worked at ABC the previous year, remarked that this competitor ██████████████████████████.

203.     ███████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ██████ Par and Mylan had higher share, and the fair share rules dictated that the bigger players should be first to cede share. Thus, Teva decided to communicate back via ABC that ██ ████████████████████████████████████████████████ ████████████████

204.     Ultimately, ABC then convinced Teva to give up the account for the benefit of the market. A few months later, on September 22, 2014, an individual at Teva could not remember why Teva had conceded and guessed it was perhaps related to a supply problem. ABC wrote to remind Teva that it was in fact an arranged concession:

> I actually think this was some type of horse trade that's going on. I know Marc [Kikuchi, ABC] and Dave R[ekenthaler, Teva] organized this… you know what happens when they get to talking!!  I think there are some products that are coming Teva's way in exchange for them giving up the Modafinil business.  Dave V[ietri, ABC] and I will follow up with Marc and make sure we all get on the same page.

(ellipses in original). Teva's Senior Director of Sales and Trade Relations replied that she would

███████████████████████████████████

205.     The reference to the "horse trade" refers to a method used by the conspirators to allocate share without competition.  Rather than listing all the drugs in a catalog and then collecting bids from the manufacturers, the distributor defendants—including Cardinal, McKesson, ABC and WBAD—began to request "wish lists" from the manufacturers.

206.     Bidding resulted in lower prices when incumbents were offered a chance to counterbid (a "right of first refusal" or "ROFR"). The goal of wish lists was to allow the manufacturers to signal to one another that they wanted win or keep certain accounts for certain drugs without forcing them to actually bid against one another. At the same time, the items left off the wish list informed the distributor Defendants so that they could explain to the manufacturers the products where their competitors had expressed little interest in selling the drug.

207.     The next day after ABC reminded Teva that Modafinil was ███████████████

████████████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████████

208.     Defendant WBAD was also involved with ABC's anticompetitive use of wish lists.  WBAD's executives were clear that their goal was to pre-arrange which products would be primarily sold by which manufacturer so that once any bidding occurred, each manufacturer would be secure in knowing it could win the business without having to put forth an aggressive price. ███████████████████████████████████████████████

██████████████████████████████████████████████████████

FILED WITH REDACTIONS – PUBLIC VERSION

[redacted]"[17]

- **Loperamide (ABC, Teva, Mylan)**

209. Another ABC episode, involving the drug Loperamide (an anti-diarrheal medication developed in the late 1960s, brand name: Imodium), illustrates the degree to which Defendants considered playing fair and following price increases to be the responsible and professional way to conduct business.

210. On June 16, 2014, ABC's [redacted] pointed out to Teva that Mylan had raised its prices back in April, but that Teva had failed to follow the price increase. ABC had spoken with Mylan regarding the price increases and wanted Teva to raise the price, too.

211. Teva did in fact plan to follow Mylan's increase, and planned to have ABC tell Mylan. Nisha Patel had discussed the future price increase with ABC at a recent Healthcare Distribution Management Association conference. Teva understood that Mylan would keep the price high only so long as it expected Teva to play fair and follow with its own increase.

[redacted]

[17] Reddy's then assembled the wishlist but doubted [redacted]

████████████████████████████████████████████████

████████████

212.    Because Teva did in fact plan to support Mylan's increase and had been in

discussions with ABC regarding a coordinated increase, the other members of the Teva team

considered this absolutely unacceptable. Behind Patel's back on a separate thread, a Teva Senior

Director ████████████████████████████████████ A Teva

Director of National Accounts agreed that it was "██████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████ on August 28, 2014

- **Buprenorphine (ABC, Teva, Sun)**

213.    In March 2016, ABC communicated with Teva and Sun to coordinate Sun's entry

into the Buprenorphine market. Buprenorphine is a tablet that dissolves under the tongue and

helps wean people away from dependence on opioids. On March 15, 2016, Teva's Senior Director

of National Sales emailed ABC's Director of Global Generic Sourcing with a request that ABC

help broker the market allocation: ██████████████████████████

████████████████████████████████████████████████

████." The ABC Director responded "█████████████████████," and Teva

thanked her "████████." The next day, ABC wrote:

████████████████████████████████

████████████████████████████

████████████████████████████

████████████████████

214.     By March 22, 2016, ABC had communicated with Sun on behalf of Teva so that the manufacturers could jointly calibrate their share targets. An ABC executive wrote to Teva that she "████████████████████." The details included were that Sun's "████████████ ██████████████████████████" Once again, Teva sincerely appreciated ABC's role. ████████████████████ Sun then avoided bidding on Teva accounts but where it did do so, Teva knew that Sun's goals were limited and Teva could concede the account without fear of further loss of business. Sun knew it could bid at a higher price and still win or retain the business because Teva would not defend every account.

- **Walgreens and later WBAD knowingly participated in the fair share conspiracy**

215.     Defendant Walgreens/WBAD is a major drug distributor that operates a chain of over 9,000 pharmacies. WBAD has a long-term agreement to purchase generic drugs together with Defendant ABC. The same individuals who coordinated market allocation and price increase schemes for Walgreens continued to do the same after Walgreens formed WBAD, and continued to do so when WBAD combined its drug purchasing efforts with ABC.  WBAD executives were equally as responsible for ABC's purchases and collusion with the manufacturers as those who were official employed by ABC. For example, on April 9, 2015, a Teva executive wrote to WBAD that she had "██████████████████████████" and then communicated Teva's expectation that "███████████████████████ ██████████████" competing.

216.     WBAD executives consistently shuttled between the manufacturer Defendants so that the manufacturers would know each other's market share goals and intentions not to compete. The following excerpt from an email regarding the drug Fluconazole, written by Dr. Reddy's

Senior Director of National Accounts, is typical of WBAD's role as a fair share liaison and coordinator. On a Sunday morning in October 2015 she wrote:



217.     Just as with the other Defendant distributors, the Walgreens and later WBAD employees were in close contact with the generic drug manufacturers that participated in the fair share conspiracy. For example, in March 2014, WBAD relayed a message from Dr. Reddy's to Teva. Reddy's wanted Teva to know that it was ███████████████████████. Reddy's wanted to Teva to know that it was still committed to the overarching agreement, but that here the rules dictated that Reddy's be allowed to offer lower prices and take share without further retaliation because Teva had not conceded accounts as it should have.

218.     Two years later, in April 2016, another WBAD executive continued to coordinate more anticompetitive activity regarding the same drug. He informed Teva that a new entrant ███████████████████████ Teva "███████████████" in the portfolio "███████ ███████████████" Such feedback from competitors was critical to the long-term maintenance of the conspiracy. The following episodes illustrate more of WBAD's participation in the fair share conspiracy.

- **Progesterone, Vancomycin, and Lidocaine (WBAD, Akorn, Actavis)**

219.     Progesterone is a hormone produced by the human body that is also available as a generic drug and is used to treat conditions relating to menstruation and pregnancy. Vancomycin

hydrochloride is an antibiotic developed in the 1950s and has been available as a generic since the 1980s.

220.     In late 2012 and early 2013, an individual at what was then Walgreens (now WBAD) worked with manufacturer defendants Akorn and Watson (now Actavis) to arrange concessions of share with the explicit goal of preserving pricing in the overall marketplace.

221.     During the week of February 18, 2013, two Akorn employees—including the Director of Sales, National Accounts—held a call with Walgreens during which they arranged for Walgreens to communicate with Akorn's competitor regarding a fair share arrangement for at least Vancomycin and Progesterone.  After the call, "███████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████

████████████████████████████████████

███████████████████████████████

███████████████████████████████

███████████████████

Walgreens then passed the message to Actavis so that Actavis would know Akorn would not compete fully and was seeking only limited share.

222.     A week later, Walgreens and the Akorn employees scheduled a conference call to discuss the Akorn-Watson allocation arrangement. Akorn sent a reminder email to Walgreens with an admission that Walgreens had also brokered another fair share deal involving the topical anesthetic drug Lidocaine:

████████████████████████████████████████

████████████████████████████████████████

FILED WITH REDACTIONS – PUBLIC VERSION

████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████████████████████

████ ").  These types of messages demonstrate the interdependent nature of the overarching

fair share agreement.

223.    Walgreens transmitted the message to Watson/Actavis. Later, Walgreens told

Akorn that its manufacturer competitor Watson/Actavis ██████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████

224.    Walgreens' actions prevented free and fair price competition. Watson/Actavis was

able to keep the business without having to lower its price. Rather than going "████████ the

average price per 125mg capsule of Vancomycin remained above $10.00 for several years and did

not drop below $5.00 until after Akorn and Actavis/Watson were named as defendants in this

multidistrict litigation.

- **Temozolomide (WBAD, Teva, Sandoz)**

225.    Temozolomide, also known by the brand name Temodar, is a brain cancer drug.

226.    Teva and Sandoz had rights to launch generic Temozolomide in August 2013, so

customers began requesting bids in July 2013. On July 18, 2013, after Sandoz communicated with

WBAD, SDZ-CW-1[19]  had a call with Nisha Patel (Teva) regarding Sandoz's current customers and options to allocate customer for Temozolomide.

227.    Sandoz then worked with WBAD to confirm the plan. On the morning of July 23, 2013, a national accounts executive at Sandoz spoke with an executive at WBAD and asked him to communicate Teva's plans. Sandoz summarized the call:



228.    Later in the afternoon, WBAD relayed the message from Teva back to Sandoz:



229.    With WBAD as an intermediary, Teva was able to communicate to Sandoz (a) when it was prepared to launch Temozolomide, (b) that it was not planning to compete aggressively or pursue more than its fair share, (c) that it had sufficient stock of Temozolomide to sustain around a 50% market share, and (d) that Sandoz should send back information regarding Sandoz's plan for Temozolomide.  Sandoz understood the implications of the communication, ████████████████████████████████████████ One Sandoz executive responded internally and exclaimed that this was ████████████████████

230.    On July 29, 2013, Patel and SDZ-CW-1 discussed how to carve up the market for Temozolomide between Sandoz and Teva. Throughout the summer, SDZ-CW-1 spoke to Patel both before and after Sandoz sent out any offers regarding Temozolomide in an effort to develop and ensure the appropriate fair share balance between the two competitors.

---

[19] This is an individual whose identity is known to the Plaintiffs, who worked at Sandoz, and who is referred to in this complaint as Sandoz Cooperating Witness #1 ("SDZ-CW-1"). Other cooperating witnesses are referred to by the same format.

**FILED WITH REDACTIONS – PUBLIC VERSION**

231.    Although SDZ-CW-1 and Patel were already in contact on July 29, 2013, the companies had multiple redundant lines of collusive communication that day. An executive at Sandoz called a senior account executive at Teva. Separately, Kevin Green (Teva) spoke to SDZ-CW-2 twice, and they spoke again on July 31. During these calls, Green told SDZ-CW-2 about Teva's launch plans and Teva's intention to take the Walgreens business.

232.    Teva and Sandoz continued to communicate their future plans with each other for other accounts.  Sandoz internal emails sent on July 31, 2013, reveal that Sandoz knew the customers Teva would contact even before Teva had done so. ██████████████████████

█████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████ On August 12, 2013, the same day as Teva's launch, cooperating witness SDZ-CW-2 met in person with Defendant Rekenthaler at the Grand Lux Café in Las Vegas during the NACDS Total Store Expo conference and they discussed the status of the Temozolomide arrangements.

- **Isosorbide mononitrate IR (WBAD, Par)**

233.    Isosorbide mononitrate (known as IsoMono) is a drug used to treat heart-related chest pain. It is taken orally and marketed in 30mg and 120mg strengths. On August 3, 2015, a national account executive at Qualitest (which is owned by Defendant Par), wrote internally to a colleague that she had left voicemails for WBAD regarding an IsoMono opportunity. █████████

████████████████████████████████████████████████████████████

███████████████████████████

234.    On August 4, 2015, Par called WBAD to discuss IsoMono, among other drugs. Immediately following the call, Par internal emails indicate that WBAD was █████████████

█████████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████

- **Disulfiram (WBAD, Breckenridge, Teva)**

235.     Disulfiram is an alcohol antagonist used to treat alcoholism. In July 2014 WBAD reached out to Teri Coward at Teva to inform her that WBAD had received a competitive offer on Disulfiram tablets from Breckenridge (at the time, the only other competitor). In the same email, WBAD passed Breckenridge's market share intentions to Teva: ███████████████████████ ████████████████

236.     Although the message got through, the rules of fair share do not always dictate a concession to a competitor. A Teva employee calculated the percentage of total market share represented by WBAD and expressed to colleagues that Breckenridge was ████████████████ ██████████████████████████████████████████████████████ ████████████████████████████████████ Teva subsequently successfully matched the competing bid to maintain the account and looked for other smaller accounts it could cede to Breckenridge.

- **Cabergoline (WBAD, ABC, Teva, Greenstone)**

237.     Cabergoline is a drug that helps reduce abnormally high levels of the hormone prolactin and is used to treat menstrual problems and tumors of the pituitary gland. WBAD coordinated with Teva and Greenstone to arrange market allocation for this drug.

238.     In December 2014, as Greenstone was preparing to enter the market for Cabergoline, Frank Harris, a senior executive responsible for generic products at WBAD,

approached Teva on Greenstone's behalf.  In a December 9, 2014 e-mail, WBAD directly sought

to facilitate a customer allocation between Greenstone and Teva:

> I need to talk to you about Cabergoline.  Greenstone is now
> shipping and they are targeting WAG and 2 small grocery chains.
> We owe Greenstone a favor and would be ok if you walked away
> from their business.  Greenstone has promised to play nice in the
> sandbox.  Let me know if you are available to discuss.

The WBAD account represented about 13% of Teva's total business for Cabergoline, and about

$861,000 in annual net sales. Teva asked for a little extra time "to figure something out on our

side." WBAD responded "Of course. I will let Gstone know not to do anything crazy."

239.    The next day, after some internal conversation at Teva, agreed to the proposed

allocation and asked WBAD to send the acceptance message back to Greenstone:

> Tell Greenstone we are playing nice in the sandbox and we will
> let them have ABC.

240.    Pursuant to this agreement, Greenstone was able to acquire ABC as a customer

for Cabergoline without any fear that Teva would compete to retain the business.  In exchange,

Greenstone had agreed to "play nice in the sandbox" – i.e., not compete with Teva for other

customers and drive prices down in the market.

- **Clomipramine (WBAD, Sandoz, Mylan, Taro)**

241.    Clomipramine (brand: Anafranil) is used for the treatment of obsessive-

compulsive disorder, panic disorder, major depressive disorder, and chronic pain.

242.    In May 2013, Mylan, Sandoz and Taro took massive price increases of over

3,000% for all forms of Clomipramine.[20] Two years later, on September 29, 2015, Defendant

---

[20] These price increases are the subject of an earlier complaint filed by Plaintiffs in August 2017
and are discussed below in section **L**.

WBAD worked to make sure that the price could stay high when a manufacturer with a de minimis share sought to gain some share.

243.     WBAD emailed Mylan with a simple message intended to have Mylan concede rather than counterbid and reduce the prices. Once again, WBAD made clear that the request was not limited to WBAD's own account, but instead impacted the competitor's intentions in the market as a whole:



It appears that this message was effective and that Mylan later ceded accounts to Mallinckrodt as per the fair share agreement, thereby sustaining the already artificially-high prices.

- **Celecoxib (WBAD, ABC, Teva, Actavis, Apotex)**

244.     Celecoxib capsules (brand name: Celebrex) is a nonsteroidal anti-inflammatory drug used in the treatment of arthritis, juvenile rheumatoid arthritis, and other painful joint disorders. Beginning in the fall of 2014, WBAD and ABC brokered a market allocation scheme between Teva, Actavis, and Apotex in accordance with the overarching fair share conspiracy.

245.     Due to patent appeals, about five competitors were poised to launch generic Celecoxib in December 2014. By October 24, 2014, ABC was already asking the various manufacturers about their share targets so that it could coordinate "pre-commitments" across the market and ensure price stability at launch.  ABC emailed Teva with a single question: ███████

███████████████████████████████████████████████████████████

███████████████████████████████████████." The next day, Teva called ABC twice and discussed Teva's intentions so that ABC could communicate them to

**FILED WITH REDACTIONS – PUBLIC VERSION**

Teva's competitors. ███████████████████████████████████." Later that day, Teva

sent ABC a correction about its estimated anticipated share given the prelaunch negotiations.

246.    On November 17, 2014, Teva circulated internally "████████████████

████████████████████████████████████████████████████████."

247.    Teva agreed that Actavis deserved its fair share of the Celecoxib market. On

November 20, 2014, Teva learned that Actavis was vying for a certain customer that had earlier

"pre-committed" to Teva. The customer explained Actavis's rationale to Teva: "██████████

████████████████████████████████████." In response, Defendant

Rekenthaler (Teva) wrote internally "████████████████████████████████

██████████"

248.    On November 28, 2014, Actavis approached WBAD and ████████████

████████████████████████████████████████. WBAD

then became actively involved in trying to broker an agreement between Teva and Actavis on

how much share each company would take upon launch.

249.    On Monday morning, December 1, 2014, WBAD's Director of Global Generic

Pharmaceutical Sourcing emailed Teva with Actavis's prices and asked "█████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████

██████████████████████"

250. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮"

251.    In the days leading up to Teva's December 10, 2014 launch, Teva executives had had numerous telephone conversations with their counterparts at Actavis.  Rekenthaler (Teva) spoke with Defendant Falkin (Actavis) multiple times.  Patel (Teva) spoke to A.B., a senior sales and marketing executive at Actavis, for over eight minutes on December 5, and for over sixteen minutes on December 8. On the day of the launch, December 10, Rekenthaler and Falkin spoke three times.

- **Isotretinoin (WBAD, ABC, Teva, Dr. Reddy's)**

252.    Isotretinoin (brand names: Claravis, Zenatane, Accutane) is a drug used to prevent severe acne and treat skin cancers. In March 2013, Defendant ABC coordinated with Teva and Dr. Reddy's to allocate the market for Isotretinoin. Reddy's John Adams reported in an internal email on March 27, 2013:



Although Marc Kikuchi is presently in a CEO role at Dr. Reddy's, at the time of the email he was at ABC. Plaintiffs do not know the identity of the person on "west coast time." In August 2014, Dr. Reddy's added the drug to its "wish list" to Defendant WBAD, asking to be given the ABC business along with other drugs.

253.    By April 9, 2015, Teva had conceded CVS, Cardinal and ABC to Dr. Reddy's although Teva was internally divided on whether to concede ABC. The Senior Director, for one,

FILED WITH REDACTIONS – PUBLIC VERSION

commented "████████████████████████████" and that it was "████████" because Teva "████████████████████████" Nevertheless, she was overruled because, given Teva's earlier concessions, "████████████████" would "████████████ ████" which was considered fair in what appeared at the time to be a three-player market.

254.    Teva then discussed that they needed to "████████████" via ABC regarding Isotretinoin. That afternoon, the Teva Senior Director wrote to WBAD and ABC executives "██ ████████████████████████" and that the Teva team hoped the Reddy's team would understand that "██████████████████."

- **Sumatriptan autoinjector (WBAD, Dr. Reddy's, Teva)**

255.    The Sumatriptan autoinjector is a spring-loaded syringe that treats acute migraine and cluster headaches. In 2016 it was the 115th most-prescribed medication in the United States with more than 6 million prescriptions.

256.    In June 2016, writing from Bern, Switzerland, a WBAD executive wrote that he needed to discuss Sumatriptan autoinjectors with Dr. Reddy's. The next day, June 28, 2016, Dr. Reddy's Senior Director and Head of National Accounts Victor Borelli spoke with WBAD's Director of Global Generic Pharmaceutical Sourcing to arrange ██████████████████████ ████████████████. An email from the Reddy's senior director corroborates:

████████████
██████████████████████████████
████
████████████████████████████
████████████
██████████████████████████████
████████████

As on other occasions, WBAD had spoken with Teva about its market share goals, found out which accounts Teva wanted to target or retain to meet those goals, and then relayed that

information. In this episode, WBAD specifically did this ███████████████

████████████████████████████████████████████████████████

███████████████ .

- **Omeprazole-sodium bicarbonate (WBAD, Dr. Reddy's, Valeant)**

257.     WBAD continued to coordinate market allocation schemes in furtherance of the

fair share conspiracy as recently as August 2016. For example, on August 3, 2016 WBAD agreed

████████████████████████████████████████████████████████

██████ for the combination drug Omeprazole-Sodium bicarbonate (brand name: Zegerid).

Although they spoke on the phone, the conspirators left traces of their conversation in emails. Dr.

Reddy's Victor Borelli wrote to WBAD:

████████████████████████████████████

███████████████████████████████████

████████████████████████████████

█████████████████████████████████████

███████

WBAD replied:

█████████████████████████████████████

███████

258.     Borelli then wrote on a separate email to his Reddy's colleagues: ███████████

████████████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████

**FILED WITH REDACTIONS – PUBLIC VERSION**

- **McKesson knowingly participated in the fair share conspiracy**

259.     McKesson's executives understood the overarching fair share agreement and the various corollary 'rules of the road' that determined how manufacturers were supposed to react to new entrants, price increases, and other "changes in market dynamics."

260.     McKesson also willingly served as a messenger and broker between the Defendant manufacturers in order to cement market allocation schemes that might otherwise have failed due to misunderstandings or lack of confidence between the manufacturer conspirators.

261.     McKesson shared the view that low-priced market entrants were irresponsible and that to offer low prices for a drug was to 'trash the market.' On trip to India with McKesson in 2014, McKesson executives noted to former Heritage President and admitted conspirator Jason Malek that ████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████

262.     Manufacturers were aware that the key generics buyers at McKesson understood the fair share system, particularly because of McKesson's extensive involvement in multiple levels of the pharmaceutical supply chain. For example, McKesson was also, in certain circumstances, a direct competitor of the manufacturers because it bid on contracts to supply large retailers such as Target.  On one such occasion, Teva conceded the account to McKesson in accordance with the fair share agreement.  McKesson also owns and operates a generic drug manufacturer known as Northstar, and sold drugs including Pravastatin.

263.     McKesson knew to provide the manufacturers the information they needed in order to avoid competition. ████████████████████████████████████
████████████

264.     The email contained nothing more than that message and the numerical code for three product sizes of hydrocortisone cream, but another individual at McKesson understood what she needed to do in order to further ████████████████████ ████████████ ███████████ determine the "current ████████████████████████████ ██████████████████████████████████████

- **Capecitabine (McKesson, Mylan, Teva, Reddy's)**

265.     Capecitabine, also known by the brand name Xelolda, is a chemotherapy drug used to treat a variety of cancers, including breast and colon cancer.

266.     As early as January 2014, both Teva and Mylan were making plans for their eventual launch of Capecitabine. Part of this planning included sharing confidential information in order to allocate the market between them. For example, by January 31, 2014 Teva knew that that Mylan was courting a specific customer, Armada Health Care, and that "Mylan estimated Armada's share on [Capecitabine] at 37%."

267.     On February 26, 2014, Defendant Jim Nesta (Mylan) called Defendant David Rekenthaler (Teva) and informed him that Mylan would not be able to launch on time with Teva. In early March 2014, Teva launched as the exclusive generic Capecitabine manufacturer. Teva remained exclusive until Mylan entered in August 2014.

268.     Dr. Reddy's began seeking share prior to its own launch, which was planned for summer 2014.  On June 4, 2014, an individual at Dr. Reddy's learned that Teva would keep the McKesson account. However, he noted over internal email that ██████████████████████ ██████████████████████████████████████████████████ ██████████████████████████████████████████████████

Reddy's Associate Director for Generic Marketing North America replied ██████████ ██████

269.    Because Reddy's had been able to signal to Teva via McKesson, ██████████ ████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████.

270.    Dr. Reddy's was also able to pass messages via a minor distributor not named as a defendant in this action. On June 11, 2014, a Director of National Accounts at Teva reported that the distributor had told ████████████████████████████████████████████ ████████████████████████████

271.    The Defendants' anticompetitive conduct relating to Capecitabine continued throughout the summer as Mylan prepared to launch. On August 4, 2014, Nesta and Rekenthaler spoke by phone three times. Nesta informed Rekenthaler that Mylan would soon enter the Capecitabine market and the pair discussed how to allocate the market, a discussion made easier by the fact that McKesson had delivered Dr. Reddy's "████████████████████." Rekenthaler wrote an email memorializing the call. "████████████████████████████ ████████████████████████████████████████" Mylan did seek the business for each of these three companies and Teva conceded each of them, pursuant to the agreement Rekenthaler had reached with Nesta.

272.    This market allocation "plan" was highlighted in other internal Teva emails sent on August 10, 2014. "Notes are showing that are [sic] plan is to concede McKesson, Econdisc, Rite-Aid, and Cardinal," Rekenthaler noted that Teva had not yet heard from Econdisc, but he knew Mylan was targeting Econdisc, because he and Defendant Nesta had previously discussed it.

273.     On August 11, 2014, Rekenthaler received a call from Nesta. Shortly after hanging up the phone, Rekenthaler sent an internal email confirming that Mylan's "primary targets are ABC, McKesson and Econdisc." He added that he did not "expect price to be aggressive."

274.     In accordance with their market allocation scheme, Mylan targeted and Teva conceded the Capecitabine business at ABC, Econdisc, and McKesson/Rite-Aid. Teva also conceded some of the "smaller guys" as well, pursuant to the agreement. On August 14, 2014, for example, a smaller customer informed Teva that it had received a bid for Capecitabine. On August 18, 2014, Rekenthaler called Nesta and the next day an internal email confirmed that Teva "will be conceding this business."

- **Amikacin (McKesson, Teva, Heritage)**

275.     Amikacin is an antibiotic developed in the 1970s that is used to treat multi-drug resistant bacterial infections and is considered an "essential medicine" by the World Health Organization.  In October 2014, as part of the overarching fair share conspiracy, McKesson conspired with Teva and Heritage to arrange a market allocation for Amikacin.

276.     In the summer of 2014, when a customer requested that Heritage reduce its price, Heritage said that it was aware that Teva's price was slightly lower but that it did not wish to reduce its prices in order to gain market share. The Heritage team decided they were "█████ ███████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████"

277.     On October 10, 2014, Heritage's Neal O'Mara reported that he had had positive conversations with an individual at McKesson who was willing to help coordinate with other manufacturers to help Heritage gain share for Amikacin. This person apparently believed it was inappropriate to provide Heritage with precise prices but O'Mara noted that ███████████████

FILED WITH REDACTIONS – PUBLIC VERSION

█████████████████████████████████ The belief that it is legal for competitors to discuss their share intentions and their market allocation targets so long as they avoid explicitly mentioning a numerical price is apparently common in the industry and explains why conspirators go to great lengths to destroy evidence of certain conversations but leave other equally inculpatory communications in plain sight.

278.   Despite her supposed unwillingness to discuss prices, what the individual at McKesson was in fact willing to do was to communicate Heritage's intent to compete for only a limited fair share so that Heritage would not face competition upon Teva's right of first refusal ("ROFR") right to counterbid. █████████████████████████████ ████████████████████████████████████:

███████████████████████████
███████████████████████████
███████████████████████████
█████████████████████

McKesson successfully passed the message to Teva. With assurances that Heritage would act responsibly in a two-player market. Heritage and Teva were then careful not to compete.

279.   By a year later, October 1, 2015, Teva had raised both its list prices and its contract prices for both the 500mg/2mL and 1g/4mL dosage forms of Amikacin ███████████

███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
█████████████████
███████████████████████ 😊
██████████████

280. When contacted by customers looking to avoid high prices, Heritage supported Teva's price increase by refusing to lower prices. Heritage wrote that they "███████████ ███████████████████████████████████████████████████████████ ██████."

● **Tizanidine (McKesson, Sandoz, Mylan, Dr. Reddy's)**

281. Tizanidine, also known by the brand name Zanaflex, is used to treat muscle spasticity due to spinal cord injury or multiple sclerosis. Around May 2013, the Tizanidine market was controlled by Reddy's (59% market share), Mylan (24%), and Sandoz (17%). An internal Dr. Reddy's presentation discussing Tizanidine noted "███████████████████████████."

282. On May 10, 2013, Sandoz learned that Reddy's had increased prices tenfold, which gave Sandoz and Mylan room to obtain their fair share at significantly higher prices. "███ ███████████████████████████████████████████████████████████ ███████████████████████████████████████."

283. On May 13, 2013, Dr. Reddy's made its list price increases public and that same day, Nesta (Mylan) had a call with SDZ-CW-4 (Sandoz).

284. Distributor Defendant McKesson was instrumental in coordinating support for the Reddy's-led price increases.██████████████████████████████ ███████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████



285.     Later that same day, Armando Kellum re-sent the price increase to the Senior Director and other McKesson employees, writing "████████████████████████ ██████████████████" The McKesson Senior Director then spoke with Dr. Reddy's and Mylan and ████████████████████████████

286.     Sandoz then matched Dr. Reddy's list prices for several dosage forms and re-raised above Dr. Reddy's price on one other dosage form on May 24, 2013. In the three days leading up to the Sandoz increase, Nesta (Mylan) confirmed support for the increase over various calls with both SDZ-CW-4 (Sandoz) and with a Dr. Reddy's national account executive.

287.     ████████████████████████████ ████████████████████. On May 29, 2013 in an internal Sandoz email to SDZ-CW-1 and Defendant Armando Kellum, SDZ-CW-3 wrote:

> Are we considering additional Tizanidine market share? I'm assuming are [sic] intent is not to be disruptive at this time.

A few minutes later, Nesta called SDZ-CW-4 and they spoke for nearly thirteen minutes. SDZ-CW-1 then replied to the Sandoz thread:

> We will sit tight for now.

Sandoz then told a customer that Sandoz was "not in a back order situation" but nevertheless would not ship additional Tizanidine orders "at this time."

288.     On June 14, 2013, Anda, a wholesale customer, e-mailed an account manager at Dr. Reddy's asking "[d]id mylan follow your increase?"  He responded, "We've heard they did."

FILED WITH REDACTIONS – PUBLIC VERSION

He. had learned of Mylan's intent to follow the price increase through his prior communications with Defendant Nesta and with Defendant McKesson.  However, Mylan had not actually raised its price on Tizanidine at the time of the inquiry, and would not do so until July 2, 2013.

289.    On June 26, 2013, a supermarket chain customer e-mailed Dr. Reddy's requesting a bid for Tizanidine.  A marketing executive at Dr. Reddy's wrote internally

> I think, given the market situation and us leading the price adjustment, I think, we should not go behind additional market share since it will erode the market even further.

Another individual replied, "[y]eah, I was just sending it as an FYI, no intention to bid."  A few weeks later, the customer forwarded the same request and Sandoz gave the pretextual response that "unfortunately" it could not supply the drug. On July 26, 2013 a Sandoz executive identified Mylan, Teva, and Apotex as the source of a "tremendous number of price increases" and said Sandoz "will be next."

- **Morris & Dickson knowingly participated in the fair share conspiracy**

290.    Morris & Dickson ("M&D") is another drug distributor that participated in the overarching conspiracy to allocate share between generic drug manufacturers in order to maintain prices and permit coordinated price increases.

291.    The manufacturer Defendants considered M&D to be a trustworthy conspirator and were frank about their adherence to fair share. For example, ███████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████ █ ███████████████████████████████████

███████████████████████████████████████████████

FILED WITH REDACTIONS – PUBLIC VERSION

[REDACTED]

292.   As a smaller wholesaler, Morris and Dickson had a strategy of offering competitive intelligence and coordinating fair share in exchange for preferable treatment from the manufacturers.  For example, on May 14, 2014, [REDACTED] of M&D requested a discount on Clonidine-TTS patch from Teva.  Teva's Associate Director of National Accounts recommended to Nisha Patel "[REDACTED]

[REDACTED]

293.   In another example, in May 2014 Defendant Tracy Sullivan (Lannett) met with M&D to obtain confidential information about how other manufacturers would support price increases. In her notes she remarked that M&D [REDACTED].["] Later that same week she had dinner with two Morris & Dickson employees along with Anne Sather (Heritage).

294.   Like the other distributors, Morris & Dickson ensured that lines of communication remained open between manufacturers even when the manufacturers were

reluctant to speak to one another directly.  For example, ███████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████

- **Eszopiclone (M&D, Cardinal, Dr. Reddy's, Sun)**

295.     Eszopiclone is a sedative-hypnotic drug used to treat insomnia. Teva, Dr.

Reddy's, Mylan, Lupin, Glenmark, Sun, and non-defendant manufacturer Roxane launched

Eszopiclone on April 15, 2014.  In the months leading up to the launch, the various manufacturers

sought to obtain "pre-commitments" with customers including the Defendant distributors. In this

chaotic seven-player simultaneous launch, the distributor Defendants, including M&D, helped the

manufacturer Defendants to settle the market with minimal competition by relaying their

intentions regarding share, preferred account targets, and pricing.

296.     Months before launch, on February 6, 2014, Cardinal reached out to Dr. Reddy's

to begin gathering information about the likely allocation plan.  Cardinal wrote "███████████

████████████████████████████████████████████████████████

██████████████████████████" That evening, a Reddy's executive provided the

answer to Cardinal's key question—"████████████████████████."—and directed a more junior

Reddy's employee to send Cardinal that answer. ███████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████

297.     Because of the large number of competitors, the Defendants had some confusion

around pricing and share intentions, despite their frequent sharing of information. ██████████████

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

298.     On April 2, 2014, Dale Kelly at Morris & Dickson reached out to Susan Knoblach at Defendant Sun to help avoid price erosion on Eszopiclone. [REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

- **Cardinal knowingly participated in the fair share conspiracy**

299.     Defendant Cardinal was also aware of the overarching fair share agreement and knowingly joined in the agreement in restraint of trade.

300.     Cardinal communicated details between the manufacturers in order to limit competition.  For example, on January 20, 2014, Teva submitted a bid to Cardinal and added a note requesting that Cardinal relay an anticompetitive message to Defendant Perrigo:

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

301.     On February 7, 2014, the Cardinal executive called Teva and said he had explained to Perrigo that Teva "[REDACTED]

██████████, but had been unsuccessful in persuading certain people at Perrigo to play fair on this drug (Imiquimod cream). Teva employees were █████████████████████████████████ █████████████████████████████████████████████████████████████████ ███████████████████████████████████████████."

302.     Cardinal's generic drug buyers were in constant contact with the manufacturers and were aware of the rules of the scheme to concede share between manufacturers. Cardinal knew that the goal was to reach a fair share apportionment. For example, on May 11, 2012, Teva's Senior Director of National Sales told an executive at Cardinal about a change in plans for the HIV/AIDS drug Combivir. Teva had made plans to supply Cardinal but ██████████████ █████████████████████████████████████████████████████████████ ████████. Teva apologized for the confusion and wrote that ████████████████████ ████████████████████████████████████████████████████ █████████████████████████████████████████████████████

303.     Cardinal executives told generic drugmakers that Cardinal wanted to prevent price erosion by maintaining current customer allocations.  For example, in December 2012, a ███████ █████████████████████████████████████████████████████████████ █████████████████████████████████████████████████████████████ █████████████████████████████████████████████████████████████ ██████

304.     Cardinal's participation in the overarching conspiracy continued even after the creation of Red Oak Sourcing in 2014. Defendant Red Oak is a joint venture between Cardinal and CVS Health that is, according to its website, "responsible for securing the generic drug portfolio for both companies." Red Oak employees negotiate on behalf of both Cardinal and CVS

Health. Some of the same employees who participated in the overarching conspiracy while at Cardinal accepted new positions at Red Oak and continued to price-fix with their manufacturer conspirators, except that they were now responsible for an even larger share of the market.

305.    The Red Oak executives often requested that the manufacturers provide charts showing the current allocation of market share. These overviews were requested so that Red Oak could more knowledgeably engage with the manufacturers on the basis of fair share.[21] For example, on multiple occasions, including at the end of April 2015 and in mid-August 2015, Red Oak requested that Teva provide ███████████████████████████████ ████████████████████████. Teva replied in an email titled "████████████," making clear that ███████████████████████. The spreadsheets contained a breakdown of the ██████████████████████████.

306.    The following sections illustrate additional episodes of Cardinal's participation in the anticompetitive fair share agreement.

- **Nystatin and Doxycycline DR (Cardinal, Heritage, Sun/Mutual, Teva, Mylan)**

307.    Developed in the 1950s, Nystatin is an antifungal drug sold in various dosage formulations including creams, ointments, and tablets.

308.    At a meeting at Cardinal's headquarters on February 12, 2013 ████████████ ███████████████████████████████████████████ ███████████████████████████████████████████ ███████████████████████████████████████ ███████████████████████████████████████

---

[21] Each of the manufacturer Defendants kept some version of a tracking spreadsheet to see where their competitors stood in terms of market share.

**FILED WITH REDACTIONS – PUBLIC VERSION**

██████████████████████████████████████████████████████

███████████████████████

309.    A month later, on February 26, 2013, Defendant Heritage's President Jason Malek and National Account Manager Anne Sather discussed Cardinal's suggestion that ███████ ███████████████████████████████████████. Sather noted that according to Cardinal: "████████████████████████████████." Malek asked if it would be possible to raise prices without inviting "██████" and Sather replied: "███████ █████████████████████." Ultimately, they agreed to join Cardinal's plan to increase prices. Sather wrote "██████████████████████████████████████████████ ██████████████████████████████████████████████ ████"

310.    Cardinal employees coordinated these price increases at an in-person meeting and a record exists only because the Heritage employee typed notes of the meeting. The notes also include other anticompetitive coordination by Cardinal on behalf of the manufacturer conspirators. At that same meeting, Cardinal reminded Heritage that Mylan █████████████ ███████████████████████, and told Heritage to expect ██████████████ ████████████. Admitted conspirator Jason Malek acknowledged that Cardinal's intel was "████████" and that "██████████████████████████████████████ ██████████."

311.    On April 16, 2013, the coordinated price increase organized by Cardinal was put into action. Sun doubled its price for Nystatin tablets. The next day, Susan Knoblauch (a Sun Senior Sales Manager) had a forty-minute call with Anne Sather.

312.    Nisha Patel (Teva) and Jason Malek (Heritage) also spoke in April 2013 and later held a call on July 9, 2013 and continued to speak in late July 2013 as Teva listed Nystatin tablets for potential price increases. Confirming Cardinal's message, Patel told Malek that ████████

████████████████████████████████████████████████████████████

313.    Another round of coordinated price increases followed from the earlier Nystatin tablets increase. This increase and the related communications are discussed below in section **K**.

- **Tolterodine ER (Cardinal, Teva, Mylan)**

314.    Another example of Cardinal's participation in the manufacturers' fair share conspiracy involved Tolterodine extended release capsules ("Tolterodine ER"), an antispasmodic drug prescribed to people who have difficulty controlling their urination.

315.    Although it was not publicly known at the time, Teva and Mylan both had plans to begin selling Tolterodine ER on January 2, 2014. Accordingly, throughout December 2013, with full knowledge that Mylan and Teva intended to allocate the market according to the overarching fair share agreement, Cardinal liaised between the two manufacturers to coordinate the details of the illegal agreement.

316.    On December 20, 2013, Dale Hill (Cardinal) called Teri Coward (Teva) and delivered the message that Mylan would launch its Tolterodine ER in two weeks.  Cardinal also provided Mylan's future pricing for Tolterodine ER, and conveyed that Mylan was "looking for a 40% market share." Cardinal knew this was sufficient for Teva and Mylan to determine whether their customers added up to fair share and said that Teva "can figure the rest out."

317.    With the market allocation and pricing details provided by Cardinal, the manufacturer conspirators were all set. Teri Coward circulated the message from Cardinal to her Teva colleagues, including Kevin Galownia, and asked to have a call "first thing Monday morning to discuss what we want to do" in terms of preparing a "target strategy." Galownia then

- 107 -

spent the weekend working up a strategy so that Teva could "pick who should receive bids." The unbidded customers would be conceded to Mylan as per the agreement communicated and confirmed via Cardinal.

318.    On Monday, December 23, 2013, David Rekenthaler (Teva) and Jim Nesta (Mylan) spoke briefly on a second line while Rekenthaler was simultaneously dialed in to a Teva conference call. Immediately after the Teva conference call, Rekenthaler tried calling Nesta two more times and Nesta ultimately returned the call.  During these calls, Rekenthaler and Nesta reached an agreement to allocate the Tolterodine ER market on launch day so that Teva and Mylan could reach their target share without eroding prices. They also discussed specific contractual language to include in their offers in order to allow room for future price increases. Rekenthaler (Teva) circulated an email with the subject "Mylan's offers" listing all the accounts where Mylan sought business, which he was able to confirm due to his calls with Nesta (Mylan).

319.    By 12:12 pm on that same day, Teva had created a revised pricing plan for the Tolterodine ER launch that incorporated Teva and Mylan's plan to allocate the market, including the submission of cover bids and abstention from bidding. The revised pricing plan included a chart identifying the major customers (and their associated market share percentage) that Teva would receive to get close to its desired 60% market share while Mylan would get its desired 40% share, as Cardinal had arranged. The following day, Christmas Eve 2013, Rekenthaler and Nesta had two more calls to confirm and refine Teva and Mylan's market allocation agreement.

320.    In exchange for Mylan either submitting cover bids or abstaining from bidding on these customers, Teva reciprocated by submitting cover bids and/or refusing to submit bids to customers that Mylan targeted. This is demonstrated by the fact that Teva's newly revised pricing

FILED WITH REDACTIONS – PUBLIC VERSION

plan now included considerably higher direct invoice prices for the major customers allocated to Mylan than had been listed prior to the calls between Nesta and Rekenthaler.

321.    The allocation between Mylan and Teva allowed Teva to launch at only 86% of the brand price for a total of $24.6 million in net sales during the first week of sales. The allocation was successful, with Teva achieving approximately 58% market share.

- **Tobramycin inhalation ("Tobi") (Akorn, Teva, Sandoz, Cardinal, WBAD, ABC)**

322.    Distributor Defendants Cardinal, ABC and WBAD each participated in the scheme to allocate manufacturer market share for Tobramycin inhalation solution (also known as Tobi). Although these distributor Defendants often initiated discussions about balancing share or increasing price in order to foment agreement, in this case they worked to finalize the agreement.

323.    Tobramycin is prescribed to people with cystic fibrosis who are suffering from bacterial infections in their lungs. The drug is sold in packs of 56 ampules because patients must inhale two ampules of Tobramycin per day for 28 days. At the time, the 56-pack of ampules cost Teva around $48.69 to produce.  As a result of the conspiracy, Teva was able to sell each 56-pack of Tobramycin for over $4,000.

324.     As early as October 2013, Sandoz began strategizing how to split the market for Tobramycin once it was released from patent protections and available for generic production. "We will aim to go for our fair share of the market" wrote a Sandoz executive responsible for product launches.  "Exact goals will depend on how Teva goes into the market on day 1, and how rational they behave on day 181." (Teva had secured a 180-day exclusivity period). As explained above, "rational" behavior is a term of art in the fair share conspiracy indicating that a competitor will play fair and cede share to avoid competition.

325.     On June 23, 2014, Nisha Patel told her colleagues that they needed to discuss which customers to retain and which to concede to new entrants, including Sandoz, in accordance with market share calculations.

326.     On July 1, 2014 Patel had seven calls with an individual at Sandoz who is referred to in this complaint as Sandoz Cooperating Witness #1 ("SDZ-CW-1"). They discussed Sandoz's launch plans and how to divide up the market for Tobramycin.

327.     On July 7, 2014, Patel and SDZ-CW-1 spoke five more times. On these calls, SDZ-CW-1 and Patel discussed how to allocate the market for Tobramycin, including specific accounts that Teva and Sandoz would maintain or concede to one another. Patel memorialized the agreement in an e-mail two days later.

328.     Patel also told SDZ-CW-1 specifically that Teva would not even submit a bid to CVS. This was significant because Tobramycin was a very expensive product, and Sandoz was able to acquire the CVS business by offering only a nominal reduction to the extremely high Teva price. A week later CVS confirmed to Teva that Sandoz had picked up the business, as planned. Teva also agreed to concede the Cardinal business to Sandoz.

329.     SDZ-CW-1 said that Sandoz was ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

330.     On July 9, 2014, one of the allocated customers—Kinney Drugs—asked Teva for a lower price on Tobramycin. A Teva analyst stated in an internal e-mail, ████████████████████████████████████████████ A Teva national accounts director was confused

by this decision and ████████████████████████████████████████

The Teva analyst responded:

> ███████████████████████████
> ████████████████████████████
> ███████████████████████████
> ████████████████████

331.     Defendant Patel's instructions to concede business to Sandoz had come after a

phone call with SDZ CW-1 on July 9, 2014.

332.     The following week, on July 17, 2014, Red Oak / Cardinal's ███████ was

concerned that the manufacturers' allocation agreement was not being executed quickly enough.

He called Teri Coward (Teva) to warn her ████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

███████████████████████████████

333.     That same week, Walgreens also coordinated with Sandoz and Teva to allocate

the market for Tobramycin. On July 16, 2014, Teva spoke with ████████████

(Walgreens/WBA), who had spoken with Sandoz that same day to discuss the launch of

Tobramycin. ██████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████  ████████

██████████████████████████████████████

██████████████████████████████████████████

██████████████████████████.

334.     When Tobramycin came up for re-bid in July 2015, Teva continued with the

agreed plan to concede to challengers in order to avoid or limit price erosion. Teva admitted to

another distributor that "████████████████████████████████

███████"

335.    That fall, as the competitors looked to rebalance share for Tobramycin inhalation,

Akorn sought a part of the ABC business. ███████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████

               ██████████████████████████████████

               ████████████████████

336.    Internally, Teva's Senior Director of Sales & Trade Relations asked "████████

████████████████████████████████████████████

████████████████████████████████████████████

████████

- **Lamotrigine ER (WBAD, McKesson, Reddy's, Wilshire, Par)**

337.    Lamotrigine Extended Release tablets (brand name: Lamictal) is an

anticonvulsant drug that treats epileptic seizures. At a sales and marketing meeting held in April

2013, the Dr. Reddy's sales team arrived with certain unspecified competitor intelligence

regarding Lamotrigine.

338.    In June 2013, the Dr. Reddy's team was planning to enter the market for

Lamotrigine in either in July or August. The only other competitors at the time were Defendants

Par and Wockhardt, although the latter had supply problems.

339.     On June 17, 2013 a member of the Dr. Reddy's sales team wrote an internal email about a customer that wanted a bid on Lamotrigine. She advised that they should "███████ ████████████████████████████████████████." If Par was unwilling to concede the business, an aggressive offer would only have the result of driving down prices. Thus, it was important for Dr. Reddy's to know which accounts Par would defend or concede.

340.     The same day, Dr. Reddy's Director of National Accounts told colleagues that he had spoken to McKesson and confirmed that McKesson ███████████████████████ ██████████████████████████████ Senior Director Victor Borelli told his colleagues that ABC had communicated to him that Par wanted to keep the ABC account.

341.     McKesson then communicated with Dr. Reddy's and Par to arrange a market allocation between the two manufacturers. Dr. Reddy's remained concerned that Par ███████ █████████████████████████████████████████████████████████████████ ████████████████████. That would then risk that Par would lower prices to retain the account to resist an unfair action, and this could disrupt the market and drive prices lower. Dr. Reddy's Senior Director for Prescription Marketing wrote:

████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████.

342.     Dr. Reddy's Director of National Accounts replied with assurances that he had "████████████████████████████████████████████████████████. He also said he would ████████████████████████████████████████████ ████████████████████████████████████████████. This was the same McKesson executive who would later ████████████████████████████████

███████████████████████████ That same day, June 26, 2013, Dr. Reddy's had

knowledge Par would █████████████████████ major account.

343.    Collusive communications regarding Lamotrigine did not end in 2013. In October

2015, Defendant WBAD coordinated with Dr. Reddy's and a manufacturer not named as a

defendant in this complaint (Wilshire) in order to allocate fair share for the drug Lamotrigine ER.

344.    On October 28, 2015, Dr. Reddy's executives had dinner with WBAD's Director

of Generic Pharmaceutical Sourcing. The next morning, he told them he had received a bid for

25% of the Walgreens business from a competitor and encouraged Reddy's to give it up in

exchange for no further competition from the competitor:

████████████████████████████████████

███████████████████████████

██████████████████████

Dr. Reddy's responded that it believed the competitor "████████████████████████

████████████" and Reddy's thought that had already been achieved, fair share style, by taking

share "████████████████████████" Reddy's noted that although its "███

██████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████████

███████████

345.    Dr. Reddy's then directed a national account manager to "███████████████

███████████████" Reddy's was concerned that the plan had gone awry, because Par was

supposed to have conceded ███████████████████████████ But Wilshire had bid only on a portion of the McKesson business,

████████████████████████████████████. Reddy's later learned ████████████████

████████████████████████████████████████████████████████

████████████████████████████████ targeting Par and not Dr. Reddy's accounts.

346.    WBAD continued to arrange allocation of share through 2016. By this time,
Defendant Actavis had entered the Lamotrigine market. On April 11, 2016, Dr. Reddy's learned
of a challenge at WBAD.  At this point, Dr. Reddy's was waiting for confirmation that the
challenger was Actavis, because, even though Dr. Reddy's was "████████████████████████

██████████ and "████████████████████████████" in order to confirm for Actavis that it was

"████████████." Reddy's Senior Director for National Accounts noted that she wanted to speak

with WBAD to ████████████████████████████████████████████████

████████████████████████████████ WBAD. Dr. Reddy's Director of Prescription

Marketing asked:

████████████████████████████████████████████████

████████████████████████████████████████████

██████████████

The Senior Director said she was "████████████████████████████████" from an individual at
WBAD. Once again, Dr. Reddy's requested the information because it knew that WBAD would
communicate share intentions back and forth between the manufacturers.

- **Paricalcitol (WBAD, McKesson, Teva, Zydus, Dr. Reddy's)**

347.    Paricalcitol, also known by the brand name Zemplar, is used to treat and prevent
high levels of parathyroid hormone in patients with long-term kidney disease. In the month
leading up to Zydus's launch of the drug, Nisha Patel and David Rekenthaler spoke with their
former colleague Kevin Green (formerly Teva, then at Zydus) and discussed which Paricalcitol

customers Teva would retain and which customers it would allocate to Zydus, the new market entrant.

348.   On March 13, 2014, Patel directed that Teva retain the ABC account and match Zydus's pricing.  The next day, on March 14, 2014, Patel called Green to update him on Teva's decision to play fair.

349.   During the morning of March 17, 2014, Defendants Patel and Green had two more phone calls where they discussed how to divvy up the market for several new Zydus products, including Paricalcitol.  A half an hour after the second call, Patel e-mailed her supervisor Kevin Galownia with a list of accounts to retain for Teva or concede to Zydus. Later that same day, Patel called Green.

350.   Over the next several weeks, Defendant Teva "strategically" conceded several customers to the new entrant Zydus.

351.   On March 28, 2014, one of Teva's customers notified a Director of National Accounts that it had received a competing offer from Zydus for its Paricalcitol business.  This person forwarded the email to Patel who responded within minutes "[w]e should concede." Patel's answer was immediate because she and Green had had a nine-minute call the day before during which Green had advised her of the incoming bid and Patel had agreed to play fair.

352.   On April 1, 2014, Defendant Teva conceded another account to Zydus and noted in Teva's Delphi database that the reason for the concession was "Strategic New Market Entrant."

*Enter Reddy's*

353.   By May 2014, Dr. Reddy's began preparations to enter the Paricalcitol market. WBAD coordinated Dr. Reddy's entry into the market by serving as a liaison between Dr.

Reddy's and its competitors even though they were also in direct communication with one another. Dr. Reddy's was targeting a 20% market share. At the time, Teva's share was 73%.

354.     On June 10, 2014, Nisha Patel spoke several times with Victor Borelli at Dr. Reddy's. Later that day, at 2:46pm, Dr. Reddy's provided WBAD with a market share report for Paricalcitol indicating that Teva was the market leader at 60% share. Having also spoken with Teva, WBAD agreed that "Teva is the right target." Dr. Reddy's then bid on a Teva account and Teva conceded it to Reddy's, dropping its market share by 3%.

355.     Teva also strategically conceded what remained of its Cardinal business (it had previously conceded some of that business to Zydus). After receiving Dr. Reddy's bid, Cardinal approached Teva and asked whether Teva would bid to retain the 4 mcg dosage form. Patel recommended that Teva concede the business: "We have ~70 share and it is ideal to concede here…"  Kevin Galownia agreed. Patel then instructed a Teva customer analyst to concede "due to [T]eva's high share." The rationale was circulated within Teva:

> Due to the fact that we have high share and already conceded on the other strengths, we are going to concede on this strength as well.

Teva's Teri Coward forwarded this statement, word-for-word, to Cardinal's ███████

356.     Dr. Reddy's formally launched Paricalcitol on June 24, 2014. On June 26, 2014, Kevin Galownia told Nisha Patel that Teva was "willing to concede 10-15% share total on Paricalcitol" to Dr. Reddy's. Teva then conceded several accounts to Dr. Reddy's, following the plan confirmed by WBAD. On July 20, 2014, after a call between Patel and Dr. Reddy's Victor Borelli, Patel instructed a Teva colleague to

> bid a little high on Paricalcitol. We should not be aggressive since we are in the process of conceding share due to additional entrants.

FILED WITH REDACTIONS – PUBLIC VERSION

Her colleague responded: "I will bid higher" on Paricalcitol.

357.    Teva decided concede yet another Paricalcitol account to Dr. Reddy's and wrote internally that it would be "[d]ue to new entrants and having to give up some share." In order to create the appearance of competition with this customer, Teva engaged in what Patel referred to as "fluff pricing," by which it offered an inflated price (cover bid) for Paricalcitol to ensure that Teva did not win the business. Indeed, the customer was "so insulted" by Teva's price that it moved to Dr. Reddy's the same day it received Teva's offer. When Defendant Patel learned of this, she remarked to a Teva salesperson (who she had been discussing "fluff pricing" with recently):

> Sorry! Had to laugh. In regards to our recent conversation....this
> is what we see when we provide fluff pricing. Can't win!

358.    On July 16, 2014, McKesson informed Teva that it had received a competing Paricalcitol bid from Dr. Reddy's. Based on assurances exchanged in earlier conversations with Dr. Reddy's, Teva initially decided to concede a portion of McKesson's business (OneStop), while retaining another portion (RiteAid a/k/a McRAD). Defendant Patel wrote internally:

> This decision is based on the number of competitors, DRL's
> potential share target and our current/conceded share. (Dr.
> Reddy's should be done with challenging our business on this
> product.)

359.    On July 18, 2014, Teva internal emails indicate that Teva was unsure of how to implement the market allocation in the case of McKesson. "I'm not sure how we communicate conceding [OneStop] and retaining [Rite Aid]" wrote a strategic customer analyst.  Patel responded that perhaps that was not necessary, but she was unsure:



A half hour later, Nisha Patel was told that Reddy's had actually submitted a bid for both portions of the McKesson Paricalcitol supply contract. Within 18 minutes of learning this, Defendant Patel called a Senior Director at Dr. Reddy's, but it was Friday at the end of the day.

360.     The Dr. Reddy's Senior Director returned Patel's call the following Monday morning, July 21, and they also spoke again the next morning, July 22, 2014, regarding allocation of the Paricalcitol market.  Around the time that she spoke with Reddy's on the morning of July 22, Patel once again asked internally whether McKesson would help coordinate the split between Teva and Dr. Reddy's.



361.     Teva then communicated with McKesson in order to coordinate the market allocation with Dr. Reddy's and reported that McKesson would "███████████████████ ██████" Later that day, Dr. Reddy's confirmed to McKesson that Reddy's "███████████ ██████████████████████████████████████████████████████████████████████ ████████████████████████████."

362.     That day, July 22, Teva and Dr. Reddy's ultimately agreed that Teva would concede all of its McKesson business (both One Stop and Rite Aid) to Dr. Reddy's. In exchange, Dr. Reddy's would surrender its bid for Teva's Paricalcitol business at Wal-Mart and would stop competing for additional market share (and driving price down further).

363.     The next day, July 23, 2014, Teva carried out its agreement to concede its entire McKesson business—both One Stop and RiteAid—to Dr. Reddy's and to retain Wal-Mart.  In its Delphi database, Teva noted that the McKesson Paricalcitol business had been conceded to a "Strategic New Market Entrant."

FILED WITH REDACTIONS – PUBLIC VERSION

364.     By early August 2014, Dr. Reddy's had attained 15-16% of the total Paricalcitol market, which it decided—pursuant to its understanding with Teva—it would "maintain for now." After the fact, McKesson reminded Teva that Dr. Reddy's had been "so aggressive because [Teva was] not giving up share."

**J.     Episodes illustrating market allocation in action**

● **Fenofibrate (Teva, Mylan, Lupin, Zydus, Dr. Reddy's, Cardinal)**

365.     Fenofibrate (brand name: Tricor) is a cholesterol drug that lowers levels of "bad" low-density lipids and raises "good" cholesterol (HDL) levels in the blood.

366.     On February 27, 2013 a senior marketing executive at Teva emailed his team asking for "any noise you may be hearing in the market relative to additional competition on Fenofibrate 48mg and 145mg." Defendant Kevin Green (Teva) then called Defendant Jim Nesta (Mylan's Vice President of National Accounts) and they spoke multiple times. Nesta divulged Mylan's anticipated launch plans.

367.     Executives from Teva, Mylan, and Lupin—at the time, the only manufacturers of Fenofibrate—then conspired to divvy up the market for the drug. From May 6-9, 2013, both Defendants Patel and Green (Teva) had multiple calls with Defendant David Berthold (Lupin), who had multiple calls with Nesta (Mylan), who closed the loop with multiple calls to Green (Teva).  The patterns of the calls indicate cooperation between these individual Defendants. On the afternoon of May 7, 2013, Nesta called Berthold immediately after hanging up with Green.

368.     On May 10, 2013, even before Mylan had made formal offers to any of Teva's customers, Teva concluded that it was best to give Mylan a certain account and updated a report designed "to determine who we want to keep and who we want to concede" to Mylan. Green and

Patel (Teva) then had calls to confirm the market allocation scheme with Nesta (Mylan) who spoke to each of them on separate calls, and with Berthold (Lupin), who spoke with Patel.

369.     The market allocation went as planned.  On May 15, 2013, less than an hour after receiving the notice of Mylan's price challenge from the agreed-upon account, Defendant Green sent an email in which he recommended conceding the account to Mylan based on "prior conversations."  Teva executive Kevin Galownia agreed "this is the customer we should concede on Fenofibrate."

370.     On May 16 and 17, 2013, Defendants Patel and Green had multiple followup calls with Defendants Nesta and Berthold during which they discussed the market allocation scheme for Fenofibrate.

*Zydus enters Fenofibrate*

371.     Defendant Green left Teva in November 2013 and took a position as an Associate Vice President of National Accounts at manufacturer Defendant Zydus.  Once at Zydus, Green took advantage of his relationships with his former Teva colleagues to collude with Teva and other competitors on several Teva/Zydus overlap drugs, including Fenofibrate.

372.     Between February 19 and February 24, 2014, Patel and Green spoke by phone at least 17 times so that Teva executives including Patel and Rekenthaler could settle on a post-launch strategy in coordination with Zydus.

373.     On or about March 7, 2014, Zydus entered the Fenofibrate market at WAC pricing that matched the price offered by Teva, Mylan, and Lupin.  In the days leading up to the launch, Defendants from all four competitors were in regular contact with each other to discuss pricing and allocation of market share to Zydus for several products, including Fenofibrate. Between March 3 and March 7, these competitors exchanged at least 26 calls with each other.

FILED WITH REDACTIONS – PUBLIC VERSION

374.     Zydus and Teva continued to discuss the market allocation scheme. A half an hour after the second of two calls with Kevin Green (Zydus) on March 17, 2014, Patel sent an email identifying Teva/Zydus overlap drugs that should be retained or conceded, including Fenofibrate. Later that same day, Patel called Green again. In the months that followed, Teva "strategically conceded" several customers to Zydus in accordance with the agreement they had reached.

375.     On March 24, 2014, Patel had a 14-minute call with Green. That same day, Patel sent internal e-mails directing that Teva concede two accounts to Zydus. She also spoke with Defendant Berthold (Lupin) to confirm the arrangement.

376.     On March 25, 2014, Zydus bid at another Teva customer and Patel emailed Rekenthaler: "Need to discuss […] we may not be aligned."  Patel then sent an internal email directing that Teva concede the account to Zydus, and Patel called both Green (Zydus) and Berthold (Lupin).

377.     On May 13, 2014, Zydus bid to supply Fenofibrate to Walgreens, which was Teva's customer.  The next day, on May 14, 2014, Patel explained in an email:

> If we concede, we will still be majority share, but only by a few share points.  On the other hand, if Zydus is seeking share, they're challenging the right supplier, but the size of the customer is large.  What are your thoughts on asking them to divide the volume 25% Zydus and 75% Teva?  This way, we've matched, retained majority and will hopefully have satisfied Zydus, and minimize them going elsewhere.

Patel's superiors approved the idea. On May 15, 2014, Patel she directed Teva employees to carry out the plan and confirmed "we will retain 75% of the award.  The remainder will go to Zydus.  Hopefully, this will satisfy their share targets."  Patel emphasized that we "need to be

responsible so that Zydus doesn't keep challenging Teva in the market."  Later that day, Green called Patel and they spoke for twenty minutes.

378.　　On June 10, 2014, a Teva Senior Analyst sent an internal email regarding a new request from a customer and wrote "We are going to concede this business to Zydus per upper management."  On the same email thread, Defendant Rekenthaler wrote that Teva would take the secondary position at the account in order to play fair with Zydus, and that Zydus was justified in seeking share because it was below its fair share. "Zydus has little market share on Fenofibrate that I can tell and they'll continue to chip away at us until they get what they are looking for." The customer— distributor Anda, which was wholly-owned by Defendant Actavis at the time and is now wholly-owned by Teva—was fully aware that Teva was conceding its business to Zydus because Zydus was a new entrant.   The next day, June 11, 2014, Green called Rekenthaler. Later in the day, Patel had a call with Green.

379.　　When Defendant Dr. Reddy's launched Fenofibrate in spring 2014., Mylan ceded share to Dr. Reddy's.  By June 10, 2014, Mylan had communicated to Defendant Cardinal that it would not let go any more Fenofibrate business to Dr. Reddy's, and Cardinal had informed Dr. Reddy's that it needed to be "done" taking share from Mylan.


- **Clonidine (Teva, Mylan, Actavis)**

380.　　Clonidine-TTS Patch—also known by the brand name Catapres-TTS —is a medication in the form of a transdermal patch that is used to treat high blood pressure.

381.　　As of September 2011, Mylan and Teva were at rough parity in the market for generic Clonidine-TTS, with Mylan at 48.4% market share and Teva at 44.4%.  But, by February 2012, Teva had taken more than its "fair share," in part because Teva believed that Mylan was

experiencing a long-term supply problem and had therefore agreed to replace Mylan as a primary supplier to Cardinal. This would have been acceptable under the fair share rules, but in fact Mylan's supply problem was only temporary, and so Mylan felt Teva was cheating by taking Mylan's business during a moment of vulnerability.

382.    In February 2012 Defendant Rekenthaler spoke with B.P., a senior national accounts executive at Mylan, and reported back that Teva should "tread carefully." Rekenthaler was concerned that Mylan had the right to retaliate against Teva for taking more than its "fair share" without consulting with Mylan.  (Having taken the former Mylan accounts, Teva had around 65%-70% market share for Clonidine-TTS).

383.    To gain back some market share, Mylan challenged Teva's Clonidine-TTS business at McKesson.  According to internal emails, in order to de-escalate the situation, Teva "conceded the McKesson business to Mylan." Mylan then took Teva's business at CVS in order to punish Teva for having taken the Cardinal account in violation of the fair share rules.

384.    On September 28, 2012 Mylan issued a temporary discontinuation notice for Clonidine-TTS. This was no news to Teva, which had already learned of Mylan's upcoming supply problems directly from Nesta (Mylan) during calls with Defendant Kevin Green (Teva) in mid-July 2012 (in internal Teva emails, the source of the information was disguised by attributing it to "market rumor").

385.    Mylan's exit from the Clonidine-TTS market presented an opportunity to raise prices and collusively reallocate the market at the inflated prices when Mylan fully reentered the market.  For example, in April 2012, Teva's direct invoice price to CVS for 0.3mg Clonidine had been $54.41. Mylan's retaliation against Teva dropped the price to $26.51. But when Mylan then

FILED WITH REDACTIONS – PUBLIC VERSION

ceded the entire Clonidine market to Teva in October 2012, Teva was able to raise the price to $80.76.

386.     Around February 2013, Mylan relaunched Clonidine-TTS and began seeking market share.  In an admission of Teva's willingness to help Mylan regain market share without competition, Defendant Rekenthaler acknowledged in a February 28, 2013 internal email that Teva was "trying to concede the Clonidine business at CVS" to Mylan.

387.     To carry out their scheme to allocate the Clonidine-TTS market without eroding price, representatives of Teva and Mylan remained in regular contact. In February and March 2013 alone, Teva and Mylan representatives called each other at least 33 different times. In March and April 2013, Teva's intentionally gave several major accounts back to Mylan.  In a successful effort to allocate the market without eroding price, Mylan also made a bid to CVS that was deliberately non-competitive, thereby allowing Teva to maintain artificially higher prices at CVS.

388.     By April 2013 Teva had "conceded all customers [it] plan[ned] on conceding." Having successfully allocated the market, Mylan and Teva next conspired to raise prices of Clonidine-TTS. On April 8, 2013 a marketing manager at Teva reported internally to his Teva colleagues that Mylan had agreed to raise prices: "Based on a discussion with Kevin Green, Mylan would follow a price increase." Defendant Green knew that Mylan would follow a price increase on Clonidine-TTS because earlier that day he had had two phone calls with Defendant Nesta (Mylan). On a followup call the next day Green and Nesta reconfirmed the agreement that Mylan would follow a Teva price increase on Clonidine-TTS. Despite misunderstandings and tension between Mylan and Teva, the conspirators were able to re-establish fair share.

FILED WITH REDACTIONS – PUBLIC VERSION

*Actavis enters Clonidine-TTS*

389.     On May 6, 2014, Actavis was granted approval to market Clonidine-TTS.  Teva and Actavis immediately commenced an extensive negotiation over price and market share.  Dave Rekenthaler (Teva) and Marc Falkin (Actavis) spoke by phone three times that day.

390.     On May 7, 2014, Rekenthaler announced to his colleagues that Actavis was entering the market.  Teva's Senior Director of Marketing then requested that Nisha Patel come up with a recommendation as to which customers Teva should concede to Actavis.

391.     On the morning of May 8, Rekenthaler (Teva) had calls with Falkin (Actavis) and Patel (Teva) had calls with Rogerson (Actavis). At 10:02 am Patel informed Teva of the results of her agreement with Actavis: "Please concede Ahold and HEB" (two supermarket pharmacy accounts).

392.     On May 9, 2014, Patel called Rogerson three times and they discussed market share allocation.  Following those conversations, Patel informed her Teva colleagues that Actavis wanted 25% of the market and would likely want 10%-15% of that share from Teva.  Rogerson and Patel had also discussed pricing for Clonidine, and Patel had encouraged Actavis to raise its price and Actavis agreed. Actavis rescinded its earlier offers and, according to internal Teva emails "resent all of their offer letters at pricing that is higher than our [Teva's] current."

393.     Rekenthaler described to his colleagues the agreement he was willing to strike with Actavis over market share, saying: "I'm okay with adjusting 15% but we're not going to play any games with them.  They take the 15% and I don't want to hear about this product again." Teva's senior sales executive cautioned him on the importance of maintaining a cooperative stance towards this competitor, saying:

**FILED WITH REDACTIONS – PUBLIC VERSION**

> now, now Mr. Rekenthaler play nice in the sand box …. If history
> repeats itself activist [sic] is going to be responsible in the
> market…."

394.    Over next two weeks, following the rules of the overarching conspiracy, Teva
continued to concede accounts to newcomer Actavis in order to apportion Actavis its fair share of
the market for Clonidine-TTS.  On May 14, 2014, for example, Patel told colleagues that Teva
must be "responsible" and concede a particular wholesaler's account to Actavis.  On May 17,
2014, Teva conceded a large retailer account to Actavis.  On May 20, 2014, Patel again declined
to bid at another customer due to the new entrant Actavis, stating: "We are trying to be
responsible with share and price."

- **Levonorgestrel-Ethinylestradiol  (Teva, Sandoz)**

395.    Ethinylestradiol-Levonorgestrel is a combination birth control drug (a single pill
containing both Ethinylestradiol and Levonorgestrel molecules). During the relevant time period,
both Teva and Sandoz marketed Ethinylestradiol-Levonorgestrel under multiple names including
both Portia and Jolessa.

396.    In May 2012, Teva had a much higher market share than Sandoz for both Portia
and Jolessa.  Teva's market share for Portia was 37% compared to Sandoz's 17%, while Teva's
market share for Jolessa was 43% compared to Sandoz's 11%.

397.    On May 11, 2012, a customer (Walmart) told Teva that another manufacturer had
made an offer to supply Portia and Jolessa.  A senior sales executive at Teva asked "We really
need to know who is challenging.  Sandoz??? Glenmark???"  Walmart answered that it was
Sandoz. The executive was reluctant to let Sandoz have the business and told Walmart "we have
conceded a number of accounts to Sandoz that were not as strategic to Teva."

**FILED WITH REDACTIONS – PUBLIC VERSION**

398.     Teva sent Walmart a response offer on May 16, 2012 and an even more competitive offer on May 18, but Teva abruptly backtracked on May 23, 2012 and removed Portia and Jolessa from the offer.  The night before this change in plans, Defendant Green (then at Teva) had spoken on the phone with cooperating witness SDZ-CW-2 (then at Sandoz) and had agreed to withdraw the offer for Portia and Jolessa.  The decision to concede the Walmart business to Sandoz led to a more equal share split between the companies for both Portia and Jolessa.  Teva discussed the decision internally and explained that the reason for the "change in plans" was that Teva was "going to concede this business to Sandoz."

399.     A year later, Sandoz continued to coordinate with Teva to achieve its "fair share" of the markets for both Portia and Jolessa.  On July 9, 2013, SDZ-CW-1 (Sandoz) called Patel and they spoke for sixteen minutes. Sandoz was going to bid on a certain Teva customer. The next day, Rekenthaler asked Patel via email "Who's over at Sandoz now?"  Patel did not respond by e-mail, but due to the close proximity of their offices she likely related her conversation with SDZ-CW-1 directly to Rekenthaler.

400.     Rekenthaler and SDZ-CW-2 (Sandoz) had two phone conversations that afternoon, and a third at 4:48 pm. Later that same evening, as a result of the communications between Rekenthaler and SDZ-CW-2, Teva submitted an intentionally inflated bid for Portia and Jolessa in order to ensure that Sandoz obtained the primary award with the customer.

- **Valsartan-HCTZ (Sandoz, Mylan)**

401.     In fall 2012, Defendants Sandoz and Mylan expected that for the first 180 days after September 21 they would have 180 days of exclusivity as the only competitors for Valsartan-HCTZ.  In the days leading up to the launch of Valsartan-HCTZ, SDZ-CW-4 and

Defendant Jim Nesta (Mylan) spoke at least twenty-one (21) times by phone during which they discussed, among other things, establishing a 50% / 50% market share split for this product.

402.     During this time, SDZ-CW-4 also kept Defendant Armando Kellum (her supervisor at Sandoz) regularly informed of her discussions with Nesta and met with Kellum in person to discuss her customer accounts, including a meeting on September 14, 2012.

403.     On the day of the launch, September 2012 Mylan issued a press release announcing that it had received final FDA approval to market generic Valsartan-HCTZ.  In an internal series of e-mails reacting to this news, a Sandoz employee remarked: "Fyi, good news, Mylan has 180 days as expected."  H.F., a senior-most executive of Sandoz Germany responded, "sometimes a little help from our competition is welcome as well."  D.D., a senior-most executive of Sandoz North America, replied "I guess this is what they call 'co-opetition.'"

404.     On November 16, 2012, Sandoz executives met to discuss sales for Valsartan-HCTZ.  A then-Sandoz executive who is now an Executive Vice President at Defendant ABC sent an internal e-mail in advance of the meeting asking "Are there opportunities with non-Sandoz customers that we should evaluate?"  After a colleague responded with a list of potential Mylan customers, Kellum responded, "I'm concerned we are going to disrupt the market.  I understand the need for additional sales but we need to be thoughtful here."  The then-Sandoz, now-ABC executive directed the Sandoz team "Do not approach new customers, with[out] me or Armando [Kellum]'s consent."

**FILED WITH REDACTIONS – PUBLIC VERSION**

- **Dexmethylphenidate ER (Teva, Sandoz, Par)**

405.    Dexmethylphenidate HCL Extended Release ("Dexmeth ER") is a generic version of the drug Focalin, and it is used to treat attention deficit hyperactivity disorder (ADHD).

406.    As Sandoz was preparing to enter the market on the 40mg strength of Dexmeth ER in February 2014, Nisha Patel (Teva) spoke frequently with SDZ-CW-1 about how to divide the market so that Sandoz could obtain its fair share without significantly eroding the price.

407.    In January 2014, Par gave up an account to Sandoz in order to keep the market share even. Notes by a Par sales and marketing executive confirm that Par also ceded ABC and had "let it go because Sandoz needed market share."

408.    On February 10, 2014, SDZ-CW-1 began internal preparations to pursue the Rite Aid account for Dexmeth ER 40mg and had a thirteen-minute call with Patel.  On February 18, 2014 Patel left a voicemail for SDZ-CW-1.  That same day, Teva conceded the Rite Aid account to Sandoz, in accordance with the agreement.  Patel and SDZ-CW-1 then spoke again by phone on February 20, 2014.

409.    Patel spoke with SDZ-CW-1 on February 10 and again on February 12, 2014, and agreed to let Sandoz have the ABC portion of the WBAD business for the 40mg strength of Dexmeth ER so long as Teva could keep the Walgreens portion.  In an e-mail to her team on February 12, Patel summarized the understanding that Teva had reached with Sandoz:

> We have 100% of the market, so will have to give someone up. ABC is the smallest wholesaler, so it makes sense for this class of trade. Sandoz is being responsible with their pricing. We should be responsible with our share. Plus, between the WBAD members, makes more sense to hold onto Walgreens than ABC, if we are going to lose one of them.

One of the Teva national account managers on the e-mail thread responded that the approach "makes total sense."

410.     On February 14, 2014, Teva also refused to lower its price for Dexmeth ER when approached by another customer, Anda, even though Sandoz's price was not significantly lower than Teva's—essentially  conceding the business to Sandoz.   (At the time, distributor Anda was owned by Defendant Actavis, although it was purchased by Defendant Teva in 2016).

411.     Throughout this time period, Sandoz abided by fair share principles and its ongoing understanding with Teva.  In February 2014, Sandoz's target market share for varying strengths of Dexmeth ER varied by how many manufacturers were in the market.

412.     Teva and Sandoz were not alone in allocating customers for certain dosage forms of Dexmeth ER.  The agreement was also carried out by other manufacturers allowing Sandoz to take share from them.  In February 2014, for example, as Sandoz was seeking share on the 15mg dosage strength of Dexmeth ER, Par "gave up the business to keep the market share even."  David Rekenthaler of Teva spoke to M.B., a senior national account executive at Par, right around the same time that Patel had been speaking to SDZ-CW-1—including two calls on February 10, two calls on February 19, and calls on February 24 and 25, 2014—in order to effectuate the scheme.

413.     The market allocation scheme between Teva and Sandoz on Dexmeth ER continued through at least mid-2015.  On May 6, 2015, for example, Teva declined to submit a bid to Walgreens for Dexmeth ER 5mg on the basis that "there is equal share in the market between competitors."  Similarly, on June 30, 2015, Sandoz declined to put in a bid to Managed Health Care Associates, a large GPO, on Dexmeth ER 20mg, on the basis that Sandoz already had 57% market share – greater than its sole competitor on this dosage strength, Teva.  When a Sandoz national account representative communicated this decision to the customer, he lied and explained that the decision not to bid was based on limited supply.

FILED WITH REDACTIONS – PUBLIC VERSION

- **Lamivudine-Zidovudine a/k/a Combivir (Teva, Lupin, Aurobindo)**

414.    Lamivudine-Zidovudine (brand name: Combivir) is a combination drug used to help control the HIV virus, ideally suppressing or delaying the onset of AIDS. Although the Defendants typically refer to drugs by generic names, they consistently call this drug Combivir.

415.    In April 2012, Teva, the incumbent, communicated with new entrants Lupin and Aurobindo about how to allocate the market for Combivir.

416.    On April 24, 2012, over e-mail, Teva Senior Director Teri Coward asked "what r you guys hearing on generic combivir" and David Rekenthaler immediately wrote back that he knew Aurobindo was entering soon because "our good friend" had told him. Rekenthaler did not want to specify the source of his information because it was Aurobindo CEO Bob Cunard, who was indeed their friend and former colleague (he had been at Teva as Vice President of Sales until October 2011).  That same day, Teva's Kevin Green called and spoke to Jim Grauso (Aurobindo) and David Berthold (Lupin) and reported specific information regarding Lupin's confidential future plans for bidding.

417.    In the days before the Lupin and Aurobindo launches, communications among all three competitors accelerated. Over the four-day period from May 7-10, 2012, Berthold (Lupin), Green (Teva) and Grauso (Aurobindo) spoke at least 32 times. On multiple occasions, a call between two competitors was followed by a call to the third. During this four-day period, the Lupin, Aurobindo and Teva individuals negotiated and discussed the specific customers Teva would concede or retain in order to make room for Lupin and Aurobindo while preventing price competition. A Teva internal email shows the results of the decisions to retain or concede accounts to Lupin and Aurobindo in accordance with the fair share agreement.

418.    On May 9, 2012, Teva's Teri Coward was directed to provide a sham bid to a major customer (She was told to "send them a proposal that will not work").  On May 11, 2012,

**FILED WITH REDACTIONS – PUBLIC VERSION**

when preparing that bid, she pushed back. "Can we send something that at least looks like we are trying?"  But Kevin Galownia replied that Teva could not go any lower or else they might risk actually winning the business. "We really need to concede this business with the accounts we have kept." He added that Teva would concede another major customer "in order to preserve market pricing as much as possible." He pointed out that such a move would give Teva its fair share as the first entrant. "40-45% market share in a three player market."  Teri Coward then informed ████████ (Cardinal) that Teva would not compete for its business because "we need to concede some share." Lupin was able to enter the market for generic Combivir and obtain more than a 30% market share without significantly eroding the price due to the understanding with Teva and Aurobindo that each was entitled to its fair share of the market.

- **Irbesartan (Teva, Lupin)**

419.    Irbesartan is a drug used in the treatment of hypertension.  It prevents the narrowing of blood vessels, thus lowering the patient's blood pressure.  Irbesartan is also known by the brand name Avapro.

420.    Teva received approval to manufacture generic Irbesartan in March 2012. At 11:27am on March 6, 2012, an account manager at Teva wrote to the Teva sales team "Lupin is promising offers today."  Less than twenty minutes later, Kevin Green (still at Teva at the time) called Berthold (Lupin), they talked for seventeen minutes, and then Green e-mailed his colleagues:

> Lupin is looking for 15% share. They already have ABC. Confirmed Zydus is out.

That afternoon, David Rekenthaler informed the Teva team that he still had not received "a call from any other manufacturer on Irbesartan." A senior commercial operations executive at Teva replied "Then work harder … "

421.     At 10:54am the next day, March 7, 2012, Green called Berthold again. By 12:20pm, Teva circulated to its sales team competitively sensitive information Green had obtained from Berthold.  Included were the details about which competitors were launching/not launching the drug, and the identity of the customers that had received offers.  Based on those details and the conversations between Green and Berthold, Teva calculated it could take about 40% share if Lupin was only looking for 15%.

- **Drospirenone-Ethinylestradiol (Teva, Lupin, Actavis)**

422.     Drospirenone and Ethinylestradiol, commonly known by the brand name Ocella, is a pair of drugs used in combination as an oral contraceptive.  Other names are Yaz, Yasmin and Gianvi.

423.     By April 2013, Lupin began coordinating with competitors for a summer 2013 entry into the market. On April 24 and 25, 2013, David Berthold (Lupin) called Kevin Green (Teva) to initiate negotiations on how the competitors would allocate fair share.

424.     By April 30, Defendant Actavis had joined the fair share negotiations. A senior sales and marketing executive at Actavis had multiple calls with Teva's David Rekenthaler and Nisha Patel.

425.     On May 8, 2013, Teva learned that Actavis had bid to take over a current Teva account for generic Ocella. In response, in order to reach a deal with other manufacturers that would give each its fair share, Nisha Patel called Richard Rogerson (Actavis). The following day, May 9, 2013, Patel received an internal report that described the specifics involved in Teva's

concession of major Ocella customers to Actavis and/or Lupin.  That afternoon, with the analysis in hand, Patel had three calls with Berthold and one with Rogerson. On May 14, 2013, Kevin Galownia recommended that Teva concede the business to Actavis.  Rekenthaler replied "Agreed."

426.    Collusive communications between competitors continued after Lupin's summer 2013 Ocella launch.  On July 10, 2013, Green spoke to Berthold twice. After the first of those calls, Green wrote "Lupin is entering the market" and requested "the normal profitability analysis on all customers with pricing and market share." Later that day, Green and Patel discussed the scheme and the two decided that Patel would call Berthold back to confirm the agreement between Teva and Lupin. Patel did so.

427.    Berthold and Patel spoke again first thing the next morning. Then, Patel e-mailed Green, saying: "BTW, Ocella. Check!"  Green, confused by the e-mail, responded:  "Huh... you are calling....correct?"  Patel meant that she had already contacted Berthold regarding the drug. "Yes.  I was saying it's all done."

428.    The lines of communication between Teva and Lupin remained open and active over the next few months as they worked out the details of their customer allocation agreement. On September 5, 2013, for example, Rekenthaler told a colleague about his knowledge of Green's discussions with Berthold regarding Lupin's desired market share.  Green spoke to Berthold by phone twice the following day to confirm the understanding between the Teva and Lupin.  Four days later, a Teva Senior Director recommended "we will likely need to give up" portions of certain accounts "to this new market entrant," meaning Lupin.

429.    In mid-October 2013, as Teva and Lupin finalized the allocation of accounts between them, the same Teva Senior Director told a colleague to be careful before conceding large

- 135 -

customers on a "bucket basis" rather than drug-by-drug in order to "make sure we are not giving up volume on products where we do not have our fair share."

- **Norethindrone-Ethinylestradiol (Teva, Lupin)**

430.    Norethindrone-Ethinylestradiol, also known by the brand name Ovcon35, is a combination of medications used as an oral contraceptive.  Teva markets its generic version of this combination medication under the name Balziva.

431.    On January 23, 2014, a customer informed Teva that a new market entrant was seeking a share of its business.  Teva employees surmised that the entrant was Lupin and discussed internally how to make room for this new player in the market. The next day, January 24, 2014, Defendant Nisha Patel (Teva) spoke to Defendant David Berthold (Lupin) twice by phone.

432.    Five days later, on January 29, 2014, based on her calls with Lupin, Patel informed Rekenthaler of her recommendation that Teva take a cooperative stance towards Lupin. "Kevin [Green] and I are in agreement that we should concede part of the business to be responsible in the market."

433.    On February 4, 2014 Patel received the profitability analysis she requested in order to determine how much of the customer's business to hand over to Lupin.  That same day, she spoke to Berthold two more times to further coordinate Lupin's seamless entry into the market.

- **Oxaprozin (Teva, Greenstone, Dr. Reddy's)**

434.    Oxaprozin, also known by the brand name Daypro, is a nonsteroidal anti-inflammatory drug (NSAID). It is used to treat rheumatoid osteoarthritis, and juvenile rheumatoid arthritis.

**FILED WITH REDACTIONS – PUBLIC VERSION**

435.     In early 2013, Teva was in the market and Greenstone wanted in, so Defendants Kevin Green (Teva) and Robin Hatosy (Greenstone) had multiple calls during which Teva agreed to concede specific customers to Greenstone in order to avoid competition and price erosion resulting from Greenstone's entry. Greenstone entered the market for Oxaprozin 600mg tablets on March 27, 2013 with the exact same WAC pricing as Teva.

436.     Part of the Oxaprozin arrangement between these manufacturers was that Teva would give up least two large customers, CVS and Cardinal, and in exchange Teva would keep Walmart. On March 27, 2013, however, Teva learned that Greenstone had either misunderstood the deal or was trying to cheat on the agreement by approaching Walmart. Teva's internal emails show that Teva was displeased because Teva had "just conceded at cardinal" and according to the agreement, Greenstone "should not have gone to Walmart. Poor strategy on their part for sure." The Teva emails make clear that there was a discussion and an understanding between Teva and Greenstone: "I thought they said they were done after cardainl..I am pissed" That same day, Green called Hatosy but she did not answer.

437.     Green called Hatosy again the next morning, and Hatosy relayed the message from Teva to her boss Defendant Jill Nailor, in a series of calls and texts. During those conversations, Greenstone agreed to withdraw the offer to Walmart and to honor the agreement with Teva. By 1:22 pm, Greenstone had withdrawn its offer and told Walmart that it was because it had "met [its] market share."

438.     Because of the agreement between Greenstone and Teva, there was minimal price erosion as a result of Greenstone's entry.

439.     A couple of months later, as Defendant Dr. Reddy's was preparing to enter the market for Oxaprozin, a Dr. Reddy's representative commented positively that "[p]ricing [is] still

high" on Oxaprozin. That individual had also talked to wholesaler Cardinal about the drug, and conveyed that "Cardinal switched to Greenstone. Teva was 'fine' with it!"

440.    On June 13, 2013, the Dr. Reddy's sales force met for an "Oxaprozin Launch Targets Discussion" to "discuss launch targets based on the market intelligence gained by the sales team." On June 27, 2013 Dr. Reddy's re-launched Oxaprozin with the same WAC price as Teva.  At the time, Teva had 60% market share.  Dr. Reddy's almost immediately got the Oxaprozin business at two customers, Keysource and Premier.

441.    Eager to obtain a large customer, Dr. Reddy's turned its sights to Walgreens. At a July 1, 2013 sales and marketing meeting, Dr. Reddy's discussed "asking to see if Teva would walk away from the business" at Walgreens.

442.    On or around July 14, 2013, Walgreens informed Kevin Green, then a National Account Director at Teva, that Dr. Reddy's had made an unsolicited bid for the Oxaprozin business, at a price of roughly half of Teva's current price.  While the Dr. Reddy's offer to Walgreens was still pending—on July 23, 2013—an individual at Dr. Reddy's called Green.  That phone call was the only call between the two individuals in their collected phone records. Two days later, Green wrote:

> If we give D[r. Reddy's] this business, they may be satisfied.  I will see if I can find this out.

443.    On July 29, 2013, on Teva internal email, Kevin Galownia suggested keeping Walgreens but conceding Teva's next largest customer for Oxaprozin—Econdisc—to Dr. Reddy's.  David Rekenthaler immediately asked Nisha Patel to "look at our business on Oxaprozin in order to accommodate Dr. Reddy's entry." At 12:33pm that day, a request was made for an Oxaprozin profitability and market share report (it was typical at Teva to run this type of report before negotiating market share with a competitor), and by 2:20 the report was

**FILED WITH REDACTIONS – PUBLIC VERSION**

complete.  Within the hour, with the report in hand, Rekenthaler placed a call to a Senior Director of National Accounts at Dr. Reddy's.  The call lasted two minutes, and was their only telephone conversation in 2013.

444.     After the conversation with the Reddy's Senior Director, Teva kept the Walgreens business but gave up the Econdisc business to Dr. Reddy's on August 7, 2013.  Kevin Green listed "Strategic Market Conditions" in Teva's Delphi database as the reason for conceding the business to Dr. Reddy's.   By September 10, 2013, in coordination with Teva, Dr. Reddy's had achieved its goal of obtaining 20% share of the Oxaprozin market.


- **Tolterodine tartrate (Teva, Greenstone)**

445.     Tolterodine tartrate, also known by the brand name Detrol, is an antispasmodic drug used to treat overactive bladder by improving the ability to control urination.

446.     On January 23, 2014 Greenstone entered the market for Tolterodine tartrate 1mg and 2mg tablets with the exact same WAC prices as Teva for all formulations. In the days leading up to Greenstone's entry, Defendants Robin Hatosy and Jill Nailor (Greenstone) had called and texted frequently with Defendants Nisha Patel and David Rekenthaler (Teva) to coordinate Greenstone's entry into the market. During these calls and via text message, Teva and Greenstone agreed that Teva would concede business to Greenstone in order to avoid significant price erosion in the market.

447.     The day after Greenstone's entry, Patel circulated an email to the Teva national account managers that stressed the importance of determining which competitors had made price challenges for certain business. The identity of the competitor was key because the primary criterion for the decision to concede accounts was fair share, not profitability.

448.    On January 28, 2014, Teva learned of a price challenge on Tolterodine at CVS. Internal Teva emails asked "do we know who this could be?" and David Rekenthaler responded "It's Greenstone, new to market. We can discuss." His Teva colleagues understood the message as an implicit signal that he had insider info from Greenstone and that he wanted to keep the discussion offline.

449.    On February 3, 2014, Nisha Patel instructed a colleague at Teva to concede the business at CVS by providing a small price reduction that she knew would not be sufficient to retain the business.  The account manager who managed the relationship with CVS challenged the decision to concede the business.  Rekenthaler emailed again in an attempt to keep the discussion offline:

> I'll discuss the details of this with you later. There was a strategy here and you weren't in the office Thursday or Friday so we proceeded. Again, it will make sense after I discuss with you.

The next day, February 4, 2014, Patel confirmed the market share allocation agreement between Teva and Greenstone in a sixteen-minute phone call with Hatosy.

- **Piroxicam (Teva, Greenstone)**

450.    Generic Piroxicam, (brand name: Feldene) is a nonsteroidal anti-inflammatory drug used to treat arthritis. Patients who cannot afford Piroxicam suffer from joint pain and limited mobility.

451.    On the morning of March 5, 2014, one of Nisha Patel's subordinates at Teva, a Manager of Customer Marketing, emailed to tell her that Greenstone had just received Piroxicam approval and was challenging Teva on several accounts. He asked her: "Do we have any strategy in place for Piroxicam?" Before responding to that e-mail, Patel sought to negotiate strategy with

Greenstone. Patel called Defendant Robin Hatosy (Greenstone) at 10:55am and they spoke

briefly. Shortly after that call, Patel called Hatosy's boss at Greenstone, Defendant Jill Nailor.

452.    Nisha Patel and Jill Nailor spoke again at 2:14pm that afternoon and then Patel

responded to the email about Teva's strategy for Piroxicam capsules:

> We will need to concede, but either way, will need to understand
> the value involved. This will help us determine the share we want
> to retain v. concede and in order of customers. Please create the
> concede analysis and customer profitability analysis.

During these negotiations with competitors regarding market entry, it was typical for Teva

employees to request a "customer profitability and share analysis" (as Patel did here) so they

could easily determine which customers to concede when talking to competitors about dividing

the market.

453.    The next day, March 6, 2014, Teva had completed the "concede analysis" and so

Patel had multiple calls with Hatosy and Nailor to discuss their plans to divvy up the market for

Piroxicam tablets between Teva and Greenstone. After those calls, Patel sent an internal email

identifying specific customers that Teva would concede to Greenstone.

454.    Whether Teva would concede CVS to Greenstone was left undecided on the calls,

so Greenstone made a Piroxicam offer to CVS. Teva refused to concede CVS because it

represented a large portion of Teva's Piroxicam sales, but on the same afternoon that Teva was

notified of the challenge, Patel called Hatosy. Teva then retained the CVS account but conceded

other customers (representing less market share) to Greenstone throughout March and April. For

example, on March 25, 2014, Teva determined that it still had more than its fair share of the

market and gave up another account to Greenstone.  Defendant Patel agreed with this decision to

concede on April 1, 2014.

- 141 -

- **Dextroamphetamine-Amphetamine ER (Adderall XR)**

455.     Dextroamphetamine-Amphetamine Extended Release, (brand name: Adderall XR) is a combination of dextroamphetamine salts and levoamphetamine salts used in the treatment of attention deficit hyperactivity disorder (ADHD) and is sometimes referred to as "Mixed Amphetamine Salts ER" or "MAS-XR."

456.     On June 22, 2012, Actavis obtained FDA approval to manufacture various formulations of MAS-XR.  At 9:58 pm that night, Defendant Rekenthaler instructed Teva employees to find out Actavis's plans. By 8:32 am the following morning, Teva had spoken to a senior Actavis sales and marketing executive, and reported back that Actavis wanted approximately 15% share and would seek the business of only "1 wholesaler (either McKesson or Cardinal)" and would not compete for business at Walgreens or CVS.

457.     One year later, a Teva customer requested a price reduction for MAS-XR, citing Actavis's desire to gain a share of the customer's business for the drug. On May 7, 2013, Teri Coward informed the customer that Teva would revise the price in order to retain 100% of the customer's business.  She made it clear that Teva had already conceded an appropriate amount of business to its competitor Actavis. She wrote to the customer, with some typos and autocorrects:

> . . . we have plenty of supply and want to keep you full business we have already let other customers go to activis go to help the market dynamites.

- **Dextroamphetamine sulfate ER (Teva, Actavis)**

458.     Dextroamphetamine sulfate Extended Release, also known by the brand name Dexedrine and sometimes referred to as "Dex Sulfate XR," is a medication used to stimulate the central nervous system in the treatment of hyperactivity and impulse control.

**FILED WITH REDACTIONS – PUBLIC VERSION**

459.     On June 19, 2014, as Actavis was entering the market for Dex Sulfate XR, Teva's
Nisha Patel asked David Rekenthaler what share of the market Actavis was targeting.
Rekenthaler responded: "20-25%."  Rekenthaler knew Actavis's market share goals because he
and Defendant Marc Falkin (Actavis) had spoken twice by phone that morning.

460.     Five days later, on June 24, 2014, a Teva employee wrote on internal email that
Actavis had entered the market for Dex Sulfate XR. She remarked that Teva had a 72.2% share of
this "multi-player market" and thus recommended giving up a large customer to Actavis and
reducing Teva's market share to 58.3%. Later internal e-mails confirmed Teva's decision to
concede that customer to Actavis because "Actavis is entering the market and seeking share."

- **Budesonide inhalation (Teva, Actavis)**

461.     Budesonide inhalation, also known by the brand name Pulmicort Respules, is an
anti-inflammatory steroid, administered through inhalers or similar devices, used to prevent and
alleviate asthma attacks.

462.     Teva obtained approval to market Budesonide inhalation in November 2008. Prior
to February 2015, Teva controlled virtually the entire market for generic Budesonide Inhalation,
with other competitors having less than 1% market share.

463.     On February 13, 2015, David Rekenthaler informed other Teva employees that
"[i]t appears that Actavis is intending on shipping" Budesonide inhalation. Rekenthaler had
spoken with Marc Falkin (Actavis) by phone three days earlier, on February 10, 2015.

464.     On February 16, 2015, Rekenthaler and Falkin had a twenty-three-minute phone
conversation. The following morning, Teva's Teri Coward confirmed that she had conceded the
Budesonide inhalation accounts of two major customers to Actavis.  She explained that Actavis's
sense of urgency to obtain the accounts was due to concerns about getting its product into market

- 143 -

before it faced legal action from the brand.  Thus, she explained, she was working with the customers on an "exit strategy" to get Teva's product out of the supply channel, so as to streamline Actavis's entry into the market.

- **Omega-3-Acid Ethyl Esters (Teva, Par)**

465.     Omega-3-Acid Ethyl Esters, also known by the brand name Lovaza, is a lipid-regulating agent used to lower levels of triglycerides in the blood.

466.     On the morning of June 26, 2014, Nisha Patel reported that Par had recently received FDA approval for Omega-3-Acid Ethyl Esters. She sent a LinkedIn direct message with her personal number to a senior executive at Par. The executive texted Patel on her cell phone later that day, and they texted throughout the afternoon and evening.

467.     The next morning, June 27, the Friday before Par's launch of the drug, T.P. (Par) called Patel and they spoke for nearly thirty minutes. That was the first and only voice call ever between the two, according to the phone records.  That same morning, Patel informed a Teva colleague that she now had "some more color" on Par's launch of Omega-3-Acid Ethyl Esters and would "fill you in when we speak."  After the discussions between Patel and T.P. (Par), Teva proceeded to concede business to Par to ensure Par's smooth entry into the market.

468.     As new competitors entered the market, Teva coordinated with them to avoid competition and keep prices high.  For example, in an internal e-mail on October 2, 2014, Teva's Kevin Galownia stated that "[w]e heard that Apotex may be launching with limited supply and at a high price."  David Rekenthaler had obtained this information through phone calls with a senior sales executive at Apotex, on September 25 and 27, 2014.

469.     On December 1, 2014, Teva was notified by a customer that it had received a price challenge on Omega-3-Acid Ethyl Esters.  Others at Teva speculated that the challenge was

- 144 -

**FILED WITH REDACTIONS – PUBLIC VERSION**

from Apotex, but Rekenthaler already knew better. "I'm confident it's Par."  Rekenthaler directed

that Teva would not reduce its price and would thus concede the business to Par.

470.     By mid-February 2015, Teva had conceded several large customers to Par to

smooth Par's entry into the market and maintain high pricing.  During this time, Rekenthaler

spoke frequently with a senior national account executive at Par.

471.     By April 2015, Apotex had officially entered the market, and consistent with the

"fair share" understanding, Teva continued to give up share. By April 25, Teva's share of the

total generic market (new prescriptions and refills) for Omega-3-Acid Ethyl Esters had dropped to

66.8%.  Rekenthaler spoke frequently with J.H. (an Apotex senior executive) to accommodate

Apotex's entry.

- **Entecavir (Teva, Par)**

472.     Entecavir, also known by the brand name Baraclude, is a medication used to treat

chronic Hepatitis B infections.

473.     On August 28, 2014, David Rekenthaler informed Teva sales employees that

Teva had received approval on Entecavir and would circulate offers later that day or the next day.

Rekenthaler noted: "[w]e are looking for at least a 60[%] share.  Known competition is Par with

an [authorized generic]."  Rekenthaler also noted that Teva would be pricing as if they were

"exclusive"—i.e., higher than typical in a two-player market—and expressed concern that

customers might react negatively to the launch of this drug "because of our recent price increase

[on other drugs]."

474.     The same day, August 28, 2014, Rekenthaler had three phone calls with M.B., a

senior national account executive at Par. They spoke again twice the next day.

**FILED WITH REDACTIONS – PUBLIC VERSION**

475.     In internal discussions over a customer request for lower pricing due to Par's entry, Rekenthaler replied that Teva would remain firm on the price and noted that he was "doubtful PAR will be much lower." Despite Teva's refusal to lower its price, that customer signed an agreement with Teva to purchase Entecavir.

476.     Teva and Par both launched their respective Entecavir products on September 4, 2014. Within days of its launch, Teva had captured 80% of the market for new generic prescriptions and 90.9% of the total generic market (new prescriptions and refills). Within a few weeks, however, Teva's share of the market was much more in line with "fair share" principles— 52.6% for new generic prescriptions, and 47% of the total generic market (new prescriptions and refills).

477.     On October 9, 2014, another customer, who had already received a discount on Entecavir, asked for an additional discount to "help close the gap with current market prices." Teva declined to provide a discount, citing that the "pricing is competitive and in line with the market." Rekenthaler had spoken to M.B. (Par) twice on October 2, 2014 to confirm Par's prices.

●     **Budesonide DR (Teva, Par, Mylan)**

478.     Budesonide DR is used to treat symptoms caused by Crohn's disease and ulcers.

479.     Shortly before Teva received approval to market Budesonide DR, Par decided to increase the price of the drug. On April 1, 2014, M.B. (Par) called David Rekenthaler (Teva) and they spoke for twenty-six minutes. The next day, April 2, 2014—the same day that Teva received FDA approval to market Budesonide DR—Par increased its price for Budesonide DR by over 15%.

480.     To coordinate the price increases and Teva's entry, Par communicated with Mylan, the only other manufacturer of Budesonide DR at the time. On April 3, 2014, the day

after the Par price increase, K.O. (a Par senior account executive) spoke to M.A. (a Mylan senior account manager), for fifteen minutes regarding the price increase and Teva's plans.

481.    On April 4, 2014, Rekenthaler informed some members of Teva's sales force that, although the company had received approval to market and manufacture Budesonide DR, Teva was not prepared to launch the product and he did not yet know when it would do so. Nonetheless, that same day Rekenthaler spoke to both Defendant Jim Nesta (Mylan) and M.B. (Par) to discuss Budesonide DR.

482.    Although Teva did not launch Budesonide DR until approximately June 2016, its executives clearly attempted to coordinate pricing and market share with its competitors in anticipation of its product launch date.

- **Enalapril maleate (Teva, Mylan, Wockhardt, Taro)**

483.    Enalapril maleate (brand name: Vasotec) is used to treat hypertension, congestive heart failure, kidney problems, and to improve chances of survival after a heart attack.

484.    By mid-2013, the Enalapril market was shared by three players:  Mylan with (60.3% share) Wockhardt (27.5%), and Teva (10.7%).  These three manufacturers coordinated a significant anticompetitive price increase for Enalapril in July 2013.

485.    On July 11, 2013, Jim Nesta (Mylan) spoke with Kevin Green (Teva) and explained that Wockhardt had agreed to follow Mylan's price increase on Enalapril. Internal Teva emails show staff citing the price increase as an explanation for customer inquiries—"this is all a result of a wockhardt price increase following a Mylan increase"—even though the customer had attributed the request to a supply issue and Wockhardt had not yet raised its prices.

486.    Internal emails show that on July 12, 2013, Teva "hope[d] to increase" and was "exploring the possibility of an increase" for Enalapril but was in the midst of "gathering all the facts" Nisha Patel gathered the facts by calling Nesta that same day, and they spoke three times.

487.    In the meanwhile, Teva's Kevin Green was attending the PBA Health Conference at the Sheraton Overland Park in Kansas, where he participated in a golf outing. A senior national account executive at Wockhardt attended the same conference and likely spoke directly to Green either at the golf outing during the day or the trade show at night, because at 12:40am that evening (i.e., the morning of July 13, 2013) the executive created a phonebook contact file with Green's cell phone number. On Sunday, July 14, 2013, Green called Patel and told her that he had confirmed that Wockhardt planned to support the Mylan price increase.

488.    The next morning, July 15, 2013, Patel wrote to a Teva executive:

> new developments…heard that Wockhardt is taking an increase
> today or tomorrow.

That same day, Green again spoke with Wockhardt and Wockhardt internally circulated specific price information obtained from Teva.

489.    On July 16, 2013, Nisha Patel wrote an internal email entitled "Enalapril Increase Overview." In it, she stated:

> As you are aware, we are current preparing the information to
> hopefully be able to implement a price increase on Enalapril. This
> is a 3-player market that we share with Mylan and Wockhardt.
> Mylan announced a price increase last week. We are hearing
> rumors that Wockhardt will follow or exceed Mylan sometime
> this week.

Once again, Patel had disguised the source of her information. Teva had not "heard rumors." It had spoken directly with its competitors.

490.    During this coordinated price increase for Enalapril, Ara Aprahamian (Taro) communicated with Patel and with a senior sales and marketing executive at Wockhardt, including calls on July 17 and 19, 2013.

491.     On July 30 and 31, 2013, Patel spoke with Aprahamian and confirmed that, in accordance with the industry's "fair share" code of conduct, Taro understood that it would not take significant share from Teva upon its launch because Teva had a relatively low market share compared to others in the market.

492.     In early December 2013, Taro was fully ready to re-enter the Enalapril market. On December 3, 2013, Aprahamian consulted twice by phone with Mylan's senior account executive, M.A.  This particular communication was important because Mylan was the market share leader and Taro was targeting more of Mylan's customers than those of other competitors.

493.     On December 5, 2013, Aprahamian called Patel to coordinate before Taro sent a proposal to a current Teva customer for the 2.5mg, 5mg, 10mg and 20mg dosage forms of Enalapril. On launch day, Taro's prices were identical to Teva's and nearly identical to Wockhardt's and Mylan's.

494.     Taro continued to gain share from both Mylan and Wockhardt, and to coordinate with both.  M.C. (Wockhardt) called Aprahamian on New Year's Eve 2013 and they agreed that so long as Wockhardt was able to retain McKesson as a customer, it would concede the distributor Morris & Dickson to Taro. S.K. (Wockhardt) described the agreement in an email after the holidays:

> I spoke to M.C. on NYE. Once we confirm we are keeping McKesson, let's yield MoDick. Call to discuss.

495.     By May 2014 the market was stable, and market share for Enalapril was reasonably distributed among the companies.  As Teva was considering whether to bid on Enalapril for an RFP sent out by a large wholesaler customer, Patel wrote:

> no bid due to potential market/customer disruption, aka strategic reasons.

FILED WITH REDACTIONS – PUBLIC VERSION

The same day she sent that e-mail—May 14, 2014—Patel texted and called Aprahamian.

- **Nortriptyline hydrochloride (Actavis, Teva)**

496.    Nortriptyline hydrochloride (brand name: Pamelor) is used to treat depression. As of early 2013, the market was shared by Teva, with a 55% share, and Actavis with the remaining 45% share.  In early November 2013, Taro made plans to re-launch the drug with a "Target Market share goal" of 25% that would leave Teva with 42% and Actavis with 31%.

497.    Several days of conversations ensued among the affected competitors in an effort to sort out how Teva and Actavis would make room for Taro in this market.  David Rekenthaler (Teva) had two calls with Marc Falkin (Actavis) on November 10, 2013.  Ara Aprahamian (Taro) had a call with Nisha Patel (Teva) on November 12, 2013.  That same day, Defendant Aprahamian announced to his colleagues that Taro would not be pursuing Teva's business with McKesson, saying simply: "Will pass on MCK on Nortrip."  Accordingly, he instructed a subordinate to put together an offer for Cardinal instead.

498.    Falkin and Rekenthaler spoke on November 14, 15 and 18, 2013.  Falkin also exchanged two text messages with Defendant Maureen Cavanaugh of Teva on November 17, and one on November 18, 2013.

499.    Immediately following this series of discussions, Aprahamian began delivering a new message to his team:  Taro had sent enough offers to Teva customers—it needed to take the rest of its share from Actavis.  On November 19, 2013 when a colleague presented an opportunity to gain business from Teva customer H.D. Smith, Aprahamian flatly rejected the idea, saying: "Looking for Actavis…We have outstanding Teva offers out."

500.    The next day, November 20, 2013, Taro found an Actavis customer that Taro might pursue.  Aprahamian placed a call to M.D., a senior national account executive at Actavis,

but they were not able to speak until two days later.  In the meantime, Teva conceded the Cardinal business to Taro as discussed in the negotiations between Actavis, Taro, and Teva.

501.     On February 6, 2014, when Defendant Aprahamian was asked if Taro wanted to pursue a certain account, Aprahamian responded that Teva had already done enough to help Taro with its re-launch and thus only Actavis accounts should be pursued: "No, need Actavis … teva gave up Cardinal and Opti, enough with them." From March 4-10, 2014, executives at Teva, Taro and Actavis called and texted each other frequently in their continuing efforts to work out the details of Taro's re-entry.

- **Niacin ER (Teva, Lupin, Zydus)**

502.     Niacin Extended Release ("Niacin ER"), also known by the brand name Niaspan Extended Release, is a medication used to treat high cholesterol. Teva had advance knowledge that Lupin planned to enter on March 20, 2014 and that Zydus planned to enter on June 28, 2014. Armed with that knowledge, Teva increased price on Niacin ER on March 7, 2014 in advance of the launches. In the days leading up to that price increase, all three competitors exchanged several calls during which they discussed, among other things, the price increase on Niacin ER and the allocation of customers to the new entrants Zydus and Lupin. Kevin Green (then at Zydus) spoke with both Patel and Rekenthaler (Teva) and with Berthold (Lupin). On March 24, 2014, a Teva executive confirmed that Teva had agreed to concede the Cardinal account to Lupin, writing over internal email "I want to make sure our strategy has not changed> we are conceding correct?" Patel had three calls with Berthold earlier in the day and replied: "Yes. The plan is to concede. This was re-confirmed earlier today, unless something has changed."

503.     On May 6, 2014, Green spoke with Rekenthaler and Patel and a Teva internal email indicates that Green provided Teva with confidential information regarding Zydus's launch

**FILED WITH REDACTIONS – PUBLIC VERSION**

plans, although there were "mixed messages on the plan of action" and Teva was unsure whether it would retain the ABC account or concede it to Zydus.

504.     Ultimately, the competitors agreed that Teva would retain ABC and would concede McKesson to Zydus. The decision is confirmed in a June 5, 2014 email that reads "Per Dave [Rekenthaler], Maureen [Cavanaugh] has agreed to concede this item." In Teva's Delphi database, the rationale for giving up the business was noted as "Strategic New Market Entrant."

505.     On June 28, 2014, Zydus formally launched Niacin ER at a per-unit WAC price that matched Teva and Lupin's prices.

- **Moexipril hcl tablets (Teva, Glenmark)**

506.     Moexipril hydrochloride, also known by the brand name Univasc, is of a class of drugs called angiotensin-converting enzyme (ACE) inhibitors. It is used to treat high blood pressure by reducing the tightening of blood vessels, allowing blood to flow more readily and the heart to pump more efficiently. Around May 2013, Nisha Patel and GLMK-CW-5 (a senior executive and cooperating witness from Defendant Glenmark) began calling, texting, and sending messages to one another via WhatsApp in order to coordinate price increases for Moexipril.

507.     Because of their coordination, when Teva learned on August 5, 2013 that Glenmark had challenged Teva at one of its largest accounts, Rekenthaler sent an email to Patel that read simply "???" Within five minutes, Patel replied "I know…made the call already." Patel had called GLMK-CW-5 to find out why Glenmark had sought to underbid Teva at ABC. Patel spoke to GLMK-CW-5 three times that day.

508.     The next day, August 6, 2013, Defendant Jim Brown (Glenmark) spoke with Patel twice by phone. During these calls, Patel reminded Brown and GLMK-CW-5 of their prior agreement not to poach each other's customers after a price increase. As a result of these

communications, Glenmark decided to withdraw its offer to ABC and honor the agreement it had

reached with Teva not to compete on Moexipril. Later that same day—August 6, 2013—a Teva

employee informed her colleagues that "[t]oday is a new day and today…. ABC has now

informed me that they will NOT be moving the Moexipril business to Glenmark."

- **Desogestrel-Ethinylestradiol (Teva, Glenmark)**

509.    Desogestrel-Ethinylestradiol is a combination pill containing two hormones:

progestin and estrogen.  This medication is an oral contraceptive and is sold as Mircette, Viorele

(Glenmark's names) and Kariva (Teva's name).

510.    On the morning of May 19, 2014, Teva learned that Glenmark had offered to

supply one of Teva's customers. After calls with Brown and Grauso at Glenmark, Teva decided to

offer a bid that it knew was nearly triple the price proposed by Glenmark, thereby ensuring that

Glenmark could win the business.

- **Gabapentin (Teva, Glenmark)**

511.    Gabapentin is an anticonvulsant drug (a muscle relaxant) that is prescribed to

people who suffer from epileptic seizures or neuropathic pain.

512.    On October 13 and 14, 2014, Nisha Patel attended the Annual Meeting of the

Pharmaceutical Care Management Association ("PCMA") in Rancho Palos Verdes, California,

along with a number of Teva's competitors.  The PCMA described its Annual Meeting as the

"ideal venue for senior executives from PBMs, specialty pharmacy, payer organizations and

pharmaceutical manufacturers to network, conduct business and learn about the most current

strategic issues impacting the industry."

**FILED WITH REDACTIONS – PUBLIC VERSION**

513.    Shortly after returning from that meeting, during the morning of October 15, 2014, Patel informed her colleagues at Teva that Glenmark planned to increase the price of Gabapentin.  The Glenmark increase had not yet been made public, and would not be effective until November 13, 2014.  Nonetheless, Patel had already obtained specific contract prices that Glenmark planned to charge to distributors after it increased list prices.  Around the time she sent the e-mail, Patel exchanged text messages with Brown (Glenmark).

514.    Teva had relatively little market share for Gabapentin, so Patel and her Teva co-conspirators discussed whether to use the Glenmark price increase as an opportunity to pick up some market share.  Over the next several weeks, Teva did pick up "a bit of share" to be more in line with fair share principles, but cautioned internally that it did not "want to disrupt Glenmark's business too much."

- **Norethindrone acetate (Teva, Amneal, Glenmark) and Bethanechol cl (Teva, Amneal)**

515.    Norethindrone acetate (Brand names Primolut Nor, Primolut N) is a female hormone used to treat endometriosis. In this market were Teva, Amneal, and Glenmark.

516.    On September 9, 2014, a customer approached Teva asking if Teva would lower its pricing on certain drugs, including Norethindrone acetate.  The same day, Nisha Patel received phone calls from two individuals at Amneal: S.R.-1, a senior sales and finance executive, and S.R.-2, a senior sales executive.  These were the first calls Patel had with either Amneal executive since she had joined Teva in April 2013.  That same day, S.R.-1 also spoke several times with Defendant Jim Brown (Glenmark).

517.    After speaking with the two Amneal executives, Teva refused to significantly reduce its price to the customer and instead provided only a nominal reduction so as not to disrupt the market.  At that time, market share was almost evenly split between the three competitors.

**FILED WITH REDACTIONS – PUBLIC VERSION**

When discussing it later, Defendant Patel acknowledged internally that Teva had "bid high" at the customer based on its understanding "that it would be an increase candidate for Amneal.  They increased shortly after."  By bidding high and not taking the business from Amneal, in anticipation of a future price increase, Teva reinforced the fair share understanding among the competitors in the market.

518.     Several months later, on January 28, 2015, Teva implemented another round of price increases that had been coordinated with multiple competitors. By this time, Patel had been promoted to Director of National Accounts (she was formerly Director of Customer Marketing) and her former supervisor Kevin Galownia, became the one responsible for Teva's price increase coordination spreadsheet. One of the drugs listed for a January 28, 2015 increase was Bethanechol chloride tablets, which are used to treat urination issues after pregnancy or surgery. On January 6, 2015, Patel a fifty-minute call with Amneal's S.R.-1 during which she agreed to support Amneal's higher prices. Under the header "Reason for Increase," Teva's spreadsheet noted "Follow Competitor – Amneal," In accordance with the overarching rules of fair share, Teva did not use Amneal's price increase as an opportunity to take share even though Amneal had a 65% share in a four-player market.

FILED WITH REDACTIONS – PUBLIC VERSION

**K.**     <u>The overarching fair share agreement leads to collusive price increases</u>

519.     By 2012 the overarching "fair share" conspiracy had been established among the Defendants. Generic manufacturers had replaced competition with coordination in order to maintain their fair share of a given generic drug market and avoid price erosion. Around this time the manufacturers began to focus more on price increases than they had in the past. There arose a concerted effort by many in the industry to significantly raise prices.

520.     Starting sometime in 2012 or even earlier, and continuing for several years, the Defendants systematically communicated with each other as they were planning new price increases, and then again shortly before or at the time of each increase. The purpose of these communications was not only to secure an agreement to raise prices, but also to reinforce the essential tenet underlying the fair share agreement – i.e., that they would not punish a competitor for leading a price increase, or steal a competitor's market share on an increase. There was an understanding among generic drug manufacturers, including the manufacturer Defendants, that a competitor's price increase be quickly followed; but even if it could not, the overarching conspiracy dictated that the competitors who had not increased their prices would, at a minimum, not seek to take advantage of a competitor's price increase by increasing their own market share (unless they had less than "fair share").

521.     It is important to note that generic drug manufacturers could not always follow a competitor's price increase quickly. Various business reasons—including supply disruptions or contractual price protection terms with certain customers that would result in the payment of significant penalties—could cause such delays. In those instances when a co-conspirator manufacturer delayed following a price increase, the underlying fair share understanding operated as a safety net to ensure that the competitor not seek to take advantage of a competitor's price increase by stealing market share.

**FILED WITH REDACTIONS – PUBLIC VERSION**

- **July 31, 2012 price increase coordination**

522.   Effective July 31, 2012, Teva increased the prices of a number of different drugs, including many where Teva's competitors were Mylan, Watson (Actavis), Sandoz, and Breckenridge.

| *Generic Drug* | *Manufacturers* |
|---|---|
| Buspirone hcl tablets<br>Estradiol tablets<br>Tamoxifen citrate tablets | Mylan, Watson (Actavis), Teva |
| Labetalol hcl capsules | Sandoz, Watson (Actavis), Teva |
| Nadolol tablets | Mylan, Sandoz, Teva |
| Loperamide hc capsules | Mylan, Teva |
| Nitrofurantoin MAC capsules | Mylan, Teva, Alvogen |
| Estradiol-Norethindrone tablets | Breckenridge, Teva |

Teva's Rekenthaler or Green coordinated each of these price increases with Teva's competitors during the following calls on the days prior to the increase:

**Mylan:** Defendant Green spoke to Defendant Nesta each day from July 23 to 26, twice on July 30, and five times on July 31, 2012

**Watson:** Defendant Rekenthaler spoke to a senior Watson sales executive twice on July 11, 2012.

**Sandoz:** Defendant Green spoke to SDZ-CW-2 at Sandoz twice on July 29, 2012 and once again on the day of the increases, July 31, 2012.

**Breckenridge**: Defendant Rekenthaler spoke to a senior sales executive at Breckenridge on July 17, 2012.

**Alvogen:** After some of the calls between Green and Nesta on July 31, Defendant Nesta called a senior sales and marketing executive at Alvogen.

FILED WITH REDACTIONS – PUBLIC VERSION

• **Nadolol (Teva, Mylan, Sandoz)**

523.    Nadolol (brand name: Corgard) is a beta-blocker drug prescribed to treat high blood pressure, reducing the risk of stroke and heart attack. In 2012 and 2013, Teva, Mylan and Sandoz had differing Nadolol supply problems but were in continuous communication to coordinate pricing and market allocation in order to maintain market stability. On July 31, 2012, after calls between SDZ-CW-2 (Sandoz) and Defendant Kevin Green (then at Teva) where they agreed to support Teva's price increase, Teva raised its price for Nadolol. Teva and Sandoz had another call on the day of the increase and individuals at Teva had five calls with Defendant James Nesta (Mylan) where they discussed the plan to increase prices.

524.    As agreed, Sandoz supported Teva's price increase with a massive price increase of its own—raising prices for various formulations over 700%—on August 27, 2012. The day before Sandoz's increase, Defendant Armando Kellum (Sandoz's Senior Director of Pricing and Contracts), called Green at Teva. (They had also spoken on August 21, the day that Sandoz internally approved the Nadolol price increase).

525.    Mylan had problems supplying Nadolol but was able to follow and match the Teva and Sandoz increases on January 4, 2013. As with the prior Nadolol increases, Nesta spoke with Green multiple times the day before the increase, and Green spoke with Kellum twice on the day of the increase. Shortly after hanging up with Green, Kellum reported internally that Mylan had made good on the agreement but disguised the source of the information by saying he had "just heard from a customer" that Teva and Mylan had followed the price increases. Kellum's phone records demonstrate that he did not speak with any customers that morning.

526.    Sandoz executives frequently made such false attributions in order to share the contents of collusive communications with competitors without leaving overt evidence. Kellum added "let's please be cautious on both of these products," meaning that Sandoz did not want to

- 158 -

inadvertently take market share from these competitors, because taking share after a price increase is inconsistent with the overarching fair share agreement.

527.     Teva and Mylan imposed another coordinated set of price increases on July 2 and July 3, 2013 and Sandoz continued to react favorably, in accordance with the overarching agreement. Shortly after the Teva increase, SDZ-CW-1 sent Defendant Patel a congratulatory message regarding the increase. Sandoz sought to obtain a "comprehensive list of items" increased so that it would "not respond to something adversely" by inappropriately competing for market share on any of those drugs. Sandoz executives had previously conveyed to their counterparts at both Mylan and Teva that Sandoz would follow their price increases and not steal their customers after an increase. Obtaining the comprehensive list of price increase drugs was an effort by Sandoz to ensure it was aware of every increase taken by both competitors so that it could live up to the agreement. On July 15, 2013, SDZ-CW-2 asked David Rekenthaler to provide Sandoz with a full, comprehensive list of all the Teva price increase drugs – not just those drugs where Teva overlapped with Sandoz. Defendant Rekenthaler complied. Understanding that it was improper to share competitively sensitive pricing information with a competitor, and in an effort to conceal such conduct, Defendant Rekenthaler first sent the Teva price increase list from his Teva work e-mail account to a personal e-mail account, and then forwarded the list from his personal e-mail account to SDZ-CW-2's personal e-mail account.

- **Labetalol hcl (Teva, Sandoz, Par)**

528.     Labetalol hydrochloride, like Nadolol, is a beta blocker that helps treat high blood pressure.

529.     Teva increased Labetalol prices on July 31, 2012 and coordinated with its competitors to maintain that supra-competitive pricing. By October 16, 2012 Sandoz overcame earlier supply problems and a Teva senior analyst wondered whether pricing at certain accounts

- 159 -

should be lowered in anticipation of the incoming competition. After speaking twice with SDZ-CW-2 at Sandoz, Defendant Green (Teva) answered the analyst's question.

> Sandoz is back in good supply. They took a 500% price increase several months back, and they are holding firm with their prices.
>
> Stay the course and maintain our higher price

530.     Two days later, on October 18, 2012, Defendant Rekenthaler had four calls with A.S., a senior sales executive at Watson to confirm that Watson was also still committed to maintaining high pricing on Labetalol.

531.     For years after, Teva continued to coordinate with its competitors to stay the course regarding Labetalol pricing.  In February 2014, for example, Teva received notice from a customer of a challenge coordinated on a price increase. Defendant Patel forwarded the e-mail to an executive at Teva with three question marks:  "???"  She responded immediately: "left message."  The message that she had left was for an executive at Defendant Par and the two executives spoke five times that same day.  The Teva executive then emailed Defendant Patel "[l]et's speak on Monday.  Just received call back with more information."

532.     The following Monday, Defendant Rekenthaler twice called and spoke with another individual. at Par. In these discussions between Teva and Par executives, Teva ultimately offered only a nominal price reduction to that customer – knowing that this would likely concede the business to Par.

- **Nitrofurantoin macrocrystal (Teva, Alvogen)**

533.     First introduced in 1953, Nitrofurantoin macrocrystal is an antibiotic for treating bladder and urinary tract infections that has been deemed an "essential medicine" by the World Health Organization.  On July 31, 2012—the same day Teva increased prices for Labetalol and Nadolo, as discussed above—Teva increased the price of various dosage forms of Nitrofurantoin

by around 90%. Teva then coordinated with its Defendant Mylan and another competitor, Alvogen, to maintain prices for the drug.

534.    On October 10, 2012, having received a customer request to lower prices, Defendant Green reached out to both Defendant Nesta at Mylan and B.H., his counterpart at Alvogen.  At 10:01am, Green called Nesta and immediately after hanging up, Green called B.H. at Alvogen for the first of three (3) calls that day, including one call lasting fourteen minutes.  To close the loop, Defendant Nesta also separately spoke to B.H. two times that same day.  In accordance with their discussions, Teva did not lower its price.

- **Nisha Patel's "Quality" rankings and price increase lists**

535.    On May 1, 2013, Defendant Patel began creating a spreadsheet with a list of drugs she called "Price Increase Candidates."  In a separate tab of the spreadsheet, Patel began ranking Teva's "Quality of Competition" by assigning manufacturers into several categories, including "Strong Leader/Follower," "Lag Follower," "Borderline" and "Stallers."  Patel understood—and stressed internally at Teva—that "price increases tend to stick and markets settle quickly when suppliers increase within a short time frame."  Thus, it was very important for Patel to identify those competitors who were willing to share information about their price increases in advance, so that Teva would be prepared to follow quickly.  Conversely, it was important for Patel to be able to inform Teva's competitors of Teva's increase plans so those competitors could also follow quickly.  Quality competitors were those who were more willing to coordinate.

536.    By May 6, 2013, Patel had completed her initial ranking of fifty-six different generic drug manufactures by their "quality, from +3 to -3. Patel considered the "highest quality" competitors to be Mylan, Watson/Actavis, Sandoz/Fougera, Glenmark and Taro.

537.    As she created the list, Defendant Patel was talking to competitors to determine their willingness to increase prices and, therefore, their rank on the scale.  For example, in one of

**FILED WITH REDACTIONS – PUBLIC VERSION**

her first conversations with CW-1 after Patel joined Teva, Patel told CW-1 that she had been hired by Teva to identify drugs where Teva could increase its prices.  She asked CW-1 how Sandoz handled price increases.  CW-1 told Patel that Sandoz would follow Teva's price increases and, importantly, would not poach Teva's customers after Teva increased.  Not surprisingly, Sandoz was one of Teva's highest "quality" competitors.  Patel and Teva based many price increase (and market allocation) decisions on this understanding with Sandoz over the next several years.

538.     As a further demonstration that the fair share understanding was universally accepted and understood among the Defendants, even companies that Defendant Patel and Teva referred to as "low quality competitors"—because they were not viewed as strong leaders or followers for price increases—consistently complied with the principles of "fair share" and "playing nice in the sandbox." For example, When Defendant Patel first created the quality of competitor rankings in early May 2013, she gave Camber Pharmaceuticals a ranking of -2. When Defendant Patel revised those rankings one year later in May 2014, Camber's ranking did not change. It remained one of the lowest ranked of all of Teva's competitors. Nonetheless, Camber adhered to the fair share understanding, and consistently applied those rules in dealing with its competitors.

- **Raloxifene hcl,  Lidovudine-Zidovudine (Teva, Camber)**

539.     In September 2014, Camber had plans to enter the market for two Camber/Teva overlap drugs: Raloxifene hydrochloride (brand name: Evista), which treats osteoporosis in postmenopausal women, and the HIV/AIDS combination drug Lamivudine-Zidovudine (brand name: Combivir).

540.     Teva had begun marketing Raloxifene in March 2014 and Camber and Actavis planned to launch September 2014. The new entrants discussed an allocation strategy with Teva

FILED WITH REDACTIONS – PUBLIC VERSION

to ensure they each received their fair share of the market. Rekenthaler had calls with Actavis on September 10, 11, and had six calls on September 16, 2014 with multiple Actavis personnel including Defendant Marc Falkin and A.B., a senior sales and marketing executive. On September 17, 2014, Rekenthaler (Teva) reported internally:

> I know Actavis will be late. Camber is talking but their [sic] being
> somewhat unclear as well. I'll know more about them after my
> trip this week.

Rekenthaler and Defendant Kon Ostaficiuk (President of Camber Pharmaceuticals) then spent the next three days—September 17-19, 2014—playing golf and having drinks at an industry outing in Kentucky. After phone calls between the two of them on September 21 and 22, 2014, Camber sent a revised offer to a potential customer (Econdisc) containing modified prices. On September 24, 2014, Patel wrote an internal Teva email conveying the arrangement Rekenthaler (Teva) had discussed with Ostaficiuk (Camber):

> Camber indicated that they are targeting Econdisc and a small
> retailer [...] and then they would be 'done.'

An internal Teva email written the next day shows that Teva accepted this fair share arrangement. Teva's Senior Director of Marketing wrote:

> Okay, we will concede additional smaller customer challenges
> (particularly distributors) since they are not going to target [a
> large distributor]"

541.    Over at Camber, President Kon Ostaficiuk followed up with similar emails to his team to cease competition for Raloxifene and Combivir. On September 29, 2014 he wrote:

> Hi Gang,
> We do not offer anything to any Teva customers…
> Not even a "bad price"!
> Please acknowledge…We do not want to upset them more!

(ellipses in original). A senior sales executive at Camber replied:

We have not made any offers to any Teva Raloxifene accounts since we received the Econ award. Both sales and contracts are aware, & requesting incumbent detail for all offers, if Teva, no offer.

The executive added "we are also not seeking any Lupin business on Lam/Zidovudine [aka generic Combivir]." Ostaficiuk replied: "Thank you. We don't want to antagonize either of them and start a war…"

542.    About a week later, on October 7, 2014, Defendant McKesson told Teva that Camber had sent an offer regarding Raloxifene. A Teva Director of National Accounts expressed surprise: "I thought they were done after securing Econdisc?" Senior Director of Sales & Trade Relations Teri Coward expressed her frustration at a competitor not playing fair, commenting "this is ridiculous" and calling Camber "total idiots." David Rekenthaler thought there had to be a miscommunication: "You're positive they sent them an offer?"

543.    Since it seemed that Camber was not sticking to the deal, Teva decided that they needed McKesson to give Camber a "message" that the "market should be stable at this point," meaning that McKesson would tell Camber it was not supposed to be competing for further business. The Teva Director of National Accounts "relayed 'the message' re market should be stable" to an individual at McKesson who said he would confirm "Camber intentions and why they said they would send an offer." It turned out to be a miscommunication. Camber had never actually made the offer, and had instead complied with its agreement with Teva.

544.    Rekenthaler (Teva) and Ostaficiuk (Camber) also discussed market allocation and prices for generic Combivir.

- **Ketoprofen, Ketorolac, and Methotrexate (Mylan, Teva)**

545.   On June 26, 2013, on the same day that Nesta (Mylan) and Green (Teva) had a one-hour phone call regarding Mylan and Teva overlap drugs, Teva produced a list of drugs to be added to the price increase list. That day, Kevin Galownia commented that "Ketoprofen would have a high likelihood of success" for a price increase. Patel alluded to the fact that she had advance knowledge of price increases:

> I definitely agree on Ketoprofen since there are rumors of activity on this one.

546.   Another Teva-Mylan overlap drug, Ketorolac, was also on the price increase list. Patel added that she would "gather intel" on both these drugs and several others and conduct an "inquiry to see if [price increases] would be possible in the near future." Because she had spoken with Mylan and other competitors, she wrote "From a 'quality of competitors' standpoint, I definitely think all but Nystatin are strong candidates" for a price increase.[22] On Friday, June 28, 2013 Patel wrote:

> it is my understanding that Mylan is announcing a long list of price increases today … hearing that Ketoprofen is on the list.

This email proves Teva had advance knowledge of Mylan's price increases. She had jumped the gun. Mylan would not announce these price increases until the following Monday, July 1, 2013. Teva then followed with its own price increase for both drugs (and others) on August 9, 2013.

547.   Similarly, on July 2, 2013, a colleague asked Defendant Patel how Teva's competitors' pricing compared with regard to the drug Methotrexate. Defendant Patel responded

---

[22] At the time, Patel felt she had not yet solidified a conspiratorial relationship with Defendant Heritage, which is why she excluded Nystatin. Defendant Cardinal helped build this relationship by confirming months earlier that Teva would follow a Heritage price increase for Nystatin. Patel later became comfortable with Heritage as a co-conspirator although and Nystatin was added to the list of price increase candidates.

FILED WITH REDACTIONS – PUBLIC VERSION

that Mylan's pricing was a little low, "but we are hearing rumors of them taking another increase," so Teva felt comfortable increasing the price of that drug on July 3, 2013. These "rumors"— which were based on the direct communications between Defendants Green and Nesta noted above—again turned out to be accurate: Mylan ultimately increased its price of Methotrexate, pursuant to its agreement with Teva, on November 15, 2013.

- **Increase lists and July 2013 coordinated price increases**

548.    On May 2, 2013 Patel spoke to her contacts at Glenmark, Actavis, and Sandoz multiple times. After one of her calls with GLMK-CW-5, Defendant Patel sent an internal e-mail to one of her subordinates directing him to add six different Glenmark drugs to Teva's "high priority" price increase list: Nabumetone; Pravastatin; Ranitidine; Moexipril; and Moexipril HCTZ, and Adapalene Gel: Glenmark then increased prices of these six drugs two weeks later, on May 16, 2013. From her conversations, Patel knew about the Glenmark increases in advance and her Teva colleagues were asked to "please make her aware" of any requests for bids on those drugs so that "as a group we can discuss where to price based on market intelligence she has collected." Teva followed with its own price increases shortly thereafter.

549.    After the implementation of the Glenmark price increases on May 16, 2013, and before Teva had the opportunity to follow those increases, Teva was approached by several customers looking for a lower price. Teva refused to bid on most of these solicitations in order to maintain market stability. When it did provide a customer with a bid, Teva intentionally bid high so that it would not win the business. As Defendant Patel stated to a Teva colleague when a large wholesaler approached Teva about bidding on several Glenmark increase drugs: "IF we bid, we need to bid high, or we will disturb the market."

550.    On May 24, 2013, Patel created a spreadsheet called "Immediate PI File" that included 12 drugs where Teva was to follow a "high quality" competitor's price increase as soon

as possible. The spreadsheet also included information about future bidding and pricing plans of Teva's competitors that Patel had learned from her discussions with competitors. Under "Competitors" she listed each manufacturer and its share, and under "Reason for Increase" she added notes such as "follow Glenmark and Amneal increase," "Sandoz also bidding high,"[23] and "Raise to follow Taro."  The drugs on the list included Nabumetone, Ranitidine, Moexipril, Moexipril-HCTZ tablets, and Adapalene gel) as well as Cefdinir oral suspension, Cefdinir capsules, Cefprozil tablets, and four formulations of Fluocinonide (ointment, emollient cream, gel, and cream).

551.    For each of the drugs on the list, Defendant Patel or another executive at Teva spoke frequently with Teva's competitors in the days and weeks leading up to May 24, 2013. During these communications, Teva and its competitors agreed to fix prices and avoid competing with each other in the markets for the identified drugs.

> **Adapalene gel**: Patel (Teva) called Aprahamian (Taro) on May 22, 2013, and they agreed to follow a Glenmark price increase. Teva followed with its own price increase on July 3, 2013, which was coordinated with both Glenmark and Taro.

> **Cefdinir capsules and oral suspension, Cefprozil tablets**: Teva's competitor for these three drugs was Lupin, and Patel spoke to Lupin's David Berthold multiple times as she was developing the price increase list.

552.    Other drugs were added to the price increase list (which went into effect on July 3, 2013), as soon Patel or Green, who were dialing competitors each day, were able to confirm that competitors would agree to a price increase.

> **Fluconazole**: After speaking with Hatosy (Greenstone) on May 28, 2013, Patel promptly added Fluconazole tablets to the price increase list. Teva's prices ranged between 875% higher and 1,570% higher than before the increase, depending on the dosage formulation.

---

[23] A contemporaneous Sandoz email confirms that "Sandoz bidding high" was part of the agreement. On May 22, 2013, a Sandoz price analyst wrote: "I know we agreed not to bid potential price increase items, but we bid Nabumetone at a high price."

**Ranitidine**: After speaking with Patel on May 30, SDZ-CW-1 wrote that for Ranitidine tablets, "I think there might be some price increases in the pipeline." He suggested that Teva and Amneal might follow, and that Sandoz could raise its effective prices "from $1.77 to $5[.]"

**Isoniazid**: After Patel and SDZ-CW-1 spoke on June 12, 2013, Patel reported back that for the drug Isoniazid, "we could have raised pricing to a higher level", and that she "hope[d] to get intel later today." Then Patel spoke again with CW-1, who provided Sandoz's prices and pricing strategy   Teva ultimately increased price on Isoniazid on January 28, 2015 in coordination with Sandoz.  Defendant Patel spoke to CW-1 for more than sixteen (16) minutes shortly before the increase, on January 22, 2015.

**Cimetidine tabs, Methotrexate tablets, Nadolol tabs, Prazosin hydrochloride capsules**: On May 14, 2013, Defendant Patel asked several Teva national account managers including Defendant Green to obtain price points on certain Mylan drugs including Cimetidine and Nadolol. Patel said she was expecting "additional Mylan intel" and expected Mylan "to take an additional increase" on Teva-Mylan overlap drugs. Mylan and Teva agreed to increase prices for these drugs drug on calls between Kevin Green (then Teva) and Jim Nesta (Mylan) on June 26, 27, 28, and confirmed their positions on the day of the Teva price increases July 3, 2013.

**Oxybutynin tabs**: After initial calls during her first week at Teva (April 29, 2013), Patel spoke with Brad Leonard at Upsher-Smith. On July 3, 2013, Teva implemented a price increase ranging between 1,100 –1,500% increase on Oxybutynin chloride, depending on the dosage strength.  Like the other drugs on the list, Teva would not have increased its price without first obtaining agreement from competitors that they would not compete with Teva or steal market share after the increase.

553.     In 2013, SDZ-CW-2 left Sandoz to join Rising.  At that time, Rising was already preparing to enter the market for a drug called Hydroxyzine Pamoate.  Teva was one of the competitors already in that market.   During several calls in early October 2013, SDZ-CW-2 coordinated with Defendants Green and Rekenthaler of Teva to acquire a large customer and facilitate Rising's entry into the Hydroxyzine Pamoate market.

554.     Later, in March 2014, SDZ-CW-2 sought to return the favor.  At that time, Rising experienced supply problems for the drug Diflunisal tablets – a two-player market involving only Teva and Rising.  In an effort to "play nice in the sandbox," and to further the ongoing understanding between the two competitors, SDZ-CW-2 contacted Defendant Rekenthaler of

FILED WITH REDACTIONS – PUBLIC VERSION

Teva and informed him of Rising's supply problems and the fact that Rising may have to leave the market at some point in the future.  The purpose for the call was to alert Defendant Rekenthaler that Teva would have the opportunity to take a price increase, as Rising would not be in a position to take on any additional market share.   On April 4, 2014, Teva increased the price on Diflunisal tablets (by as much as 182%), as well as Hydroxyzine Pamoate (by as much as 165%).  In the weeks leading up to those price increases, Defendant Rekenthaler communicated several times with SDZ-CW-2 at Rising to coordinate the increases.

555.    When Rising decided to leave the Diflunisal market in mid-July 2014, SDZ-CW-2 called Rekenthaler to let him know.  Four months later – after Rising remedied its supply problems – Rising re-entered the market for Diflunisal.  Consistent with the fair share understanding discussed above, and the rules of engagement that were generally followed in the industry, SDZ-CW-2 and Defendant Rekenthaler communicated in advance of Rising's re-entry to identify specific customers that Rising would obtain and, most importantly, to ensure the retention of the high prices that Teva had established through its price increase in April 2014.  On December 3, 2014, Rising re-entered the market for Diflunisal tablets.  Its new pricing matched Teva's WAC price increase from April 2014.   Defendant Rekenthaler's successful efforts to coordinate price increases and customer allocation agreements with SDZ-CW-2 of Rising led Defendant Patel to increase Rising's quality competitor ranking in May 2014.

- **Etodolac and Etodolac ER (Sandoz, Taro, Teva, Zydus)**

556.    In July 2013, Sandoz, Teva and Taro conspired to significantly raise the price of Etodolac ER, a non-steroidal anti-inflammatory drug that helps reduce pain, swelling and joint stiffness from arthritis. This episode illustrates the fair share conspiracy's coordinated price increases, in parallel with market allocation schemes, across time.

*Etodolac Price Increases*

**FILED WITH REDACTIONS – PUBLIC VERSION**

557.     Around July 2013, Sandoz included Etodolac on a list of drugs where it believed it could increase prices within the month. To accomplish the increase without losing market share, SDZ-CW-3, at the time a senior executive at Sandoz, called Defendant Ara Aprahamian (Taro). After the call, Aprahamian immediately called Defendant Nisha Patel (Teva). On July 18, Patel closed the loop by calling SDZ-CW-1, another Sandoz sales executive. During these phone calls, Sandoz, Taro and Teva agreed to raise prices for both Etodolac and Etodolac ER. Following the calls, Patel added Etodolac to her price increase spreadsheet and noted that a price increase on the ER formulation "could follow" an increase on the immediate release formulation, and that this was "Shared with Taro." Based on her conversations with SDZ-CW-1 and with Ara Aprahamian, Nisha Patel understood that Sandoz planned to increase its price on Etodolac, and that Taro would follow suit and raise its price for Etodolac ER. During those conversations, Teva agreed to follow both price increases and she noted this in a price increase spreadsheet ("All strong competitors. Etodolac ER Could follow IR (Shared with Taro)").

558.     On July 23, 2013, Sandoz held a conference call to discuss planned price increases and SDZ-CW-1 called Patel prior to the conference. They spoke for fourteen minutes and SDZ-CW-1 confirmed the details of the Sandoz price increase on Etodolac. That same day, SDZ-CW-3 called Aprahamian to discuss their cooperation on the price increase.

559.     Sandoz's Etodolac price increase became effective on July 26, 2013. Patel, having already discussed the issue with Sandoz, wrote in an internal email,

> Please watch ordering activity for both, IR, and ER. The intent is that we will follow in the near future, but a date has not been determined.

On Taro internal email, Aprahamian also put out the call to slow or halt one-time buys until prices could be increased:

> Not so fast. Why the request. Market just changed on this and
> not apt to undercut.

On August 1, 2013, shortly after a call with Patel, Aprahamian instructed a colleague at Taro to begin a price increase for Etodolac and Etodolac ER and urged "we need to get these out next week." To indicate that he wanted to take the discussion offline—off the email record—Aprahamian added "Will come over and discuss with you."

560.    At Teva, minutes of an August 5, 2013 meeting contain "Etodolac – Sandoz did take price increase on IR, Taro taking a price increase on IR and ER this week." In an email summarizing Teva's upcoming August 9, 2013 price increases, Patel confirmed that Teva was increasing its prices for Etodolac and Etodolac ER because Teva senior executives knew that Taro would be raising its prices on both drugs.  Kevin Galownia received the email and instructed Nisha Patel to delete those entries, but never instructed her to stop communicating with the company's competitors, including Taro.

561.    Teva and Taro raised prices for Etodolac and Etodolac ER simultaneously, with the price increases effective on August 9, 2013.  Both their AWP and their WAC prices were increased to the same level.  The increases were substantial.  For Etodolac, Teva's average increase was 414%; for Etodolac ER, the average increase was 198%.

*Etodolac Market Allocation*

562.    On May 12, 2014, Zydus entered the Etodolac ER market at WAC pricing that matched Teva and Taro's artificially high pricing. Patel served as a relay between Aprahamian and Green (then at Zydus) in over a dozen calls and texts in the week before the Zydus launch during which they discussed the allocation of market share to the new entrant.

563.    In a parallel set of communications on May 20 and 21, 2014, a senior sales executive at Zydus texted Defendant Maureen Cavanaugh (Teva). Days later, on Teva internal

email a Senior Analyst recommended conceding a specific account to Zydus because "we will have to give up some share with a new market entrant." Patel replied "agree with concede."

564.    Five weeks later, on June 27 and July 2, 2014, Econdisc, notified Teva that it had received a competitive offer for its Etodolac ER business. Later that day, Patel spoke with Defendant Aprahamian at Taro for fourteen (14) minutes.

565.    The next day, on July 3, 2014, Patel sent an internal e-mail stating "We will concede" and Teva conceded the business.

566.    When Patel's supervisor Kevin Galownia learned that Teva had lost the Econdisc business, he sent an internal e-mail asking "Did we choose not to match this?" Patel responded, "Yes. New market entrant – Zydus."  Galownia replied, "Okay good.  Thank you."

- **"Round 2" – August 2013 multi-drug coordinated price increases**

567.    On August 9, 2013, Teva raised prices on twelve different drugs. These increases were again coordinated with a number of Teva's competitors, including Defendants Mylan, Sandoz, Taro, Lupin, Glenmark, Zydus and Apotex. The price increases were based on a "Round 2" list of increase candidates that Teva's Patel prepared after she spoke with contacts at competitors over a span of a few days from July 8 to July 11, 2013. In that timeframe, in order to coordinate the upcoming increases, Patel had calls with GLMK-CW-5 (Glenmark), David Berthold (Lupin), Jim Grauso (Aurobindo), Rick Rogerson (Actavis), SDZ-CW-1 (Sandoz), and Jason Malek (Heritage).

568.    Several of the drugs included in Round 2 had already undergone a recent price increase (Ketoprofen, Ketodolac, Etodolac and Etodolac ER, and Pravastatin). The Round 2 price increase list also included Amiloride-HCTZ tabs, Clemastine Fumarate tabs, Diclofenac tablets, Dilitiazem tablets, Doxazosin Mesylate, and Tolmetin sodium capsules. For example, Teva's new,

increased Doxazosin Mesylate price (a 1,053% increase) matched Apotex's (and Mylan's) recent price increases.  Apotex itself had increased the price of this drug on July 23, 2013.  B.H. of Apotex and Defendant Patel of Teva spoke regarding this increase the week before Apotex took the increase, in addition to coordinating before Teva followed on August 9, 2013.

- **Haloperidol, Trifluoperazine hcl (Sandoz, Mylan)**

569.      Haloperidol (brand name: Haldol) and Trifluoperazine hydrochloride, (brand name: Stelazine) are antipsychotic drugs used to treat disorders such as schizophrenia and Tourette syndrome. On August 6, 2013, Defendant Nesta of Mylan called SDZ-CW-4 at Sandoz twice. Both calls were less than a minute long.  Three days later, on August 9, 2013, Mylan implemented significant price increases on both Haloperidol and Trifluoperazine HCL.  For Haloperidol, Mylan increased the WAC price by 250% on several formulations.  For Trifluoperazine HCL, Mylan increased the WAC price by 80% on all formulations.

570.      On August 19, 2013, S.G., a national account executive at Sandoz, sent an internal e-mail stating that Mylan increased its prices on Haloperidol and Trifluoperazine and that Sandoz needed to "rationalize the market." On August 22, 2013, SDZ-CW-1 confirmed the coordinated increase strategy with his Sandoz colleagues, noting "I would imagine we will be fast followers."

571.      On September 18, 2013, in an email about Sandoz's plan to concede Trifluoperazine hcl market share to Mylan, SDZ-CW-1 stated "Mylan has 73% and we have 24%. This is a no brainer."

572.      On October 2, 2013, after had Sandoz received a bid request from a (Walgreens) Mylan customer for both Haloperidol and Trioofluoperazine, SDZ-CW-1 directed the Sandoz national account executive assigned to Walgreens ("WAGS") to decline to bid and to lie about the reason for doing so:

FILED WITH REDACTIONS – PUBLIC VERSION

> We discussed internally and decided not to pursue WAGS on
> these at this point. We have been running up against Mylan a lot
> lately (Nadolol, Benaz/Hctz) and fear blowback if we take on any
> more products at this moment.
>
> Trying to be responsible in the sandbox.
>
> I recommend you blame supply.

573.    This was consistent with the interdependent nature of the overarching fair share conspiracy, which sought to dampen competition across drugs. Despite not having communicated since August 6, 2013, on October 3, 4, and 14, 2013, SDZ-CW-4 and Defendant Nesta spoke by phone several times to confirm support for the price increase on the two drugs. Sandoz increased its WAC pricing on Haloperidol to match Mylan's pricing on October 25, 2013, but, due to price protection terms in contracts, waited to follow on Trifluoperazine HCL until January 31, 2014

- **April 4, 2014 multi-drug coordinated price increases**

574.    On April 4, 2014, Teva raised prices on twenty-two different generic drugs. Nearly all of these increases were coordinated with a number of Teva's high-quality competitors who by now were familiar co-conspirators, including Defendants Sandoz, Taro, Actavis, Mylan, Lupin and Greenstone.  Teva also began coordinating with some of what it regarded at the time as "lesser-quality" competitors—such as Defendant Breckenridge, Heritage, Versapharm, Inc. ("Versapharm") and Rising Pharmaceuticals, Inc. ("Rising")—as new sources for anticompetitive agreements.  For this price increase, Teva also decided to lead many more price increases – which was riskier for Teva and required even greater coordination with competitors.

575.    Defendant Patel began developing the strategy for the April 2014 increases in January 2014. The strategy was well known and authorized by individuals at higher levels at Teva, including Defendants Cavanaugh and Rekenthaler.  For example, on January 16, 2014,

Patel sent a document to her supervisor titled "2014 Pricing Strategy Brainstorm," where she outlined her plan for implementing price increases:

**2014 Pricing Strategy Brainstorm**

- Lead more increases
- Candidate Identification:
  - Exclusive items
  - Number of competitors; Target 2-4 total players, where quality of competitor is high
  - Teva has majority share and quality of competitors is high - lead
  - Competitors with long term supply issues
  - Competitors exiting market
  - Low or limited financial exposure
  - Adjust pricing in accordance with volume (secondary, dual, etc)
- Follow market pricing promptly
  - Delayed reactions erode pricing
  - Teva is the market leader. Ability to react to market changes should be reflective of reputation.

576.    As before, Patel prepared a list of candidate drugs for a coordinated price increase after speaking with Aprahamian (Taro), GLMK-CW-5 (Glenmark), Robin Hatosy. (Greenstone), Berthold (Lupin), Malek (Heritage), SDZ-CW-1 (Sandoz), Rogerson (Actavis), and S.C. (Breckenridge) between February 4 and February 7, 2014. Patel's price increase list included specific price points developed on the basis of information divulged from Lupin, Breckenridge, and others. The list was refined and circulated again in February 26, 2014 and an update was sent on March 17, 2014 with the title "PI Candidates." Teva, Defendants Patel and Rekenthaler both were communicating frequently with competitors Taro, Lupin, Actavis, Greenstone, Zydus, Heritage, and Rising in the days before the March 17 version. Teva's price increase list was finalized on April 4, 2014. An excerpt from a Teva spreadsheet shows the list:

FILED WITH REDACTIONS – PUBLIC VERSION

| Product Description | Lead/Follow | Competitors |
|---|---|---|
| AZITHROMYCIN ORAL SUSPENSION | Follow | Greenstone |
| AZITHROMYCIN SUSPENSION | Follow | Greenstone |
| BUMETANIDE TABLETS | Lead | Sandoz |
| CEPHALEXIN SUSPENSION | Follow | Lupin |
| CLARITHROMYCIN ER TABLETS | Follow | Actavis; Zydus |
| CYPROHEPTADINE HCL TABLETS 4MG 100 | Follow | Breckenridge |
| DICLOXACILLIN SODIUM CAPSULES | Lead | Sandoz |
| DIFLUNISAL TABLETS | Lead | Rising |
| ESTAZOLAM TABLETS | Follow | Actavis |
| ETHOSUXIMIDE CAPSULES | Lead | Versapharm |
| ETHOSUXIMIDE ORAL SOLUTION | Lead | Versapharm |
| HYDROXYZINE PAMOATE CAPSULES | Lead | Sandoz; Actavis |
| KETOCONAZOLE CREAM 2% | Lead | Taro; Sandoz |
| KETOCONAZOLE TABLETS | Lead | Taro; Mylan |
| MEDROXYPROGESTERONE TABLETS | Follow | Greenstone |
| MIMVEY (ESTRADIOL/NORETH) TAB | Follow | Breckenridge |
| NYSTATIN ORAL TABLETS | Lead | Heritage; Mutual |
| PENTOXIFYLLINE TABLETS | Lead | Apotex; Mylan |
| TAMOXIFEN CITRATE TABLETS | Follow | Actavis |
| THEOPHYLLINE ER TABLETS 100MG 100 | Lead | Heritage |

577.     Teva then carried out these price increases. For example, on April 4, 2014, Teva raised its WAC prices on Cephalexin Oral Suspension to match Lupin's prices exactly.  The increases to the WAC price ranged from 90% to 185% higher, depending on the formulation.

- **Azithromycin, Medroxyprogesterone (Teva, Greenstone/Pfizer)**

578.     In late November and early December 2013, Defendant Greenstone began planning with Teva to increase prices on several overlap drugs including Azithromycin Oral Suspension, Azithromycin Suspension and Medroxyprogesterone tablets.  Defendants Nisha Patel (Teva) and Robin Hatosy (Greenstone) were in contact during this time, including on December 2, 2013, the day that Greenstone was slated to announce price increases on Azithromycin Suspension, Azithromycin Oral Suspension and Medroxyprogesterone.

**FILED WITH REDACTIONS – PUBLIC VERSION**

579.     Because Greenstone was a high-quality competitor, and because the companies had successfully conspired to raise prices previously, it was understood between the two that if Greenstone raised prices Teva would follow and would not seek to poach Greenstone's customers after the increase.  On December 2, 2013, Patel sent an e-mail to several colleagues at Teva notifying them of an impending Greenstone price increase, which she had discussed with Hatosy: "I'm hearing that Greenstone just announced an increase on Azithromycin oral suspensions, effective January 1." A few days later, emails confirm Teva's plan to support the Greenstone increase by declining to supply Greenstone's customer:

> Since the new pricing requires a WAC [list price] increase, I am inclined to decline to bid at this time. Further, in a 2 player market we have 54% share ... Do you agree with the "decline to bid at this time" approach?

580.     Teva's Kevin Galownia agreed. That afternoon, the directive percolated throughout Teva's salesforce in stark terms:

> We've been informed that we will not be pursuing any business on the Azithromycin OS.
>
> As Greenstone recently took a price increase that will not be visible to the market in January, it's been decided to hold off until that time. Once the information is available, we will consider a price increase [...] Please inform the customer that we are unable to provide an offer at this time.

581.     Over the next several months – during the period of time before Teva followed Greenstone's price increases – Teva continued to refuse to bid (and avoid taking Greenstone's market share) when requested by customers, for both Azithromycin formulations and Medroxyprogesterone tablets.  For example, on January 27, 2014, Teva was approached by a large wholesaler asking for bids on both Azithromycin Suspension and Medroxyprogesterone due

FILED WITH REDACTIONS – PUBLIC VERSION

to a "Change in Market Dynamics." After speaking with Hatosy that same day, Patel agreed with the recommendation not to provide a bid to that customer.

582.     Consistent with the understanding between the two companies, Teva followed Greenstone's price increases for Azithromycin Oral Suspension, Azithromycin Suspension and Medroxyprogesterone tablets on April 4, 2014. Patel and Hatosy spoke twice that day.

- **Clarithromycin ER tabs, Tamoxifen Citrate, and Estazolam (Teva, Actavis)**

583.     Teva and Actavis coordinated a price increases for Clarithromycin ER tablets, a drug also increased by Teva on April 4, 2014. As of December 2013, Teva, Actavis and Zydus were the only three generic manufacturers actively selling Clarithromycin ER.

584.     A Cardinal bid request was forwarded to Patel on January 2, 2014. Immediately after receiving that e-mail, at 9:40am, Defendant Patel called Defendant Rogerson at Actavis. Shortly after her call with Actavis, at 10:12am, Defendant Patel wrote internally: "I think we have an opportunity to go higher. Let's aim for around $148 net and request feedback" from Cardinal.

585.     A week later, on January 9, 2014, Cardinal accepted Teva's bid at the higher price. That morning, Patel again called Rogerson. Shortly after that call, Patel sent an e-mail internally at Teva stating: "It looks like Cardinal accepted our bid at the higher price. We may have an opportunity to take some increases."

586.     Patel and Rogerson spoke on the morning of March 14, 2014. Within minutes after hanging up with Rogerson, Patel informed others at Teva about the Actavis increase:

> I'm hearing that Actavis announced a bunch of price increases yesterday. Please share any intel you gather. I believe some of the products, that overlap with Teva, are as follows (not sure if there are any more): Tamoxifen, Mirtazipine, Estazolam.

587.     Within half an hour of sending that e-mail, Patel added: "We intend to follow where we can." Patel spoke with Rogerson again later that day, and shortly after hanging up she concisely reported: "Actavis took an increase. We will follow."

588.     Teva followed the Actavis price increases on Tamoxifen Citrate and Estazolam less than three weeks later, on April 4, 2014. After the price increases became effective, Teva took steps not to disrupt the market or steal market share from Actavis.  For example, on May 14, Patel declined to bid at ABC on both Tamoxifen Citrate and Estazolam, stating:

    unable to bid (strategic reasons, for internal purposes).

 When Patel and her other conspirators at Teva used the term "strategic" in this context, it was
 code for the fact that there was an understanding in place with a competitor.

589.     Similarly, on May 21, 2014, a Teva analyst recommended that, pursuant to the far share understanding in the industry, Teva ought not bid on a large customer  for Tamoxifen Citrate "as we are first in a two-player market with good share already" (At the time, Teva had 58.4% of the market, and Actavis had 40.7%).  Patel responded: "Agree. We should decline to bid."

- **Ketoconazole cream and tablets. (Teva, Taro, Sandoz, Mylan, Apotex)**

590.     For Ketoconazole cream, Teva's competitors were Taro and Sandoz.  For the tablets formulation, Teva's competitors were Taro, Mylan and Apotex. Teva led the price increases for both drugs, but made sure to coordinate with all of its competitors before doing so.

591.     On April 4, 2014, the day of the price increases, Patel spoke separately with both Defendant Aprahamian (Taro) and SDZ-CW-1 (Sandoz).  During each call, she let them know that Teva was increasing the price of Ketoconazole.  The same day, Defendant Rekenthaler spoke to Defendant Nesta of Mylan. Also that same day, Defendant Aprahamian spoke to SDZ-CW-3 at

Sandoz.  They discussed the Teva increase and the fact that Taro would follow.  SDZ-CW-3 then sent an e-mail internally at Sandoz, alerting colleagues of the price increase and conveying information about Taro's price increase plans:

> As an FYI, Teva increased contract price and WAC on Keto Cream yesterday (tripled). Taro will more than likely follow shortly. We should determine is Teva had additional increases yesterday as well.

592.     CW-1 at Sandoz immediately told his colleagues not to bid on any new opportunities for the drugs.  That same day, Defendant Aprahamian sent a similar e-mail internally to his colleagues at Taro.

593.     On April 7, 2014 a Taro sales executive sent an internal e-mail stating: "we are not going to bid this product. . . . Taro has 27% share in a 4-player market." In a follow-up e-mail, E.G., a Director of Corporate Accounts at Taro, confirmed that Taro would decline to bid, but indicated that Taro would need to lie about the reason: "Yes, we are declining, but we need to advise its [sic.] due to supply."

594.     Although Sandoz immediately understood that it would follow these price increases, it was not able to implement them until October.  The delay was due to the fact that Sandoz had contracts with certain customers that contained price protection terms which would impose substantial penalties on Sandoz if it increased its prices at that time – and those penalties would have caused Sandoz to miss certain financial targets during the months after April, 2014. At Sandoz, senior management held monthly budget meetings where they analyzed whether it made financial sense to implement a particular price increase.  In this case, the ramifications of the price protection terms meant it did not make sense for Sandoz to follow until October 2014.

595.     In the months after the Teva and Taro increases, Teva held up its end of the agreement not to poach its competitors' customers. On May 14, 2014, Teva was approached by

**FILED WITH REDACTIONS – PUBLIC VERSION**

Cardinal requesting a bid due to the Taro increases, and the agreed answer was "Unable to bid at this time" although noted "for internal purposes it is for strategic reasons." Shortly before sending the e-mail, Defendant Patel exchanged several text messages with Defendant Aprahamian at Taro.

596.    Later that same day, Defendant Patel also directed that Teva decline to bid for Ketoconazole at ABC, citing the same logic:  "unable to bid (strategic reasons, for internal purposes)."

597.    Sandoz ultimately followed the Teva and Taro increases for Ketoconazole Cream on October 10, 2014.  That same day, Defendant Patel and CW-1 at Sandoz spoke. The Teva increases on Ketoconazole were significant.  For the cream, Teva, Taro and Sandoz all increased the WAC price by approximately 110%.  For the tablets, Teva's WAC increases were approximately 250%, but its customer price increases were substantially larger – averaging 528%.

- **Cyproheptadine, Norethindrone-Ethinylestradiol (Mimvey) tabs (Teva, Breckenridge)**

598.    On November 14, 2013, Breckenridge increased its pricing on both Estradiol/Norethindrone acetate tablets ("Mimvey") and Cyproheptadine HCL tablets. For Cyproheptadine, Breckenridge increased its WAC pricing by as high as 150%, and raised its customer contract pricing even higher – 400%.

599.    In the weeks leading up to those increases – when Defendant Patel was still out on maternity leave – Defendant Rekenthaler had several phone calls with D.N. at Breckenridge to coordinate the price increases. The two spoke twice on October 14, 2013 and had a twenty-six (26) minute call on October 24, 2013.   After those calls, they did not speak again until mid-January 2014, when Teva began preparing to implement its increase.

600.    Teva consistently refused to bid or take on any additional market share after the Breckenridge increase.  For example, on February 7, 2014, a customer gave Teva an opportunity

to pick up new business on Cyproheptadine.  When she learned the news, Defendant Patel called

S.C. at Breckenridge.  After the call, Patel wrote "Let's hold off on providing a bid. We can

provide a bid when we are in a position to do so (post increase)."

601.    On April 4, 2014, Teva followed the Breckenridge price increases with substantial

increases of Mimvey (contract increases of as much as 393%) and Cyproheptadine HCL tablets

(contract increases of as much as 526%).  In addition, Teva increased the WAC price on Mimvey

(Estradiol-Norethindrone acetate tablets) by 26% and the WAC price on Cyproheptadine HCL

tablets by as much as 95% — to exactly match Breckenridge's WAC price on both products.

602.    Teva raised prices even higher on its customer contracts.  Teva increased the

contract pricing of Mimvey by as much as 393%, and the contract pricing of Cyproheptadine

HCL tablets by as much as 526%.

603.    As Defendant Patel planned for Teva's April 4, 2014 price increases, both she and

Defendant Rekenthaler continued to communicate with their counterparts at Breckenridge.

Defendant Rekenthaler spoke to D.N. at Breckenridge on January 15, 2014 – the day after

Defendant Patel sent her first list of "Increase Potentials Q1 2014" to K.G. – for nineteen (19)

minutes.  Similarly, Defendant Patel spoke with S.C. – a sales executive at Breckenridge – two

times on February 7, 2014, as she was determining whether Teva should provide a bid to a

customer.  After her discussions with S.C., Teva declined to bid for the business in order to avoid

taking market share away from Breckenridge as a result of the price increases.

- **Diflunisal (Teva / Rising)**

604.    Rising became a more appealing potential co-conspirator when SDZ-CW-2, who

had formerly been employed at Sandoz, left to join Rising in August 2013. Rekenthaler had

known SDZ-CW-2 for many years, going back to when they both worked together at Teva several

years prior. Teva and Rising conspired to raise prices of Diflunisal. On March 17, 2014

Defendant Rekenthaler spoke with SDZ-CW-2 twice. During those calls, SDZ-CW-2 informed Defendant Rekenthaler that Rising was having supply problems for Diflunisal and stated that it would be a good opportunity for Teva to take a price increase. Defendant Rekenthaler and SDZ-CW-2 spoke once again on March 31, 2014, shortly before the Teva price increase for Diflunisal. On April 4, 2014 Teva increased is WAC pricing on Diflunisal by as much as 30%, and its contract pricing by as much as 182% for certain customers.

- **Pentoxifylline (Teva / Apotex)**

605.    In April 2013, Apotex hired J.H. as a senior executive and Defendant Rekenthaler (Teva) began communicating regularly with J.H.  There is no record that they had ever communicated by phone before that.  That relationship continued through 2014.  On April 4, 2014, Teva increased the price on Pentoxifylline by as much as 69%.  Despite the fact that Apotex was the market leader at that time, Teva chose to lead the price increase on Pentoxifylline.

606.    In the weeks leading up to Teva's price increase, Defendant Rekenthaler of Teva engaged in numerous communications with J.H. at Apotex including on March 7, 2014. During these calls, Defendant Rekenthaler gathered Apotex's pricing plans and conveyed them to Defendant Patel, also at Teva.

- **Nystatin (Teva, Heritage, Sun)**

607.    Another round of coordinated price increases followed from the earlier Nystatin tablets increase coordinated by Cardinal (discussed above beginning at paragraph 308). Throughout February and March 2014, Jason Malek (Heritage) and Defendant Nisha Patel (Teva) had a series of phone calls discussing price increases for multiple drugs, including Nystatin. On February 5, 2014, Malek returned a call from Patel. The two spoke for more than an hour and discussed a price increase for at least the drugs Nystatin and Theophylline.

608.     Following these discussions, Teva more than doubled its Nystatin tablets list price to a price nearly identical to Sun's, effective April 4, 2014

609.     On April 15, 2014, Malek had a seventeen-minute phone conversation with Patel in which they discussed prices of at least seven different drugs: Acetazolamide, Glipizide-Metformin, Glyburide, Glyburide-Metformin, Leflunomide, Nystatin, and Theophylline. During their conversation, Malek and Patel agreed that Teva would lead the price increases for Nystatin and Theophylline, and that if Heritage increased prices for the other five drugs—Acetazolamide, Glipizide-Metformin, Glyburide, Glyburide-Metformin, and Leflunomide—Teva would increase its prices for these drugs, or at a minimum, would not challenge Heritage's price increases.

610.     Anne Sather (Heritage) was made responsible for communicating with manufacturer Defendant Sun about the agreed-upon price increase for Nystatin tablets. On April 22, 2014, she and Susan Knoblauch (Sun) spoke for more than forty-five minutes and agreed to increase the prices of numerous drugs, including Nystatin tablets. After her call, Anne Sather emailed her Heritage co-conspirators Jeff Glazer, Jason Malek, Matthew Edelson, Rich Smith, and Neal O'Mara to report that Sun was "on board."  Glazer rapidly emailed her to tell her not to write such emails. Glazer then contacted Sather using his cell phone.

611.     Around May 8, 2014, Malek requested an update on the status of Sather's negotiations with competitors. Sather confirmed the agreement she had reached with Sun.

612.     On June 25, 2014, during an internal Heritage teleconference about pricing, Sather exchanged text messages with Knoblauch (Sun), informing her of the details of Heritage's anticipated price increases.

613.     The agreements held. For example, on July 8, 2014, a large retail customer emailed Teva for a quote on Nystatin tablets, because its current supplier (Sun or Heritage) had

announced a large price increase. Teva either did not provide a bid or provided a high cover bid that allowed Teva, Sun, and Heritage to maintain their anticompetitive agreement.

- **Amiloride-HCTZ, Cimetidine, Diclofenac, Enalapril maleate, Fluvastatin caps, Flurbiprofen, Loperamide hcl, Prazosin hcl, Prochlorperazine, Sotalol hcl (Teva / Mylan)**

614.    Effective April 17, 2014, Mylan increased its WAC pricing on a number of different drugs, including several that overlapped with Teva. Mylan also increased its contract prices, but at least some of those price increases would not become effective until mid-May 2014.

615.    Pursuant to the established understanding between the two companies, Teva immediately decided that it would follow the Mylan increases. On April 21, 2014, T.S., a national account executive at Teva, circulated two spreadsheets with WAC and AWP pricing information for the price increases taken by Mylan. The spreadsheets were created by Mylan personnel. In response, Patel forwarded the information to the Teva sales team and stated: "Our intention is to follow Mylan on this increase. Below, you will see the list of increase items where Teva overlaps with Mylan. Please share any pricing intelligence you are able to obtain. Thank you in advance!"

616.    On May 9, 2014, Nisha Patel wrote to her Teva colleagues, asking them to reach out to Mylan:

> Sorry to be so persistent, but we have not received any Mylan price increase intelligence yet. Whatever you can find would be greatly appreciated. Our intention is to become better, quicker followers, but without intel, we are unable to do so.
>
> In fact, I cannot see Teva being able to follow in the next round of mass price changes (without any price points) at this point. Of course we can always follow by guessing, but it could cause needless price disruption in the market.

617.     An hour and twenty minutes after the email, Rekenthaler (Teva) called Nesta (Mylan) in order to obtain the requested Mylan price points so that Teva could carry out its agreement to support Mylan's price increases.

618.     Patel also asked Teva Director of National Accounts Teri Sherman to help contact Mylan to coordinate prices.  "Please help!" wrote Patel "I have ZERO intel." Patel then alluded to the fact that she had lost one of her best contacts with Mylan when Defendant Green left Teva for Zydus. "At some point, I know I'll have to find another source of magic 😊." The next day (May 10), Sherman sent Patel a spreadsheet entitled "Mylan-Price List A.xls" that had been created by a Mylan employee.

619.     Teva spoke with Mylan again on May 27, 2014 (Rekenthaler and Nesta), and by May 28 Teva had prepared a spreadsheet that reflected the agreement between Mylan and Teva. The spreadsheet listed several drugs for a coordinated increase, categorizing them into a "bucket" called "Follow/Urgent" with the comment "Follow Mylan increase.". The drugs listed were Amiloride-HCTZ tablets; Cimetidine tabs; Diclofenac tabs, Enalapril maleate tabs; Fluvastatin caps; Flurbiprofen tabs; Loperamide hcl caps; Prazosin hcl caps; Prochlorperazine tabs; Sotalol hcl tabs.

- **Fluocinonide, Carbamazepine, Clotrimazole, Warfarin (Teva, Taro)**

620.     On June 3, 2014—the date of the Taro price increases on Fluocinonide, Carbamazepine, Clotrimazole, Warfarin and other drugs—Defendants Patel and Aprahamian exchanged five messages. After those messages, Defendant Patel reported to her Teva colleagues that Taro had in fact raised its pricing on Fluocinonide. She added:

> I expect to provide guidance at some point in the morning. I'm also hearing Warfarin, Carbamazepine as well. I'll be looking at shares and intel tomorrow and will provide commentary. (Taro is

> a high-quality competitor. It's just a matter of who the others
> are.)

621.     At 5:08pm that evening, Defendant Patel (Teva) and Defendant Aprahamian (Taro) spoke on the phone. The next morning they sent each other texts and spoke for 26 minutes. Shortly after hanging up, Defendant Patel sent an e-mail to Teva Senior Director Kevin Galownia implying that she now knew something she did not want to put into writing:

> I have additional intel (I can discuss with you) that will be useful.

622.     On June 13, 2014, Defendant Patel sent an internal e-mail alerting her group, including her supervisor K.G., about a list of drugs on which Teva planned to raise prices. A number of them—including Carbamazepine Chewable tablets, Carbamazepine tablets, Clotrimazole Topical Solution, Fluocinonide Cream, Emollient Cream, Gel and Ointment, and Warfarin sodium tablets—included the notation "Follow/Urgent- Taro" as the reason for the increase. For that list of drugs, Defendant Patel directed that "we should not provide any decreases on these products."  Defendant Patel's directive meant that Teva would not seek to compete for market share against Taro or Zydus when approached by customers due to those competitors' price increases.

623.     On August 28, 2014, Teva followed the Taro price increases on Fluocinonide, Carbamazepine tablets and chew tablets, Clotrimazole topical and Warfarin tablets.

- **Warfarin (Teva, Taro, Zydus) and Topiramate sprinkle (Teva, Zydus)**

624.     Warfarin is a widely-prescribed blood thinner known by the brand name Coumadin. Topiramate sprinkle capsules are used to treat epileptic seizures and migraines.  In June 2014, Defendant Zydus increased prices of both these drugs and Taro increased the price of Warfarin. In the days between the price increases, Teva, Taro and Zydus coordinated regarding these drugs through calls between Patel and Aprahamian (Taro) and Patel, Rekenthaler (Teva) and

**FILED WITH REDACTIONS – PUBLIC VERSION**

Green (former Teva, then Zydus), and Patel and Green (Zydus). The strategy was in place by around June 13 as evidenced by an internal Teva email ("note that we intend to follow [the] Taro and Zydus increase price.")

625.    Defendant Patel sent a directive not to compete for market share against Taro or Zydus when approached by customers due to Taro/Zydus price increases for these drugs.  On August 28, 2014, Teva followed the Taro price increases on Warfarin tablets.

- **August 28, 2014 multi-drug coordinated price increases**

626.    On August 28, 2014, Teva raised its list prices on a number of different drugs including Amiloride-HCTZ (+50% increase), Amoxicillin (+25%), Carbamazepine chew tabs (270%), Carbamazepine tabs (+1538%), Cimetidine tabs (+25%), Clemastine fumarate tabs (+45%), Clotrimazole topical solution (+208%), Amoxicillin-Clavulanate potassium chewable tablets,  Desmopressin tablets (+75%), Diclofenac K tablets (+50%), Disopyramide phosphate tabs (+100%), Enalapril maleate tabs (+230%), Epitol tabs (+1538%), Flurbiprofen (+75%), Flutamide caps, Fluvastatin sodium tabs, Hydroxyurea caps, Loperamide caps, Penicillin VK tabs, Prazosin hcl caps, and Warfarin sodium tabs (+5%).

627.    The day before these increases became effective, on August 27, 2014, Nisha Patel (Teva) spent the morning coordinating the strategy for the price increases on individual calls with CW-1 (Sandoz), Rogerson (Actavis), Aprahamian (Taro), Green (formerly Teva, then at Zydus), and Brown (Glenmark). These competitors did not rely on Teva as a hub of communication; they also called each other to discuss and confirm support for price increases of the listed drugs. For example, regarding Enalapril, Aprahamian (Taro) spoke to M.C. (Wockhardt's Vice President of Sales and Marketing) on August 8 and August 14. Regarding Prochlorperazine, Nesta communicated with M.D., a senior sales executive at non-Defendant manufacturer Cadista Pharmaceuticals, and Defendant Rekenthaler (Teva) on the same day.

**FILED WITH REDACTIONS – PUBLIC VERSION**

628.     In addition to these phone communications, representatives from Teva and every other Defendant met in Boston, Massachusetts shortly before the increase, from August 23-26, 2014, for the NACDS annual event, one of the largest pharmaceutical industry meetings of the year. Defendants Cavanaugh, Rekenthaler and Patel attended, along with other Teva executives.

629.     Teva's August 28, 2014, price increases were coordinated with its competitors and most were meant to carry through on the agreement to follow increases led by other competitors. For those drugs where Teva had agreed to lead the increase, Teva's competitors followed up with price increases as part of the same coordination.

630.     By October 10, 2014, Sandoz had joined Teva's price increase on three drugs: Amoxicillin-Clavulanate potassium chewable tablets; Diclofenac potassium tablets; and Penicillin V potassium tablets. Following the normal pattern, Defendant Patel of Teva spoke to SDZ-CW-1 of Sandoz on the day of these Sandoz price increases.

631.     By October 15, 2014 Teva knew that manufacturer Defendant Actavis would follow along with the increase plan. On December 19, 2014, Actavis follow through and increased prices for Desmopressin acetate tablets.  Defendants Rekenthaler of Teva and Falkin of Actavis spoke frequently in the days and weeks leading up to the Actavis price increase.

632.     Similarly, on March 4, 2015, Mylan followed the Teva and Sandoz price increases on Diclofenac potassium tablets.  Defendant Rekenthaler coordinated that price increase with Defendant Nesta of Mylan during three calls on February 18-19, 2015.

- **January 28, 2015 multi-drug coordinated price increases**

633.     On January 28, 2015, Teva raised prices on a number of different drugs, including the drugs listed on the following page, which shows a spreadsheet found in a Teva Excel file.[24]

---

[24] Additional rows listing more dosage forms and additional columns with information such as market share percentage for each competitor, old price, and new price have been cropped to fit

Nisha Patel or David Rekenthaler arranged these price increases on calls with Defendants Actavis, Amneal, Dr. Reddy's, Heritage, Lannett, Mylan, Par, Sandoz, and Taro.

634. A May 29, 2015 version of the spreadsheet contained additional notes on the coordinated price increases led by Teva: for Danazol capsules (90% increase), someone had noted "Lannett followed February 2015," for Diltiazem hcl and Ketorolac tromethamine tablets (both 90% increase) someone had noted "Mylan followed March 2015," and for Estradiol tablets (90% increase), someone had noted "Actavis followed May 2015."

---

the page. Apart from these edits, the information appears exactly as it did to the conspirators in 2015, including the coloring, font, and text.

**FILED WITH REDACTIONS – PUBLIC VERSION**



**FILED WITH REDACTIONS – PUBLIC VERSION**

- **Ciprofloxacin hcl, Glimepiride (Teva, Dr. Reddy's)**

635. Ciprofloxacin hydrochloride, also known by various brand names including Cetraxal, Otiprio and Ciloxan, is a multipurpose antibiotic.  Dr. Reddy's significantly increased its pricing on both Ciprofloxacin tablets and Glimepiride tablets (a diabetes drug) on August 18, 2014. In the days and weeks leading up to the Dr. Reddy's price increases for these drugs a senior sales executive at Dr. Reddy's spoke frequently with Defendant Patel about the planned price increases. Internal emails at Dr. Reddy's indicate that Reddy's knew to expect Teva increase prices for glimepiride ("Teva had price increases today. No glimepiride though!").  Teva ultimately joined Dr. Reddy's price increases during its next major round of price increases on January 28, 2015. Teva matched Dr. Reddy's WAC price exactly for both Ciprofloxacin hcl and Glimepiride—,. When Teva did follow the Dr. Reddy's (and Actavis) price increases on Ciprofloxacin HCL and Glimepiride, on January 28, 2015, Teva raised its WAC pricing to match Dr. Reddy's WAC prices exactly. That same day, Dr. Reddy's was (again) able to obtain a full copy of Teva's price increase list. That list included many drugs that Dr. Reddy's did not market.

636. Actavis—the only other "quality competitor" in the market for Ciprofloxacin— increased its pricing for that drug on December 19, 2014 to exactly match Dr. Reddy's WAC pricing.  In the days leading up to the Actavis price increase, Defendant Rekenthaler of Teva spoke to Defendant Falkin of Actavis several times to coordinate the increase, including twice on December 17 (with one call lasting nearly nine (9) minutes) and once on December 18, 2014.

- **Griseofulvin microsize oral suspension (Teva, Reddy's)**

637. Griseofulvin microsize oral suspension, also known by the brand name Grifulvin V, is a medication used to treat fungal infections of the skin, hair and nails that do not respond to creams or lotions.

638.     On September 9, 2014, Actavis notified its customers of a price increase on Griseofulvin. In the days leading up to September 9, 2014, Defendants Patel and Rekenthaler of Teva communicated with Defendants Falkin and Rogerson of Actavis to coordinate the increase. The Actavis price increase became effective on October 6, 2014.

639.     Teva promptly added Griseofulvin to its own price increase list, with the notation "Follow Competitor – Actavis" as the reason for the price increase. Teva followed the Actavis increase for Griseofulvin during the next mass price increase event on January 28, 2015 and matched Actavis's WAC pricing exactly. In the days leading up to that price increase, Defendants Rekenthaler of Teva and Falkin of Actavis coordinated frequently.

### L.     Price increases discussed in previously-filed complaints

640.     Plaintiffs (apart from Plaintiff North Sunflower) previously filed standalone single-drug complaints regarding seventeen drugs. Because Plaintiffs had no knowledge of the anticompetitive communications cited in this Complaint at the time when they filed those earlier actions, the allegations of antitrust violations were based on the existence of massive parallel price increases. As illustrated in this section, the price increases for these drugs were supported by the same principles of fair share as discussed in this action. For the convenience of the Court and the parties, Plaintiffs intend to seek leave to amend and consolidate the claims in those previously-filed actions into this Complaint. The single-drug cases would then be superseded by this action and those standalone dockets could then be closed.

   • **Clomipramine (Sandoz, Mylan, Taro)**

641.     Clomipramine (brand: Anafranil) is used for the treatment of obsessive-compulsive disorder, panic disorder, major depressive disorder, and chronic pain.

642.     Mylan, Sandoz and Taro coordinated to support each other's price increases, including a price increase on May 1, 2013 which hiked the price of certain formulations more than 3,000%. For example, 75mg capsules skyrocketed in price:



643.     In the weeks leading up to the Taro price increase on Clomipramine, Defendant Ara Aprahamian (Taro) spoke several times with both SDZ-CW-3 at Sandoz and a national account manager at Mylan.  On several occasions during this time period, Aprahamian hung up the phone with one competitor and immediately called the next.  At the same time, SDZ-CW-4 of Sandoz spoke with a senior sales executive at Taro.  During these conversations, Defendants Taro, Sandoz, and Mylan agreed to raise the price of Clomipramine.  After speaking with Aprahamian twice on April 30, 2013, SDZ-CW-3 hand-wrote notes identifying a list of products as "Taro increases 5/1." SDZ-CW-3's notebook also indicates that SDZ-CW-3 began communicating with Aprahamian about Taro's May 1 increase as early as April 2, 2013.

644.     As part of the agreement to raise prices and not poach each other's customers on Clomipramine, Sandoz consistently refused to bid for Taro's customers after Taro raised its price.

- 195 -

**FILED WITH REDACTIONS – PUBLIC VERSION**

For example, on April 30, 2013, a customer told Sandoz it had received a price increase letter from Taro and asked whether Sandoz wanted to bid for the business.  Defendant Kellum e-mailed SDZ-CW-4 stating "I'm not inclined to do anything here … We can blame supply." Taro did agree to concede one customer to Sandoz so that Sandoz could achieve its fair share of the market.

645.     On May 1, 2013, a customer e-mailed Sandoz asking for a bid on Clomipramine. In responses, Aprahamian had a calls with SDZ-CW-3 the next two days and SDZ-CW-3 relayed the content of these calls to Kellum.  On May 3, 2013, SDZ-CW-4 e-mailed Kellum regarding an upcoming call with the customer:

> When we speak to the clomipramine – let's reiterate we need to keep it on the DL from taro as long as possible. . . . like we don't already know the cat's out of the bag.

646.     Mylan increased its Clomipramine WAC prices on May 16, 2013, following calls between Ara Aprahamian (Taro) Mike Aigner (Mylan) and SDZ-CW-3 (Sandoz), and a parallel set of multiple calls that SDZ-CW-4 (Sandoz) had separately with Jim Nesta (Mylan) and D.S. (Taro). All these calls between competitors occurred in the week before the increase. When Taro was approached by a Mylan customer on July 3, 2013 Aprahamian wrote to Taro colleagues "not inclined to take on new business."

647.     Internal Taro emails on July 20, 2013 confirmed "Sandoz is in the market (and adjusted price to match ours)." Two days later, Sandoz increased its WAC pricing to match the per-unit cost of Taro and Mylan's clomipramine.

648.     Sandoz was approached by a Mylan customer on August 5, 2013 and Kellum shot down the idea of taking 25% of Mylan's business:

> that is tempting but I worry very disruptive.

649.    The next day, Nesta (Mylan) called SDZ-CW-4 at Sandoz twice and appears to have left voicemails. On August, 7, 2014 an individual at Sandoz wrote back to Kellum

> based upon your concerns, I will kill this unless I hear otherwise
> from you.

650.    In December 2013, Sandoz received an inquiry from a Bloomberg reporter who questioned the propriety of the large increases that Sandoz had taken in recent months on a whole host of drugs, including Clomipramine and several other drugs at issue in this Complaint.  After several conversations with antitrust counsel, Defendant Kellum prepared a response to Bloomberg that admitted that Sandoz had raised prices by 1778%  to 2778% and stated that Sandoz had "followed Mylan and Taro when we learned they had taken a price increase which we first learned from the pricing services we subscribe to."

651.    As is clear from the above allegations, Defendant Kellum's statement was a misleading lie.  In reality, Sandoz had raised its prices after coordinating the increases with Taro and Mylan in advance, and had stayed true to its commitments to keep those prices high.

- **Divalproex ER (Mylan, Par, Dr. Reddy's, Zydus)**

652.    In a previously-filed complaint (17-cv-3816), IRPs alleged that by October 2013 Defendants Impax, Lannett, Mylan, Par, and West-Ward had conspired to increase the prices of Divalproex ER tablets.

653.    Internal emails from the Dr. Reddy's confirm that "Mylan walked away from McKesson without responding to the ROFR at all," that afterwards it "appear[ed] that the market has stabilized" and that when offered a "recent opportunity" the team discussed it, but an individual "was concerned with upsetting the market, so we didn't go after it."

- **Pravastatin (Teva, Glenmark, Apotex, Zydus, Lupin)**

654.     As early as May 2, 2013, Nisha Patel engaged in discussions regarding a price

increase for Pravastatin with GLMK-CW-5, a senior executive at Glenmark. Early in the morning

of May 2, 2013 as she was in the process of formulating her list of "high quality" competitors and

the list of price increase candidates, Patel informed a colleague that she expected to have some

"priority items" to add to the price increase list "shortly." Within minutes, she received a call

from GLMK-CW-5 and they discussed price increases for a number of different drugs, including

Pravastatin. Shortly after that call, Patel sent an e-mail to her Teva colleague directing him to add

Pravastatin, and several other Glenmark drugs, to the price increase list. Patel obtained specific

price points from Glenmark for its Pravastatin (and other) price increases—well before the

Glenmark increases became public—and documented those price points in her price increase

spreadsheet.

655.     Defendant Kevin Green (then at Teva) was responsible for coordinating with

Zydus. On May 3, 2013, Green called a senior executive at Zydus, twice. Over the next several

weeks, Green communicated numerous times, with two senior executives at Zydus—including

former ABC executive and experienced fair share horse-trader Mark Kikuchi—to coordinate a

price increase on Pravastatin. After these calls, Green conveyed to his Teva colleagues Nisha

Patel and David Rekenthaler what he had learned from his communications with the Zydus

executives.

656.     On May 17, 2013, while Patel was on the phone discussing Pravastatin and other

drugs with Defendant Berthold (Lupin), she received a call from GLMK-CW-5 which went to

voicemail.  Immediately after she hung up with Berthold, she called GLMK-CW-5.

657.     From May 20-24, 2013, Patel also had a series of calls with a senior sales

executive at Apotex, during which Apotex agreed to raise its price for Pravastatin. Then, on May

- 198 -

28, 2013, Apotex raised its price for Pravastatin by over 100%. Apotex's new, higher prices for Pravastatin exactly matched Glenmark's May 16, 2013 price increase.

658.    From June 9-13, 2013, Green (still at Teva) had multiple calls with the two executives from Zydus. They agreed to raise Pravastatin prices, and did so on June 14, 2013.

659.    On August 4-5, 2013, Green spoke with an executive at Zydus to confirm support for the Pravastatin price increases, and Teva followed through with increased Pravastatin prices on August 9, 2013.  A couple of days after Teva implemented its increase, in an internal email Patel confirmed that it was Green who had indeed coordinated the Pravastatin price increase with Zydus ("KGn got the Zydus intel").

660.    The day before the Teva increase, Patel sent an estimate of the "net upside" to Teva as a result of certain price increases.  She estimated that, for Pravastatin alone, the "net upside after credits" to Teva was $ 674,670,548 per quarter.

- **Baclofen (Teva, Lannett, Par, Upsher-Smith)**

661.    Baclofen (brand names: Gablofen and Lioresal) is a muscle relaxant used to treat muscle spasms caused by certain conditions such as multiple sclerosis and spinal cord injury or disease.

662.    On calls during Nisha Patel's first week at Teva in April 2013, Patel and B.L. (Upsher-Smith) reached an understanding that Teva and Upsher-Smith would follow each other's price increases and not compete for each other's customers after a price increase. Their agreement was further cemented in June and July 2013, when the two competitors agreed to substantially raise the price of Oxybutynin chloride. There was no need for the two competitors to communicate directly regarding Baclofen because it was already understood between them that Teva would follow an Upsher-Smith price increase based on Defendant Patel's prior conversations with B.L., and based on the history of collusion between the two competitors.

- 199 -

**FILED WITH REDACTIONS – PUBLIC VERSION**

663.     Effective February 21, 2014, Defendant Upsher-Smith increased WAC prices for Baclofen by 350% to 420%, depending on the formulation. Teva initially considered following the Upsher-Smith price increase quickly, as part of its April 4, 2014 price increases, but decided against it because at the time Nisha Patel worried that Defendant Par (which then operated the Qualitest label) might be a 'low-quality' competitor that could not be fully trusted to play fair, and would perhaps 'steal' business in the event of price increase. But, in April 2014, Teva learned that Qualitest had supply problems and would perhaps exit the market and so, effective April 15, 2014, Teva raised its Baclofen WAC pricing to match Upsher-Smith's pricing exactly.

664.     . Teva increased its WAC pricing from 350% – 447%, depending on the dosage strength. Teva would not have increased its prices on Baclofen unless it had an understanding in place with Upsher-Smith.

665.     Pursuant to the agreement between the companies, Teva did not seek to take any customers from Upsher-Smith during the time period after Upsher-Smith's increase and before Teva could follow. Even after Teva's increase, when Qualitest customers approached Teva for a bid due to Qualitest's supply problems, Teva deferred to Upsher-Smith. In a June 11, 2014 internal Teva e-mail, Patel wrote:

> Dynamics have changed, but I think we need to see if Upsher wants to pick up share. We have an unreasonably high share.

Kevin Galownia agreed:

> I think this is the right thing to do. . . . we should just give them a high bid.

666.     On June 12, 2014, as Lannett prepared to enter the market seeking a 10% market share due to supply issues, Defendant Tracy Sullivan (Lannett) used Facebook Messenger to contact Nisha Patel:

**FILED WITH REDACTIONS – PUBLIC VERSION**

> I was hoping to touch base with you about some industry news.
> What is your cell phone? Or could you give me a call when you
> have a minute. [Phone number redacted]

The message was sent at 11:16 am. At 11:30 am, Patel called Sullivan. This was the first phone

conversation between Sullivan and Patel since Patel had joined Teva in April 2013.  During the

conversation, Tracy Sullivan informed Nisha Patel that Lannett would be entering the market for

Baclofen shortly.  In a follow-up message through Facebook Messenger later that afternoon,

Sullivan confirmed "Definitely mid July. I'll touch base with you in a few weeks."

667.     On July 11, 2014, as Teva was evaluating whether to take on additional Baclofen

business with a large wholesaler, Patel stated to a Teva colleague:

> [n]ot sure if it helps your review, but there is another entrant
> coming to market (Lannett).  I'm not sure about their share
> targets, but I know it's probably soon.

That same day, Patel sent a text message to Sullivan. "Around?"  Sullivan immediately called

Patel and left a voicemail, and Patel called back.  After the call Patel texted "Thank you!!" and

Sullivan replied "No prob!"

668.     On July 22, 2014, Teva received a challenge from a competitor at one of its

accounts, but declined to provide a bid to retain the account.  Defendant Patel specifically agreed

with the decision to concede, stating "I believe this is Lannett."  Teva's internal tracking database

noted that the customer had been conceded to a "Strategic New Market Entrant."

669.     Teva had significantly increased its price for Baclofen in April 2014 (following an

Upsher-Smith price increase), and was able to maintain those prices even after Lannett entered the

market a few months later.  When Lannett entered the market, it matched Teva's WAC price

exactly.

FILED WITH REDACTIONS – PUBLIC VERSION

- **Benazepril-HCTZ (Sandoz, Mylan, Rising)**

670.     In July 2013, Sandoz finalized its plan to re-launch Benazepril HCTZ and coordinated the launch with Mylan. On July 12, 2013, a marketing executive at Sandoz sent an internal e-mail regarding Benazepril stating: "[b]efore any release, we are expecting Mylan to raise their price." Similarly, during a Commercial Operations meeting on July 15, 2013, it was confirmed that Sandoz was just waiting for confirmation of a Mylan price increase before re-entering the market.

671.     The next day, on July 16, 2013, SDZ-CW-4 spoke with Defendant Nesta and sent the July 2013 E-mail outlining the Mylan price increase drugs that Defendant Nesta had provided to her (discussed more fully above??). That list did not include Benazepril HCTZ. CW-1 forwarded the email to Defendant Kellum and "See note below for Mylan increases …I'm surprised benazepril hctz isn't on the list below for Mylan?" SDZ-CW-1 then emailed SDZ-CW-4 asking "Benazepril hctz? Was hoping to see that one."

672.     Over the next few days, SDZ-CW-4 and Defendant Nesta communicated several times during which they discussed support for a coordinated price increase on Benazepril HCTZ. On August 9, 2013 Mylan carried out the agreed strategy by increasing WAC pricing by over 300% on all dosage forms. On August 20, 2013, consistent with their agreement to maintain share and high prices, Sandoz re-entered the Benzepril HCTZ market and essentially matched Mylan's pricing.

673.     A third competitor, Rising, entered the Benazapril-HCTZ market on April 2, 2014 as the authorized generic. When Rising entered, it essentially matched the WAC pricing of Sandoz and Mylan. Both before and after entering the market, SDZ-CW-2 – then at Rising – communicated with his former colleagues at Sandoz ,SDZ-CW-1, SDZ-CW-2, and another individual, about market share for Benazepril-HCTZ. Through those communications, Sandoz

**FILED WITH REDACTIONS – PUBLIC VERSION**

ultimately agreed to relinquish the ABC account to Rising so that the new entrant could achieve its fair share of the market.

- **Desonide (Actavis, Perrigo, Sandoz, Taro)**

674.    In a previously filed complaint (17-cv-3815), based on the evidence of massive price increases available at the time, Plaintiffs alleged that around May 2013, Mylan and Sun conspired to increase the prices of generic Desonide cream and ointment, which are topical corticosteroids. The Defendants did not challenge those allegations. As the manufacturer defendants have begun to produce documents in this MDL, Plaintiff have begun to locate non-price evidence of collusion on various formulations of Desonide. For example, an internal Sandoz strategy document from December 2013 noted that Actavis had re-entered the market for Desonide lotion and the "next step" was to "relinquish 30% share," including concession of specific accounts (McKesson, WalMart, and Econdisc)

- **Fluocinonide (Teva, Taro, Sandoz, Actavis)**

675.    Fluocinonide, is a topical corticosteroid used for the treatment of a variety of skin conditions, including eczema, dermatitis, psoriasis, and vitiligo. It is one of the most widely prescribed dermatological drugs in the United States and comes in various formulations: a cream, an emollient cream, a gel, and an ointment.

676.    Taro and Sandoz had worked together to increase prices in 2012. On February 17, 2012, Taro's VP of Prescription Sales pushed back on the temptation to cheat on fair share:

> We are raising our prices to send a message to Fougera that that is a good thing and we will follow. Stealing share may send the wrong message. Think.

677.    Teva coordinated with Taro and Sandoz to increase the price of all four formulations of Fluocinonide in July 2013, based in part on discussions between Defendants Patel

and Aprahamian that began when Patel was still employed at Defendant ABC. The increases to the WAC prices in 2013 were 10 to 17%, depending on the formulation.

678.     Teva and Taro then raised prices a second time in a set of coordinated increases that Taro made effective June 3, 2014. These increases doubled, tripled, or quadrupled the cost of the drug (for different tube sizes of Fluocinonide cream the WAC prices became 206%-754% higher, for gel 155%-255% higher, for ointment 206-483% higher, and for emollient cream, 160-430% higher). Internal documents prior to the Taro increases show that Teva had already listed these formulations as "Follow/Urgent" even though Taro had not yet increased its price on those drugs or notified its customers that it would be doing so. Patel (Teva) coordinated with Aprahamian (Taro) both before and after the Taro increases in order to assure Taro that Teva agreed to support the increase. The day after the Taro price increase became effective, Patel had a twenty-five minute call with Aprahamian and within minutes of hanging up, she wrote in an email to her superiors.

> I have additional intel (I can discuss with you) that will be useful. We should probably discuss how we want to handle all Taro increase items. Taro is a high quality competitor and I think we need to be responsible where we have adequate market share.

679.     Teva acted in accordingly, and declined to supply customers who came to Teva seeking a lower price given Taro's increase.

680.     By June 23, 2014, Teva was in possession of confidential Taro price points for different categories of customers and used this information to carry out its agreement to raise prices along with Taro. The Teva price increases on Fluocinonide became effective on July 1, 2014. Teva increased its WAC pricing to match Taro's pricing almost exactly.

681.     Taro, via Defendant Aprahamian, also shared this confidential pricing information with SDZ-CW-3 at Sandoz, during a conversation on June 20, 2014. Sandoz was mainly selling

the gel and not actively marketing the ointment at the time, but Aprahamian provided Taro's confidential effective prices for both the gel and the ointment as well as several other Teva-Sandoz overlap drugs.  SDZ-CW-3 took very detailed notes of the pricing information Aprahamian provided, which again were not publicly available. Based on a history and pattern of practice between SDZ-CW-3 and Defendant Aprahamian, it was understood that Sandoz would follow the Taro price increase. Sandoz ceased sales of the ointment by September 2014, but on October 10, 2014, Sandoz followed through with the conspirators' coordinated pricing plan and increased its WAC price for the flucinonide gel by 491%. That same day, Defendant Patel spoke to SDZ-CW-1 at Sandoz by phone for more than three (3) minutes.

682.    Actavis also participated in the price increases, although it sold only the cream. Actavis followed the Taro and Teva price increases in December 2014 by raising its prices to the exact WAC prices as Teva and Taro. The Actavis price increase on Fluocinonide cream was effective December 19, 2014.  Not surprisingly, in the days and weeks leading up to the Actavis price increase, the co-conspirators at Actavis, Taro and Teva were all communicating frequently.

- **Levothyroxine (Sandoz, Lannett)**

683.    Levothyroxine is a synthetic form of the thyroid hormone thyroxine used to treat hypothyroidism, goiter, and thyroid cancer. Levothyroxine was the second most prescribed drug, measured by number of prescriptions, in the United States in the first quarter of 2010.  Over 120 million prescriptions are written annually for Levothyroxine in the United States, treating 15% of the population over the age of 55.

684.    Since approximately December 2010, Defendants Mylan, Sandoz, and Lannett have dominated the generic Levothyroxine market.

685.    In the years 2013 and 2014, the three competitors coordinated to significantly raise the price of Levothyroxine.  Defendant Jim Nesta (Mylan) spearheaded the discussions by

- 205 -

**FILED WITH REDACTIONS – PUBLIC VERSION**

speaking with a senior sales executive at Lannett, and with SDZ-CW-4 of Sandoz.  In addition to communicating directly with SDZ-CW-4 on this drug, Nesta also communicated indirectly with Sandoz through a mutual contact at a competitor company—Defendant Kevin Green (Teva).  Notably, Levothyroxine was not a drug that Teva sold.

686.     As detailed above, Mylan increased prices on a number of drugs on January 4, 2013, including Levothyroxine.  The day before the Mylan increase, on January 3, 2013, Nesta and Green of Teva spoke at least four times by phone.  The next morning—the day of the Mylan price increases—Green spoke twice with Kellum.

687.     Shortly after hanging up the phone with Green, Kellum sent an internal e-mail stating, among other things, that he "[j]ust heard from a customer that . . . Mylan took a significant price increase on Levothyroxine" and Defendant Kellum advised his team to "please be cautious" on this product.  As the phone records demonstrate, Kellum's source for the information was not "a customer," but rather Defendant Green of Teva.

688.     On January 14, 2013 Lannett raised its pricing for Levothyroxine to match Mylan.  Notably, after these phone calls, Defendant Nesta would not speak again with his contact at Lannett until August 6, 2013—three days before Mylan increased its prices for Levothyroxine a second time.

689.     On July 16, 2013—as detailed above—SDZ-CW-4 spoke with Defendant Nesta and sent the an email identifying the Mylan price increases.  The price list included Levothyroxine and noted that Lannett had followed.

690.     On August 6, 2013, Defendant Nesta called SDZ-CW-4 two times. A few minutes after the second call, Defendant Nesta called K.S. at Lannett.  The call lasted 24 seconds (likely a

voicemail).  Three days later, on August 9, 2013, Mylan increased WAC pricing on Levothyroxine for a second time.

691.     On August 10, 2013, a national account executive at Sandoz, sent an internal e-mail that stated:

> Mylan took a 300% price increase on Levothyroxine!!!  Based on my intelligence (we will need to confirm), please lock down inventory (strict allocation per AK) and no new product offers until we can clarify the situation.

SDZ-CW-4 replied to S.G.'s e-mail stating, "This is correct based on my info as well."

692.     Pursuant to their ongoing understanding, Lannett followed quickly and matched Mylan's WAC pricing on August 14, 2013.

693.     On September 5, 2013, a Mylan customer contacted Lannett and requested a bid on Levothyroxine.  Lannett internally noted that the volume was small and so "it wouldn't attract much attention from Mylan if it went to us …."  Nonetheless, on September 12, 2013, Lannett declined the opportunity and blamed supply issues stating "[a]s much as we'd love to take on the business, we are not in a position to do so at this time."

694.     During a September 10, 2013 earnings call, Lannett's CEO Arthur Bedrosian was asked for his reaction to Mylan's Levothyroxine price increase.

> You mean after I sent them a thank you note?  I'm just kidding. . . I'm always grateful to see responsible generic drug companies realize that our cost of doing business is going up as well. . . . So whenever people start acting responsibly and raise prices as opposed to the typical spiral down of generic drug prices, I'm grateful.

695.     On September 13, 2013, Sandoz did indeed act "responsibly" and, consistent with the understanding it had with its competitors, raised WAC pricing to match Mylan and Lannett.

FILED WITH REDACTIONS – PUBLIC VERSION

696.    The three competitors – Defendants Mylan, Lannett, and Sandoz – did not stop there.  They coordinated again to raise price on Levothyroxine in April/May 2014.

- **Propranolol (Teva, Actavis, Breckenridge, Heritage, Mylan, Par)**

697.    Defendants David Rekenthaler (Teva) spoke with Marc Falkin (Actavis) and separately with Jim Nesta (Mylan) multiple times in the week before Actavis notified its customers of significant increases to its Propranolol list prices on January 15, 2015.  On these calls, Actavis, Teva and Mylan coordinated the price increase for Propranolol. a day later, as a result of the calls between competitors, Propranolol was listed on Teva's price increase list, and Teva raised its pricing on January 28, 2015. Teva (Rekenthaler) and Falkin (Actavis) spoke again twice the day before the Actavis propranolol price increase became effective on February 16, 2015.  Mylan ultimately followed the Teva and Actavis price increases for Propranolol with a price increase of its own on July 10, 2015.

## V.    THE STATUTES OF LIMITATIONS DO NOT BAR PLAINTIFFS' CLAIMS

### A.    The Statutes of Limitations Did Not Begin to Run Because Plaintiffs Did Not and Could Not Discover Defendants' Unlawful Conspiracy

698.    Plaintiffs had no knowledge of the specific events alleged in sections I, J, and K and L, or of facts sufficient to place them on inquiry notice of the claims set forth herein, until, at the earliest, May 10, 2019. Prior to that time, no information available to Plaintiffs was sufficient to suggest Defendants' conduct relating to the Drugs at Issue new identified in this complaint.

FILED WITH REDACTIONS – PUBLIC VERSION

699.     Plaintiffs had no contact or interaction with any of the Defendants in this case by which they could have discovered Defendants' conspiracy.

700.     Defendants repeatedly and expressly stated throughout the Class Period, including on their public websites, that they maintained antitrust/fair competition policies, which prohibited the type of collusion alleged in this Complaint. It was reasonable for members of the Classes to believe that Defendants were complying with their own antitrust policies.

701.     For these reasons, the statutes of limitations as to Plaintiffs' claims under the federal and state laws identified herein did not begin to run, and have been tolled, with respect to the claims that Plaintiffs have alleged in this Complaint.

### B.     Fraudulent Concealment Tolled the Statutes of Limitations.

702.     In the alternative, application of the doctrine of fraudulent concealment tolled the statutes of limitations on the claims asserted by Plaintiffs.

703.     Defendants actively concealed, suppressed, and omitted to disclose material facts to Plaintiffs and members of the Classes concerning Defendants' unlawful activities to artificially inflate prices for generic drugs. The concealed, suppressed, and omitted facts would have been important to Plaintiffs and members of the Classes as they related to the cost of generic drugs they purchased. Defendants misrepresented the real cause of price increases and/or the absence of price reductions in generic drugs. Defendants' false statements and conduct concerning the prices of generic drugs were deceptive as they had the tendency or capacity to mislead Plaintiffs and members of the Classes to believe that they were purchasing generic drugs at prices established by a free and fair market.

FILED WITH REDACTIONS – PUBLIC VERSION

## 1. Active Concealment of the Conspiracy.

704.    Defendants engaged in an illegal scheme to fix prices, allocate customers and rig bids. Criminal and civil penalties for engaging in such conduct are severe. Not surprisingly, Defendants took affirmative measures to conceal their conspiratorial conduct.

705.    Through their lying, deceptive, and false statements, Defendants effectively concealed their conspiracy, thereby causing economic harm to Plaintiffs and the Classes. Defendants' misrepresentations regarding their price changes were intended to lull Plaintiffs and the Classes into accepting the price hikes as a normal result of competitive and economic market trends rather than the consequences of Defendants' collusive acts. The public statements made by Defendants were designed to mislead Plaintiffs and the Classes into paying unjustifiably higher prices for generic drugs.

706.    For example, Heritage executives took overt steps to conceal their illegal activity and destroy evidence of any wrongdoing going back to at least 2012. This conduct included a concerted and conscious effort to destroy documents, instructions not to put incriminating evidence in writing, directives not to use email, and the deletion of incriminating text messages.

707.    The Defendants also gave pretextual reasons for price increases. For example, during an August 11, 2015 earnings call, Dilip Shanghvi, the Managing Director at Sun Pharmaceutical Industries Ltd., misleadingly discussed "competitive pressure on some of the products…where competitive intensity has increased," when in fact, Sun was engaged in a conspiracy to lessen competitive forces and inflate prices.

708.    In an interview with journalists in August 2019, Teva CEO Kåre Schultz said that "[b]ased on everything we have seen, we have not found any evidence whatsoever of any organized price-fixing on our behalf, so we deny the allegations." Teva's CEO continues to

mislead the public about the nature of this case and Teva's conduct. In an interview with Barron's published on November 7, 2019, he stated that Teva had produced over a million documents and:

> We have not found any evidence in all those documents that we in any way participated in organized collusion or price fixing.

709.    Mylan has also released similarly false and misleading statements, for example on August 14, 2019 Mylan stated:

> With assistance from outside counsel we thoroughly investigated allegations made against our company and employees in the civil complaint filed by various state attorneys general, including the most recent allegation relating to obstruction. We have not found any evidence to corroborate the allegations.

710.    These types of false statements and others made by Defendants helped conceal the illegal conspiracy entered into by Defendants to fix, stabilize, maintain and raise the price of generic drugs to inflated, supracompetitive levels.

711.    Through their misleading, deceptive, false and fraudulent statements, Defendants effectively concealed their conspiracy, thereby causing economic harm to Plaintiffs and the Classes. Defendants' misrepresentations regarding their price changes were intended to lull Plaintiffs and the Classes into accepting the price hikes as a normal result of competitive and economic market trends rather than as the consequence of Defendants' collusive acts. The public statements made by Defendants were designed to mislead Plaintiffs and the Classes into paying unjustifiably higher prices for generic drugs.

### 2.    Plaintiffs Exercised Reasonable Diligence.

712.    Defendants' anticompetitive conspiracy, by its very nature, was self-concealing. Accordingly, a reasonable person under the circumstances would not have been alerted to investigate the legitimacy of Defendants' prices before these disclosures.

713.     Because of the deceptive practices and techniques of secrecy employed by Defendants and their co-conspirators to conceal their illicit conduct, Plaintiffs and the Classes could not have discovered the details of the conspiracy alleged herein at an earlier date by the exercise of reasonable diligence.

714.     Therefore, the running of any statutes of limitations has been tolled for all claims alleged by Plaintiffs and the Classes as a result of Defendants' anticompetitive and unlawful conduct. Despite the exercise of reasonable diligence, Plaintiffs and Members of the Classes were unaware of Defendants' unlawful conduct and did not know that they were paying supracompetitive prices throughout the United States during the Class Period.

715.     For these reasons, Plaintiffs' claims are timely under all of the federal, state and common laws identified herein.

## VII.    CONTINUING VIOLATIONS

716.     This Complaint alleges a continuing course of conduct (including conduct within the limitations periods), and Defendants' unlawful conduct has inflicted continuing and accumulating harm within the applicable statutes of limitations. Thus, Plaintiffs and the members of the Damages Classes can recover for damages that they suffered during any applicable limitations period.

## VIII.   DEFENDANTS' ANTITRUST VIOLATIONS

717.     During the Class Period, set forth below, Defendants engaged in a continuing agreement, understanding, and conspiracy in restraint of trade to allocate customers, rig bids, and fix, raise, and/or stabilize prices for the Drugs at Issue sold in the United States.

718.     In formulating and effectuating the contract, combination or conspiracy, Defendants:

FILED WITH REDACTIONS – PUBLIC VERSION

(a)   participated in meetings and conversations regarding the prices of the Drugs at Issue;

(b)   agreed during those meetings and conversations to charge prices at specified levels and otherwise to increase and/or maintain prices of the Drugs at Issue sold in the United States;

(c)   agreed during those meetings and conversations to allocate customers, rig bids, and fix the price of the Drugs at Issue; and

(d)   issued price announcements and price quotations in accordance with their agreements.

719.   Defendants and their co-conspirators engaged in the activities described above for the purpose of effectuating the unlawful agreements described in this Complaint.

720.   Defendants' contract, combination and conspiracy constitutes an unreasonable restraint of trade and commerce in violation of Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3) and the laws of various State Damages Jurisdictions enumerated below.

721.   As a result of Defendants' unlawful conduct, Plaintiffs and the other members of the Classes have been injured in their business and property in that they have paid more for the Drugs at Issue than they would have paid in a competitive market. Wholesalers who purchased directly from Defendants were able to pass on overcharges to Plaintiff pharmacies, who have no meaningful ability to set their own resale / retail prices due to the automated and contract-bound nature of the modern pharmaceutical supply chain. The impairment of generic competition at the direct purchaser level caused similar injuries to all privately-owned pharmacies, who were equally denied the opportunity to purchase less expensive generic versions of the drugs.

722.   The unlawful contract, combination and conspiracy has had the following effects, among others:

(a)   price competition in the markets for the Drugs at Issue have been artificially restrained;

(b)   prices for the Drugs at Issue sold by Defendants have been raised, fixed, maintained, or stabilized at artificially high and non-competitive levels; and

**FILED WITH REDACTIONS – PUBLIC VERSION**

(c)     pharmacy purchasers of the Drugs at Issue sold by Defendants
have been deprived of the benefit of free and open competition in
the market for the Drugs at Issue.

## IX.    CLASS ACTION ALLEGATIONS

723.    Plaintiffs bring this action on behalf of themselves and on behalf of three classes:

(1) a class seeking injunctive relief under federal law

(the "**Pharmacy and Hospital Injunctive Class**"),

(2) a class seeking damages under federal law for purchases from the implicated

distributor Defendants

(the "**Pharmacy and Hospital Federal Damages Class**"),

(3) a class seeking all remedies available under state antitrust and consumer

protection laws, also known as "unfair or deceptive trade practices" laws

(the "**Pharmacy and Hospital State Damages Class**").

724.    **Pharmacy and Hospital Injunctive Class**. Plaintiffs bring this action on behalf

of themselves and as a class action under Rule 23(a) and (b)(2) of the Federal Rules of Civil

Procedure, seeking equitable and injunctive relief on behalf of the following class (the "Injunctive

Class"):

All dispensers of drugs in the United States that purchased one or
more of the generic Drugs at Issue in this complaint from March 1,
2011 through the present.

This class excludes: (a) Defendants, their officers, directors,
management, employees, subsidiaries and affiliates; (b) entities
owned in part by judges or justices involved in this action or any
members of their immediate families; (c) all pharmacies owned or
operated by publicly traded companies.

The Drugs at Issue are listed in the Appendix to this complaint.

725.     **Pharmacy and Hospital <u>Federal Damages</u> Class**. Plaintiffs bring this action on behalf of themselves and as a class action under Fed. R. Civ P. Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure, seeking damages under the Sherman Act on behalf of the following class (the "Federal Damages Class"):

> All dispensers of drugs (including hospitals and independent pharmacies), in the United States and its territories, that purchased the generic Drugs at Issue directly from distributor Defendants AmerisourceBergen Corp., Cardinal, Red Oak, Harvard, H.D. Smith, McKesson, Morris & Dickson, or Walgreens Boots Alliance or its subsidiaries, from March 1, 2011 through the present.

> This class excludes: (a) Defendants, their officers, directors, management, employees, subsidiaries and affiliates; (b) entities owned in part by judges or justices involved in this action or any members of their immediate families; (c) all pharmacies owned and operated by publicly traded companies.

> The Drugs at Issue are listed in the appendix to this complaint.

726.     **Pharmacy and Hospital <u>State Damages</u> Class.** Plaintiffs also bring this action on behalf of themselves and as a class action under Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure seeking damages pursuant to the common law of unjust enrichment and the state antitrust, unfair competition, and consumer protection laws of the states and territories listed below (the "State Damages Jurisdictions")[25] on behalf of the following class (the "State Damages Class"):

---

[25] The State Damages Jurisdictions, for purposes of this complaint, are: Alabama, Alaska, Arizona, Arkansas, California, Colorado, <u>Connecticut,</u> Delaware, Florida, Georgia, Idaho, ~~Illinois~~, Iowa, Kansas, Louisiana, Maine, Maryland, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Montana, Nebraska, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Carolina, North Dakota, Oregon, Pennsylvania, Rhode Island, ~~South Carolina~~, South Dakota, Tennessee, Texas, Utah, Vermont, Virginia, Washington, West Virginia, Wisconsin and Wyoming as well as the District of Columbia and Puerto Rico.

**FILED WITH REDACTIONS – PUBLIC VERSION**

All dispensers of drugs (including hospitals and independent pharmacies), in the State Damages Jurisdictions that purchased one or more of the generic Drugs at Issue from any source other than:

(a) the distributor Defendants (AmerisourceBergen Corp., Cardinal, Red Oak, Harvard, H.D. Smith, McKesson, or Morris & Dickson), or

(b) the manufacturer Defendants (Akorn, Alvogen, Actavis, Amneal, Apotex, Aurobindo, Barr, Bausch, Breckenridge, Caraco, Camber, Citron, Endo, Glenmark, Greenstone, Heritage, Lannett, Lupin, Mayne, Mutual, Mylan, Par, Perrigo, Pfizer, Pliva, Rising, Sandoz/Fougera, Sun, Taro, Teva, Upsher-Smith, URL Pharma, West-Ward, Wockhardt, Zydus).

This class excludes:  (a) Defendants, their officers, directors, management, employees, subsidiaries and affiliates; (b) any entities owned in part by judges or justices involved in this action or any members of their immediate families; (c) all pharmacies owned or operated by publicly traded companies.

The Drugs at Issue are listed in the Appendix to this complaint.

727.     While Plaintiffs do not know the exact number of the members of the Classes, Plaintiffs believe there are thousands of members in each Class.

728.     Common questions of law and fact exist as to all members of the Classes. This is particularly true given the nature of Defendants' conspiracy, which was generally applicable to all the members of both Classes, thereby making appropriate relief with respect to the Classes as a whole. Such questions of law and fact common to the Classes include, but are not limited to:

> (d)     Whether Defendants and their co-conspirators engaged in a combination and conspiracy among themselves to fix, raise, maintain and/or stabilize prices of Drugs at Issue and/or engaged in market allocation for Drugs at Issue sold in the United States;
> (e)     The identity of other participants of the conspiracy;
> (f)     The duration of the conspiracy and the acts carried out by Defendants and their co-conspirators in furtherance of the conspiracy;
> (g)     Whether the conspiracy violated the Sherman Act,
> (h)     Whether the conspiracy violated state antitrust and unfair competition laws, and/or state consumer protection laws,

- 216 -

**FILED WITH REDACTIONS – PUBLIC VERSION**

> (i)     Whether Defendants unjustly enriched themselves to the detriment
>         of the Plaintiffs and the members of the Classes, thereby entitling
>         Plaintiffs and the members of the Classes to disgorgement of all
>         benefits derived by Defendants,
>
> (j)     Whether the conduct of Defendants and their co-conspirators, as
>         alleged in this Complaint, caused injury to the business or property
>         of Plaintiffs and the members of the Classes;
>
> (k)     The effect of the conspiracy on the prices of Drugs at Issue sold in
>         the United States during the Class Period;
>
> (l)     Whether the Defendants and their co-conspirators actively
>         concealed, suppressed, and omitted to disclose material facts to
>         Plaintiffs and members of the Classes concerning Defendants'
>         unlawful activities to artificially inflate prices for Drugs at Issue,
>         and/or fraudulently concealed the unlawful conspiracy's existence
>         from Plaintiffs and the other members of the Classes;
>
> (m)     The appropriate injunctive and related equitable relief for the
>         Injunctive Class; and
>
> (n)     The appropriate class-wide measure of damages for the Damages
>         Classes.

729.    Plaintiffs' claims are typical of the claims of the members of the Classes. Plaintiffs and all members of the Classes are similarly affected by Defendants' wrongful conduct in that they paid artificially inflated prices for Defendants' Drugs at Issue. Plaintiffs' claims arise out of the same common course of conduct giving rise to the claims of the other members of the Classes.

730.    Plaintiffs will fairly and adequately protect the interests of the Classes. Plaintiffs' interests are coincident with, and not antagonistic to, those of the other members of the Classes. Plaintiffs are represented by counsel who are competent and experienced in the prosecution of antitrust and class action litigation.

731.    The questions of law and fact common to the members of the Classes predominate over any questions affecting only individual members, including legal and factual issues relating to liability and damages.

732.    Class action treatment is a superior method for the fair and efficient adjudication of the controversy. Such treatment will permit a large number of similarly situated entities to prosecute their common claims in this single forum simultaneously, efficiently and without the unnecessary duplication of evidence, effort and expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured hospitals and pharmacies with a method for obtaining redress for claims that might not be practicable to pursue individually, substantially outweigh any difficulties that may arise in management of this class action. The prosecution of separate actions by individual members of the Classes would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

FILED WITH REDACTIONS – PUBLIC VERSION

## X.    CAUSES OF ACTION

733.    In the Counts laid out below, Plaintiffs seek several forms of relief, against different sets of Defendants, under both federal and state law. As to the overarching conspiracy in which all Defendants participated, and as to each drug-specific conspiracy in which certain Defendants participated as alleged above, Plaintiffs seek relief under the laws specified in the Counts below.

- **COUNT 1**
  **Violation of Sections 1 and 3 of the Sherman Act—Injunctive Relief**
  (against all Defendants on behalf of Plaintiffs and the Injunctive Class)

734.    Plaintiffs incorporate by reference the allegations set forth above as if fully set forth herein. This count is brought against all Defendants for their participation in an overarching conspiracy to fix, raise and/or stabilize the prices of the Drugs at Issue.

735.    During the Class Period, Defendants and their unnamed co-conspirators entered into and engaged in a "contract, combination, or conspiracy" in unreasonable "restraint of trade" in violation of Sections 1 and 3 of the Sherman Act (15 U.S.C. § 1, 3). The Defendants' conspiratorial acts have caused unreasonable restraints in the market for the generic drugs at issue in this complaint.

736.    Defendants and their co-conspirators entered into a continuing agreement, understanding and conspiracy in restraint of trade to artificially allocate customers, rig bids and raise, maintain and fix prices for generic Drugs at Issue, thereby creating anticompetitive effects.

737.    The acts done by each of the Defendants as part of, and in furtherance of, their contract, combination, or conspiracy were authorized, ordered, or done by their officers, agents, employees, or representatives while actively engaged in the management of Defendants' affairs.

FILED WITH REDACTIONS – PUBLIC VERSION

738.    As a result of Defendants' unlawful conduct, Plaintiffs and other similarly situated pharmacies and hospitals in the Injunctive Class have been harmed by being forced to pay inflated, supracompetitive prices for generic Drugs at Issue.

739.    Defendants' conspiracy had the following effects, among others:

(a)    Price competition in the market for the Drugs at Issue has been restrained, suppressed, and/or eliminated in the United States;

(b)    Prices for the Drugs at Issue provided by Defendants and their co-conspirators have been fixed, raised, maintained, and stabilized at artificially high, non-competitive levels throughout the United States; and

(c)    Plaintiffs and members of the Injunctive Class have been deprived of the benefits of free and open competition.

740.    Plaintiffs and members of the Injunctive Class have been injured and will continue to be injured in their business and property by paying more for the Defendants' Drugs at Issue than they would have paid and will pay in the absence of the conspiracy.

741.    Plaintiffs must continue purchasing the Drugs at Issue in order to continue to operate their businesses.

742.    Defendants' contract, combination, or conspiracy is a per se violation of the federal antitrust laws.

743.    Plaintiffs and members of the Injunctive Class are entitled to an injunction against Defendants, preventing and restraining the continuing violations alleged herein.

FILED WITH REDACTIONS – PUBLIC VERSION

- **COUNT 2**
  **Violation of Sections 1 and 3 of the Sherman Act—Damages**
  (on behalf of Plaintiffs and the Federal Damages Class against distributor
  Defendants AmerisourceBergen Corp., Cardinal, Red Oak, Harvard, H.D. Smith,
  McKesson, Morris & Dickson, and WBAD for purchases made directly from
  these Defendants)

744.     Plaintiffs incorporate by reference the allegations set forth above as if fully set

forth herein. This count is brought against all distributor Defendants for their participation in an

overarching conspiracy to fix, raise and/or stabilize the prices of the Drugs at Issue, listed in the

Appendix to this complaint.

745.     The distributor Defendants shared with their manufacturer Defendant co-

conspirators a common goal of maintaining and increasing market-wide prices, including both list

prices and contract prices, and of allocating fair share among the manufacturers in order to

prevent price erosion. As a result of the distributor Defendants' unlawful conduct in violation of

Sections 1 and 3 of the Sherman Act (15 U.S.C. § 1, 3), Plaintiffs and other similarly situated

pharmacies and hospitals in the Federal Damages Class who made direct purchases of the Drugs

At Issue from the distributor Defendants were forced to pay inflated, supracompetitive prices for

the generic Drugs at Issue. Plaintiffs and members of the Damages Class who made such direct

purchases seek treble damages for those purchases, and the cost of suit, including reasonable

attorney's fees, as per 15 U.S.C. § 15(a).

FILED WITH REDACTIONS – PUBLIC VERSION

- **COUNT 3**
  **Violation of Sections 1 and 3 of the Sherman Act—Damages**
  (against ABC on behalf of Plaintiffs and the Federal Damages Class for purchases made directly from ABC and H.D. Smith)

746.     Plaintiffs incorporate by reference the allegations set forth above as if fully set forth herein. In the alternative to Count 2, which alleges that the distributor Defendants participated in an overarching, interdependent conspiracy with a common goal of maintaining and increasing the prices of the drugs listed,  this Count is brought solely against Defendant ABC and the Defendants listed in the chart below for their participation in the following subsidiary schemes, which, if Count 2 is not sustained, are legally cognizable as individual agreements in restraint of trade in violation of the Sherman Act.   Plaintiffs and members of the Federal Damages Class who made such direct purchases from Defendant ABC seek treble damages for those purchases, and the cost of suit, including reasonable attorney's fees, as per 15 U.S.C. § 15(a).

| Drug | Defendants / *Co-Conspirators* |
|---|---|
| Acyclovir tablets | ABC (H.D. Smith conduct), Heritage, Zydus |
| Amphetamine IR capsules | ABC, Aurobindo, Teva |
| Buprenorphine tablets | ABC, Sun, Teva |
| Cabergoline tablets | ABC, Greenstone, Teva |
| Lamotrigine ER tablets | ABC, Dr. Reddy's, *Wilshire* |
| Loperamide hcl capsules | ABC, Mylan, Teva |
| Modafinil tabs | ABC, Teva, *Ingenus* |
| Pioglitazone-Metformin tablets | ABC, Sandoz, Teva |
| Valganciclovir tablets | ABC (H.D. Smith conduct), Dr. Reddy's, Camber |
| Zoledronic Acid injection | ABC, Heritage, Dr. Reddy's |

**FILED WITH REDACTIONS – PUBLIC VERSION**

- **COUNT 4**
  **Violation of Sections 1 and 3 of the Sherman Act—Damages**
  (against H.D. Smith on behalf of Plaintiffs and the Federal Damages Class for purchases made directly from H.D. Smith and ABC)

747.    Plaintiffs incorporate by reference the allegations set forth above as if fully set forth herein. In the alternative to Count 2, which alleges that the distributor Defendants participated in an overarching, interdependent conspiracy with a common goal of maintaining and increasing the prices of the drugs listed, this Count is brought solely against Defendant H.D. Smith and the Defendants listed in the chart below for their participation in the following subsidiary schemes, which, if Count 2 is not sustained, are legally cognizable as individual agreements in restraint of trade in violation of the Sherman Act.   Plaintiffs and members of the Federal Damages Class who made such direct purchases from Defendant H.D. Smith seek treble damages for those purchases, and the cost of suit, including reasonable attorney's fees, as per 15 U.S.C. § 15(a).

| Drug | Defendants / Co-Conspirators |
|---|---|
| Acyclovir tablets | H.D. Smith, Heritage, Zydus |
| Valganciclovir | H.D. Smith, Camber, Dr. Reddy's |

**FILED WITH REDACTIONS – PUBLIC VERSION**

- **COUNT 5**
  **Violation of Sections 1 and 3 of the Sherman Act—Damages**
  (against Cardinal and Red Oak on behalf of Plaintiffs and the Federal Damages
  Class for purchases made directly from Cardinal, Harvard, and Red Oak)

748.    Plaintiffs incorporate by reference the allegations set forth above as if fully set forth herein. In the alternative to Count 2, which alleges that the distributor Defendants participated in an overarching, interdependent conspiracy with a common goal of maintaining and increasing the prices of the drugs listed, this Count is brought solely against Cardinal, Red Oak, and the Defendants listed in the chart below for their participation in the following subsidiary schemes, which, if Count 2 is not sustained, are legally cognizable as individual agreements in restraint of trade in violation of the Sherman Act.   Plaintiffs and members of the Federal Damages Class who made such direct purchases from Cardinal, Red Oak, or Harvard seek treble damages for those purchases, and the cost of suit, including reasonable attorney's fees, as per 15 U.S.C. § 15(a).

| Drug | Defendants / Co-Conspirators |
|---|---|
| Doxycycline hyclate DR | Cardinal, Heritage, Mylan |
| Eplerenone tablets | Cardinal (Harvard), Greenstone, Upsher-Smith |
| Fenofibrate tablets | Cardinal, Teva, Mylan, Lupin, Zydus, Dr. Reddy's |
| Eszopiclone tabs | Cardinal, Dr. Reddy's, M&D, Sun |
| Imiquimod cream | Cardinal, Perrigo, Teva |
| Metoprolol ER tablets | Cardinal (Harvard), Actavis, Dr. Reddy's, Par |
| Montelukast oral granules | Cardinal, Dr. Reddy's, Teva |
| Nystatin tablets | Cardinal, Heritage, Sun/Mutual, Teva |
| Tobramycin inhalation | Cardinal, Akorn, Teva |
| Tolterodine ER capsules | Cardinal, Mylan, Teva |

**FILED WITH REDACTIONS – PUBLIC VERSION**

- **COUNT 6**
  **Violation of Sections 1 and 3 of the Sherman Act—Damages**
  (against Harvard on behalf of Plaintiffs and the Federal Damages Class for
  purchases made directly from Cardinal, Harvard, and Red Oak)

749.     Plaintiffs incorporate by reference the allegations set forth above as if fully set
forth herein. In the alternative to Count 2, which alleges that the distributor Defendants
participated in an overarching, interdependent conspiracy with a common goal of maintaining and
increasing the prices of the drugs listed, this Count is brought solely against Defendant H.D.
Smith and the Defendants listed in the chart below for their participation in the following
subsidiary schemes, which, if Count 2 is not sustained, are legally cognizable as individual
agreements in restraint of trade in violation of the Sherman Act.   Plaintiffs and members of the
Federal Damages Class who made such direct purchases from Defendant H.D. Smith seek treble
damages for those purchases, and the cost of suit, including reasonable attorney's fees, as per 15
U.S.C. § 15(a).

| Drug | Defendants / *Co-Conspirators* |
|------|-------------------------------|
| Eplerenone tablets | Harvard, Greenstone, Dr. Reddy's |
| Metoprolol ER tablets | Harvard, Actavis, Dr. Reddy's, Par |

FILED WITH REDACTIONS – PUBLIC VERSION

- **COUNT 7**
  **Violation of Sections 1 and 3 of the Sherman Act—Damages**
  (against McKesson on behalf of Plaintiffs and the Federal Damages Class for
  purchases made directly from McKesson)

750.    Plaintiffs incorporate by reference the allegations set forth above as if fully set

forth herein. In the alternative to Count 2, which alleges that the distributor Defendants

participated in an overarching, interdependent conspiracy with a common goal of maintaining and

increasing the prices of the drugs listed, this Count is brought solely against McKesson and the

Defendants listed in the chart below for their participation in the following subsidiary schemes,

which, if Count 2 is not sustained, are legally cognizable as individual agreements in restraint of

trade in violation of the Sherman Act.   Plaintiffs and members of the Federal Damages Class who

made such direct purchases from McKesson seek treble damages for those purchases, and the cost

of suit, including reasonable attorney's fees, as per 15 U.S.C. § 15(a).

| Drug | Defendants / Co-Conspirators |
|---|---|
| Amikacin injection | McKesson, Heritage, Teva |
| Capecitabine tablets | McKesson, Dr. Reddy's, Teva |
| Paricalcitol capsules | McKesson, Dr. Reddy's, Teva |
| Raloxifene hcl tabs | McKesson, Teva, Camber |
| Tizanidine HCL tablets | McKesson, Dr. Reddy's, Mylan, Sandoz |

**FILED WITH REDACTIONS – PUBLIC VERSION**

**COUNT 8**
**Violation of Sections 1 and 3 of the Sherman Act—Damages**
(against Morris & Dickson on behalf of Plaintiffs and the Federal Damages Class
for purchases made directly from Morris & Dickson)

751.    Plaintiffs incorporate by reference the allegations set forth above as if fully set forth herein. In the alternative to Count 2, which alleges that the distributor Defendants participated in an overarching, interdependent conspiracy with a common goal of maintaining and increasing the prices of the drugs listed, this Count is brought solely against Defendant H.D. Smith and the Defendants listed in the chart below for their participation in the following subsidiary schemes, which, if Count 2 is not sustained, are legally cognizable as individual agreements in restraint of trade in violation of the Sherman Act.   Plaintiffs and members of the Federal Damages Class who made such direct purchases from Defendant H.D. Smith seek treble damages for those purchases, and the cost of suit, including reasonable attorney's fees, as per 15 U.S.C. § 15(a).

| Drug | Defendants / *Co-Conspirators* |
|---|---|
| Eplerenone tablets | M&D, Greenstone, Dr. Reddy's |
| Eszopiclone tablets | M&D, Sun, Dr. Reddy's |
| Levothyroxine tablets | M&D, Lannett, Mylan, Sandoz |
| Ursodiol capsules | M&D, Lannett, Actavis |

**FILED WITH REDACTIONS – PUBLIC VERSION**

- **COUNT 9**
  **Violation of Sections 1 and 3 of the Sherman Act—Damages**
  (against WBAD on behalf of Plaintiffs and the Federal Damages Class for
  purchases made directly from Defendant WBAD or ABC)

752.     Plaintiffs incorporate by reference the allegations set forth above as if fully set forth herein. In the alternative to Count 2, which alleges that the distributor Defendants participated in an overarching, interdependent conspiracy with a common goal of maintaining and increasing the prices of the drugs listed, this Count is brought solely against Defendant H.D. Smith and the Defendants listed in the chart below for their participation in the following subsidiary schemes, which, if Count 2 is not sustained, are legally cognizable as individual agreements in restraint of trade in violation of the Sherman Act.   Plaintiffs and members of the Federal Damages Class who made such direct purchases from Defendant H.D. Smith seek treble damages for those purchases, and the cost of suit, including reasonable attorney's fees, as per 15 U.S.C. § 15(a).

| Drug | Defendants / Co-Conspirators |
|---|---|
| Buprenorphine-Naloxone tablets | WBAD, Amneal, Teva |
| Cabergoline tablets | WBAD, Greenstone, Teva |
| Clomipramine capsules | WBAD, Mallinckrodt, Mylan |
| Disulfiram tablets | WBAD, Breckenridge, Teva |
| Isotretinoin capsules | WBAD, ABC, Teva, Dr. Reddy's |
| Lamotrigine ER tablets | WBAD, Dr. Reddy's, *Wilshire* |
| Lidocaine injection | WBAD, Par (Qualitest), Akorn |
| Montelukast granules | WBAD, Dr. Reddy's, Sandoz |
| Omeprazole-Sodium bicarbonate capsules | WBAD, Oceanside, Dr. Reddy's, Valeant |
| Paricalcitol tablets and capsules | WBAD, Dr. Reddy's, Teva, Zydus, McKesson |
| Progesterone tablets | WBAD, Akorn, Actavis |
| Sumatriptan autoinjector | WBAD, Dr. Reddy's, Mylan |
| Tobramycin inhalation | WBAD, Akorn, Teva |
| Vancomycin hcl capsules | WBAD, Akorn, Actavis |

FILED WITH REDACTIONS – PUBLIC VERSION

**FILED WITH REDACTIONS – PUBLIC VERSION**

- **COUNT 10**
  **Violation of State Antitrust Statutes**[26]
  (against all Defendants, on behalf of Plaintiffs and the State Damages Class, for purchases from any source other than Defendants)

753.    Plaintiffs incorporate by reference the allegations set forth above as if fully set forth herein. This count is brought against all Defendants for their participation in an overarching conspiracy to fix, raise and/or stabilize the prices of the Drugs at Issue listed in the Appendix to this complaint.

754.    In the alternative, this count is also brought against Defendant-participants in each of the drug-specific sub-agreements described above and in Plaintiffs' previous actions filed in MDL 2724, which include the following:

| Drug | Defendants / Co-Conspirators |
|---|---|
| Acyclovir tabs | Heritage, Zydus, H.D. Smith |
| Adapalene gel | Glenmark, Teva, Taro |
| Allopurinol tabs | Dr. Reddy's, Mylan, Par |
| Amikacin injection | Heritage, Teva, McKesson |
| Amiloride-HCTZ tabs | Mylan, Teva |
| Amitriptyline tabs | Mylan, Par, Sandoz |
| Amoxicillin-Clavulanate potassium chew tabs | Sandoz, Teva |
| Amphetamine-Dextroamphetamine ER, IR caps | Actavis, Aurobindo (IR only), Teva, ABC |
| Azithromycin oral suspension | Greenstone, Teva |
| Baclofen tabs | Lannett, Par, Teva, Upsher-Smith |
| Benazepril-HCTZ tabs | Sandoz, Mylan, Rising |
| Bethanechol cl tabs | Actavis, Teva |
| Budesonide DR caps | Mylan, Par, DAVA, Teva |
| Budesonide inhalation | Actavis, Greenstone, Teva |
| Bumetanide tabs | Sandoz, Teva |
| Buprenorphine tabs | Sun, Teva, ABC |
| Buprenorphine-Naloxone tabs | Sun, Teva, WBAD |
| Buspirone hcl tabs | Mylan, Teva |
| Cabergoline tabs | Greenstone, Teva, ABC, WBAD |

---

[26] Statutory antitrust violations are alleged herein for the following jurisdictions: Arizona, California, District of Columbia, ~~Illinois~~, Iowa, Kansas, Maine, Michigan, Minnesota, Mississippi, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Oregon, Rhode Island, South Dakota, Tennessee, Vermont, West Virginia and Wisconsin.

FILED WITH REDACTIONS – PUBLIC VERSION

| | |
|---|---|
| Capecitabine tabs | Teva, Mylan, Dr. Reddy's, McKesson |
| Carbamazepine chewable tabs | Taro, Teva |
| Carbamazepine tabs | Apotex, Taro, Teva |
| Cefdinir caps, oral suspension | Lupin, Teva |
| Cefprozil tabs | Teva, Lupin |
| Celecoxib caps | Teva, Actavis, Apotex |
| Cephalexin suspension | Lupin, Teva |
| Cimetidine tabs | Mylan, Teva |
| Ciprofloxacin hcl tabs | Actavis, Dr. Reddy's, Teva |
| Clarithromycin ER tabs | Actavis, Teva, Zydus |
| Clemastine fumarate tabs | Sandoz, Teva |
| Clomipramine caps | Mylan, Sandoz, Taro, WBAD |
| Clonidine TTS patch | Teva, Actavis, Mylan, Par |
| Clotrimazole topical solution | Taro, Teva |
| Cyproheptadine hcl tabs | Breckenridge, Teva |
| Desmopressin acetate tabs | Actavis, Teva |
| Desogestrel-Ethinylestradiol tabs | Glenmark, Teva |
| Dexmethylphenidate hcl ER caps | Par incl. Dava, Sandoz, Teva |
| Dextroamphetamine sulfate ER caps | Actavis, Teva |
| Diclofenac potassium tabs | Mylan, Sandoz, Teva |
| Dicloxacillin sodium caps | Sandoz, Teva |
| Diflunisal tabs | Teva, Rising |
| Diltiazem hcl tabs | Mylan. Teva |
| Disopyramide phosphate caps | Actavis, Teva |
| Disulfiram tabs | Teva, Breckenridge, WBAD |
| Divalproex ER tabs | Dr. Reddy's, Mylan, Par, Zydus |
| Doxazosin mesylate tabs | Apotex, Mylan, Teva |
| Doxycycline hyclate caps | Actavis, Par, Sun, West-Ward |
| Doxycycline hyclate DR tabs | Heritage, Mayne, Mylan, Cardinal |
| Drospirenone-Ethinylestradiol tabs | Teva, Lupin, Actavis |
| Enalapril maleate tabs | Mylan, Taro, Teva, Wockhardt |
| Entecavir tabs | Teva, Par |
| Epitol tabs | Apotex, Taro, Teva |
| Eplerenone tabs | Harvard, M&D, Greenstone, Dr. Reddy's |
| Estazolam tabs | Actavis, Teva |
| Estradiol tabs | Actavis, Mylan, Teva |
| Eszopiclone tabs | Cardinal, Dr. Reddy's, M&D, Sun |
| Ethinylestradiol-Levonorgestrel  tabs | Sandoz, Teva |
| Ethinylestradiol-Norethindrone acetate tabs | Breckenridge, Teva |
| Ethosuximide caps, oral solution | Teva, Akorn (Versapharm) |
| Etodolac tabs | Teva, Taro, Sandoz |
| Etodolac ER tabs | Taro, Teva, Zydus |
| Fenofibrate tabs | Lupin, Mylan, Teva, Zydus, Dr. Reddy's, Cardinal |

FILED WITH REDACTIONS – PUBLIC VERSION

| | |
|---|---|
| Fluconazole tabs | Glenmark, Greenstone, Teva, WBAD, Dr. Reddy's |
| Fluocinonide cream, emollient cream, gel and ointment | Actavis, Taro, Teva |
| Fluoxetine HCL tabs | Mylan, Par incl. Dava, Teva |
| Flurbiprofen tabs | Mylan, Teva |
| Flutamide caps | Actavis, Par incl. Dava, Teva |
| Fluvastatin Sodium caps | Mylan, Teva |
| Gabapentin tabs | Teva, Glenmark |
| Glimepiride tabs | Dr. Reddy's, Teva |
| Griseofulvin suspension | Actavis, Teva |
| Haloperidol tabs | Mylan, Sandoz |
| Hydroxyurea caps | Par incl. Dava, Teva |
| Hydroxyzine caps | Actavis, Teva |
| Imiquimod cream | Teva, Perrigo, Cardinal |
| Irbesartan tabs | Teva, Lupin |
| Isoniazid tabs | Sandoz, Teva |
| Isotretinoin caps | Teva, Dr. Reddy's, WBAD, ABC |
| Ketoconazole cream, tabs | Sandoz, Mylan, Taro, Teva |
| Ketoprofen caps | Mylan, Teva |
| Ketorolac tromethamine tabs | Mylan, Teva |
| Labetalol hcl tabs | Par incl. Dava, Sandoz, Teva |
| Lamivudine-Zidovudine tabs | Aurobindo, Teva, Lupin |
| Lamotrigine ER tabs | McKesson, Dr. Reddy's, *Wilshire*, Par, WBAD, ABC |
| Leflunomide tabs | Apotex, Heritage, Teva |
| Levothyroxine tabs | Lannett, Mylan, Sandoz |
| Lidocaine injection | Akorn, Actavis, WBAD |
| Loperamide hcl caps | Mylan, Teva, ABC |
| Medroxyprogesterone tabs | Greenstone, Teva |
| Meprobamate tabs | Dr. Reddy's, Heritage |
| Methotrexate tabs | Mylan, Teva |
| Metoprolol succinate ER tabs | Reddy's, Par, Teva, Harvard |
| Modafinil tabs | Teva, *Ingenus*, ABC, Par, Mylan |
| Moexipril hcl tabs | Teva, Glenmark |
| Moexipril hcl-HCTZ tabs | Teva, Glenmark |
| Montelukast oral granules | Teva, Dr. Reddy's, Mylan, Cardinal |
| Nabumetone tabs | Actavis, Glenmark, Sandoz, Teva |
| Nadolol tabs | Mylan, Sandoz, Teva |
| Niacin ER tabs | Lupin, Teva, Zydus |
| Nimodipine caps | Ascend, Heritage, Sun |
| Nitrofurantoin macrocrystal caps | Mylan, Teva, Alvogen |
| Norethindrone acetate tabs | Actavis, Amneal, Teva |
| Norethindrone-Ethinylestradiol tabs | Glenmark, Lupin, Teva |
| Nortriptyline hcl caps | Actavis, Teva, Taro |

**FILED WITH REDACTIONS – PUBLIC VERSION**

| | |
|---|---|
| Nystatin tabs | Heritage, Sun, Teva, Cardinal |
| Omega-3-Acid Ethyl esters | Actavis, Par, Teva |
| Omeprazole -Sodium bicarbonate caps | Reddy's, Valeant/Oceanside, WBAD |
| Oxaprozin tabs | Dr. Reddy's, Greenstone, Sandoz, Teva |
| Oxybutynin cl tabs | Teva, Upsher-Smith |
| Paricalcitol tabs and caps | Dr. Reddy's, Teva, Zydus, McKesson, WBAD |
| Paromomycin caps | Heritage, Sun |
| Penicillin VK tabs | Aurobindo, Greenstone, Sandoz, Teva |
| Pentoxifylline tabs | Apotex, Mylan, Teva |
| Pioglitazone-Metformin tabs | Sandoz, Teva, ABC |
| Piroxicam caps | Teva, Greenstone |
| Pravastatin tabs | Apotex, Glenmark, Lupin, Sandoz, Teva, Zydus |
| Prazosin hcl caps | Mylan, Teva |
| Prochlorperazine tabs | Sandoz, Teva |
| Progesterone tabs | Akorn, Actavis, WBAD |
| Propranolol tabs | Actavis, Heritage, Mylan, Par, Teva |
| Raloxifene hcl tabs | Teva, Camber, McKesson |
| Ranitidine hcl tabs | Actavis, Glenmark, Sandoz, Teva |
| Sumatriptan autoinjector | Dr. Reddy's, Mylan, WBAD |
| Tamoxifen citrate tabs | Actavis, Mylan, Teva |
| Temozolomide caps | Teva, Sandoz |
| Theophylline ER tabs | Heritage, Teva |
| Tizanidine hcl tabs | Dr. Reddy's, Mylan, Sandoz, McKesson |
| Tobramycin inhalation solution | Teva, Sandoz, Cardinal, WBAD, ABC, Akorn |
| Tolmetin sodium caps | Mylan, Teva |
| Tolterodine ER caps | Teva, Mylan, Cardinal |
| Tolterodine tartrate tabs | Teva, Greenstone |
| Topiramate sprinkle caps | Actavis, Teva, Zydus |
| Trifluoperazine hcl | Mylan, Sandoz |
| Valganciclovir tabs | Dr. Reddy's, Camber, H.D. Smith |
| Valsartan-HCTZ tabs | Mylan, Sandoz |
| Vancomycin hcl caps | Akorn, Actavis, WBAD |
| Warfarin Sodium tabs | Taro, Teva, Zydus |
| Zoledronic Acid injection | Dr. Reddy's, Heritage, Par, ABC |

755.     During the Class Period, Defendants and their co-conspirators engaged in a

continuing contract, combination or conspiracy with respect to the sale of the Drugs at Issue in

FILED WITH REDACTIONS – PUBLIC VERSION

unreasonable restraint of trade and commerce and in violation of the various state antitrust and other statutes set forth below.

756.    The contract, combination, or conspiracy consisted of an agreement among Defendants and their co-conspirators to fix, raise, inflate, stabilize, and/or maintain the prices of the Drugs at Issue and to allocate customers for the Drugs at Issue in the United States.

757.    In formulating and effectuating this conspiracy, Defendants and their co-conspirators performed acts in furtherance of the combination and conspiracy, including participating in meetings and conversations among themselves in the United States and elsewhere during which they agreed to price the Drugs at Issue at certain levels, and otherwise to fix, increase, inflate, maintain, or stabilize effective prices paid by Plaintiffs and members of the Damages Class with respect to the Drugs at Issue provided in the United States; and participating in meetings and trade association conversations among themselves in the United States and elsewhere to implement, adhere to, and police the unlawful agreements they reached.

758.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

759.    In addition, Defendants have profited significantly from the conspiracy. Defendants' profits derived from their anticompetitive conduct come at the expense and detriment of plaintiffs and the members of the Damages Class.

760.    Accordingly, plaintiffs and the members of the Damages Class in each of the following jurisdictions seek damages (including statutory damages where applicable), to be trebled or otherwise increased as permitted by a particular jurisdiction's antitrust law, injunctive

relief, including restitution and/or disgorgement, and costs of suit, including reasonable attorneys'
fees, to the extent permitted by the following state laws.

761.    Trusts are combinations, contracts, understandings or agreements, express or
implied when inimical to the public welfare and with the effect of, inter alia, restraining trade,
increasing the price or output of a commodity, or hindering competition in the production and sale
of a commodity.

762.    Defendants' anticompetitive acts described above were knowing, willful and
constitute violations or flagrant violations of the following state antitrust statutes, and plaintiffs
seek all relief available under such statutes:

| State | Antitrust Statute |
|---|---|
| Arizona | Arizona Revised Statutes, § 44-1401, *et seq* |
| California | Cal. Bus.& Prof. Code §16720; treble damages and cost of suit, including fees, pursuant to § 16750(a) |
| Connecticut | Conn. Gen. Stat. § 35-26 and § 35-28. Plaintiffs and the Classes seek all relief available under Conn. Gen. Stat. § 35-34 and § 35-35 for all purchases on or after July 10, 2017 |
| District of Columbia | District of Columbia Code § 28-4501 |
| ~~Illinois~~[27] | ~~Illinois Antitrust Act (740 Illinois Compiled Statutes 10/1, et seq.)~~ |
| Iowa | Iowa Code § 553.1, et seq. |
| Kansas | Kansas Statutes § 50-101 |
| Maine | Maine Rev. Stat. 10, § 1101, et seq |
| Maryland | For violations of Md. Code, Com. Law § 11-204(a)(1). Plaintiffs and the Classes seek all relief available under Md. Code, Com. Law § 11-209(b) for all purchases on or after October 1, 2017 |
| Michigan | Michigan Compiled Laws § 445.771, et seq. |
| Minnesota | Minnesota Statutes § 325D.49, et seq. |
| Mississippi | Mississippi Code § 75-21-1, et seq. |

---

[27] Plaintiffs acknowledge that this claim was dismissed with prejudice by the Court's February 15, 2019 Order (16-md-2724 Dkt. 858) and reassert the claim here solely for purposes of preservation for appeal.

**FILED WITH REDACTIONS – PUBLIC VERSION**

| Nebraska | Nebraska Revised Statutes § 59-801, et seq. |
|---|---|
| Nevada | Nevada Revised Statutes § 598A.010, et seq. |
| New Hampshire | New Hampshire Revised Statutes § 356:1, et seq. |
| New Mexico | New Mexico Statutes § 57-1-1, et seq. |
| New York | New York General Business Law § 340, et seq. Defendants' conduct is a per se violation of the statute. |
| North Carolina | North Carolina General Statutes § 75-1, et seq. |
| North Dakota | North Dakota Century Code § 51-08.1-01, et seq. |
| Oregon | Oregon Revised Statutes § 646.705, et seq. |
| Rhode Island | for all purchases on or after July 15, 2013 pursuant to the Rhode Island Antitrust Act, Rhode Island General Laws § 6-36-1, et seq. |
| South Dakota | South Dakota Codified Laws § 37-1-3.1, et seq. |
| Tennessee | Tennessee Code § 47-25-101, et seq. |
| Vermont | Vermont Stat. 9 § 2453, et seq. |
| West Virginia | West Virginia Code § 47-18-1, et seq. |
| Wisconsin | Wisconsin Statutes § 133.01, et seq. |

763.     As to All Jurisdictions Above: Plaintiffs and members of the Damages Class in each of the above jurisdictions have been injured in their business and property by reason of Defendants' unlawful combination, contract, conspiracy and agreement. Plaintiffs and members of the Damages Class have paid more for generic Drugs at Issue than they otherwise would have paid in the absence of Defendants' unlawful conduct. This injury is of the type the antitrust laws of the above states were designed to prevent and flows from that which makes Defendants' conduct unlawful.

764.     In addition, Defendants have profited significantly from the aforesaid conspiracy. Defendants' profits derived from their anticompetitive conduct come at the expense and detriment of Plaintiffs and members of the Damages Class.

765.     Accordingly, Plaintiffs and members of the Damages Class in each of the above jurisdictions seek damages (including statutory damages where applicable), to be trebled or

FILED WITH REDACTIONS – PUBLIC VERSION

otherwise increased as permitted by a particular jurisdiction's antitrust law, and costs of suit,

including reasonable attorneys' fees, to the extent permitted by the above state laws.

- **COUNT 11**
  **Violation of State Consumer Protection Statutes** [28]
  (on behalf of Plaintiffs and the Damages Class)

766.    Plaintiffs incorporate by reference the allegations set forth above as if fully set

forth herein. This count is brought against all Defendants for their participation in an overarching

conspiracy to fix, raise and/or stabilize the prices of Drugs at Issue.

767.    In the alternative, this count is also brought against Defendant-participants in each

of the drug-specific sub-agreements alleged above at paragraph 754 in Count 10.

768.    During the Class Period, Defendants marketed, sold, or distributed generic Drugs

at Issue in each of the states listed below,

769.    Defendants engaged in unfair competition or unfair, unconscionable, deceptive or

fraudulent acts or practices in violation of the state consumer protection and unfair competition

statutes listed below. Defendants knowingly agreed to, and did in fact, act in restraint of trade or

commerce by affecting, fixing, controlling, and/or maintaining at non-competitive and artificially

inflated levels, the prices at which generic Drugs at Issue were sold in each of the states listed

below.

770.    Defendants' illegal conduct had the following substantial effects on commerce

and generic drug purchasers:  (1) price competition for the Drugs at Issue was restrained and/or

eliminated throughout the states listed below; (2) prices of the generic Drugs at Issue were raised,

---

[28] Statutory consumer protection / deceptive trade violations are alleged herein for the following jurisdictions: Alaska, Arkansas, California, Colorado, Delaware, Florida, ~~Georgia~~, Minnesota, Nebraska, New Hampshire, New Jersey, New Mexico, New York, North Carolina, North Dakota, Rhode Island, ~~South Carolina~~, South Dakota, ~~West Virginia~~ and Wisconsin.

fixed, maintained, and stabilized at artificially high levels throughout the states listed below. (3) Plaintiffs and members of the Damages Class, who resided in the states listed below and/or purchased the Drugs at Issue in the states listed below were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for the Drugs at Issue, in New Hampshire.

771.   Defendants deceived Plaintiffs and/or class members in each state into believing that the Drugs at Issue were competitively priced. Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for generic Drugs at Issue. Defendants misrepresented to all purchasers during the Class Period that Defendants' generic Drugs at Issue prices were competitive and fair by not disclosing the nature of their overarching and individual agreements in restraint of trade. Defendants and their co-conspirators made public statements about the prices of the Drugs at Issue that either omitted material information that rendered the statements that they made materially misleading or affirmatively misrepresented the real cause of price increases for the Drugs at Issue; and Defendants alone possessed material information that was relevant to purchasers, but failed to provide the information. As a direct and proximate result of Defendants' willful, unconscionable and deceptive commercial practices Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property.

772.   Plaintiffs and members of the Damages Class lacked any meaningful choice in purchasing the generic Drugs at Issue because they were unaware of the unlawful overcharge, and there was no alternative source of supply through which Plaintiffs and members of the Damages Class could avoid the overcharges. Defendants' conduct with regard to sales of generic Drugs at Issue, including their illegal conspiracy to secretly fix the price of the Drugs at Issue at

FILED WITH REDACTIONS – PUBLIC VERSION

supracompetitive levels and overcharge generic drug purchasers, was substantively

unconscionable because it was one-sided and unfairly benefited Defendants at the expense of

Plaintiffs and the public. Defendants took grossly unfair advantage of Plaintiffs and members of

the Damages Class. The suppression of competition that has resulted from Defendants'

conspiracy has ultimately resulted in unconscionably higher prices such that there was a gross

disparity between the price paid and the value received for the Drugs at Issue.

773.    Defendants' price-fixing conspiracy could not have succeeded absent deceptive

conduct by Defendants to cover up their illegal acts. Secrecy was integral to the formation,

implementation and maintenance of Defendants' price-fixing conspiracy. Defendants committed

inherently deceptive and self-concealing actions, of which Plaintiffs and members of the Damages

Class could not possibly have been aware.

774.    Defendants and their co-conspirators publicly provided pretextual and false

justifications regarding their price increases. Defendants' public statements concerning the price

of generic Drugs at Issue created the illusion of competitive pricing controlled by market forces

rather than supracompetitive pricing driven by Defendants' illegal conspiracy. Moreover,

Defendants deceptively concealed their unlawful activities by mutually agreeing not to divulge

the existence of the conspiracy to outsiders.

775.    Defendants took efforts to conceal their illegal agreements from Plaintiffs and

members of the Damages Class.

| State | Plaintiffs seek all relief available under consumer protection statutes: |
|-------|--------------------------------------------------------------------------|
| Alaska | Alaska Statute § 45.50.471, et seq |
| Arkansas | Arkansas Code § 4-88-107(a)(10), against all Defendants; Arkansas Code § 4-88-303, against Defendants that increased prices by more than 10% from January 3 to February 2, 2014, or from February 18 to March 20, 2015. |
| California | Cal. Bus. & Prof. Code § 17200 *et seq.*, incl. §§ 17200.31; 17203; and 17204 |
| Colorado | Colorado Rev. Stat. § 6-1-101, et seq. |
| Delaware | Delaware Consumer Fraud Act, 6 Del. Code § 2511, et seq. |
| Florida | Deceptive and Unfair Trade Practices Act, Fla. Stat. § 501.201, et seq. |
| ~~Georgia~~ | ~~Uniform Deceptive Trade Practices Act, Georgia Code § 10-1-370~~ |
| Minnesota | Uniform Deceptive Trade Practices Act, Minn. Stat. § 325D.43, et seq. |
| Nebraska | Nebraska Consumer Protection Act, Neb. Rev. Stat. § 59-1601, et seq. |
| New Hampshire | N.H. Rev. Stat. § 358-A:1, et seq., |
| New Mexico | Defendants' acts resulted in a gross disparity between the value received by Plaintiffs and the prices paid by them for generic Drugs at Issue in violation of N.M.S.A. Stat. § 57-12-3 and N.M.S.A., § 57-12-2E. |
| New Jersey | N.J. Statutes § 56:8-1, et seq., against all Defendants; N.J. Statutes § 56:8-107 against Defendants that increased prices by more than 10% from October 27 to November 26, 2012, from January 2 to February 1, 2014, or from January 26 to February 25, 2015. |
| New York | N.Y. Gen. Bus. Law § 349(h). |
| North Carolina | North Carolina Gen. Stat. § 75-1.1, *et seq*. Additionally, Defendants charged "unreasonably excessive prices" in violation of North Carolina. Gen..Stat. § 75-38 for sales in North Carolina in the 45 days after April 28, 2014, January 26, 2015, October 1, 2015, and January 20, 2016. |
| North Dakota | North Dakota Unlawful Sales or Advertising Practices Statute, N.D. Century Code § 51-15-01, *et seq*. |
| ~~South Carolina~~ | ~~South Carolina Unfair Trade Practices Act, S.C. Code Ann. § 39-5-10~~ |
| South Dakota | South Dakota Deceptive Trade Practices and Consumer Protection Statute, S.D. Codified Laws § 37-24-1, *et seq*. |
| ~~West Virginia~~ | ~~West Virginia Consumer Credit and Protection Act, W.Va. Code § 46A-6-101~~ |
| Wisconsin | Wisconsin Consumer Protection Statutes, Wisc. Stat. § 100.18, *et seq*. |

**FILED WITH REDACTIONS – PUBLIC VERSION**

- **COUNT 12**
  **Unjust Enrichment**
  (against all Defendants on behalf of Plaintiffs and the State Damages Class)

776.    Plaintiffs incorporate by reference the allegations set forth above as if fully set forth herein. This claim is pleaded in the alternative to the other claims in this Complaint. This claim is brought under the equity precedents of each of the State Damages Jurisdictions.

777.    Defendants have unlawfully benefited from their sales of generic Drugs at Issue because of the unlawful and inequitable acts alleged in this Complaint. Defendants unlawfully overcharged Plaintiffs and Class member pharmacies and hospitals, who purchased generic Drugs at Issue at prices that were more than they would have been but for Defendants' unlawful actions. Pharmacies and hospitals are intended purchasers of the Drugs at Issue.

778.    Defendants' financial benefits resulting from their unlawful and inequitable acts are traceable to overpayments by Plaintiffs and members of the State Damages Class.

779.    Plaintiffs and the State Damages Class have conferred upon Defendants an economic benefit, in the nature of profits resulting from unlawful overcharges, to the economic detriment of Plaintiffs and the State Damages Class.

780.    Defendants have been enriched by revenue resulting from unlawful overcharges for generic Drugs at Issue while Plaintiffs have been impoverished by the overcharges they paid for generic Drugs at Issue imposed through Defendants' unlawful conduct. Defendants' enrichment and Plaintiffs' impoverishment are connected.

781.    There is no justification for Defendants' retention of, and enrichment from, the benefits they received, which caused impoverishment to Plaintiffs and the State Damages Class, because Plaintiffs and the State Damages Class paid supracompetitive prices that inured to Defendants' benefit, and it would be inequitable for Defendants to retain any revenue gained from

their unlawful overcharges. Plaintiffs did not interfere with Defendants' affairs in any manner that conferred these benefits upon Defendants.

782.     The benefits conferred upon Defendants were not gratuitous, in that they constituted revenue created by unlawful overcharges arising from Defendants' illegal and unfair actions to inflate the prices of generic Drugs at Issue.

783.     The benefits conferred upon Defendants are measurable, in that the revenue Defendants have earned due to their unlawful overcharges of generic Drugs at Issue are ascertainable by review of sales records.

784.      Defendants have paid no consideration to any other person for any of the unlawful benefits they received from Plaintiffs and the State Damages Class with respect to Defendants' sales of the Drugs at Issue.

785.     The economic benefit of overcharges and monopoly profits derived by Defendants through charging supracompetitive and artificially inflated prices for generic Drugs at Issue is a direct and proximate result of Defendants' unlawful practices.

786.     The financial benefits derived by Defendants rightfully belong to Plaintiffs and the Damages Class, because Plaintiffs and the Damages Class paid supracompetitive prices during the Class Period, inuring to the benefit of Defendants.

787.     It would be inequitable under unjust enrichment principles under the law of the District of Columbia and the laws of all states and territories of the United States, except Ohio and Indiana, for Defendants to be permitted to retain any of the overcharges for generic Drugs at Issue derived from Defendants' unlawful, unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

**FILED WITH REDACTIONS – PUBLIC VERSION**

788.     Defendants are aware of and appreciate the benefits bestowed upon them by Plaintiffs and the Damages Class. Defendants consciously accepted the benefits and continue to do so as of the date of this filing, as prices for many of the Drugs at Issue remain inflated above pre-conspiracy levels.

789.     Defendants should be compelled to disgorge in a common fund for the benefit of Plaintiffs and the State Damages Class all unlawful or inequitable proceeds they received from their sales of the generic Drugs at Issue.

790.     A constructive trust should be imposed upon all unlawful or inequitable sums received by Defendants traceable to indirect purchases of generic Drugs at Issue by Plaintiffs and the State Damages Class. Plaintiffs and the State Damages Class have no adequate remedy at law.

## VI.     REQUEST FOR RELIEF

791.     Plaintiffs request that:

a.   The Court determine that this action may be maintained as a class action under Rule 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure, and direct that reasonable Notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to each and every member of the Class;

b.   The Defendants' unlawful conduct be decreed: (i) an unreasonable restraint of trade or commerce in violation of Section 1 of the Sherman Act; (ii) a per se violation of Section 1 of the Sherman Act; (iii) an unlawful combination, agreement, understanding and/or concert of action in violation of the state antitrust and unfair competition and consumer protection laws as set forth herein; and (iv) acts of unjust enrichment by Defendants.

c.   Plaintiffs and members of the Damages Class recover damages, to the maximum extent allowed by state and federal laws, and that a judgment in favor of Plaintiffs and members of the Damages Class be entered against Defendants jointly and severally in an amount to be trebled to the extent such laws permit;

d.   Plaintiffs and members of the Damages Class recover damages, to the maximum extent allowed by such laws, in the form of restitution and/or disgorgement of profits unlawfully obtained;

**FILED WITH REDACTIONS – PUBLIC VERSION**

e.  Plaintiffs and members of the Damages Class be awarded restitution, including disgorgement of profits Defendants obtained as a result of their acts of unfair competition and acts of unjust enrichment, and the Court establish of a constructive trust consisting of all ill-gotten gains from which Plaintiffs and members of the Damages Class may make claims on a pro rata basis;

f.  Defendants and their employees be permanently enjoined from continuing, maintaining or renewing the conduct alleged herein, or from entering into any other conspiracy having a similar purpose or effect.

g.  Plaintiffs and members of the Classes be awarded pre- and post-judgment interest as provided by law, and that such interest be awarded at the highest legal rate;

h.  Plaintiffs and members of the Classes recover their costs of suit, including reasonable attorneys' fees, as provided by law; and

i.  Plaintiffs and members of the Classes have such other and further relief as the case may require and the Court may deem just and proper.

## VII.   <u>JURY DEMAND</u>

Plaintiffs demand a trial by jury, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, of all issues so triable.

Dated: December 20, 2019                    Respectfully submitted,

/s/  Peter Gil-Montllor                          /s/  Jonathan W. Cuneo

Peter Gil-Montllor                               Jonathan W. Cuneo
Christian Hudson                                 Victoria Sims
**CUNEO, GILBERT & LADUCA LLP**      **CUNEO, GILBERT & LADUCA LLP**
16 Court Street, Suite 1012                   4725 Wisconsin Ave., NW Suite 200
Brooklyn, NY 11241                           Washington, DC 20016
202-789-3960                                     202-789-3960
pgil-montllor@cuneolaw.com                jonc@cuneolaw.com

*Lead Counsel for the Indirect Reseller Plaintiffs*

**FILED WITH REDACTIONS – PUBLIC VERSION**

## VIII.   APPENDIX: DRUGS AT ISSUE

Docket numbers in parentheses indicate that pharmacy Plaintiffs previously filed an action in MDL 2724 asserting claims regarding that drug. Plaintiffs intend to consolidate those claims into this complaint.

Acetazolamide ER capsules ("caps") (18-cv-2533)
Acetazolamide tablets ("tabs") (18-cv-2533)
Acyclovir tabs
Adapalene gel
Albuterol tabs (17-AL-27243)
Allopurinol tabs
Amikacin injection
Amiloride-Hydrochlorothiazide ("HCTZ") tabs
Amitriptyline tabs (17-cv-3807)
Amoxicillin-Clavulanate potassium chew tabs
Amphetamine-Dextroamphetamine ER caps
Amphetamine-Dextroamphetamine IR caps
Azithromycin oral suspension

Baclofen tabs (17-cv-3808)
Benazepril-HCTZ tabs (17-cv-3811)
Bethanechol chloride ("cl") tabs
Budesonide DR caps
Budesonide inhalation
Bumetanide tabs
Buprenorphine sublingual tabs
Buprenorphine-Naloxone sublingual tabs
Buspirone hydrochloride ("hcl") tabs

Cabergoline tabs
Capecitabine tabs
Carbamazepine chewable tabs
Carbamazepine tabs
Cefdinir caps
Cefdinir oral suspension
Cefprozil tabs
Celecoxib caps
Cephalexin suspension
Cimetidine tabs
Ciprofloxacin hcl tabs
Clarithromycin ER tabs
Clemastine fumarate tabs
Clobetasol cream (17-cv-3812)
Clobetasol emollient cream (17-cv-3812)
Clobetasol gel (17-cv-3812)
Clobetasol ointment (17-cv-3812)
Clobetasol topical solution (17-cv-3812)
Clomipramine caps (17-cv-3813)
Clonidine-TTS patch
Clotrimazole topical solution
Cyproheptadine hcl tabs

Desmopressin acetate tabs
Desogestrel-Ethinylestradiol tabs
Desonide cream (17-cv-3815)
Desonide ointment (17-cv-3815)
Dexmethylphenidate hcl ER caps
Dextroamphetamine sulfate ER caps
Diclofenac potassium tabs
Dicloxacillin sodium caps
Diflunisal tabs
Digoxin tabs (17-cv-3814)
Diltiazem hcl tabs
Disopyramide phosphate caps
Disulfiram tabs
Divalproex ER tabs (17-cv-3816)
Doxazosin mesylate tabs
Doxycycline hyclate caps (17-cv-973)
Doxycycline hyclate tabs (17-cv-973)
Doxycycline hyclate DR tabs (17-cv-973)
Doxycycline monohydrate tabs (18-cv-2533)
Drospirenone-Ethinylestradiol tabs

Econazole cream (17-cv-3817)
Enalapril maleate tabs
Entecavir tabs
Epitol tabs
Eplerenone tabs
Estazolam tabs
Estradiol tabs
Ethinylestradiol-Levonorgestrel tabs
Ethinylestradiol-Norethindrone acetate tabs
Ethosuximide caps
Ethosuximide oral solution
Etodolac tabs
Etodolac ER tabs

Fenofibrate tabs
Fluconazole tabs
Fluocinonide cream (17-cv-3818)
Fluocinonide ointment (17-cv-3818)
Fluocinonide gel (17-cv-3818)
Fluocinonide emollient cream (17-cv-3818)
Fluoxetine hcl tabs
Flurbiprofen tabs
Flutamide caps
Fluvastatin sodium caps
Fosinopril-HCTZ tabs (18-cv-2533)

**FILED WITH REDACTIONS – PUBLIC VERSION**

Gabapentin tabs
Glimepiride tabs
Glipizide-Metformin tabs (18-cv-2533)
Glyburide tabs (18-cv-2533)
Glyburide-Metformin tabs (18-cv-2533)
Griseofulvin suspension

Haloperidol tabs
Hydroxyurea caps
Hydroxyzine caps

Imiquimod cream
Irbesartan tabs
Isoniazid tabs
Isotretinoin caps

Ketoconazole cream
Ketoconazole tabs
Ketoprofen caps
Ketorolac tromethamine tabs

Labetalol hcl tabs
Lamivudine-Zidovudine (Combivir) tabs
Lamotrigine ER tabs
Leflunomide tabs (18-cv-2533)
Levothyrozine tabs (17-cv-3820)

Lidocaine injection
Lidocaine-Prilocaine cream (17-cv-3819)
Loperamide hcl caps

Medroxyprogesterone tabs
Meprobamate tabs (18-cv-2533)
Methotrexate tabs
Metoprolol succinate ER tabs
Modafinil tabs
Moexipril hcl tabs
Moexipril hcl-HCTZ tabs
Montelukast oral granules

Nabumetone tabs
Nadolol tabs
Niacin ER tabs
Nimodipine caps (18-cv-2533)
Nitrofurantoin macrocrystal caps
Norethindrone acetate tabs
Norethindrone-Ethinylestradiol tabs
Nortriptyline hcl caps
Nystatin cream
Nystatin ointment

Nystatin tabs

Omega-3-Acid Ethyl esters caps
Omeprazole-Sodium bicarbonate caps
Oxaprozin tabs
Oxybutynin cl tabs

Paricalcitol tabs
Paricalcitol caps
Paromomycin caps (18-cv-2533)
Penicillin VK tabs
Pentoxifylline tabs
Pioglitazone-Metformin tabs
Piroxicam caps
Pravastatin tabs (17-cv-3821)
Prazosin hcl caps
Prochlorperazine tabs
Progesterone tabs
Propranolol tabs (17-cv-3822)

Raloxifene hcl tabs
Ranitidine hcl tabs

Sumatriptan autoinjector

Tamoxifen citrate tabs
Temozolomide caps
Theophylline ER tabs (18-cv-2533)
Tizanidine hcl tabs
Tobramycin inhalation solution
Tolmetin sodium caps
Tolterodine ER caps
Tolterodine tartrate tabs
Topiramate sprinkle caps
Trifluoperazine hcl tabs

Ursodiol caps (17-cv-3823)

Valganciclovir tabs
Valsartan-HCTZ tabs
Vancomycin hcl caps
Verapamil hcl tabs (18-cv-2533)
Verapamil ER tabs (18-cv-2533)
Verapamil DR caps (18-cv-2533)

Warfarin sodium tabs

Zoledronic Acid injection (18-cv-2533)

**FILED WITH REDACTIONS – PUBLIC VERSION**