# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE: GENERIC PHARMACEUTICALS PRICING ANTITRUST LITIGATION | MDL 2724<br>16-MD-2724<br>HON. CYNTHIA M. RUFE |
| RELIABLE PHARMACY;<br>HALLIDAY'S & KOIVISTO'S PHARMACY;<br>RUSSELL'S MR. DISCOUNT DRUGS;<br>FALCONER PHARMACY;<br>CHET JOHNSON DRUG;<br>NORTH SUNFLOWER MEDICAL CENTER;<br>on behalf of themselves and all others similarly situated,<br>     *Plaintiffs*,<br>  v. | CIVIL ACTION NO.<br><br>19-cv-6044<br><br><br><br>JURY TRIAL DEMANDED<br><br>CLASS ACTION |
| ACTAVIS HOLDCO US, INC.;<br>ACTAVIS PHARMA, INC.;<br>ACTAVIS ELIZABETH LLC;<br>AKORN INC.;<br>AKORN SALES, INC.;<br>ALVOGEN, INC.;<br>AMERISOURCEBERGEN DRUG CORP.;<br>AMNEAL PHARMACEUTICALS, INC.;<br>AMNEAL PHARMACEUTICALS LLC;<br>APOTEX CORP.;<br>ARA APRAHAMIAN;<br>AUROBINDO PHARMA USA, INC.;<br>BAUSCH HEALTH AMERICAS, INC.;<br>BAUSCH HEALTH US, LLC;<br>BARR PHARMACEUTICALS, LLC;<br>DAVID BERTHOLD;<br>BRECKENRIDGE PHARMACEUTICAL, INC.;<br>JAMES BROWN;<br>CAMBER PHARMACEUTICALS, INC.;<br>CARDINAL HEALTH, INC.;<br>CARACO PHARMACEUTICAL LABORATORIES LTD.;<br>MAUREEN CAVANAUGH;<br>CITRON PHARMA, LLC;<br>DAVA PHARMACEUTICALS, LLC;<br>TRACY SULLIVAN DIVALERIO;<br>DR. REDDY'S LABORATORIES, INC.;<br>ENDO INTERNATIONAL PLC;<br>MARC FALKIN;<br>GLENMARK PHARMACEUTICALS, INC.;<br>G & W LABORATORIES;<br>JAMES GRAUSO;<br>HI-TECH PHARMACAL CO. INC.; | **PHARMACY and HOSPITAL PLAINTIFFS' ("IRPs")**<br><br>**<u>AMENDED DECEMBER 2019 COMPLAINT</u>** |

**FILED WITH REDACTIONS – PUBLIC VERSION**

KAVOD PHARMACEUTICALS LLC.;
KEVIN GREEN;
GREEENSTONE LLC;
GENERICS BIDCO I, LLC;
ROBIN HATOSY;
THE HARVARD DRUG GROUP, LLC;
H.D. SMITH, LLC;
HERITAGE PHARMACEUTICALS INC.;
ARMANDO KELLUM;
LANNETT COMPANY, INC.;
LUPIN PHARMACEUTICALS, INC.;
MAYNE PHARMA INC.;
MCKESSON CORP.;
MORRIS & DICKSON CO., LLC;
MUTUAL PHARMACEUTICAL CO., INC.;
MYLAN INC.;
MYLAN PHARMACEUTICALS, INC.;
MYLAN N.V.;
JILL NAILOR;
JAMES NESTA;
KONSTANTIN OSTAFICIUK;
PAR PHARMACEUTICAL INC.;
NISHA PATEL;
OCEANSIDE PHARMACEUTICALS, INC.;
PERRIGO NEW YORK, INC.;
PFIZER INC.;
PLIVA, INC.;
RED OAK SOURCING, LLC;
DAVID REKENTHALER;
RICHARD ROGERSON;
SANDOZ, INC.;
SUN PHARMACEUTICAL INDUSTRIES, INC.;
TARO PHARMACEUTICALS U.S.A., INC.;
TEVA PHARMACEUTICALS USA, INC.;
UPSHER-SMITH LABORATORIES, LLC;
URL PHARMA, INC.;
VERSAPHARM, INC.;
WALGREENS BOOTS ALLICANCE, INC.;
WALGREENS BOOTS ALLIANCE
DEVELOPMENT GMBH;
WOCKHARDT USA LLC; and
ZYDUS PHARMACEUTICALS (USA), INC.,

_Defendants_.

**FILED WITH REDACTIONS – PUBLIC VERSION**

**FILED WITH REDACTIONS – PUBLIC VERSION**

## TABLE OF CONTENTS

| | | | |
|---|---|---|---|
| I. | | INTRODUCTION | 14 |
| II. | | JURISDICTION AND VENUE | 15 |
| III. | | PARTIES | 16 |
| | A. | Plaintiff Pharmacies and Hospitals | 16 |
| | B. | Manufacturer Defendants | 21 |
| | | 1. Actavis | 21 |
| | | 2. Akorn | 22 |
| | | 3. Alvogen | 23 |
| | | 4. Amneal | 23 |
| | | 5. Apotex | 24 |
| | | 6. Aurobindo | 24 |
| | | 7. Bausch Health / Valeant | 24 |
| | | 8. Breckenridge | 25 |
| | | 9. Camber | 25 |
| | | 10. Citron | 25 |
| | | 11. Dr. Reddy's | 25 |
| | | 12. Glenmark | 26 |
| | | 13. G&W | 26 |
| | | 14. Heritage | 26 |
| | | 15. Kavod / Rising | 27 |
| | | 16. Lannett | 28 |
| | | 17. Lupin | 28 |
| | | 18. Mayne | 28 |
| | | 19. Mylan | 29 |

**FILED WITH REDACTIONS – PUBLIC VERSION**

20.    Par ........................................................................................29

21.    Perrigo ................................................................................30

22.    Pfizer / Greenstone ...........................................................31

23.    Sandoz / Fougera ..............................................................31

24.    Sun / Mutual / Caraco .......................................................34

25.    Taro ....................................................................................35

26.    Teva ...................................................................................36

27.    Upsher-Smith .....................................................................37

28.    Wockhardt .........................................................................37

29.    Zydus .................................................................................37

C.    Distributor Defendants ..................................................................38

1.    AmerisourceBergen ...........................................................38

2.    Cardinal .............................................................................39

3.    Harvard ..............................................................................39

4.    Red Oak .............................................................................39

5.    McKesson ..........................................................................40

6.    Morris & Dickson .............................................................40

7.    Walgreens Boots Alliance .................................................40

D.    Individual Defendants ...................................................................42

1.    Ara Aprahamian (Taro)......................................................42

2.    David Berthold (Lupin)......................................................43

3.    James Brown (Glenmark) ..................................................43

4.    Maureen Cavanaugh (Teva)...............................................43

5.    Tracy Sullivan DiValerio (Lannett) ...................................43

6.    Marc Falkin (Actavis and Teva) ........................................44

**FILED WITH REDACTIONS – PUBLIC VERSION**

7.  James Grauso (Aurobindo and Glenmark) .................................................44

8.  Kevin Green (Teva and Zydus)...................................................................44

9.  Robin Hatosy (Greenstone).........................................................................44

10. Armando Kellum (Sandoz) .........................................................................45

11. Jill Nailor (Greenstone)..............................................................................46

12. James Nesta (Mylan)...................................................................................46

13. Konstantin Ostaficiuk (Camber) ................................................................46

14. Nisha Patel (Teva).......................................................................................46

15. David Rekenthaler (Teva and Apotex) .......................................................47

16. Richard Rogerson (Actavis and Teva) ........................................................47

E.  Co-Conspirators ....................................................................................................47

IV. FACTUAL ALLEGATIONS .............................................................................................48

A.  The Generic Drug Industry's Overarching "Fair Share" Conspiracy ...................48

1.  The rules of the fair share conspiracy ........................................................52

2.  The logic of the fair share conspiracy........................................................56

3.  The origins and methods of the fair share conspiracy ...............................58

4.  The terminology of the fair share conspiracy ............................................61

5.  Defendants' methods for concealing the conspiracy ..................................65

B.  Major Distributors Joined the Manufacturers' Fair Share Conspiracy .................67

1.  Distributor Defendants often benefit from higher market-wide drug prices
    ......................................................................................................................71

2.  Events illustrating the role of Distributor Defendants in the fair share
    conspiracy ....................................................................................................73

    (a) H.D. Smith knowingly participated in the fair share
        conspiracy ...........................................................73

        (i) Valganciclovir (H.D. Smith, Camber, Dr.
            Reddy's)...............................................................74

**FILED WITH REDACTIONS – PUBLIC VERSION**

(ii)  Acyclovir (H.D. Smith, Heritage, Zydus) .................................................................77

(b)  Harvard knowingly participated in the manufacturers' fair share conspiracy ....................79

(i)  Metoprolol succinate ER (Harvard, Actavis, Dr. Reddy's, Par) .......................................80

(ii)  Eplerenone (Harvard, M&D, Greenstone, Upsher-Smith)..............................................81

(c)  ABC knowingly participated in the fair share conspiracy ............................................82

(i)  Pioglitazone-Metformin IR (ABC, Sandoz, Teva) ......................................................83

(ii)  Dextroamphetamine-Amphetamine IR (ABC, Actavis, Teva) ...............................84

(iii)  Modafinil (ABC, Teva)............................85

(iv)  Loperamide (ABC, Teva, Mylan).............87

(v)  Buprenorphine (ABC, Sun, Teva) ............88

(d)  Walgreens and later WBAD knowingly participated in the fair share conspiracy ....................................89

(i)  Progesterone and Vancomycin (WBAD, Actavis, Akorn)...........................................91

(ii)  Temozolomide (WBAD, Teva, Sandoz)....92

(iii)  Disulfiram (WBAD, Breckenridge, Teva) .................................................................94

(iv)  Cabergoline (ABC, WBAD, Greenstone, Teva) .....................................................95

(v)  Celecoxib (WBAD, ABC, Actavis, Apotex, Teva) .....................................................96

(vi)  Isotretinoin (WBAD, ABC, Dr. Reddy's, Teva) .....................................................98

**FILED WITH REDACTIONS – PUBLIC VERSION**

(vii) Sumatriptan autoinjector (WBAD, Dr. Reddy's, Teva)...........................................99

(viii) Omeprazole-sodium bicarbonate (WBAD, Dr. Reddy's, Valeant) .............................100

(e) McKesson knowingly participated in the fair share conspiracy ...........................................101

(i) Capecitabine (McKesson, Dr. Reddy's, Mylan, Teva,)............................................102

(ii) Amikacin (McKesson, Heritage, Teva) ...104

(iii) Tizanidine (McKesson, Dr. Reddy's, Mylan, Sandoz) ....................................................106

(iv) Lamotrigine ER (McKesson, ABC, WBAD, Dr. Reddy's, Par, Wilshire).....................108

(v) Paricalcitol (McKesson, WBAD, Dr. Reddy's, Teva, Zydus)............................111

(f) Morris & Dickson knowingly participated in the fair share conspiracy..................................116

(i) Eszopiclone (M&D, Cardinal, Dr. Reddy's, Sun, Roxane)............................................117

(g) Cardinal knowingly participated in the fair share conspiracy ...........................................118

(i) Nystatin (Cardinal, Heritage, Mylan, Sun/Mutual, Teva) ....................................121

(ii) Tolterodine ER (Cardinal, Mylan, Teva) ..............................................................122

(iii) Tobramycin inhalation ("Tobi") (Cardinal, ABC, WBAD, Akorn, Sandoz, Teva)......124

C. Episodes Illustrating Defendants Fixing Prices, Allocating Markets, and/or Rigging Bids for Multiple Drugs Simultaneously ...............................................128

1. July 2012 multi-drug coordinated price increases (Actavis, Alvogen, Breckenridge, Mylan, Sandoz, Teva) ....................................................128

(a) Nadolol.............................................................129

FILED WITH REDACTIONS – PUBLIC VERSION

   (b) Labetalol HCL ....................................................131

   (c) Nitrofurantoin macrocrystal...............................132

2. July 2013 multi-drug coordinated price increases (Actavis, Amneal, Glenmark, Greenstone, Lupin, Mylan, Sandoz, Taro, Teva, Upsher-Smith) ............................................................................132

   (a) Adapalene ..........................................................134

   (b) Cefdinir, Cefprozil .............................................134

   (c) Fluconazole ........................................................134

   (d) Ranitidine...........................................................134

   (e) Isoniazid.............................................................134

   (f) Cimetidine, Methotrexate, Nadolol.....................135

   (g) Oxybutynin ........................................................135

3. August 2013 multi-drug coordinated price increases (Apotex, Glenmark, Lupin, Mylan, Sandoz, Taro, Teva, Zydus)............................136

   (a) Ketoprofen and Ketorolac...................................136

   (b) Etodolac and Etodolac ER ..................................137

4. April 2014 multi-drug coordinated price increases (Actavis, Breckenridge, Greenstone, Heritage, Lupin, Mylan, Rising, Sandoz, Taro, Teva, Versapharm)..............................................................................139

   (a) Cephalexin Oral Suspension ...............................141

   (b) Cyproheptadine HCL and Norethindrone Acetate - Ethinylestradiol (Mimvey)...................................142

   (c) Pentoxifylline.....................................................143

   (d) Theophylline ER .................................................143

   (e) Azithromycin Oral Suspension, Medroxyprogesterone ...........................................144

   (f) Clarithromycin ER, Tamoxifen Citrate, and Estazolam............................................................144

   (g) Ketoconazole......................................................146

**FILED WITH REDACTIONS – PUBLIC VERSION**

|  | (h) | Hydroxyzine Pamoate and Diflunisal Tablets .....147 |

5. April-May 2014 multi-drug coordinated price increases (Mylan, Teva) .......................................................................148

6. August 2014 multi-drug coordinated price increases (Actavis, Glenmark, Sandoz, Taro, Teva, Zydus).................................................150

        (a) Carbamazepine, Clotrimazole, Fluocinonide, and Warfarin .............................................................151

        (b) Topiramate sprinkle ............................................153

7. January 2015 multi-drug coordinated price increases (Actavis, Amneal, Dr. Reddy's, Heritage, Lannett, Mylan, Par, Sandoz, Taro, Teva).........153

        (a) Ciprofloxacin HCL, Glimepiride ........................156

        (b) Griseofulvin microsize oral suspension ...............156

        (c) Bethanechol CL ..................................................157

D. Further Episodes Illustrating Defendants Fixing Prices, Allocating Markets, and/or Rigging Bids ........................................................157

1. Fenofibrate (Cardinal, Teva, Dr. Reddy's, Lupin, Mylan, Zydus) ..........157

2. Clonidine (Teva, Actavis, Mylan) ........................................159

3. Levonorgestrel-Ethinylestradiol (Teva, Sandoz) ....................................161

4. Valsartan-HCTZ (Mylan, Sandoz)........................................................162

5. Dexmethylphenidate ER (Teva, Par, Sandoz) .........................................162

6. Lamivudine-Zidovudine (Combivir) (Teva, Aurobindo, Lupin).............163

7. Irbesartan (Teva, Lupin) ........................................................165

8. Drospirenone-Ethinylestradiol (Teva, Actavis, Lupin) .........................166

9. Norethindrone-Ethinylestradiol (Ovcon 35) (Teva, Lupin)....................167

10. Oxaprozin (Teva, Dr. Reddy's, Greenstone, Sandoz) ............................167

11. Tolterodine tartrate (Teva, Greenstone)..................................................169

12. Piroxicam (Teva, Greenstone) ...............................................................170

FILED WITH REDACTIONS – PUBLIC VERSION

13.   Dextroamphetamine-Amphetamine ER (Adderall XR) (Teva, Actavis).171

14.   Dextroamphetamine sulfate ER (Teva, Actavis) .....................................171

15.   Budesonide inhalation (Teva, Actavis).....................................................172

16.   Omega-3-Acid Ethyl Esters (Teva, Apotex, Par) ....................................173

17.   Entecavir (Teva, Par) ................................................................................174

18.   Budesonide DR (Teva, Mylan, Par).........................................................175

19.   Enalapril maleate (Teva, Mylan, Taro, Wockhardt)................................175

20.   Nortriptyline HCL (Teva, Actavis, Taro) ................................................178

21.   Niacin ER (Teva, Lupin, Zydus)..............................................................179

22.   Moexipril hcl tablets (Teva, Glenmark)...................................................180

23.   Desogestrel-Ethinylestradiol (Teva, Glenmark) ......................................180

24.   Gabapentin (Teva, Glenmark) ..................................................................181

25.   Norethindrone acetate (Teva, Amneal, Glenmark)...................................182

26.   Raloxifene hcl and Lamivudine-Zidovudine (Combivir) (McKesson, Teva, Actavis, Camber, Lupin)..........................................................................183

27.   Etodolac ER (Teva, Taro, Zydus).............................................................185

28.   Haloperidol and Trifluoperazine hcl (Mylan, Sandoz)............................186

29.   Potassium Chloride (Actavis, Mylan, Sandoz, Upsher-Smith, Zydus)....187

30.   Betamethasone dipropionate, Betamethasone dipropionate augmented, Betamethasone dipropionate-Clotrimazole, Betamethasone valerate, and Hydrocortisone valerate (McKesson, Sandoz, Actavis, Taro, Perrigo, G&W) ........................................................................................................190

31.   Fluocinolone Acetonide (Sandoz, Taro, G&W, Teligent)........................201

32.   Lidocaine HCL (Akorn, Sandoz, Taro) ....................................................207

33.   Timolol maleate (Bausch Health, Sandoz) ..............................................210

34.   Latanoprost (Akorn, Bausch Health, Greenstone, Sandoz) .....................213

35.   Neomycin-Polymyxin-Hydrocortisone (Bausch Health, Sandoz)...........215

FILED WITH REDACTIONS – PUBLIC VERSION

36.     Oxycodone HCL Oral Solution (Glenmark, Lannett)..............................216

37.     Tobramycin Dexamethasone (Bausch Health, Sandoz)..........................218

V.      THE STATUTES OF LIMITATIONS DO NOT BAR PLAINTIFFS' CLAIMS..........219

A.      The Statutes of Limitations Did Not Begin to Run Because Plaintiffs Did Not and Could Not Discover Defendants' Unlawful Conspiracy .....................................219

B.      Fraudulent Concealment Tolled the Statutes of Limitations ...............................220

1.      Active concealment of the conspiracy .....................................................220

2.      Plaintiffs exercised reasonable diligence .................................................222

VII.    CONTINUING VIOLATIONS ........................................................................................223

VIII.   DEFENDANTS' ANTITRUST VIOLATIONS................................................................223

IX.     CLASS ACTION ALLEGATIONS ...............................................................................225

X.      CAUSES OF ACTION ....................................................................................................230

COUNT 1 Violation of Sections 1 and 3 of the Sherman Act—Injunctive Relief (against all Defendants on behalf of Plaintiffs and the Injunctive Class) ...................................................................................................................231

COUNT 2 Violation of Sections 1 and 3 of the Sherman Act—Damages  (on behalf of Plaintiffs and the Federal Damages Class against distributor Defendants ABC, Cardinal, Red Oak, Harvard, H.D. Smith, McKesson, Morris & Dickson, and WBAD for purchases made directly from these Defendants) ............................................................................................................233

COUNT 2 (a) Violation of Sections 1 and 3 of the Sherman Act—Damages (against ABC on behalf of Plaintiffs and the Federal Damages Class for purchases made directly from ABC, H.D. Smith, WBAD) ....................234

COUNT 2 (b) Violation of Sections 1 and 3 of the Sherman Act—Damages (against H.D. Smith on behalf of Plaintiffs and the Federal Damages Class for purchases made directly from H.D. Smith or ABC) ..........................235

COUNT 2 (c) Violation of Sections 1 and 3 of the Sherman Act—Damages (against Cardinal and Red Oak on behalf of Plaintiffs and the Federal Damages Class for purchases made directly from Cardinal, Harvard, or Red Oak) .................................................................................................236

**FILED WITH REDACTIONS – PUBLIC VERSION**

COUNT 2 (d) Violation of Sections 1 and 3 of the Sherman Act—Damages (against Harvard on behalf of Plaintiffs and the Federal Damages Class for purchases made directly from Cardinal, Harvard, or Red Oak) ..............237

COUNT 2 (e)  Violation of Sections 1 and 3 of the Sherman Act—Damages (against McKesson on behalf of Plaintiffs and the Federal Damages Class for purchases made directly from McKesson) .........................................238

COUNT 2 (f) Violation of Sections 1 and 3 of the Sherman Act—Damages (against Morris & Dickson on behalf of Plaintiffs and the Federal Damages Class for purchases made directly from Morris & Dickson) ....................................................................................................239

COUNT 2 (g) Violation of Sections 1 and 3 of the Sherman Act—Damages (against WBAD on behalf of Plaintiffs and the Federal Damages Class for purchases made directly from Defendant WBAD, ABC, or H.D. Smith) ....................................................................................................240

COUNT 3 Violation of State Antitrust Statutes (against all Defendants, on behalf of Plaintiffs and the State Damages Class, for purchases from any source other than the manufacturer Defendants)..................................................241

COUNT 4 Violation of State Consumer Protection Statutes  (Against all Defendants, on behalf of Plaintiffs and the State Damages Class)..........249

COUNT 5 Unjust Enrichment .........................................................................253

VI.     REQUEST FOR RELIEF .................................................................256

VII.    JURY DEMAND .............................................................................257

APPENDIX A: DRUGS AT ISSUE IN THIS COMPLAINT ....................................258

APPENDIX B: ALL IRP DRUGS AT ISSUE IN MDL 2724....................................262

APPENDIX C: DRUGS AT ISSUE IN PREVIOUS IRP COMPLAINTS ...............................265

APPENDIX D: DEFENDANTS BY IRP COMPLAINT TYPE .................................266

APPENDIX E: MOTION TO DISMISS STATUS OF IRP ACTIONS IN MDL 2724 .............267

APPENDIX F: SUMMARY OF COUNTS IN THIS COMPLAINT (19-CV-6044) ................269

**FILED WITH REDACTIONS – PUBLIC VERSION**

I.        **INTRODUCTION**

1.        Defendants (generic drug manufacturers and distributors) have participated in an overarching "fair share" conspiracy to maintain and raise prices of more than a hundred generic drugs and to allocate customers and drug markets between manufacturers in order to assign each Defendant manufacturer its "fair share" of business while keeping prices high.

2.        Plaintiffs are independent pharmacies and hospitals that purchased and later dispensed these drugs, and, due to Defendants' antitrust violations, paid illegally inflated prices for these drugs. Plaintiffs have previously filed actions in MDL 2724 alleging that the Defendants in those actions, many of which are named here, caused Plaintiffs economic harm when they conspired to allocate markets and fix prices and thereby violated Section 1 of the Sherman Act as well as the antitrust, consumer protection, and unjust enrichment laws of various states.

3.        The anticompetitive conduct alleged in those previously-filed actions[1] and the conduct described herein were all acts in furtherance of an overarching conspiracy among

---

[1] The actions previously filed by Plaintiffs in MDL 2724 include: **Albuterol** (16-AL-27243-CMR, Dkt. 2); **Amitriptyline** (16-AM-27243-CMR, Dkt. 2); **Baclofen** (16-BC-27243-CMR, Doc. 9); **Benazepril** (16-BZ-27243-CMR, Dkt. 2); **Clobetasol** (16-CB-27243-CMR, Dkt. 13); **Clomipramine** (16-CM-27243-CMR, Dkt. 2); **Desonide** (16-DS-27243-CMR, Dkt. 12); **Digoxin** (16-DG-27243-CMR, Dkt. 34); **Divalproex** (16-DV-27243-CMR, Dkt. 6); **Doxycycline** (16-DX-27243-CMR, Dkt. 39); **Econazole** (16-EC-27243-CMR, Dkt. 2); **Fluocinonide** (16-FL-27243-CMR, Dkt. 10); **Levothyroxine** (16-LV-27243-CMR, Dkt. 8); **Lidocaine-Prilocaine** (16-LD-27243-CMR, Dkt. 12); **Pravastatin** (16-PV-27243-CMR, Dkt. 9); **Propranolol** (16-PP-27243-CMR, Dkt. 5); and **Ursodiol** (16-FL-27243-CMR, Dkt. 8), as well as a **multi-drug "Overarching" complaint** (18-cv-2533-CMR, Dkt. 1) that sought relief for overcharges on the following drugs: Acetazolamide tabs ("tabs") and extended release ("ER") caps ("caps"), Doxycycline hyclate tabs, caps, and delayed release ("DR") tabs, Doxycycline monohydrate tabs, Fosinopril-Hydrochlorothiazide ("Fosi-HCTZ") tabs, Glipizide-Metformin tabs, Glyburide tabs, Glyburide-Metformin tabs, Leflunomide tabs, Meprobamate tabs, Nimodipine caps, Nystatin cream, ointment, and tabs; Paromomycin caps, Theophylline ER tabs, Verapamil

**FILED WITH REDACTIONS – PUBLIC VERSION**

Defendants. When faced with competition, Defendants' employees met in person and called, emailed, and texted one another in order to coordinate the tactical details of their overarching anticompetitive strategy. These tactics included exchanging confidential pricing and marketing plans, targeting or ceding certain accounts in order to allocate customers, agreeing to follow list price increases or effective price increases, and submitting false bids. This fair share conspiracy affected the prices of the drugs already identified in Plaintiffs' previously-filed MDL 2724 actions as well as the Drugs at Issue[2] identified here.

4.      Plaintiffs' allegations are based on information obtained from individuals with knowledge of the acts alleged herein and on information made public during ongoing government investigations of Defendants, but the bulk of the specific facts alleged herein were not known to Plaintiffs until, at the earliest, May 10, 2019, when the Plaintiff States filed a complaint based primarily on the computer files of two Teva sales executives.

5.      Having investigated the anticompetitive communications in those files, Plaintiffs in this Complaint allege that additional Defendants—including certain major generic drug distributors—participated in the conspiracy, and that markets for at least 130 additional drugs were collusively allocated or price-fixed by the Defendants.

## II.                    JURISDICTION AND VENUE

6.      This Court has jurisdiction over the subject matter of this action as it arises under Section 1 of the Sherman Act, 15 U.S.C. § 1, and Section 4 of the Clayton Act, 15 U.S.C. § 15. Further, this Court has jurisdiction under 28 U.S.C. §§ 1331, 1337(a).

---

hydrochloride ("HCL") tabs, ER tabs, and DR caps, and Zoledronic Acid injection. The factual allegations in the foregoing IRP complaints are incorporated herein by reference.
[2] The Drugs at Issue for purposes of this complaint are identified in Appendix A.

7.     Venue is proper in this District pursuant to 15 U.S.C. §§ 15 and 22, and 28 U.S.C.

§ 1391(b), (c) and (d), because during the Class Period Defendants transacted business

throughout the United States, including in this District; Defendants resided, transacted business,

were found, or had agents within this District, and a portion of the affected interstate trade and

commerce discussed below was carried out in this District.

8.     This Court has personal jurisdiction over each Defendant because each

Defendant: (a) transacted business throughout the United States, including in this District;

(b) participated in the selling and distribution of Drugs at Issue throughout the United States,

including in this District; (c) had and maintained substantial contacts within the United States,

including in this District; and/or (d) was engaged in an unlawful conspiracy to inflate the prices

for Drugs at Issue that was directed at and had the intended effect of causing injury to persons

residing in, located in, or doing business throughout the United States, including in this District.

## III.          PARTIES

### A.     Plaintiff Pharmacies and Hospitals

9.     Plaintiff **Reliable Pharmacy** ("Reliable") is a privately-held independent

pharmacy located in Northridge, California. During the Class Period, Reliable purchased drugs

affected by the anticompetitive conduct at issue in this complaint at supracompetitive prices and

was thereby injured and suffered damages as a result of Defendants' unlawful conduct. These

purchases include purchases made directly from distributor Defendants McKesson, H.D. Smith,

and AmerisourceBergen Drug Corp. and indirectly from sources other than the Defendants.[3]

---

[3] Reliable purchased at least these drugs from distributor Defendants McKesson and/or from
H.D. Smith, and AmerisourceBergen Drug Corp.: Acetazolamide tabs, Acetazolamide ER caps,
Acyclovir tabs, Adapalene gel, Albuterol tabs, Amiloride HCL-HCTZ tabs, Amikacin injection,
Amitriptyline tabs, Amoxicillin-Clavulanate chewable tabs, Amphetamine/Dextroamphetamine
ER and IR tabs, Azithromycin oral suspension, Baclofen tabs, Benazepril-HCTZ tabs,

10.    Plaintiff **Falconer Pharmacy, Inc**. ("Falconer") is a privately held independent pharmacy located in Falconer, New York. During the Class Period, Falconer purchased drugs affected by the anticompetitive conduct at issue in this complaint at supracompetitive prices and was thereby injured and suffered damages as a result of Defendants' unlawful conduct. These purchases include purchases made indirectly (from sources other than the Defendants) and

---

Bethanechol chloride tabs, Budesonide DR caps, Budesonide inhalation, Bumetanide tabs, Buprenorphine, Buprenorphine-Naloxone tabs, Buspirone HCL tabs, Cabergoline tabs, Calcipotriene topical solution, Calcitriol caps, Capecitabine tabs, Carbamazepine chewable tabs, Carbamazepine tabs, Cefdinir caps, oral suspension, and tabs, Cefixime, Celecoxib caps, Cephalexin suspension, Cimetidine tabs, Ciprofloxacin HCL tabs, Clarithromycin ER tabs, Clemastine fumarate tabs, Clobetasol emollient cream, cream, gel, ointment, and topical solution, Clonidine-TTS patch, Clomipramine caps, Clotrimazole topical solution, Colistimethate, Combivir tabs, Cyproheptadine HCL tabs, Desmopressin acetate tabs, Desogestrel-Ethinyl Estradiol tabs, Dexmethylphenidate HCL ER, Desonide cream, ointment, Dexmethylphenidate HCL ER, Dextroamphetamine sulfate ER, Diclofenac potassium tabs, Dicloxacillin sodium caps, Diflunisal tabs, Digoxin tabs, Diltiazem HCL tabs, Disopyramide phosphate caps, Disulfiram, Divalproex ER tabs, Doxazosin Mesylate tabs, Doxycycline monohydrate tabs, Doxycycline hyclate caps, Doxycycline hyclate DR tabs, Drospirenone-Ethinylestradiol tabs, Econazole cream, Enalapril maleate tabs, Entecavir tabs, Epitol tabs, Eplerenone tabs, Estazolam tabs, Estradiol tabs, Ethinylestradiol-Levonorgestrel tabs, Ethinylestradiol-Norethindrone acetate tabs, Ethosuximide caps, oral solution, Etodolac ER tabs, Etodolac tabs, Fenofibrate tabs, Fluconazole tabs, Fluocinonide cream, ointment, gel, and emollient cream, Fluoxetine HCL tabs, Flurbiprofen tabs, Flutamide caps, Gabapentin tabs, Glimepiride tabs, Glipizide-Metformin tabs, Glyburide tabs, Glyburide-Metformin tabs, Griseofulvin suspension, Haloperidol tabs, Hydroxyurea caps, Hydroxyzine caps, Imiquimod, Irbesartan tabs, Isoniazid tabs, Ketoconazole cream, Ketoconazole tabs, Ketoprofen caps, Ketorolac tromethamine tabs, Labetalol HCL tabs, Lamotrigine ER, Leflunomide tabs, Levothyroxine tabs, Lidocaine-Prilocaine cream, Loperamide HCL caps, Medroxyprogesterone tabs, Meprobamate tabs, Metronidazole gel, Metoprolol ER, Methotrexate tabs, Modafinil tabs, Montelukast oral granules, Nabumetone tabs, Nadolol tabs, Niacin ER, Nimodipine caps, Nitrofurantoin macrocrystal caps, Norethindrone acetate tabs, Nortriptyline HCL caps, Nystatin tabs, ointment and cream, Omega-3-Acid Ethyl Esters caps, Omeprazole-Sodium bicarbonate caps, Oxaprozin tabs, Oxybutynin Cl tabs, Paricalcitol caps, Penicillin VK tabs, Pentoxifylline tabs, Pioglitazone-Metformin, Piroxicam caps, Pravastatin tabs, Prazosin HCL caps, Prochlorperazine tabs, Propranolol caps, Propranolol tabs, Raloxifene HCL tabs, Ranitidine HCL tabs, Tamoxifen citrate tabs, Temozolomide caps, Theophylline ER tabs, Tizanidine HCL tabs, Tobramycin inhalation and ophthalmic solution, Tolterodine tartrate tabs, Topiramate sprinkle caps, Trifluoperazine HCL tabs, Ursodiol caps, Valganciclovir tabs, Valsartan-HCTZ, Verapamil tabs, ER caps, and DR caps, Warfarin sodium tabs, and Zoledronic Acid injection.

**FILED WITH REDACTIONS – PUBLIC VERSION**

directly from distributor Anda, a wholly-owned subsidiary of Defendant Teva since 2016 and before then, a wholly-owned subsidiary of Defendant Actavis).[4]

11.     Plaintiff **Halliday's & Koivisto's Pharmacy** ("Halliday's") is an independent pharmacy located at 4133 University Boulevard in Jacksonville, Florida. Halliday's has served the Jacksonville community for over 50 years. During the Class Period, Halliday's purchased drugs affected by the anticompetitive conduct at issue in this complaint at supracompetitive prices and was thereby injured and suffered damages as a result of Defendants' unlawful conduct. These purchases include purchases made directly from distributor Defendant McKesson and indirectly from sources other than the Defendants.[5]

---

[4] Falconer purchased at least these drugs: Acetazolamide, Adapalene, Albuterol tabs, Amitriptyline, Azithromycin, Baclofen, Benazepril-HCTZ ,Bethanechol Chloride, Budesonide DR, Budesonide inhalation, Buspirone HCL, Ciprofloxacin HCL, Clarithromycin ER, Clobetasol, Clomipramine, Clotrimazole, Cyproheptadine HCL, Desmopressin Acetate, Desonide, Dextroamphetamine sulfate ER, Diclofenac potassium tabs, Digoxin, Diltiazem HCL, Doxazosin mesylate, Divalproex ER, Doxycycline hyclate, Doxycycline monohydrate, Econazole, Enalapril maleate, Estradiol, Etodolac, Etodolac ER, Fenofibrate, Fluocinonide, Fluoxetine HCL, Fosinopril-HCTZ Gabapentin, Glimepiride, Glipizide-Metformin, Glyburide, Glyburide-Metformin, Ketorolac Tromethamine, Labetalol HCL, Leflunomide, Levothyroxine, Lidocaine-Prilocaine tabs Loperamide HCL, Nitrofurantoin microcrystal, Norethindrone Acetate, Nortriptyline HCL, Penicillin VK, Pravastatin, Prazosin HCL, Propranolol, Ranitidine HCL, Theophylline ER, Tolterodine ER, Tolterodine Tartrate, Ursodiol, Verapamil, Warfarin sodium tabs.

[5] Halliday's purchased at least these drugs, mostly from distributor Defendant McKesson: Acyclovir tabs, Adapalene gel, Amphetamine IR, Amphetamine/Dextroamphetamine ER/IR, Azithromycin oral suspension, Baclofen tabs, Bethanechol Chloride tabs, Buspirone, Cabergoline, Carbamazepine, Cefdinir, Celecoxib, Cephalexin suspension, Ciprofloxacin HCL tabs, Clarithromycin ER tabs, Clonidine -TTS Patch, Clomipramine, Clotrimazole topical solution, Cyproheptadine HCL tabs, Desmopressin Acetate tabs, Desogestrel-Ethinylestradiol tabs, Dexmethylphenidate HCL ER, Diclofenac potassium tabs, Dicloxacillin sodium caps, Diflunisal tabs, Diltiazem HCL tabs, Doxazosin Mesylate tabs, Doxycycline hyclate DR tabs, Drospirenone-Ethinylestradiol tabs, Enalapril Maleate tabs, Eplerenone tabs, Estazolam tabs, Estradiol tabs, Eszopiclone tabs, Levonorgestrel, Ethinylestradiol-Norethindrone, Ethosuximide, Etodolac ER tabs, Etodolac, Fluconazole tabs, Fluocinonide, Fluoxetine HCL tabs, Flurbiprofen tabs, Gabapentin tabs, Glimepiride tabs, Griseofulvin suspension, Haloperidol tabs, Hydroxyzine caps, Irbesartan tabs, Isoniazid tabs, Ketoconazole, Ketoprofen caps, Ketorolac, Tromethamine tabs, Labetalol HCL tabs, Levothyroxine tabs, Loperamide HCL caps,

12.     Plaintiff **North Sunflower Medical Center** ("North Sunflower") is a hospital located at 840 N. Oak Avenue in Ruleville, Mississippi. First established in 1950 as North Sunflower County Hospital, the hospital has grown to a staff of approximately 500 employees and includes a pharmacy that dispenses drugs to patients at North Sunflower. During the Class Period North Sunflower purchased drugs affected by the anticompetitive conduct at issue in this complaint at supracompetitive prices and was thereby injured and suffered damages as a result of Defendants' unlawful conduct. These purchases include purchases made directly from distributor Defendants Cardinal and Morris & Dickson and indirectly from sources other than the Defendants.[6]

---

Medroxyprogesterone tabs, Methotrexate tabs, Metronidozole, Modafinil tabs, Nabumetone tabs, Nadolol tabs, Niacin ER, Nitrofurantoin MAC caps, Norethindrone, Norethindrone-Ethinylestradiol, Nortriptyline hydrochloride caps, Omega-3-Acid Ethyl Esters caps, Oxybutynin Chloride tabs, Penicillin VK tabs, Pentoxifylline tabs, Piroxicam caps, Prazosin HCL caps, Prochlorperazine tabs, Raloxifene HCL tabs, Ranitidine HCL tabs, Sotalol, Tamoxifen Citrate tabs, Tizanidine HCL tabs, Tobramycin, Tolterodine ER, Tolterodine Tartrate tabs, Topiramate Sprinkle caps, Trifluorperazine HCL tabs, Ursodiol caps, Valsartan-HCTZ, Valganciclovir tabs, Warfarin sodium tabs.

[6] North Sunflower purchased at least these drugs from distributor Defendants Cardinal and/or Morris & Dickson: Acetazolamide tabs, Acyclovir tabs, Amiloride HCL/HCTZ tabs, Amikacin injection, Amitriptyline tabs, Amoxicillin-Clavulanate tabs, Azithromycin oral suspension, Baclofen tabs, Bethanechol Chloride tabs, Budesonide inhalation, Bumetanide tabs, Buspirone hydrochloride tabs, Calcitriol caps, Carbamazepine tablet, Cefdinir, Celecoxib caps, Cephalexin suspension, Cimetidine tabs, Ciprofloxacin HCL tabs, Clobetasol, Clonidine TTS Patch, Clotrimazole topical solution, Combivir tabs, Cyproheptadine HCL tabs, Diclofenac potassium tabs, Digoxin tabs, Diltiazem HCL tabs, Divalproex ER tabs, Doxazosin Mesylate tabs, Doxycycline Monohydrate tabs, Doxycycline hyclate RR caps, Econazole cream, Enalapril Maleate tabs, Entecavir tabs, Eplerenone tabs, Estradiol tabs, Etodolac tabs, Fenofibrate tabs, Fluconazole tabs, Fluoxetine HCL tabs, Glimepiride tabs, Glyburide tabs, Glyburide-Metformin tabs, Griseofulvin suspension, Haloperidol tabs, Hydroxyurea caps, Hydroxyzine caps, Irbesartan tabs, Isoniazid tabs, Ketoconazole tabs, Ketorolac, Tromethamine tabs, Labetalol HCL tabs, Labetalol tabs, Lamivudine/ Zidovudine tabs, Leflunomide tabs, Levothyroxine tabs, Lidocaine-Prilocaine cream, Loperamide HCL caps, Medroxyprogesterone tabs, Metronidozole, Metoprolol, Methotrexate tabs, Modafinil tabs, Montelukast Oral Granules, Nabumetone tabs, Nadolol tabs, Niacin ER, Nitrofurantoin MAC caps, Nortriptyline hydrochloride caps, Nystatin ointment, Nystatin cream, Omega-3-Acid Ethyl Esters caps, Oxaprozin tabs, Oxybutynin Chloride tabs, Paricalcitol caps, Penicillin VK tabs, Pentoxifylline tabs, Pravastatin tabs,

13.     Plaintiff **Russell's Mr. Discount Drugs** ("Russell's") was a privately held independent pharmacy located at 334 Depot Street, in Lexington, Mississippi from the time of its opening in February 1986 until it sold the prescription drugs portion of its business to a pharmacy chain on July 14, 2016. During the Class Period, Russell's purchased drugs affected by the anticompetitive conduct at issue in this complaint at supracompetitive prices and was thereby injured and suffered damages as a result of Defendants' unlawful conduct. These purchases include purchases made directly from distributor Defendant Harvard and indirectly from sources other than the Defendants.[7]

14.     Plaintiff **Chet Johnson Drug** ("Chet Johnson") is a privately held independent pharmacy in Amery, Wisconsin. During the Class Period Chet Johnson purchased drugs affected by the anticompetitive conduct at issue in this complaint at supracompetitive prices and was thereby injured and suffered damages as a result of Defendants' unlawful conduct. These

---

Prazosin HCL caps, Prochlorperazine tabs, Propranolol caps, Propranolol tabs, Raloxifene HCL tabs, Ranitidine HCL tabs, Tamoxifen Citrate tabs, Theophylline ER tabs, Tizanidine HCL tabs, Tobramycin inhalation solution, Tolterodine ER, Tolterodine Tartrate tabs, Trifluorperazine HCL tabs, Ursodiol caps, Verapamil, Warfarin sodium tabs, Zoledronic Acid injection.

[7] Russell's purchased at least the following drugs, including purchases from distributor Defendant Harvard: Amoxicillin-Clavulanate, Azithromycin oral suspension, Bumetanide tabs, Cephalexin suspension, Ciprofloxacin HCL tabs, Clarithromycin ER tabs, Clonidine-TTS Patch, Clotrimazole topical solution, Cyproheptadine HCL tabs, Dexmethylphenidate HCL ER, Diclofenac potassium tabs, Dicloxacillin sodium caps, Diltiazem HCL tabs, Doxazosin Mesylate tabs, Enalapril Maleate tabs, Estradiol tabs, Etodolac tabs, Fenofibrate tabs, Fluconazole tabs, Gabapentin tabs, Glimepiride tabs, Griseofulvin suspension, Haloperidol tabs, Irbesartan tabs, Ketoconazole, Ketorolac, Tromethamine tabs, Labetalol HCL tabs, Labetalol tabs, Loperamide HCL caps, Medroxyprogesterone tabs, Moexipril Nabumetone tabs, Niacin ER, Nitrofurantoin MAC ,Nortriptyline hydrochloride caps ,Omega-3-Acid Ethyl Esters capsule, Oxaprozin tabs, Oxybutynin Chloride, Pentoxifylline tabs, Prazosin HCL caps, Prochlorperazine tabs, Raloxifene HCL tabs, Tizanidine HCL tabs, Tolterodine Tartrate tabs, Trifluorperazine HCL tabs, Valsartan HCTZ, Warfarin sodium tabs.

**FILED WITH REDACTIONS – PUBLIC VERSION**

purchases include purchases made directly from distributor Defendant McKesson and indirectly from sources other than the Defendants.[8]

**B.    Manufacturer Defendants**

     *1.   Actavis*

15.    Defendant **Actavis Holdco U.S., Inc.** ("Actavis") is a Delaware corporation with its principal place of business in Parsippany, New Jersey. In August 2016, Teva Pharmaceutical USA, Inc. acquired the generics business of Allergan plc, including Actavis, Inc. Upon the acquisition, Actavis, Inc.—the acquired Allergan plc generics operating company (formerly known as Watson Pharmaceuticals)—was renamed Allergan Finance, LLC, which in turn assigned all of the assets and liabilities of the former Allergan plc generic business to the newly formed Actavis Holdco, including subsidiaries Defendant Actavis Pharma, Inc. and Defendant Actavis Elizabeth LLC, among others. Actavis Holdco is a wholly-owned subsidiary of Defendant Teva Pharmaceuticals USA, Inc., which is a Delaware corporation with its principal

---

[8] Chet Johnson purchased at least the following drugs, mostly from distributor Defendant McKesson: Adapalene gel, Amphetamine/Dextroamphetamine ER/IR, Azithromycin oral suspension, Baclofen tabs, Budesonide DR caps, Budesonide inhalation, Buspirone hydrochloride tabs, Cabergoline tabs, Celecoxib caps, Cephalexin suspension, Cimetidine tabs, Clemastine Fumarate tabs, Clonidine-TTS Patch, Clomipramine caps, Cyproheptadine HCL tabs, Desogestrel-Ethinylestradiol tabs, Diclofenac potassium tabs, Dicloxacillin sodium caps, Diflunisal tabs, Diltiazem HCL tabs, Disopyramide Phosphate caps, Doxazosin Mesylate tabs, Drospirenone-Ethinylestradiol tabs, Enalapril Maleate tabs, Epitol tabs, Estradiol tabs, Etodolac tabs, Fenofibrate tabs, Fluconazole tabs, Fluocinonide, Fluoxetine HCL tabs, Flurbiprofen tabs, Fluvastatin sodium caps, Glimepiride tabs, Haloperidol tabs, Hydroxyzine caps, Hydroxyurea caps, Irbesartan tabs, Ketoconazole, Ketorolac, Tromethamine tabs, Loperamide HCL caps, Medroxyprogesterone tabs, Methotrexate tabs, Nabumetone tabs, Nitrofurantoin MAC caps, Norethindrone Acetate tabs, Nortriptyline hydrochloride caps, Omega-3-Acid Ethyl Esters capsule, Oxaprozin tabs, Prazosin HCL caps, Raloxifene HCL tabs, Sotalol, Tamoxifen Citrate tabs, Tizanidine HCL tabs, Tolterodine Tartrate tabs, Topiramate Sprinkle caps, Warfarin sodium tabs.

**FILED WITH REDACTIONS – PUBLIC VERSION**

place of business in North Wales, Pennsylvania. Teva Pharmaceuticals USA, Inc. is a wholly-owned subsidiary of Teva Pharmaceutical Industries Ltd., an Israeli entity.

16.     Defendant **Actavis Pharma, Inc.** ("Actavis Pharma") is a Delaware corporation with its principal place of business in Parsippany, New Jersey. It is a wholly-owned subsidiary of Actavis Holdco and is a principal operating company in the U.S. for Teva's generic products acquired from Allergan plc. It manufactures, markets, and/or distributes generic drugs. Actavis Pharma, Inc. is registered with the Pennsylvania Department of State as a foreign corporation and maintains a registered agent in Pennsylvania.

17.     Defendant **Actavis Elizabeth LLC** ("Actavis Elizabeth") is a Delaware company with its principal place of business in Elizabeth, New Jersey. It is a wholly-owned subsidiary of Actavis Holdco.

18.     Unless addressed individually, Actavis Holdco, Actavis Pharma, and Actavis Elizabeth are collectively referred to herein as "Actavis." During the Class Period, Actavis marketed and sold generic pharmaceuticals in this District and throughout the United States.

### 2.    *Akorn*

19.     Defendant **Akorn, Inc**. is a Louisiana company with its principal place of business in Lake Forest, Illinois.  It is the parent company of Hi-Tech Pharmacal Co., Inc. and Akorn Sales, Inc.

20.     Defendant **Akorn Sales, Inc**. is a Delaware corporation. It is a wholly-owned subsidiary of Akorn Inc. It is registered with the Pennsylvania Department of State as a foreign corporation and maintains a registered agent in Pennsylvania.

21.     Defendant **Hi-Tech Pharmacal Co., Inc.** ("Hi-Tech") is a Delaware corporation with its principal place of business in Amityville, New York. It is a wholly-owned subsidiary of

Akorn, Inc. Akorn Inc. acquired and integrated Hi-Tech into its operations in April 2014

22.    Defendant **Versapharm, Inc.** ("Versapharm") is a Georgia corporation with its principal place of business in Marietta, GA. It is a wholly-owned subsidiary of Akorn, Inc. Versapharm was acquired by Akorn, Inc. in August 2014.

23.    Unless addressed individually, Akorn Inc., Akorn Sales, Inc., Hi-Tech and Versapharm are collectively referred to herein as "Akorn." During the Class Period, Akorn marketed and sold generic pharmaceuticals in this District and throughout the United States

### 3.  *Alvogen*

24.    Defendant **Alvogen Inc.** ("Alvogen") is a Delaware corporation with its principal place of business in Pine Brook, New Jersey. It is a privately held company that was founded in 2009 by a former CEO of Defendant Actavis. During the Class Period, Alvogen marketed and sold generic pharmaceuticals in this District and throughout the United States.

### 4.  *Amneal*

25.    Defendant **Amneal Pharmaceuticals LLC** ("Amneal LLC") is a Delaware company with its principal place of business in Bridgewater, New Jersey.

26.    Defendant **Amneal Pharmaceuticals Inc.** ("Amneal Inc.") is a Delaware corporation with its principal place of business in Bridgewater, New Jersey. Amneal Inc. owns a portion of Amneal LLC and, as the managing member of Amneal LLC, conducts and exercises full control over all activities of Amneal LLC.

27.    Unless addressed individually, Amneal LLC and Amneal Inc. are collectively referred to herein as "Amneal." During the Class Period, Amneal marketed and sold generic pharmaceuticals in this District and throughout the United States.

**FILED WITH REDACTIONS – PUBLIC VERSION**

### 5. *Apotex*

28.     Defendant **Apotex Corp.** ("Apotex") is a Delaware corporation with its principal

place of business in Weston, Florida. During the Class Period, Apotex marketed and sold generic

pharmaceuticals in this District and throughout the United States.

### 6. *Aurobindo*

29.     Defendant **Aurobindo Pharma USA, Inc.** ("Aurobindo") is a Delaware

corporation with its principal place of business in Dayton, New Jersey. Aurobindo is a subsidiary

of Aurobindo Pharma Limited, a corporation based in Hyderabad, India. During the Class

Period, Aurobindo marketed and sold generic pharmaceuticals in this District and throughout the

United States.

### 7. *Bausch Health / Valeant*

30.     Defendant **Bausch Health Americas, Inc.** (formerly Valeant Pharmaceuticals

International, Inc.) is a Delaware corporation with its US headquarters located in Bridgewater,

New Jersey. Defendant **Bausch Health US, LLC** (formerly Valeant Pharmaceuticals North

America LLC) is a Delaware limited liability company with its principal place of business in

Bridgewater, New Jersey. Bausch Health US, LLC is registered with the Pennsylvania

Department of State as a foreign corporation and maintains a registered agent in Pennsylvania.

31.     Defendant **Oceanside Pharmaceuticals, Inc.** ("Oceanside") is a wholly-owned

subsidiary of Bausch Health Americas, Inc. It is a Delaware corporation with its principal place

of business in Bridgewater, New Jersey. Unless addressed individually, Bausch Health

Americas, Inc., Bausch Health USA, LLC, Oceanside, Valeant Pharmaceuticals International,

Inc., and Valeant Pharmaceuticals North America LLC are collectively referred to as "Bausch

Health" or "Valeant." During the Class Period, Valeant marketed and sold generic pharmaceuticals in this District and throughout the United States.

### 8. *Breckenridge*

32.    Defendant **Breckenridge Pharmaceutical, Inc.** ("Breckenridge") is a Florida corporation with its principal place of business in Berlin, Connecticut. During the Class Period, Breckenridge marketed and sold generic pharmaceuticals in this District and throughout the United States.

### 9. *Camber*

33.    Defendant **Camber Pharmaceuticals, Inc.** ("Camber") is a Delaware corporation with its principal place of business in Piscataway, New Jersey. Camber is a wholly-owned subsidiary of Hetero Drugs, an Indian pharmaceutical company. During the Class Period, Camber marketed and sold generic pharmaceuticals in this District and throughout the United States.

### 10. *Citron*

34.    Defendant **Citron Pharma, LLC** ("Citron") is a New Jersey corporation with its principal place of business in East Brunswick, New Jersey. During the Class Period, Citron marketed and sold generic pharmaceuticals in this District and throughout the United States.

35.    Aceto Corporation (which purchased Citron's generic drugs assets) has disclosed that the DOJ executed a search warrant at Aceto's offices in Port Washington, New York.

### 11. *Dr. Reddy's*

36.    Defendant **Dr. Reddy's Laboratories, Inc.** ("Dr. Reddy's," "Reddy's," or "DRL") is a New Jersey corporation with its principal place of business in Princeton, New Jersey. It is a wholly-owned subsidiary of Dr. Reddy's Laboratories Ltd., which is an Indian

**FILED WITH REDACTIONS – PUBLIC VERSION**

company with its principal place of business in Hyderabad, in the state of Telangana, India. Dr. Reddy's is registered with the Pennsylvania Department of State as a foreign corporation and maintains a registered agent in Pennsylvania. During the Class Period, Dr. Reddy's marketed and sold generic pharmaceuticals in this District and throughout the United States.

### 12. Glenmark

37.     Defendant **Glenmark Pharmaceuticals, Inc.** ("Glenmark") is a Delaware corporation with its principal place of business in Mahwah, New Jersey. It is a wholly-owned subsidiary of Glenmark Pharmaceuticals Ltd., headquartered in Mumbai, in the state of Maharashtra, India. During the Class Period, Glenmark marketed and sold generic pharmaceuticals in this District and throughout the United States.

### 13. G&W

38.     Defendant **G&W Laboratories, Inc.** ("G&W") is a New Jersey corporation with its principal place of business in South Plainfield, New Jersey. During the Class Period, G&W marketed and sold generic pharmaceuticals in this District and throughout the United States.

### 14. Heritage

39.     Defendant **Heritage Pharmaceuticals, Inc.** ("Heritage") is a Delaware corporation with its principal place of business in Eatontown, New Jersey. It is the exclusive United States commercial operation for Emcure Pharmaceuticals Private Ltd., an Indian company headquartered in Pune, in the state of Maharashtra, India. During the Class Period, Heritage marketed and sold generic pharmaceuticals in this District and throughout the United States.

40.     On May 31, 2019, the Department of Justice charged Heritage with a criminal violation of the Sherman Antitrust Act, 15 U.S.C. § 1. In a deferred prosecution agreement with the DOJ, Heritage admitted that from about April 2014 until at least December 2015, Heritage

"knowingly entered into and engaged in a combination and conspiracy with other persons and entities engaged in the production and sale of generic pharmaceutical products." Heritage admitted that one purpose of the conspiracy was "to allocate customers and fix and maintain prices of glyburide sold in the United States."  As part of this agreement, paid a $225,000 fine and is required to cooperate with the DOJ in its ongoing criminal investigation of generic drug price-fixing.

41.     Additionally, Heritage's former CEO Jeffrey "Jeff" Glazer and former President Jason Malek both pleaded guilty to criminal price-fixing charges in January 2017. They await sentencing pending their continuing cooperation with the DOJ's criminal investigation.

### 15. Kavod / Rising

42.     Defendant **Kavod Pharmaceuticals LLC**, formerly known as Rising Pharmaceuticals, LLC and Rising Pharmaceuticals, Inc. (collectively referred to as "Rising"), is a Delaware corporation with, upon information and belief, its principal place of business in Saddle Brook, New Jersey.

43.     On December 3, 2019, Rising admitted to fixing prices and allocating customers for Benazepril-HCTZ. It has been charged with one count of a felony conspiracy in restraint of trade, and agreed to a deferred prosecution agreement with the Department of Justice. Rising sold and conspired regarding drugs other than Benazepril-HCTZ and marketed and sold generic pharmaceuticals in this District and throughout the United States during the Class Period.

44.     On March 2, 2020, in a deferred prosecution agreement following criminal charges filed by the Department of Justice, Defendant Sandoz, Inc. admitted that it had conspired with Rising "to suppress and eliminate competition by agreeing to allocate customers for, and

stabilize, maintain, and fix prices of, Benazepril-HCTZ sold in the United States, from at least as early as April 2014 and continuing until at least September 2015."

### 16. Lannett

45.     Defendant **Lannett Company, Inc.** ("Lannett") is a Delaware corporation with its principal place of business in Philadelphia, Pennsylvania. Lannett is registered with the Pennsylvania Department of State as a foreign corporation. During the Class Period, Lannett marketed and sold generic pharmaceuticals in this District and throughout the United States.

### 17. Lupin

46.     Defendant **Lupin Pharmaceuticals, Inc.** ("Lupin") is a Delaware corporation that has its principal place of business in Baltimore, Maryland. Lupin is a wholly-owned subsidiary of Lupin Limited, an Indian company with its principal place of business in Mumbai, India. During the Class Period, Lupin marketed and sold generic pharmaceuticals in this District and throughout the United States.

### 18. Mayne

47.     Defendant **Mayne Pharma Inc.** is a Delaware corporation that has its principal place of business in Raleigh, North Carolina. Mayne Pharma Inc. is registered with the Pennsylvania Department of State as a foreign corporation and maintains a registered agent in Pennsylvania. In 2012, Mayne Pharma Inc. acquired Metrics, Inc. and its division Midlothian Laboratories, and has also operated under the name Midlothian since that time. In 2013, Mayne Pharma Inc. acquired Libertas Pharma. Unless addressed individually, Metrics, Inc. Midlothian Laboratories, Libertas Pharma and Mayne Pharma Inc. are collectively referred to herein as "Mayne." During the Class Period, Mayne marketed and sold generic pharmaceuticals in this District and throughout the United States.

**FILED WITH REDACTIONS – PUBLIC VERSION**

### *19. Mylan*

48.     Defendant **Mylan Inc.** is a Pennsylvania corporation with its principal place of business in Canonsburg, Pennsylvania.

49.     Defendant **Mylan Pharmaceuticals, Inc.** is a West Virginia corporation with its principal place of business in Morgantown, West Virginia. It is a subsidiary of Mylan Inc. Mylan Pharmaceuticals, Inc. is registered with the Pennsylvania Department of State as a foreign corporation and maintains a registered agent in Pennsylvania.

50.     Mylan Inc. and Mylan Pharmaceuticals, Inc. are wholly-owned subsidiaries of Defendant **Mylan N.V.**, a Dutch pharmaceutical company. Unless addressed individually, Mylan Inc., Mylan Pharmaceuticals, Inc., and Mylan N.V. are collectively referred to herein as "Mylan." During the Class Period, Mylan marketed and sold generic pharmaceuticals in this District and throughout the United States.

51.     DOJ subpoenas have been served on certain Mylan employees and senior management, as well as on the company itself, seeking information about communications with competitors regarding certain drugs, and, in September 2016, the FBI raided Mylan's offices pursuant to a search warrant issued in connection with the DOJ's price-fixing investigation.

### *20. Par*

52.     Defendant **Par Pharmaceutical Inc.** ("Par") is a New York corporation with its principal place of business in Chestnut Ridge, New York. Par is registered with the Pennsylvania Department of State as a foreign corporation and maintains a registered agent in Pennsylvania.

53.     Defendant **Generics Bidco I, LLC** ("Generics Bidco") is a Delaware company with its principal place of business in Huntsville, Alabama. Generics Bidco formerly conducted business as Qualitest Pharmaceuticals ("Qualitest").

54.     Defendant **DAVA Pharmaceuticals, LLC** ("DAVA") is a Delaware company with its principal place of business in Fort Lee, New Jersey.

55.     Par, Generics Bidco, and DAVA are wholly-owned subsidiaries of Defendant **Endo International plc** ("Endo"), an Irish corporation with its principal place of business located in Dublin, Ireland and its U.S. headquarters located in Malvern, Pennsylvania. In August 2014, Endo acquired DAVA. In September 2015, Endo acquired Par. At the time of that acquisition, Endo had a separate subsidiary, Qualitest, that it had acquired in 2010. Par is thus the successor in interest to both DAVA and Qualitest. Unless addressed individually, Endo, Par, Qualitest, and DAVA are collectively referred to henceforth as "Par." During the Class Period, Par marketed and sold generic pharmaceuticals in this District and throughout the United States.

### 21. *Perrigo*

56.     Defendant **Perrigo New York, Inc.** ("Perrigo") is a Delaware corporation with its executive offices in Allegan, Michigan and its primary business location in the Bronx, New York. It is a subsidiary of Perrigo Company plc, an Irish company with its principal place of business in Dublin, Ireland. Perrigo is registered with the Pennsylvania Department of State as a foreign corporation and maintains a registered agent in Pennsylvania. During the Class Period, Perrigo marketed and sold generic pharmaceuticals to customers in this District and other locations in the United States.

57.     In May 2017, Perrigo revealed that its corporate offices had been raided by federal authorities seeking evidence related to generic drug pricing.

58.     On March 2, 2020, in a deferred prosecution agreement that followed from criminal price-fixing charges filed by the Department of Justice, Defendant Sandoz, Inc. admitted that it had conspired with Perrigo "to suppress and eliminate competition by agreeing to

allocate customers and rig bids for, and stabilize, maintain, and fix prices of, generic drugs sold in the United States, from at least as early as July 2013 and continuing until at least December 2015." Sandoz's admission of conduct in violation of the Sherman Act 15 U.S.C. specifically included, but was not limited to, sales of Desonide ointment.

### 22. Pfizer / Greenstone

59.     Defendant **Greenstone LLC** ("Greenstone") is a limited liability company with its principal place of business in North Peapack, New Jersey.

60.     Greenstone is a wholly-owned subsidiary of Defendant **Pfizer Inc.** ("Pfizer"), a Delaware corporation with its principal place of business in New York, New York. At all relevant times Greenstone has operated as the generic drug division of Pfizer. Greenstone operates out of Pfizer's Peapack, New Jersey campus, and a majority of Greenstone's employees are also employees of Pfizer's Essential Health Division, including Greenstone's President. Greenstone employees also use Pfizer for financial analysis, human resources, and employee benefit purposes, making the two companies essentially indistinguishable. During the Class Period, Greenstone and Pfizer marketed and sold generic pharmaceuticals in this District and throughout the United States.

### 23. Sandoz / Fougera

61.     Defendant **Sandoz, Inc.** is a Colorado corporation with its principal place of business in Princeton, New Jersey. Sandoz, Inc. is a subsidiary of Novartis AG, a global pharmaceutical company based in Basel, Switzerland. Sandoz, Inc. is registered with the Pennsylvania Department of State as a foreign corporation and maintains a registered agent in Pennsylvania.

**FILED WITH REDACTIONS – PUBLIC VERSION**

62.     Sandoz's former Director of Contracts and Pricing, Defendant Armando Kellum, has pleaded guilty to federal criminal price-fixing charges arising from conduct during his time at Sandoz, Inc.

63.     Defendant **Fougera Pharmaceuticals Inc.** ("Fougera") is a New York corporation with its principal place of business in Melville, New York. Fougera is a wholly-owned subsidiary of Defendant Sandoz, Inc. In 2012, Sandoz acquired and integrated Fougera into its US-based generic pharmaceutical business.

64.     Unless addressed individually, Fougera and Sandoz, Inc. are collectively referred to henceforth as "Sandoz." During the Class Period, Sandoz marketed and sold generic pharmaceuticals in this District and throughout the United States.

65.     On March 2, 2020 Sandoz, Inc. was charged by the Department of Justice with four counts of violating the Sherman Antitrust Act, 15 U.S.C. § 1.  Specifically, the DOJ charged Sandoz with:

- Conspiring with Defendant Taro Pharmaceuticals U.S.A., Inc. "to suppress and eliminate competition by agreeing to allocate customers and rig bids for, and stabilize, maintain, and fix prices of, generic drugs sold in the United States, from at least as early as March 2013 and continuing until at least December 2015" (specifically including Clobetasol cream, emollient cream, gel, ointment, and solution, Desonide ointment, and Nystatin-Triamcinolone cream).

- Conspiring with Defendant Rising "to suppress and eliminate competition by agreeing to allocate customers for, and stabilize, maintain, and fix prices of, benazepril HCTZ sold in the United States, from at least as early as April 2014 and continuing until at least September 2015."

- Conspiring with Defendant Perrigo "to suppress and eliminate competition by agreeing to allocate customers and rig bids for, and stabilize, maintain, and fix prices of, generic drugs sold in the United States, from at least as early as July 2013 and continuing until at least December 2015" (specifically including desonide ointment).

- Conspiring with Defendant Teva "to suppress and eliminate competition by agreeing to allocate customers and rig bids for, and stabilize, maintain, and fix

FILED WITH REDACTIONS – PUBLIC VERSION

prices of, generic drugs sold in the United States, from at least as early as July 2013 and continuing until at least December 2015" (specifically including tobramycin inhalation solution).

66.     On that same day, Sandoz entered into a deferred prosecution agreement with the DOJ relating to those four charges, in which Sandoz acknowledged that "it is responsible for the acts…that give rise to the charges in the Information [concerning the claims]," and "admits, accepts, and acknowledges that the facts set forth in the agreement's Statement of Facts are true and accurate."  Sandoz agreed "that it will neither contest the admissibility of, nor contradict, any of the facts set forth in the Statement of Facts" in any proceeding relating to the prosecution of the above charges.  Sandoz also agreed to cooperate fully and truthfully with the DOJ in its continuing criminal investigation of violations of federal antitrust and related criminal laws involving the production and sale of generic drugs in the United States.  In return for the agreement, Sandoz also agreed to pay a $195,000,000 penalty to the United States Treasury.

67.     On February 14, 2020, Sandoz employee Defendant Armando Kellum pleaded guilty to one count of unlawful restraint of interstate trade and commerce in violation of Section 1 of the Sherman Act (15 U.S.C. § 1). The criminal information notes that from at least as early as March 2013, and continuing until at least June 2015, Kellum, on behalf of Sandoz, along with Defendant Ara Aprahamian and co-conspirators at Sandoz and Defendant Taro "knowingly entered into and engaged in a conspiracy to suppress and eliminate competition by agreeing to allocate customers and rig bids for, and stabilize, maintain, and fix prices of, generic drugs sold in the United States." This conduct included at least a 1000% WAC price increase on many formulations and sizes of clobetasol. A further discussion of the details of the guilty conduct can be found in Kellum's party description, below.

FILED WITH REDACTIONS – PUBLIC VERSION

### 24. *Sun / Mutual / Caraco*

68.     Defendant **Sun Pharmaceutical Industries, Inc.** ("SPII") is a Michigan corporation with its principal place of business in Cranbury, New Jersey. SPII is a wholly-owned subsidiary of Sun Pharmaceutical Industries Ltd. ("Sun Pharma"), an Indian corporation, which also owns a majority stake in Taro Pharmaceutical Industries, Ltd., and Taro's U.S. subsidiary, Taro Pharmaceuticals USA, Inc. Beginning in 1997, Sun Pharma began a series of investments in Defendant **Caraco Pharmaceutical Laboratories Ltd.** ("Caraco") and in 2013 acquired 100% of Caraco and merged it into SPII to become Sun Pharma's US operations for generic pharmaceutical products. In late 2012, SPII acquired Defendant **URL Pharma, Inc.** ("URL") and its subsidiary, Defendant Mutual Pharmaceutical Co., Inc., both of which have their principal place of business in Philadelphia, PA. Until at least June 2016, URL and Mutual Pharmaceutical Co., Inc. operated a pharmaceutical manufacturing facility in Philadelphia. URL was registered with the Pennsylvania Department of State as a foreign corporation and maintained a registered agent in Pennsylvania during the Class Period until April 28, 2015, at which time it was merged with Mutual Pharmaceutical Co., Inc.

69.     Defendant **Mutual Pharmaceutical Co., Inc.** ("Mutual") is a Delaware corporation with its principal place of business located in Philadelphia, PA. It is a wholly-owned subsidiary of SPII. Since April 29, 2015 (the day after Mutual and URL merged), Mutual has been registered with the Pennsylvania Department of State as a foreign corporation and maintains a registered agent in Pennsylvania. Many of the pharmaceutical products sold and distributed throughout the United States during the Class Period by SPII, URL and Mutual were marked with the trade name "MUTUAL" on the pill or capsule.

FILED WITH REDACTIONS – PUBLIC VERSION

70.     Unless addressed individually, Defendants SPII, URL, Mutual and Caraco are collectively referred to herein as "Sun." During the Class Period, Sun marketed and sold generic pharmaceuticals in this District and throughout the United States.

### 25. *Taro*

71.     Defendant **Taro Pharmaceuticals U.S.A., Inc.** ("Taro") is a New York corporation with its principal place of business in Hawthorne, New York. Taro is a wholly-owned subsidiary of Taro Pharmaceutical Industries, Ltd., an Israeli entity, which in turn is majority owned by Defendant Sun Pharmaceutical Industries, Inc. During the Class Period, Taro marketed and sold generic pharmaceuticals in this District and throughout the United States.

72.     On March 2, 2020 Defendant Sandoz, Inc. was charged by the Department of Justice with (among other charges) conspiring with Taro, in violation of the Sherman Antitrust Act, 15 U.S.C. § 1, "to suppress and eliminate competition by agreeing to allocate customers and rig bids for, and stabilize, maintain, and fix prices of, generic drugs sold in the United States, from at least as early as March 2013 and continuing until at least December 2015."  Also on March 2, 2020, pursuant to a deferred prosecution agreement, Sandoz admitted that it had indeed conspired with Taro regarding at least Clobetasol cream, emollient cream, gel, ointment, and solution, Desonide ointment, and Nystatin-Triamcinolone cream.

73.     On February 4, 2020, a federal grand jury in this District returned an indictment against former Vice President of Sales and Marketing at Taro, Defendant Ara Aprahamian, charging him with three counts, including two counts of *per se* unlawful restraint of interstate trade and commerce in violation of Section 1 of the Sherman Act (15 U.S.C. § 1), for forming agreements with co-conspirators in the generic drug manufacturing industry to increase prices and to allocate customers for numerous drugs from at least as early as March 2013 until at least

**FILED WITH REDACTIONS – PUBLIC VERSION**

December 2015. A further discussion of the details of the alleged conduct can be found in Aprahamian's party description, below.

### 26. Teva

74.     Defendant **Teva Pharmaceuticals USA, Inc.** ("Teva USA") is a Delaware corporation with its principal place of business in North Wales, Pennsylvania. It is a subsidiary of Teva Pharmaceutical Industries Ltd. (Teva Industries), an Israeli entity. Teva is registered with the Pennsylvania Department of State as a foreign corporation. On October 3 2016, Teva Pharmaceutical Industries Ltd. announced that it had completed its acquisition of the wholesaler Anda, Inc. ("Anda") and that "Anda, Inc., one of the leading distributors of generic medicines in the U.S., is now part of Teva." As announced at the time, Anda has "become part of Teva's distribution network," creating a functional economic unity between Teva and Anda such that, as of October 2016, Teva has sold its generic Drugs at Issue, as well as the Drugs at Issue of Teva's co-conspirators, to independent pharmacies throughout the United States, including to Plaintiff Falconer Pharmacy.

75.     Defendant **Barr Pharmaceuticals, LLC** ("Barr") is a Delaware company with its principal place of business North Wales, Pennsylvania. Barr is a wholly-owned subsidiary of Teva Industries, which acquired Barr (then called Barr Pharmaceuticals, Inc.) in 2008. Prior to its acquisition by Teva Industries, Barr was a holding company that operated through its principal subsidiaries: Barr Laboratories, Inc., Duramed Pharmaceuticals, Inc., and PLIVA, d.d. (a Croatian corporation with its headquarters in Zagreb, Croatia).

76.     Defendant **PLIVA, Inc.** ("PLIVA") is a New Jersey corporation with its principal place of business in East Hanover, New Jersey. PLIVA is a wholly-owned subsidiary of Teva Industries, which acquired the PLIVA assets as part of the Barr acquisition.

**FILED WITH REDACTIONS – PUBLIC VERSION**

77.     Unless addressed individually, Teva USA, Anda, Barr, and PLIVA are collectively referred to henceforth as "Teva." During the Class Period, Teva sold generic pharmaceuticals in this District and throughout the United States.

78.     On March 2, 2020 Defendant Sandoz, Inc. was charged by the Department of Justice with (among other charges) conspiring with Teva, in violation of the Sherman Antitrust Act, 15 U.S.C. § 1, "to suppress and eliminate competition by agreeing to allocate customers and rig bids for, and stabilize, maintain, and fix prices of, generic drugs sold in the United States, from at least as early as July 2013 and continuing until at least December 2015." The charge specifically included, but did not limit itself to, sales of Tobramycin inhalation solution. Sandoz entered into a deferred prosecution agreement relating to the charge (and others).

### 27. Upsher-Smith

79.     Defendant **Upsher-Smith Laboratories, LLC** (formerly known as Upsher-Smith Laboratories, Inc.) ("Upsher-Smith"), is a Minnesota limited liability company, with its principal place of business in Maple Grove, Minnesota. It is a subsidiary of Sawaii Pharmaceutical Co., Ltd., a large generics company in Japan. During the Class Period, Upsher-Smith has marketed and sold generic pharmaceuticals in this District and throughout the United States.

### 28. Wockhardt

80.     Defendant **Wockhardt USA LLC** ("Wockhardt") is a Delaware limited liability company, with its principal place of business in Parsippany, New Jersey. During the Class Period, Wockhardt marketed and sold generic pharmaceuticals in this District and throughout the United States.

### 29. Zydus

81.     Defendant **Zydus Pharmaceuticals (USA), Inc.** ("Zydus") is a New Jersey corporation with its principal place of business in Pennington, NJ. It is a subsidiary of Cadila

FILED WITH REDACTIONS – PUBLIC VERSION

HealthCare, an Indian company headquartered in Mumbai. Zydus is registered with the Pennsylvania Department of State as a foreign corporation and maintains a registered agent in Pennsylvania. During the Class Period, Zydus marketed and sold generic pharmaceuticals in this District and throughout the United States.

### C.   Distributor Defendants

#### 1.   *AmerisourceBergen*

82.      Defendant **AmerisourceBergen Drug Corp.** ("ABC") is a wholesaler of pharmaceutical drugs that distributes generic drugs throughout the country, including to one or more Plaintiffs. It is incorporated in Delaware, with its principal place of business in Chesterbrook, Pennsylvania. According to its 2018 Annual Report, AmerisourceBergen Drug Company received $160 billion in annual revenue. It is ranked #10 on the Fortune 500 list.

83.      On January 3, 2018, Defendant ABC fully acquired Defendant **H.D. Smith, LLC** ("H.D. Smith"). Formerly known as H.D. Smith Wholesale Drug Co., H.D. Smith, LLC was a privately held wholesaler of pharmaceutical drugs and medical products. It was incorporated in Delaware, with its principal place of business in Springfield, Illinois. At the time of its acquisition, it was the largest wholesaler to independent pharmacies in the United States.

84.      Many of the individual conspirators named in this action were colleagues at AmerisourceBergen and remained in contact with their former co-workers. For example, Patel had a longstanding relationship with Defendant Robin Hatosy, a national account executive at Defendant Greenstone, due to their being former co-workers at ABC.

85.      During the Class Period, ABC and H.D. Smith marketed and sold generic pharmaceuticals in this District and throughout the United States.

**FILED WITH REDACTIONS – PUBLIC VERSION**

### 2. *Cardinal*

86.     Defendant **Cardinal Health, Inc.** is a wholesaler of pharmaceutical drugs and medical products that distributes generic drugs throughout the country, including to one or more Plaintiffs. It is incorporated in Ohio, with its principal place of business in Dublin, Ohio. According to its 2019 Annual Report, Cardinal Health, Inc. received $145.5 billion in annual revenue. It is ranked #16 on the Fortune 500 list.

### 3. *Harvard*

87.     Defendant **The Harvard Drug Group, LLC** ("Harvard") is a wholly-owned subsidiary of Cardinal, Health Inc.. It is not affiliated with Harvard University. Cardinal Health, Inc. fully acquired Harvard on July 6, 2015. At the time of its acquisition, Harvard had reported annual revenues of approximately $450 million.

88.     Unless addressed individually, Cardinal Health, Inc. and Harvard are collectively referred to henceforth as "Cardinal." During the Class Period, Cardinal marketed and sold generic pharmaceuticals in this District and throughout the United States.

### 4. *Red Oak*

89.     Defendant **Red Oak Sourcing, LLC** ("Red Oak") is a joint venture established by Defendant Cardinal Health Inc. and CVS Health Corporation to source and supply both companies' generic pharmaceutical products. The joint venture was announced in December 2013, and began operations in mid-2014. Its principal place of business is in Foxborough, Massachusetts. CVS Health Corporation and Cardinal each own fifty percent of the company. According to the Drug Channels Institute, Red Oak controlled a 32% share of U.S. generic purchasing volume in 2017, making it the largest buyer of generic drugs in the country. During

**FILED WITH REDACTIONS – PUBLIC VERSION**

the Class Period, Red Oak marketed and sold generic pharmaceuticals in this District and throughout the United States.

### 5. *McKesson*

90.     Defendant **McKesson Corp.** ("McKesson") is a wholesaler of pharmaceutical drugs and medical products that distributes generic drugs throughout the country, including to one or more Plaintiffs. It is incorporated in Delaware, with its principal place of business in Irving, Texas. According to its 2019 Annual Report, McKesson received $214.3 billion in annual revenue. It is ranked #7 on the Fortune 500 list. During the Class Period, McKesson marketed and sold generic pharmaceuticals in this District and throughout the United States.

### 6. *Morris & Dickson*

91.     Defendant **Morris & Dickson Co., LLC** ("Morris & Dickson") is a privately held wholesaler of pharmaceutical drugs that distributes generic drugs throughout the country, including to one or more Plaintiffs. It is incorporated in Louisiana, with its principal place of business in Shreveport, Louisiana. It is reported to be the largest privately-owned wholesale pharmaceutical distributor in the United States, receiving $4 billion in annual revenue in 2018. During the Class Period, Morris & Dickson marketed and sold generic pharmaceuticals in this District and throughout the United States.

### 7. *Walgreens Boots Alliance*

92.     Defendant **Walgreens Boots Alliance, Inc.** ("WBA") is the largest retail pharmacy and health conglomerate currently operating in the U.S. and Europe. It is incorporated in Delaware, with its principal place of business in Deerfield, Illinois. According to its 2018 Annual Report, Walgreens Boots Alliance, Inc. received $131.5 billion in sales.

93.     Defendant **Walgreens Boots Alliance Development GmbH** is Walgreens Boots Alliance, Inc.'s drug purchasing arm. It is incorporated in Switzerland, with its principal place of business in Bern, Switzerland. It was formed in 2012 as a joint venture between Alliance Boots and Walgreens Co. and later became a subsidiary of Defendant Walgreens Boots Alliance, Inc. Since 2013, Walgreens Boots Alliance Development GmbH has negotiated and purchased generic drugs on behalf of Defendants ABC and WBA under the terms of an agreement that extends until 2026. (As of August 2019, WBA has an approximate 27% stake in ABC and one seat on ABC's Board of Directors).

94.     In communications relevant to the price-fixing conspiracy, conspirators tend to refer to the individuals who work for these entities as "WBAD." In sections of this complaint describing the earlier days of the conspiracy (circa 2011), the individuals are often collectively called "Walgreens," "WAG," or "Wags" by their co-conspirators because WBA and Walgreens Boots Alliance Development GmbH had not yet been formed and WAG was the stock ticker of the business formerly known as Walgreens. Around the end of 2013 the co-conspirators began to refer to these same individuals as "WBAD" if they are involved in purchasing for Walgreens Boots Alliance, Inc. or Walgreens Boots Alliance Development GmbH, and even when they are engaging in negotiations for drugs that were then transferred to ABC and sold to Plaintiffs and the Class members. Unless addressed individually, Defendants Walgreens Boots Alliance, Inc. and Walgreens Boots Alliance Development GmbH are collectively referred to henceforth as "Walgreens" or "WBAD."

95.     During the Class Period, WBAD marketed and sold generic pharmaceuticals in this District and throughout the United States.

**FILED WITH REDACTIONS – PUBLIC VERSION**

D.     **Individual Defendants**

1.  *Ara Aprahamian (Taro)*

96.     Defendant **Ara Aprahamian** is an individual residing at 14 Catalpa Court, Bardonia, New York. Defendant Aprahamian was the Director, Pricing & Contracting at Defendant Actavis from August 2010 to March 2013, and was the Vice President of Sales and Marketing at Defendant Taro from March 2013 to August 2018.

97.     On February 4, 2020, a federal grand jury in this District returned an indictment against Defendant Aprahamian, charging him with two counts of per se unlawful restraint of interstate trade and commerce in violation of Section 1 of the Sherman Act (15 U.S.C. § 1), and one count of making unlawfully, willfully, and knowingly materially false, fictious, and fraudulent statements and representations in connection with a federal investigation, in violation of 18 U.S.C. § 1001(a)(2).

98.     The indictment charges that Aprahamian formed agreements with co-conspirators in the generic drug manufacturing industry to increase prices and to allocate customers for numerous drugs from at least as early as March 2013 until at least December 2015.  The indictment specifically describes agreements Aprahamian made with Defendant Sandoz regarding Clotrimazole cream, Desonide ointment, Fluocinonide ointment, Lidocaine ointment, and Nystatin-Triamcinolone cream and ointment, and with Defendant Teva regarding Carbamazepine tabs and chews, Clotrimazole topical solution 1%, Etodolac Immediate Release ("IR") and Extended Release ("ER") tablets, Fluocinonide cream, emollient cream, gel, and ointment, and Warfarin tablets.

**FILED WITH REDACTIONS – PUBLIC VERSION**

99.     Defendant Aprahamian is also mentioned by name as a participant in criminal antitrust conspiracies in the criminal information filed along with Defendant Armando Kellum's guilty plea agreement with the Department of Justice, as detailed below.

### 2. David Berthold (Lupin)

100.     Defendant **David Berthold** is an individual residing at 21 Hillcrest Road, Towaco, New Jersey. At all times relevant to this Complaint, Defendant Berthold was the Head of Sales or Vice President of Sales – U.S. Generics, at Defendant Lupin.

### 3. James Brown (Glenmark)

101.     Defendant **James "Jim" Brown** is an individual residing at 4521 Christensen Circle in Littleton, Colorado. At all times relevant to this Complaint, Defendant Brown was the Vice President of Sales or Senior Director of Sales at Defendant Glenmark.

### 4. Maureen Cavanaugh (Teva)

102.     Defendant **Maureen Cavanaugh** is an individual residing at 529 North York Road, Hatboro, Pennsylvania. From January 2009 until April 2018, Cavanaugh was the Senior Vice President, Commercial Officer, North America, Senior Vice President Sales and Marketing, or Vice President Customer Operations and Marketing for Defendant Teva.  She then became Senior Vice President and Chief Commercial Officer for Defendant Lannett.

### 5. Tracy Sullivan DiValerio (Lannett)

103.     Defendant **Tracy Sullivan DiValerio** is an individual residing at 2 Pierre Court, Marlton, New Jersey. At all times relevant to this Complaint, Defendant Sullivan DiValerio was a Director of National Accounts or a National Account Manager, Generic Pharmaceuticals at Defendant Lannett.

### 6. *Marc Falkin (Actavis and Teva)*

104.     Defendant **Marc Falkin** is an individual residing at 2915 Weston Road, Westin, Florida. From August 2013 to February 2018, Defendant Falkin was the Vice President, Marketing, Pricing and Contracts at Defendant Actavis or Senior Vice President, U.S. Generic Sales at Defendant Teva. Since March 2018, he is Senior Vice President and Chief Commercial Officer at non-Defendant drug manufacturer Cipla.

### 7. *James Grauso (Aurobindo and Glenmark)*

105.     Defendant **James (Jim) Grauso** is an individual residing at 113 Windsor Lane, Ramsey, New Jersey. Defendant Grauso worked at Defendant Aurobindo as a Senior Vice President, Commercial Operations from December 2011 through January 2014. Since February 2014, Grauso has been employed as the Executive Vice President, N.A. Commercial Operations at Defendant Glenmark.  Prior to his time at Aurobindo, he served as Vice President, Sales & Marketing at Defendant G&W.

### 8. *Kevin Green (Teva and Zydus)*

106.     Defendant **Kevin Green** is an individual residing at 110 Coachlight Circle, Chalfont, Pennsylvania. Defendant Green was Director, National Accounts at Defendant Teva from January 2006 through late October 2013. From November 2013 to the present, Green is the Associate Vice President, National Accounts at Defendant Zydus. Since April 2018, Green is also the Vice President, Sales at Zydus.

### 9. *Robin Hatosy (Greenstone)*

107.     Defendant **Robin Hatosy** is an individual residing at 155 Providence Forge Road, Royersford, Pennsylvania. At all times relevant to this Complaint, Defendant Hatosy was employed as a Director of National Accounts at Defendant Greenstone.

### 10. Armando Kellum (Sandoz)

108.    Defendant **Armando Kellum** is an individual residing at 56 Gravel Hill Road, Huntingdon Valley, Pennsylvania. At all times relevant to this Complaint, Kellum was the Vice President, Contracting and Business Analytics at Defendant Sandoz.

109.    On February 14, 2020, Kellum pleaded guilty to one count of unlawful restraint of interstate trade and commerce in violation of Section 1 of the Sherman Act (15 U.S.C. § 1). The criminal information notes that from at least as early as March 2013, and continuing until at least June 2015, Kellum, on behalf of Sandoz, along with Defendant Ara Aprahamian and co-conspirators at Sandoz and Defendant Taro "knowingly entered into and engaged in a conspiracy to suppress and eliminate competition by agreeing to allocate customers and rig bids for, and stabilize, maintain, and fix prices of, generic drugs sold in the United States."

110.    The information provides several examples of this conduct.  For instance, it notes that Kellum worked with Aprahamian and co-conspirators at Sandoz and Taro to discuss drug launches that either company planned to make on generic drugs that the other was already in the market for, including the soliciting and relinquishing of customers.  Kellum would then agree with his co-conspirators on which customers the launching company would solicit, so as to allow "the launching company to obtain customers quickly at the highest price possible, and minimize the decline of price for the drugs being launched."  Such discussions could include the "dead net price(s)" for certain customers of the drug.

111.    The information also notes that Kellum, other co-conspirators at Sandoz, and Aprahamian agreed to increase prices of certain generic drugs by discussing the amount of the increase, receiving non-public prices for Taro's various classes of trade, and declining requests for bids from Taro's customers.  As an example, such activity was undertaken for multiple

formulations and sizes of clobetasol, allowing Sandoz and Taro to increase WAC prices on many

of those formulations in excess of 1000%.  Kellum also instructed Sandoz employees not to poach

Taro's clobetasol customers.

### 11. Jill Nailor (Greenstone)

112.      Defendant **Jill Nailor** is an individual residing at 1918 McRae Lane, Mundelein,

Illinois. Since August 2010, Nailor has been Senior Director, Sales and National Accounts or

Director, Generics and Analytics at Defendant Greenstone.  Prior to her time there, she worked as

Divisional Merchandise Manager at Defendant WBAD (then Walgreens).

### 12. James Nesta (Mylan)

113.      Defendant **James (Jim) Nesta** is an individual residing at 9715 Devonshire Drive,

Huntersville, North Carolina. Since 2012, Nesta has served as Vice President, National Accounts

at Defendant Mylan.

### 13. Konstantin Ostaficiuk (Camber)

114.      Defendant **Konstantin Ostaficiuk** is an individual residing at 29 Horizon Drive,

Mendham, New Jersey. At all times relevant to this Complaint, Ostaficiuk was the President or

Vice President of Sales and Marketing at Defendant Camber.

### 14. Nisha Patel (Teva)

115.      Defendant **Nisha Patel** is an individual residing at 103 Chinaberry Lane,

Collegeville, Pennsylvania. Between April 2013 and December 2016, Patel worked as a Director

of Strategic Customer Marketing and as a Director of National Accounts at Defendant Teva. Prior

to her time at Teva, Patel worked as Director, Global Generic Sourcing and Senior Category

Manager, Global Generic Sourcing at Defendant ABC.  Since September 2017, Patel works at

non-Defendant drug manufacturer Cipla.

### *15. David Rekenthaler (Teva and Apotex)*

116.     Defendant **David Rekenthaler** is an individual residing at 2626 Lulworth Lane, Marietta, Georgia. From January 2006 to April 2015, Rekenthaler was the Vice President, Sales US Generics at Defendant Teva. After a short time at co-conspirator Wilshire Pharmaceuticals, Inc., he became Vice President of Sales at Defendant Apotex starting in June 2016.

### *16. Richard Rogerson (Actavis and Teva)*

117.     Defendant **Richard "Rick" Rogerson** is an individual residing at 32 Chestnut Trail, Flemington, New Jersey. Rogerson was the Executive Director of Pricing and Business Analytics (March 2014 – August 2016) and Director of Pricing, U.S. Generics (April 2002 – March 2014) at Defendant Actavis. From August 2016 to March 2018 he was Senior Director, New Product Launch & Business Analytics at Teva.

## E.      <u>Co-Conspirators</u>

118.     Various other individuals and corporations, not named as defendants in this Complaint, have participated as co-conspirators with Defendants in the violations alleged herein, and have performed acts and made statements in furtherance of the conspiracy. The names of all additional co-conspirators are presently unknown to Plaintiffs. Plaintiffs may amend this Complaint to include the names of additional co-conspirators or to name these co-conspirators as Defendants as they are discovered.

119.     The wrongful acts alleged to have been done by any one Defendant or co-conspirator were authorized, ordered, or done by its directors, officers, managers, agents, employees, or representatives while actively engaged in the management, direction, or control of such Defendant's or co-conspirator's affairs.

## IV.        FACTUAL ALLEGATIONS

### A.        The Generic Drug Industry's Overarching "Fair Share" Conspiracy

120.    Defendants have each participated in a mutually-established code of conduct that was intentionally developed to allow generic drug manufacturers to curtail or eliminate free and fair competition and thus artificially maintain and inflate generic drug prices. Plaintiffs, pharmacies and hospitals that purchase and dispense these drugs, seek relief in this action because they have been forced to pay and continue to pay supracompetitive prices for the Drugs at Issue and also suffer actual losses when they dispense the drugs without being reimbursed for the artificially-high cost.

121.    The foundational premise of the Defendants' illegal agreement is the idea of "fair share," which they abbreviate to "FS." Fair share is an understanding that each manufacturer of a given drug is entitled to a proportional market share—a certain percentage of the sales—of that drug market. Defendants all agree it is greedy and irresponsible to compete beyond one's fair share, because competition forces manufacturers to lower their prices to retain the same supply contracts.

122.    This type of market allocation agreement is a classic "conspiracy in restraint of trade" forbidden by the federal Sherman Act, 15 U.S.C. § 1, and the antitrust statutes of every state and territory. Defendants have no reasonable pro-competitive justification for discussions of market share targets between generic drug manufacturers, for encouraging competitors to follow price increases, or for confirming ahead of time that they will follow an increase.

123.    The Defendants reinforced their overarching understanding at industry conferences, private dinners, cocktail nights, baseball games and golf outings, and via calls, emails, texts, and private app messages when they could not speak in person. Conversations between competitors discussing customer allocation, cover bids, specific nonpublic prices, and

future price increases are so pervasive in the industry that some conspirators did not even question whether their arrangements were legal despite being warned to conceal their communications.

124. Plaintiffs have direct evidence of dozens of acts in furtherance of the fair share conspiracy. Many of these conspiratorial episodes were recounted in earlier complaints and many more are detailed herein, because this complaint seeks relief for conduct relating to over a hundred drugs not identified in Plaintiffs' earlier complaints.

125. This Court has already recognized that "Plaintiffs have sufficiently alleged the existence of an overarching conspiracy" by generic drug manufacturers, including most of the Defendants named in this action, based on the principles of fair share. *See In re Generic Pharmaceuticals Pricing Antitrust Litigation*, 16-md-2724, Dkt. 1070 (E.D. Pa. Aug. 15, 2019). This Court held that Plaintiffs' earlier complaints sufficiently alleged "a single conspiracy with a common goal, facilitated by multiple schemes specific to various individual generic drugs." *Id.* This Court also held that Plaintiffs' factual allegations made plausible the "claim that Defendants' actions regarding the prices of individual generic drugs in their portfolios were beneficial to and reinforced a broader scheme regarding generic drug prices." *Id.* Finally, this Court held that Plaintiffs' "allegations of significant overlap among Defendants and the alleged individual drug conspiracies" were independently sufficient to allege an overarching conspiracy as a matter of law. *Id.*

126. The Department of Justice continues to pursue a parallel criminal investigation of the generic pharmaceutical industry's price-fixing practices. As of the filing of this complaint, the DOJ's investigation has resulted in guilty pleas from Defendant Heritage's CEO and President,

Jeffrey Glazer and Jason Malek.  Heritage itself paid a fine and restitution for price-fixing of Glyburide and signed non-prosecution and deferred prosecution agreements for other drugs.

127.    Recently, the DOJ filed criminal charges against Defendant Ara Aprahamian (Taro) regarding illegal agreements he secured with competitors Sandoz and Teva.  Defendant Armando Kellum (Sandoz) pleaded guilty to having made illegal agreements with Aprahamian and Taro. Defendant Rising admitted in a deferred prosecution agreement that it had conspired to allocate customers and fix prices with Sandoz. And in its own deferred prosecution agreement, Defendant Sandoz admitted to the DOJ that it made illegal agreements to allocate customers and fix prices with at least Taro, Teva, Rising, and Perrigo. The following chart shows the outcomes of the DOJ's investigation thus far:

FILED WITH REDACTIONS – PUBLIC VERSION

| Indictment/ Information Date | Defendant | Status | 15 U.S.C. § 1 violations charged include these drugs | Co-conspirators (if specified by DOJ in charges) |
|---|---|---|---|---|
| 12/16/2016 | Jason Malek (Heritage) | Plead Guilty | Count 1: Doxycycline hyclate Count 2: Glyburide | |
| 12/16/2016 | Jeffrey Glazer (Heritage) | Plead Guilty | Count 1: Doxycycline hyclate Count 2: Glyburide | |
| 5/31/2019 | Heritage | DPA admits anticompetitive conduct | Count 1: Glyburide | |
| 12/3/2019 | Rising | DPA admits anticompetitive conduct | Count 1: Benazepril-HCTZ | |
| 2/4/2020 | Ara Aprahamian[9] (Taro) | Indicted | Count 1: Clotrimazole, Desonide, Fluocinonide, Lidocaine, Nystatin-Triamcinolone  Count 2: Carbamazepine, Clotrimazole, Etodolac IR and ER, Fluocinonide, Warfarin | Count 1: Sandoz  Count 2: Teva |
| 2/14/2020 | Armando Kellum (Sandoz) | Plead Guilty | Count 1: Clobetasol | Count 1: Taro, Aprahamian, unnamed Sandoz employees |
| 3/2/2020 | Sandoz | DPA admits anticompetitive conduct | Count 1: Clobetasol, Desonide, Nystatin-Triamcinolone Count 2: Benazepril-HCTZ Count 3: Desonide Count 4: Tobramycin | Count 1: Taro  Count 2: Rising Count 3: Perrigo Count 4: Teva |

128.     This complaint alleges that more Defendants participated in the conspiracy than was previously known, including several distributors as well as manufacturers. Plaintiffs have thus far filed eighteen open actions:  seventeen actions that focus on single drugs, and an

---

[9] The grand jury also indicted Defendant Aprahamian for making false statements to federal investigators, a violation of 18 U.S.C. § 1001.

FILED WITH REDACTIONS – PUBLIC VERSION

eighteenth multi-drug action alleging an overarching conspiracy as to a separate set of drugs.[10] This complaint adds claims relating to over a hundred additional generic drugs, and Plaintiffs again allege that subsidiary schemes were part of an overarching conspiracy based on the principles of fair share and are therefore legally cognizable as a single overarching conspiracy in which all Defendants participated (in the alternative, Plaintiffs allege that each of these drug-specific subsidiary schemes are actionable as individual conspiracies).

129.    Plaintiffs' allegations rely heavily on computer files produced to the States in their investigation which have now been produced to Plaintiffs. Because Defendant Teva produced to the States the largest volume of documents, the episodes of the conspiracy alleged herein are mostly told from Teva's perspective. This complaint depicts the Teva tip of the overarching iceberg.

### 1.   *The rules of the fair share conspiracy*

130.    The foundational principle of the Defendants' fair share agreement is that each manufacturer is entitled to an equal slice of the market share pie of a given drug. Their formula is fair share $= \frac{1}{n}$ where $n$ is the number of "players" (i.e., manufacturers) in the market. In a "two-player" market, fair share is ½ or 50%; with three players it is ⅓ (33%); with four it is ¼ (25%).[11]

---

[10] Just as this complaint is primarily built from documents found at Defendant Teva, the earlier multi-drug "overarching" action, 18-cv-2533, is based on evidence from Defendant Heritage. Heritage has admitted to price-fixing in a parallel criminal action brought by the Antitrust Division of the Department of Justice.

[11] The Defendants sometimes discuss whether and how much leeway should be given to a formerly exclusive manufacturer when a second manufacturer enters in the market. *E.g.*, on January 22, 2013, John Adams (Dr. Reddy's) called Neal O'Mara (Heritage). Dr. Reddy's thought that if it were the first to launch Zoledronic Acid, it deserved around a 60% share of the market. If Heritage launched at the same time as Dr. Reddy's, the expectation was a 50-50 split.

131.     There are also several corollary principles that the participants in the conspiracy understand and agree with. First, and most important, competing beyond fair share is irresponsible, irrational, and greedy. Second, when seeking market share, new entrants or "under-indexed" competitors are supposed to take share from the biggest player (the one with the most share), although it is considered acceptable to take share from any manufacturer that has more than its fair share.[12] Third, incumbent manufacturers are supposed to concede a handful of accounts to new entrants so that newcomers can get to fair share without aggressive prices and without risking a cascade of bids and counterbids that could rapidly erode prices. Fourth, no one should target the customers of a manufacturer who is below fair share unless they are willing to concede some other accounts to that manufacturer. Fifth, when any manufacturer increases prices, manufacturers who already have their fair share are not to use the opportunity to win additional share. Instead, when customers seek new bids in response to price increases, Defendants in each sub-agreement are supposed to refuse to bid ("walk away") or provide inflated cover bids. Sixth, if a competitor suffers only a temporary supply disruption, poaching its customers is considered unfair, but it is permissible to take more than fair share in the case of a long-term supply problem.[13]

132.     Defendants frequently discuss and mostly adhere to these rules, but there are moments of betrayal and occasional bad blood.  On occasions when Defendants are tempted to cheat the fair share rules, they are typically policed by superiors or by employees in closer contact

---

[12] *E.g.*, an October 2012 Dr. Reddy's presentation regarding its "key molecules" stated that for the drug Tacrolimus, " ███████████████████████████████████ " and that Reddy's, " ███████████████████████████████████████████████ ."

[13] *E.g.*, as expressed by an individual at Defendant Camber Pharmaceuticals, "Fair share only applies when there is not [sic] supply constraints."

with competitors. For example, when manufacturer Defendant Mylan increased prices of the drug

Allopurinol in March 2015, manufacturer Defendant Dr. Reddy's considered poaching a Mylan

customer that was interested in avoiding the Mylan price increase. The Dr. Reddy's plant

operations team said it could supply the additional volume. The Director of Prescription

Marketing for North America Generics noted that he wanted to " ████████████ " and " ████████████

████████████ " and was hesitant to take much business from Mylan. " ████████ " he wrote,

" ████████████████████████████████ " because Reddy's

" ████████████████████ " He concluded that " ████████████████

████████████████████████████████ ." Reddy's Director of National

Accounts then left him a voicemail to the effect that it was a bad idea to " ████████ " and upset

existing relationships with Mylan. Having heard this message, the Director of Prescription

Marketing instructed his Reddy's team not to pursue the Mylan customers at all.

133.     Despite occasional grumblings about having to concede share, not a single one of

the dozens of individuals who had knowledge of the fair share conspiracy ever took affirmative

steps to withdraw from the conspiracy. Some did the opposite—they promised to keep quiet.

134.     Because the Defendants understood the basic tenets of fair share and knew that

other Defendants agreed, they did not need to communicate each and every time they wanted to

put the agreement into action. For example, on December 20, 2012, an individual at what was

then Walgreens (now distributor Defendant WBAD) gave Dr. Reddy's the name of a drug

(Montelukast granules, a widely-prescribed asthma treatment) and the message "I hear they are

launching in two weeks." Dr. Reddy's knew the next steps by heart:



**FILED WITH REDACTIONS – PUBLIC VERSION**

In this instance, having received the signal from Walgreens, Mylan and Dr. Reddy's did not need to directly communicate regarding the specific drug in order to implement a market allocation as per the rules of the overarching fair share agreement. The Reddy's team knew from prior discussions with Mylan that Mylan would want Walgreens, they knew that the overall agreement meant they had to " ▋▋▋▋▋▋▋ " and they knew the estimated share value of Walgreens plus one other account, so they could calculate on their own whether Mylan had won its fair share. It also helped that earlier that year distributor Defendant Cardinal had coordinated between Dr. Reddy's and the other manufacturer of Montelukast granules, Defendant Teva. Internal Teva emails from July 2012 note:

135.    Some implementation actions required more detailed discussions. For example, Defendants at times had differing information on the share represented by a certain customer or had information that was out of date. With so many products to track, the Defendants created fair share calculation spreadsheets but they sometimes entered the wrong numbers into their formulas or accidentally used data for a similarly named drug or a different formulation. These miscalculations and inconsistencies in perception of share status were a source of friction among the conspirators. Much of the evidence in this case comes from these moments of friction when Defendants had to troubleshoot their conspiracy and get each other back on track towards fair share. When the fair share conspiracy was operating smoothly, fewer conversation were needed.

**FILED WITH REDACTIONS – PUBLIC VERSION**

## 2. *The logic of the fair share conspiracy*

136.     Generic drugs are commodity products. In a competitive commodity market, a new manufacturer or one with little share must offer prices lower than the competition in order to win customers. Defendants realize this. "[I]f you look at generics, we're all the same product," testified Michael Perfetto, Defendant Actavis's VP of Sales and Marketing, in an unrelated case. By making room for new entrants and "under-indexed" manufacturers, the Defendants ensure that the newcomers will not attempt to win market share by offering lower prices, which Defendants call "trashing the market." The newcomers are therefore able to enter the market at artificially elevated prices, and, thereafter, all of the conspirators are able to raise their prices, customer by customer, with knowledge that their share is mostly safe from competition.

137.     Defendants' internal documents indicate that the market allocation and price increase aspects of the fair share scheme are linked because Defendants began to consider coordinated price increases once they had established a fair share balance with their competitors. For example, a Dr. Reddy's presentation from November 2016 shows a plan to increase the price of a drug fourfold based on the fact that Reddy's █████████████████████████████

█████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████

██████████████████████████████████████

138.     The overarching conspiracy works because, to manufacture a generic drug and sell it in the United States, a manufacturer must have a Food and Drug Administration approval known as an ANDA (Abbreviated New Drug Application). Completing an ANDA takes time, but because Defendants can buy, trade, or license already-approved ANDAs, and because many of the manufacturer Defendants do not make all the drugs they sell but instead subcontract to third party factories (including to each other), they are always industry competitors of one another even if

FILED WITH REDACTIONS – PUBLIC VERSION

they are not product competitors at a certain moment. Prior to the fair share agreement, the observed tendency in generic drug markets was for prices to decrease rapidly with each new entrant, which is consistent with the standard equilibrium model of supply and demand.[14]

139.    From documents and interviews with former employees of Defendants, Plaintiffs have learned that many conspirators believe that, if price competition were to occur, each manufacturer would "naturally" end up with roughly its fair share, except at much lower prices (manufacturers would undercut one another until prices were close to cost). Fair share is a shortcut that arrives at the final "natural" balance of share by circumventing true competition and its concomitant negative pressure on prices. The shared goal is to short-circuit the market so that the same "natural" balance of share can be established at a higher price than would occur without collusion.

140.    The Defendants' continued and repeated adherence to the rules of fair share created an interdependent framework of trust that enabled and encouraged further anticompetitive activity. For example, customers in one generic drug market were sometimes traded for customers in a different generic drug market. In other instances, competitors would support a price increase for one drug with the understanding that their competitors would support a price increase for a different drug. In the conspiratorial episodes discussed below, which comprise subsidiary schemes within the overarching conspiracy, the reader will see discussions of fair share involving multiple drugs and trading business on one drug for business on another.

---

[14] Generic drug markets with multiple competitors where Defendants are in the minority still exhibit rapid price erosion when the Defendants are not successful in getting these other "irresponsible" manufacturers to play fair.

FILED WITH REDACTIONS – PUBLIC VERSION

### 3. *The origins and methods of the fair share conspiracy*

141.    Arranging fair share is a longstanding practice among the Defendants. As early as

July 19, 2011, internal discussions at manufacturer Defendant Sandoz show the overarching

agreement in action. A Sandoz national account executive reported that a potential customer had

asked for pricing "                    " He asked his Sandoz superiors whether Sandoz

would "              " given that "                              

          ," another manufacturer Defendant. Sandoz's Vice President of National Accounts replied

simply "      " Ten days later, Sandoz received yet another customer request due to Perrigo's

price increase. The superiors at Sandoz once again told him "                  " and told him

not to "                " the Sandoz supply operations team whether Sandoz could supply the

customer. Around the same time, an email from the Vice President of National Accounts at a

Sandoz/Fougera predecessor company encapsulated the rules and logic of fair share:



142.    Although Defendants took care to conceal their communications, excited

utterances provide a glimpse into the Defendants' attitudes towards "irresponsible" actions. These

attitudes are the wellspring of the conspiracy and are reinforced at the frequent social events

where Defendants' executives gather. For example, in 2011, Defendant Fougera (a predecessor to

Defendant Sandoz) complained to an executive at what was then Walgreens (now WBAD) that

employees at another manufacturer were "███████████" because "███████████
███████████████████████" The Walgreens executive replied that "███████████
█████" but "███████████████████████" Fougera then asked Walgreens to "████
███████████████████████ and suggested that Walgreens retaliate
in order to punish the "███████████" of not following a price increase. "███████████
███████████████████████████████████"
Walgreens shared the sentiment that declining to follow a price increase was ████. "████
███████████████████." The Fougera employee then summed
up the Defendants' attitude:

███████████████████████████
███████████

143.    The Defendants' own documents confirm that the fair share understanding has a
long history and is firmly entrenched in the minds of the conspirators. A management consultancy
hired by Sandoz to write a bird's-eye strategic report noted in December 2013 that Sandoz
employees were "███████████" given "███████████" Specifically, the
consultants observed that Sandoz was reluctant to "███████████" or "███████████
███████████████████████████████████
████." The report recommended that Sandoz set up an official process to discuss products and
make a "███████████████████████." The report also mentioned in
its "███████████" that "███████████████████████
███████████████████."

144.    Because all Defendants shared in the fair share understanding, similar overview
reports from other Defendants make the same points. A highly confidential April 2014 Teva
presentation entitled "███████████" stated "███████████████████

██████████████████████████████ ." A highly confidential Upsher-Smith

2016 leadership presentation noted that fair share is the '█████████' of the industry and

described it succinctly: '█████████████████████████████████████████'

When a junior employee at Defendant Taro was introduced to the concept of fair share in 2013,

his superiors explained:

██████████████████████████████████████
██████████████

145.     By 2012, the overarching fair share conspiracy had been established among the

Defendants. Generic manufacturers had replaced competition with coordination in order to

maintain their fair share of a given generic drug market and avoid price erosion. Around this time

the manufacturers began to focus more on price increases than they had in the past. There arose a

concerted effort by many in the industry to significantly raise prices.

146.     Starting sometime in 2012 or even earlier, and continuing for several years, the

Defendants systematically communicated with each other as they were planning new price

increases, and then again shortly before or at the time of each increase. The purpose of these

communications was not only to secure an agreement to raise prices, but also to reinforce the

essential tenet underlying the fair share agreement – *i.e.*, that they would not punish a competitor

for leading a price increase, or steal a competitor's market share on an increase. There was an

understanding among generic drug manufacturers, including the manufacturer Defendants, that a

competitor's price increase should be followed quickly. If it could not be, the overarching

conspiracy dictated that the competitors who had not increased their prices would, at a minimum,

not seek to take advantage of a competitor's price increase by increasing their own market share

(unless they had less than fair share).

Case 2:19-cv-06044-CMR   Document 61   Filed 05/15/20   Page 61 of 269


147.     It is important to note that generic drug manufacturers could not always follow a competitor's price increase quickly. Various business reasons—including supply disruptions or contractual price protection terms with certain customers that would result in the payment of significant penalties—could cause such delays.  In those instances when a manufacturer's co-conspirators delayed in following a price increase, the underlying fair share understanding operated as a safety net to ensure that competitors would not take advantage of the price increase by stealing market share.

148.     Some conspirators created spreadsheets to coordinate the many moving parts of the overarching conspiracy. For example, in May 2013, Defendant Nisha Patel (Teva) created an Excel file entitled "Price Increase Candidates" where she ranked fifty-six of Teva's manufacturer competitors and assigned them a +3 to -3 "Quality" score according to their willingness to collaborate on price increases.[15] Patel understood—and stressed internally to her Teva colleagues —that "price increases tend to stick and markets settle quickly when suppliers increase within a short time frame."

### 4.  *The terminology of the fair share conspiracy*

149.     In their communications with one another, particularly in emails and texts, the Defendants use seemingly innocuous terms of art that allow them to conceal and more efficiently carry out the conspiracy. These terms are vague enough business jargon to allow a measure of deniability, but have specific connotations understood by all those who participate in the fair

---

[15] Even companies that Defendant Patel and Teva referred to as "low quality competitors"— because they were not viewed as strong leaders or followers for price increases—consistently complied with the principles of fair share. For example, she initially gave Defendant Camber a ranking of "-2," one of the lowest scores. When she revised those rankings one year later in May 2014, Camber's ranking did not change. Nonetheless, Camber adhered to the fair share understanding, and consistently applied those rules in dealing with its competitors.

FILED WITH REDACTIONS – PUBLIC VERSION

share agreement.[16] Several examples are worth mentioning, as they are used frequently and found in the communications cited as evidence in this complaint.

150.    **"Playing fair."** Following the rules of the fair share understanding is considered "playing fair." In August 2013, in response to a Dr. Reddy's employee advising internally that they should " ████████████████████████████████████████████ ," a colleague at Dr. Reddy's wrote:



151.    **"Acting responsibly in the market."** A responsible competitor is one that avoids price erosion by refraining from bidding aggressively, seeks only its fair share, follows through with coordinated price increases, or generally abides by the fair share understanding. For example, in August 2014, Defendant Upsher-Smith discussed potential competition for one of its products and under the heading " ████ " it noted " ████████████████████████████████ ████████████████████████████ ." In October 2013, Sandoz's Associate Director of Pricing used the term when he wrote internally that Sandoz had " ████████████ " one of Mylan's customers.

> We have been running up against Mylan a lot lately (Nadolol, BenazHctz), and fear blowback if we take on any more products at this moment.
>
> Trying to be responsible in the Sandbox

---

[16] The drug industry has a separate, unrelated term of art called "fair share allocation" which refers to rationing of existing inventory during times of drug shortages based on previous purchases. This use of "fair share" or "on allocation," which applies only during shortages, cannot be confused with the conspiratorial fair share which involves divvying up markets by ceding accounts to competitors regardless of any shortage.

I recommend you blame supply.

The term "**sandbox**" is used to refer to the generic drug industry as a whole and also deliberately alludes to the importance of "playing" well with others in a certain space. "Mature" competitors act "responsibly" in the "sandbox."

152.     **"Rational"** and **"irrational"** have the same meaning as "responsible" when referring to the willingness of competitors to play fair. A rational competitor does not erode the market, seeks only its "fair share," and follows price increases. For example, this slide from a Dr. Reddy's ("DRL") presentation lists the key conditions for price increases as part of a "▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮."

**Price Optimization**
Price Increase Framework

• Standard Conditions for Price Increases
  – Limited number of competitors:  <= 3 (incl. DRL)
    • Rational competitors
  – Tight or short supply scenarios
  – Molecule size / increase large enough to be impactful
    • Lost Share and/or customer pushback
  – Market Share Leader
  – DRL Inventory on Hand

"**Irrational**" means that the conspirators perceive a manufacturer to be acting out of retaliation or cheating the fair share agreement by lowering prices on certain drugs in order to take share. For example, in September 2015 Defendant Taro was worried about a bid for Desonide cream:

153.     **"Disrupting the market" and "rocking the boat."** Responsible/rational competitors do not rock the boat; irresponsible/irrational competitors rock the boat by pursuing

FILED WITH REDACTIONS – PUBLIC VERSION

too much share or taking other actions to "disrupt" the trust in a fairly shared market. Defendants want to avoid being perceived as rocking the boat. An internal email from Defendant Sandoz illustrates the term in the context of fair share:

> Please work on a game plan with the team to pick up another account… we should try to get to 20%ish share, without rocking the boat in the market too much
> Thanks

154.    **"Under-indexed."** When manufacturers need other manufacturer or distributor Defendants to know that they are under their fair share (and are therefore entitled to more business), they use the term "under-indexed" as a shorthand that connotes both the concept of fair share and the manufacturers' current status. ███████████████████████████████████

████████████████████████████████████████████████████████████████

███████████████████████ .

155.    **"Due to Market Dynamics."** This capacious term of art is used by the conspirators as a vague rationale that obscures whether a decision or event was related to a coordinated price increase, the debut of a new entrant, or an attempt to give up share to an under-indexed competitor. Defendants attribute the cause of an event or the reason for a decision to "market dynamics" when the event or decision is unrelated to a manufacturer's inability to supply that drug.[17] Notes found at Defendant Taro regarding the drug Carbamazepine ER state that:

---

[17] There is also evidence that Defendants disguised decisions not to compete by falsely claiming supply problems, but decisions were more frequently attributed to "market dynamics."

**FILED WITH REDACTIONS – PUBLIC VERSION**

Defendants prick up their ears when they hear talk of unspecified "market dynamics." When
distributor Defendant ABC cited market dynamics as the reason for requesting a bid on the
antibiotic Ciprofloxacin, an employee at manufacturer Defendant Aurobindo wrote internally:

████████████████████████████████████████

156.    **Being "done."** When a manufacturer is satisfied with its share on a drug and does
not intend to compete any further, it is often said to be "done." For example, in August 2015, Dr.
Reddy's VP of Sales and Marketing wrote "███████████████████" about bidding on two
customers. "███████████████████████████████████████████████
████," meaning new business might be outweighed by retaliatory prices if Par perceived
Reddy's as seeking more than its fair share. Another executive agreed: "████████████
██████████████████████████." Reddy's Senior Director for North
America responded:

████████████████████████████████████████

#### 5. *Defendants' methods for concealing the conspiracy*

157.    Individuals at each of the Defendant manufacturers and distributors had different
degrees of awareness of the unlawful nature of their anticompetitive conduct. Some appear
oblivious. They spoke freely about the fair share understanding with competitors, and took notes.
Others underwent antitrust training and learned—or already knew—that they needed to conceal
the fact that they had discussed price increases and market share targets with competitors.
Individuals often made halfhearted gestures of compliance intended to reinforce the consensus
that they did not really need to be so careful with their information-sharing (for example, ██

████████████████████████████████████████████████████
███████████████████████████████. ██████████

██████████████████████████████ because the idea of not divulging the source of a

bid is viewed as inherently ridiculous (despite being recommended or required in many of the

distributor Defendants' own internal policies). Those individuals who became aware that they

needed to conceal their conduct took up tactics to avoid detection and destroy evidence.

158.     **Private emails and message apps**: In order to avoid detection, certain

Defendants communicated via alternative messaging systems not linked to their corporate email

accounts or cell phone numbers. These included personal email, LinkedIn Messenger, Facebook

Messenger, Apple's iMessage, and the end-to-end encryption messenger WhatsApp. Because

these messaging systems are not preserved in the way that corporate email is archived and

preserved on backup tapes, often the only way of recovering the message is to seize the physical

device from the individual and then enlist a forensic data technician to bypass security features

and extract images and text. Even then, only the messages stored locally on the device may be

retrievable.

159.     Plaintiffs cannot know the total number of messages that have been deleted but

Plaintiffs do know that Defendants used these means to communicate details about the

conspiracy. For example, Defendant Nisha Patel, one of the key conspirators at Defendant Teva,

used non-SMS messaging on her phone to communicate with one of Teva's competitors,

Defendant Amneal, and to confirm that Amneal would concede a specific customer so long as it

could retain another.

160.     **Scrubbing and misattributing reports**: On several occasions, Defendants left

evidence of their own attempts to edit documents to avoid use of the term "fair share" or to delete

references to knowledge of upcoming price increases by competitors. Defendants also falsely

attributed or anonymized sources of information to camouflage anticompetitive communications.

161.    **Going offline**: Unsurprisingly, individuals who had some inkling that it was unwise to leave a paper trail when discussing fair share asked to end email conversations and to speak over the phone or in person. In May 2014, an employee at Taro saw a confidential internal spreadsheet with fair share calculations and sent the author an email asking "Hi Alex, please explain FS, (Fair Share)?"  Although the email was sent in the evening, Defendant Ara Aprahamian (Taro's Vice President of Sales and Marketing) wrote back within six minutes "No emails please. Phone call. Alex let's discuss." For the same reason, in August 2014, Defendants Nisha Patel and David Rekenthaler wrote "will call" and "I'll catch up with you today" in response to emails because they wanted to discuss their backchannel communications with manufacturer Defendant Mylan without leaving evidence in the form of an email.

B.      **Major Distributors Joined the Manufacturers' Fair Share Conspiracy**

162.    Thus far, this multidistrict litigation has focused on the role of generic drug manufacturers in the years-long scheme to fix the prices of generic drugs. But certain major drug distributors (namely Defendants Cardinal, AmerisourceBergen Drug Corp. ("ABC"), McKesson, Walgreens/WBAD, and Morris & Dickson) understood, agreed with, and did their part to achieve the common goals of the fair share conspiracy: to prevent price erosion by "stabilizing" and "settling" the market, and to encourage coordinated price increases. These distributor Defendants are drug wholesalers that purchase from the manufacturer Defendants. In 2017, they controlled over 81% of the total purchasing volume of generic drugs in the United States.

163.    The distributor Defendants knowingly participated in the overarching agreement and in subsidiary schemes in restraint of trade by orchestrating coordinated price increases, by passing anticompetitive messages at the behest of their manufacturer co-conspirators, and by brokering the allocation of customers in order to establish fair share. They arranged the

manufacturers' collusive price increases by confirming that the manufacturers would not undercut one another's price increases and would work in concert to drive prices up. Additionally, the distributors served a crucial policing function in the tight-knit industry by criticizing employees at manufacturers who sought to lower prices to compete legitimately, because actual competition on the basis of price is seen as "irresponsible" "irrational," "aggressive," and "not playing fair."

164.    The Defendant distributors and the Defendant manufacturers agreed with one another that the smart people in the industry operated on a fair share basis in order to control prices. For example:

- On April 23, 2012, drug manufacturer Defendant Lannett told distributor Defendant Cardinal that " ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬ " Lannett hoped to reach its " ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬." Lannett added that the strategy might be hampered by " ▬▬▬

- In September 2013, a WBA generics buyer agreed with Dr. Reddy's Senior Director of National Accounts that it was inappropriate for Defendant Apotex to continue to seek share for a certain drug because Apotex ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬.

165.    "Fair share" was consistently used as a conspiratorial term of art in the discussions between Defendant distributors and manufacturers. For example:

- On November 3, 2014, Dr. Reddy's executives discussed a ▬▬▬▬ ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬. The Senior Director and Head of National Accounts noted that ▬▬▬▬▬▬▬▬▬▬▬ ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬ ▬▬▬▬▬▬▬▬▬.

- On July 10, 2014, WBAD asked Taro for a call to discuss a ▬▬▬▬▬ ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬ ▬▬▬▬▬▬." Because Walgreens so frequently involved itself in market allocation schemes, Defendant Heritage noted that Walgreens " ▬▬▬▬ ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬" and that " ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬ ▬▬▬▬▬."

- In January 2015, a WBAD category manager told Teva that Teva was ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

FILED WITH REDACTIONS – PUBLIC VERSION

██████████████████████████████████

- In October 2015, Teva told Cardinal that it was "██████████████████"
  ████████████████████████████████████████"

- In April 2016, Taro sent offers to McKesson along with a note that the
  Taro salespeople were ████████████████████████████████████
  ████████████████.

166.    Discussions and decisions based on fair share were effective because the
Defendant distributors and the Defendant manufacturers all understood the meaning of the term
and its corollary rules. The manufacturers knew that certain distributors were in the know and
required no further explanation in order to carry out their common goals.

167.    Distributor Defendants often requested from the manufacturers a summary of the
current fair share arrangement. On more than one occasion, Teva's emails to distributors included
spreadsheet attachments showing each manufacturer's current accounts and the corresponding
market share so that distributors would understand the balance of share of that drug, handle bids
in accordance with the fair share arrangement, and pass updates to other manufacturers about the
intentions of their competitors.

168.    Distributor Defendants began to develop their own language to further the
conspiracy, much like the manufacturer Defendants. For instance, ABC used the phrase "horse
trade" to refer to a method used by the conspirators to allocate share without competition. And
rather than listing all the drugs in a catalog and then collecting bids from the manufacturers, the
distributor Defendants—including Cardinal, McKesson, ABC and WBAD—began to request
"wish lists" from the manufacturers.

169.    Bidding resulted in lower prices when incumbents were offered a chance to
counterbid (a "right of first refusal" or "ROFR"). The goal of wish lists was to allow the

FILED WITH REDACTIONS – PUBLIC VERSION

manufacturers to signal to one another that they wanted win or keep certain accounts for certain drugs without forcing them to actually bid against one another. At the same time, the items left off the wish list informed the distributor Defendants so that they could explain to the manufacturers the products where their competitors had expressed little interest in selling the drug.

170. For instance, in discussing Modafinil (explored in further detail below), ABC told Teva that Modafinil was ███████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████." 

171. WBAD was also involved with ABC's anticompetitive use of wish lists. WBAD's executives were clear that their goal was to pre-arrange which products would be primarily sold by which manufacturer so that once any bidding occurred, each manufacturer would be secure in knowing it could win the business without having to put forth an aggressive price. "███████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████"[18]

172. These distributor Defendants went beyond the normal course of business in their communications with their suppliers, the manufacturer Defendants. A distributor must necessarily

---

[18] Reddy's then assembled the wish list but doubted whether they should ask for more business for certain drugs where Reddy's already had the leading market share. "████████████████" asked a senior executive. Dr. Reddy's Senior Director of National Accounts replied "████████"

discuss its own purchases with its suppliers, the manufacturers. But the distributor Defendants did

more: they arranged anticompetitive communications that affected the market as a whole.

### 1. *Distributor Defendants often benefit from higher market-wide drug prices*

173.    The distributor and manufacturer defendants called, texted, emailed, app-

messaged, and met with one another regarding their common interest in higher prices market-

wide. For example, in May 2012, at a widely-attended trade show organized by distributor

Defendant H.D. Smith, manufacturers and wholesaler distributors discussed price increases for

topical creams and ointments. Over email, a Fougera national accounts executive reported "█

███████████████████████████████████████████████████████

█████████████" because they can █████████████ and "████████████████████

███."

174.    Defendant McKesson's SEC 10-K filings during every year of the conspiracy

confirm that it benefits from higher prices and may lose profits when the manufacturer-level price

increases decrease in frequency or decrease in magnitude:

> A significant portion of our distribution arrangements with the
> manufacturers provides us compensation based on a percentage of
> our purchases. In addition, we have certain distribution
> arrangements with pharmaceutical manufacturers that include an
> inflation-based compensation component whereby we benefit
> when the manufacturers increase their prices as we sell our existing
> inventory at the new higher prices. For these manufacturers, a
> reduction in the frequency and magnitude of price increases, as well
> as restrictions in the amount of inventory available to us, could
> have a material adverse impact on our gross profit margin.

175.    Defendant ABC also admits that it has reason to benefit from higher prices in its

2014 10-K, and in filings in subsequent years:

> [ABC's] gross profit from brand-name and generic manufacturers
> continues to be subject to fluctuation based upon the timing and
> extent of manufacturer price increases. If the frequency or rate of
> branded and generic pharmaceutical price increases slows, our

results of operations could be adversely affected. In addition, generic pharmaceuticals are also subject to price deflation. If the frequency or rate of generic pharmaceutical price deflation accelerates, our results of operations could be adversely affected.

176.    From 2013 to 2016—the key years during which the market allocation and price-increase schemes took full effect—the revenue of distributor Defendants Cardinal, ABC, and McKesson increased by 20%, 67%, and 55%, respectively.

177.    The distributor Defendants encouraged the manufacturers to increase prices. For example, in spring 2014, distributor Defendant Harvard called manufacturer Defendant Heritage and "███████████" how much Heritage should increase its prices given competing bids of competitors. Harvard and Heritage reviewed 24 drugs and Harvard suggested that Heritage ████ ███████████████. The price increases ranged from ██████████ higher than Heritage's price at the time. Internal Heritage emails confirm that ███████████████████████ ████████████.

178.    Distributor Defendant Cardinal had several discussions with manufacturer Defendant Sandoz concerning a way to ███████████████████████████ ███████████████. At the time, Cardinal knew it should conceal such efforts. Sandoz reported Cardinal's stance as follows:

███████████████████████████████████████
███████████████████████████████████████

179.    Ultimately, because of Cardinal's fears that the plan might become public, the plan was canceled at that time. But Cardinal did agree that it was a "███████████████" and ultimately Sandoz took other steps with Cardinal "███████████████

FILED WITH REDACTIONS – PUBLIC VERSION

███████████." In June 2013, Sandoz noted that ████████████████████████ with Defendant McKesson.

180.     Likewise, in April 2014 distributor Defendant Morris & Dickson ("M&D") wanted an ███████████████████████ of the opioid drug Oxycodone. According to one of her documents, manufacturer Defendant Sun's Susan Knoblauch was left with the impression that M&D preferred ████████████████████████████

█████████████████████████████████████

████████████████████████████████████

█████████" meaning all the distributors would pay higher prices.

181.     The following section illustrates how the distributor Defendants actively participated in the fair share conspiracy in order to coordinate prices and price increases and arrange allocation of fair share between the manufacturer Defendants.

### 2. Events illustrating the role of Distributor Defendants in the fair share conspiracy

#### (a)  H.D. Smith knowingly participated in the fair share conspiracy

182.     Defendant H.D. Smith was a pharmaceutical distributor that sold to dispensers of prescription drugs including independent pharmacies and hospitals like the Plaintiffs. H.D. Smith was wholly acquired by Defendant AmerisourceBergen Drug Corp. ("ABC") in January 2018.

183.     Because the individuals responsible for arranging supply contracts for H.D. Smith were in constant contact with the manufacturer Defendants, they understood that, according to the rules of fair share, manufacturers agreed they should act "responsibly" by conceding share to new entrants and refusing to steal share when another competitor increased prices. For example, on multiple occasions in the spring and summer of 2015, manufacturer Defendant Teva told H.D.

Smith that Teva would not lower prices and would concede business to other manufacturers "███

████████████████████████████."

184.     H.D. Smith's employees were aware of the fair share rules and the pricing

consequences of not following them. For example, on March 4, 2014, Dr. Reddy's complained to

H.D. Smith that another manufacturer not named in this complaint was not playing fair:

████████████████████████████████████████
████████████████████████

H.D. Smith replied that it would have ███████████████████████████████

███████████████████████████████████████████████████████

███. A few days later, on March 7, 2014, Dr. Reddy's reiterated the message for H.D. Smith to

relay to other manufacturers. "████████████████████████████████

████████████████████████."

As illustrated below, H.D. Smith participated in the fair share conspiracy and then sold drugs to

Plaintiffs at supracompetitive prices that were inflated due to its anticompetitive conduct.

### (i)     Valganciclovir (H.D. Smith, Camber, Dr. Reddy's)

185.     H.D. Smith worked with manufacturer Defendants to further the fair share

conspiracy by rigging bids for Valganciclovir.

186.     Valganciclovir is an antiviral drug used to treat cytomegalovirus infections in

people with HIV/AIDS or patients having received an organ transplant.

187.     On September 21, 2015, distributor H.D. Smith asked manufacturer Dr. Reddy's

for a new price for Valganciclovir (an HIV/AIDS drug) due to a competing bid from another

manufacturer, Defendant Camber. Dr. Reddy's decided to concede the H.D. Smith account to the

new entrant. Conceding accounts to new entrants is one of the key principles of the Defendants'

overarching fair share agreement. Dr. Reddy's Director of Marketing Christine Walton wrote:



Dr. Reddy's Senior Director & Head of National Accounts Victor Borelli added:

188.    H.D. Smith had told the Dr. Reddy's team that the bid from Camber would be

████████. They then learned from H.D. Smith that the price ██████████████████

███████████████████. Victor Borelli (Dr. Reddy's) wrote:

189.    On September 22, 2015, Kate Neely (Dr. Reddy's Senior Director of National

Accounts) emailed Dena Mando (H.D. Smith) in order to make clear that the reason for the

concession was to avoid competition between manufacturers. "██████████████████

████," Neely wrote to Mando, adding,

190.    But, the next day, September 23, 2015, Neely asked her Reddy's colleagues to

██████████████████.

191.    The Dr. Reddy's team changed its mind and decided to keep the H.D. Smith

business, but they worried that ██████████████████████

███████████████. Camber would see Reddy's defending its current contracts and

**FILED WITH REDACTIONS – PUBLIC VERSION**

would be inclined to "████████████," thereby eroding price, to the detriment of all. Reddy's might then become known as an irrational or irresponsible competitor.

192.    Neely had a solution. She asked Dena Mando at H.D. Smith to tell the competition directly:

████████████████████████████

In this context, "██████████" is meant to indicate that the price is the "████" price and should be maintained. Neely knew that both H.D. Smith and Camber the manufacturer competitor would understand this meaning of the term "██████████" and Camber would then know to keep prices ████████████████████

193.    Dena Mando agreed to pass the price-fixing message to Camber ████████████ ████████████████████████████ "█████████ ████" she wrote. Neely replied "████" and then wrote to her team at Dr. Reddy's:

████████████████████████████

194.    Dr. Reddy's Senior Director & Head of National Accounts Victor Borelli wanted to double-check that H.D. Smith would get the message through to Camber. He asked Neely:

████████████████████████████

That evening, Dena Mando and Kate Neely met for drinks at Neely's home before dining together at a restaurant at the W Hotel in Hoboken. Neely confirmed once again that the ████████████ ████████████████████████████. Neely replied to Borelli at 6:13 pm:

████████████████████████████

195.    H.D. Smith remained in contact a few days later as manufacturer Defendant Aurobindo entered the market. On September 28, 2015, Neely wrote:



Mando replied "⬛⬛⬛⬛⬛." As a result of the H.D Smith's participation in this subsidiary scheme, Camber, Dr. Reddy's and Aurobindo were able to keep prices high for Valganciclovir.

### (ii)    Acyclovir (H.D. Smith, Heritage, Zydus)

196.    In November 2014, H.D. Smith coordinated between Defendant Heritage and Defendant Zydus in order to allocate fair share without price erosion for the drug Acyclovir.

197.    Developed in the 1970s, ⬛⬛⬛ is antiviral drug that treats herpes, chickenpox, shingles, and post-transplant viral infections by preventing the viruses from using human host cells to replicate their DNA. ⬛⬛⬛⬛⬛⬛.

198.    On November 10, 2014 when Defendant Zydus had recently entered the market for Acyclovir, Defendant Heritage's Associate Director for Pricing and Contracts recommended that Heritage "⬛⬛" from certain accounts ⬛⬛⬛⬛⬛⬛. Vice President of Marketing Operations Lew Soars disagreed that the fair share rules required Heritage to give up business at H.D. Smith:



199.    The Heritage team had the same dilemma as the Reddy's team in the Valganciclovir episode described above. They wanted to retain the business and they thought it was fair to do so, but they did not want Zydus to consider them irrational for refusing to give up share. National Account Manager Anne Sather then agreed with H.D. Smith's Dena Mando that

FILED WITH REDACTIONS – PUBLIC VERSION

Mando would ███████████████████████████████████████

███████████████████████. Sather was the Heritage contact person for H.D. Smith. On Nov

10, 2014, Soars recommended to Anne Sather:

██████████████████████████████████████████████████

Soars knew that his colleague Anne Sather would "████████████████████████████

████ via Dena Mando at H.D. Smith because Soars was the former Director of Generic

Pharmaceuticals Business Development at H.D. Smith. He had worked closely with Mando.

Sather replied "██████" and specifically confirmed that she would "████████████████."

      200.    At an in-person meeting on November 17, 2014, Sather communicated "██

████" to H.D. Smith so that Zydus would know Heritage was ████████████████ and

that Zydus needed to ███████████████ in order to avoid price erosion.

      201.    In an internal Heritage email on November 19, 2014 Soars (Heritage) mentioned

the price stability rationale behind their discussions with H.D. Smith:

██████████████████████████████████████████████████

Soars (Heritage) added that Anne Sather would follow up with Dena Mando from H.D. Smith "█

██████████████████████████████████████████████████

█████████████." In another email, Soars confirmed that "█████████████████████████

███████."

- 78 -

**FILED WITH REDACTIONS – PUBLIC VERSION**

### (b) Harvard knowingly participated in the manufacturers' fair share conspiracy

202.    Defendant Harvard Drug Co-Op is a formerly independent drug distributor that

was wholly acquired by distributor Defendant Cardinal in 2016. Both before and after the

acquisition, multiple Harvard employees knowingly participated in the overarching fair share

scheme. The acquisition did not disrupt the channels of collusive communication between the

Defendants. At a meeting in 2016, distributor Defendant ABC told manufacturer Defendant

Sandoz that Cardinal's acquisition of Harvard would ███████████████████████████

███████████ and "███████████████████."

203.    Generic drug manufacturers have two main ways of making sales to distributors

such as Harvard. The simplest is when a customer requests a "one-time buy" or "spot purchase"

of a specific number of units. The manufacturer responds with a price—which is often the list

price (the Wholesale Acquisition Cost or "WAC" price) or very close to it— and if the customer

accepts, the drugs are shipped. The second and far more prevalent means of selling generic drugs

is through ongoing supply contracts, typically renegotiated at least once a year. The customer

sends a request for proposal ("RFP") either for a single drug or for a list of drugs and then

receives bids from the manufacturers. Incumbent manufacturers are usually given a chance to

counterbid the lowest bid, and the process may involve multiple rounds of bidding.[19] The

manufacturer with the lowest net price typically wins the bid and sometimes the runner-up is also

awarded a "secondary" contract, to be used as a backup or for a certain percentage of purchases.

---

[19] Evidence indicates that from 2010 to 2017, as the fair share understanding became more and
more effective as the manufacturer and distributor conspirators built trust with one another, the
distributor Defendants deliberately limited the number of rounds of bidding in order to avoid
competition and prevent price erosion.

From them on, until the next RFP or renegotiation, the customer can place orders for drugs and pay the RFP contract price rather than the published list price.

204.    During rounds of RFP bidding for multiple generic drugs at other distributors, Harvard ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ one another's pricing. For example, at least one Harvard employee used a private email account to send RFP details to the private email accounts of individuals at two or more of the manufacturer Defendants. The use of private emails was designed to avoid detection because the conspirators knew that exchanging confidential details during RFPs was not an acceptable business practice.

### (i)    Metoprolol succinate ER (Harvard, Actavis, Dr. Reddy's, Par)

205.    Harvard voluntarily worked as a go-between to gather agreement from the manufacturers regarding their pricing intentions on Metoprolol Succinate ER, in accordance with the fair share conspiracy.

206.    Metoprolol Succinate ER is a beta blocker used to treat high blood pressure, chest pain, and heart failure. It can also be used to lower the risk of death after a heart attack.

207.    By January 2014, two Harvard employees had each liaised with Dr. Reddy's, Actavis, and Par to secure an agreement to maintain or increase the price of Metoprolol succinate ER (brand name: Toprol XL), a beta-blocker drug that treats chest pain and high blood pressure. Contemporaneous notes taken by a member of the Par sales team state that:



208.    By the time these notes were circulated in January 2014, Harvard had confirmed with each of the manufacturers (Dr. Reddy's, Actavis, and Par) that each would follow a price increase by its competitors. Later in 2014, Harvard once again confirmed and then individually

**FILED WITH REDACTIONS – PUBLIC VERSION**

reiterated to Dr. Reddy's, Actavis, and Par ████████████████████████████████

████████████████. Harvard's shuttle diplomacy between the manufacturers as part of the

overarching conspiracy eliminated the possibility of free and fair competition for Metoprolol

succinate ER.

### (ii)    Eplerenone (Harvard, M&D, Greenstone, Upsher-Smith)

209.    Harvard arranged a concerted concession of share between Defendant Upsher-

Smith Labs and Defendant Greenstone to allocate the market for the drug Eplerenone (brand

name: Inspra), in accordance with the fair share conspiracy.

210.    Eplerenone is an antihypertensive drug which is prescribed to increase the

chances of surviving congestive heart failure after a heart attack and also to treat high blood

pressure. Upsher-Smith did not actually produce this drug and instead purchased it from a third

manufacturer, Defendant Sandoz. Harvard coordinated between manufacturers Upsher-Smith and

Greenstone in order to allow Upsher-Smith to reach fair share without targeting Sandoz's

customers.

211.    On or about May 7, 2015, Upsher-Smith's Senior National Account Manager

communicated with Harvard's Director of Sourcing/Supplier Relations to send the message that

Greenstone needed to concede share to Upsher-Smith. Upsher-Smith had also sent a nearly

identical message via the distributor Defendant Morris & Dickson ████████████████████

████████ :

████████████████████████████████████████████████████
████████████████

212.    Harvard's Director of Sourcing/Supplier relations or another individual at

Harvard passed the message to Defendant Greenstone. By May 12, 2015, Harvard confirmed to

Upsher-Smith that Greenstone would concede the business to Upsher-Smith, as requested, consistent with the rules of the fair share understanding.

213.    A few weeks later, at an HDMA trade association meeting on June 6, 2015, Sandoz representatives told Harvard representatives that Sandoz greatly appreciated Harvard's

████████████████████████████████████████████████████████

."

**(c)    ABC knowingly participated in the fair share conspiracy**

214.    Along with distributor Defendants H.D. Smith and Harvard, distributor Defendant AmerisourceBergen Drug Corp. ("ABC") also knowingly participated in the overarching fair share conspiracy. Tellingly, Sandoz employee notes from a 2015 trade association meeting list "market share" as the first criterion of ABC's philosophy on pricing. A Mylan internal presentation identified ABC as a distributor that followed the "fair share" model.

215.    Many of the fair share agreement's most active conspirators worked for ABC at some point in their careers. Nisha Patel, whose computer files and dozens of acts of price-fixing are the main corpus of evidence for this complaint, began her pharmaceutical career at ABC. Marc Kikuchi arranged fair share deals as a Senior Vice President at ABC before he became a CEO at Defendant Zydus. He is presently CEO at Defendant Dr. Reddy's.

216.    In March 2013, Defendant ABC and Defendant Walgreens Boots Alliance entered into a long-term agreement (now extended until 2026) to collaborate on the purchase of drugs, including all purchases from the manufacturer Defendants. In practice, this meant that distributor conspirators who had formerly worked separately to allocate fair share and coordinate price increases among the manufacturers were now officially working together. ABC and WBAD employees often joined one another's email threads and discussed allocations and price increases with the manufacturers as a group. For example, ████████████████████████████

[REDACTED]

217.     By 2017, the WBAD and ABC conspirators were in charge of a combined 26% of the volume of all generic drugs purchased in the United States.

### (i)     Pioglitazone-Metformin IR (ABC, Sandoz, Teva)

218.     In April 2013, Defendant ABC participated in the overarching conspiracy by ensuring a market allocation of Pioglitazone-Metformin IR between Teva and Sandoz. This was an instance when the standard fair share formula was voluntarily amended, requiring more explicit communication than was typical of the conspiracy.

219.     Pioglitazone-Metformin (brand name: Actoplus Met) is a combination drug: a single tablet that contains both Pioglitazone, which interacts with insulin, and Metformin, which decreases glucose production in the liver. Taken together, these molecules help people with Type 2 diabetes control their blood glucose levels.

220.     On April 23, 2013, ABC contacted Teva executives Kevin Green and Dave Rekenthaler, who are both Defendants in this action. ABC's anticompetitive message was simple. Sandoz had entered the market for Pioglitazone-Metformin and wanted Teva, the biggest player, to give Sandoz the ABC business. ABC made clear that Teva's decision on whether to concede to Sandoz would affect the overall competition in the Pioglitazone-Metformin market because Sandoz would be sated and would not compete further. ABC wrote to Teva:

[REDACTED]

**FILED WITH REDACTIONS – PUBLIC VERSION**

221.    Within minutes, Kevin Green emailed his Teva team "███████████████

██████████████." A Teva Senior Director replied ███████████████████████

██████████████████████████████████████████████████

██████████████████. In accordance with fair share, Teva conceded the account to Sandoz.

222.    A week later, a Sandoz employee who did not have a pricing or sales role

wondered whether Sandoz might pursue Rite-Aid's business for Pioglitazone-Metformin. A

Sandoz Associate Director of Pricing said ██████████████████████████████

████████████████" [20] █████████████████████████████████████

███████████████████████████████████████████████.

### (ii)    Dextroamphetamine-Amphetamine IR (ABC, Actavis, Teva)

223.    In the first quarter of 2014, following the same pattern as the Pioglitazone-

Metformin episode discussed above, ABC arranged a market allocation for Dextroamphetamine-

Amphetamine Immediate Release.

224.    Dextroamphetamine-Amphetamine IR is a combination drug consisting of

multiple amphetamine salts in a single capsule, it is also known as Mixed Amphetamine Salts,

MAS-IR, or by the brand name Adderall. The drug is used to treat attention deficit hyperactivity

disorder.

---

[20] An apparent error in the same Sandoz email ████████████████████████████

████████████████████████████████████████████████████

████████████████████████

**FILED WITH REDACTIONS – PUBLIC VERSION**

225.     By March 18, 2014, ABC had communicated with Aurobindo and then communicated to Teva that Aurobindo wanted ████████████████████████ ██████████████████████████████████████████████ ████████████████████████. That same day, Defendant Rekenthaler had a thirty-minute call with a senior executive at Aurobindo where they discussed the allocation for Dextroamphetamine-Amphetamine IR.

226.     ABC's communications enabled Teva to make fair share arrangements to divide the market with a third manufacturer, Defendant Actavis. On March 17, 2014, Defendant Patel (Teva) had multiple calls with Defendant Richard Rogerson (Actavis's Director of Pricing), and Rekenthaler spoke with Defendant Marc Falkin (Actavis). Rekenthaler and Falkin spoke again seven times on March 20, 2014 to discuss allocation of the market for Dextroamphetamine-Amphetamine IR.

227.     On April 16, 2014, Teva learned of a challenger at one of its accounts but not its identity. Defendant Patel informed her superiors that the challenger was Actavis and recommended that Teva concede the account to Actavis. At 1:43pm, she communicated to another colleague that the decision had been made to concede. Apparently closing the loop, she called Defendant Rogerson at Actavis at 1:55pm to tell him that Teva would play fair.

**(iii)     Modafinil (ABC, Teva)**

228.     Modafinil, known by the brand name Provigil, is a generic drug that treats sleep disorders including narcolepsy and obstructive sleep apnea (halted breathing during sleep). As of the date of this complaint, the average price for a 200mg tablet of Modafinil is around 63 cents. In early 2014, when ABC had coordinated a fair share market allocation scheme between Teva and other manufacturers, the average price was over $12.00 per tablet.

229.    On May 22, 2014, Teva learned that a new market entrant—a co-conspirator manufacturer not named as a defendant in this complaint—had challenged Teva's share of Modafinil sales at ABC. Internally, Teva employees wondered whether ██████████████. ███████████████████████████████████. They decided they needed to ███████████████████████████. On a call the next day, two individuals from ABC informed Teva that the new entrant would ███████████████████████ ████████████████. Defendant Nisha Patel (Teva), who had worked at ABC the previous year, remarked that this competitor █████████████████████████.

230.    ██████████████████████████

████████████████████████████████████████

████████████████████████████████████████

██████. Par and Mylan had higher share, and the fair share rules dictated that the bigger players should be first to cede share. Thus, Teva decided to communicate back via ABC that ███

████████████████████████████████████████

██████████."

231.    After further discussions about fair share intentions, ABC convinced Teva to give up the account for the benefit of the market. A few months later, on September 22, 2014, an individual at Teva could not remember why Teva had conceded and guessed it was perhaps related to a supply problem. ABC wrote to remind Teva that it was in fact an arranged concession between manufacturers:



**FILED WITH REDACTIONS – PUBLIC VERSION**

████████████████████████████████
██████████████

████████████. Teva's Senior Director of Sales and Trade Relations replied that she would

████████████████████████.

232.    The next day, ██████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████"

**(iv)    Loperamide (ABC, Teva, Mylan)**

233.    Another ABC episode, involving the drug Loperamide (an anti-diarrheal medication developed in the late 1960s, brand name: Imodium), illustrates the degree to which Defendants considered playing fair and following price increases to be the responsible and professional way to conduct business.

234.    On June 16, 2014, ABC's ██████████ pointed out to Teva that Mylan had raised its prices back in April, but that Teva had failed to follow the price increase. ABC had spoken with Mylan regarding the price increases and wanted Teva to raise the price, too.

235.    Teva did in fact plan to follow Mylan's increase, and planned to have ABC tell Mylan. Nisha Patel had discussed the future price increase with ABC at a recent Healthcare Distribution Management Association conference. Teva understood that Mylan would keep the price high only so long as it expected Teva to play fair and follow with its own increase.

████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████ .

236.    Because Teva did in fact plan to support Mylan's increase and had been in discussions with ABC regarding a coordinated increase, the other members of the Teva team considered this absolutely unacceptable. Behind Patel's back on a separate thread, a Teva Senior Director ███████████████████████████████████████ ." A Teva Director of National Accounts agreed that it was ███████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████████████████

███████████████████████████████████ on August 28, 2014.

### (v)    Buprenorphine (ABC, Sun, Teva)

237.    In March 2016, ABC communicated with Teva and Sun to coordinate Sun's entry into the Buprenorphine market. Buprenorphine is a tablet that dissolves under the tongue and helps wean people away from dependence on opioids.

238.    On March 15, 2016, Teva's Senior Director of National Sales emailed ABC's Director of Global Generic Sourcing with a request that ABC help broker the market allocation:

████████████████████████████████████████████████████

██████████████████████████████████ ." The ABC Director responded " █████████████████████████████ ," and Teva thanked her " ███████ ." The next day, ABC wrote:

████████████████████████████████████████████████

FILED WITH REDACTIONS – PUBLIC VERSION

239.     By March 22, 2016, ABC had communicated with Sun on behalf of Teva so that the manufacturers could jointly calibrate their share targets. An ABC executive wrote to Teva that she "████████████████████." The details included were that Sun's "████████████ ████████████████████████████." Once again, Teva sincerely appreciated ABC's role. ████████████████████. Sun then avoided bidding on Teva accounts but where it did do so, Teva knew that Sun's goals were limited and Teva could concede the account without fear of further loss of business. Sun knew it could bid at a higher price and still win or retain the business because Teva would not defend every account.

**(d)     Walgreens and later WBAD knowingly participated in the fair share conspiracy**

240.     Defendant Walgreens/WBAD is a major drug distributor that operates a chain of over 9,000 pharmacies. WBAD has a long-term agreement to purchase generic drugs together with Defendant ABC. The same individuals who coordinated market allocation and price increase schemes for Walgreens continued to do the same after Walgreens formed WBAD, and continued to do so when WBAD combined its drug purchasing efforts with ABC. WBAD executives were equally as responsible for ABC's purchases and collusion with the manufacturers as those who were officially employed by ABC. For example, on April 9, 2015, a Teva executive wrote to WBAD that she had "████████████████████████" and then communicated Teva's expectation that "████████████████████████████████ ████████████████" competing.

241.     WBAD executives consistently shuttled between the manufacturer Defendants so that the manufacturers would know each other's market share goals and intentions not to compete For example, in August 2015 a national account executive at Qualitest (which is owned by Defendant Par) noted that WBAD had "████████████████████████" for the

drug Isosorbide mononitrate, which is used to treat heart-related chest pain. Par told WBAD that

Par wanted "███████████████████." The next day Par and WBAD had a call during which

the Par executive explained the "██████████████████████████████████

█████████████████████████████████████████.

Afterwards, Par's internal emails indicate that WBAD was "███████████████."

242.    Another example: the following excerpt from an email regarding the drug

Fluconazole, written by Dr. Reddy's Senior Director of National Accounts, is typical of WBAD's

role as a fair share liaison and coordinator. On a Sunday morning in October 2015 she wrote:

██████████████████████████████████████████
██████████████████████████████████████████
██████████████████████████████████████████
██████████████████

243.    Just as with the other Defendant distributors, the Walgreens and later WBAD

employees were in close contact with the generic drug manufacturers that participated in the fair

share conspiracy. For example, in March 2014, WBAD relayed a message from Dr. Reddy's to

Teva. Reddy's wanted Teva to know that it was ████████████████████████

███████████████████████████████████. Reddy's

wanted Teva to know that Reddy's was still committed to the overarching agreement, but that

here the rules dictated that Reddy's be allowed to offer lower prices and take share without further

retaliation because Teva had not conceded accounts as it should have.

244.    Two years later, in April 2016, another WBAD executive continued to coordinate

more anticompetitive activity regarding the same drug. He informed Teva that a new entrant

██████████████████████████████████████

██████████████████  Teva "█████████████████████" in the portfolio "███████

**FILED WITH REDACTIONS – PUBLIC VERSION**

██████████████████████████████," Such feedback from competitors was critical to the long-term maintenance of the conspiracy. The following episodes illustrate more of WBAD's participation in the fair share conspiracy.

       **(i)**     **Progesterone and Vancomycin (WBAD, Actavis, Akorn)**

245.    Progesterone is a hormone produced by the human body that is also available as a generic drug and is used to treat conditions relating to menstruation and pregnancy. Vancomycin hydrochloride is an antibiotic developed in the 1950s and has been available as a generic since the 1980s.

246.    In late 2012 and early 2013, an individual at Walgreens worked with manufacturer defendants Akorn and Watson (now Actavis) to arrange concessions of share with the explicit goal of preserving pricing in the overall marketplace.

247.    During the week of February 18, 2013, two Akorn employees—including the Director of Sales, National Accounts—held a call with Walgreens during which they arranged for Walgreens to communicate with Akorn's competitor regarding a fair share arrangement for at least Vancomycin and Progesterone. After the call, ████████████████████

████████████████████████████

████████████████████████████████

██████████

                ████████████████████████████

████████████████████

Walgreens then passed the message to Actavis so that Actavis would know Akorn would not compete fully and was seeking only limited share.

**FILED WITH REDACTIONS – PUBLIC VERSION**

248.     A week later, Walgreens and the Akorn employees scheduled a conference call to discuss the Akorn-Watson allocation arrangement. Akorn sent a reminder email to Walgreens with an admission that Walgreens had also brokered another fair share deal involving the topical anesthetic drug Lidocaine:



). These types of messages demonstrate the interdependent nature of the overarching fair share agreement.

249.     Walgreens transmitted the message to Watson/Actavis. Later, Walgreens told Akorn that its manufacturer competitor Watson/Actavis

.

250.     Walgreens' actions prevented free and fair price competition. Watson/Actavis was able to keep the business without having to lower its price. Rather than going           the average price per 125mg capsule of Vancomycin remained above $10.00 for several years and did not drop below $5.00 until after Akorn and Actavis/Watson were named as defendants in this multidistrict litigation.

            (ii)     **Temozolomide (WBAD, Teva, Sandoz)**

251.    Temozolomide, also known by the brand name Temodar, is a drug used to treat brain cancer. As part of the overarching fair share conspiracy, WBAD worked with Teva and Sandoz to allocate the market for the drug.

252.    Teva and Sandoz had rights to launch generic Temozolomide in August 2013, so customers began requesting bids in July 2013. On July 18, 2013, after Sandoz communicated with WBAD, SDZ-CW-1[21] had a call with Nisha Patel (Teva) regarding Sandoz's current customers and options to allocate customer for Temozolomide.

253.    Sandoz then worked with WBAD to confirm the plan. On the morning of July 23, 2013, a national accounts executive at Sandoz spoke with an executive at WBAD and asked him to communicate Teva's plans. Sandoz summarized the call:



254.    Later in the afternoon, WBAD relayed the message from Teva back to Sandoz:



255.    With WBAD as an intermediary, Teva was able to communicate to Sandoz (a) when it was prepared to launch Temozolomide, (b) that it was not planning to compete aggressively or pursue more than its fair share, (c) that it had sufficient stock of Temozolomide to sustain around a 50% market share, and (d) that Sandoz should send back information regarding Sandoz's plan for Temozolomide. Sandoz understood the implications of the communication,

---

[21] This is an individual whose identity is known to the Plaintiffs, who worked at Sandoz, and who is referred to in this complaint as Sandoz Cooperating Witness #1 ("SDZ-CW-1"). Other cooperating witnesses are referred to by the same format.

FILED WITH REDACTIONS – PUBLIC VERSION

███████████████████████████████.” One Sandoz executive responded internally and exclaimed that this was "████████████████"

256.     On July 29, 2013, Patel and SDZ-CW-1 discussed how to carve up the market for Temozolomide between Sandoz and Teva. Throughout the summer, SDZ-CW-1 spoke to Patel both before and after Sandoz sent out any offers regarding Temozolomide in an effort to develop and ensure the appropriate fair share balance between the two competitors.

257.     Although SDZ-CW-1 and Patel were already in contact on July 29, 2013, the companies had multiple redundant lines of collusive communication that day. An executive at Sandoz called a senior account executive at Teva. Separately, Kevin Green (Teva) spoke to SDZ-CW-2 twice, and they spoke again on July 31. During these calls, Green told SDZ-CW-2 about Teva's launch plans and Teva's intention to take the Walgreens business.

258.     Teva and Sandoz continued to communicate their future plans with each other for other accounts. Sandoz internal emails sent on July 31, 2013, reveal that Sandoz knew the customers Teva would contact even before Teva had done so. "████████████████████████ ████████████████████████████████████████████[.]" Also on July 31, ███████████ ███████████████████████████████████████████████████████████ ██████████████████████████████████.” On August 12, 2013, the same day as Teva's launch, cooperating witness SDZ-CW-2 met in person with Defendant Rekenthaler at the Grand Lux Café in Las Vegas during the NACDS Total Store Expo conference and they discussed the status of the Temozolomide arrangements.

**(iii)     Disulfiram (WBAD, Breckenridge, Teva)**

259.     Disulfiram is an alcohol antagonist used to treat alcoholism. As part of the overarching fair share conspiracy, WBAD worked with Breckenridge and Teva to allocate the market for the drug.

260.    In July 2014 WBAD reached out to Teri Coward at Teva to inform her that WBAD had received a competitive offer on Disulfiram tablets from Breckenridge (at the time, the only other competitor). In the same email, WBAD passed Breckenridge's market share intentions to Teva: "⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛"

261.    Although the message got through, the rules of fair share do not always dictate a concession to a competitor. A Teva employee calculated the percentage of total market share represented by WBAD and expressed to colleagues that Breckenridge was ⬛⬛⬛⬛⬛

⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛

⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛ Teva subsequently successfully matched the competing bid to maintain the account and looked for other smaller accounts it could cede to Breckenridge.

### (iv)    Cabergoline (ABC, WBAD, Greenstone, Teva)

262.    Cabergoline is a drug that helps reduce abnormally high levels of the hormone prolactin and is used to treat menstrual problems and tumors of the pituitary gland. As part of the overarching fair share conspiracy, WBAD coordinated with Teva and Greenstone to arrange market allocation for this drug.

263.    In December 2014, as Greenstone was preparing to enter the market for Cabergoline, Frank Harris, a senior executive responsible for generic products at WBAD, approached Teva on Greenstone's behalf. In a December 9, 2014 e-mail, WBAD directly sought to facilitate a customer allocation between Greenstone and Teva:



**FILED WITH REDACTIONS – PUBLIC VERSION**

The WBAD account represented about 13% of Teva's total business for Cabergoline, and about $861,000 in annual net sales. Teva asked for a little extra time "to figure something out on our side." WBAD responded "Of course. I will let Gstone know not to do anything crazy."

264.    The next day, after some internal conversation at Teva, agreed to the proposed allocation and asked WBAD to send the acceptance message back to Greenstone:

265.    Pursuant to this agreement, Greenstone was able to acquire ABC as a customer for Cabergoline without any fear that Teva would compete to retain the business. In exchange, Greenstone had agreed to "play nice in the sandbox" – i.e., not compete with Teva for other customers and drive prices down in the market.

(v)    **Celecoxib (WBAD, ABC, Actavis, Apotex, Teva)**

266.    Celecoxib capsules (brand name: Celebrex) is a nonsteroidal anti-inflammatory drug used in the treatment of arthritis, juvenile rheumatoid arthritis, and other painful joint disorders. Beginning in the fall of 2014, WBAD and ABC brokered a market allocation scheme between Teva, Actavis, and Apotex in accordance with the overarching fair share conspiracy.

267.    Due to patent appeals, about five competitors were poised to launch generic Celecoxib in December 2014. By October 24, 2014, ABC was already asking the various manufacturers about their share targets so that it could coordinate "pre-commitments" across the market and ensure price stability at launch. ABC emailed Teva with a single question: "

." The next day, Teva called ABC twice and discussed Teva's intentions so that ABC could communicate them to

Teva's competitors. ███████████████████████████████████." Later that day, Teva

sent ABC a correction about its estimated anticipated share given the prelaunch negotiations.

268.   On November 17, 2014, Teva circulated internally "████████████████

████████████████████████████████████████."

269.   Teva agreed that Actavis deserved its fair share of the Celecoxib market. On

November 20, 2014, Teva learned that Actavis was vying for a certain customer that had earlier

"pre-committed" to Teva. The customer explained Actavis's rationale to Teva: "████████

██████████████████████████." In response, Defendant

Rekenthaler (Teva) wrote internally "████████████████████████

█████."

270.   On November 28, 2014, Actavis approached WBAD and ████████████

██████████████████████████████████. WBAD

then became actively involved in trying to broker an agreement between Teva and Actavis on

how much share each company would take upon launch.

271.   On Monday morning, December 1, 2014, WBAD's Director of Global Generic

Pharmaceutical Sourcing emailed Teva with Actavis's prices and asked ████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████

272. ████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████

273.     In the days leading up to Teva's December 10, 2014 launch, Teva executives had

had numerous telephone conversations with their counterparts at Actavis. Rekenthaler (Teva)

spoke with Defendant Falkin (Actavis) multiple times. Patel (Teva) spoke to A.B., a senior sales

and marketing executive at Actavis, for over eight minutes on December 5, and for over sixteen

minutes on December 8. On the day of the launch, December 10, Rekenthaler and Falkin spoke

three times.

                    (vi)    Isotretinoin (WBAD, ABC, Dr. Reddy's, Teva)

274.     Isotretinoin (brand names: Claravis, Zenatane, Accutane) is a drug used to prevent

severe acne and treat skin cancers. In March 2013, WBAD and ABC coordinated with Teva and

Dr. Reddy's to allocate the market for Isotretinoin. Dr. Reddy's John Adams reported in an

internal email on March 27, 2013:



Although Marc Kikuchi is presently in a CEO role at Dr. Reddy's, at the time of the email he was

at ABC. Plaintiffs do not know the identity of the person on "west coast time." In August 2014,

Dr. Reddy's added the drug to its "wish list" to Defendant WBAD, asking to be given the ABC

business along with other drugs.

275.     By April 9, 2015, Teva had conceded CVS, Cardinal and ABC to Dr. Reddy's

although Teva was internally divided on whether to concede ABC. The Senior Director, for one,

commented "████████████████████████████████" and that it was "██████" because

FILED WITH REDACTIONS – PUBLIC VERSION

Teva "███████████████████'s." Nevertheless, she was overruled

because, given Teva's earlier concessions, "█████████████" would "███████████

█████" which was considered fair in what appeared at the time to be a three-player market.

276.     Teva then discussed that they needed to "████████████" via ABC regarding

Isotretinoin. That afternoon, the Teva Senior Director wrote to WBAD and ABC executives "███

████████████████████████" and that the Teva team hoped the Reddy's team

would understand that "█████████████████."

### (vii)    Sumatriptan autoinjector (WBAD, Dr. Reddy's, Teva)

277.     The Sumatriptan autoinjector is a spring-loaded syringe that treats acute migraine

and cluster headaches. In 2016 it was the 115th most-prescribed medication in the United States

with more than 6 million prescriptions. As part of the overarching fair share conspiracy, WBAD

coordinated with Dr. Reddy's and Teva to arrange market allocation for the drug.

278.     In June 2016, writing from Bern, Switzerland, a WBAD executive wrote that he

needed to discuss Sumatriptan autoinjectors with Dr. Reddy's. The next day, June 28, 2016, Dr.

Reddy's Senior Director and Head of National Accounts Victor Borelli spoke with WBAD's

Director of Global Generic Pharmaceutical Sourcing to arrange ███████████████████████

████████████. An email from the Reddy's senior director corroborates:

As on other occasions, WBAD had spoken with Teva about its market share goals, found out

which accounts Teva wanted to target or retain to meet those goals, and then relayed that

information. In this episode, WBAD specifically did this ████████████████████

.

(viii)   **Omeprazole-sodium bicarbonate (WBAD, Dr. Reddy's, Valeant)**

279.   WBAD continued to coordinate market allocation schemes in furtherance of the fair share conspiracy as recently as August 2016. For example, it did so for the combination drug Omeprazole-Sodium bicarbonate (brand name: Zegerid). Omeprazole-sodium bicarbonate is a combination medicine used to treat heartburn and other symptoms of gastroesophageal disease.

280.   On August 3, 2016 WBAD agreed for Omeprazole-sodium bicarbonate. Although they spoke on the phone, the conspirators left traces of their conversation in emails. Dr. Reddy's Victor Borelli wrote to WBAD:

WBAD replied:

281.   Borelli then wrote on a separate email to his Reddy's colleagues: .

**(e)     McKesson knowingly participated in the fair share conspiracy**

282.    Distributor Defendant McKesson's executives understood the overarching fair share agreement and the corollary rules that determined how manufacturers were supposed to react to new entrants, price increases, and other "changes in market dynamics."

283.    McKesson also willingly served as a messenger and broker between the Defendant manufacturers in order to cement market allocation schemes that might otherwise have failed due to misunderstandings or lack of confidence between the manufacturer conspirators.

284.    McKesson shared the view that low-priced market entrants were irresponsible and that to offer low prices for a drug was to "trash the market."

285.    Manufacturers were aware that the key generics buyers at McKesson understood the fair share system, particularly because of McKesson's extensive involvement in multiple levels of the pharmaceutical supply chain. For example, McKesson was also, in certain circumstances, a direct competitor of the manufacturers because it bid on contracts to supply large retailers such as Target. On one such occasion, Teva conceded the account to McKesson in accordance with the fair share agreement. McKesson also owns and operates a generic drug manufacturer known as Northstar.

286.    McKesson knew to provide the manufacturers the information they needed in order to avoid competition. For example, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

287.    The email contained nothing more than that message and the numerical code for three product sizes of hydrocortisone cream, but another individual at McKesson understood what she needed to do in order to further ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

████████████████████████████████████████████████████████

████████████████████████████████████████████

### (i)      Capecitabine (McKesson, Dr. Reddy's, Mylan, Teva,)

288.     Capecitabine, also known by the brand name Xelolda, is a chemotherapy drug used to treat a variety of cancers, including breast and colon cancer. As part of the overarching fair share conspiracy, McKesson coordinated with Mylan, Teva, and Dr. Reddy's to allocate the market for the drug.

289.     As early as January 2014, both Teva and Mylan were making plans for their eventual launch of Capecitabine. Part of this planning included sharing confidential information in order to allocate the market between them. For example, by January 31, 2014 Teva knew that that Mylan was courting a specific customer, ███████████████, and that "██████████ ██████████████████████."

290.     On February 26, 2014, Defendant Jim Nesta (Mylan) called Defendant David Rekenthaler (Teva) and informed him that Mylan would not be able to launch on time with Teva. In early March 2014, Teva launched as the exclusive generic Capecitabine manufacturer. Teva remained exclusive until Mylan entered in August 2014.

291.     Dr. Reddy's began seeking share prior to its own launch, which was planned for summer 2014. On June 4, 2014, an individual at Dr. Reddy's learned that Teva would keep the McKesson account. However, he noted over internal email that he█████████████████████ ████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████." Reddy's Associate Director for Generic Marketing North America replied "███████████████ ██."

**FILED WITH REDACTIONS – PUBLIC VERSION**

292.     Because Dr. Reddy's had been able to signal to Teva via McKesson, ▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓.

293.     Dr. Reddy's was also able to pass messages via a minor distributor not named as a defendant in this action. On June 11, 2014, a Director of National Accounts at Teva reported that the distributor had told ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓."

294.     The Defendants' anticompetitive conduct relating to Capecitabine continued throughout the summer as Mylan prepared to launch. On August 4, 2014, Nesta and Rekenthaler spoke by phone three times. Nesta informed Rekenthaler that Mylan would soon enter the Capecitabine market and the pair discussed how to allocate the market, a discussion made easier by the fact that McKesson had delivered Dr. Reddy's "▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓." Rekenthaler wrote an email memorializing the call. ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓." Mylan did seek the business for each of these three companies and Teva conceded each of them, pursuant to the agreement Rekenthaler had reached with Nesta.

295.     This market allocation "plan" was highlighted in other internal Teva emails sent on August 10, 2014. "▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓.

296.     On August 11, 2014, Rekenthaler received a call from Nesta. Shortly after
hanging up the phone, Rekenthaler sent an internal email confirming that ███████████
███████████████████████████.″ He added that he did not ″███████████
██████.″

297.     In accordance with their market allocation scheme, Mylan targeted and Teva
conceded the Capecitabine business at ABC, Econdisc, and McKesson/Rite-Aid. Teva also
conceded some of the "smaller guys" as well, pursuant to the agreement. On August 14, 2014, for
example, a smaller customer informed Teva that it had received a bid for Capecitabine. On
August 18, 2014, Rekenthaler called Nesta and the next day an internal email confirmed that Teva
"████████████████.″

### (ii)     Amikacin (McKesson, Heritage, Teva)

298.     Amikacin is an antibiotic developed in the 1970s that is used to treat multi-drug
resistant bacterial infections and is considered an "essential medicine" by the World Health
Organization. In October 2014, as part of the overarching fair share conspiracy, McKesson
conspired with Teva and Heritage to arrange a market allocation and increase prices for
Amikacin.

299.     In the summer of 2014, when a customer requested that Heritage reduce its price,
Heritage said that it was aware that Teva's price was slightly lower but that it did not wish to
reduce its prices in order to gain market share. The Heritage team decided they were "██████
████████████████████████████████████████████████
████████████████████████████[.]"

300.     On October 10, 2014, Heritage's Neal O'Mara reported that he had had positive
conversations with an individual at McKesson who was willing to help coordinate with other
manufacturers to help Heritage gain share for Amikacin. This person apparently believed it was

inappropriate to provide Heritage with precise prices but O'Mara noted that " ▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮." The belief that it is legal for competitors to

discuss their share intentions and their market allocation targets so long as they avoid explicitly

mentioning a numerical price is apparently common in the industry and explains why conspirators

go to great lengths to destroy evidence of certain conversations but leave other equally

inculpatory communications in plain sight.

301.    Despite her supposed unwillingness to discuss prices, what the individual at

McKesson was in fact willing to do was to communicate Heritage's intent to compete for only a

limited fair share so that Heritage would not face competition upon Teva's right of first refusal

("ROFR") right to counterbid. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

McKesson successfully passed the message to Teva. With assurances that Heritage would act

responsibly in a two-player market. Heritage and Teva were then careful not to compete.

302.    By a year later, October 1, 2015, Teva had raised both its list prices and its

contract prices for both the 500mg/2mL and 1g/4mL dosage forms of Amikacin ▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮

303.     When contacted by customers looking to avoid high prices, Heritage supported Teva's price increase by refusing to lower prices. Heritage wrote that they "███████████ ███████████████████████████████████████████████████████ ██████."

### (iii)     Tizanidine (McKesson, Dr. Reddy's, Mylan, Sandoz)

304.     Tizanidine, also known by the brand name Zanaflex, is used to treat muscle spasticity due to spinal cord injury or multiple sclerosis. As part of the overarching fair share conspiracy, McKesson coordinated with Dr. Reddy's, Mylan, and Sandoz to allocate share and increase prices for the drug.

305.     Around May 2013, the Tizanidine market was controlled by Reddy's (59% market share), Mylan (24%), and Sandoz (17%). An internal Dr. Reddy's presentation discussing Tizanidine noted "███████████████████████████"

306.     On May 10, 2013, Sandoz learned that Reddy's had increased prices tenfold, which gave Sandoz and Mylan room to obtain their fair share at significantly higher prices. "█ ███████████████████████████████████████████████████ ████████████████████████████████████████████.

307.     On May 13, 2013, Dr. Reddy's made its list price increases public and that same day, Nesta (Mylan) had a call with SDZ-CW-4 (Sandoz).

308.     Distributor Defendant McKesson was instrumental in coordinating support for the Reddy's-led price increases. ███████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

**FILED WITH REDACTIONS – PUBLIC VERSION**

███████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████

        ████████████████████████████████████
        ███

309.     Later that same day, Armando Kellum re-sent the price increase to the Senior

Director and other McKesson employees, writing "████████████████████████████████

█████████████." The McKesson Senior Director then spoke with Dr. Reddy's and Mylan and

████████████████████████████████."

310.     Sandoz then matched Dr. Reddy's list prices for several dosage forms and re-

raised above Dr. Reddy's price on one other dosage form on May 24, 2013. In the three days

leading up to the Sandoz increase, Nesta (Mylan) confirmed support for the increase over various

calls with both SDZ-CW-4 (Sandoz) and with a Dr. Reddy's national account executive.

311.     ████████████████████████████████████████

██████████████████████████. On May 29, 2013 in an internal Sandoz email to SDZ-CW-1

and Defendant Armando Kellum, SDZ-CW-3 wrote:

        █████████████████████████████████████████
        █████████████████████

A few minutes later, Nesta called SDZ-CW-4 and they spoke for nearly thirteen minutes. SDZ-

CW-1 then replied to the Sandoz thread:

        ███████████████████

Sandoz then told a customer that Sandoz was "████████████████████████████████

█████████████████████████████."

312.     On June 14, 2013, Anda, a wholesale customer, e-mailed an account manager at

Dr. Reddy's asking ███████████████████████████████████████████████████████████

███.'' He. had learned of Mylan's intent to follow the price increase through his prior

communications with Defendant Nesta and with Defendant McKesson. However, Mylan had not

actually raised its price on Tizanidine at the time of the inquiry, and would not do so until July 2,

2013.

313.     On June 26, 2013, a supermarket chain customer e-mailed Dr. Reddy's requesting

a bid for Tizanidine. A marketing executive at Dr. Reddy's wrote internally:

Another individual replied, "[y]eah, I was just sending it as an FYI, no intention to bid." A few

weeks later, the customer forwarded the same request and Sandoz gave the pretextual response

███████████████████████████████████████████. On July 26, 2013 a Sandoz executive identified

Mylan, Teva, and Apotex as the source of a "███████████████████████████████████████

███████████████.''

(iv)    **Lamotrigine ER (McKesson, ABC, WBAD, Dr. Reddy's, Par, Wilshire)**

314.     Lamotrigine Extended Release tablets (brand name: Lamictal) is an

anticonvulsant drug that treats epileptic seizures. As part of the overarching fair share conspiracy,

McKesson, ABC, and WBAD coordinated with Dr. Reddy's, Par, and non-defendant co-

conspirator Wilshire to allocate market share for the drug.

315.     At a sales and marketing meeting held in April 2013, the Dr. Reddy's sales team

arrived with certain unspecified competitor intelligence regarding Lamotrigine.

316.     In June 2013, the Dr. Reddy's team was planning to enter the market for Lamotrigine in either in July or August. The only other competitors at the time were Defendants Par and Wockhardt, although the latter had supply problems.

317.     On June 17, 2013 a member of the Dr. Reddy's sales team wrote an internal email about a customer that wanted a bid on Lamotrigine. She advised that they should "⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛." If Par was unwilling to concede the business, an aggressive offer would only have the result of driving down prices. Thus, it was important for Dr. Reddy's to know which accounts Par would defend or concede.

318.     The same day, Dr. Reddy's Director of National Accounts told colleagues that he had spoken to McKesson and confirmed that McKesson ⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛." Senior Director Victor Borelli told his colleagues that ABC had communicated to him that Par wanted to keep the ABC account.

319.     McKesson then communicated with Dr. Reddy's and Par to arrange a market allocation between the two manufacturers. Dr. Reddy's remained concerned that Par ⬛⬛⬛⬛ ⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛ ⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛. That would then risk that Par would lower prices to retain the account to resist an unfair action, and this could disrupt the market and drive prices lower. Dr. Reddy's Senior Director for Prescription Marketing wrote:

⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛ ⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛

320.     Dr. Reddy's Director of National Accounts replied with assurances that he had "⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛. He also said he would ⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛

███████████████████████████████████████████. This was the same McKesson executive who would later ████████████████████████████████████████████████. That same day, June 26, 2013, Dr. Reddy's had knowledge Par would ███████████████████████████ major account.

321.    Collusive communications regarding Lamotrigine did not end in 2013. In October 2015, Defendant WBAD coordinated with Dr. Reddy's and a manufacturer not named as a defendant in this complaint (Wilshire) in order to allocate fair share for the drug Lamotrigine ER.

322.    On October 28, 2015, Dr. Reddy's executives had dinner with WBAD's Director of Generic Pharmaceutical Sourcing. The next morning, he told them he had received a bid for 25% of the Walgreens business from a competitor and encouraged Reddy's to give it up in exchange for no further competition from the competitor:

███████████████████████████████████████████████████████

Dr. Reddy's responded that it believed the competitor "████████████████████████████ ████████████" and Reddy's thought that had already been achieved, fair share style, by taking share "██████████████████████████████" Reddy's noted that although its "█ ███████████████████████████████████████████████████ ███████████████████████████████████████████████████ ███████████████████████████████████████████████████ ███████████████████████████████████████████████████ ████████."

323.    Dr. Reddy's then directed a national account manager to "████████████████████████ ███████████████████." Reddy's was concerned that the plan had gone awry, because Par was

supposed to have conceded █████████████████████████████████████████

█████████████████████. But Wilshire had bid only on a portion of the McKesson business,

██████████████████████████████████. Reddy's later learned ████████████████████

████████████████████████████████████████████████████████

████████████████████████. targeting Par and not Dr. Reddy's accounts.

324.    WBAD continued to arrange allocation of share through 2016. By this time,

Defendant Actavis had entered the Lamotrigine market. On April 11, 2016, Dr. Reddy's learned

of a challenge at WBAD. At this point, Dr. Reddy's was waiting for confirmation that the

challenger was Actavis, because, even though Dr. Reddy's was "██████████████████████

████████ and "████████████████████████████" in order to confirm for Actavis that it was

"████████." Reddy's Senior Director for National Accounts noted that she wanted to speak

with WBAD to ██████████████████████████████████████████████████████

████████████████████████████ WBAD. Dr. Reddy's Director of Prescription

Marketing asked:

█████████████████████████████████████████████████
█████████████████████████████████████████████████
████████

The Senior Director said she was "████████████████████████████" from an individual at

WBAD. Once again, Dr. Reddy's requested the information because it knew that WBAD would

communicate share intentions back and forth between the manufacturers.

    (v)    **Paricalcitol (McKesson, WBAD, Dr. Reddy's, Teva, Zydus)**

325.    Paricalcitol, also known by the brand name Zemplar, is used to treat and prevent

high levels of parathyroid hormone in patients with long-term kidney disease. As part of the

overarching fair share conspiracy, Cardinal, McKesson, and WBAD coordinated with Dr.

Reddy's, Teva, and Zydus to allocate market share for the drug.

326.     In the month leading up to Zydus's launch of the drug, Nisha Patel and David Rekenthaler spoke with their former colleague Kevin Green (formerly Teva, then at Zydus) and discussed which Paricalcitol customers Teva would retain and which customers it would allocate to Zydus, the new market entrant.

327.     On March 13, 2014, Patel directed that Teva retain the ABC account and match Zydus's pricing. The next day, on March 14, 2014, Patel called Green to update him on Teva's decision to play fair.

328.     During the morning of March 17, 2014, Defendants Patel and Green had two more phone calls where they discussed how to divvy up the market for several new Zydus products, including Paricalcitol. A half an hour after the second call, Patel e-mailed her supervisor Kevin Galownia with a list of accounts to retain for Teva or concede to Zydus. Later that same day, Patel called Green.

329.     Over the next several weeks, Defendant Teva "strategically" conceded several customers to the new entrant Zydus.

330.     On March 28, 2014, one of Teva's customers notified a Director of National Accounts that it had received a competing offer from Zydus for its Paricalcitol business. This person forwarded the email to Patel who responded within minutes "[w]e should concede." Patel's answer was immediate because she and Green had had a nine-minute call the day before during which Green had advised her of the incoming bid and Patel had agreed to play fair.

331.     On April 1, 2014, Defendant Teva conceded another account to Zydus and noted in Teva's Delphi database that the reason for the concession was "Strategic New Market Entrant."

332.     By May 2014, Dr. Reddy's began preparations to enter the Paricalcitol market. WBAD coordinated Dr. Reddy's entry into the market by serving as a liaison between Dr.

Reddy's and its competitors even though they were also in direct communication with one another. Dr. Reddy's was targeting a 20% market share. At the time, Teva's share was 73%.

333.     On June 10, 2014, Nisha Patel spoke several times with Victor Borelli at Dr. Reddy's. Later that day, at 2:46pm, Dr. Reddy's provided WBAD with a market share report for Paricalcitol indicating that Teva was the market leader at 60% share. Having also spoken with Teva, WBAD agreed that "Teva is the right target." Dr. Reddy's then bid on a Teva account and Teva conceded it to Reddy's, dropping its market share by 3%.

334.     Teva also strategically conceded what remained of its Cardinal business (it had previously conceded some of that business to Zydus). After receiving Dr. Reddy's bid, Cardinal approached Teva and asked whether Teva would bid to retain the 4 mcg dosage form. Patel recommended that Teva concede the business: "We have ~70 share and it is ideal to concede here…"  Kevin Galownia agreed. Patel then instructed a Teva customer analyst to concede "due to [T]eva's high share." The rationale was circulated within Teva:

> Due to the fact that we have high share and already conceded on the other strengths, we are going to concede on this strength as well.

Teva's Teri Coward forwarded this statement, word-for-word, to Cardinal's ███ .

335.     Dr. Reddy's formally launched Paricalcitol on June 24, 2014. On June 26, 2014, Kevin Galownia told Nisha Patel that Teva was "willing to concede 10-15% share total on Paricalcitol" to Dr. Reddy's. Teva then conceded several accounts to Dr. Reddy's, following the plan confirmed by WBAD. On July 20, 2014, after a call between Patel and Dr. Reddy's Victor Borelli, Patel instructed a Teva colleague to

> bid a little high on Paricalcitol. We should not be aggressive since we are in the process of conceding share due to additional entrants.

Her colleague responded: "I will bid higher" on Paricalcitol.

336.    Teva decided concede yet another Paricalcitol account to Dr. Reddy's and wrote internally that it would be "[d]ue to new entrants and having to give up some share." In order to create the appearance of competition with this customer, Teva engaged in what Patel referred to as "fluff pricing," by which it offered an inflated price (cover bid) for Paricalcitol to ensure that Teva did not win the business. Indeed, the customer was "so insulted" by Teva's price that it moved to Dr. Reddy's the same day it received Teva's offer. When Defendant Patel learned of this, she remarked to a Teva salesperson (who she had been discussing "fluff pricing" with recently):

> Sorry! Had to laugh. In regards to our recent conversation....this is what we see when we provide fluff pricing. Can't win!

337.    On July 16, 2014, McKesson informed Teva that it had received a competing Paricalcitol bid from Dr. Reddy's. Based on assurances exchanged in earlier conversations with Dr. Reddy's, Teva initially decided to concede a portion of McKesson's business (OneStop), while retaining another portion (RiteAid a/k/a McRAD). Defendant Patel wrote internally:

> This decision is based on the number of competitors, DRL's potential share target and our current/conceded share. (Dr. Reddy's should be done with challenging our business on this product.)

338.    On July 18, 2014, Teva internal emails indicate that Teva was unsure of how to implement the market allocation in the case of McKesson. "I'm not sure how we communicate conceding [OneStop] and retaining [Rite Aid]" wrote a strategic customer analyst. Patel responded that perhaps that was not necessary, but she was unsure:



**FILED WITH REDACTIONS – PUBLIC VERSION**

A half hour later, Nisha Patel was told that Reddy's had actually submitted a bid for both portions of the McKesson Paricalcitol supply contract. Within 18 minutes of learning this, Defendant Patel called a Senior Director at Dr. Reddy's, but it was Friday at the end of the day.

339.    The Dr. Reddy's Senior Director returned Patel's call the following Monday morning, July 21, and they also spoke again the next morning, July 22, 2014, regarding allocation of the Paricalcitol market. Around the time that she spoke with Reddy's on the morning of July 22, Patel once again asked internally whether McKesson would help coordinate the split between Teva and Dr. Reddy's.



340.    Teva then communicated with McKesson in order to coordinate the market allocation with Dr. Reddy's and reported that McKesson would " ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮ ." Later that day, Dr. Reddy's confirmed to McKesson that Reddy's " ▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ .

341.    That day, July 22, Teva and Dr. Reddy's ultimately agreed that Teva would concede all of its McKesson business (both One Stop and Rite Aid) to Dr. Reddy's. In exchange, Dr. Reddy's would surrender its bid for Teva's Paricalcitol business at Wal-Mart and would stop competing for additional market share (and driving price down further).

342.    The next day, July 23, 2014, Teva carried out its agreement to concede its entire McKesson business—both One Stop and RiteAid—to Dr. Reddy's and to retain Wal-Mart. In its Delphi database, Teva noted that the McKesson Paricalcitol business had been conceded to a "Strategic New Market Entrant."

343.    By early August 2014, Dr. Reddy's had attained 15-16% of the total Paricalcitol market, which it decided—pursuant to its understanding with Teva—it would "maintain for now." After the fact, McKesson reminded Teva that Dr. Reddy's had been "so aggressive because [Teva was] not giving up share."

**(f)    Morris & Dickson knowingly participated in the fair share conspiracy**

344.    Defendant Morris & Dickson ("M&D") is another drug distributor that participated in the overarching conspiracy to allocate share between generic drug manufacturers in order to maintain prices and permit coordinated price increases.

345.    The manufacturer Defendants considered M&D to be a trustworthy conspirator and were frank about their adherence to fair share. For example, ▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮."

346.    As a smaller wholesaler, Morris and Dickson had a strategy of offering competitive intelligence and coordinating fair share in exchange for preferable treatment from the manufacturers. For example, on May 14, 2014, ▮▮▮▮▮ of M&D requested a discount on Clonidine-TTS patch from Teva. Teva's Associate Director of National Accounts recommended

to Nisha Patel "███████████████████████████████████████████

████████████████████████████████████████

█████████████████████████████████████████████

████████████████████████████████████████████

█████████████████████████████████████████████

███████████████████████████████████████

█████████████████████████████████████████████

████████████████████████████████."

     347.     In another example, in May 2014 Defendant Tracy Sullivan (Lannett) met with

M&D to obtain confidential information about how other manufacturers would support price

increases. In her notes she remarked that M&D "██████████████████████████

██████████████████████████." Later that same week, two Morris &

Dickson employees arranged a dinner with Sullivan and co-conspirator Anne Sather (Heritage).

Emails from March 2015 confirm that M&D employees were willing to relay confidential

competitive information received from manufacturers to the relevant competing manufacturers.

          **(i)**       **Eszopiclone (M&D, Cardinal, Dr. Reddy's, Sun,** Roxane**)**

     348.     Eszopiclone is a sedative-hypnotic drug used to treat insomnia. Teva, Dr.

Reddy's, Mylan, Lupin, Glenmark, Sun, and non-defendant manufacturer Roxane launched

Eszopiclone on April 15, 2014. In the months leading up to the launch, the various manufacturers

sought to obtain "pre-commitments" with customers including the Defendant distributors. In this

chaotic seven-player simultaneous launch, and as part of the overarching fair share conspiracy,

M&D and Cardinal helped the manufacturer Defendants to settle the market with minimal

competition by relaying their intentions regarding share, preferred account targets, and pricing.

349.    Months before launch, on February 6, 2014, Cardinal reached out to Dr. Reddy's to begin gathering information about the likely allocation plan. Cardinal wrote "███████████ ██████████████████████████████████████████████████████████████████ ██████████████████████████████████" That evening, a Dr. Reddy's executive provided the answer to Cardinal's key question—██████████████████████████—and directed a more junior Reddy's employee to send Cardinal that answer. ████████████████████████ ██████████████████████████████████████████████████████████████████ ███████████████████████████.

350.    Because of the large number of competitors, the Defendants had some confusion around pricing and share intentions, despite their frequent sharing of information. █████████ ██████████████████████████████████████████████████████████████████ █████████████████████████████████████████████████████████ ███████████████████████████████████████████████████ ███████████████████████████████████████████████████ ████████████████.

351.    On April 2, 2014, Dale Kelly at Morris & Dickson reached out to Susan Knoblach at Defendant Sun to help avoid price erosion on Eszopiclone. ████████████████████████ ██████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████ ████████████████████████████."

**(g)     Cardinal knowingly participated in the fair share conspiracy**

352.    Distributor Defendant Cardinal was also aware of the overarching fair share agreement and knowingly joined in the agreement in restraint of trade.

**FILED WITH REDACTIONS – PUBLIC VERSION**

353.     Cardinal communicated details between the manufacturers in order to limit competition. For example, on January 20, 2014, Teva submitted a bid to Cardinal and added a note requesting that Cardinal relay an anticompetitive message to Defendant Perrigo:

354.     On February 7, 2014, the Cardinal executive called Teva and said he had explained to Perrigo that Teva "█████████████████████████████████████ ████████, but had been unsuccessful in persuading certain people at Perrigo to play fair on this drug (Imiquimod cream). Teva employees were ███████████████████████████ ███████████████████████████████████████████ ████████████████████████."

355.     Cardinal's generic drug buyers were in constant contact with the manufacturers and were aware of the rules of the scheme to concede share between manufacturers. Cardinal knew that the goal was to reach a fair share apportionment. For example, on May 11, 2012, Teva's Senior Director of National Sales told an executive at Cardinal about a change in plans for the HIV/AIDS drug Combivir. Teva had made plans to supply Cardinal but ████████████████ ███████████████████████████████████████ ████████. Teva apologized for the confusion and wrote that ███████████████████ ███████████████████████████████████ ████████████████████████████████████████.

FILED WITH REDACTIONS – PUBLIC VERSION

356.     Cardinal executives told generic drugmakers that Cardinal wanted to prevent price erosion by maintaining current customer allocations. For example, in December 2012, a ███████

████████████████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████████████

████ .

357.     Cardinal's participation in the overarching conspiracy continued even after the creation of Red Oak Sourcing in 2014. Defendant Red Oak is a joint venture between Cardinal and CVS Health that is, according to its website, "responsible for securing the generic drug portfolio for both companies." Red Oak employees negotiate on behalf of both Cardinal and CVS Health. Some of the same employees who participated in the overarching conspiracy while at Cardinal accepted new positions at Red Oak and continued to price-fix with their manufacturer conspirators, except that they were now responsible for an even larger share of the market.

358.     The Red Oak executives often requested that the manufacturers provide charts showing the current allocation of market share. These overviews were requested so that Red Oak could more knowledgeably engage with the manufacturers on the basis of fair share.[22] For example, on multiple occasions, including at the end of April 2015 and in mid-August 2015, Red Oak requested that Teva provide comparative market share charts showing which customers had been allocated to which manufacturers. Teva replied in an email titled ████████████ making clear that it was Red Oak that sought the information. The spreadsheets contained a breakdown of the current market share of each manufacturer for the requested drugs.

---

[22] Each of the manufacturer Defendants kept some version of a tracking spreadsheet to see where their competitors stood in terms of market share.

359. The following sections illustrate additional episodes of Cardinal's participation in the anticompetitive fair share agreement.

**(i)    Nystatin (Cardinal,** Heritage, Mylan, Sun/Mutual, Teva**)**

360. Developed in the 1950s, Nystatin is an antifungal drug sold in various dosage formulations including creams, ointments, and tablets. As part of the overarching fair share conspiracy, Cardinal coordinated with Heritage, Sun/Mutual, Mylan, and Teva to allocate market share and increase prices for the drug.[23]

361. At a meeting at Cardinal's headquarters on February 12, 2013



362. A month later, on February 26, 2013, Defendant Heritage's President Jason Malek and National Account Manager Anne Sather discussed Cardinal's suggestion that ███████ ███████████████████████████████████████████████████n. Sather noted that according to Cardinal: "██████████████████████████████████." Malek asked if it would be possible to raise prices without inviting "████████" and Sather replied: "█████████ ████████████████." Ultimately, they agreed to join Cardinal's plan to increase prices.

---

[23] In this complaint, IRPs bring claims for Nystatin tabs only against distributor Defendant Cardinal.  IRPs' previously brought claims against the manufacturers of Nystatin tabs in an earlier multi-drug complaint (18-cv-2533-CMR, Dkt. 1). Those claims have already been sustained against Defendants' motion to dismiss.

Sather wrote "███████████████████████████████████████████

████████████████████████████████████████████████

██ ."

363.     Cardinal employees coordinated these price increases at an in-person meeting and a record exists only because the Heritage employee typed notes of the meeting. The notes also include other anticompetitive coordination by Cardinal on behalf of the manufacturer conspirators. At that same meeting, Cardinal reminded Heritage that Mylan ██████████████, and told Heritage to expect ████████████████████████. Admitted conspirator Jason Malek acknowledged that Cardinal's intel was "████████" and that "the ████████████████████████████████████████████."

364.     On April 16, 2013, the coordinated price increase organized by Cardinal was put into action. Sun doubled its price for Nystatin tablets. The next day, Susan Knoblauch (a Sun Senior Sales Manager) had a forty-minute call with Anne Sather.

365.     Nisha Patel (Teva) and Jason Malek (Heritage) also spoke in April 2013 and later held a call on July 9, 2013 and continued to speak in late July 2013 as Teva listed Nystatin tablets for potential price increases. Confirming Cardinal's message, Patel told Malek that ████████████████████████████████████████████████████████.

366.     Another round of coordinated price increases followed from the earlier Nystatin tablets increase. This increase and the related communications are discussed below in Section IV(C)(4).

**(ii)     Tolterodine ER (Cardinal, Mylan, Teva)**

367.     Another example of Cardinal's participation in the manufacturers' fair share conspiracy involved Tolterodine extended release capsules ("Tolterodine ER"), an antispasmodic drug prescribed to people who have difficulty controlling their urination.

368.     Although it was not publicly known at the time, Teva and Mylan both had plans to begin selling Tolterodine ER on January 2, 2014. Accordingly, throughout December 2013, with full knowledge that Mylan and Teva intended to allocate the market according to the overarching fair share agreement, Cardinal liaised between the two manufacturers to coordinate the details of the illegal agreement.

369.     On December 20, 2013, ███████ (Cardinal) called Teri Coward (Teva) and delivered the message that Mylan would launch its Tolterodine ER in two weeks. Cardinal also provided Mylan's future pricing for Tolterodine ER, and conveyed that Mylan was "looking for a 40% market share." Cardinal knew this was sufficient for Teva and Mylan to determine whether their customers added up to fair share and said that Teva "can figure the rest out."

370.     With the market allocation and pricing details provided by Cardinal, the manufacturer conspirators were all set. Teri Coward circulated the message from Cardinal to her Teva colleagues, including Kevin Galownia, and asked to have a call "first thing Monday morning to discuss what we want to do" in terms of preparing a "target strategy." Galownia then spent the weekend working up a strategy so that Teva could "pick who should receive bids." The unbidded customers would be conceded to Mylan as per the agreement communicated and confirmed via Cardinal.

371.     On Monday, December 23, 2013, David Rekenthaler (Teva) and Jim Nesta (Mylan) spoke briefly on a second line while Rekenthaler was simultaneously dialed in to a Teva conference call. Immediately after the Teva conference call, Rekenthaler tried calling Nesta two

more times and Nesta ultimately returned the call. During these calls, Rekenthaler and Nesta reached an agreement to allocate the Tolterodine ER market on launch day so that Teva and Mylan could reach their target share without eroding prices. They also discussed specific contractual language to include in their offers in order to allow room for future price increases. Rekenthaler (Teva) circulated an email with the subject "Mylan's offers" listing all the accounts where Mylan sought business, which he was able to confirm due to his calls with Nesta (Mylan).

372.    By 12:12 pm on that same day, Teva had created a revised pricing plan for the Tolterodine ER launch that incorporated Teva and Mylan's plan to allocate the market, including the submission of cover bids and abstention from bidding. The revised pricing plan included a chart identifying the major customers (and their associated market share percentage) that Teva would receive to get close to its desired 60% market share while Mylan would get its desired 40% share, as Cardinal had arranged. The following day, Christmas Eve 2013, Rekenthaler and Nesta had two more calls to confirm and refine Teva and Mylan's market allocation agreement.

373.    In exchange for Mylan either submitting cover bids or abstaining from bidding on these customers, Teva reciprocated by submitting cover bids and/or refusing to submit bids to customers that Mylan targeted. This is demonstrated by the fact that Teva's newly revised pricing plan now included considerably higher direct invoice prices for the major customers allocated to Mylan than had been listed prior to the calls between Nesta and Rekenthaler.

374.    The allocation between Mylan and Teva allowed Teva to launch at only 86% of the brand price for a total of $24.6 million in net sales during the first week of sales. The allocation was successful, with Teva achieving approximately 58% market share.

        **(iii)    Tobramycin inhalation ("Tobi") (Cardinal, ABC, WBAD, Akorn, Sandoz, Teva)**

FILED WITH REDACTIONS – PUBLIC VERSION

375.     Distributor Defendants Cardinal, ABC and WBAD each participated in the scheme to allocate manufacturer market share for Tobramycin inhalation solution (also known as Tobi). Although these distributor Defendants often initiated discussions about balancing share or increasing price in order to foment agreement, in this case they worked to finalize the agreement.

376.     Tobramycin is prescribed to people with cystic fibrosis who are suffering from bacterial infections in their lungs. The drug is sold in packs of 56 ampules because patients must inhale two ampules of Tobramycin per day for 28 days. At the time, the 56-pack of ampules cost Teva around $48.69 to produce. As a result of the conspiracy, Teva was able to sell each 56-pack of Tobramycin for over $4,000.

377.      As early as October 2013, Sandoz began strategizing how to split the market for Tobramycin once it was released from patent protections and available for generic production. "We will aim to go for our fair share of the market" wrote a Sandoz executive responsible for product launches. "Exact goals will depend on how Teva goes into the market on day 1, and how rational they behave on day 181." (Teva had secured a 180-day exclusivity period). As explained above, "rational" behavior is a term of art in the fair share conspiracy indicating that a competitor will play fair and cede share to avoid competition.

378.     On June 23, 2014, Nisha Patel told her colleagues that they needed to discuss which customers to retain and which to concede to new entrants, including Sandoz, in accordance with market share calculations.

379.     On July 1, 2014 Patel had seven calls with an individual at Sandoz who is referred to in this complaint as Sandoz Cooperating Witness #1 ("SDZ-CW-1"). They discussed Sandoz's launch plans and how to divide up the market for Tobramycin.

380.     On July 7, 2014, Patel and SDZ-CW-1 spoke five more times. On these calls,
SDZ-CW-1 and Patel discussed how to allocate the market for Tobramycin, including specific
accounts that Teva and Sandoz would maintain or concede to one another. Patel memorialized the
agreement in an e-mail two days later.

381.     Patel also told SDZ-CW-1 specifically that Teva would not even submit a bid to
CVS. This was significant because Tobramycin was a very expensive product, and Sandoz was
able to acquire the CVS business by offering only a nominal reduction to the extremely high Teva
price. A week later CVS confirmed to Teva that Sandoz had picked up the business, as planned.
Teva also agreed to concede the Cardinal business to Sandoz.

382.     SDZ-CW-1 said that Sandoz was "

."

383.     On July 9, 2014, one of the allocated customers—Kinney Drugs—asked Teva for
a lower price on Tobramycin. A Teva analyst stated in an internal e-mail,
." A Teva national accounts director was confused
by this decision and responded "."
The Teva analyst responded:



384.     Defendant Patel's instructions to concede business to Sandoz had come after a
phone call with SDZ CW-1 on July 9, 2014.

385.     The following week, on July 17, 2014, Red Oak / Cardinal's ████████ was concerned that the manufacturers' allocation agreement was not being executed quickly enough. He called Teri Coward (Teva) to warn her ███████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

███████████████████████████████████████."

386.     That same week, Walgreens also coordinated with Sandoz and Teva to allocate the market for Tobramycin. On July 16, 2014, Teva spoke with ███████████████ (Walgreens/WBA), who had spoken with Sandoz that same day to discuss the launch of Tobramycin. ███████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████

387.     When Tobramycin came up for re-bid in July 2015, Teva continued with the agreed plan to concede to challengers in order to avoid or limit price erosion. Teva admitted to another distributor that "███████████████████████████████████████

████████."

388.     That fall, as the competitors looked to rebalance share for Tobramycin inhalation, Akorn sought a part of the ABC business. ███████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████



389.    Internally, Teva's Senior Director of Sales & Trade Relations asked "

."

390.    On March 2, 2020, Sandoz was charged by the Department of Justice with a violation of the Sherman Antitrust Act, 15 U.S.C. § 1, for its conspiracy with Teva regarding Tobi.  As part of a deferred prosecution agreement, Sandoz admitted that "[f]rom in or about July 2013 and continuing in or about December 2015, Sandoz conspired to suppress and eliminate competition by agreeing to allocate customers and rig bids for, and/or stabilize, maintain, and fix prices of, certain generic drugs, including tobramycin inhalation solution, with [Teva]."

C.    **Episodes Illustrating Defendants Fixing Prices, Allocating Markets, and/or Rigging Bids for Multiple Drugs Simultaneously**

   1.    *July 2012 multi-drug coordinated price increases (Actavis, Alvogen, Breckenridge, Mylan, Sandoz, Teva)*

      *Busiprone HCL, Estradiol, Estradiol-Norethindrone (Mimvey), Labetalol HCL, Loperamide HC, Nadolol, Nitrofurantoin MAC, and Tamoxifen Citrate (at least)*

391.    Effective July 31, 2012, Teva increased the prices of a number of different drugs, including many where Teva's competitors were Mylan, Watson (Actavis), Alvogen, Sandoz, or Breckenridge. Teva's Rekenthaler or Green coordinated each of these price increases with Teva's competitors during calls on the days prior to the increase. Some examples of the scheme follow.

| Generic Drug | Conspirator Manufacturers |
|---|---|
| **Buspirone HCL tablets** <br> **Estradiol tablets** <br> **Tamoxifen citrate tablets** | Mylan, Watson (Actavis), Teva |
| **Labetalol HCL capsules** | Sandoz, Watson (Actavis), Teva, Par |
| **Nadolol tablets** | Mylan, Sandoz, Teva |
| **Loperamide HCL capsules** | Mylan, Teva |
| **Nitrofurantoin macrocrystal capsules** | Mylan, Teva, Alvogen |
| **Estradiol-Norethindrone tablets** | Breckenridge, Teva |

### (a)      Nadolol

392.     Nadolol (brand name: Corgard) is a beta-blocker drug prescribed to treat high blood pressure, reducing the risk of stroke and heart attack.

393.     In 2012 and 2013, Teva, Mylan and Sandoz had differing Nadolol supply problems but were in continuous communication to coordinate pricing and market allocation in order to maintain market stability. On July 31, 2012, after calls between SDZ-CW-2 (Sandoz) and Defendant Kevin Green (then at Teva) where they agreed to support Teva's price increase, Teva raised its price for Nadolol. Teva also had five calls with Defendant James Nesta (Mylan) where they discussed the plan to increase prices. As agreed, Sandoz supported Teva's price increase with a massive price increase of its own—raising prices for various formulations over 700%—on August 27, 2012.

394.     Mylan had problems supplying Nadolol but was able to follow and match the Teva and Sandoz increases on January 4, 2013. As with the prior Nadolol increases, Nesta spoke with Green multiple times the day before the increase, and Green spoke with Kellum twice on the day of the increase. Shortly after hanging up with Green, Kellum reported internally that Mylan had made good on the agreement but disguised the source of the information by saying he had

"just heard from a customer" that Teva and Mylan had followed the price increases. Kellum's phone records demonstrate that he did not speak with any customers that morning.

395.    Sandoz executives frequently made such false attributions in order to share the contents of collusive communications with competitors without leaving overt evidence. Kellum added "let's please be cautious on both of these products," meaning that Sandoz did not want to inadvertently take market share from these competitors, because taking share after a price increase is inconsistent with the overarching fair share agreement.

396.    Teva and Mylan imposed another coordinated set of price increases on July 2 and July 3, 2013 and Sandoz continued to react favorably, in accordance with the overarching agreement. Shortly after the Teva increase, Sandoz sought to obtain a "comprehensive list of items" increased so that it would "not respond to something adversely" by inappropriately competing for market share on any of those drugs. Sandoz executives had previously conveyed to their counterparts at both Mylan and Teva that Sandoz would follow their price increases and not steal their customers after an increase. Obtaining the comprehensive list of price increase drugs was an effort by Sandoz to ensure it was aware of every increase taken by both competitors so that it could live up to the agreement. On July 15, 2013, SDZ-CW-2 asked David Rekenthaler to provide Sandoz with a full, comprehensive list of all the Teva price increase drugs – not just those drugs where Teva overlapped with Sandoz. Defendant Rekenthaler complied. Understanding that it was improper to share competitively sensitive pricing information with a competitor, and in an effort to conceal such conduct, Defendant Rekenthaler first sent the Teva price increase list from his Teva work e-mail account to a personal e-mail account, and then forwarded the list from his personal e-mail account to SDZ-CW-2's personal e-mail account.

(b)     **Labetalol HCL**

397.     Labetalol hydrochloride, like Nadolol, is a beta blocker that helps treat high blood pressure.

398.     Teva increased Labetalol prices on July 31, 2012 and coordinated with its competitors to maintain that supra-competitive pricing. For instance, in October 16, 2012, Sandoz overcame earlier supply problems, leading a Teva senior analyst to wonder whether pricing at certain accounts should be lowered in anticipation of the incoming competition. After speaking twice with SDZ-CW-2 at Sandoz, Defendant Green (Teva) answered the analyst's question.

> Sandoz is back in good supply. They took a 500% price increase several months back, and they are holding firm with their prices.
>
> Stay the course and maintain our higher price

399.     Two days later, on October 18, 2012, Defendant Rekenthaler had four calls with A.S., a senior sales executive at Watson (Actavis) to confirm that Watson was also still committed to maintaining high pricing on Labetalol.

400.     For years after, Teva continued to coordinate with its competitors to stay the course regarding Labetalol pricing. In February 2014, for example, Teva received notice from a customer of a challenge coordinated on a price increase. Defendant Patel forwarded the e-mail to an executive at Teva with three question marks:  "???" She responded immediately: "left message." The message that she had left was for an executive at Defendant Par and the two executives spoke five times that same day. The Teva executive then emailed Defendant Patel "[l]et's speak on Monday. Just received call back with more information."

401.     The following Monday, Defendant Rekenthaler twice called and spoke with another individual at Par. In these discussions between Teva and Par executives, Teva ultimately

offered only a nominal price reduction to that customer – even though it knew that this would

likely concede the business to Par.

### (c) Nitrofurantoin macrocrystal

402. First introduced in 1953, Nitrofurantoin macrocrystal is an antibiotic for treating

bladder and urinary tract infections that has been deemed an "essential medicine" by the World

Health Organization.

403. On July 31, 2012—the same day Teva increased prices for Labetalol and Nadolol,

as discussed above—Teva increased the price of various dosage forms of Nitrofurantoin by

around 90%. Teva then coordinated with Defendant Mylan and Defendant Alvogen to maintain

prices for the drug.

404. On October 10, 2012, having received a customer request to lower prices,

Defendant Green reached out to both Defendant Nesta at Mylan and B.H., his counterpart at

Alvogen. In accordance with their discussions, Teva did not lower its price.

### 2. *July 2013 multi-drug coordinated price increases (Actavis, Amneal, Glenmark, Greenstone, Lupin, Mylan, Sandoz, Taro, Teva, Upsher-Smith)*

*Adapalene, Cefdinir, Cefprozil, Cimetidine, Fluconazole, Fluocinonide, Isoniazid, Methotrexate, Moexipril, Moexipril HCTZ, Nabumetone, Nadolol, Oxybutynin, Prazosin HCL, and Ranitidine (at least)*

405. Patel's increase lists were used in conjunction with several instances of

anticompetitive market share allocation and price increases in the spring and summer of 2013, all

of which were part of the overarching fair share agreement. On May 2, 2013 Patel spoke to her

contacts at Glenmark, Actavis, and Sandoz multiple times. After one of her calls with GLMK-

CW-5, Defendant Patel sent an internal e-mail to one of her subordinates directing him to add six

different Glenmark drugs to Teva's "high priority" price increase list: Nabumetone, Pravastatin,

Ranitidine, Moexipril, Moexipril HCTZ, and Adapalene Gel. Glenmark then increased prices of

these six drugs two weeks later, on May 16, 2013. Teva followed with its own price increases shortly thereafter.

406.     After the implementation of the Glenmark price increases on May 16, 2013, and before Teva had the opportunity to follow those increases, Teva was approached by several customers looking for a lower price. Teva refused to bid on most of these solicitations in order to maintain market stability. When it did provide a customer with a bid, Teva intentionally bid high so that it would not win the business. As Defendant Patel stated to a Teva colleague when a large wholesaler approached Teva about bidding on several Glenmark increase drugs:  "IF we bid, we need to bid high, or we will disturb the market."

407.     On May 24, 2013, Patel created a spreadsheet called "Immediate PI File" that included 12 drugs where Teva was to follow a "high quality" competitor's price increase as soon as possible. The spreadsheet also included information about future bidding and pricing plans of Teva's competitors that Patel had learned from her discussions with competitors. Under "Competitors" she listed each manufacturer and its share, and under "Reason for Increase" she added notes such as "follow Glenmark and Amneal increase," "Sandoz also bidding high,"[24] and "Raise to follow Taro." The drugs on the list included Nabumetone, Ranitidine, Moexipril, Moexipril-HCTZ tablets, and Adapalene gel as well as Cefdinir oral suspension, Cefdinir capsules, Cefprozil tablets, and four formulations of Fluocinonide (including emollient cream and gel).

408.     For each of the drugs on the list, Defendant Patel or another executive at Teva spoke frequently with Teva's competitors in the days and weeks leading up to May 24, 2013.

---

[24] A contemporaneous Sandoz email confirms that "Sandoz bidding high" was part of the agreement. On May 22, 2013, a Sandoz price analyst wrote: "I know we agreed not to bid potential price increase items, but we bid Nabumetone at a high price."

During these communications, Teva and its competitors agreed to fix prices and avoid competing with each other in the markets for the identified drugs. Other drugs were added to the price increase list (which went into effect on July 3, 2013), as soon Patel or Green, who were dialing competitors each day, were able to confirm that competitors would agree to a price increase.

### (a)      Adapalene

409.     Patel (Teva) called Aprahamian (Taro) on May 22, 2013, and they agreed to follow a Glenmark price increase. Teva followed with its own price increase on July 3, 2013, which was coordinated with both Glenmark and Taro.

### (b)      Cefdinir, Cefprozil

410.     Teva's competitor for these three drugs was Lupin, and Patel spoke to Lupin's David Berthold multiple times as she was developing the price increase list.

### (c)      Fluconazole

411.     After speaking with Hatosy (Greenstone) on May 28, 2013, Patel promptly added Fluconazole tablets to the price increase list. Teva's prices ranged between 875% higher and 1,570% higher than before the increase, depending on the dosage formulation.

### (d)      Ranitidine

412.     After speaking with Patel on May 30, SDZ-CW-1 wrote that for Ranitidine tablets, "I think there might be some price increases in the pipeline." He suggested that Teva and Amneal might follow, and that Sandoz could raise its effective prices "from $1.77 to $5[.]"

### (e)      Isoniazid

413.     After Patel and SDZ-CW-1 spoke on June 12, 2013, Patel reported back that for the drug Isoniazid, "we could have raised pricing to a higher level", and that she "hope[d] to get intel later today." Then Patel spoke again with CW-1, who provided Sandoz's prices and pricing strategy   Teva ultimately increased price on Isoniazid on January 28, 2015 in coordination with

Sandoz. Defendant Patel spoke to CW-1 for more than sixteen (16) minutes shortly before the increase, on January 22, 2015.

**(f)      Cimetidine, Methotrexate, Nadolol**

414.      On May 14, 2013, Defendant Patel asked several Teva national account managers including Defendant Green to obtain price points on certain Mylan drugs including Cimetidine and Nadolol. Patel said she was expecting "additional Mylan intel" and expected Mylan "to take an additional increase" on Teva-Mylan overlap drugs. Mylan and Teva agreed to increase prices for these drugs drug on calls between Kevin Green (then Teva) and Jim Nesta (Mylan) on June 26, 27, 28, and confirmed their positions on the day of the Teva price increases July 3, 2013.

415.      Similarly, on July 2, 2013, a colleague asked Defendant Patel how Teva's competitors' pricing compared with regard to the drug Methotrexate. Defendant Patel responded that Mylan's pricing was a little low, "but we are hearing rumors of them taking another increase," so Teva felt comfortable increasing the price of that drug on July 3, 2013. These "rumors"— which were based on the direct communications between Defendants Green and Nesta noted above—again turned out to be accurate: Mylan ultimately increased its price of Methotrexate, pursuant to its agreement with Teva, on November 15, 2013.

**(g)      Oxybutynin**

416.      Shortly after she joined Teva, Nisha Patel spoke with Brad Leonard at Upsher-Smith on April 29, 2013 to arrange a price increase for Oxybutynin chloride tablets. During June 2013, Patel exchanged texts with Leonard and a separate employee at Upsher-Smith spoke with a VP of National Accounts at Par regarding their coordinated price increase.  On July 3, 2013, Teva implemented a price increase ranging between 1,100% and 1,500% on Oxybutynin chloride, depending on the dosage strength.  Like the other drugs on the list, Teva would not have increased

its price without first obtaining agreement from competitors that they would not compete with Teva or steal market share after the increase.

### 3. *August 2013 multi-drug coordinated price increases (Apotex, Glenmark, Lupin, Mylan, Sandoz, Taro, Teva, Zydus)*

*Amiloride-HCTZ, Clemastine Fumarate, Diclofenac, Dilitiazem, Doxazosin Mesylate, Etodolac, Etodolac ER, Ketorolac, Ketoprofen, and Tolmetin Sodium (at least)*

417.    On August 9, 2013, Teva raised prices on approximately a dozen different drugs. These increases were again coordinated with a number of Teva's competitors, including Defendants Mylan, Sandoz, Taro, Lupin, Glenmark, Zydus and Apotex. The price increases were based on a "Round 2" list of increase candidates that Teva's Patel prepared after she spoke with contacts at competitors over a span of a few days from July 8 to July 11, 2013.

418.    Several of the drugs included in Round 2 had already undergone a recent price increase (Ketoprofen, Ketodolac, Etodolac, and Etodolac ER). The Round 2 price increase list also included Amiloride-HCTZ tabs, Clemastine Fumarate tabs, Diclofenac tablets, Dilitiazem tablets, Doxazosin Mesylate, and Tolmetin sodium capsules. For example, Teva's new, increased Doxazosin Mesylate price (a 1,053% increase) matched Apotex's (and Mylan's) recent price increases. Apotex itself had increased the price of this drug on July 23, 2013. B.H. of Apotex and Defendant Patel of Teva spoke regarding this increase the week before Apotex took the increase, in addition to coordinating before Teva followed on August 9, 2013.

### (a)    Ketoprofen and Ketorolac

419.    Ketoprofen is a nonsteroidal anti-inflammatory drug used to treat pain and arthritis. Ketorolac is a nonsteroidal anti-inflammatory drug used to treat pain. As part of the overarching fair share agreement, Teva and Mylan agreed to the allocation of market shares for

these drugs between the manufacturers. Partaking in the fair share agreement, they also anticompetitively increased the price of the drugs.

420.     On June 26, 2013, on the same day that Nesta (Mylan) and Green (Teva) had a one-hour phone call regarding Mylan and Teva overlap drugs, Teva produced a list of drugs to be added to the price increase list. That day, Kevin Galownia commented that "Ketoprofen would have a high likelihood of success" for a price increase. Another Teva-Mylan overlap drug, Ketorolac, was also on the price increase list. Patel noted that she would "gather intel" on both these drugs and several others and conduct an "inquiry to see if [price increases] would be possible in the near future." Because she had spoken with Mylan and other competitors, she wrote "From a 'quality of competitors' standpoint, I definitely think all but Nystatin are strong candidates" for a price increase.[25]

421.     Mylan would announce these price increases on Monday, July 1, 2013. Teva then followed with its own price increase for both drugs (and others) on August 9, 2013.

### (b)     Etodolac and Etodolac ER

422.     Etodolac and Etodolac ER are non-steroidal anti-inflammatory drugs that help reduce pain, swelling and joint stiffness from arthritis. As part of Teva's August 2013 price increase (and the overarching fair share agreement), Teva, Sandoz, and Taro agreed to the allocation of market shares for these drugs between the manufacturers. Partaking in the fair share agreement, they also anticompetitively increased the price of the drugs.

---

[25] At the time, Patel felt she had not yet solidified a conspiratorial relationship with Defendant Heritage, which is why she excluded Nystatin. Defendant Cardinal helped build this relationship by confirming months earlier that Teva would follow a Heritage price increase for Nystatin. Patel later became comfortable with Heritage as a co-conspirator although and Nystatin was added to the list of price increase candidates.

**FILED WITH REDACTIONS – PUBLIC VERSION**

423.    Around July 2013, Sandoz included Etodolac on a list of drugs where it believed it could increase prices within the month. To accomplish the increase without losing market share, SDZ-CW-3, at the time a senior executive at Sandoz, called Defendant Ara Aprahamian (Taro). After the call, Aprahamian immediately called Defendant Nisha Patel (Teva). On July 18, Patel closed the loop by calling SDZ-CW-1, another Sandoz sales executive. During these phone calls, Sandoz, Taro and Teva agreed to raise prices for both Etodolac and Etodolac ER. Following the calls, Patel added Etodolac to her price increase spreadsheet and noted that a price increase on the ER formulation "could follow" an increase on the immediate release formulation, and that this was "Shared with Taro." Based on her conversations with SDZ-CW-1 and with Ara Aprahamian, Nisha Patel understood that Sandoz planned to increase its price on Etodolac, and that Taro would follow suit and raise its price for Etodolac ER. During those conversations, Teva agreed to follow both price increases and she noted this in a price increase spreadsheet ("All strong competitors. Etodolac ER Could follow IR (Shared with Taro)").

424.    Sandoz's Etodolac price increase became effective on July 26, 2013. On August 1, 2013, shortly after a call with Patel, Aprahamian instructed a colleague at Taro to begin a price increase for Etodolac and Etodolac ER and urged "we need to get these out next week." To indicate that he wanted to take the discussion offline—off the email record—Aprahamian added "Will come over and discuss with you."

425.    At Teva, minutes of an August 5, 2013 meeting contain "Etodolac – Sandoz did take price increase on IR, Taro taking a price increase on IR and ER this week." In an email summarizing Teva's upcoming August 9, 2013 price increases, Patel confirmed that Teva was increasing its prices for Etodolac and Etodolac ER because Teva senior executives knew that Taro would be raising its prices on both drugs. Kevin Galownia received the email and instructed

Nisha Patel to delete those entries, but never instructed her to stop communicating with the company's competitors, including Taro.

426.    Teva and Taro raised prices for Etodolac and Etodolac ER simultaneously, with the price increases effective on August 9, 2013. Both their AWP and their WAC prices were increased to the same level. The increases were substantial. For Etodolac, Teva's average increase was 414%; for Etodolac ER, the average increase was 198%.

427.    This drug is included in the second count of DOJ's indictment of Defendant Aprahamian, which alleges that "in or around July and August 2013, defendant ARA APRAHAMIAN and [a cooperating witness] discussed and agreed to increase prices for etodolac ER," and "[a]fter being told by [a cooperating witness] that [Teva] was going to implement the agreed-upon etodolac ER price increase on or about August 9, 2013, defendant APRAHAMIAN ensured that Company A [Taro] implemented its etodolac ER increase on the same date.

### 4.  *April 2014 multi-drug coordinated price increases (Actavis, Breckenridge, Greenstone, Heritage, Lupin, Mylan, Rising, Sandoz, Taro, Teva, Versapharm)*

> *Azithromycin, Bumetanide, Cephalexin, Clarithromycin ER, Cyproheptadine HCL, Dicloxacillin Sodium, Diflunisal, Estazolam, Ethosuximide, Hydroxyzine, Ketoconazole, Medroxyprogesterone, Norethindrone Acetate - Ethinylestradiol (Mimvey), Pentoxifylline, Tamoxifen Citrate, and Theophylline ER (at least)*

428.    On April 4, 2014, Teva raised prices on twenty-two different generic drugs. Nearly all of these increases were coordinated with a number of Teva's "high-quality" competitors who by now were familiar co-conspirators, including Defendants Sandoz, Taro, Actavis, Mylan, Lupin and Greenstone. Teva also began coordinating with some of what it regarded at the time as "lesser-quality" competitors—such as Defendants Breckenridge, Heritage, Versapharm, and Rising—as new sources for anticompetitive agreements. For this price increase, Teva also

decided to lead many more price increases – which was riskier for Teva and required even greater coordination with competitors.

429.     Defendant Patel began developing the strategy for the April 2014 increases in January 2014. The strategy was well known and authorized by individuals at higher levels at Teva, including Defendants Cavanaugh and Rekenthaler. For example, on January 16, 2014, Patel sent a document to her supervisor titled "2014 Pricing Strategy Brainstorm," where she outlined her plan for implementing price increases:

### 2014 Pricing Strategy Brainstorm

- Lead more increases
- Candidate Identification:
    - Exclusive items
    - Number of competitors; Target 2-4 total players, where quality of competitor is high
    - Teva has majority share and quality of competitors is high - lead
    - Competitors with long term supply issues
    - Competitors exiting market
    - Low or limited financial exposure
    - Adjust  pricing in accordance with volume (secondary, dual, etc)
- Follow market pricing promptly
    - Delayed reactions erode pricing
    - Teva is the market leader. Ability to react to market changes should be reflective of reputation.

430.     As before, Patel prepared a list of candidate drugs for a coordinated price increase after speaking with Aprahamian (Taro), GLMK-CW-5 (Glenmark), Robin Hatosy. (Greenstone), Berthold (Lupin), Malek (Heritage), SDZ-CW-1 (Sandoz), Rogerson (Actavis), and S.C. (Breckenridge) between February 4 and February 7, 2014. Patel's price increase list included specific price points developed on the basis of information divulged from Lupin, Breckenridge, and others. The list was refined and circulated again in February 26, 2014 and an update was sent on March 17, 2014 with the title "PI Candidates." Teva, Defendants Patel and Rekenthaler both were communicating frequently with competitors Taro, Lupin, Actavis, Greenstone, Zydus,

FILED WITH REDACTIONS – PUBLIC VERSION

Heritage, and Rising in the days before the March 17 version. Teva's price increase list was finalized on April 4, 2014. An excerpt from a Teva spreadsheet shows the list:

| Product Description | Lead/Follow | Competitors |
|---|---|---|
| AZITHROMYCIN ORAL SUSPENSION | Follow | Greenstone |
| AZITHROMYCIN SUSPENSION | Follow | Greenstone |
| BUMETANIDE TABLETS | Lead | Sandoz |
| CEPHALEXIN SUSPENSION | Follow | Lupin |
| CLARITHROMYCIN ER TABLETS | Follow | Actavis; Zydus |
| CYPROHEPTADINE HCL TABLETS 4MG 100 | Follow | Breckenridge |
| DICLOXACILLIN SODIUM CAPSULES | Lead | Sandoz |
| DIFLUNISAL TABLETS | Lead | Rising |
| ESTAZOLAM TABLETS | Follow | Actavis |
| ETHOSUXIMIDE CAPSULES | Lead | Versapharm |
| ETHOSUXIMIDE ORAL SOLUTION | Lead | Versapharm |
| HYDROXYZINE PAMOATE CAPSULES | Lead | Sandoz; Actavis |
| KETOCONAZOLE CREAM 2% | Lead | Taro; Sandoz |
| KETOCONAZOLE TABLETS | Lead | Taro; Mylan |
| MEDROXYPROGESTERONE TABLETS | Follow | Greenstone |
| MIMVEY (ESTRADIOL/NORETH) TAB | Follow | Breckenridge |
| NYSTATIN ORAL TABLETS | Lead | Heritage; Mutual |
| PENTOXIFYLLINE TABLETS | Lead | Apotex; Mylan |
| TAMOXIFEN CITRATE TABLETS | Follow | Actavis |
| THEOPHYLLINE ER TABLETS 100MG 100 | Lead | Heritage |

**(a)      Cephalexin Oral Suspension**

431.      Cephalexin Oral Suspension is an antibiotic used to treat certain kinds of bacterial infections.

432.      As part of its multi-drug increase, on April 4, 2014, Teva raised its WAC prices on Cephalexin Oral Suspension to match Lupin's prices exactly. The increases to the WAC price ranged from 90% to 185% higher, depending on the formulation.

        **(b)**    **Cyroheptadine HCL and Norethindrone Acetate -**
                 **Ethinylestradiol (Mimvey)**

433.     Cyproheptadine is an antihistamine used to relieve allergy symptoms. Norethindrone Acetate - Ethinylestradiol (Mimvey) is an oral birth control pill.

434.     On November 14, 2013, Breckenridge increased its pricing on both Norethindrone-Ethinyl Estradiol tablets (Mimvey) and Cyproheptadine HCL tablets. For Cyproheptadine, Breckenridge increased its WAC pricing by as high as 150%, and raised its customer contract pricing even higher – 400%.

435.     In the weeks leading up to those increases – when Defendant Patel was still out on maternity leave – Defendant Rekenthaler had several phone calls with D.N. at Breckenridge to coordinate the price increases.

436.     Teva consistently refused to bid or take on any additional market share after the Breckenridge increase and before its multi-drug increase. For example, on February 7, 2014, a customer gave Teva an opportunity to pick up new business on Cyproheptadine. When she learned the news, Defendant Patel called S.C. at Breckenridge. After the call, Patel wrote "Let's hold off on providing a bid. We can provide a bid when we are in a position to do so (post increase)."

437.     On April 4, 2014, Teva followed the November 14, 2013 Breckenridge price increases with substantial increases of Mimvey (contract increases of as much as 393%) and Cyproheptadine HCL tablets (contract increases of as much as 526%). In addition, Teva increased the WAC price on Mimvey (Estradiol-Norethindrone acetate tablets) by 26% and the WAC price on Cyproheptadine HCL tablets by as much as 95% — to exactly match Breckenridge's WAC price on both products.

438.    Teva raised prices even higher on its customer contracts. Teva increased the contract pricing of Mimvey by as much as 393%, and the contract pricing of Cyproheptadine HCL tablets by as much as 526%.

### (c)    Pentoxifylline

439.    Pentoxifylline is a vasodilator and anti-inflammatory drug used to treat poor circulation by improving the flow of blood through blood vessels.

440.    In April 2013, Apotex hired J.H. as a senior executive and Defendant Rekenthaler (Teva) began communicating regularly with J.H. There is no record that they had ever communicated by phone before then. Their relationship continued through 2014.

441.    In the weeks leading up to Teva's price increase, Rekenthaler engaged in numerous communications with J.H. at Apotex including on March 7, 2014. During these calls, Defendant Rekenthaler gathered Apotex's pricing plans and conveyed them to Defendant Patel, also at Teva.

442.    On April 4, 2014, as part of its multi-drug price increase, Teva increased the price on Pentoxifylline by as much as 69%. Despite the fact that Apotex was the market leader at that time, Teva chose to lead the price increase on Pentoxifylline.

### (d)    Theophylline ER

443.    Theophylline ER is a bronchodilator used to open air passages in the lungs, in the treatment of heart failure, asthma, bronchitis, and pulmonary edema.

444.    In the leadup to Teva's April 4, 2014 multi-drug price increases, in February and March 2014 Jason Malek (Heritage) and Defendant Nisha Patel (Teva) had a series of phone calls discussing price increases for multiple drugs, including Theophylline ER. On February 5, 2014, Malek returned a call from Patel. The two spoke for more than an hour and discussed a price increase for at least the drugs Theophylline and Nystatin.

**(e)      Azithromycin Oral Suspension, Medroxyprogesterone**

445.      Azithromycin is an antibiotic used to treat various types of infections, including pink eye. Medroxyprogesterone is a hormone used to treat menstruation problems caused by a hormone imbalance.

446.      In the leadup to Teva's April 4, 2014 price increases, in late November and early December 2013, Defendant Greenstone began planning with Teva to increase prices on their overlap drugs including Azithromycin oral suspension and Medroxyprogesterone tablets. Because Greenstone was a high-quality competitor, and because the companies had successfully conspired to raise prices previously, it was understood between the two that if Greenstone raised prices, Teva would follow and would not seek to poach Greenstone's customers after the increase.

447.      Over the next several months – during the period of time before Teva followed Greenstone's price increases – Teva refused to bid (and so avoided taking Greenstone's market share) when requested by customers, for both Azithromycin and Medroxyprogesterone. For example, on January 27, 2014, Teva was approached by a large wholesaler asking for bids on both Azithromycin suspension and Medroxyprogesterone due to a "Change in Market Dynamics." After speaking with Hatosy that same day, Patel agreed with the recommendation not to provide a bid to that customer.

448.      Consistent with the understanding between the two companies, Teva followed Greenstone's price increases for Azithromycin oral suspension and Medroxyprogesterone tablets on April 4, 2014. Patel and Hatosy spoke twice that day.

**(f)      Clarithromycin ER, Tamoxifen Citrate, and Estazolam**

449.      Clarithromycin is an antibiotic used to treat and prevent infections. Tamoxifen is an estrogen modulator used to treat breast cancer. Estazolam is a sedative used to treat insomnia symptoms.

450.     Teva and Actavis coordinated a price increases for Clarithromycin ER tablets in the leadup to Teva's price increases on April 4, 2014. As of December 2013, Teva, Actavis and Zydus were the only three generic manufacturers actively selling Clarithromycin ER.

451.     A Cardinal bid request was forwarded to Patel on January 2, 2014. Immediately after receiving that e-mail, at 9:40am, Defendant Patel called Defendant Rogerson at Actavis. Shortly after her call with Actavis, at 10:12am, Defendant Patel wrote internally: "I think we have an opportunity to go higher. Let's aim for around $148 net and request feedback" from Cardinal.

452.     A week later, on January 9, 2014, Cardinal accepted Teva's bid at the higher price. That morning, Patel again called Rogerson. Shortly after that call, Patel sent an e-mail internally at Teva stating: "It looks like Cardinal accepted our bid at the higher price. We may have an opportunity to take some increases."

453.     Patel and Rogerson spoke on the morning of March 14, 2014. Within minutes after hanging up with Rogerson, Patel informed others at Teva about the Actavis increase:

> I'm hearing that Actavis announced a bunch of price increases yesterday. Please share any intel you gather. I believe some of the products, that overlap with Teva, are as follows (not sure if there are any more): Tamoxifen, Mirtazipine, Estazolam.

454.     Within half an hour of sending that e-mail, Patel added: "We intend to follow where we can." Patel spoke with Rogerson again later that day, and shortly after hanging up she concisely reported: "Actavis took an increase. We will follow."

455.     Teva followed the Actavis price increases on Tamoxifen Citrate and Estazolam less than three weeks later, on April 4, 2014. After the price increases became effective, Teva took steps not to disrupt the market or steal market share from Actavis. For example, on May 14, Patel declined to bid at ABC on both Tamoxifen Citrate and Estazolam, stating:

> unable to bid (strategic reasons, for internal purposes).

When Patel and her other conspirators at Teva used the term "strategic" in this context, it was code for the fact that there was an understanding in place with a competitor.

456.   Similarly, on May 21, 2014, a Teva analyst recommended that, pursuant to the fair share understanding in the industry, Teva ought not bid on a large customer for Tamoxifen Citrate "as we are first in a two-player market with good share already" (At the time, Teva had 58.4% of the market, and Actavis had 40.7%). Patel responded: "Agree. We should decline to bid."

### (g)   Ketoconazole

457.   Ketoconazole is an antifungal medication used to treat certain infections caused by fungus.

458.   For Ketoconazole cream, Teva's competitors were Taro and Sandoz. For the tablet formulation, Teva's competitors were Taro and Mylan. Teva led the price increases for both drugs, but made sure to coordinate with all of its competitors before doing so.

459.   On April 4, 2014, the day of the price increases, Patel spoke separately with both Defendant Aprahamian (Taro) and SDZ-CW-1 (Sandoz). During each call, she let them know that Teva was increasing the price of Ketoconazole. The same day, Defendant Rekenthaler spoke to Defendant Nesta of Mylan. Also, that same day, Defendant Aprahamian spoke to SDZ-CW-3 at Sandoz. They discussed the Teva increase and the fact that Taro would follow. Following an internal email from SDZ-CW-3, CW-1 at Sandoz immediately told his colleagues not to bid on any new opportunities for the drugs. That same day, Defendant Aprahamian sent a similar e-mail internally to his colleagues at Taro.

460.   On April 7, 2014 a Taro sales executive sent an internal e-mail stating: "we are not going to bid this product. . . . Taro has 27% share in a 4-player market." In a follow-up e-mail,

**FILED WITH REDACTIONS – PUBLIC VERSION**

E.G., a Director of Corporate Accounts at Taro, confirmed that Taro would decline to bid, but indicated that Taro would need to lie about the reason: "Yes, we are declining, but we need to advise its [sic.] due to supply."

461.     In the months after the Teva and Taro increases, Teva held up its end of the agreement not to poach its competitors' customers.

462.     Sandoz ultimately followed the Teva and Taro increases for Ketoconazole Cream on October 10, 2014. That same day, Defendant Patel and CW-1 at Sandoz spoke. The Teva increases on Ketoconazole were significant. For the cream, Teva, Taro and Sandoz all increased the WAC price by approximately 110%. For the tablets, Teva's WAC increases were approximately 250%, but its customer price increases were substantially larger – averaging 528%.

### (h)     Hydroxyzine Pamoate and Diflunisal Tablets

463.     Hydroxyzine Pamoate is an antihistamine useful to treat allergic itches, anxiety, and even serve as an anesthetic. Diflunisal is a nonsteroidal anti-inflammatory drug used to treat pain and arthritis.

464.     In 2013, SDZ-CW-2 left Sandoz to join Rising. At that time, Rising was already preparing to enter the market for a drug called Hydroxyzine Pamoate. Teva was one of the competitors already in that market. During several calls in early October 2013, SDZ-CW-2 coordinated with Defendants Green and Rekenthaler of Teva to acquire a large customer and facilitate Rising's entry into the Hydroxyzine Pamoate market.

465.     Later, in March 2014, SDZ-CW-2 sought to return the favor. At that time, Rising experienced supply problems for the drug Diflunisal tablets – a two-player market involving only Teva and Rising. SDZ-CW-2 contacted Defendant Rekenthaler of Teva and informed him of Rising's supply problems and the fact that Rising may have to leave the market at some point in the future. Therefore, Teva would have the opportunity to take a price increase. On April 4,

2014, Teva increased the price on Diflunisal tablets (by as much as 182%), as well as Hydroxyzine Pamoate (by as much as 165%). In the weeks leading up to those price increases, Defendant Rekenthaler communicated several times with SDZ-CW-2 at Rising to coordinate the increases.

466.    When Rising decided to leave the Diflunisal market in mid-July 2014, SDZ-CW-2 called Rekenthaler to let him know. Four months later – after Rising remedied its supply problems – Rising re-entered the market for Diflunisal. Consistent with the fair share understanding discussed above, and the rules of engagement that were generally followed in the industry, SDZ-CW-2 and Defendant Rekenthaler communicated in advance of Rising's re-entry to identify specific customers that Rising would obtain and, most importantly, to ensure the retention of the high prices that Teva had established through its price increase in April 2014. Rising's new pricing matched Teva's WAC price increase from April 2014.

### 5.    *April-May 2014 multi-drug coordinated price increases (Mylan, Teva)*

*Amiloride-HCTZ, Cimetidine, Diclofenac, Enalapril maleate, Fluvastatin caps, Flurbiprofen, Loperamide HCL, Prazosin HCL, Prochlorperazine, and Sotalol HCL (at least)*

467.    Effective April 17, 2014, Mylan increased its WAC pricing on a number of different drugs, including several that overlapped with Teva. Mylan also increased its contract prices, but at least some of those price increases would not become effective until mid-May 2014.

468.    Pursuant to the established understanding between the two companies, Teva immediately decided that it would follow the Mylan increases. On April 21, 2014, T.S., a national account executive at Teva, circulated two spreadsheets with WAC and AWP pricing information for the price increases taken by Mylan. The spreadsheets were created by Mylan personnel. In response, Patel forwarded the information to the Teva sales team and stated: "Our intention is to

follow Mylan on this increase. Below, you will see the list of increase items where Teva overlaps

with Mylan. Please share any pricing intelligence you are able to obtain. Thank you in advance!"

469.    On May 9, 2014, Nisha Patel wrote to her Teva colleagues, asking them to reach

out to Mylan. An hour and twenty minutes after the email, Rekenthaler (Teva) called Nesta

(Mylan) in order to obtain the requested Mylan price points so that Teva could carry out its

agreement to support Mylan's price increases. Patel also asked Teva Director of National

Accounts Teri Sherman to help contact Mylan to coordinate prices. "Please help!" wrote Patel "I

have ZERO intel." Patel then alluded to the fact that she had lost one of her best contacts with

Mylan when Defendant Green left Teva for Zydus. "At some point, I know I'll have to find

another source of magic 😊." The next day (May 10), Sherman sent Patel a spreadsheet entitled

"Mylan-Price List A.xls" that had been created by a Mylan employee.

470.    Teva spoke with Mylan again on May 27, 2014 (Rekenthaler and Nesta), and by

May 28 Teva had prepared a spreadsheet that reflected the agreement between Mylan and Teva.

The spreadsheet listed several drugs for a coordinated increase, categorizing them into a "bucket"

called "Follow/Urgent" with the comment "Follow Mylan increase." The drugs listed were

Amiloride-HCTZ tablets, Cimetidine tabs, Diclofenac tabs, Enalapril maleate tabs, Fluvastatin

caps, Flurbiprofen tabs, Loperamide HCL caps,[26] Prazosin HCL caps, Prochlorperazine tabs, and

Sotalol HCL tabs.

---

[26] *See* Section IV(C)(2)(c)(iv) for further details on collusion with ABC.

6. *August 2014 multi-drug coordinated price increases (Actavis, Glenmark, Sandoz, Taro, Teva, Zydus)*

*Amiloride-HCTZ, Amoxicillin-Clavulanate, Carbamazepine, Cimetidine, Clemastine Fumarate, Clotrimazole, Desmopressin, Diclofenac, Disopyramide phosphate, Enalapril maleate, Epitol, Flurbiprofen, Flutamide, Fluvastatin, Hydroxyurea, Loperamide, Penicillin V K, Prazosin HCL, and Warfarin (at least)*

471.    As part of the overarching fair share conspiracy, Teva led an effort with Sandoz, Actavis, Taro, Zydus, and Glenmark to anticompetitively increase prices on numerous drugs, as well as allocate market shares amongst the manufacturers. On August 28, 2014, Teva raised its list prices on a number of different drugs including Amiloride-HCTZ (+50% increase), Amoxicillin-Clavulanate potassium chewable tablets (+25%), Carbamazepine chew tabs (270%), Carbamazepine tabs (+1538%), Cimetidine tabs (+25%), Clemastine fumarate tabs (+45%), Clotrimazole topical solution (+208%), Desmopressin tablets (+75%), Diclofenac K tablets (+50%), Disopyramide phosphate tabs (+100%), Enalapril maleate tabs (+230%), Epitol tabs (+1538%), Flurbiprofen (+75%), Flutamide caps, Fluvastatin sodium tabs, Hydroxyurea caps, Loperamide caps, Penicillin V potassium tabs, Prazosin HCL caps, and Warfarin sodium tabs (+5%).

472.    In the month before these increases became effective, representatives from Teva, Sandoz, Actavis, Taro, Zydus, and Glenmark communicated with each other telephonically and in person at the August 23-26, 2014 NACDS annual event in Boston, Massachusetts. These communications discussed and confirmed support for price increases of the listed drugs.

473.    Teva's August 28, 2014, price increases were coordinated with its competitors and most were meant to carry through on the agreement to follow increases led by other competitors. For those drugs where Teva had agreed to lead the increase, Teva's competitors followed up with price increases as part of the same coordination.

474.     By October 10, 2014, Sandoz had joined Teva's price increase on three drugs: Amoxicillin-Clavulanate potassium chewable tablets; Diclofenac potassium tablets; and Penicillin V potassium tablets. Following the normal pattern, Defendant Patel of Teva spoke to SDZ-CW-1 of Sandoz on the day of these Sandoz price increases.

475.     By October 15, 2014 Teva knew that manufacturer Defendant Actavis would follow along with the increase plan. On December 19, 2014, Actavis followed through and increased prices for Desmopressin acetate tablets. Defendants Rekenthaler of Teva and Falkin of Actavis spoke frequently in the days and weeks leading up to the Actavis price increase.

476.     Similarly, on March 4, 2015, Mylan followed the Teva and Sandoz price increases on Diclofenac potassium tablets. Defendant Rekenthaler coordinated that price increase with Defendant Nesta of Mylan during three calls on February 18-19, 2015.

### (a)      Carbamazepine, Clotrimazole, Fluocinonide, and Warfarin

477.     On June 3, 2014—the date of the Taro price increases on Fluocinonide, Carbamazepine, Clotrimazole, Warfarin and other drugs[27]—Defendants Patel and Aprahamian exchanged five messages. After those messages, Defendant Patel reported to her Teva colleagues that Taro had in fact raised its pricing on Fluocinonide. She added:

> I expect to provide guidance at some point in the morning. I'm also hearing Warfarin, Carbamazepine as well. I'll be looking at shares and intel tomorrow and will provide commentary. (Taro is a high-quality competitor. It's just a matter of who the others are.)

478.     At 5:08pm that evening, Defendant Patel (Teva) and Defendant Aprahamian (Taro) spoke on the phone. The next morning, they sent each other texts and spoke for 26

---

[27] Zydus would also raise its price for at least Warfarin in June 2014.

minutes. Shortly after hanging up, Defendant Patel sent an e-mail to Teva Senior Director Kevin

Galownia implying that she now knew something she did not want to put into writing:

> I have additional intel (I can discuss with you) that will be useful.

479.    On June 13, 2014, Defendant Patel sent an internal e-mail alerting her group,

including her supervisor K.G., about a list of drugs on which Teva planned to raise prices. A

number of them—including Carbamazepine chewable tablets, Carbamazepine tablets,

Clotrimazole topical solution, Fluocinonide emollient cream and gel,[28] and Warfarin sodium

tablets—included the notation "Follow/Urgent- Taro" as the reason for the increase. For that list

of drugs, Defendant Patel directed that "we should not provide any decreases on these products."

Defendant Patel's directive meant that Teva would not seek to compete for market share against

Taro or Zydus when approached by customers due to those competitors' price increases.

480.    On August 28, 2014, Teva followed the Taro price increases on Fluocinonide,

Carbamazepine tablets and chew tablets, Clotrimazole topical and Warfarin tablets.

481.    Agreements between Taro and Teva to rig bids, fix prices, and allocate customers

for Carbamazepine, Clotrimazole, Fluocinonide, and Warfarin (among others) are specifically

described in Defendant Ara Aprahamian's indictment.  Agreements between Taro and Sandoz

regarding Clotrimazole and Fluocinonide are also described in the indictment.  The indictment

alleges that these wrongful acts occurred from at least as early as March 2013 until at least

December 2015, which would include this multi-drug coordinated price increase.

---

[28] IRPs previously brought claims against Actavis, Taro, and Teva for anticompetitive conduct concerning Fluocinonide cream, emulsified base cream, gel, and ointment in *In re Fluocinonide Cases*, No. 17-cv-3818, 16-FL-27243 (E.D. Penn.).  Only the emollient cream formulation is included in IRPs' claims in this Complaint.

(b)     **Topiramate sprinkle**

482.     Topiramate sprinkle capsules are used to treat epileptic seizures and migraines. As part of the overarching fair share agreement, Teva and Zydus agreed to the allocation of market share for Topiramate sprinkle caps between the manufacturers. Partaking in the fair share agreement, they also anticompetitively increased the price of the drug.

483.     In June 2014, Defendant Zydus increased the prices of the drug. In the days following the price increase, Teva and Zydus coordinated regarding the drug through calls between Patel, Rekenthaler (Teva) and Green (former Teva, then Zydus), and Patel and Green (Zydus). The strategy was in place by around June 13 as evidenced by the aforementioned internal Teva email ("note that we intend to follow [the] Taro and Zydus increase price.")

484.     Defendant Patel sent a directive not to compete for market share against Zydus when approached by customers due to the Zydus price increase for the drug.

**7. *January 2015 multi-drug coordinated price increases (Actavis, Amneal, Dr. Reddy's, Heritage, Lannett, Mylan, Par, Sandoz, Taro, Teva)***

*Bethanechol, Carbidopa/Levodopa, Ciprofloxacin, Danazol, Diltiazem HCL, Estradiol, Fluoxetine HCL, Fluvastatin, Glimepiride, Griseofulvin, Isoniazid, Ketoprofen, Ketorolac Tromethamine, Methyldopa, Nortriptyline HCL, and Penicillin (at least)*

485.     As part of the overarching fair share conspiracy, Teva led an effort with Actavis, Amneal, Dr. Reddy's, Heritage, Lannett, Mylan, Par, Sandoz, and Taro to anticompetitively increase prices on numerous drugs, as well as allocate market shares amongst the manufacturers.

486.     On January 28, 2015, Teva raised prices on a number of different drugs, including the drugs listed in this section below, which shows a spreadsheet found in a Teva Excel file.[29]

---

[29] Additional rows listing more dosage forms and additional columns with information such as market share percentage for each competitor, old price, and new price have been cropped to fit the page. Apart from these edits, the information appears exactly as it did to the conspirators in

Nisha Patel or David Rekenthaler arranged these price increases on calls with Defendants Actavis, Amneal, Dr. Reddy's, Heritage, Lannett, Mylan, Par, Sandoz, and Taro.

487.    By this time, Patel had been promoted to Director of National Accounts (she was formerly Director of Customer Marketing) and her former supervisor Kevin Galownia became the one responsible for Teva's price increase coordination spreadsheet. Patel continued her outreach to competitors, however.

488.    A May 29, 2015 version of the spreadsheet contained additional notes on the coordinated price increases led by Teva: for Danazol capsules (90% increase), someone had noted "Lannett followed February 2015," for Diltiazem HCL and Ketorolac tromethamine tablets (both 90% increase) someone had noted "Mylan followed March 2015," and for Estradiol tablets (90% increase), someone had noted "Actavis followed May 2015."

---

2015, including the coloring, font type, and text. Note: Propranolol HCL is included solely to keep fidelity with the original chart. It is not among the drugs at issue for this complaint.

**FILED WITH REDACTIONS – PUBLIC VERSION**

| Product Description | Price Increase Strategy | Reason for Increase | % WAC Increase | Comp 1 | Comp 2 | Comp 3 | Comp 4 | Comp 5 |
|---|---|---|---|---|---|---|---|---|
| BETHANECHOL CHLORIDE TABLETS 5MG 100 | Market Intel | Follow Competitor -Amneal | 26% | AMNEAL | WOCKHARDT | RISING | GLOBAL | UPSHER-SMITH |
| BETHANECHOL CHLORIDE TABLETS 10MG 100 | Market Intel | Follow Competitor -Amneal | 50% | AMNEAL | WOCKHARDT | RISING | GLOBAL | UPSHER-SMITH |
| CARBIDOPA/LEVODOPA TAB 10MG/100MG 100 | 50% Increase | Lead -Limited Competition | 50% | ACTAVIS | MYLAN | SUN | | |
| CIPROFLOXACIN TABLETS 250MG 100 | 193% Increase | Follow Competitor -DRL & Actavis | 193% | ACTAVIS | DR. REDDYS | WESTWARD | NSTAR | PACK |
| CIPROFLOXACIN TABLETS 500MG 100 | 186% Increase | Follow Competitor -DRL & Actavis | 186% | ACTAVIS | DR. REDDYS | WESTWARD | NSTAR | PACK |
| CIPROFLOXACIN TABLETS 500MG 500 | 201% Increase | Follow Competitor -DRL & Actavis | 201% | ACTAVIS | DR. REDDYS | WESTWARD | NSTAR | PACK |
| CIPROFLOXACIN TABLETS 750MG 100 | 460% Increase | Follow Competitor -DRL & Actavis | 460% | ACTAVIS | DR. REDDYS | WESTWARD | NSTAR | PACK |
| DANAZOL CAPSULES 50MG 100 | 90% Increase | Lead -Semi-Exclusive | 90% | LANNETT | | | | |
| DILTIAZEM HCL TABLETS 30MG 100 | 90% Increase | Lead -Semi-Exclusive | 90% | MYLAN | | | | |
| DILTIAZEM HCL TABLETS 120MG 100 | 90% Increase | Lead -Semi-Exclusive | 90% | MYLAN | | | | |
| ESTRADIOL TABLETS 0.5MG 100 | 90% Increase | Lead -Semi-Exclusive | 90% | ACTAVIS | MYLAN | | | |
| ESTRADIOL TABLETS 1MG 100 | 90% Increase | Lead -Semi-Exclusive | 90% | ACTAVIS | MYLAN | | | |
| ESTRADIOL TABLETS 2MG 100 | 90% Increase | Lead -Semi-Exclusive | 90% | ACTAVIS | MYLAN | | | |
| FLUOXETINE HCL TABLETS 10MG 30 | 612% Increase | Mylan (New Market Entrant) | 612% | PAR | MYLAN | | | |
| FLUOXETINE HCL TABLETS 10MG 1000 | 571% Increase | Mylan (New Market Entrant) | 571% | PAR | MYLAN | | | |
| GLIMEPIRIDE TABLETS 1MG 100 | 300% Increase | Follow Competitor- DRL | 300% | DR. REDDYS | ACCORD | INT LABS | VIRTUS | BLUEPOINT |
| GLIMEPIRIDE TABLETS 2MG 100 | 300% Increase | Follow Competitor- DRL | 300% | DR. REDDYS | ACCORD | INT LABS | VIRTUS | BLUEPOINT |
| GLIMEPIRIDE TABLETS 4MG 100 | 300% Increase | Follow Competitor- DRL | 300% | DR. REDDYS | ACCORD | INT LABS | VIRTUS | BLUEPOINT |
| GRISEOFULVIN SUSPENSION 125MG/5ML 120ML | 50% Increase | Follow Competitor- Actavis | 50% | ACTAVIS | QUALITEST | PERRIGO | | |
| ISONIAZID TABLETS 100MG 100 | 50% Increase | Lead -Limited Competition | 50% | SANDOZ | LANNETT | WESTWARD | VERSAPHARM | |
| ISONIAZID TABLETS 300MG 100 | 50% Increase | Lead -Limited Competition | 50% | SANDOZ | LANNETT | WESTWARD | VERSAPHARM | |
| KETOPROFEN CAPSULES 50MG 100 | 90% Increase | Lead -Semi-Exclusive | 90% | MYLAN | | | | |
| KETOPROFEN CAPSULES 75MG 100 | 90% Increase | Lead -Semi-Exclusive | 90% | MYLAN | | | | |
| KETOROLAC TROMETHAMINE TABLETS 10MG | 90% Increase | Lead -Semi-Exclusive (Mylan Supply Issues) | 90% | MYLAN | | | | |
| METHYLDOPA TABLETS 250MG 100 | 90% Increase | Lead -Semi-Exclusive | 90% | MYLAN | ACCORD | | | |
| METHYLDOPA TABLETS 500MG 100 | 90% Increase | Lead -Semi-Exclusive | 90% | MYLAN | ACCORD | | | |
| NORTRIPTYLINE HCL CAPSULES 10MG 100 | 90% Increase | Lead- Cost of Goods Increased | 90% | ACTAVIS | TARO | | | |
| PENICILLIN VK SOLUTION 125MG/5ML 100ML | 90% Increase | Lead- Semi Exclusive | 90% | DAVA | | | | |
| PENICILLIN VK SOLUTION 125MG/5ML 200ML | 90% Increase | Lead- Semi Exclusive | 90% | DAVA | | | | |
| PENICILLIN VK SOLUTION 250MG/5ML 100ML | 90% Increase | Lead- Semi Exclusive | 90% | DAVA | | | | |
| PROPRANOLOL HCL TABLETS 10MG 100 | Market Intel | Follow Competitor - Actavis | 605% | HERITAGE | ACTAVIS | QUALITEST | NSTAR | MYLAN |
| PROPRANOLOL HCL TABLETS 10MG 1000 | Market Intel | Follow Competitor - Actavis | 690% | HERITAGE | ACTAVIS | QUALITEST | NSTAR | MYLAN |
| PROPRANOLOL HCL TABLETS 20MG 100 | Market Intel | Follow Competitor - Actavis | 632% | HERITAGE | ACTAVIS | QUALITEST | NSTAR | MYLAN |
| PROPRANOLOL HCL TABLETS 40MG 100 | Market Intel | Follow Competitor - Actavis | 755% | HERITAGE | ACTAVIS | QUALITEST | NSTAR | MYLAN |
| PROPRANOLOL HCL TABLETS 60MG 100 | Market Intel | Follow Competitor - Actavis | 43% | HERITAGE | ACTAVIS | QUALITEST | NSTAR | MYLAN |
| PROPRANOLOL HCL TABLETS 80MG 100 | Market Intel | Follow Competitor - Actavis | 790% | HERITAGE | ACTAVIS | QUALITEST | NSTAR | MYLAN |
| PROPRANOLOL HCL TABLETS 80MG 500 | Market Intel | Follow Competitor - Actavis | 838% | HERITAGE | ACTAVIS | QUALITEST | NSTAR | MYLAN |
| FLUVASTATIN SODIUM CAPSULES 20MG 100 | 47% Increase | Follow Competitor -Mylan | 47% | MYLAN | | | | |
| FLUVASTATIN SODIUM CAPSULES 40MG 100 | 11% Increase | Follow Competitor -Mylan | 11% | MYLAN | | | | |

FILED WITH REDACTIONS – PUBLIC VERSION

(a)     **Ciprofloxacin HCL, Glimepiride**

489.     Ciprofloxacin hydrochloride, also known by various brand names including Cetraxal, Otiprio and Ciloxan, is a multipurpose antibiotic. Glimepiride is an oral diabetes medication used to treat Type 2 diabetes.

490.     Dr. Reddy's significantly increased its pricing on both Ciprofloxacin tablets and Glimepiride tablets on August 18, 2014. In the days and weeks leading up to the Dr. Reddy's price increases for these drugs a senior sales executive at Dr. Reddy's spoke frequently with Defendant Patel about the planned price increases.

491.     Teva ultimately joined Dr. Reddy's price increases during its January 28, 2015 price increases. Teva matched Dr. Reddy's WAC price exactly for both Ciprofloxacin HCL and Glimepiride. When Teva did follow the Dr. Reddy's (and Actavis) price increases on Ciprofloxacin HCL and Glimepiride, on January 28, 2015, Teva raised its WAC pricing to match Dr. Reddy's WAC prices exactly. That same day, Dr. Reddy's was (again) able to obtain a full copy of Teva's price increase list. That list included many drugs that Dr. Reddy's did not market.

492.     Actavis—the only other "quality competitor" in the market for Ciprofloxacin—increased its pricing for that drug on December 19, 2014 to exactly match Dr. Reddy's WAC pricing. In the days leading up to the Actavis price increase, Defendant Rekenthaler of Teva spoke to Defendant Falkin of Actavis several times to coordinate the increase.

(b)     **Griseofulvin microsize oral suspension**

493.     Griseofulvin microsize oral suspension, also known by the brand name Grifulvin V, is a medication used to treat fungal infections of the skin, hair and nails that do not respond to creams or lotions.

494.     On September 9, 2014, Actavis notified its customers of a price increase on Griseofulvin. In the days leading up to September 9, 2014, Defendants Patel and Rekenthaler of

- 156 -

Teva communicated with Defendants Falkin and Rogerson of Actavis to coordinate the increase. The Actavis price increase became effective on October 6, 2014.

495.    Teva promptly added Griseofulvin to its own price increase list, with the notation "Follow Competitor – Actavis" as the reason for the price increase. Teva followed the Actavis increase for Griseofulvin during the next mass price increase event on January 28, 2015 and matched Actavis's WAC pricing exactly. In the days leading up to that price increase, Defendants Rekenthaler of Teva and Falkin of Actavis coordinated frequently.

### (c)    Bethanechol CL

496.    One of the drugs listed for a January 28, 2015 increase was Bethanechol chloride tablets, which are used to treat urination issues after pregnancy or surgery. On January 6, 2015, Patel had a fifty-minute call with Amneal's S.R.-1 during which she agreed to support Amneal's higher prices. Under the header "Reason for Increase," Teva's spreadsheet noted "Follow Competitor – Amneal," In accordance with the overarching rules of fair share, Teva did not use Amneal's price increase as an opportunity to take share even though Amneal had a 65% share in a four-player market.

## D.    Further Episodes Illustrating Defendants Fixing Prices, Allocating Markets, and/or Rigging Bids

### 1.    Fenofibrate (Cardinal, Teva, Dr. Reddy's, Lupin, Mylan, Zydus)

497.     Fenofibrate (brand name: Tricor) is a cholesterol drug that lowers levels of "bad" low-density lipids and raises "good" cholesterol (HDL) levels in the blood. As part of the overarching fair share agreement, Teva, Mylan, Lupin, Zydus, Dr. Reddy's, and Cardinal agreed to the allocation of market share for the drug between the manufacturers.

498.    Executives from Teva, Mylan, and Lupin—at the time, the only manufacturers of Fenofibrate—conspired to divvy up the market for the drug. From May 6-9, 2013, both

Defendants Patel and Green (Teva) had multiple calls with Defendant David Berthold (Lupin), who had multiple calls with Nesta (Mylan), who closed the loop with multiple calls to Green (Teva). On the afternoon of May 7, 2013, Nesta called Berthold immediately after hanging up with Green.

499.    On May 10, 2013, even before Mylan had made formal offers to any of Teva's customers, Teva concluded that it was best to give Mylan a certain account and updated a report designed "to determine who we want to keep and who we want to concede" to Mylan. Green and Patel (Teva) then had calls to confirm the market allocation scheme with Nesta (Mylan) who spoke to each of them on separate calls, and with Berthold (Lupin), who spoke with Patel.

500.    The market allocation went as planned. On May 15, 2013, less than an hour after receiving the notice of Mylan's price challenge from the agreed-upon account, Defendant Green sent an email in which he recommended conceding the account to Mylan based on "prior conversations." Teva executive Kevin Galownia agreed "this is the customer we should concede on Fenofibrate."

501.    Defendant Green left Teva in November 2013 and took a position as an Associate Vice President of National Accounts at manufacturer Defendant Zydus. Once at Zydus, Green took advantage of his relationships with his former Teva colleagues to collude with Teva and other competitors on several Teva/Zydus overlap drugs, including Fenofibrate.

502.    On or about March 7, 2014, Zydus entered the Fenofibrate market at WAC pricing that matched the price offered by Teva, Mylan, and Lupin. In the days leading up to the launch, Defendants from all four competitors were in regular contact with each other to discuss pricing and allocation of market share to Zydus for several products, including Fenofibrate. In the

FILED WITH REDACTIONS – PUBLIC VERSION

months that followed, Teva "strategically conceded" several customers to Zydus in accordance with the agreement they had reached.

503.    On June 10, 2014, a Teva Senior Analyst sent an internal email regarding a new request from a customer and wrote "We are going to concede this business to Zydus per upper management." The customer— distributor Anda, which was wholly-owned by Defendant Actavis at the time and is now wholly-owned by Teva—was fully aware that Teva was conceding its business to Zydus because Zydus was a new entrant.

504.    When Defendant Dr. Reddy's launched Fenofibrate in spring 2014, Mylan ceded share to Dr. Reddy's. By June 10, 2014, Mylan had communicated to Defendant Cardinal that it would not let go any more Fenofibrate business to Dr. Reddy's, and Cardinal had informed Dr. Reddy's that it needed to be "done" taking share from Mylan.

## 2.  *Clonidine (Teva, Actavis, Mylan)*

505.    Clonidine-TTS Patch—also known by the brand name Catapres-TTS —is a medication in the form of a transdermal patch that is used to treat high blood pressure. As part of the overarching fair share agreement, Teva, Mylan, and Actavis agreed to the allocation of market share for the drug between the manufacturers, as well as price increases for the drug.

506.    As of September 2011, Mylan and Teva were at rough parity in the market for generic Clonidine-TTS, with Mylan at 48.4% market share and Teva at 44.4%. But, by February 2012, Teva had taken more than its "fair share." To gain back some market share, Mylan challenged Teva's Clonidine-TTS business at McKesson. According to internal emails, in order to de-escalate the situation, Teva "conceded the McKesson business to Mylan." Mylan then took Teva's business at CVS in order to punish Teva for having taken the Cardinal account for the drug, in violation of the fair share rules.

507.     On September 28, 2012 Mylan issued a temporary discontinuation notice for Clonidine-TTS. Mylan's exit from the Clonidine-TTS market presented an opportunity to raise prices and collusively reallocate the market at the inflated prices when Mylan fully reentered the market in February 2013. For example, in April 2012, Teva's direct invoice price to CVS for 0.3mg Clonidine had been $54.41. Mylan's retaliation against Teva dropped the price to $26.51. But when Mylan then ceded the entire Clonidine market to Teva in October 2012, Teva was able to raise the price to $80.76.

508.     To carry out their scheme to allocate the Clonidine-TTS market without eroding price, representatives of Teva and Mylan remained in regular contact. In February and March 2013 alone, Teva and Mylan representatives called each other at least 33 different times. By April 2013 Teva had "conceded all customers [it] plan[ned] on conceding."

509.     Having successfully allocated the market, Mylan and Teva next conspired to raise prices of Clonidine-TTS. On April 8, 2013 a marketing manager at Teva reported internally to his Teva colleagues that Mylan had agreed to raise prices: "Based on a discussion with Kevin Green, Mylan would follow a price increase."

510.     On May 6, 2014, Actavis was granted approval to market Clonidine-TTS. Teva and Actavis immediately commenced an extensive negotiation over price and market share. Following those conversations, Patel informed her Teva colleagues that Actavis wanted 25% of the market and would likely want 10%-15% of that share from Teva. Rekenthaler described to his colleagues the agreement he was willing to strike with Actavis over market share, saying: "I'm okay with adjusting 15% but we're not going to play any games with them. They take the 15% and I don't want to hear about this product again."

FILED WITH REDACTIONS – PUBLIC VERSION

511.     Over the next two weeks, following the rules of the overarching conspiracy, Teva continued to concede accounts to newcomer Actavis in order to apportion Actavis its fair share of the market for Clonidine-TTS.

### 3.   *Levonorgestrel-Ethinylestradiol (Teva, Sandoz)*

512.     Ethinylestradiol-Levonorgestrel is a combination birth control drug (a single pill containing both Ethinylestradiol and Levonorgestrel molecules). During the relevant time period, both Teva and Sandoz marketed Ethinylestradiol-Levonorgestrel under multiple names including both Portia and Jolessa.   As part of the overarching fair share agreement, Teva, and Sandoz agreed to the allocation of market share for the drug between the manufacturers.

513.     In May 2012, Teva had a much higher market share than Sandoz for both Portia and Jolessa. Teva's market share for Portia was 37% compared to Sandoz's 17%, while Teva's market share for Jolessa was 43% compared to Sandoz's 11%.

514.     On May 11, 2012, a customer (Walmart) told Teva that another manufacturer had made an offer to supply Portia and Jolessa. Teva sent Walmart response offers on May 16 and May 18, 2012, but Teva abruptly backtracked on May 23, 2012 and removed Portia and Jolessa from the offer. The night before this change in plans, Defendant Green (then at Teva) had spoken on the phone with cooperating witness SDZ-CW-2 (then at Sandoz) and had agreed to withdraw the offer for Portia and Jolessa. The decision to concede the Walmart business to Sandoz led to a more equal share split between the companies for both Portia and Jolessa.

515.     A year later, Sandoz continued to coordinate with Teva to achieve its fair share of the markets for both Portia and Jolessa. As a result of communications between Patel and SDZ-CW-1 (Sandoz) and Rekenthaler and SDZ-CW-2 in July 2013, Teva submitted an intentionally inflated bid for Portia and Jolessa in order to ensure that Sandoz obtained the primary award with the customer.

### 4. *Valsartan-HCTZ (Mylan, Sandoz)*

516.     Valsartan-HCTZ is an antihypertensive drug used to treat high blood pressure. As part of the overarching fair share agreement, Sandoz and Mylan agreed to the allocation of market share for the drug between the manufacturers.

517.     In the days leading up to the launch of Valsartan-HCTZ in the fall of 2012, SDZ-CW-4 and Defendant Jim Nesta (Mylan) spoke at least twenty-one (21) times by phone during which they discussed, among other things, establishing a 50% / 50% market share split for this product. On the day of the launch, H.F., a senior-most executive of Sandoz Germany wrote regarding Mylan "sometimes a little help from our competition is welcome as well." D.D., a senior-most executive of Sandoz North America, replied "I guess this is what they call 'co-opetition.'"

518.     On November 16, 2012, Sandoz executives met to discuss sales for Valsartan-HCTZ. A then-Sandoz executive who is now an Executive Vice President at Defendant ABC sent an internal e-mail in advance of the meeting, asking "Are there opportunities with non-Sandoz customers that we should evaluate?"  After a colleague responded with a list of potential Mylan customers, Kellum responded, "I'm concerned we are going to disrupt the market. I understand the need for additional sales but we need to be thoughtful here." The then-Sandoz, now-ABC executive directed the Sandoz team "Do not approach new customers, with[out] me or Armando [Kellum]'s consent."

### 5. *Dexmethylphenidate ER (Teva, Par, Sandoz)*

519.     Dexmethylphenidate HCL Extended Release ("Dexmeth ER") is a generic version of the drug Focalin, and it is used to treat attention deficit hyperactivity disorder (ADHD). As part of the overarching fair share agreement, Teva, Sandoz, and Par agreed to the allocation of market share for the drug between the manufacturers.

FILED WITH REDACTIONS – PUBLIC VERSION

520.     As Sandoz was preparing to enter the market on the 40mg strength of Dexmeth ER in February 2014, Nisha Patel (Teva) spoke frequently with SDZ-CW-1 about how to divide the market so that Sandoz could obtain its fair share without significantly eroding the price.

521.     In January 2014, Par gave up an account to Sandoz in order to keep the market share even. Notes by a Par sales and marketing executive confirm that Par also ceded ABC and had "let it go because Sandoz needed market share." In February 2014, as Sandoz was seeking share on the 15mg dosage strength of Dexmeth ER, Par "gave up the business to keep the market share even."

522.     In February 2014, Teva conceded its Rite Aid account to Sandoz, in accordance with the agreement, and also agreed to let Sandoz have the ABC portion of the WBAD business for the 40mg strength of Dexmeth ER so long as Teva could keep the Walgreens portion. Teva also refused to lower its price for Dexmeth ER when approached by another customer, Anda, even though Sandoz's price was not significantly lower than Teva's—essentially conceding the business to Sandoz.  (At the time, distributor Anda was owned by Defendant Actavis, although it was purchased by Defendant Teva in 2016). The market allocation scheme between Teva and Sandoz on Dexmeth ER continued through at least mid-2015.

### 6. *Lamivudine-Zidovudine (Combivir) (Teva, Aurobindo, Lupin)*

523.     Lamivudine-Zidovudine (brand name: Combivir) is a combination drug used to help control the HIV virus, ideally suppressing or delaying the onset of AIDS. Although the Defendants typically refer to drugs by generic names, they consistently call this drug Combivir. As part of the overarching fair share agreement, Teva, Lupin, and Aurobindo agreed to the allocation of market share for the drug between the manufacturers.

524.     In April 2012, Teva, the incumbent, communicated with new entrants Lupin and Aurobindo about how to allocate the market for Combivir. Teva Senior Director Teri Coward

- 163 -

asked "what r you guys hearing on generic combivir" and David Rekenthaler immediately wrote

back that he knew Aurobindo was entering soon because "our good friend" had told him.

Rekenthaler did not want to specify the source of his information because it was Aurobindo CEO

Bob Cunard, who was indeed their friend and former colleague (he had been at Teva as Vice

President of Sales until October 2011).  That same day, Teva's Kevin Green called and spoke to

Jim Grauso (Aurobindo) and David Berthold (Lupin) and reported specific information regarding

Lupin's confidential future plans for bidding.

525.    In the days before the Lupin and Aurobindo launches, communications among all

three competitors accelerated. Over the four-day period from May 7-10, 2012, Berthold (Lupin),

Green (Teva) and Grauso (Aurobindo) spoke at least 32 times. On multiple occasions, a call

between two competitors was followed by a call to the third. During this four-day period, the

Lupin, Aurobindo and Teva negotiated and discussed the specific customers Teva would concede

or retain in order to make room for Lupin and Aurobindo while preventing price competition. A

Teva internal email shows the results of the decisions to retain or concede accounts to Lupin and

Aurobindo in accordance with the fair share agreement.

526.    On May 9, 2012, Teva's Teri Coward was directed to provide a sham bid to a

major customer (She was told to "send them a proposal that will not work"). On May 11, 2012,

when preparing that bid, she pushed back. "Can we send something that at least looks like we are

trying?"  But Kevin Galownia replied that Teva could not go any lower or else they might risk

actually winning the business. "We really need to concede this business with the accounts we

have kept." He added that Teva would concede another major customer "in order to preserve

market pricing as much as possible." He pointed out that such a move would give Teva its fair

share as the first entrant. "40-45% market share in a three player market." Teri Coward then

informed ▮▮▮ (Cardinal) that Teva would not compete for its business because "we need to concede some share." Lupin was able to enter the market for generic Combivir and obtain more than a 30% market share without significantly eroding the price due to the understanding with Teva and Aurobindo that each was entitled to its fair share of the market.

### 7. *Irbesartan (Teva, Lupin)*

527.     Irbesartan is a drug used in the treatment of hypertension. It prevents the narrowing of blood vessels, thus lowering the patient's blood pressure. Irbesartan is also known by the brand name Avapro. As part of the overarching fair share agreement, Teva and Lupin agreed to allocation of market share for the drug between the manufacturers.

528.     Teva received approval to manufacture generic Irbesartan in March 2012. At 11:27am on March 6, 2012, an account manager at Teva wrote to the Teva sales team "Lupin is promising offers today." Less than twenty minutes later, Kevin Green (still at Teva at the time) called Berthold (Lupin), they talked for seventeen minutes, and then Green e-mailed his colleagues:

> Lupin is looking for 15% share. They already have ABC. Confirmed Zydus is out.

529.     At 10:54am the next day, March 7, 2012, Green called Berthold again. By 12:20pm, Teva circulated to its sales team competitively sensitive information Green had obtained from Berthold. Included were the details about which competitors were launching/not launching the drug, and the identity of the customers that had received offers. Based on those details and the conversations between Green and Berthold, Teva calculated it could take about 40% share if Lupin was only looking for 15%.

FILED WITH REDACTIONS – PUBLIC VERSION

### 8. *Drospirenone-Ethinylestradiol (Teva, Actavis, Lupin)*

530.    Drospirenone and Ethinylestradiol, commonly known by the brand name Ocella, is a pair of drugs used in combination as an oral contraceptive. Other names are Yaz, Yasmin and Gianvi. As part of the overarching fair share agreement, Teva, Lupin, and Actavis agreed to the allocation of market share for the drug between the manufacturers.

531.    In April 2013, Lupin began coordinating with competitors for a summer 2013 entry into the market. By the end of that month, Defendant Actavis had also joined the fair share negotiations.

532.    On May 8, 2013, Teva learned that Actavis had bid to take over a current Teva account for generic Ocella. In response, Teva communicated with Actavis and Lupin, and drew up an internal report that described the specifics involved in Teva's concession of major Ocella customers to Actavis and/or Lupin. On May 14, 2013, Kevin Galownia recommended that Teva concede the business to Actavis. Rekenthaler replied "Agreed."

533.    On July 10, 2013, Teva and Lupin discussed Lupin's launch in the market, requiring more agreement as to allocation of market share. Teva again drew up an internal report. Later that day, Green and Patel discussed the scheme and the two decided that Patel would call Berthold back to confirm the agreement between Teva and Lupin. Patel did so. The lines of communication between Teva and Lupin remained open and active over the next few months as they worked out the details of their customer allocation agreement.

534.    In mid-October 2013, as Teva and Lupin finalized the allocation of accounts between them, a Teva Senior Director told a colleague to be careful before conceding large customers on a "bucket basis" rather than drug-by-drug in order to "make sure we are not giving up volume on products where we do not have our fair share."

### 9.  *Norethindrone-Ethinylestradiol (Ovcon 35) (Teva, Lupin)*

535.     Norethindrone-Ethinylestradiol, also known by the brand name Ovcon35, is a combination of medications used as an oral contraceptive. Teva markets its generic version of this combination medication under the name Balziva. As part of the overarching fair share agreement, Teva, and Lupin agreed to allocate market share for the drug.

536.     On January 23, 2014, a customer informed Teva that a new market entrant was seeking a share of its business in Ovcon 35. Teva employees surmised that the entrant was Lupin and discussed internally how to make room for this new player in the market. The next day, January 24, 2014, Defendant Nisha Patel (Teva) spoke to Defendant David Berthold (Lupin) twice by phone.

537.     Five days later, on January 29, 2014, based on her calls with Lupin, Patel informed Rekenthaler of her recommendation that Teva take a cooperative stance towards Lupin. "Kevin [Green] and I are in agreement that we should concede part of the business to be responsible in the market."

538.     On February 4, 2014 Patel received the profitability analysis she requested in order to determine how much of the customer's business to hand over to Lupin. That same day, she spoke to Berthold two more times to further coordinate Lupin's seamless entry into the market.

### 10. *Oxaprozin (Teva, Dr. Reddy's, Greenstone, Sandoz)*

539.     Oxaprozin, also known by the brand name Daypro, is a nonsteroidal anti-inflammatory drug (NSAID). It is used to treat rheumatoid osteoarthritis, and juvenile rheumatoid arthritis. As part of the overarching fair share agreement, Dr. Reddy's Greenstone, Sandoz and Teva and agreed to increase price and allocate market share between the manufacturers.

**FILED WITH REDACTIONS – PUBLIC VERSION**

540.     In the summer of 2012, Teva's Kevin Green coordinated an Oxaprozin price increase with his competitors at Sandoz, including Defendant Kellum. As per their understanding that Sandoz would not undercut Teva-led price increases, Sandoz sextupled its prices in November 2012 to match or exceed Teva's WAC prices. Internal Sandoz emails from January 2013 confirm that Sandoz stayed true to the agreement by refraining from selling Oxaprozin to new customers because "Teva did the right thing here."

541.     In early 2013 Greenstone wanted in on the Oxaprozin market, so Kevin Green (Teva) and Robin Hatosy (Greenstone) had multiple calls during which Teva agreed to concede specific customers to Greenstone in order to avoid competition and price erosion resulting from Greenstone's entry. Greenstone entered the market for Oxaprozin 600mg tablets on March 27, 2013 with the exact same WAC pricing as Teva.

542.     A couple of months later, as Defendant Dr. Reddy's was preparing to enter the market for Oxaprozin, a Dr. Reddy's representative commented positively that "[p]ricing [is] still high" on Oxaprozin. That individual had also talked to distributor Defendant Cardinal about other manufacturers' intentions and was told that Teva had been "fine with" allowing Greenstone to take the Cardinal business at the same price.

543.     On June 27, 2013, Dr. Reddy's re-launched Oxaprozin with the same WAC price as Teva. Eager to obtain a large customer, Dr. Reddy's turned its sights to Walgreens. While the Dr. Reddy's offer to Walgreens was still pending—on July 23, 2013—an individual at Dr. Reddy's called Green. That phone call was the only call between the two individuals in their collected phone records. Two days later, Green wrote:

> If we give D[r. Reddy's] this business, they may be satisfied. I will
> see if I can find this out.

- 168 -

544.     On July 29, 2013, on Teva internal email, Kevin Galownia suggested keeping Walgreens but conceding Teva's next largest customer for Oxaprozin—Econdisc—to Dr. Reddy's. David Rekenthaler immediately asked Nisha Patel to "look at our business on Oxaprozin in order to accommodate Dr. Reddy's entry." Within a few hours, Rekenthaler placed a call to a Senior Director of National Accounts at Dr. Reddy's. The call lasted two minutes, and was their only telephone conversation in 2013. After the conversation, Teva kept the Walgreens business but gave up the Econdisc business to Dr. Reddy's on August 7, 2013.

545.     Kevin Green listed "Strategic Market Conditions" in Teva's Delphi database as the reason for conceding the business to Dr. Reddy's.  By September 10, 2013, in coordination with Teva, Dr. Reddy's had achieved its goal of obtaining 20% share of the Oxaprozin market.

### 11. Tolterodine tartrate (Teva, Greenstone)

546.     Tolterodine tartrate, also known by the brand name Detrol, is an antispasmodic drug used to treat overactive bladder by improving the ability to control urination. As part of the overarching fair share agreement, Teva and Greenstone agreed to the allocation of market share for the drug between the manufacturers.

547.     On January 23, 2014 Greenstone entered the market for Tolterodine tartrate 1mg and 2mg tablets with the exact same WAC prices as Teva for all formulations. In the days leading up to Greenstone's entry, Teva and Greenstone agreed that Teva would concede business to Greenstone in order to avoid significant price erosion in the market.

548.     The day after Greenstone's entry, Patel circulated an email to the Teva national account managers that stressed the importance of determining which competitors had made price challenges for certain business. The identity of the competitor was key because the primary criterion for the decision to concede accounts was fair share, not profitability.

- 169 -

549.     On January 28, 2014, Teva learned of a price challenge on Tolterodine at CVS. Internal Teva emails asked "do we know who this could be?" and David Rekenthaler responded "It's Greenstone, new to market. We can discuss." His Teva colleagues understood the message as an implicit signal that he had insider info from Greenstone and that he wanted to keep the discussion offline.

550.     On February 3, 2014, Nisha Patel instructed a colleague at Teva to concede the business at CVS by providing a small price reduction that she knew would not be sufficient to retain the business. The account manager who managed the relationship with CVS challenged the decision to concede the business. Rekenthaler emailed again in an attempt to keep the discussion offline:

> I'll discuss the details of this with you later. There was a strategy here and you weren't in the office Thursday or Friday so we proceeded. Again, it will make sense after I discuss with you.

The next day, February 4, 2014, Patel confirmed the market share allocation agreement between Teva and Greenstone in a sixteen-minute phone call with Hatosy.

### 12. Piroxicam (Teva, Greenstone)

551.     Generic Piroxicam, (brand name: Feldene) is a nonsteroidal anti-inflammatory drug used to treat arthritis. Patients who cannot afford Piroxicam suffer from joint pain and limited mobility. As part of the overarching fair share agreement, Teva and Greenstone agreed to the allocation of market share for the drug between the manufacturers.

552.     On the morning of March 5, 2014, one of Nisha Patel's subordinates at Teva, a Manager of Customer Marketing, emailed to tell her that Greenstone had just received Piroxicam approval and was challenging Teva on several accounts. By the next day, Teva had completed its "concede analysis," which was an internal report used to determine concessions to competitors and balance fair share. After receiving the "concede analysis," Patel had multiple calls with

- 170 -
**FILED WITH REDACTIONS – PUBLIC VERSION**

Hatosy and Nailor to discuss their plans to divvy up the market for Piroxicam tablets between Teva and Greenstone. After those calls, Patel sent an internal email identifying specific customers that Teva would concede to Greenstone.

553.    Teva refused to concede CVS because it represented a large portion of Teva's Piroxicam sales. Following a call between Patel and Hatosy, Teva retained the CVS account but conceded other customers (representing less market share) to Greenstone throughout March and April.

### 13. Dextroamphetamine-Amphetamine ER (Adderall XR) (Teva, Actavis)

554.    Dextroamphetamine-Amphetamine Extended Release, (brand name: Adderall XR) is a combination of dextroamphetamine salts and levoamphetamine salts used in the treatment of attention deficit hyperactivity disorder (ADHD) and is sometimes referred to as "Mixed Amphetamine Salts ER" or "MAS-XR." As part of the overarching fair share agreement, Teva and Actavis agreed to the allocation of market share for the drug between the manufacturers.

555.    On June 22, 2012, Actavis obtained FDA approval to manufacture various formulations of MAS-XR. At 9:58 pm that night, Defendant Rekenthaler instructed Teva employees to find out Actavis's plans. By 8:32 am the following morning Teva had spoken to a senior Actavis sales and marketing executive, and reported back that Actavis wanted approximately 15% share and would seek the business of only "1 wholesaler (either McKesson or Cardinal)" and would not compete for business at Walgreens or CVS.

### 14. Dextroamphetamine sulfate ER (Teva, Actavis)

556.    Dextroamphetamine sulfate Extended Release, also known by the brand name Dexedrine and sometimes referred to as "Dex Sulfate XR," is a medication used to stimulate the central nervous system in the treatment of hyperactivity and impulse control. As part of the

overarching fair share agreement, Teva and Actavis agreed to the allocation of market share for the drug between the manufacturers.

557.     On June 19, 2014, as Actavis was entering the market for Dex Sulfate XR, Teva's Nisha Patel asked David Rekenthaler what share of the market Actavis was targeting. Rekenthaler responded: "20-25%." Rekenthaler knew Actavis's market share goals because he and Defendant Marc Falkin (Actavis) had spoken twice by phone that morning.

558.     Five days later, on June 24, 2014, a Teva employee wrote on internal email that Actavis had entered the market for Dex Sulfate XR. She remarked that Teva had a 72.2% share of this "multi-player market" and thus recommended giving up a large customer to Actavis and reducing Teva's market share to 58.3%. Later internal e-mails confirmed Teva's decision to concede that customer to Actavis because "Actavis is entering the market and seeking share."

### 15. Budesonide inhalation (Teva, Actavis)

559.     Budesonide inhalation, also known by the brand name Pulmicort Respules, is an anti-inflammatory steroid, administered through inhalers or similar devices, used to prevent and alleviate asthma attacks. As part of the overarching fair share agreement, Teva and Actavis agreed to the allocation of market share for the drug between the manufacturers.

560.     Teva obtained approval to market Budesonide inhalation in November 2008. Prior to February 2015, Teva controlled virtually the entire market for generic Budesonide Inhalation, with other competitors having less than 1% market share.

561.     On February 10, 2015, David Rekenthaler spoke with Marc Falkin (Actavis), who told him about Actavis's plans to launch Budesonide inhalation.

562.     A week later, on February 17, 2015, Rekenthaler and Falkin had a twenty-three-minute phone conversation. The following morning, Teva's Teri Coward confirmed that she had conceded the Budesonide inhalation accounts of two major customers to Actavis.

### 16. *Omega-3-Acid Ethyl Esters (Teva, Apotex, Par)*

563.     Omega-3-Acid Ethyl Esters, also known by the brand name Lovaza, is a lipid-regulating agent used to lower levels of triglycerides in the blood. As part of the overarching fair share agreement, Teva, Par, and Apotex agreed to the allocation of market share for the drug between the manufacturers.

564.     On the morning of June 26, 2014, Nisha Patel reported that Par had recently received FDA approval for Omega-3-Acid Ethyl Esters. She sent a LinkedIn direct message with her personal number to a senior executive at Par. The executive texted Patel on her cell phone later that day, and they texted throughout the afternoon and evening.

565.     The next morning, June 27, the Friday before Par's launch of the drug, T.P. (Par) called Patel and they spoke for nearly thirty minutes. That was the first and only voice call ever between the two, according to the phone records. That same morning, Patel informed a Teva colleague that she now had "some more color" on Par's launch of Omega-3-Acid Ethyl Esters and would "fill you in when we speak." After discussions between Patel and T.P. (Par), Teva proceeded to concede business to Par to ensure Par's smooth entry into the market.

566.     As new competitors entered the market, Teva coordinated with them to avoid competition and keep prices high. For example, in an internal e-mail on October 2, 2014, Teva's Kevin Galownia stated that "[w]e heard that Apotex may be launching with limited supply and at a high price." David Rekenthaler had obtained this information through phone calls with a senior sales executive at Apotex, on September 25 and 27, 2014. By April 2015, Apotex had officially entered the market, and consistent with the fair share understanding, Teva gave up share.

567.     On December 1, 2014, Teva was notified by a customer that it had received a price challenge on Omega-3-Acid Ethyl Esters. Others at Teva speculated that the challenge was from Apotex, but Rekenthaler had been speaking with senior executives at both Par and Apotex,

and did not need to guess. "I'm confident it's Par," he wrote. Rekenthaler directed that Teva would not reduce its price and would thus concede the business to Par. By mid-February 2015, Teva had conceded several large customers to Par to smooth Par's entry into the market and maintain high pricing.

### 17. Entecavir (Teva, Par)

568.    Entecavir, also known by the brand name Baraclude, is a medication used to treat chronic Hepatitis B infections. As part of the overarching fair share agreement, Teva and Par agreed to the allocation of market share for the drug between the manufacturers.

569.    On August 28, 2014, David Rekenthaler informed Teva sales employees that Teva had received approval on Entecavir and would circulate offers later that day or the next day. Rekenthaler noted: "[w]e are looking for at least a 60[%] share. Known competition is Par with an [authorized generic]." The same day, August 28, 2014, Rekenthaler had three phone calls with M.B., a senior national account executive at Par, regarding Par's pricing. They spoke again twice the next day. In internal discussions following those calls, Rekenthaler directed that Teva would remain firm on the price of Entecavir because he knew Par's prices would not be "much lower."

570.    Teva and Par both launched their respective Entecavir products on September 4, 2014. Within days of its launch, Teva had captured 80% of the market for new generic prescriptions and 90.9% of the total generic market (new prescriptions and refills). Within a few weeks, however, Teva's share of the market was much more in line with fair share principles— 52.6% for new generic prescriptions, and 47% of the total generic market (new prescriptions and refills).

571.    On October 9, 2014, another customer, who had already received a discount on Entecavir, asked for an additional discount to "help close the gap with current market prices."

Teva declined to provide a discount, citing that the "pricing is competitive and in line with the market." Rekenthaler had spoken to M.B. (Par) twice on October 2, 2014 to confirm Par's prices.

### 18. Budesonide DR (Teva, Mylan, Par)

572.    Budesonide DR is used to treat symptoms caused by Crohn's disease and ulcers. As part of the overarching fair share agreement, Teva, Par, and Mylan agreed to the allocation of market share for the drug between the manufacturers. Partaking in the fair share agreement, they also anticompetitively increased the price of the drug.

573.    Shortly before Teva received approval to market Budesonide DR, Par decided to increase the price of the drug. On April 1, 2014, M.B. (Par) called David Rekenthaler (Teva) and they spoke for twenty-six minutes. The next day, April 2, 2014—the same day that Teva received FDA approval to market Budesonide DR—Par increased its price for Budesonide DR by over 15%.

574.    To coordinate the price increases and Teva's entry, Par communicated with Teva and Mylan, the only other manufacturer of Budesonide DR at the time. On April 3, 2014, the day after the Par price increase, K.O. (a Par senior account executive) spoke to M.A. (a Mylan senior account manager), for fifteen minutes regarding the price increase and Teva's plans.

575.    Ultimately, Teva was unable to launch Budesonide DR until approximately June 2016, but its competitors Par and Mylan were able to maintain supracompetitive pricing as of result of these discussions between Teva, Mylan and Par executives.

### 19. Enalapril maleate (Teva, Mylan, Taro, Wockhardt)

576.    Enalapril maleate (brand name: Vasotec) is used to treat hypertension, congestive heart failure, kidney problems, and to improve chances of survival after a heart attack. As part of the overarching fair share agreement, Teva, Mylan, Wockhardt, and Taro agreed to the allocation

FILED WITH REDACTIONS – PUBLIC VERSION

of market share for the drug between the manufacturers. Partaking in the fair share agreement, they also anticompetitively increased the price of the drug.

577.     By mid-2013, the Enalapril market was shared by three players:  Mylan with (60.3% share) Wockhardt (27.5%), and Teva (10.7%). These three manufacturers coordinated a significant anticompetitive price increase for Enalapril. On July 11, 2013, Jim Nesta (Mylan) spoke with Kevin Green (Teva) and explained that Wockhardt had agreed to follow Mylan's price increase on Enalapril. Internal Teva emails show staff citing the price increase as an explanation for customer inquiries—"this is all a result of a wockhardt price increase following a Mylan increase"—even though the customer had attributed the request to a supply issue and Wockhardt had not yet raised its prices.

578.     Internal emails show that on July 12, 2013, Teva "hope[d] to increase" and was "exploring the possibility of an increase" for Enalapril but was in the midst of "gathering all the facts" Nisha Patel gathered the facts by calling Nesta that same day, and they spoke three times.

579.     In the meanwhile, Teva's Kevin Green was attending the PBA Health Conference at the Sheraton Overland Park in Kansas, where he participated in a golf outing. A senior national account executive at Wockhardt attended the same conference and likely spoke directly to Green either at the golf outing during the day or the trade show at night, because at 12:40am that evening (i.e., the morning of July 13, 2013) the executive created a phonebook contact file with Green's cell phone number. On Sunday, July 14, 2013, Green called Patel and told her that he had confirmed that Wockhardt planned to support the Mylan price increase.

580.     The next morning, July 15, 2013, Patel wrote to a Teva executive:

> new developments…heard that Wockhardt is taking an increase today or tomorrow.

That same day, Green again spoke with Wockhardt and Wockhardt internally circulated specific price information obtained from Teva.

581.    On July 16, 2013, Nisha Patel wrote an internal email entitled "Enalapril Increase Overview." In it, she stated:

> As you are aware, we are current preparing the information to hopefully be able to implement a price increase on Enalapril. This is a 3-player market that we share with Mylan and Wockhardt. Mylan announced a price increase last week. We are hearing rumors that Wockhardt will follow or exceed Mylan sometime this week.

Once again, Patel had disguised the source of her information. Teva had not "heard rumors." It had spoken directly with its competitors.

582.    During this coordinated price increase for Enalapril, Ara Aprahamian (Taro) communicated with Patel and with a senior sales and marketing executive at Wockhardt, including calls on July 17 and 19, 2013. On July 30 and 31, 2013, Patel spoke with Aprahamian and confirmed that, in accordance with the industry's fair share code of conduct, Taro understood that it would not take significant share from Teva upon its launch because Teva had a relatively low market share compared to others in the market. On Taro's launch day, December 5, 2013, Taro's prices were identical to Teva's and nearly identical to Wockhardt's and Mylan's.

583.    Taro continued to gain share from both Mylan and Wockhardt, and to coordinate with both. M.C. (Wockhardt) called Aprahamian on New Year's Eve 2013 and they agreed that so long as Wockhardt was able to retain McKesson as a customer, it would concede the distributor Morris & Dickson to Taro. S.K. (Wockhardt) described the agreement in an email after the holidays:

> I spoke to M.C. on NYE. Once we confirm we are keeping McKesson, let's yield MoDick. Call to discuss.

584.     By May 2014 the market was stable, and market share for Enalapril was reasonably distributed among the companies, setting up the price increases discussed in Section IV(F) above. As Teva was considering whether to bid on Enalapril for a large customer, Patel texted and called Aprahamian and wrote in an internal email:

> [N]o bid due to potential market/customer disruption, aka strategic reasons.

### 20. Nortriptyline HCL (Teva, Actavis, Taro)

585.     Nortriptyline hydrochloride (brand name: Pamelor) is used to treat depression. As part of the overarching fair share agreement, Actavis, Teva, and Taro agreed to the allocation of market share for the drug between the manufacturers.

586.     As of early 2013, the market was shared by Teva, with a 55% share, and Actavis with the remaining 45% share. In early November 2013, Taro made plans to re-launch the drug with a "Target Market share goal" of 25% that would leave Teva with 42% and Actavis with 31%.

587.     Several days of conversations ensued among the affected competitors in an effort to sort out how Teva and Actavis would make room for Taro in this market. Communications occurred between Teva and Actavis, and Teva and Taro, in mid-November, 2013. On November 12, 2013, Defendant Aprahamian announced to his colleagues that Taro would not be pursuing Teva's business with McKesson, saying simply: "Will pass on MCK on Nortrip." Accordingly, he instructed a subordinate to put together an offer for Cardinal instead. Teva conceded the Cardinal business to Taro as discussed in the negotiations between Actavis, Taro, and Teva

588.     Taro had sent enough offers to Teva customers—it needed to take the rest of its share from Actavis. On November 19, 2013 when a colleague presented an opportunity to gain business from Teva customer H.D. Smith, Aprahamian flatly rejected the idea, saying: "Looking

for Actavis…We have outstanding Teva offers out." The next day Taro found an Actavis

customer that Taro might pursue

### 21. *Niacin ER (Teva, Lupin, Zydus)*

589.     Niacin Extended Release ("Niacin ER"), also known by the brand name Niaspan

Extended Release, is a medication used to treat high cholesterol.  As part of the overarching fair

share agreement, Teva, Lupin, and Zydus agreed to the allocation of market share for the drug

between the manufacturers.  Partaking in the fair share agreement, they also anticompetitively

increased the price of the drug.

590.     Teva had advance knowledge that Lupin planned to enter the market on March

20, 2014 and that Zydus planned to enter on June 28, 2014. Armed with that knowledge, Teva

increased price on Niacin ER on March 7, 2014 in advance of the launches. In the days leading up

to that price increase, all three competitors exchanged several calls during which they discussed,

among other things, the price increase on Niacin ER and the allocation of customers to the new

entrants Zydus and Lupin.

591.     Similarly, on May 6, 2014, a Teva internal email indicates that Green provided

Teva with confidential information regarding Zydus's launch plans, although there were "mixed

messages on the plan of action" and Teva was unsure whether it would retain the ABC account or

concede it to Zydus.  Ultimately, the competitors agreed that Teva would retain ABC and would

concede McKesson to Zydus. The decision is confirmed in a June 5, 2014 email that reads "Per

Dave [Rekenthaler], Maureen [Cavanaugh] has agreed to concede this item."  In Teva's Delphi

database, the rationale for giving up the business was noted as "Strategic New Market Entrant."

592.     On June 28, 2014, Zydus formally launched Niacin ER at a per-unit WAC price

that matched Teva and Lupin's prices.

**FILED WITH REDACTIONS – PUBLIC VERSION**

### 22. *Moexipril hcl tablets (Teva, Glenmark)*

593.     Moexipril hydrochloride, also known by the brand name Univasc, is of a class of drugs called angiotensin-converting enzyme (ACE) inhibitors, used to treat high blood pressure by reducing the tightening of blood vessels, allowing blood to flow more readily and the heart to pump more efficiently.  As part of the overarching fair share agreement, Teva, and Glenmark agreed to the allocation of market share for the drug between the manufacturers.  Partaking in the fair share agreement, they also anticompetitively increased the price of the drug.

594.     Around May 2013, Nisha Patel and GLMK-CW-5 (a senior executive and cooperating witness from Defendant Glenmark) began calling, texting, and sending messages to one another via WhatsApp in order to coordinate price increases for Moexipril.

595.     Because of their coordination, when Teva learned on August 5, 2013 that Glenmark had challenged Teva at one of its largest accounts, Rekenthaler sent an email to Patel that read simply "???" Within five minutes, Patel replied "I know…made the call already." Patel had called GLMK-CW-5 to find out why Glenmark had sought to underbid Teva at ABC. Patel spoke to GLMK-CW-5 three times that day.

596.      The next day, August 6, 2013, Defendant Jim Brown (Glenmark) spoke with Patel twice by phone. During these calls, Patel reminded Brown and GLMK-CW-5 of their prior agreement not to poach each other's customers after a price increase. As a result of these communications, Glenmark decided to withdraw its offer to ABC and honor the agreement it had reached with Teva not to compete on Moexipril.

### 23. *Desogestrel-Ethinylestradiol (Teva, Glenmark)*

597.     Desogestrel-Ethinylestradiol is a combination pill containing two hormones: progestin and estrogen.  This medication is an oral contraceptive and is sold as Mircette, Viorele (Glenmark's names) and Kariva (Teva's name).  As part of the overarching fair share agreement,

Teva and Glenmark agreed to the allocation of market share for the drug between the manufacturers.

598.     On the morning of May 19, 2014, Teva learned that Glenmark had offered to supply one of Teva's customers. After calls with Brown and Grauso at Glenmark, Teva decided to offer a bid that it knew was nearly triple the price proposed by Glenmark, thereby ensuring that Glenmark could win the business.

### 24. Gabapentin (Teva, Glenmark)

599.     Gabapentin is an anticonvulsant drug (a muscle relaxant) that is prescribed to people who suffer from epileptic seizures or neuropathic pain.  As part of the overarching fair share agreement, Teva and Glenmark agreed to the allocation of market share for the drug between the manufacturers.  Partaking in the fair share agreement, they also anticompetitively increased the price of the drug.

600.     On October 13 and 14, 2014, Nisha Patel attended the Annual Meeting of the Pharmaceutical Care Management Association ("PCMA") in Rancho Palos Verdes, California, along with a number of Teva's competitors.  Shortly after returning from that meeting, during the morning of October 15, 2014, Patel informed her colleagues at Teva that Glenmark planned to increase the price of Gabapentin.  The Glenmark increase had not yet been made public, and would not be effective until November 13, 2014.  Nonetheless, Patel had already obtained specific contract prices that Glenmark planned to charge to distributors after it increased list prices.  Around the time she sent the e-mail, Patel exchanged text messages with Brown (Glenmark).

601.     Teva had relatively little market share for Gabapentin, so Patel and her Teva co-conspirators discussed whether to use the Glenmark price increase as an opportunity to pick up some market share.  Over the next several weeks, Teva did pick up "a bit of share" to be more in

line with fair share principles, but cautioned internally that it did not "want to disrupt Glenmark's business too much."

### 25. *Norethindrone acetate (Teva, Amneal, Glenmark)*

602.     Norethindrone acetate (Brand names Primolut Nor, Primolut N) is a female hormone used to treat endometriosis. As part of the overarching fair share agreement, Teva, Amneal, and Glenmark agreed to the allocation of market share for the drug between the manufacturers and anticompetitively increased the price of the drug.

603.     On September 9, 2014, a customer approached Teva asking if Teva would lower its pricing on certain drugs, including Norethindrone acetate.  The same day, Nisha Patel received phone calls from two individuals at Amneal: S.R.-1, a senior sales and finance executive, and S.R.-2, a senior sales executive.  These were the first calls Patel had with either Amneal executive since she had joined Teva in April 2013.  That same day, S.R.-1 also spoke several times with Defendant Jim Brown (Glenmark).

604.     After speaking with the two Amneal executives, Teva refused to significantly reduce its price to the customer and instead provided only a nominal reduction so as not to disrupt the market.  At that time, market share was almost evenly split between the three competitors. When discussing it later, Defendant Patel acknowledged internally that Teva had "bid high" at the customer based on its understanding "that it would be an increase candidate for Amneal.  They increased shortly after."  By bidding high and not taking the business from Amneal, in anticipation of a future price increase, Teva reinforced the fair share understanding among the competitors in the market.

**FILED WITH REDACTIONS – PUBLIC VERSION**

### 26. *Raloxifene hcl and Lamivudine-Zidovudine (Combivir) (McKesson, Teva, Actavis, Camber, Lupin)*

605.     In September 2014, Camber had plans to enter the market for two Camber/Teva overlap drugs: Raloxifene hydrochloride (brand name: Evista), which treats osteoporosis in postmenopausal women, and the HIV/AIDS combination drug Lamivudine-Zidovudine (brand name: Combivir).  As part of the overarching fair share agreement, Teva, Actavis, Aurobindo, Lupin, Camber, and McKesson arranged the allocation of market shares for the drugs between the manufacturers.

606.     Teva had begun marketing Raloxifene in March 2014 and Camber and Actavis planned to launch September 2014. The new entrants discussed an allocation strategy with Teva to ensure they each received their fair share of the market. Rekenthaler had calls with Actavis on September 10, 11, and had six calls on September 16, 2014 with multiple Actavis personnel including Defendant Marc Falkin and A.B., a senior sales and marketing executive. On September 17, 2014, Rekenthaler (Teva) reported internally:

> I know Actavis will be late. Camber is talking but their [sic] being somewhat unclear as well. I'll know more about them after my trip this week.

Rekenthaler and Defendant Kon Ostaficiuk (President of Camber Pharmaceuticals) then spent the next three days—September 17-19, 2014—playing golf and having drinks at an industry outing in Kentucky. After phone calls between the two of them on September 21 and 22, 2014, Camber sent a revised offer to a potential customer (Econdisc) containing modified prices. On September 24, 2014, Patel wrote an internal Teva email conveying the arrangement Rekenthaler (Teva) had discussed with Ostaficiuk (Camber):

> Camber indicated that they are targeting Econdisc and a small retailer […] and then they would be 'done.'

An internal Teva email written the next day shows that Teva accepted this fair share arrangement.

Teva's Senior Director of Marketing wrote:

> Okay, we will concede additional smaller customer challenges (particularly distributors) since they are not going to target [a large distributor]"

607.     Over at Camber, President Kon Ostaficiuk followed up with similar emails to his team to cease competition for Raloxifene and Combivir. On September 29, 2014 he wrote:

> Hi Gang,
> We do not offer anything to any Teva customers…
> Not even a "bad price"!
> Please acknowledge…We do not want to upset them more!

(ellipses in original). A senior sales executive at Camber replied:

> We have not made any offers to any Teva Raloxifene accounts since we received the Econ award. Both sales and contracts are aware, & requesting incumbent detail for all offers, if Teva, no offer.

The executive added "we are also not seeking any Lupin business on Lam/Zidovudine [aka generic Combivir]." Ostaficiuk replied: "Thank you. We don't want to antagonize either of them and start a war…"

608.     About a week later, on October 7, 2014, Defendant McKesson told Teva that Camber had sent an offer regarding Raloxifene. A Teva Director of National Accounts expressed surprise: "I thought they were done after securing Econdisc?" Senior Director of Sales & Trade Relations Teri Coward expressed her frustration at a competitor not playing fair, commenting "this is ridiculous" and calling Camber "total idiots." David Rekenthaler thought there had to be a miscommunication: "You're positive they sent them an offer?"

609.     Since it seemed that Camber was not sticking to the deal, Teva decided that they needed McKesson to give Camber a "message" that the "market should be stable at this point,"

meaning that McKesson would tell Camber it was not supposed to be competing for further business. The Teva Director of National Accounts "relayed 'the message' re market should be stable" to an individual at McKesson who said he would confirm "Camber intentions and why they said they would send an offer." It turned out to be a miscommunication. Camber had never actually made the offer, and had instead complied with its agreement with Teva.

### 27. *Etodolac ER (Teva, Taro, Zydus)*

610.    Section C.3 above alleges that in August 2013 Defendants coordinated price increases for multiple drugs. including Etodolac ER.  In addition to this anticompetitive conduct, as part of the overarching fair share agreement, Teva, Taro and Zydus continued to allocate market share for Etodolac ER.

611.    On May 12, 2014, Zydus entered the Etodolac ER market at WAC pricing that matched Teva and Taro's artificially high pricing. Patel served as a relay between Aprahamian and Green (then at Zydus) in over a dozen calls and texts in the week before the Zydus launch during which they discussed the allocation of market share to the new entrant.

612.    In a parallel set of communications on May 20 and 21, 2014, a senior sales executive at Zydus texted Defendant Maureen Cavanaugh (Teva). Days later, on Teva internal email a Senior Analyst recommended conceding a specific account to Zydus because "we will have to give up some share with a new market entrant." Patel replied "agree with concede."

613.    Five weeks later, on June 27 and July 2, 2014, Econdisc notified Teva that it had received a competitive offer for its Etodolac ER business. Later that day, Patel spoke with Defendant Aprahamian at Taro for fourteen (14) minutes.

614.    The next day, on July 3, 2014, Patel sent an internal e-mail stating "We will concede" and Teva conceded the business.

### 28. *Haloperidol and Trifluoperazine hcl (Mylan, Sandoz)*

615.     Haloperidol (brand name: Haldol) and Trifluoperazine hydrochloride, (brand name: Stelazine) are antipsychotic drugs used to treat disorders such as schizophrenia and Tourette syndrome. As part of the overarching fair share agreement, Sandoz and Mylan agreed to the allocation of market shares for these drugs between the manufacturers.  Partaking in the fair share agreement, they also anticompetitively increased the price of the drugs.

616.     On August 6, 2013, Defendant Nesta of Mylan called SDZ-CW-4 at Sandoz twice.  Three days later, on August 9, 2013, Mylan implemented significant price increases on both Haloperidol and Trifluoperazine HCL.  For Haloperidol, Mylan increased the WAC price by 250% on several formulations.  For Trifluoperazine HCL, Mylan increased the WAC price by 80% on all formulations.

617.     On August 19, 2013, S.G., a national account executive at Sandoz, sent an internal e-mail stating that Mylan increased its prices on Haloperidol and Trifluoperazine and that Sandoz needed to "rationalize the market." On August 22, 2013, SDZ-CW-1 confirmed the coordinated increase strategy with his Sandoz colleagues, noting "I would imagine we will be fast followers."

618.     On September 18, 2013, in an email about Sandoz's plan to concede Trifluoperazine hcl market share to Mylan, SDZ-CW-1 stated "Mylan has 73% and we have 24%. This is a no brainer."

619.     On October 2, 2013, after had Sandoz received a bid request from a Mylan customer for both Haloperidol and Triofluoperazine, SDZ-CW-1 directed the Sandoz national account executive assigned to Walgreens ("WAGS") to decline to bid and to lie about the reason for doing so:

We discussed internally and decided not to pursue WAGS on these at this point. We have been running up against Mylan a lot lately (Nadolol, Benaz/Hctz) and fear blowback if we take on any more products at this moment.

Trying to be responsible in the sandbox.

I recommend you blame supply.

620.     This was consistent with the interdependent nature of the overarching fair share conspiracy, which sought to dampen competition across drugs. On October 3-4 and October 14, 2013, SDZ-CW-4 and Defendant Nesta spoke by phone several times to confirm support for the price increase on the two drugs. Sandoz increased its WAC pricing on Haloperidol to match Mylan's pricing on October 25, 2013, but, due to price protection terms in contracts, waited to follow on Trifluoperazine HCL until January 31, 2014

### 29. Potassium Chloride (Actavis, Mylan, Sandoz, Upsher-Smith, Zydus)

621.     Potassium Chloride tablets, also known by the brand name K-Dur, among others, is a medication used to prevent and to treat low potassium, which is important for the heart, muscles, and nerves.  As part of the overarching fair share agreement, Upsher-Smith, Sandoz, Actavis, Zydus, and Mylan conspired to fix, raise, maintain or stabilize the prices of Potassium Chloride tablets (8 mEq, 10 mEq, 20 mEq) beginning at least as early as July 2010.

622.     During the relevant time frame, Defendants Upsher-Smith, Sandoz, Actavis, Zydus and Mylan were the primary manufacturers of Potassium Chloride 8 MEQ, 10 MEQ and 20 MEQ tablets.

623.     The market for Potassium Chloride tablets was mature and at all relevant times had multiple manufacturers.

624.     For years, the prices of Potassium Chloride tablets were relatively low and stable. Upsher-Smith, Sandoz and Actavis were the dominant suppliers in the market in the early years.

Upsher-Smith manufactured tablets and marketed and sold them under the brand name Klor Con. Upsher-Smith also supplied tablets to Sandoz, which in turn marketed and sold them under a Sandoz label.

625.    In the summer of 2010, Upsher-Smith, Sandoz and Actavis imposed nearly simultaneous and very large price increases. In the space of approximately 6 weeks, all three manufacturers tripled their list (WAC) prices. █████████████████████

626.    In June 2011, Zydus entered the market. Rather than offer better prices to win market share, Zydus tracked the high prices of Upsher-Smith, Sandoz and Actavis.

627.    As of July 1, 2014, Upsher-Smith ceased to market and sell Klor-Con under the Upsher-Smith label, but instead licensed the Klor-Con name to Sandoz. Thus, after July 1, 2014, Sandoz sold Klor-Con Potassium Chloride tablets under the Sandoz label, though the tablets continued to be manufactured by Upsher-Smith.

628.    In the second half of 2014, Mylan entered the market for Potassium Chloride tablets. Like Zydus before it, Mylan entered at high prices that tracked the other manufacturers already in the market.

629.    The WAC price chart below shows the large, parallel and sustained price increases for Potassium Chloride tablets. Note: The pricing patterns for 8 MEQ, 10 MEQ and 20 MEQ dosages were very similar. Only the chart for the 10 MEQ dosage is included here.



630.    Throughout this period, Upsher-Smith, Sandoz, Actavis, Zydus and Mylan met at trade conferences and communicated directly with each other in furtherance of their price-fixing agreement on Potassium Chloride tablets and of their Fair Share agreement.

631.     For example, during the summer of 2010, D.Z, the Senior National Account Manager at Upsher-Smith, and K.K., a Senior National Account Executive at Sandoz, communicated a number of times by telephone both before and after the August list (WAC) price increases by Sandoz and Upsher-Smith.

632.     During the summer of 2011, before Zydus entered the Potassium Chloride ER market, it first communicated with the incumbent suppliers. K.R., Zydus's Assistant Vice President of National Accounts, communicated frequently that summer by phone, including voice and text messages, with D.L., a Director of National Accounts at Sandoz.

633.     In the fall of 2014 when Mylan was entering the Potassium Chloride ER market, Mylan's Jim Nesta spoke to Marc Falkin at Actavis twice on September 23, 2014. They also had been communicating over the summer leading up to Mylan's entry. When Mylan finally joined the market, it did so at elevated prices consistent with the Fair Share and price-fixing agreement.

### 30. *Betamethasone dipropionate, Betamethasone dipropionate augmented, Betamethasone dipropionate-Clotrimazole, Betamethasone valerate, and Hydrocortisone valerate (McKesson, Sandoz, Actavis, Taro, Perrigo, G&W)*

634.     Betamethasone dipropionate, Betamethasone dipropionate augmented, Betamethasone valerate, and Hydrocortisone valerate are medications used to help relieve redness, itching, swelling, or other discomforts caused by certain skin conditions.  Betamethasone dipropionate-Clotrimazole is a combination of two drugs and is used to treat fungal infections. As part of the overarching fair share agreement, Sandoz, Actavis, Taro, Perrigo, and G&W conspired to fix, raise, maintain or stabilize the prices of Betamethasone dipropionate cream, ointment and lotion, Betamethasone valerate cream and ointment, Betamethasone dipropionate-Clotrimazole cream and lotion, Betamethasone dipropionate augmented lotion and Hydrocortisone valerate cream at least as early as October 2010.  McKesson also coordinated with Taro, Perrigo, and G&W with regards to Hydrocortisone valerate cream.

635.    During the relevant time frame, the primary manufacturers of these products were

as follows:

| Drug | Formulation | Manufacturers |
|---|---|---|
| Betamethasone dipropionate | Cream | Actavis, Sandoz, Taro |
|  | Ointment | Actavis, Sandoz |
|  | Lotion | Sandoz, Perrigo |
| Betamethasone dipropionate augmented | Lotion | Sandoz, Taro |
| Betamethasone dipropionate-Clotrimazole | Cream | Actavis, Sandoz, Taro |
|  | Lotion | Sandoz, Taro |
| Betamethasone valerate | Cream | Actavis, Sandoz, Taro |
|  | Ointment | Actavis, Sandoz |
| Hydrocortisone valerate | Cream | Taro, Perrigo, G&W |

636.    The markets for the above products were mature and at all relevant times had

multiple manufacturers.

637.    The Defendant manufacturers imposed extraordinary price increases across all

formulations of these drugs. Defendants increased the prices of some formulations by more than

20 times. Indeed, ███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████. As the various charts below highlight, the price

increases by Defendants were close in time and amount.

638.    Throughout, Defendants were hyper-conscientious about monitoring and adhering

to Fair Shares and maintaining high prices. For example, an internal analysis by Sandoz in

November 2013 ███████████████████████████████████████████████

███████████████████████████████████████████████. The

analysis noted that ███████████████████████████████ Another Sandoz internal

analysis admonished employees ████████████████████████████████████

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ In line with the Fair

Share agreement (and as memorialized in an internal Sandoz document), rather than compete for

new business, ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

639.    The following charts present NSP prices (i.e., prices paid by Defendants'

customers) and list prices (i.e., WAC) for the cream formulations of Betamethasone Dipropionate,

Betamethasone Valerate, Betamethasone Dipropionate Clotrimazole and Hydrocortisone

Valerate. The charts highlight the parallel pricing by Actavis, Sandoz and Taro.  The charts also

show that when G&W entered the Hydrocortisone Valerate market, rather than offer lower prices

to win customers, they offered prices equal or higher to the incumbent manufacturers.

FILED WITH REDACTIONS – PUBLIC VERSION



**FILED WITH REDACTIONS – PUBLIC VERSION**





FILED WITH REDACTIONS – PUBLIC VERSION





FILED WITH REDACTIONS – PUBLIC VERSION



640.    The following charts present NSP prices and list prices for ointment formulations of Betamethasone Dipropionate and Betamethasone Valerate and highlight the parallel pricing by Actavis and Sandoz.



FILED WITH REDACTIONS – PUBLIC VERSION





**FILED WITH REDACTIONS – PUBLIC VERSION**



641.    The following charts present NSP and list prices for the lotion formulations of Betamethasone Dipropionate, Betamethasone Dipropionate Clotrimazole and Betamethasone Dipropionate Augmented and highlight the parallel pricing by Sandoz and Perrigo and by Sandoz and Taro.



FILED WITH REDACTIONS – PUBLIC VERSION



**FILED WITH REDACTIONS – PUBLIC VERSION**





642.    Throughout this period, Actavis, Sandoz, Taro, Perrigo and G&W met at trade conferences and communicated directly with each other in furtherance of their price-fixing agreements on Betamethasone Dipropionate, Betamethasone Valerate, Betamethasone Dipropionate Clotrimazole, Hydrocortisone Valerate and their fair share agreement.

643.    For example, on January 4, 2011, Perrigo implemented a large list (WAC) price increase on Betamethasone dipropionate lotion. On January 7, T.P., Director of National

FILED WITH REDACTIONS – PUBLIC VERSION

Accounts at Perrigo spoke to A.T., a National Account Executive at Sandoz. On January 11, Sandoz imposed its own list (WAC) price increase.

644.    Similarly, D.L., Director of National Accounts at Sandoz and D.S.,  an Associate Vice President of National Accounts at Taro, communicated a number of times during the relevant period as Sandoz and Taro coordinated pricing. In April 2011, when both companies raised prices on Betamethasone dipropionate-Clotrimazole lotion, the two spoke by phone. In October 2012, when Sandoz announced another price increase on lotion, the two spoke again. In February 2013, when Taro raised its lotion prices to follow Sandoz, the two spoke yet again.

645.    During the same period that D.L (Sandoz) and D.S. (Taro) were communicating, M.B., Taro VP of Marketing, and M.P., Actavis VP of Sales and Marketing, also were communicating; the two men communicated by phone every month from February 2011 through May 2012.

646.    In March 2013, when Taro and Perrigo began to raise prices to customers for Hydrocortisone Valerate cream, the two companies were communicating. D.S., the AVP of National Accounts at Taro, and A.F., Perrigo National Account Director, communicated by phone on March 13, 2013.

647.    When G&W was preparing to enter the Hydrocortisone valerate cream market in early 2015, T.P, Director of National Accounts at Perrigo, spoke a number of times to E.V., a VP of Sales at Marketing at G&W, between January and March 2015.  Perrigo also spoke with McKesson regarding G&W's entry, as discussed in Section IV(C)(2)(e).  When G&W entered the market, it matched the prices of Perrigo and Taro.

### 31. Fluocinolone Acetonide (Sandoz, Taro, G&W, Teligent)

648.    Fluocinolone Acetonide is a medication used to treat inflammation and itching caused by certain skin conditions.  As part of the overarching fair share agreement, Sandoz, Taro,

**FILED WITH REDACTIONS – PUBLIC VERSION**

G&W, and non-defendant co-conspirator Teligent conspired to fix, raise, maintain or stabilize the prices of Fluocinolone Acetonide creams, ointments and solutions beginning at least as early as January 2012.

649.    During the relevant time frame, the primary manufacturers of Fluocinolone Acetonide were as follows:

| *Drug* | *Formulation* | *Manufacturers* |
|---|---|---|
| Fluocinolone Acetonide | Cream | Sandoz, Teligent, G&W |
| | Ointment | Sandoz, Teligent, G&W |
| | Solution | Sandoz, Teligent, Taro |

650.    Before 2012, Sandoz was the sole supplier of Fluocinolone Acetonide cream, ointment and solution. As the sole supplier, Sandoz's list prices for cream ointment and solution were well under $1 for each product, and its NSP prices were ████████ .

651.    Things changed in January 2012, when G&W entered the cream and ointment markets. Historically, adding a manufacturer (i.e., another source of supply) to a single source market tended to drive down prices. But Defendants' Fair Share agreement aimed to reverse this consequence of competition, and succeeded in doing so with Fluocinonide Acetonide products. Rather than result in lower prices, G&W's entrance into the cream and ointment markets resulted in significantly higher prices.

652.    In late December 2011, in anticipation of G&W entering the cream and ointment market, Sandoz announced enormous price increases. Sandoz increased list prices on cream, ointment and solution approximately 300%. When G&W entered the market only weeks later, it announced virtually identical WAC prices on its cream and ointment products.

653.    Almost immediately after G&W announced its prices, Sandoz acknowledged internally that because ████████████████████████████████████████████████████████

▮▮▮▮▮▮▮▮ Over the following weeks, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

654.    In the solution market, a highly similar pattern emerged. In late October 2012, in anticipation of Teligent entering the market, Sandoz doubled the list prices of its solution (on top of the tripled prices it had imposed less than a year earlier). Weeks later, Teligent announced virtually identical WAC prices for its new solution products.

655.    As it had done with G&W earlier that year, internally, Sandoz ▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮ Over the ensuing weeks, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮ Yet again, adherence to the Fair Share agreement enabled Defendants to impose and maintain significantly higher prices by eschewing competition.

656.    In competitive generic markets, the addition of a third manufacturer (and yet another source of supply) tends to drive prices down even more. Yet even the entrance of a third manufacture to the Fluocinolone Acetonide markets did not have that effect. When Teligent joined the ointment market in early 2013 and the cream market in mid-2014 it announced list prices nearly identical to those of Sandoz and G&W. And when Taro entered the solution market in the spring of 2015, it matched the list prices of Sandoz and Teligent.

657.    The list price (WAC) charts for Fluocinolone Acetonide cream, ointment and solution show the large and parallel price increases imposed by Sandoz, G&W, Teligent and Taro. The NSP price charts show that the list price increases had real consquences; customers paid higher prices for these products. The charts also show that prices have remained above prior

levels. (The prices of other dosages of Fluocinolone Acetonide cream exhibit similar patterns and are not included here.)









FILED WITH REDACTIONS – PUBLIC VERSION



658.     Throughout this period, Sandoz, G&W, Teligent and Taro met at trade conferences and communicated directly with each other in furtherance of their price-fixing agreements on Fluocinolone Acetonide and their Fair Share agreement.

FILED WITH REDACTIONS – PUBLIC VERSION

659.     For example, around the time that G&W was entering the Fluocinolone Acetonide cream and ointment markets, K.O., G&W President, communicated by phone with W.K., Sandoz Senior VP of Commercial Operations, on February 8, 9 and 10, 2012.

660.     Similarly, when Teligent was entering the Fluocinolone Acetonide cream market in late spring/early summer of 2014, E.V., G&W VP of Sales and Marketing, communicated by phone with S.M., Teligent Director of National Accounts, on April 29 and May 1, 2014. A few months before, E.V. (G&W) also had communicated by phone with J.G., Teligent President and CEO, in November 2013 and January 2014.

### 32. Lidocaine HCL (Akorn, Sandoz, Taro)

661.     Lidocaine HCL 5% is used as an anesthetic lubricant for intubation and for the temporary relief of pain associated with minor burns.  As part of the overarching fair share agreement, Sandoz, Taro, and Akorn conspired to fix, raise, maintain or stabilize the prices of Lidocaine HCL 5% ointment beginning at least as early as April 2012.

662.     During the relevant time frame, Defendants Sandoz, Taro and Akorn were the primary manufacturers of Lidocaine HCL 5% ointment.

663.     The market for Lidocaine HCL 5% ointment was mature and at all relevant times had multiple manufacturers.

664.     The prices of Lidocaine HCL 5% ointment were relatively low and stable for years. Sandoz and Taro were the only two manufacturers in the market until the spring of 2012, at which point Akorn began to sell Lidocaine ointment. In anticipation Akorn's entry, Sandoz raised prices. At the time, Sandoz had a dominant share of the market. In order to cede share to Akorn—as required by the Fair Share agreement—Sandoz needed to raise prices to maintain (or even augment) its dollar sales notwithstanding the loss of volume.

665.     Shortly after Sandoz raised prices, Akorn launched its product in the spring of 2012. Rather than offer lower prices to win customers based on better pricing, Akorn matched the recently raised prices offered by Sandoz. Sandoz, as anticipated and agreed to with Akorn and Taro, ceded share of the Lidocaine market. Although Sandoz's unit sales declined (as customers were ceded to Taro and Akorn) its dollar sales remained relatively stable, owing to the higher prices it was able to charge because of the price-fixing agreement between the manufacturers.

666.     By 2013, all three manufacturers had brought their Lidocaine prices to approximately the same level. They carefully abided by their agreement to ensure that each of them had a Fair Share of the market while maintaining high prices. For example, in early 2013 after Taro raised its prices, a large buyer sent out requests to Akorn and Sandoz for better pricing. Internally, Taro discussed ███████████████████████████████████████████████

███████████████████████████████████████████████████████████

████████████████████████████████████████████

667.     Taro applauded the success of the Fair Share agreement in allowing it to increase prices and gain share in the Lidocaine market. ███████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████

668.     The list (WAC) price and NSP price charts below show the parallel and elevated pricing for Lidocaine HCL 5% ointment by Sandoz, Akorn and Taro beginning in 2012 and that prices remained elevated above prior levels for years.

FILED WITH REDACTIONS – PUBLIC VERSION





669.    Throughout this period, Sandoz, Taro and Akorn met at trade conferences and communicated directly with each other in furtherance of their price-fixing agreements on Lidocaine and their Fair Share agreement.

FILED WITH REDACTIONS – PUBLIC VERSION

670.    For example, as Akorn was preparing to enter the market in March 2012, it communicated directly with Taro. M.B., a VP of Marketing at Taro, spoke to E.B., Akorn's VP of Sales and Marketing, on February 24, 28 and March 14 and 29.

671.    Meanwhile, the incumbent suppliers—Taro and Sandoz—were in touch as well. On March 7, 8 and 17, 2012, K.K., a Sandoz Senior National Account Executive, communicated by phone with Taro's D.S., AVP of National Accounts at Taro.

### 33. Timolol maleate (Bausch Health, Sandoz)

672.    Timolol maleate is used to treat high pressure inside the eye due to glaucoma (open angle-type) or other eye disease (e.g., ocular hypertension).  As part of the overarching fair share agreement, Sandoz and Bausch Health conspired to fix, raise, maintain or stabilize the prices of Timolol Maleate ophthalmic gel forming solution beginning at least as early as December 2013.

673.    During the relevant time frame, Defendants Bausch Health and Sandoz were the primary manufacturers of Timolol Maleate.

674.    The market for Timolol Maleate was mature and at all relevant times had multiple manufacturers.

675.    For years, the prices for Timolol Maleate ophthalmic gel forming solution were relatively low and stable.

676.    A May 2013 Sandoz internal document posed the following question: ▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮  Not long after this analysis, Sandoz and Bausch Health almost simultaneously and out of the blue, imposed very large price increases. List (WAC) prices more than tripled, ▮▮▮▮▮▮

▮▮▮. Even as prices skyrocketed, market share remained roughly split between the companies.

FILED WITH REDACTIONS – PUBLIC VERSION

677.    The list (WAC) price chart and NSP price chart below show the large increases and parallel pricing by Bausch Health and Sandoz. (Note: the prices of the 0.5% formulation of Timolol Maleate followed a very similar pattern. Only the 0.25% charts are included here.)





678.     Throughout this period, Bausch Health and Sandoz met at trade conferences and communicated directly with each other in furtherance of their price-fixing agreement on Timolol Maleate and of their Fair Share agreement.

679.     For example, both companies sent representatives to the ECRM Retail Pharmacy Efficient Program Planning Session at the Omni Amelia Island Plantation Resort in Amelia Island, Florida on February 23-26, 2014. Sandoz had raised its list (WAC) prices shortly before the conference. Bausch Health announced its own list (WAC) price increases for Timolol Maleate shortly after the conference, on March 12, 2014.

- **Atropine Sulfate (Bausch Health, Sandoz)**

680.     Atropine Sulfate is an anticholinergic and is available as, for example, a 1% Ophthalmic Solution for use in eye examinations to dilate the pupil and to treat certain eye conditions. As part of the overarching fair share agreement, Sandoz, and Bausch Health conspired to fix, raise, maintain or stabilize the prices of Atropine Sulfate.

681.     The market for Atropine Sulfate Ophthalmic Solution is mature. At all relevant times, there have been multiple manufacturers.

682.     Defendants Bausch Health and Sandoz dominated the sales of Atropine Sulfate with close to an 80/20 split at all relevant times.

683.     ███████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████████



684.     The GAO noted that Atropine Sulfate had "extraordinary price increases" in the years 2010-2011.

685.     ████████████████████████████████████████████████

686.     The ability of Bausch Health and Sandoz to reach agreements on Atropine Sulfate Ophthalmic Solution was aided by the prevalence of trade association meetings and conferences where the parties were able to meet in person.

687.     ████████████████████ by Bausch Health and Sandoz are consistent with the Fair Share Agreement.  No non-collusive market factors (e.g., product shortages) can explain the artificially inflated prices.

### 34. Latanoprost (Akorn, Bausch Health, Greenstone, Sandoz)

688.     Latanoprost is used to treat glaucoma and high pressure in the eyes. As part of the overarching fair share agreement, Akorn, Bausch Health, Greenstone, and Sandoz conspired to fix, raise, maintain or stabilize the prices of Latanoprost.

689.     The market for Latanoprost Opthalmic Liquid Eye (0.005%) is mature. At all relevant times, there have been multiple manufacturers.

690.     Defendants Akorn, Bausch Health, Greenstone, and Sandoz dominate sales for Latanoprost.

691.

692.     The ability of Akorn, Bausch Health, Greenstone, and Sandoz to reach agreements on Latanoprost was aided by the prevalence of trade association meetings and conferences where the parties were able to meet in person.

FILED WITH REDACTIONS – PUBLIC VERSION

693.     The parallel price increases by Akorn, Bausch Health, Greenstone, and Sandoz are consistent with the Fair Share Agreement.  No non-collusive market factors (e.g., product shortages) can explain the artificially inflated prices.

### 35. Neomycin-Polymyxin-Hydrocortisone (Bausch Health, Sandoz)

694.     Neomycin-Polymyxin-Hydrocortisone is a combination of three drugs used to treat outer ear infections caused by bacteria. As part of the overarching fair share agreement, Bausch Health and Sandoz conspired to fix, raise, maintain or stabilize the prices of Neomycin-Polymyxin-Hydrocortisone solution.

695.     The market for Neomycin Polymyxin Hydrocortisone Solution (3.5mg-10MU 1%) is mature. At all relevant times, there have been multiple manufacturers.

696.     Defendants Bausch Health and Sandoz dominate sales of Neomycin Polymyxin Hydrocortisone

697.

FILED WITH REDACTIONS – PUBLIC VERSION



698.     The ability of Bausch Health and Sandoz to reach agreements on Neomycin Polymyxin Hydrocortisone was aided by the prevalence of trade association meetings and conferences where the parties were able to meet in person.

699.     The parallel price increases by Bausch Health and Sandoz are consistent with the Fair Share Agreement.  No non-collusive market factors (e.g., product shortages) can explain the artificially inflated prices.

### 36. Oxycodone HCL Oral Solution (Glenmark, Lannett)

700.     Oxycodone HCL is an opioid agonist indicated for the management of moderate to severe acute and chronic pain where the use of an opioid analgesic is appropriate. As part of the overarching fair share agreement, Glenmark and Lannett conspired to fix, raise, maintain or stabilize the prices of Oxycodone HCL.

701.     The market for Oxycodone HCL is mature. At all relevant times, there have been multiple manufacturers of Oxycodone HCL. Defendants Glenmark and Lannett dominated the

market for Oxycodone HCL 20mg/ml Oral Solution with ████████████████████

███

702.   ██████████████████████████████████

█████████████████████████████████████████

██████████████████████████████



703.   The GAO noted that Oxycodone HCL had "extraordinary price increases" in the years 2010-2011.  Glenmark and Lannett's prices ████████████████████

704.   The ability of Glenmark and Lannett to reach agreements on Oxycodone HCL was aided by the prevalence of trade association meetings and conferences where the parties were able to meet in person.

705.   ██████████████████ by Glenmark and Lannett are consistent with the Fair Share Agreement.   No non-collusive market factors (e.g., product shortages) can explain the artificially inflated prices.

### *37. Tobramycin Dexamethasone (Bausch Health, Sandoz)*

706.    Tobramycin Dexamethasone is an antibiotic used to treat bacterial eye infections. As part of the overarching fair share agreement, Bausch Health and Sandoz conspired to fix, raise, maintain or stabilize the prices of Tobramycin Dexamethasone.

707.    The market for Tobramycin Dexamethasone is mature. At all relevant times, there have been multiple manufacturers.

708.    Defendants Bausch Health and Sandoz dominate sales of Tobramycin Dexamethasone Ophthalmic Liquid (0.3-0.1%)

709.

710.     The ability of Bausch Health and Sandoz to reach agreements on Tobramycin Dexamethasone was aided by the prevalence of trade association meetings and conferences where the parties were able to meet in person.

711.     ███████████████████ by Bausch Health and Sandoz are consistent with the Fair Share Agreement.  No non-collusive market factors (e.g., product shortages) can explain the artificially inflated prices.

## V.     THE STATUTES OF LIMITATIONS DO NOT BAR PLAINTIFFS' CLAIMS

### A.     The Statutes of Limitations Did Not Begin to Run Because Plaintiffs Did Not and Could Not Discover Defendants' Unlawful Conspiracy

712.     Plaintiffs had no knowledge of the specific events alleged in sections A, B, C, and D of this Complaint or of facts sufficient to place them on inquiry notice of the claims set forth herein, until, at the earliest, May 10, 2019. Prior to that time, no information available to Plaintiffs was sufficient to suggest Defendants' conduct relating to the Drugs at Issue newly identified in this complaint.

713.     Plaintiffs had no contact or interaction with any of the Defendants in this case by which they could have discovered Defendants' conspiracy.

714.     Defendants repeatedly and expressly stated throughout the Class Period, including on their public websites, that they maintained antitrust/fair competition policies, which prohibited the type of collusion alleged in this Complaint. It was reasonable for members of the Classes to believe that Defendants were complying with their own antitrust policies.

715.     For these reasons, the statutes of limitations as to Plaintiffs' claims under the federal and state laws identified herein did not begin to run, and have been tolled, with respect to the claims that Plaintiffs have alleged in this Complaint.

FILED WITH REDACTIONS – PUBLIC VERSION

### B.   Fraudulent Concealment Tolled the Statutes of Limitations

716.    In the alternative, application of the doctrine of fraudulent concealment tolled the statutes of limitations on the claims asserted by Plaintiffs.

717.    Defendants actively concealed, suppressed, and omitted to disclose material facts to Plaintiffs and members of the Classes concerning Defendants' unlawful activities to artificially inflate prices for generic drugs. The concealed, suppressed, and omitted facts would have been important to Plaintiffs and members of the Classes as they related to the cost of generic drugs they purchased. Defendants misrepresented the real cause of price increases and/or the absence of price reductions in generic drugs. Defendants' false statements and conduct concerning the prices of generic drugs were deceptive as they had the tendency or capacity to mislead Plaintiffs and members of the Classes to believe that they were purchasing generic drugs at prices established by a free and fair market.

#### 1.   Active concealment of the conspiracy

718.    Defendants engaged in an illegal scheme to fix prices, allocate customers and rig bids. Criminal and civil penalties for engaging in such conduct are severe. Not surprisingly, Defendants took affirmative measures to conceal their conspiratorial conduct.

719.    Through their lying, deceptive, and false statements, Defendants effectively concealed their conspiracy, thereby causing economic harm to Plaintiffs and the Classes. Defendants' misrepresentations regarding their price changes were intended to lull Plaintiffs and the Classes into accepting the price hikes as a normal result of competitive and economic market trends rather than the consequences of Defendants' collusive acts. The public statements made by Defendants were designed to mislead Plaintiffs and the Classes into paying unjustifiably higher prices for generic drugs.

720.    For example, Heritage executives took overt steps to conceal their illegal activity and destroy evidence of any wrongdoing going back to at least 2012. This conduct included a concerted and conscious effort to destroy documents, instructions not to put incriminating evidence in writing, directives not to use email, and the deletion of incriminating text messages.

721.    The Defendants also gave pretextual reasons for price increases. For example, during an August 11, 2015 earnings call, Dilip Shanghvi, the Managing Director at Sun Pharmaceutical Industries Ltd., misleadingly discussed "competitive pressure on some of the products…where competitive intensity has increased," when in fact, Sun was engaged in a conspiracy to lessen competitive forces and inflate prices.

722.    In an interview with journalists in August 2019, Teva CEO Kåre Schultz said that "[b]ased on everything we have seen, we have not found any evidence whatsoever of any organized price-fixing on our behalf, so we deny the allegations." Teva's CEO continues to mislead the public about the nature of this case and Teva's conduct. In an interview with Barron's published on November 7, 2019, he stated that Teva had produced over a million documents and:

> We have not found any evidence in all those documents that we in any way participated in organized collusion or price fixing.

723.    Mylan has also released similarly false and misleading statements, for example on August 14, 2019 Mylan stated:

> With assistance from outside counsel we thoroughly investigated allegations made against our company and employees in the civil complaint filed by various state attorneys general, including the most recent allegation relating to obstruction. We have not found any evidence to corroborate the allegations.

724.    These types of false statements and others made by Defendants helped conceal the illegal conspiracy entered into by Defendants to fix, stabilize, maintain and raise the price of generic drugs to inflated, supracompetitive levels.

FILED WITH REDACTIONS – PUBLIC VERSION

725.    Through their misleading, deceptive, false and fraudulent statements, Defendants effectively concealed their conspiracy, thereby causing economic harm to Plaintiffs and the Classes. Defendants' misrepresentations regarding their price changes were intended to lull Plaintiffs and the Classes into accepting the price hikes as a normal result of competitive and economic market trends rather than as the consequence of Defendants' collusive acts. The public statements made by Defendants were designed to mislead Plaintiffs and the Classes into paying unjustifiably higher prices for generic drugs.

### 2.    *Plaintiffs exercised reasonable diligence*

726.    Defendants' anticompetitive conspiracy, by its very nature, was self-concealing. Accordingly, a reasonable person under the circumstances would not have been alerted to investigate the legitimacy of Defendants' prices before these disclosures.

727.    Because of the deceptive practices and techniques of secrecy employed by Defendants and their co-conspirators to conceal their illicit conduct, Plaintiffs and the Classes could not have discovered the details of the conspiracy alleged herein at an earlier date by the exercise of reasonable diligence.

728.    Therefore, the running of any statutes of limitations has been tolled for all claims alleged by Plaintiffs and the Classes as a result of Defendants' anticompetitive and unlawful conduct. Despite the exercise of reasonable diligence, Plaintiffs and Members of the Classes were unaware of Defendants' unlawful conduct and did not know that they were paying supracompetitive prices throughout the United States during the Class Period.

729.    For these reasons, Plaintiffs' claims are timely under all of the federal, state and common laws identified herein.

FILED WITH REDACTIONS – PUBLIC VERSION

VII.   **CONTINUING VIOLATIONS**

730.    This Complaint alleges a continuing course of conduct (including conduct within the limitations periods), and Defendants' unlawful conduct has inflicted continuing and accumulating harm within the applicable statutes of limitations. Thus, Plaintiffs and the members of the Federal and States Damages Classes can recover for damages that they suffered during any applicable limitations period.

VIII.  **DEFENDANTS' ANTITRUST VIOLATIONS**

731.    During the Class Period, set forth below, Defendants engaged in a continuing agreement, understanding, and conspiracy in restraint of trade to allocate customers, rig bids, and fix, raise, and/or stabilize prices for the Drugs at Issue sold in the United States.

732.    In formulating and effectuating the contract, combination or conspiracy, Defendants:

> (a)    participated in meetings and conversations regarding the prices of the Drugs at Issue;
> (b)    agreed during those meetings and conversations to charge prices at specified levels and otherwise to increase and/or maintain prices of the Drugs at Issue sold in the United States;
> (c)    agreed during those meetings and conversations to allocate customers, rig bids, and fix the price of the Drugs at Issue; and
> (d)    issued price announcements and price quotations in accordance with their agreements.

733.    Defendants and their co-conspirators engaged in the activities described above for the purpose of effectuating the unlawful agreements described in this Complaint.

734.    Defendants' contract, combination and conspiracy constitutes an unreasonable restraint of trade and commerce in violation of Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3) and the laws of various State Damages Jurisdictions enumerated below.

735.    As a result of Defendants' unlawful conduct, Plaintiffs and the other members of the Classes have been injured in their business and property in that they have paid more for the

Drugs at Issue than they would have paid in a competitive market. Wholesalers who purchased

directly from Defendants were able to pass on overcharges to Plaintiff pharmacies, who have no

meaningful ability to set their own resale / retail prices due to the automated and contract-bound

nature of the modern pharmaceutical supply chain. The impairment of generic competition at the

direct purchaser level caused similar injuries to all privately-owned pharmacies, who were equally

denied the opportunity to purchase less expensive generic versions of the drugs.

736.    The unlawful contract, combination and conspiracy has had the following effects,

among others:

> (a)    price competition in the markets for the Drugs at Issue have been
>         artificially restrained;
>
> (b)    prices for the Drugs at Issue sold by Defendants have been raised,
>         fixed, maintained, or stabilized at artificially high and non-
>         competitive levels; and
>
> (c)    pharmacy purchasers of the Drugs at Issue sold by Defendants
>         have been deprived of the benefit of free and open competition in
>         the market for the Drugs at Issue.

FILED WITH REDACTIONS – PUBLIC VERSION

IX.    **CLASS ACTION ALLEGATIONS**

737.    Plaintiffs bring this action on behalf of themselves and on behalf of three classes:

(1)    a class seeking injunctive relief under federal law:
the "**Pharmacy and Hospital Injunctive Class**"

(2)    a class seeking damages under federal law for purchases from the implicated
distributor Defendants:
the "**Pharmacy and Hospital Federal Damages Class**"

(3)    a class seeking all remedies available under state antitrust and consumer
protection laws, also known as "unfair or deceptive trade practices" laws, as
well as state common law:
the "**Pharmacy and Hospital State Damages Class**"

738.    **Pharmacy and Hospital Injunctive Class**. Plaintiffs bring this action on behalf

of themselves and as a class action under Rule 23(a) and (b)(2) of the Federal Rules of Civil

Procedure, seeking equitable and injunctive relief on behalf of the following class (the "Injunctive

Class"):

> All dispensers of drugs in the United States that purchased one or
> more of the generic Drugs at Issue in this complaint from January
> 1, 2010 through the present.
>
> This class excludes: (a) Defendants, their officers, directors,
> management, employees, subsidiaries and affiliates; (b) entities
> owned in part by judges or justices involved in this action or any
> members of their immediate families; (c) all pharmacies owned or
> operated by publicly traded companies.
>
> The Drugs at Issue are listed in Appendix A to this complaint.

**FILED WITH REDACTIONS – PUBLIC VERSION**

739.     **Pharmacy and Hospital <u>Federal Damages</u> Class**. Plaintiffs bring this action on behalf of themselves and as a class action under Fed. R. Civ P. Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure, seeking damages under the Sherman Act on behalf of the following class (the "Federal Damages Class"):

> All dispensers of drugs (including hospitals and independent pharmacies), in the United States and its territories, that purchased the generic Drugs at Issue directly from distributor Defendants AmerisourceBergen Corp., Cardinal, Red Oak, Harvard, H.D. Smith, McKesson, Morris & Dickson, or WBAD or their subsidiaries, from January 1, 2010 through the present.

> This class excludes: (a) Defendants, their officers, directors, management, employees, subsidiaries and affiliates; (b) entities owned in part by judges or justices involved in this action or any members of their immediate families; (c) all pharmacies owned and operated by publicly traded companies.

> The Drugs at Issue are listed in Appendix A to this complaint.

**FILED WITH REDACTIONS – PUBLIC VERSION**

740.    **Pharmacy and Hospital <u>State Damages</u> Class.** Plaintiffs also bring this action on behalf of themselves and as a class action under Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure seeking damages pursuant to the common law of unjust enrichment and the state antitrust, unfair competition, and consumer protection laws of the states and territories listed below (the "State Damages Jurisdictions")[30] on behalf of the following class (the "State Damages Class"):

> All dispensers of drugs (including hospitals and independent pharmacies), in the State Damages Jurisdictions that purchased one or more of the generic Drugs at Issue from any source other than the manufacturer Defendants (Actavis, Akorn, Alvogen, Amneal, Apotex, Aurobindo, Barr, Bausch Health, Breckenridge, Caraco, Camber, Citron, Dr. Reddy's, Endo, Glenmark, G&W, Greenstone, Heritage, Lannett, Lupin, Mayne, Mutual, Mylan, Par, Perrigo, Pfizer, PLIVA, Rising, Sandoz/Fougera, Sun, Taro, Teva, Upsher-Smith, URL Pharma, Wockhardt, Zydus) from January 1, 2010 to the present.

> This class excludes:  (a) Defendants, their officers, directors, management, employees, subsidiaries and affiliates; (b) any entities owned in part by judges or justices involved in this action or any members of their immediate families; (c) all pharmacies owned or operated by publicly traded companies.

> The Drugs at Issue are listed in Appendix A to this complaint.

---

[30] The State Damages Jurisdictions, for purposes of this complaint, are: Alabama, Alaska, Arizona, Arkansas, California, Colorado, Connecticut, Delaware, Florida, Georgia, Idaho, ~~Illinois~~, Iowa, Kansas, Louisiana, Maine, Maryland, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Montana, Nebraska, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Carolina, North Dakota, Oregon, Pennsylvania, Rhode Island, ~~South Carolina~~, South Dakota, Tennessee, Texas, Utah, Vermont, Virginia, Washington, West Virginia, Wisconsin and Wyoming as well as the District of Columbia and Puerto Rico.

741.    While Plaintiffs do not know the exact number of the members of the Classes,

Plaintiffs believe there are thousands of members in each Class.

742.    Common questions of law and fact exist as to all members of the Classes. This is

particularly true given the nature of Defendants' conspiracy, which was generally applicable to all

the members of both Classes, thereby making appropriate relief with respect to the Classes as a

whole. Such questions of law and fact common to the Classes include, but are not limited to:

> (a)    Whether Defendants and their co-conspirators engaged in a combination and conspiracy among themselves to fix, raise, maintain and/or stabilize prices of Drugs at Issue and/or engaged in market allocation for Drugs at Issue sold in the United States;
>
> (b)    The identity of other participants of the conspiracy;
>
> (c)    The duration of the conspiracy and the acts carried out by Defendants and their co-conspirators in furtherance of the conspiracy;
>
> (d)    Whether the conspiracy violated the Sherman Act,
>
> (e)    Whether the conspiracy violated state antitrust and unfair competition laws, and/or state consumer protection laws,
>
> (f)    Whether Defendants unjustly enriched themselves to the detriment of the Plaintiffs and the members of the Classes, thereby entitling Plaintiffs and the members of the Classes to disgorgement of all benefits derived by Defendants,
>
> (g)    Whether the conduct of Defendants and their co-conspirators, as alleged in this Complaint, caused injury to the business or property of Plaintiffs and the members of the Classes;
>
> (h)    The effect of the conspiracy on the prices of Drugs at Issue sold in the United States during the Class Period;
>
> (i)    Whether the Defendants and their co-conspirators actively concealed, suppressed, and omitted to disclose material facts to Plaintiffs and members of the Classes concerning Defendants' unlawful activities to artificially inflate prices for Drugs at Issue, and/or fraudulently concealed the unlawful conspiracy's existence from Plaintiffs and the other members of the Classes;
>
> (j)    The appropriate injunctive and related equitable relief for the Injunctive Class; and
>
> (k)    The appropriate class-wide measure of damages for the Damages Classes.

743.    Plaintiffs' claims are typical of the claims of the members of the Classes.

Plaintiffs and all members of the Classes are similarly affected by Defendants' wrongful conduct

in that they paid artificially inflated prices for Defendants' Drugs at Issue. Plaintiffs' claims arise out of the same common course of conduct giving rise to the claims of the other members of the Classes.

744.    Plaintiffs will fairly and adequately protect the interests of the Classes. Plaintiffs' interests are coincident with, and not antagonistic to, those of the other members of the Classes. Plaintiffs are represented by counsel who are competent and experienced in the prosecution of antitrust and class action litigation.

745.    The questions of law and fact common to the members of the Classes predominate over any questions affecting only individual members, including legal and factual issues relating to liability and damages.

746.    Class action treatment is a superior method for the fair and efficient adjudication of the controversy. Such treatment will permit a large number of similarly situated entities to prosecute their common claims in this single forum simultaneously, efficiently and without the unnecessary duplication of evidence, effort and expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured hospitals and pharmacies with a method for obtaining redress for claims that might not be practicable to pursue individually, substantially outweigh any difficulties that may arise in management of this class action. The prosecution of separate actions by individual members of the Classes would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

X.    **CAUSES OF ACTION**

747.    In the Counts laid out below, Plaintiffs seek several forms of relief, against different sets of Defendants, under both federal and state law. As to the overarching conspiracy in which all Defendants participated, and as to each drug-specific conspiracy in which certain Defendants participated as alleged above, Plaintiffs seek relief under the laws specified in the Counts below.

**FILED WITH REDACTIONS – PUBLIC VERSION**

### COUNT 1
### Violation of Sections 1 and 3 of the Sherman Act—Injunctive Relief
*(against all Defendants on behalf of Plaintiffs and the Injunctive Class)*

748.     Plaintiffs incorporate by reference the allegations set forth above as if fully set forth herein. This count is brought against all Defendants for their participation in an overarching conspiracy to fix, raise and/or stabilize the prices of the Drugs at Issue, listed in Appendix A to this complaint.

749.     During the Class Period, Defendants and their unnamed co-conspirators entered into and engaged in a "contract, combination, or conspiracy" in unreasonable "restraint of trade" in violation of Sections 1 and 3 of the Sherman Act (15 U.S.C. § 1, 3). The Defendants' conspiratorial acts have caused unreasonable restraints in the market for the generic drugs at issue in this complaint.

750.     Defendants and their co-conspirators entered into a continuing agreement, understanding and conspiracy in restraint of trade to artificially allocate customers, rig bids and raise, maintain and fix prices for generic Drugs at Issue, thereby creating anticompetitive effects.

751.     The acts done by each of the Defendants as part of, and in furtherance of, their contract, combination, or conspiracy were authorized, ordered, or done by their officers, agents, employees, or representatives while actively engaged in the management of Defendants' affairs.

752.     As a result of Defendants' unlawful conduct, Plaintiffs and other similarly situated pharmacies and hospitals in the Injunctive Class have been harmed by being forced to pay inflated, supracompetitive prices for generic Drugs at Issue.

753.     Defendants' conspiracy had the following effects, among others:

(a)     Price competition in the market for the Drugs at Issue has been restrained, suppressed, and/or eliminated in the United States;

FILED WITH REDACTIONS – PUBLIC VERSION

    (b)      Prices for the Drugs at Issue provided by Defendants and their co-conspirators have been fixed, raised, maintained, and stabilized at artificially high, non-competitive levels throughout the United States; and

    (c)      Plaintiffs and members of the Injunctive Class have been deprived of the benefits of free and open competition.

754.    Plaintiffs and members of the Injunctive Class have been injured and will continue to be injured in their business and property by paying more for the Defendants' Drugs at Issue than they would have paid and will pay in the absence of the conspiracy.

755.    Plaintiffs must continue purchasing the Drugs at Issue in order to continue to operate their businesses.

756.    Defendants' contract, combination, or conspiracy is a per se violation of the federal antitrust laws.

757.    Plaintiffs and members of the Injunctive Class are entitled to an injunction against Defendants, preventing and restraining the continuing violations alleged herein.

FILED WITH REDACTIONS – PUBLIC VERSION

### _COUNT 2_
### _Violation of Sections 1 and 3 of the Sherman Act—Damages_
_(on behalf of Plaintiffs and the Federal Damages Class against distributor Defendants ABC, Cardinal, Red Oak, Harvard, H.D. Smith, McKesson, Morris & Dickson, and WBAD for purchases made directly from these Defendants)_

758. Plaintiffs incorporate by reference the allegations set forth above as if fully set forth herein. This count is brought against all distributor Defendants for their participation in an overarching conspiracy to fix, raise and/or stabilize the prices of the Drugs at Issue, as listed in Appendix A to this complaint.

759. The distributor Defendants shared with their manufacturer Defendant co-conspirators a common goal of maintaining and increasing market-wide prices, including both list prices and contract prices, and of allocating fair share among the manufacturers in order to prevent price erosion. As a result of the distributor Defendants' unlawful conduct in violation of Sections 1 and 3 of the Sherman Act (15 U.S.C. § 1, 3), Plaintiffs and other similarly situated pharmacies and hospitals in the Federal Damages Class who made direct purchases of the Drugs at Issue from the distributor Defendants were forced to pay inflated, supracompetitive prices for the generic Drugs at Issue. Plaintiffs and members of the Federal Damages Class who made such direct purchases seek treble damages for those purchases, and the cost of suit, including reasonable attorney's fees, as per 15 U.S.C. § 15(a).

**FILED WITH REDACTIONS – PUBLIC VERSION**

**COUNT 2 (a)**
**Violation of Sections 1 and 3 of the Sherman Act—Damages**
*(against ABC on behalf of Plaintiffs and the Federal Damages Class for purchases made directly from ABC, H.D. Smith, WBAD)*

760.     Plaintiffs incorporate by reference the allegations set forth above as if fully set forth herein. In the alternative to Count 2, which alleges that the distributor Defendants participated in an overarching, interdependent conspiracy with a common goal of maintaining and increasing the prices of the Drugs at Issue listed in Appendix A, this Count is brought solely against Defendant ABC for its participation in the following subsidiary schemes, which, if Count 2 is not sustained, are legally cognizable as individual agreements in restraint of trade in violation of the Sherman Act.  Plaintiffs and members of the Federal Damages Class who made such direct purchases from Defendant ABC seek treble damages for those purchases, and the cost of suit, including reasonable attorney's fees, as per 15 U.S.C. § 15(a).

| Drug | Count 2 (a)<br>Defendant(s) / *Co-Conspirators* |
|---|---|
| Acyclovir tablets | **ABC (H.D. Smith conduct),** *Heritage, Zydus* |
| Buprenorphine tablets | **ABC**, *Sun, Teva* |
| Celecoxib capsules | **ABC,** *WBAD, Actavis, Apotex, Teva* |
| Dextroamphetamine-Amphetamine IR capsules | **ABC**, *Teva, Actavis, Aurobindo* |
| Isotretinoin capsules | **ABC,** *WBAD, Dr. Reddy's, Teva* |
| Lamotrigine ER tablets | **ABC,** *McKesson, WBAD, Par, Dr. Reddy's, Wilshire* |
| Loperamide HCL capsules | **ABC**, *Mylan, Teva* |
| Modafinil tablets | **ABC**, *Teva,* |
| Pioglitazone-Metformin tablets | **ABC**, *Sandoz, Teva* |
| Tobramycin inhalation (Tobi) | **ABC,** *Cardinal, WBAD, Akorn, Sandoz, Teva* |
| Valganciclovir tablets | **ABC (H.D. Smith conduct),** *Camber, Dr. Reddy's* |

***COUNT 2 (b)***
***Violation of Sections 1 and 3 of the Sherman Act—Damages***
*(against H.D. Smith on behalf of Plaintiffs and the Federal Damages Class for purchases made directly from H.D. Smith or ABC)*

761.    Plaintiffs incorporate by reference the allegations set forth above as if fully set forth herein. In the alternative to Count 2, which alleges that the distributor Defendants participated in an overarching, interdependent conspiracy with a common goal of maintaining and increasing the prices of the Drugs at Issue listed in Appendix A, this Count is brought solely against Defendant H.D. Smith for its participation in the following subsidiary schemes, which, if Count 2 is not sustained, are legally cognizable as individual agreements in restraint of trade in violation of the Sherman Act.  Plaintiffs and members of the Federal Damages Class who made such direct purchases from Defendant H.D. Smith seek treble damages for those purchases, and the cost of suit, including reasonable attorney's fees, as per 15 U.S.C. § 15(a).

| Drug | Count 2 (b)<br>Defendant(s) / *Co-Conspirators* |
|---|---|
| Acyclovir tablets | **H.D. Smith**, *Heritage, Zydus* |
| Valganciclovir tablets | **H.D. Smith**, *Camber, Dr. Reddy's* |

**FILED WITH REDACTIONS – PUBLIC VERSION**

**_COUNT 2 (c)_**
**_Violation of Sections 1 and 3 of the Sherman Act—Damages_**
*(against Cardinal and Red Oak on behalf of Plaintiffs and the Federal Damages
Class for purchases made directly from Cardinal, Harvard, or Red Oak)*

762.     Plaintiffs incorporate by reference the allegations set forth above as if fully set

forth herein. In the alternative to Count 2, which alleges that the distributor Defendants

participated in an overarching, interdependent conspiracy with a common goal of maintaining and

increasing the prices of the Drugs at Issue listed in Appendix A, this Count is brought solely

against Cardinal and Red Oak for their participation in the following subsidiary schemes, which,

if Count 2 is not sustained, are legally cognizable as individual agreements in restraint of trade in

violation of the Sherman Act.  Plaintiffs and members of the Federal Damages Class who made

such direct purchases from Cardinal, Red Oak, Harvard, or M&D seek treble damages for those

purchases, and the cost of suit, including reasonable attorney's fees, as per 15 U.S.C. § 15(a).

| Drug | Count 2 (c)<br>Defendant(s) / Co-Conspirators |
|---|---|
| Eplerenone tablets | **Cardinal (Harvard),** M&D, *Greenstone, Upsher-Smith* |
| Eszopiclone tablets | **Cardinal,** M&D, *Dr. Reddy's, Sun* |
| Fenofibrate tablets | **Cardinal,** *Teva, Mylan, Lupin, Zydus, Dr. Reddy's* |
| Imiquimod cream | **Cardinal,** *Perrigo, Teva* |
| Metoprolol Succinate ER tablets | **Cardinal (Harvard),** *Actavis, Dr. Reddy's, Par* |
| Montelukast oral granules | **Cardinal,** *Dr. Reddy's, Teva* |
| Nystatin tablets | **Cardinal,** *Heritage, Sun/Mutual, Teva* |
| Paricalcitol tablets and capsules | **Cardinal,** *McKesson, WBAD, Dr. Reddy's, Teva, Zydus* |
| Tobramycin inhalation | **Cardinal,** *ABC, WBAD, Akorn, Teva, Sandoz* |
| Tolterodine ER capsules | **Cardinal,** *Mylan, Teva* |

FILED WITH REDACTIONS – PUBLIC VERSION

### COUNT 2 (d)
### Violation of Sections 1 and 3 of the Sherman Act—Damages
*(against Harvard on behalf of Plaintiffs and the Federal Damages Class for purchases made directly from Cardinal, Harvard, or Red Oak)*

763.     Plaintiffs incorporate by reference the allegations set forth above as if fully set forth herein. In the alternative to Count 2, which alleges that the distributor Defendants participated in an overarching, interdependent conspiracy with a common goal of maintaining and increasing the prices of the Drugs at Issue listed in Appendix A, this Count is brought solely against Defendant Harvard for its participation in the following subsidiary schemes, which, if Count 2 is not sustained, are legally cognizable as individual agreements in restraint of trade in violation of the Sherman Act.  Plaintiffs and members of the Federal Damages Class who made such direct purchases from Defendant Harvard, Cardinal, or Red Oak seek treble damages for those purchases, and the cost of suit, including reasonable attorney's fees, as per 15 U.S.C. § 15(a).

| Drug | Count 2 (d)<br>Defendant / Co-Conspirators |
|---|---|
| Eplerenone tablets | **Harvard,** *M&D, Greenstone, Upsher-Smith* |
| Metoprolol Succinate ER tablets | **Harvard,** *Actavis, Dr. Reddy's, Par* |

FILED WITH REDACTIONS – PUBLIC VERSION

***COUNT 2 (e)***
***Violation of Sections 1 and 3 of the Sherman Act—Damages***
*(against McKesson on behalf of Plaintiffs and the Federal Damages Class for purchases made directly from McKesson)*

764.    Plaintiffs incorporate by reference the allegations set forth above as if fully set forth herein. In the alternative to Count 2, which alleges that the distributor Defendants participated in an overarching, interdependent conspiracy with a common goal of maintaining and increasing the prices of the Drugs at Issue listed in Appendix A, this Count is brought solely against McKesson for its participation in the following subsidiary schemes, which, if Count 2 is not sustained, are legally cognizable as individual agreements in restraint of trade in violation of the Sherman Act.  Plaintiffs and members of the Federal Damages Class who made such direct purchases from McKesson seek treble damages for those purchases, and the cost of suit, including reasonable attorney's fees, as per 15 U.S.C. § 15(a).

| Drug | Count 2 (e) Defendant / Co-Conspirators |
|---|---|
| Amikacin injection | **McKesson**, *Heritage, Teva* |
| Capecitabine tablets | **McKesson**, *Dr. Reddy's, Teva, Mylan* |
| Hydrocortisone valerate cream | **McKesson**, *Perrigo, Taro, G&W* |
| Lamotrigine ER tablets | **McKesson**, *ABC, WBAD, Dr. Reddy's, Par, Wilshire* |
| Paricalcitol capsules | **McKesson**, *WBAD, Dr. Reddy's, Teva, Zydus* |
| Raloxifene HCL tablets | **McKesson**, *Teva, Camber, Actavis, Lupin* |
| Tizanidine tablets | **McKesson**, *Dr. Reddy's, Mylan, Sandoz* |

**FILED WITH REDACTIONS – PUBLIC VERSION**

### COUNT 2 (f)
### Violation of Sections 1 and 3 of the Sherman Act—Damages
*(against Morris & Dickson on behalf of Plaintiffs and the Federal Damages Class for purchases made directly from Morris & Dickson)*

765.     Plaintiffs incorporate by reference the allegations set forth above as if fully set forth herein. In the alternative to Count 2, which alleges that the distributor Defendants participated in an overarching, interdependent conspiracy with a common goal of maintaining and increasing the prices of the Drugs at Issue listed in Appendix A, this Count is brought solely against Defendant Morris & Dickson for its participation in the following subsidiary schemes, which, if Count 2 is not sustained, are legally cognizable as individual agreements in restraint of trade in violation of the Sherman Act.  Plaintiffs and members of the Federal Damages Class who made such direct purchases from Defendant Morris & Dickson seek treble damages for those purchases, and the cost of suit, including reasonable attorney's fees, as per 15 U.S.C. § 15(a).

| Drug | Count 2 (f) Defendant / Co-Conspirators |
|---|---|
| Eplerenone tablets | **M&D,** *Harvard, Greenstone, Upsher-Smith* |
| Eszopiclone tablets | **M&D,** *Cardinal, Sun, Dr. Reddy's* |

**FILED WITH REDACTIONS – PUBLIC VERSION**

**COUNT 2 (g)**
*Violation of Sections 1 and 3 of the Sherman Act—Damages*
*(against WBAD on behalf of Plaintiffs and the Federal Damages Class for*
*purchases made directly from Defendant WBAD, ABC, or H.D. Smith)*

766.    Plaintiffs incorporate by reference the allegations set forth above as if fully set

forth herein. In the alternative to Count 2, which alleges that the distributor Defendants

participated in an overarching, interdependent conspiracy with a common goal of maintaining and

increasing the prices of the Drugs at Issue listed in Appendix A, this Count is brought solely

against Defendant WBAD for its participation in the following subsidiary schemes, which, if

Count 2 is not sustained, are legally cognizable as individual agreements in restraint of trade in

violation of the Sherman Act.   Plaintiffs and members of the Federal Damages Class who made

such direct purchases from Defendants WBAD, McKesson, or ABC seek treble damages for those

purchases, and the cost of suit, including reasonable attorney's fees, as per 15 U.S.C. § 15(a).

| Drug | Count 2 (g)<br>**Defendant** / *Co-Conspirators* |
|---|---|
| Cabergoline tablets | **WBAD**, *Greenstone, Teva* |
| Celecoxib capsules | **WBAD,** ABC, *Teva, Actavis, Apotex* |
| Disulfiram tablets | **WBAD**, *Breckenridge, Teva* |
| Isotretinoin capsules | **WBAD**, *ABC, Teva, Dr. Reddy's* |
| Lamotrigine ER tablets | **WBAD**, *ABC, McKesson, Dr. Reddy's, Wilshire, Par* |
| Montelukast granules | **WBAD**, *Dr. Reddy's, Mylan* |
| Omeprazole-Sodium bicarbonate capsules | **WBAD**, *Oceanside, Dr. Reddy's, Valeant* |
| Paricalcitol tablets and capsules | **WBAD**, McKesson, *Dr. Reddy's, Teva, Zydus* |
| Progesterone tablets | **WBAD**, *Akorn, Actavis* |
| Sumatriptan autoinjector | **WBAD**, *Dr. Reddy's, Teva* |
| Temozolomide capsules | **WBAD**, *Teva, Sandoz* |
| Tobramycin inhalation | **WBAD**, *ABC, Cardinal, Akorn, Sandoz, Teva* |
| Vancomycin HCL capsules | **WBAD**, *Akorn, Actavis* |

**FILED WITH REDACTIONS – PUBLIC VERSION**

**COUNT 3**
**_Violation of State Antitrust Statutes_**[31]
*(against all Defendants, on behalf of Plaintiffs and the State Damages Class, for purchases from any source other than the manufacturer Defendants)*

767.    Plaintiffs incorporate by reference the allegations set forth above as if fully set forth herein. This count is brought against all Defendants for their participation in an overarching conspiracy to fix, raise and/or stabilize the prices of the Drugs at Issue listed in Appendix A to this complaint. This claim is brought against all Defendants for purchases made by Plaintiffs and the State Damages Class from any source other than the manufacturer Defendants. (This count does not overlap with Counts 2 or 2 (a-g). So long as Plaintiffs have a live federal damages claim against a distributor defendant for purchases of a drug from that distributor, this count excludes those purchases).

768.    In the alternative, this count is also brought against Defendant-participants in each of the drug-specific sub-agreements described above which include the following:

| Drug | Count 3 Defendant(s) / *Co-Conspirators* |
|---|---|
| Acyclovir tablets | **H.D. Smith, Heritage, Zydus** |
| Adapalene gel | **Glenmark, Teva, Taro** |
| Allopurinol tablets | **Dr. Reddy's, Mylan** |
| Amikacin injection | **McKesson, Heritage, Teva** |
| Amiloride-HCTZ tablets | **Mylan, Teva** |
| Amoxicillin-Clavulanate potassium chew tablets | **Sandoz, Teva** |
| Azithromycin oral suspension | **Greenstone, Teva** |
| Betamethasone dipropionate augmented lotion | **Sandoz, Taro** |
| Betamethasone dipropionate-Clotrimazole cream | **Actavis, Sandoz, Taro** |
| Betamethasone dipropionate-Clotrimazole lotion | **Sandoz, Taro** |

---

[31] Statutory antitrust violations are alleged herein for the following jurisdictions: Arizona, California, Connecticut, District of Columbia, ~~Illinois~~, Iowa, Kansas, Maine, Michigan, Minnesota, Mississippi, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Oregon, Rhode Island, South Dakota, Tennessee, Vermont, West Virginia and Wisconsin.

FILED WITH REDACTIONS – PUBLIC VERSION

| | |
|---|---|
| Betamethasone dipropionate cream | **Actavis, Sandoz, Taro** |
| Betamethasone dipropionate lotion | **Sandoz, Perrigo** |
| Betamethasone dipropionate ointment | **Actavis, Sandoz** |
| Betamethasone valerate cream | **Actavis, Sandoz, Taro** |
| Betamethasone valerate ointment | **Actavis, Sandoz** |
| Bethanechol cl tablets | **Actavis, Teva, Amneal** |
| Budesonide DR capsules | **Mylan, Par incl. DAVA, Teva** |
| Budesonide inhalation | **Actavis, Teva** |
| Bumetanide tablets | **Sandoz, Teva** |
| Buprenorphine tablets | **ABC, Sun, Teva** |
| Buspirone HCL tablets | **Mylan, Actavis, Teva** |
| Cabergoline tablets | **WBAD, Greenstone, Teva** |
| Capecitabine tablets | **McKesson, Dr. Reddy's, Teva, Mylan** |
| Carbamazepine chewable tablets | **Taro, Teva** |
| Carbamazepine ER tablets | **Taro, Sandoz** |
| Carbamazepine tablets | **Apotex, Taro, Teva** |
| Carbidopa/Levodopa tablets | **Teva, Actavis, Mylan** |
| Cefdinir capsules | **Lupin, Teva, Sandoz** |
| Cefdinir oral suspension | **Lupin, Teva, Sandoz** |
| Cefprozil tablets | **Lupin, Teva, Sandoz** |
| Celecoxib capsules | **Actavis, Apotex, ABC, Teva, WBAD** |
| Cephalexin suspension | **Lupin, Teva** |
| Cimetidine tablets | **Mylan, Teva** |
| Ciprofloxacin HCL tablets | **Actavis, Dr. Reddy's, Teva** |
| Clarithromycin ER tablets | **Actavis, Teva** |
| Clemastine fumarate tablets | **Sandoz, Teva** |
| Clonidine TTS patch | **Teva, Actavis, Mylan** |
| Clotrimazole topical solution | **Taro, Teva** |
| Cyproheptadine HCL tablets | **Breckenridge, Teva** |
| Danazol capsules | **Lannett, Teva** |
| Desmopressin acetate tablets | **Actavis, Teva** |
| Desogestrel-Ethinylestradiol tablets | **Glenmark, Teva** |
| Dexmethylphenidate HCL ER capsules | **Par incl. DAVA, Sandoz, Teva** |
| Dextroamphetamine sulfate ER capsules | **Actavis, Teva** |
| Dextroamphetamine-Amphetamine ER (Adderall XR) | **Actavis, Teva** |
| Dextroamphetamine-Amphetamine IR capsules | **ABC, Teva, Actavis, Aurobindo** |
| Diclofenac potassium tablets | **Mylan, Sandoz, Teva** |
| Dicloxacillin sodium capsules | **Sandoz, Teva** |
| Diflunisal tablets | **Teva, Rising** |
| Diltiazem HCL tablets | **Mylan, Teva** |
| Disopyramide phosphate capsules | **Actavis, Teva** |
| Disulfiram tablets | **WBAD, Breckenridge, Teva** |
| Doxazosin mesylate tablets | **Apotex, Mylan, Teva** |

**FILED WITH REDACTIONS – PUBLIC VERSION**

| | |
|---|---|
| Drospirenone-Ethinylestradiol tablets | **Teva, Lupin, Actavis** |
| Enalapril maleate tablets | **Mylan, Taro, Teva, Wockhardt** |
| Entecavir tablets | **Teva, Par** |
| Epitol tablets | **Apotex, Taro, Teva** |
| Eplerenone tablets | **M&D, Harvard, Greenstone, Upsher-Smith** |
| Estazolam tablets | **Actavis, Teva** |
| Estradiol tablets | **Actavis, Mylan, Teva** |
| Eszopiclone tablets | **M&D, Cardinal, Sun, Dr. Reddy's,** *Roxane* |
| Ethinylestradiol-Levonorgestrel tablets | **Sandoz, Teva** |
| Ethosuximide capsules, oral solution | **Teva, Akorn (Versapharm)** |
| Etodolac ER tablets | **Taro, Teva, Zydus** |
| Etodolac tablets | **Teva, Taro, Sandoz** |
| Fenofibrate tablets | **Cardinal, Dr. Reddy's, Lupin, Mylan, Teva, Zydus** |
| Fluconazole tablets | **Citron, Dr. Reddy's, Glenmark, Greenstone, Teva, WBAD** |
| Fluocinolone acetonide cream | **Sandoz, G&W,** *Teligent* |
| Fluocinolone acetonide ointment | **Sandoz, G&W,** *Teligent* |
| Fluocinolone acetonide solution | **Sandoz, Taro,** *Teligent* |
| Fluocinonide emollient cream | **Actavis, Taro, Teva, Sandoz** |
| Fluoxetine HCL tablets | **Mylan, Par incl. DAVA, Teva** |
| Flurbiprofen tablets | **Mylan, Teva** |
| Flutamide capsules | **Actavis, Par incl. DAVA, Teva** |
| Fluvastatin sodium capsules | **Mylan, Teva** |
| Gabapentin tablets | **Teva, Glenmark** |
| Glimepiride tablets | **Dr. Reddy's, Teva** |
| Griseofulvin suspension | **Actavis, Teva** |
| Haloperidol tablets | **Mylan, Sandoz** |
| Hydrocortisone valerate cream | **McKesson, Perrigo, Taro,** *G&W* |
| Hydroxyurea capsules | **Par incl. DAVA, Teva** |
| Hydroxyzine pamoate capsules | **Actavis, Teva, Rising** |
| Imiquimod cream | **Cardinal, Perrigo, Teva** |
| Irbesartan tablets | **Teva, Lupin** |
| Isoniazid tablets | **Sandoz, Teva** |
| Isotretinoin capsules | **WBAD, ABC, Teva, Dr. Reddy's** |
| Ketoconazole cream | **Sandoz, Mylan, Taro, Teva, Apotex** |
| Ketoconazole tablets | **Sandoz, Mylan, Taro, Teva, Apotex** |
| Ketoprofen capsules | **Mylan, Teva** |
| Ketorolac tromethamine tablets | **Mylan, Teva** |
| Labetalol HCL tablets | **Par, Sandoz, Teva, Actavis (Watson)** |
| Lamivudine-Zidovudine tablets | **McKesson, Actavis, Camber, Aurobindo, Teva, Lupin** |

FILED WITH REDACTIONS – PUBLIC VERSION

| | |
|---|---|
| Lamotrigine ER tablets | **WBAD, ABC, McKesson, Dr. Reddy's, Par,** *Wilshire* |
| Latanoprost ophthalmic liquid eye | **Akorn, Bausch Health, Greenstone, Sandoz** |
| Lidocaine HCL ointment | **Akorn, Sandoz, Taro** |
| Loperamide HCL capsules | **ABC, Mylan, Teva** |
| Medroxyprogesterone tablets | **Greenstone, Teva** |
| Methotrexate tabs | **Mylan, Teva** |
| Methyldopa tablets | **Mylan, Teva** |
| Metoprolol succinate ER tablets | **Actavis, Dr. Reddy's, Harvard, Par** |
| Modafinil tablets | **ABC, Teva** |
| Moexipril HCL tablets | **Teva, Glenmark** |
| Moexipril HCL-HCTZ tablets | **Teva, Glenmark** |
| Montelukast oral granules | **Cardinal, WBAD, Dr. Reddy's, Teva, Mylan** |
| Nabumetone tablets | **Actavis, Glenmark, Sandoz, Teva** |
| Nadolol tablets | **Mylan, Sandoz, Teva** |
| Neomycin-Polymixin-Hydrocortisone solution | **Bausch Health, Sandoz** |
| Niacin ER tablets | **Lupin, Teva, Zydus** |
| Nitrofurantoin macrocrystal capsules | **Mylan, Teva, Alvogen** |
| Norethindrone acetate - Ethinylestradiol (Mimvey) tablets | **Breckenridge, Teva** |
| Norethindrone acetate tablets | **Glenmark, Amneal, Teva** |
| Norethindrone-Ethinylestradiol (Ovcon 35) tablets | **Lupin, Teva** |
| Nortriptyline HCL capsules | **Actavis, Teva, Taro** |
| Nystatin tablets | **Cardinal,** *Heritage, Sun/Mutual,* **Teva** |
| Nystatin-Triamcinolone cream | **Sandoz, Taro** |
| Nystatin-Triamcinolone ointment | **Sandoz, Taro** |
| Omega-3-Acid Ethyl esters | **Par, Teva, Apotex** |
| Omeprazole-Sodium bicarbonate capsules | **WBAD, Oceanside, Dr. Reddy's, Valeant** |
| Oxaprozin tablets | **Dr. Reddy's, Greenstone, Sandoz, Teva** |
| Oxybutynin cl tablets | **Par, Teva, Upsher-Smith** |
| Oxycodone HCL oral solution | **Glenmark, Lannett** |
| Paricalcitol capsules | **WBAD, McKesson, Dr. Reddy's, Teva, Zydus** |
| Paricalcitol tablets | **WBAD, McKesson, Dr. Reddy's, Teva, Zydus** |
| Penicillin V potassium tablets | **Aurobindo, Greenstone, Sandoz, Teva** |
| Pentoxifylline tablets | **Apotex, Teva** |
| Pioglitazone-Metformin tablets | **ABC, Sandoz, Teva** |
| Piroxicam capsules | **Teva, Greenstone** |
| Potassium chloride tablets | **Actavis, Mylan, Sandoz, Upsher-Smith, Zydus** |
| Prazosin HCL capsules | **Mylan, Teva** |

**FILED WITH REDACTIONS – PUBLIC VERSION**

| Prochlorperazine tablets | **Teva, Mylan** |
|---|---|
| Progesterone tablets | **WBAD, Akorn, Actavis** |
| Raloxifene HCL tablets | **McKesson, Teva, Camber, Actavis, Lupin** |
| Ranitidine HCL tablets | **Actavis, Glenmark, Sandoz, Teva, Amneal** |
| Sotalol HCL tablets | **Mylan, Teva** |
| Sumatriptan autoinjector | **WBAD, Dr. Reddy's, Teva** |
| Tamoxifen citrate tablets | **Actavis, Mylan, Teva** |
| Temozolomide capsules | **WBAD, Teva, Sandoz** |
| Theophylline ER tablets | **Teva, Heritage** |
| Timolol Maleate ophthalmic gel forming solution | **Bausch Health, Sandoz** |
| Tizanidine tablets | **McKesson, Dr. Reddy's, Mylan, Sandoz** |
| Tobramycin Dexamethasone opthalmic liquid | **Bausch Health, Sandoz** |
| Tobramycin inhalation | **WBAD, ABC, Cardinal, Akorn, Sandoz, Teva** |
| Tolmetin sodium capsules | **Mylan, Teva** |
| Tolterodine ER capsules | **Cardinal, Mylan, Teva** |
| Tolterodine tartrate tablets | **Teva, Greenstone** |
| Topiramate sprinkle capsules | **Teva, Zydus** |
| Trifluoperazine HCL | **Mylan, Sandoz** |
| Valganciclovir tablets | **H.D. Smith, Camber, Dr. Reddy's** |
| Valsartan-HCTZ tablets | **Mylan, Sandoz** |
| Vancomycin HCL capsules | **WBAD, Akorn, Actavis** |
| Warfarin Sodium tablets | **Taro, Teva, Zydus** |

769.    During the Class Period, Defendants and their co-conspirators engaged in a continuing contract, combination or conspiracy with respect to the sale of the Drugs at Issue in unreasonable restraint of trade and commerce and in violation of the various state antitrust and other statutes set forth below.

770.    The contract, combination, or conspiracy consisted of an agreement among Defendants and their co-conspirators to fix, raise, inflate, stabilize, and/or maintain the prices of the Drugs at Issue and to allocate customers for the Drugs at Issue in the United States.

771.    In formulating and effectuating this conspiracy, Defendants and their co-conspirators performed acts in furtherance of the combination and conspiracy, including participating in meetings and conversations among themselves in the United States and elsewhere

during which they agreed to price the Drugs at Issue at certain levels, and otherwise to fix, increase, inflate, maintain, or stabilize effective prices paid by Plaintiffs and members of the Damages Class with respect to the Drugs at Issue provided in the United States; and participating in meetings and trade association conversations among themselves in the United States and elsewhere to implement, adhere to, and police the unlawful agreements they reached.

772.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

773.    In addition, Defendants have profited significantly from the conspiracy. Defendants' profits derived from their anticompetitive conduct come at the expense and detriment of plaintiffs and the members of the Damages Class.

774.    Accordingly, plaintiffs and the members of the Damages Class in each of the following jurisdictions seek damages (including statutory damages where applicable), to be trebled or otherwise increased as permitted by a particular jurisdiction's antitrust law, injunctive relief, including restitution and/or disgorgement, and costs of suit, including reasonable attorneys' fees, to the extent permitted by the following state laws.

775.    Trusts are combinations, contracts, understandings or agreements, express or implied when inimical to the public welfare and with the effect of, inter alia, restraining trade, increasing the price or output of a commodity, or hindering competition in the production and sale of a commodity.

776.    Defendants' anticompetitive acts described above were knowing, willful and constitute violations or flagrant violations of the following state antitrust statutes, and plaintiffs seek all relief available under such statutes:

**FILED WITH REDACTIONS – PUBLIC VERSION**

| State | Antitrust Statute |
|-------|-------------------|
| Arizona | Arizona Revised Statutes, § 44-1401, *et seq* |
| California | Cal. Bus. & Prof. Code §16720; treble damages and cost of suit, including fees, pursuant to § 16750(a) |
| Connecticut | Conn. Gen. Stat. § 35-26 and § 35-28. Plaintiffs and the Classes seek all relief available under Conn. Gen. Stat. § 35-34 & § 35-35 for all purchases on or after July 10, 2017 |
| District of Columbia | District of Columbia Code § 28-4501 |
| ~~Illinois~~[32] | ~~Illinois Antitrust Act (740 Illinois Compiled Statutes 10/1, et seq.)~~ |
| Iowa | Iowa Code § 553.1, et seq. |
| Kansas | Kansas Statutes § 50-101 |
| Maine | Maine Rev. Stat. 10, § 1101, et seq |
| Maryland | For violations of Md. Code, Com. Law § 11-204(a)(1). Plaintiffs and the Classes seek all relief available under Md. Code, Com. Law § 11-209(b) for all purchases on or after October 1, 2017 |
| Michigan | Michigan Compiled Laws § 445.771, et seq. |
| Minnesota | Minnesota Statutes § 325D.49, et seq. |
| Mississippi | Mississippi Code § 75-21-1, et seq. |
| Nebraska | Nebraska Revised Statutes § 59-801, et seq. |
| Nevada | Nevada Revised Statutes § 598A.010, et seq. |
| New Hampshire | New Hampshire Revised Statutes § 356:1, et seq. |
| New Mexico | New Mexico Statutes § 57-1-1, et seq. |
| New York | New York General Business Law § 340, et seq. Defendants' conduct is a per se violation of the statute. |
| North Carolina | North Carolina General Statutes § 75-1, et seq. |
| North Dakota | North Dakota Century Code § 51-08.1-01, et seq. |
| Oregon | Oregon Revised Statutes § 646.705, et seq. |
| Rhode Island | for all purchases on or after July 15, 2013 pursuant to the Rhode Island Antitrust Act, Rhode Island General Laws § 6-36-1, et seq. |
| South Dakota | South Dakota Codified Laws § 37-1-3.1, et seq. |
| Tennessee | Tennessee Code § 47-25-101, et seq. |
| Vermont | Vermont Stat. 9 § 2453, et seq. |
| West Virginia | West Virginia Code § 47-18-1, et seq. |
| Wisconsin | Wisconsin Statutes § 133.01, et seq. |

FILED WITH REDACTIONS – PUBLIC VERSION

777.     As to All Jurisdictions Above: Plaintiffs and members of the Damages Class in each of the above jurisdictions have been injured in their business and property by reason of Defendants' unlawful combination, contract, conspiracy and agreement. Plaintiffs and members of the Damages Class have paid more for generic Drugs at Issue than they otherwise would have paid in the absence of Defendants' unlawful conduct. This injury is of the type the antitrust laws of the above states were designed to prevent and flows from that which makes Defendants' conduct unlawful.

778.     In addition, Defendants have profited significantly from the aforesaid conspiracy. Defendants' profits derived from their anticompetitive conduct come at the expense and detriment of Plaintiffs and members of the Damages Class.

779.     Accordingly, Plaintiffs and members of the Damages Class in each of the above jurisdictions seek damages (including statutory damages where applicable), to be trebled or otherwise increased as permitted by a particular jurisdiction's antitrust law, and costs of suit, including reasonable attorneys' fees, to the extent permitted by the above state laws.

---

[32] Plaintiffs acknowledge that this claim was dismissed with prejudice by the Court's February 15, 2019 Order (16-md-2724 Dkt. 858) and reassert the claim here solely for purposes of preservation for appeal.

### *COUNT 4*
### *Violation of State Consumer Protection Statutes* [33]
*(Against all Defendants, on behalf of Plaintiffs and the State Damages Class)*

780.    Plaintiffs incorporate by reference the allegations set forth above as if fully set forth herein. This count is brought against all Defendants for their participation in an overarching conspiracy to fix, raise and/or stabilize the prices of Drugs at Issue listed in Appendix A to this complaint. This claim is brought against all Defendants for purchases made by Plaintiffs and the State Damages Class from any source other than the manufacturer Defendants. (This count does not overlap with Counts 2 or 2 (a-g). So long as Plaintiffs have a live federal damages claim against a distributor defendant for purchases of a drug from that distributor, this count excludes those purchases).

781.    In the alternative, this count is also brought against Defendant-participants in each of the drug-specific sub-agreements alleged above in Count 3 and also repeated in Appendix A.

782.    During the Class Period, Defendants marketed, sold, or distributed generic Drugs at Issue in each of the states listed below,

783.    Defendants engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of the state consumer protection and unfair competition statutes listed below. Defendants knowingly agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling, and/or maintaining at non-competitive and artificially inflated levels, the prices at which generic Drugs at Issue were sold in each of the states listed below.

---

[33] Statutory consumer protection / deceptive trade violations are alleged herein for the following jurisdictions: Alaska, Arkansas, California, Colorado, Delaware, Florida, ~~Georgia~~, Minnesota, Nebraska, New Hampshire, New Jersey, New Mexico, New York, North Carolina, North Dakota, Rhode Island, ~~South Carolina~~, South Dakota, ~~West Virginia~~ and Wisconsin.

**FILED WITH REDACTIONS – PUBLIC VERSION**

784. Defendants' illegal conduct had the following substantial effects on commerce and generic drug purchasers: (1) price competition for the Drugs at Issue was restrained and/or eliminated throughout the states listed below; (2) prices of the generic Drugs at Issue were raised, fixed, maintained, and stabilized at artificially high levels throughout the states listed below; (3) Plaintiffs and members of the Damages Class, who resided in the states listed below and/or purchased the Drugs at Issue in the states listed below were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for the Drugs at Issue, in New Hampshire.

785. Defendants deceived Plaintiffs and/or class members in each state into believing that the Drugs at Issue were competitively priced. Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for generic Drugs at Issue. Defendants misrepresented to all purchasers during the Class Period that Defendants' generic Drugs at Issue prices were competitive and fair by not disclosing the nature of their overarching and individual agreements in restraint of trade. Defendants and their co-conspirators made public statements about the prices of the Drugs at Issue that either omitted material information that rendered the statements that they made materially misleading or affirmatively misrepresented the real cause of price increases for the Drugs at Issue; and Defendants alone possessed material information that was relevant to purchasers, but failed to provide the information. As a direct and proximate result of Defendants' willful, unconscionable and deceptive commercial practices Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property.

786. Plaintiffs and members of the Damages Class lacked any meaningful choice in purchasing the generic Drugs at Issue because they were unaware of the unlawful overcharge, and

there was no alternative source of supply through which Plaintiffs and members of the Damages Class could avoid the overcharges. Defendants' conduct with regard to sales of generic Drugs at Issue, including their illegal conspiracy to secretly fix the price of the Drugs at Issue at supracompetitive levels and overcharge generic drug purchasers, was substantively unconscionable because it was one-sided and unfairly benefited Defendants at the expense of Plaintiffs and the public. Defendants took grossly unfair advantage of Plaintiffs and members of the Damages Class. The suppression of competition that has resulted from Defendants' conspiracy has ultimately resulted in unconscionably higher prices such that there was a gross disparity between the price paid and the value received for the Drugs at Issue.

787.     Defendants' price-fixing conspiracy could not have succeeded absent deceptive conduct by Defendants to cover up their illegal acts. Secrecy was integral to the formation, implementation and maintenance of Defendants' price-fixing conspiracy. Defendants committed inherently deceptive and self-concealing actions, of which Plaintiffs and members of the Damages Class could not possibly have been aware.

788.     Defendants and their co-conspirators publicly provided pretextual and false justifications regarding their price increases. Defendants' public statements concerning the price of generic Drugs at Issue created the illusion of competitive pricing controlled by market forces rather than supracompetitive pricing driven by Defendants' illegal conspiracy. Moreover, Defendants deceptively concealed their unlawful activities by mutually agreeing not to divulge the existence of the conspiracy to outsiders.

789.     Defendants took efforts to conceal their illegal agreements from Plaintiffs and members of the Damages Class.

FILED WITH REDACTIONS – PUBLIC VERSION

| State | Plaintiffs seek all relief available under consumer protection statutes: |
|---|---|
| Alaska | Alaska Statute § 45.50.471, et seq |
| Arkansas | Arkansas Code § 4-88-107(a)(10), against all Defendants; Arkansas Code § 4-88-303, against Defendants that increased prices by more than 10% from January 3 to February 2, 2014, or from February 18 to March 20, 2015. |
| California | Cal. Bus. & Prof. Code § 17200 *et seq.*, incl. §§ 17200.31; 17203; and 17204 |
| Colorado | Colorado Rev. Stat. § 6-1-101, et seq. |
| Delaware | Delaware Consumer Fraud Act, 6 Del. Code § 2511, et seq. |
| Florida | Deceptive and Unfair Trade Practices Act, Fla. Stat. § 501.201, et seq. |
| ~~Georgia~~ | ~~Uniform Deceptive Trade Practices Act, Georgia Code § 10-1-370~~ |
| Minnesota | Uniform Deceptive Trade Practices Act, Minn. Stat. § 325D.43, et seq. |
| Nebraska | Nebraska Consumer Protection Act, Neb. Rev. Stat. § 59-1601, et seq. |
| New Hampshire | N.H. Rev. Stat. § 358-A:1, et seq., |
| New Mexico | Defendants' acts resulted in a gross disparity between the value received by Plaintiffs and the prices paid by them for generic Drugs at Issue in violation of N.M.S.A. Stat. § 57-12-3 and N.M.S.A., § 57-12-2E. |
| New Jersey | N.J. Statutes § 56:8-1, et seq., against all Defendants; N.J. Statutes § 56:8-107 against Defendants that increased prices by more than 10% from October 27 to November 26, 2012, from January 2 to February 1, 2014, or from January 26 to February 25, 2015. |
| New York | N.Y. Gen. Bus. Law § 349(h). |
| North Carolina | North Carolina Gen. Stat. § 75-1.1, *et seq*. Additionally, Defendants charged "unreasonably excessive prices" in violation of North Carolina. Gen. Stat. § 75-38 for sales in North Carolina in the 45 days after April 28, 2014, January 26, 2015, October 1, 2015, and January 20, 2016. |
| North Dakota | North Dakota Unlawful Sales or Advertising Practices Statute, N.D. Century Code § 51-15-01, *et seq*. |
| ~~South Carolina~~ | ~~South Carolina Unfair Trade Practices Act, S.C. Code Ann. § 39-5-10~~ |
| South Dakota | South Dakota Deceptive Trade Practices and Consumer Protection Statute, S.D. Codified Laws § 37-24-1, *et seq*. |
| ~~West Virginia~~ | ~~West Virginia Consumer Credit and Protection Act, W.Va. Code § 46A-6-101~~ |
| Wisconsin | Wisconsin Consumer Protection Statutes, Wisc. Stat. § 100.18, *et seq*. |

FILED WITH REDACTIONS – PUBLIC VERSION

**_COUNT 5_**
**_Unjust Enrichment_**
_(against all Defendants on behalf of Plaintiffs and the State Damages Class)_

790.    Plaintiffs incorporate by reference the allegations set forth above as if fully set forth herein. This claim is pleaded in the alternative to the other claims in this Complaint. This claim is brought under the equity precedents of each of the State Damages Jurisdictions.

791.    Defendants have unlawfully benefited from their sales of generic Drugs at Issue (as listed in Appendix A to this complaint) because of the unlawful and inequitable acts alleged in this Complaint. Defendants unlawfully overcharged Plaintiffs and Class member pharmacies and hospitals, who purchased generic Drugs at Issue at prices that were more than they would have been but for Defendants' unlawful actions. Pharmacies and hospitals are intended purchasers of the Drugs at Issue.

792.    Defendants' financial benefits resulting from their unlawful and inequitable acts are traceable to overpayments by Plaintiffs and members of the State Damages Class.

793.    Plaintiffs and the State Damages Class have conferred upon Defendants an economic benefit, in the nature of profits resulting from unlawful overcharges, to the economic detriment of Plaintiffs and the State Damages Class.

794.    Defendants have been enriched by revenue resulting from unlawful overcharges for generic Drugs at Issue while Plaintiffs have been impoverished by the overcharges they paid for generic Drugs at Issue imposed through Defendants' unlawful conduct. Defendants' enrichment and Plaintiffs' impoverishment are connected.

795.    There is no justification for Defendants' retention of, and enrichment from, the benefits they received, which caused impoverishment to Plaintiffs and the State Damages Class, because Plaintiffs and the State Damages Class paid supracompetitive prices that inured to

Defendants' benefit, and it would be inequitable for Defendants to retain any revenue gained from their unlawful overcharges. Plaintiffs did not interfere with Defendants' affairs in any manner that conferred these benefits upon Defendants.

796.    The benefits conferred upon Defendants were not gratuitous, in that they constituted revenue created by unlawful overcharges arising from Defendants' illegal and unfair actions to inflate the prices of generic Drugs at Issue.

797.    The benefits conferred upon Defendants are measurable, in that the revenue Defendants have earned due to their unlawful overcharges of generic Drugs at Issue are ascertainable by review of sales records.

798.     Defendants have paid no consideration to any other person for any of the unlawful benefits they received from Plaintiffs and the State Damages Class with respect to Defendants' sales of the Drugs at Issue.

799.    The economic benefit of overcharges and monopoly profits derived by Defendants through charging supracompetitive and artificially inflated prices for generic Drugs at Issue is a direct and proximate result of Defendants' unlawful practices.

800.    The financial benefits derived by Defendants rightfully belong to Plaintiffs and the Damages Class, because Plaintiffs and the Damages Class paid supracompetitive prices during the Class Period, inuring to the benefit of Defendants.

801.    It would be inequitable under unjust enrichment principles under the law of the District of Columbia and the laws of all states and territories of the United States, except Ohio and Indiana, for Defendants to be permitted to retain any of the overcharges for generic Drugs at Issue derived from Defendants' unlawful, unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

FILED WITH REDACTIONS – PUBLIC VERSION

802.    Defendants are aware of and appreciate the benefits bestowed upon them by Plaintiffs and the Damages Class. Defendants consciously accepted the benefits and continue to do so as of the date of this filing, as prices for many of the Drugs at Issue remain inflated above pre-conspiracy levels.

803.    Defendants should be compelled to disgorge in a common fund for the benefit of Plaintiffs and the State Damages Class all unlawful or inequitable proceeds they received from their sales of the generic Drugs at Issue.

804.    A constructive trust should be imposed upon all unlawful or inequitable sums received by Defendants traceable to indirect purchases of generic Drugs at Issue by Plaintiffs and the State Damages Class. Plaintiffs and the State Damages Class have no adequate remedy at law.

**FILED WITH REDACTIONS – PUBLIC VERSION**

## VI.    REQUEST FOR RELIEF

805.    Plaintiffs request that:

a.  The Court determine that this action may be maintained as a class action under Rule 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure, and direct that reasonable Notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to each and every member of the Class;

b.  The Defendants' unlawful conduct be decreed: (i) an unreasonable restraint of trade or commerce in violation of Section 1 of the Sherman Act; (ii) a *per se* violation of Section 1 of the Sherman Act; (iii) an unlawful combination, agreement, understanding and/or concert of action in violation of the state antitrust and unfair competition and consumer protection laws as set forth herein; and (iv) acts of unjust enrichment by Defendants.

c.  Plaintiffs and members of the Damages Class recover damages, to the maximum extent allowed by state and federal laws, and that a judgment in favor of Plaintiffs and members of the Damages Class be entered against Defendants jointly and severally in an amount to be trebled to the extent such laws permit;

d.  Plaintiffs and members of the Damages Class recover damages, to the maximum extent allowed by such laws, in the form of restitution and/or disgorgement of profits unlawfully obtained;

e.  Plaintiffs and members of the Damages Class be awarded restitution, including disgorgement of profits Defendants obtained as a result of their acts of unfair competition and acts of unjust enrichment, and the Court establish of a constructive trust consisting of all ill-gotten gains from which Plaintiffs and members of the Damages Class may make claims on a pro rata basis;

f.  Defendants and their employees be permanently enjoined from continuing, maintaining or renewing the conduct alleged herein, or from entering into any other conspiracy having a similar purpose or effect.

g.  Plaintiffs and members of the Classes be awarded pre- and post-judgment interest as provided by law, and that such interest be awarded at the highest legal rate;

h.  Plaintiffs and members of the Classes recover their costs of suit, including reasonable attorneys' fees, as provided by law; and

i.  Plaintiffs and members of the Classes have such other and further relief as the case may require and the Court may deem just and proper.

## VII.   **JURY DEMAND**

   Plaintiffs demand a trial by jury, pursuant to Rule 38(b) of the Federal Rules of Civil

Procedure, of all issues so triable.


Dated: March 11, 2020      Respectfully submitted,

_/s/  Peter Gil-Montllor_       _/s/  Jonathan W. Cuneo_

Peter Gil-Montllor        Jonathan W. Cuneo
Christian Hudson         Victoria Sims
**CUNEO, GILBERT & LADUCA LLP**   **CUNEO, GILBERT & LADUCA LLP**
16 Court Street, Suite 1012     4725 Wisconsin Ave., NW Suite 200
Brooklyn, NY 11241       Washington, DC 20016
202-789-3960         202-789-3960
pgil-montllor@cuneolaw.com     jonc@cuneolaw.com

             _Lead Counsel for the Indirect Reseller Plaintiffs_

**FILED WITH REDACTIONS – PUBLIC VERSION**

**APPENDIX A:** DRUGS AT ISSUE IN THIS COMPLAINT

| Drug | Defendant(s) / *Co-Conspirators* |
|---|---|
| Acyclovir tablets | **H.D. Smith, Heritage, Zydus** |
| Adapalene gel | **Glenmark, Teva, Taro** |
| Allopurinol tablets | **Dr. Reddy's, Mylan** |
| Amikacin injection | **McKesson, Heritage, Teva** |
| Amiloride-HCTZ tablets | **Mylan, Teva** |
| Amoxicillin-Clavulanate potassium chew tablets | **Sandoz, Teva** |
| Azithromycin oral suspension | **Greenstone, Teva** |
| Betamethasone dipropionate augmented lotion | **Sandoz, Taro** |
| Betamethasone dipropionate-Clotrimazole cream | **Actavis, Sandoz, Taro** |
| Betamethasone dipropionate-Clotrimazole lotion | **Sandoz, Taro** |
| Betamethasone dipropionate cream | **Actavis, Sandoz, Taro** |
| Betamethasone dipropionate lotion | **Sandoz, Perrigo** |
| Betamethasone dipropionate ointment | **Actavis, Sandoz** |
| Betamethasone valerate cream | **Actavis, Sandoz, Taro** |
| Betamethasone valerate ointment | **Actavis, Sandoz** |
| Bethanechol cl tablets | **Actavis, Teva, Amneal** |
| Budesonide DR capsules | **Mylan, Par incl. DAVA, Teva** |
| Budesonide inhalation | **Actavis, Teva** |
| Bumetanide tablets | **Sandoz, Teva** |
| Buprenorphine tablets | **ABC, Sun, Teva** |
| Buspirone HCL tablets | **Mylan, Actavis, Teva** |
| Cabergoline tablets | **WBAD, Greenstone, Teva** |
| Capecitabine tablets | **McKesson, Dr. Reddy's, Teva, Mylan** |
| Carbamazepine chewable tablets | **Taro, Teva** |
| Carbamazepine ER tablets | **Taro, Sandoz** |
| Carbamazepine tablets | **Apotex, Taro, Teva** |
| Carbidopa/Levodopa tablets | **Teva, Actavis, Mylan** |
| Cefdinir capsules | **Lupin, Teva, Sandoz** |
| Cefdinir oral suspension | **Lupin, Teva, Sandoz** |
| Cefprozil tablets | **Lupin, Teva, Sandoz** |
| Celecoxib capsules | **Actavis, Apotex, ABC, Teva, WBAD** |
| Cephalexin suspension | **Lupin, Teva** |
| Cimetidine tablets | **Mylan, Teva** |
| Ciprofloxacin HCL tablets | **Actavis, Dr. Reddy's, Teva** |
| Clarithromycin ER tablets | **Actavis, Teva** |
| Clemastine fumarate tablets | **Sandoz, Teva** |
| Clonidine TTS patch | **Teva, Actavis, Mylan** |
| Clotrimazole topical solution | **Taro, Teva** |

**FILED WITH REDACTIONS – PUBLIC VERSION**

| | |
|---|---|
| Cyproheptadine HCL tablets | **Breckenridge, Teva** |
| Danazol capsules | **Lannett, Teva** |
| Desmopressin acetate tablets | **Actavis, Teva** |
| Desogestrel-Ethinylestradiol tablets | **Glenmark, Teva** |
| Dexmethylphenidate HCL ER capsules | **Par incl. DAVA, Sandoz, Teva** |
| Dextroamphetamine sulfate ER capsules | **Actavis, Teva** |
| Dextroamphetamine-Amphetamine ER (Adderall XR) | **Actavis, Teva** |
| Dextroamphetamine-Amphetamine IR capsules | **ABC, Teva, Actavis, Aurobindo** |
| Diclofenac potassium tablets | **Mylan, Sandoz, Teva** |
| Dicloxacillin sodium capsules | **Sandoz, Teva** |
| Diflunisal tablets | **Teva, Rising** |
| Diltiazem HCL tablets | **Mylan, Teva** |
| Disopyramide phosphate capsules | **Actavis, Teva** |
| Disulfiram tablets | **WBAD, Breckenridge, Teva** |
| Doxazosin mesylate tablets | **Apotex, Mylan, Teva** |
| Drospirenone-Ethinylestradiol tablets | **Teva, Lupin, Actavis** |
| Enalapril maleate tablets | **Mylan, Taro, Teva, Wockhardt** |
| Entecavir tablets | **Teva, Par** |
| Epitol tablets | **Apotex, Taro, Teva** |
| Eplerenone tablets | **M&D, Harvard, Greenstone, Upsher-Smith** |
| Estazolam tablets | **Actavis, Teva** |
| Estradiol tablets | **Actavis, Mylan, Teva** |
| Eszopiclone tablets | **M&D, Cardinal, Sun, Dr. Reddy's,** *Roxane* |
| Ethinylestradiol-Levonorgestrel tablets | **Sandoz, Teva** |
| Ethosuximide capsules, oral solution | **Teva, Akorn (Versapharm)** |
| Etodolac ER tablets | **Taro, Teva, Zydus** |
| Etodolac tablets | **Teva, Taro, Sandoz** |
| Fenofibrate tablets | **Cardinal, Dr. Reddy's, Lupin, Mylan, Teva, Zydus** |
| Fluconazole tablets | **Citron, Dr. Reddy's, Glenmark, Greenstone, Teva, WBAD** |
| Fluocinolone acetonide cream | **Sandoz, G&W,** *Teligent* |
| Fluocinolone acetonide ointment | **Sandoz, G&W,** *Teligent* |
| Fluocinolone acetonide solution | **Sandoz, Taro,** *Teligent* |
| Fluocinonide emollient cream | **Actavis, Taro, Teva, Sandoz** |
| Fluoxetine HCL tablets | **Mylan, Par incl. DAVA, Teva** |
| Flurbiprofen tablets | **Mylan, Teva** |
| Flutamide capsules | **Actavis, Par incl. DAVA, Teva** |
| Fluvastatin sodium capsules | **Mylan, Teva** |
| Gabapentin tablets | **Teva, Glenmark** |
| Glimepiride tablets | **Dr. Reddy's, Teva** |
| Griseofulvin suspension | **Actavis, Teva** |

**FILED WITH REDACTIONS – PUBLIC VERSION**

| | |
|---|---|
| Haloperidol tablets | **Mylan, Sandoz** |
| Hydrocortisone valerate cream | **McKesson, Perrigo, Taro**, G&W |
| Hydroxyurea capsules | **Par incl. DAVA, Teva** |
| Hydroxyzine pamoate capsules | **Actavis, Teva, Rising** |
| Imiquimod cream | **Cardinal, Perrigo, Teva** |
| Irbesartan tablets | **Teva, Lupin** |
| Isoniazid tablets | **Sandoz, Teva** |
| Isotretinoin capsules | **WBAD, ABC, Teva, Dr. Reddy's** |
| Ketoconazole cream | **Sandoz, Mylan, Taro, Teva, Apotex** |
| Ketoconazole tablets | **Sandoz, Mylan, Taro, Teva, Apotex** |
| Ketoprofen capsules | **Mylan, Teva** |
| Ketorolac tromethamine tablets | **Mylan, Teva** |
| Labetalol HCL tablets | **Par, Sandoz, Teva, Actavis (Watson)** |
| Lamivudine-Zidovudine tablets | **McKesson, Actavis, Camber, Aurobindo, Teva, Lupin** |
| Lamotrigine ER tablets | **WBAD, ABC, McKesson, Dr. Reddy's, Par**, *Wilshire* |
| Latanoprost ophthalmic liquid eye | **Akorn, Bausch Health, Greenstone, Sandoz** |
| Lidocaine HCL ointment | **Akorn, Sandoz, Taro** |
| Loperamide HCL capsules | **ABC, Mylan, Teva** |
| Medroxyprogesterone tablets | **Greenstone, Teva** |
| Methotrexate tabs | **Mylan, Teva** |
| Methyldopa tablets | **Mylan, Teva** |
| Metoprolol succinate ER tablets | **Actavis, Dr. Reddy's, Harvard, Par** |
| Modafinil tablets | **ABC, Teva** |
| Moexipril HCL tablets | **Teva, Glenmark** |
| Moexipril HCL-HCTZ tablets | **Teva, Glenmark** |
| Montelukast oral granules | **Cardinal, WBAD, Dr. Reddy's, Teva, Mylan** |
| Nabumetone tablets | **Actavis, Glenmark, Sandoz, Teva** |
| Nadolol tablets | **Mylan, Sandoz, Teva** |
| Neomycin-Polymixin-Hydrocortisone solution | **Bausch Health, Sandoz** |
| Niacin ER tablets | **Lupin, Teva, Zydus** |
| Nitrofurantoin macrocrystal capsules | **Mylan, Teva, Alvogen** |
| Norethindrone acetate - Ethinylestradiol (Mimvey) tablets | **Breckenridge, Teva** |
| Norethindrone acetate tablets | **Glenmark, Amneal, Teva** |
| Norethindrone-Ethinylestradiol (Ovcon 35) tablets | **Lupin, Teva** |
| Nortriptyline HCL capsules | **Actavis, Teva, Taro** |
| Nystatin tablets | **Cardinal**, *Heritage, Sun/Mutual, Teva* |
| Nystatin-Triamcinolone cream | **Sandoz, Taro** |
| Nystatin-Triamcinolone ointment | **Sandoz, Taro** |
| Omega-3-Acid Ethyl esters | **Par, Teva, Apotex** |

**FILED WITH REDACTIONS – PUBLIC VERSION**

| | |
|---|---|
| Omeprazole-Sodium bicarbonate capsules | **WBAD, Oceanside, Dr. Reddy's, Valeant** |
| Oxaprozin tablets | **Dr. Reddy's, Greenstone, Sandoz, Teva** |
| Oxybutynin cl tablets | **Par, Teva, Upsher-Smith** |
| Oxycodone HCL oral solution | **Glenmark, Lannett** |
| Paricalcitol capsules | **WBAD, McKesson, Dr. Reddy's, Teva, Zydus** |
| Paricalcitol tablets | **WBAD, McKesson, Dr. Reddy's, Teva, Zydus** |
| Penicillin V potassium tablets | **Aurobindo, Greenstone, Sandoz, Teva** |
| Pentoxifylline tablets | **Apotex, Teva** |
| Pioglitazone-Metformin tablets | **ABC, Sandoz, Teva** |
| Piroxicam capsules | **Teva, Greenstone** |
| Potassium chloride tablets | **Actavis, Mylan, Sandoz, Upsher-Smith, Zydus** |
| Prazosin HCL capsules | **Mylan, Teva** |
| Prochlorperazine tablets | **Teva, Mylan** |
| Progesterone tablets | **WBAD, Akorn, Actavis** |
| Raloxifene HCL tablets | **McKesson, Teva, Camber, Actavis, Lupin** |
| Ranitidine HCL tablets | **Actavis, Glenmark, Sandoz, Teva, Amneal** |
| Sotalol HCL tablets | **Mylan, Teva** |
| Sumatriptan autoinjector | **WBAD, Dr. Reddy's, Teva** |
| Tamoxifen citrate tablets | **Actavis, Mylan, Teva** |
| Temozolomide capsules | **WBAD, Teva, Sandoz** |
| Theophylline ER tablets | **Teva, Heritage** |
| Timolol Maleate ophthalmic gel forming solution | **Bausch Health, Sandoz** |
| Tizanidine tablets | **McKesson, Dr. Reddy's, Mylan, Sandoz** |
| Tobramycin Dexamethasone opthalmic liquid | **Bausch Health, Sandoz** |
| Tobramycin inhalation | **WBAD, ABC, Cardinal, Akorn, Sandoz, Teva** |
| Tolmetin sodium capsules | **Mylan, Teva** |
| Tolterodine ER capsules | **Cardinal, Mylan, Teva** |
| Tolterodine tartrate tablets | **Teva, Greenstone** |
| Topiramate sprinkle capsules | **Teva, Zydus** |
| Trifluoperazine HCL | **Mylan, Sandoz** |
| Valganciclovir tablets | **H.D. Smith, Camber, Dr. Reddy's** |
| Valsartan-HCTZ tablets | **Mylan, Sandoz** |
| Vancomycin HCL capsules | **WBAD, Akorn, Actavis** |
| Warfarin Sodium tablets | **Taro, Teva, Zydus** |

**FILED WITH REDACTIONS – PUBLIC VERSION**

**APPENDIX B:** ALL IRP DRUGS AT ISSUE IN MDL 2724

Docket numbers in parentheses indicate that pharmacy Plaintiffs previously filed an action in MDL 2724 asserting claims regarding that drug. Drugs without docket numbers indicate a drug at issue in this complaint.

Acetazolamide ER capsules ("caps") (18-cv-2533)
Acetazolamide tablets ("tabs") (18-cv-2533)
Acyclovir tabs
Adapalene gel
Albuterol tabs (17-AL-27243)
Allopurinol tabs
Amikacin injection
Amiloride-Hydrochlorothiazide ("HCTZ") tabs
Amitriptyline tabs (17-cv-3807)
Amoxicillin-Clavulanate potassium chew tabs
Amphetamine-Dextroamphetamine ER caps
Amphetamine-Dextroamphetamine IR caps
Azithromycin oral suspension

Baclofen tabs (17-cv-3808)
Benazepril-HCTZ tabs (17-cv-3811)
Bethanechol chloride ("cl") tabs
Budesonide DR caps
Budesonide inhalation
Bumetanide tabs
Buprenorphine sublingual tabs
Buspirone hydrochloride ("hcl") tabs

Cabergoline tabs
Capecitabine tabs
Carbamazepine chewable tabs
Carbamazepine tabs
Cefdinir caps
Cefdinir oral suspension
Cefprozil tabs
Celecoxib caps
Cephalexin suspension
Cimetidine tabs
Ciprofloxacin hcl tabs
Clarithromycin ER tabs
Clemastine fumarate tabs
Clobetasol cream (17-cv-3812)
Clobetasol emollient cream (17-cv-3812)
Clobetasol gel (17-cv-3812)
Clobetasol ointment (17-cv-3812)
Clobetasol topical solution (17-cv-3812)
Clomipramine caps (17-cv-3813)

Clonidine-TTS patch
Clotrimazole topical solution
Cyproheptadine hcl tabs

Desmopressin acetate tabs
Desogestrel-Ethinylestradiol tabs
Desonide cream (17-cv-3815)
Desonide ointment (17-cv-3815)
Dexmethylphenidate hcl ER caps
Dextroamphetamine sulfate ER tabs
Diclofenac potassium tabs
Dicloxacillin sodium caps
Diflunisal tabs
Digoxin tabs (17-cv-3814)
Diltiazem hcl tabs
Disopyramide phosphate caps
Disulfiram tabs
Divalproex ER tabs (17-cv-3816)
Doxazosin mesylate tabs
Doxycycline hyclate caps (17-cv-973)
Doxycycline hyclate tabs (17-cv-973)
Doxycycline hyclate DR tabs (17-cv-973)
Doxycycline monohydrate tabs (18-cv-2533)
Drospirenone-Ethinylestradiol tabs

Econazole cream (17-cv-3817)
Enalapril maleate tabs
Entecavir tabs
Epitol tabs
Eplerenone tabs
Estazolam tabs
Estradiol tabs
Ethinylestradiol-Levonorgestrel tabs
Ethinylestradiol-Norethindrone acetate tabs
Ethosuximide caps
Ethosuximide oral solution
Etodolac tabs
Etodolac ER tabs

Fenofibrate tabs
Fluconazole tabs
Fluocinonide cream (17-cv-3818)

**FILED WITH REDACTIONS – PUBLIC VERSION**

Fluocinonide ointment (17-cv-3818)
Fluocinonide gel (17-cv-3818)
Fluocinonide emollient cream
Fluoxetine hcl tabs
Flurbiprofen tabs
Flutamide caps
Fluvastatin sodium caps
Fosinopril-HCTZ tabs (18-cv-2533)

Gabapentin tabs
Glimepiride tabs
Glipizide-Metformin tabs (18-cv-2533)
Glyburide tabs (18-cv-2533)
Glyburide-Metformin tabs (18-cv-2533)
Griseofulvin suspension

Haloperidol tabs
Hydroxyurea caps
Hydroxyzine caps

Imiquimod cream
Irbesartan tabs
Isoniazid tabs
Isotretinoin caps

Ketoconazole cream
Ketoconazole tabs
Ketoprofen caps
Ketorolac tromethamine tabs

Labetalol hcl tabs
Lamivudine-Zidovudine (Combivir) tabs
Lamotrigine ER tabs
Leflunomide tabs (18-cv-2533)
Levothyroxine tabs (17-cv-3820)
Lidocaine-Prilocaine cream (17-cv-3819)
Loperamide hcl caps

Medroxyprogesterone tabs
Meprobamate tabs (18-cv-2533)
Methotrexate tabs
Metoprolol succinate ER tabs
Modafinil tabs
Moexipril hcl tabs
Moexipril hcl-HCTZ tabs
Montelukast oral granules

Nabumetone tabs
Nadolol tabs
Niacin ER tabs
Nimodipine caps (18-cv-2533)
Nitrofurantoin macrocrystal caps
Norethindrone acetate tabs
Norethindrone-Ethinylestradiol tabs
Nortriptyline hcl caps
Nystatin cream (18-cv-2533)
Nystatin ointment (18-cv-2533)
Nystatin tabs (18-cv-2533)

Omega-3-Acid Ethyl esters caps
Omeprazole-Sodium bicarbonate caps
Oxaprozin tabs
Oxybutynin cl tabs

Paricalcitol tabs
Paricalcitol caps
Paromomycin caps (18-cv-2533)
Penicillin V potassium tabs
Pentoxifylline tabs
Pioglitazone-Metformin tabs
Piroxicam caps
Pravastatin tabs (17-cv-3821)
Prazosin hcl caps
Prochlorperazine tabs
Progesterone tabs
Propranolol tabs (17-cv-3822)

Raloxifene hcl tabs
Ranitidine hcl tabs

Sumatriptan autoinjector

Tamoxifen citrate tabs
Temozolomide caps
Theophylline ER tabs (18-cv-2533)
Tizanidine hcl tabs
Tobramycin inhalation solution
Tolmetin sodium caps
Tolterodine ER caps
Tolterodine tartrate tabs
Topiramate sprinkle caps
Trifluoperazine hcl tabs

Ursodiol caps (17-cv-3823)

FILED WITH REDACTIONS – PUBLIC VERSION

Valganciclovir tabs
Valsartan-HCTZ tabs
Vancomycin hcl caps
Verapamil hcl tabs (18-cv-2533)
Verapamil ER caps (18-cv-2533)
Verapamil DR caps (18-cv-2533)

Warfarin sodium tabs

Zoledronic Acid injection (18-cv-2533)

FILED WITH REDACTIONS – PUBLIC VERSION

**APPENDIX C:** DRUGS AT ISSUE IN PREVIOUS IRP COMPLAINTS

| **Individual Drug Complaints**<br><br>*filed in March and August 2017* | **"Overarching" Complaint focused on Heritage 18-cv-2533**<br>*filed June 8, 2018* |
|---|---|
| Albuterol tabs (17-cv-3806) | Acetazolamide ER caps |
| Amitriptyline tabs (17-cv-3807) | Acetazolamide tabs |
| Baclofen tabs (17-cv-3808) | Doxycycline monohydrate tabs |
| Benazepril-HCTZ tabs (17-cv-3811) | Fosinopril-HCTZ tabs |
| Clobetasol cream, emollient cream, gel, ointment, and topical solution (17-cv-3812) | Glipizide-Metformin tabs |
| Clomipramine caps (17-cv-3813) | Glyburide tabs |
| Desonide cream, ointment, (17-cv-3815) | Glyburide-Metformin tabs |
| Digoxin tabs (17-cv-3814) | Leflunomide tabs |
| Divalproex ER tabs (17-cv-3816) | Meprobamate tabs |
| Doxycycline (17-cv-973) | Nimodipine caps |
| Econazole cream (17-cv-3817) | Nystatin tabs |
| Fluocinonide cream, gel, emulsified cream, ointment (17-cv-3818) | Nystatin cream |
| Levothyroxine tabs (17-cv-3820) | Nystatin ointment |
| Lidocaine-Prilocaine cream (17-cv-3819) | Paromomycin caps |
| Pravastatin tabs (17-cv-3821) | Theophylline ER tabs |
| Propranolol caps, tabs (17-cv-3822) | Verapamil DR caps |
| Ursodiol caps (17-cv-3823) | Verapamil ER caps |

**FILED WITH REDACTIONS – PUBLIC VERSION**

**APPENDIX D:** DEFENDANTS BY IRP COMPLAINT TYPE

| Defendants in drug-by-drug actions filed in 2017 | Defendants in 18-cv-2533 "Overarching" Complaint focused on Heritage | Defendants in 19-cv-6044 (this complaint) | |
|---|---|---|---|
| | | Manufacturers | **Distributors** |
| | | | *Individuals* |
| Actavis | Actavis | Actavis | |
| Akorn / Hi-Tech | | Akorn / Hi-Tech / Versapharm | **AmerisourceBergen / H.D. Smith** |
| | | Alvogen | **Cardinal / Red Oak / Harvard** |
| | | Amneal | |
| Apotex | Apotex | Apotex | **McKesson** |
| Aurobindo | Aurobindo | Aurobindo | **Morris & Dickson** |
| | | Bausch / Valeant / Oceanside | **WBAD / Walgreens** |
| Breckenridge | | Breckenridge | |
| | | Camber | |
| Citron | Citron | Citron | |
| Dr. Reddy's | Dr. Reddy's | Dr. Reddy's | *Ara Aprahamian [Taro]* |
| Glenmark | Glenmark | Glenmark | *David Berthold [Lupin]* |
| | | Kavod / Rising | *James Brown [Glenmark]* |
| | | G&W Labs | *Maureen Cavanaugh [Teva]* |
| | | Greenstone / Pfizer | *Tracy Sullivan Divalerio [Lannett]* |
| Heritage | Heritage | Heritage | |
| Impax | | | *Marc Falkin [Actavis]* |
| Lannett | Lannett | Lannett | *James Grauso [Glenmark]* |
| Lupin | | Lupin | *Kevin Green [Teva/Zydus]* |
| Mayne | | Mayne | *Robin Hatosy [Greenstone]* |
| Mylan / URL | Mylan | Mylan / URL | *Armando Kellum [Sandoz]* |
| Par | Par / Dava / Generics Bidco | Par / Dava / Endo / Generics Bidco | *Jill Nailor [Greenstone]* |
| | | | *James Nesta [Mylan]* |
| Perrigo | Perrigo | Perrigo | *Konstatin Ostaficiuk [Camber]* |
| Sandoz / Fougera | Sandoz / Fougera | Sandoz / Fougera | |
| Sun | Sun / Mutual | Sun / Mutual / Caraco | *Nisha Patel [Teva]* |
| Taro | Taro | Taro | *David Rekenthaler [Teva]* |
| ~~Teligent~~ | | | *Richard Rogerson [Actavis]* |
| Teva | Teva / Pliva / Barr | Teva / Pliva / Barr | |
| West-Ward | West-Ward | | |
| Wockhardt / Morton Grove | | Wockhardt | |
| Upsher-Smith | | Upsher-Smith | |
| Zydus | Zydus | Zydus | |
| | *Rajiv Malik [Mylan]* | | |

**FILED WITH REDACTIONS – PUBLIC VERSION**

**APPENDIX E:** MOTION TO DISMISS STATUS OF IRP ACTIONS IN MDL 2724

| Complaint | Defendants named by IRPs | Docket | Motion to Dismiss (MTD) status |
|---|---|---|---|
| Albuterol tabs | Mylan, Sun | 17-cv-3806 | No Defs moved to dismiss allegations in 16-AL-27243, Dkt. 2 |
| Amitriptyline tabs | Mylan, Par, Sandoz | 17-cv-3807 | No Defs moved to dismiss allegations in 16-AM-27243, Dkt. 2 |
| Baclofen tabs | Lannett, Par, Teva, Upsher-Smith | 17-cv-3808 | No Defs moved to dismiss allegations in 16-BC-27243, Dkt. 9 |
| Benazepril-HCTZ tabs | Sandoz, Mylan | 17-cv-3811 | No Defs moved to dismiss allegations in 16-BZ-27243, Dkt. 2 |
| Clobetasol cream, emollient cream, gel, ointment, and topical solution | Actavis, Akorn, Hi-Tech, Perrigo, Sandoz, Taro, Wockhardt | 17-cv-3812 | Oct. 16, 2018 – Ruled plausible, MTD denied.  (Opinion on "Group 1" drugs, 16-md-2724, Dkt 721).<br><br>March 2, 2020 – Sandoz DPA admits to conspiring with Taro regarding all five formulations of Clobetasol. |
| Clomipramine caps | Mylan, Sandoz, Taro, | 17-cv-3813 | No Defs moved to dismiss allegations in 16-CM-27243, Dkt. 2 |
| Digoxin tabs | Impax, Lannett, Mylan, Par, West-Ward | 17-cv-3814 | Oct. 16, 2018 – Ruled plausible, MTD denied.  (Opinion on "Group 1" drugs, 16-md-2724, Dkt 721). |
| Desonide cream Desonide ointment | Actavis, Perrigo, Sandoz, Taro | 17-cv-3815 | No Defs moved to dismiss allegations in 16- DS-27243, Dkt. 1<br>March 2, 2020, Sandoz admitted conduct |
| Divalproex ER tabs | Dr. Reddy's, Mylan, Par, Zydus | 17-cv-3816 | Oct. 16, 2018 – Ruled plausible, MTD denied.  (Opinion on "Group 1" drugs, 16-md-2724, Dkt 721). |
| Econazole cream | Perrigo, Taro, ~~Teligent~~ | 17-cv-3817 | Oct. 16, 2018 – Claims against Teligent dismissed, MTD otherwise denied.  (Opinion on "Group 1" drugs, 16-md-2724, Dkt 721). |
| Fluocinonide cream, ointment | Actavis, Taro, Teva | 17-cv-3818 | No Defs moved to dismiss allegations in 16-FL-27243, Dkt. 10. |
| ~~Glyburide~~ | Aurobindo, Citron, Heritage, Teva | 17-cv-1543 | All claims consolidated into 18-cv-2533, docket closed. |
| Lidocaine-Prilocaine cream | Akorn/Hi-Tech, Impax, Sandoz/Fougera | 17-cv-3819 | No Defs moved to dismiss allegations in 16-LD-27243, Dkt. 12. |
| Levothyroxine tabs | Lannett, Mylan, Sandoz | 17-cv-3820 | No Defs moved to dismiss allegations in 16-LV-27243, Dkt. 8. |
| Pravastatin tabs | Apotex, Glenmark, Lupin, Teva, Zydus | 17-cv-3821 | Oct. 16, 2018 – Ruled plausible, MTD denied.  (Opinion on "Group 1" drugs, 16-md-2724, Dkt 721). |
| Propranolol tabs | Actavis, Heritage, Mylan, Par, Teva | 17-cv-3822 | No Defs moved to dismiss allegations in 16-PP-27243, Dkt. 5. |

**FILED WITH REDACTIONS – PUBLIC VERSION**

| Complaint | Defendants named by IRPs | Docket | Motion to Dismiss (MTD) status |
|---|---|---|---|
| Ursodiol caps | Actavis, Epic, Lannett | 17-cv-3823 | No Defs moved to dismiss allegations in 16-FL-27243, Dkt. 8. |
| Doxycycline hyclate caps<br>Doxycycline hyclate DR tabs | Actavis, Par, Sun, West-Ward | 17-cv-973 | Oct. 16, 2018 – Ruled plausible, MTD denied.  (Opinion on "Group 1" drugs, 16-md-2724, Dkt 721). |
| *IRP "Overarching" Heritage-focused Complaint*<br><br>Acetazolamide ER caps<br>Acetazolamide tabs<br>Doxycycline monohydrate tabs<br>Fosinopril-HCTZ tabs<br>Glipizide-Metformin tabs<br>Glyburide tabs<br>Glyburide-Metformin tabs<br>Leflunomide tabs<br>Meprobamate tabs<br>Nimodipine caps<br>Nystatin tabs<br>Nystatin cream<br>Nystatin ointment<br>Paromomycin caps<br>Theophylline ER tabs<br>Verapamil DR caps<br>Verapamil ER caps | Actavis<br>Apotex<br>Aurobindo<br>Citron<br>Dr. Reddy's<br>Glenmark<br>Heritage<br>Lannett<br>Mylan<br>Par / Dava / Generics Bidco<br>Perrigo<br>Sandoz / Fougera<br>Sun / Mutual<br>Taro<br>Teva / Pliva / Barr<br>West-Ward<br>Zydus<br>*Rajiv Malik [Mylan]* | 18-cv-2533<br><br>filed on 6/8/18 | Aug. 15, 2019 – Ruled plausible as part of an overarching conspiracy alleged in 18-cv-02533 (16-md-2724, Dkt 1070). |
| *IRP "Dec 2019" Complaint*<br><br>*See* App'x A | *See* App'x D | 19-cv-6044 | Dec 20, 2019 – Complaint filed.<br>March 10, 2020 – Motion to amend filed (this version)<br><br>No briefing schedule set. |

FILED WITH REDACTIONS – PUBLIC VERSION

**APPENDIX F:** SUMMARY OF COUNTS IN THIS COMPLAINT (19-CV-6044)

| Count | | Type of claim | on behalf of | against Defendants | Scope of commerce |
|---|---|---|---|---|---|
| 1 | | Federal injunctive (15 U.S.C. § 1) | Injunctive Class | All Defendants (manufacturers + distributors) | Purchases of any Drug at Issue |
| 2 | | Federal damages (15 U.S.C. § 1) *overarching conspiracy* | Federal Damages Class | All distributor Defendants | Purchases of any Drug at Issue from any distributor Defendant |
| in the alternative to 2 | 2(a) | Federal damages (15 U.S.C. § 1) *certain distributor conduct* | Federal Damages Class | ABC | Purchases of certain drugs from certain distributor Defendants (specified in each count) |
| | 2(b) | | | H.D. Smith | |
| | 2(c) | | | Cardinal; Red Oak | |
| | 2(d) | | | Harvard | |
| | 2(e) | | | McKesson | |
| | 2(f) | | | Morris & Dickson | |
| | 2(g) | | | WBAD | |
| 3 | | State antitrust statutes *overarching conspiracy* *(in the alternative, each sub-conspiracy)* | State Damages Class | All Defendants (manufacturers + distributors) | Purchases of any Drug at Issue from any source other than the manufacturer Defendants (excludes purchases of drugs for which Plaintiffs have a live federal damages claim against a distributor Defendant) |
| 4 | | State consumer protection statutes *overarching conspiracy* *(in the alternative, each sub-conspiracy)* | | | |
| 5 | | State common law (Unjust Enrichment) | | | |

**FILED WITH REDACTIONS – PUBLIC VERSION**