**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **IN RE: GENERIC PHARMACEUTICALS PRICING ANTITRUST LITIGATION** | **MDL 2724**<br>**16-MD-2724**<br>**HON. CYNTHIA M. RUFE** |
| **THIS DOCUMENT RELATES TO:**<br><br>***Reliable Pharmacy et al. v. Actavis Holdco U.S., Inc. et al.*** | **Civil Action No.**<br><br>**19-cv-6044**<br><br>**ORAL ARGUMENT REQUESTED**<br><br>**REDACTED PUBLIC VERSION** |

**PURCHASING DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR
JOINT MOTION TO DISMISS INDIRECT RESELLER PLAINTIFFS' AMENDED
<u>CLASS ACTION COMPLAINT</u>**

## <u>TABLE OF CONTENTS</u>

**Page**

I.      PRELIMINARY STATEMENT .................................................................. 1

II.     BACKGROUND ..................................................................................... 3

III.    LEGAL STANDARD ............................................................................... 7

IV.     LAW APPLICABLE TO VERTICAL BUSINESS RELATIONSHIPS .......................... 8

V.      ARGUMENT ........................................................................................ 9

        A.      IRPs' Overarching Conspiracy Fails as a Matter of Law Because IRPs Fail
                to Allege Any Agreement Among Purchasing Defendants. .................... 9

        B.      IRPs' Complaint Fails to Connect Purchasing Defendants to the Alleged
                Overarching Manufacturer Conspiracy................................................ 10

                1.      IRPs Fail to Allege Direct Evidence Connecting Purchasing
                        Defendants to the Alleged Manufacturer Overarching Conspiracy.......... 10

                2.      IRPs Fail to Allege Circumstantial Evidence Connecting
                        Purchasing Defendants to the Alleged Manufacturer Overarching
                        Conspiracy. ............................................................................... 11

                        a.      IRPs Do Not Allege Parallel Conduct by Purchasing
                                Defendants. ...................................................................... 11

                        b.      IRPs Fail to Allege Any "Plus Factors" Connecting
                                Purchasing Defendants With the Alleged Overarching
                                Conspiracy. ...................................................................... 14

        C.      IRPs' Drug-Specific Allegations Against Purchasing Defendants Ignore
                the Distinct Treatment of Vertical Relationships in Antitrust Law. .................... 21

        D.      *Illinois Brick* Bars IRPs' Antitrust Damages Claims Against Purchasing
                Defendants. ............................................................................................. 24

        E.      IRPs' Pendent State Law Claims Should Be Dismissed....................................... 27

VI.     IRPS' CLAIMS AS TO PURCHASING DEFENDANTS SHOULD BE DISMISSED
        WITH PREJUDICE. ....................................................................................... 27

VII.    CONCLUSION.............................................................................................. 29

**FILED WITH REDACTIONS – PUBLIC VERSION**

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Am. Mot. Inns v. Holiday Inns,*
  521 F.2d 1230 (3d Cir. 1975)...................................................................................26

*Ashcroft v. Iqbal,*
  556 U.S. 662 (2009)...............................................................................................7

*In re Baby Food Antitrust Litig.,*
  166 F.3d 112 (3d Cir. 1999)....................................................................................15

*Bateman Eichler, Hill Richards, Inc. v. Berner,*
  472 U.S. 299 (1985)...............................................................................................26

*Bell Atl. Corp. v. Twombly,*
  550 U.S. 544 (2007).........................................................................7, 11, 12, 18

*Brantley v. NBC Universal, Inc.,*
  675 F.3d 1192 (9th Cir. 2012) ...............................................................................18

*Burtch v. Milberg Factors, Inc.,*
  662 F.3d 212 (3d Cir. 2011).....................................................................................7

*Bus. Elecs. Corp. v. Sharp Elecs. Corp.,*
  485 U.S. 717 (1988)..................................................................................................8

*In re Chocolate Confectionary Antitrust Litig.,*
  801 F.3d 383 (3d Cir. 2015)..........................................................................11, 12

*In re Chocolate Confectionary Antitrust Litig.,*
  999 F. Supp. 2d 777 (M.D. Pa. 2014), *aff'd*, 801 F.3d 383 (3d Cir. 2015) ...........13

*Connelly v. Steel Valley Sch. Dist.,*
  706 F.3d 209 (3d Cir. 2013)....................................................................................27

*Cosmetic Gallery, Inc. v. Schoeneman Corp.,*
  495 F.3d 46 (3d Cir. 2007)......................................................................................19

*Dole v. Arco Chem. Co.,*
  921 F.2d 484 (3d Cir. 1990)....................................................................................28

*Foman v. Davis,*
  371 U.S. 178 (1962)................................................................................................28

**FILED WITH REDACTIONS – PUBLIC VERSION**

*In re Generic Pharm. Pricing Antitrust Litig.*,
    338 F. Supp. 3d 404 (E.D. Pa. 2018) ....................................................3, 14, 16, 20

*Howard Hess Dental Labs. Inc. v. Dentsply Int'l, Inc.*,
    424 F.3d 363 (3d Cir. 2005)..........................................................................24, 26

*Howard Hess Dental Labs. Inc. v. Dentsply Int'l, Inc.*,
    602 F.3d 237 (3d Cir. 2010)..................................................................................9

*In re Hypodermic Prods. Antitrust Litig.*,
    484 F. App'x 669 (3d Cir. 2012) ........................................................................25

*Ill. Brick Co. v. Illinois*,
    431 U.S. 720 (1977).............................................................................................24

*Ill. Corp. Travel, Inc. v. Am. Airlines, Inc.*,
    806 F.2d 722 (7th Cir. 1986) ...........................................................................8, 12

*In re Ins. Brokerage Antitrust Litig.*,
    618 F.3d 300 (3d Cir. 2010)........................................................................ *passim*

*Interstate Circuit, Inc. v. United States*,
    306 U.S. 208 (1939).............................................................................................11

*Kleen Prods. LLC v. Int'l Paper*,
    276 F. Supp. 3d 811 (N.D. Ill. 2017) ...................................................................8

*Lifewatch Servs. Inc. v. Highmark Inc.*,
    902 F.3d 323 (3d Cir. 2018)............................................................................7, 14

*Marion Diagnostic Ctr., LLC v. McKesson Corp.*,
    386 F. Supp. 3d 477 (E.D. Pa. 2019) ........................................................ *passim*

*Mid-West Paper Prods. Co. v. Cont'l Grp., Inc.*,
    596 F.2d 573 (3d Cir. 1979)................................................................................24

*Monsanto Co. v. Spray-Rite Serv. Corp.*,
    465 U.S. 752 (1984).................................................................................... *passim*

*In re Musical Instruments & Equip. Antitrust Litig.*,
    798 F.3d 1186 (9th Cir. 2015) ............................................................................10

*In re Online Travel Co. (OTC) Hotel Booking Antitrust Litig.*,
    997 F. Supp. 2d 526 (N.D. Tex. 2014) ..........................................................11, 15

*Rick-Mik Enters. Inc. v. Equilon Enters., LLC*,
    532 F.3d 963 (9th Cir. 2008) ..............................................................................27

**FILED WITH REDACTIONS – PUBLIC VERSION**

*Royal Mile Co. v. UPMC*,
   No. 10-1609, 2013 U.S. Dist. LEXIS 138678 (W.D. Pa. Sept. 27, 2013)..............................27

*U.S. ex rel. Schumann v. AstraZeneca Pharms. L.P.*,
   769 F.3d 837 (3d Cir. 2014).......................................................................................28

*St. Clair v. Citizens Fin. Grp.*,
   340 F. App'x 62 (3d Cir. 2009) ................................................................................27

*In re Text Messaging Antitrust Litig.*
   782 F.3d 867 (7th Cir. 2015) ....................................................................................13

*Total Benefits Planning Agency, Inc. v. Anthem Blue Cross & Blue Shield*,
   552 F.3d 430 (6th Cir. 2008) ......................................................................................9

*Toys "R" Us, Inc. v. FTC*,
   221 F. 3d 928 (7th Cir. 2000) ...........................................................................11, 12

*Wallach v. Eaton Corp.*,
   814 F. Supp. 2d 428 (D. Del. 2011) ..........................................................................26

*Wallach v. Eaton Corp.*,
   837 F.3d 356 (3d Cir. 2016).....................................................................................26

*Warren Gen. Hosp. v. Amgen Inc.*,
   643 F.3d 77 (3d Cir. 2011)......................................................................................25

**Statutes and Other Relevant Authority**

Fed. R. Civ. P. 8(a)(2).................................................................................................7

P. Areeda & Hovenkamp, ANTITRUST LAW ¶ 1474c (4th ed. 2017) ...........................................15

**FILED WITH REDACTIONS – PUBLIC VERSION**

## I.      PRELIMINARY STATEMENT

Purchasing Defendants[1]—composed of distributors, sourcing agents, and a pharmacy—buy or source generic drugs from manufacturers.  They do not compete with manufacturers and are not plausible co-conspirators in any alleged manufacturer conspiracy.  Indeed, most Purchasing Defendants are absent members of proposed plaintiff classes in other suits pending in this multidistrict litigation ("MDL").  Nevertheless, the Indirect Reseller Plaintiffs ("IRPs") seek to turn this MDL on its head by transforming some of the largest plaintiffs into defendants and by misappropriating Purchasing Defendants' claims for themselves.  There is no basis for IRPs' claims and no reason to dramatically alter the landscape of this MDL.  IRPs' allegations do not support a claim that any Purchasing Defendant participated in any conspiracy.[2]

Only one other complaint in this MDL has been brought against a Purchasing Defendant.  That complaint, brought by Marion Diagnostic Center, LLC ("Marion") against McKesson, was dismissed for two independent reasons: (1) Marion failed to plausibly allege that McKesson joined in any alleged manufacturer conspiracy, and (2) because Marion was an indirect purchaser, *Illinois Brick* barred Marion from bringing federal antitrust damages claims against the manufacturers.  *Marion Diagnostic Ctr., LLC v. McKesson Corp.*, 386 F. Supp. 3d 477, 486-87 (E.D. Pa. 2019) ("*Marion*").  Critically, the Court held that a conspiracy claim could not be upheld against McKesson—a distributor of Manufacturer Defendants' drugs—based merely on allegations that McKesson profited from the alleged increase in generic drug prices, that McKesson had a strong

---

[1] As referred to herein, the nine "Purchasing Defendants" are:  AmerisourceBergen Drug Corp. ("ABDC"), H.D. Smith, LLC ("H.D. Smith"), Cardinal Health, Inc. ("Cardinal Health"), The Harvard Drug Group, LLC ("Harvard Drug"), McKesson Corp. ("McKesson"), Morris & Dickson Co., LLC ("Morris & Dickson"), Red Oak Sourcing, LLC ("Red Oak"), Walgreens Boots Alliance, Inc. ("Walgreens"), Walgreens Boots Alliance Development GmbH ("WBAD").  WBAD has not been served in this action.
[2] Separate memoranda by some Purchasing Defendants elaborate further on these points in the context of IRPs' allegations specific to certain Purchasing Defendants.

FILED WITH REDACTIONS – PUBLIC VERSION

partnership with one of the alleged ringleaders of Manufacturer Defendants' conspiracy, and that McKesson generally supported trade association activities. *Id.* at 483.

IRPs' December 2019 Amended Complaint ("Complaint") largely repeats those same allegations against Purchasing Defendants. IRPs allege, for example, that some Purchasing Defendants stood to gain greater profits from higher drug prices and had strong relationships with Manufacturer Defendants. Apparently recognizing that those allegations are not enough to sustain conspiracy claims against Purchasing Defendants, IRPs also cite purported communications between Purchasing Defendants and Manufacturer Defendants about competing suppliers' identities and bids, market prices and trends, and competing suppliers' intentions. But these allegations do not cure the same fundamental problems that doomed Marion's complaint.

Communications between Purchasing Defendants and Manufacturer Defendants do not support the inference that Purchasing Defendants joined any conspiracy. *First*, these bilateral communications between Purchasing Defendants and Manufacturer Defendants fail to connect Purchasing Defendants *to each other*. This failure compels dismissal of the overarching conspiracy claims against Purchasing Defendants. *Second*, in the context of the vertical customer-supplier relationship between Purchasing Defendants and Manufacturer Defendants, these types of communications are procompetitive: they are precisely the types of communications that customers use to entice *competing* bids. As the Supreme Court recognized nearly forty years ago, it is expected that a manufacturer and a distributor will discuss commercially sensitive matters such as price, supply, market share, and market conditions because "distributors are an important source of information for manufacturers." *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 763 (1984). Indeed, in the Third Circuit, these types of communications do not support a conspiracy claim as a matter of law because they are the types of communications that "could be

FILED WITH REDACTIONS – PUBLIC VERSION

a powerful tool for . . . negotiat[ing] a more favorable agreement with a particular [partner]." *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 329 (3d Cir. 2010).  Accordingly, these "new" allegations regarding Purchasing Defendants are not helpful to IRPs, as they do not support an inference that Purchasing Defendants participated in any conspiracy.

Separately, like Marion, IRPs fail to solve their *Illinois Brick* problem.  IRPs are "indirect" purchasers of generic drugs.  Because no exception to *Illinois Brick* applies, IRPs are barred from bringing federal antitrust damages claims.  This Court already decided this exact issue in *Marion*, and there is no reason to depart from that ruling here.

Finally, Purchasing Defendants respectfully submit that IRPs' claims should be dismissed with prejudice.  The Court's decision in *Marion* established the law relevant to these vertical claims, and IRPs have had access to hundreds of thousands (if not millions) of records from dozens of parties and non-parties produced during the course of the State AG investigation[3] to allege any claims that might have existed.  It is time for finality for these claims.

## II.     BACKGROUND[4]

Purchasing Defendants are either customers of, or assist customers of, Manufacturer Defendants.[5]   Some, like ABDC, Cardinal Health,[6] McKesson, and Morris & Dickson, are distributors whose functions include purchasing drugs for resale.  Compl. ¶¶ 82, 86, 90-91.[7]  Red

---

[3] These documents were shared with IRPs pursuant to the Court's November 14, 2018 Order (ECF No. 758).

[4] This Court is well familiar with the allegations made by the variety of plaintiffs in this MDL against Manufacturer Defendants.  *See, e.g.*, *In re Generic Pharm. Pricing Antitrust Litig.*, 338 F. Supp. 3d 404, 411-34 (E.D. Pa. 2018) ("*In re Generics*").  Purchasing Defendants do not repeat those general allegations here.

[5] "Manufacturer Defendants" colloquially refers to all generic drug manufacturers named as defendants in any of the actions in this MDL. As used when referring to the IRPs' Complaint, it refers specifically to all defendants other than the Purchasing Defendants.

[6] Cardinal Health notes that IRPs have erroneously named Cardinal Health, Inc., a holding company, as a defendant.

[7] ABDC and Cardinal Health currently own H.D. Smith and Harvard Drug, respectively.  Compl. ¶¶ 83, 87.

3

Oak and WBAD are purchasing agents that pool the purchasing volume of various pharmacies and distributors to negotiate lower prices from generic drug manufacturers.  *Id.* ¶¶ 89, 93.[8]  Defendant Walgreens operates the largest pharmacy chain in the United States.  *Id.* ¶ 92.[9]

  To date, all of the criminal indictments and—with a single exception—all of the civil cases in this MDL have exclusively alleged that Manufacturer Defendants conspired with each other to allocate market share and raise prices.  The lone exception is the complaint filed in 2018 against McKesson by another indirect purchaser plaintiff, Marion, and the Court dismissed that complaint last year.  *See generally Marion*, 386 F. Supp. 3d 477.  Like in *Marion*, IRPs' latest Complaint seeks to broaden the scope of this litigation by asserting that some of the manufacturers' customers—*i.e.*, members of the putative classes that are now suing Manufacturer Defendants— were really co-conspirators.

  Specifically, IRPs seek to implicate Purchasing Defendants in the alleged overarching conspiracy that the Court has found plausible against Manufacturer Defendants, Compl. ¶¶ 758-59, as well as in various discrete individual drug conspiracies.  *Id.* ¶¶ 760-66.  Critically, however, IRPs do not allege any agreement between or among any Purchasing Defendants.  In other words, Purchasing Defendants' alleged involvement in these conspiracies is purely vertical, with no Purchasing Defendant conspiring with any other Purchasing Defendant.

  Unlike Manufacturer Defendants, each of which is involved in the production of just a subset of the drugs at issue, Purchasing Defendants are involved in the purchasing process for

---

[8] Red Oak and WBAD's sole function is to negotiate purchases of generic drugs for their respective principals.  These entities neither purchase these drugs themselves, nor sell (or resell) any drugs.

[9] Indeed, Walgreens would be the largest member of IRPs' putative class but for the fact that this class excludes "pharmacies owned and operated by publicly traded companies"—a distinction that IRPs fail to explain.  *Id.* ¶ 739.  This distinction also has the convenient effect of excluding CVS Health Corporation, which is a 50% co-owner (with Cardinal Health) of Purchasing Defendant Red Oak.

nearly all drugs across the generic pharmaceutical industry. *See id.* at Appx. B. Yet IRPs'

allegations attempt to link each Purchasing Defendant to just a fraction of the 151-plus drugs

involved in the alleged manufacturer conspiracy, and even a smaller fraction of the thousands of

drugs in each distributor's drug portfolio.[10] IRPs allege no involvement whatsoever by Purchasing

Defendants with regard to the remaining drugs, despite IRPs' allegation that Purchasing

Defendants "served a crucial policing function" across the industry. *Id.* ¶ 163.

By necessity, Purchasing Defendants are in near-constant communication with their

suppliers. *Id.* ¶¶ 182-390. Just like distributors in other industries, these customer-supplier

conversations frequently involve discussions of prices, volumes, market shares, market conditions,

and competition. IRPs themselves acknowledge that a "distributor must necessarily discuss its

own purchases with its suppliers, the manufacturers." *Id.* ¶ 172.

To support their claim that Purchasing Defendants joined the alleged manufacturer

conspiracy, IRPs point to excerpts of such vertical communications. Although these

communications may contain some of the same buzzwords that IRPs have identified in

communications *between manufacturers*, Purchasing Defendants are situated very differently, and

their use of such charged language neither carries the same meaning nor suggests a similar

---

[10] Those drugs are acyclovir, amikacin, buprenorphine, cabergoline, capecitabine, celecoxib, dextroamphetamine-amphetamine IR, disulfiram, eplerenone, eszopiclone, fenofibrate, hydro valerate cream, imiquimod, isotretinoin, lamotrigine, loperamide, metroprolol succinate ER, modafinil, montelukast, nystatin, omeprazole-sodium bicarbonate, paricalcitol, pioglitzaone-metformin IR, progesterone/vancomycin, raloxifene, sumatriptan autoinjector, temozolomide, tizanidine, tobramycin inhalation, tolterodine, valganiciclovir, and vancomycin. One Purchasing Defendant, Red Oak, is not named (as either a Defendant or a co-conspirator) to any of these alleged conspiracies. Others, like Harvard, Drug, H.D. Smith, and Morris & Dickson, allegedly are only involved in the conspiracy with respect to two drugs. *See id.* ¶¶ 205-08, 209-13, Harvard Drug (metoprolol succinate ER and eplerenone); *id.* ¶¶ 185-95, 196-201, H.D. Smith (valganciclovir and acyclovir); *id.* ¶¶ 211, 348-51, Morris & Dickson (eplerenone and eszopiclone). Isorbide mononitrate, lidocaine, and moxifloxacin are not included in IRPs' drug list (*see* Compl. at Appx. A), but IRPs include them in their allegations against Purchasing Defendants.

anticompetitive intent. These communications generally fall into four main categories, none of which is inappropriate in the context of a supplier-customer relationship as further explained below:

- Customer-supplier communications about competing suppliers' identities and bids;[11]

- Customer-supplier communications about competing suppliers' intentions, such as entry plans, target market shares, and willingness to defend or "concede" bids;[12]

- Customer-supplier communications about market prices and trends;[13] and

- Customer-supplier communications about how the customer wants the supplier to bid.[14]

While some Purchasing Defendants have different business models and pricing structures, each seeks to procure generic drugs at the lowest possible overall price. *See, e.g., id.* ¶¶ 184, 180, 336, 381. Indeed, IRPs concede that "[t]he manufacturer with the lowest net price typically wins the bid and sometimes the runner-up is also awarded a 'secondary' contract, to be used as a backup . . . ." *Id.* ¶ 203. To assure supply to customers, distributors sometimes also request "a 'one-time buy' or 'spot purchase' of a specific number of units." *Id.* Nowhere do IRPs offer a single example of any Purchasing Defendant acting contrary to its own self-interest—*i.e.*, awarding a bid to a higher-priced bidder without an otherwise lawful and appropriate rationale.

---

[11] *See, e.g., id.* ¶¶ 185-95, H.D. Smith (valganciclolir); *id.* ¶¶ 286-87, McKesson (hydro valerate cream).

[12] S*ee, e.g., id.* ¶¶ 196-201, H.D. Smith (acyclovir); *id.* ¶¶ 237-39, ABDC (buprenorphine); *id.* ¶¶ 209-13, Harvard Drug (eplerenone); *id.* ¶ 241, WBAD (isosorbide mononitrate); *id.* ¶¶ 298-303, McKesson (amikacin); *id.* ¶¶ 348-51, Morris & Dickson (eszopiclone); *id.* ¶¶ 134, 367-74, 497-504, Cardinal Health (montelukast, tolterodine, fenofibrate).

[13] S*ee, e.g., id.* ¶¶ 205-08, Harvard Drug (metoprolol succinate ER); *id.* ¶¶ 233-36, ABDC (loperamide); *id.* ¶¶ 304-13, McKesson (tizanidine); *id.* ¶¶ 360-66, 348-49 Cardinal (nystatin, eszopiclone).

[14] *See, e.g., id.* ¶¶ 245-50; 262-65; 248, WBAD (progesterone/vancomycin; cabergoline; lidocaine); *id.* ¶¶ 375-90; 353-54, 497-504, Cardinal Health (tobramycin inhalation, imiquimod cream).

6

### III.    LEGAL STANDARD

A complaint fails to state a claim upon which relief can be granted where the "'plain statement of the claim'" lacks enough substance to establish entitlement to relief.  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting Fed. R. Civ. P. 8(a)(2)).  A complaint's well-pleaded factual allegations must allow "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged," *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556), and it must contain "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570.  "[D]etermining whether a complaint states a plausible claim is context-specific, requiring the reviewing court to draw on its experience and common sense." *Iqbal*, 556 U.S. at 663-64 (citing *Twombly*, 550 U.S. at 556).

IRPs lack any direct evidence that Purchasing Defendants agreed to join any conspiracy. Instead, IRPs exclusively rely on circumstantial evidence, heightening their pleading burden. "Circumstantial evidence of parallel behavior must be pled in 'a context that raises a suggestion of a preceding agreement, not merely parallel conduct that could just as well be independent action.'"  *Burch v. Milberg Factors, Inc.*, 662 F.3d 212, 226 (3d Cir. 2011) (quoting *Twombly*, 550 U.S. at 557).  "'[A] claim based on parallel—even consciously parallel—conduct alone would be insufficient to survive dismissal[.]'"  *Marion*, 386 F. Supp. 3d at 483 (quoting *Lifewatch Servs. Inc. v. Highmark Inc.*, 902 F.3d 323, 335 (3d Cir. 2018)).  Consequently, in addition to alleging parallel conduct, plaintiffs relying on circumstantial allegations must allege something "more"— often referred to as "plus factors."  *See id.* at 483-84.  Where there are "obvious alternative explanation[s]" for the facts alleged, circumstantial allegations are insufficient to state a claim. *Ins. Brokerage*, 618 F.3d at 322-23 (alteration in original) (citations omitted) (internal quotation marks omitted).

7

## IV.   LAW APPLICABLE TO VERTICAL BUSINESS RELATIONSHIPS

The antitrust laws limit the range of inferences that can be drawn from commercial communications between vertically related parties for three reasons.  First, communications between manufacturers and distributors are fundamentally different from discussions among horizontal competitors.  *Marion*, 386 F. Supp. 3d at 485 n.57 (quoting *Monsanto*, 465 U.S. at 762); *Kleen Prods. LLC v. Int'l Paper*, 276 F. Supp. 3d 811, 835 (N.D. Ill. 2017) (stating that "constant communication" does not, without more, suggest agreement to fix prices, "particularly . . . when the defendants have legitimate reasons to talk to one another[,]" *e.g.*, as "customers and suppliers").  Indeed, "distributors are an important source of information for manufacturers." *Monsanto*, 465 U.S. at 763.  For that reason, in a vertical relationship, discussions about commercially sensitive information are necessary, "frequent," and "beneficial[.]"   *Ill. Corp. Travel, Inc. v. Am. Airlines, Inc.*, 806 F.2d 722, 726 (7th Cir. 1986).

Second, a "manufacturer and its distributors have legitimate reasons to exchange information about the prices and the reception of their products in the market."  *Monsanto*, 465 U.S. at 762.  Indeed, vertically situated businesses sharing such information "could be a powerful tool for . . .  negotiat[ing] a more favorable agreement with a particular [partner]."  *Ins. Brokerage*, 618 F.3d at 329; *see also Monsanto*, 465 U.S. at 763-64 ("In order to assure an efficient distribution system, manufacturers and distributors *constantly must coordinate* their activities to assure that their product will reach the consumer persuasively and efficiently." (emphasis added)). Discouraging such procompetitive discussions in a buyer-seller relationship would "'create an irrational dislocation in the market' by preventing legitimate communication between a manufacturer and its distributors."  *Bus. Elecs. Corp. v. Sharp Elecs. Corp.*, 485 U.S. 717, 726 (1988) (quoting *Monsanto*, 465 U.S. at 764).

8

Third, these types of commercially sensitive communications are as consistent with *independent* conduct as they are with collusion, and therefore they must be scrutinized judiciously. *See Ins. Brokerage*, 618 F.3d at 330 ("It is true that *if* a horizontal conspiracy of the sort asserted by plaintiffs existed, the exchange of information alleged could conceivably serve the 'policing' function plaintiffs describe.  But it does not follow that this disclosure of information plausibly implies such a conspiracy; it is at least equally consistent with unconcerted action." (emphasis in original)).

## V.    ARGUMENT

### A.    IRPs' Overarching Conspiracy Fails as a Matter of Law Because IRPs Fail to Allege Any Agreement Among Purchasing Defendants.

IRPs' claim that Purchasing Defendants participated in a *per se* unlawful overarching conspiracy fails as a matter of law because there are no factual allegations connecting Purchasing Defendants to each other.  Courts allow such *per se* claims against vertically related parties only in the unusual circumstance where multiple competitors at each level of the distribution chain are connected to each other in a hub-and-spoke conspiracy, which is a "hybrid of both vertical and horizontal conspiracies."  *Howard Hess Dental Labs. Inc. v. Dentsply Int'l, Inc.*, 602 F.3d 237, 254 (3d Cir. 2010).  Such a conspiracy consists of "'a hub, generally the dominant purchaser or supplier in the relevant market, and the spokes, made up of the distributors involved in the conspiracy.  The rim of the wheel is the connecting agreements among the horizontal competitors (distributors) that form the spokes.'"  *Id.* at 255 (quoting *Total Benefits Planning Agency, Inc. v. Anthem Blue Cross & Blue Shield*, 552 F.3d 430, 435 n.3 (6th Cir. 2008)).

Where, as here, the conspiracy is alleged to consist of multiple "hubs" and multiple "spokes," the Third Circuit has held that there must be a horizontal agreement among all similarly situated members to be legally cognizable as a single conspiracy.  In *Insurance Brokerage*, the

9

plaintiffs alleged multiple broker-centered hub-and-spoke conspiracies (with insurers as the spokes), in addition to a "global" conspiracy among *all* of the broker and insurer defendants. *See Ins. Brokerage*, 618 F.3d at 311-14. The Third Circuit rejected the alleged "global" conspiracy because the complaint failed to plausibly allege collusion at the broker (distributor) level. *Id.* at 348.

IRPs' Complaint suffers from this exact same flaw. It contains no allegations—not even conclusory ones—that Purchasing Defendants colluded among themselves. Accordingly, IRPs' overarching conspiracy allegations as to Purchasing Defendants fail to state a claim because IRPs do not even attempt to allege collusion among Purchasing Defendants.

**B.     IRPs' Complaint Fails to Connect Purchasing Defendants to the Alleged Overarching Manufacturer Conspiracy.**

IRPs also fail to connect Purchasing Defendants to the alleged overarching manufacturer conspiracy. They offer no direct evidence, and their supposed circumstantial evidence does not provide any economically plausible basis for inferring their conscious commitment to any alleged manufacturer conspiracy.

**1.     IRPs Fail to Allege Direct Evidence Connecting Purchasing Defendants to the Alleged Manufacturer Overarching Conspiracy.**

Even after substantial discovery, IRPs do not plead facts to explain "who is alleged to have conspired with whom, what exactly they agreed to, and how the alleged conspiracy was organized and carried out." *In re Musical Instruments & Equip. Antitrust Litig.*, 798 F.3d 1186, 1193 n.5 (9th Cir. 2015) (internal quotation marks omitted). They do not identify any "document or conversation explicitly manifesting the existence of [an] agreement" with the manufacturers, *Ins. Brokerage*, 618 F.3d at 324 n.23, and no Purchasing Defendant has been named as a co-conspirator in any indictment, plea, or government complaint. Simply put, IRPs fail to allege conduct that "'is

**FILED WITH REDACTIONS – PUBLIC VERSION**

explicit and requires no inferences to establish'" the participation of Purchasing Defendants in the alleged overarching conspiracy.  *Id*. (citation omitted).

> **2.**      **IRPs Fail to Allege Circumstantial Evidence Connecting Purchasing Defendants to the Alleged Manufacturer Overarching Conspiracy.**

IRPs likewise fail to plead circumstantial evidence that plausibly supports an inference that Purchasing Defendants participated in and had a conscious commitment to the Manufacturer Defendants' alleged overarching conspiracy.

> **a.**      **IRPs Do Not Allege Parallel Conduct by Purchasing Defendants.**

IRPs do not allege the requisite parallel conduct among Purchasing Defendants.  To satisfy the parallel conduct requirement, IRPs must plead facts demonstrating that Purchasing Defendants took actions that tracked—*i.e.*, were parallel to—those of their alleged co-conspirators, and that this parallel conduct was somehow anticompetitive.  Examples of parallel conduct—when accompanied by other "plus factors"—include similarly timed price changes (*In re Chocolate Confectionary Antitrust Litig.*, 801 F.3d 383, 392 (3d Cir. 2015)), market entry decisions (*Twombly*, 550 U.S. at 551), adoption of new policies (*Interstate Circuit, Inc. v. United States*, 306 U.S. 208, 215-17 (1939)), termination of suppliers or distributors (*Toys "R" Us, Inc. v. FTC*, 221 F. 3d 928, 931-32 (7th Cir. 2000)), or uniform adoption of new business arrangements (*In re Online Travel Co. (OTC) Hotel Booking Antitrust Litig.*, 997 F. Supp. 2d 526, 531 (N.D. Tex. 2014)). IRPs have not alleged anything of the sort by Purchasing Defendants.

> *i.*      *No Parallel Conduct Between Purchasing Defendants and Manufacturer Defendants*

IRPs have not identified any actions that a Purchasing Defendant took in parallel with any Manufacturer Defendant.  That is not surprising given that Purchasing Defendants' business activities are of a wholly different nature than those of Manufacturer Defendants.  That is the

**FILED WITH REDACTIONS – PUBLIC VERSION**

conclusion this Court reached in *Marion* with respect to McKesson, and nothing in IRPs'
Complaint merits a departure from that holding. *Marion*, 386 F. Supp. 3d at 483.

>                *ii.    No Parallel Conduct Among Purchasing Defendants*

IRPs have also failed to identify any parallel action *among* Purchasing Defendants. There
are no allegations that Purchasing Defendants charged similar prices as one another (*Chocolate
Confectionary*, 801 F.3d at 392); entered or refrained from entering the markets for certain drugs
in unison (*Twombly*, 550 U.S. at 551); began or terminated supplier or customer relationships
simultaneously (*Toys "R" Us*, 221 F.3d at 931-32); or otherwise took or refrained from taking any
action in "parallel" with one another.

Rather, IRPs' allegations reflect only that each Purchasing Defendant did what one would
expect a distributor to do—negotiate vigorously with its suppliers. *See generally* Compl. ¶¶ 185-
390.[15] There is no precedent for concluding that these sorts of commercial discussions are
sufficient "parallel conduct" for purposes of analyzing a Section 1 claim. "In any chain of
distribution discussions of price will be frequent—and as *Monsanto* pointed out, beneficial too."
*Ill. Corp. Travel*, 806 F.2d at 726. Indeed, if bilateral purchaser-supplier discussions about market
conditions constituted parallel conduct, federal pleading standards would be reduced to an
absurdity because purchasers across various industries engage in these sorts of discussions all the
time. As the Third Circuit held in *Insurance Brokerage*, an overarching conspiracy case that
involves vertically related commercial actors requires the plaintiff to come forward with some
specialized form of parallel conduct. *Ins. Brokerage*, 618 F.3d at 328 (stating that "[i]f the parallel

---

[15] For instance, IRPs allege regular negotiations between Purchasing Defendants and the manufacturers that
supply them certain drugs. They also allege that Purchasing Defendants would push back on price increases
from Manufacturer Defendants. For example, IRPs allege that Cardinal Health rejected a potential
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ because it would ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Compl.
¶ 178; *see also id.* ¶¶ 180, 336. Such "push back," of course, is exactly what distributors typically do, and
is inconsistent with participation in a price-fixing conspiracy.

decisions [by the alleged conspirators] to pay contingent commissions imply a horizontal agreement, then it is difficult to see why parallel decisions to pay standard commissions . . . would not also imply an agreement.  For that matter, plaintiffs' logic would divine a horizontal agreement from virtually any parallel" conduct in the context of a vertical relationship).

Even if communicating with one's supplier could somehow constitute the requisite parallel conduct contemplated by *Twombly* and *Insurance Brokerage*, the particular communications cited in IRPs' Complaint would not suffice because they largely relate to different drugs of different dosages and frequently took place years apart from one another.  The conduct is not parallel in a temporal sense, in substantive terms, or in any other way.  For example, ABDC discussing pioglitazone-metformin IR with its suppliers in 2013 can in no way be considered parallel to McKesson discussing hydrocortisone valerate cream with its suppliers in 2015; nor can Harvard discussing metoprolol succinate ER with its suppliers in 2014 be considered parallel to WBAD discussing temozolomide with its suppliers in 2013; nor can Cardinal discussing tolterodine ER with its suppliers in 2013 be considered parallel to Morris & Dickson discussing eszopiclone with its suppliers in 2014.  *See, e.g.*, Compl. ¶¶ 218-22; 286-87; 205-08; 251-58; 367-74; 348-51; *see also In re Text Messaging Antitrust Litig.* 782 F.3d 867, 877 (7th Cir. 2015) ("For months on end there were price differences in their services."); *In re Chocolate Confectionary Antitrust Litig.*, 999 F. Supp. 2d 777, 787 (M.D. Pa. 2014) (explaining that parallel pricing must be "reasonably proximate in time and value" to raise an inference of conspiracy), *aff'd*, 801 F.3d 383 (3d Cir. 2015).  Without any set of parallel actions, the Court should dismiss IRPs' Complaint as to Purchasing Defendants.

13

        **b.**       **IRPs Fail to Allege Any "Plus Factors" Connecting Purchasing Defendants With the Alleged Overarching Conspiracy.**

As this Court has explained, even if IRPs could identify parallel conduct on the part of Purchasing Defendants, that "'alone [is] insufficient to survive dismissal.'" *In re Generics*, 338 F. Supp. 3d at 447 (alteration in original) (quoting *Lifewatch Servs., Inc.*, 902 F.3d at 335). They also need to identify "plus factors," *i.e.*, conduct in addition to the parallel actions that make "'the inference of independent action . . . less likely than that of concerted action.'" *Id.* at 448 (citation omitted). The Third Circuit has identified three such "plus factors" that can nudge a purely circumstantial complaint into the realm of plausibility: "'(1) evidence that the defendant had a motive to enter into a price-fixing conspiracy; (2) evidence that the defendant acted contrary to its interests; and (3) evidence implying a traditional conspiracy.'" *Ins. Brokerage*, 618 F.3d at 322 (citation omitted); *see also Marion*, 386 F. Supp. 3d at 483-84. As to Purchasing Defendants, IRPs' Complaint does not contain any of the three.

        **i.**       *IRPs Fail to Allege Any Plausible Motive for Purchasing Defendants to Participate in the Alleged Manufacturer Conspiracies.*

IRPs fail to adequately allege that any Purchasing Defendant had any motive to join the alleged manufacturer conspiracies. The only substantive allegation IRPs make is that, despite different business models and pricing structures, *some* Purchasing Defendants stood to profit from higher prices because they are compensated based on a percentage of purchases, or because higher prices might grow the value of existing inventory. *See* Compl. ¶¶ 174-75. These conclusory allegations appear premised on the notion that *some* Purchasing Defendants had inflation-protected pricing arrangements. There is nothing suspect about a wholesaler using these sorts of pricing models, which are common across a range of industries and can help insulate the wholesaler from the risk of rising prices. *See* P. Areeda & H. Hovenkamp, ANTITRUST LAW ¶ 1474c (4th ed. 2017)

14

**FILED WITH REDACTIONS – PUBLIC VERSION**

("[T]he distributor taking its usual markup does not share a 'conscious commitment' . . . as the Supreme Court has required." (quoting *Monsanto*, 465 U.S. at 764)); *see also OTC Hotel Booking*, 997 F. Supp. 2d at 538-39 (explaining that even if both the hotels and their online travel agency partners stood to benefit from higher prices on hotel rooms, that did not imply that their agreements with each other resulted from conspiracies among the companies at each level). As this Court has previously explained, "'[p]rofit is a legitimate motive in pricing decisions, and something more is required before a court can conclude that competitors conspired to fix pric[es].'" *Marion*, 386 F. Supp. 3d at 485 (alterations in original) (citation omitted); *see also In re Baby Food Antitrust Litig.*, 166 F.3d 112, 133 (3d Cir. 1999) ("[I]f, as the plaintiffs contend, the defendants had a motive to achieve higher prices, then every company in every industry would have such a motive." (citation omitted) (internal quotation marks omitted)).

Furthermore, IRPs' theory wholly ignores Purchasing Defendants' varied positions in the industry. The only common element across Purchasing Defendant group is that each of them treats drugs as *inputs* in their business model. If they were truly colluding, one might expect such collusion to take the form of parallel coordination on resale prices or commission percentages, or to ensure that the prices they charge to their customers would be fixed or inflated. However, allegations of a concerted effort to *spend more* make no economic sense without assurances that the other Purchasing Defendants at the same level of the distribution chain would collude to charge similar prices to their customers. No such assurances exist or have been alleged here. Even if a Purchasing Defendant hoped that the slightly higher margin would increase profitability in some cases, without parallel coordination on resale prices they would: (1) risk getting stuck with overpriced shipments if their competitors did not raise their resale price; (2) risk losing profits due

FILED WITH REDACTIONS – PUBLIC VERSION

to the lower quantity sold at the higher prices; and (3) have foregone far more effective ways to increase profits if they really were colluding, as described above.

Finally, IRPs' Complaint is devoid of allegations about market structure at Purchasing Defendants' level (*e.g.*, market concentration, barriers to entry, or substitutability), which this Court previously considered in finding that Manufacturer Defendants had a motive to collude. *See In re Generics*, 338 F. Supp. 3d at 448.

ii.     *IRPs Fail to Allege That Purchasing Defendants Took Any Actions Against Their Respective Self-Interests.*

IRPs likewise have not alleged any actions Purchasing Defendants took that would be against their respective self-interests absent a conspiracy.  IRPs seek to infer that Purchasing Defendants joined Manufacturer Defendants' alleged conspiracies from communications that fall into roughly four categories, none of which are against Purchasing Defendants' independent self-interests.  To the contrary, the four categories of communications described in IRPs' Complaint are normal, everyday forms of negotiating.  Indeed, these allegations generally reflect the same thing: that Purchasing Defendants were exchanging information to solicit competing bids, to ensure their stable supply of generic drugs at the lowest available price, and to better understand market dynamics generally.

(a)     Customer-supplier communications about competing suppliers' identities and bids

IRPs allege that at various times, a Purchasing Defendant would reveal competitors' identities and information about bids it received from other suppliers.  For example, IRPs allege that in 2015, when manufacturer ███████ was looking to enter the market for hydro valerate cream, ████████████████████████████████████████ and that Purchasing Defendant responded.  Compl. ¶¶ 286-87.  The sharing of this type of information during the bidding process is normal, lawful, and an established technique for "negotiat[ing] a more favorable agreement with

16

a particular [partner]." *Ins. Brokerage*, 618 F.3d at 329.  In declining to infer a conspiracy based on similar allegations in *Insurance Brokerage*, the Third Circuit explained that this type of behavior is not suspicious because it is analogous to a "manufacturer's practice of informing each of its distributors of the identities of its other distributors—as well as the prices they paid and the volume of product they received[.]" *Id.* at 329-30.  IRPs' allegations are cut from this same cloth. They are not actions against Purchasing Defendants' self-interests—purchasers in many industries routinely inform suppliers about competing bids to attract additional, even more competitive bids. There is nothing suspicious about these types of communications.

<div style="margin-left:2em;">

(b)   Customer-supplier communications about competing suppliers' intentions, such as entry plans, target market shares, and willingness to defend or "concede" bids

</div>

IRPs allege various instances where a Purchasing Defendant would inform its respective suppliers about other competing supplier's intentions, such as entry plans, target market shares, and willingness to defend or "concede" bids.  *See, e.g.*, Compl. ¶¶ 212, 220, 255.  But such communications are to be expected because distributors and other purchasers are "important source[s] of information for manufacturers."  *Monsanto*, 465 U.S. at 763.  Telling a supplier that a competitor will be entering shortly is a common-sense way to push the existing supplier to lower prices, and IRPs' allegations reflect that dynamic.  For instance, IRPs allege that a Manufacturer Defendant believed that a Purchasing Defendant ██████████████████████ ████████████████ and ████████████████████████ Compl. ¶ 346.  Similarly, IRPs allege that a Purchasing Defendant told a Manufacturer Defendant employee on the phone that another manufacturer would be launching a drug shortly.  *Id.* ¶ 369. A manufacturer acknowledging that a distributor was a valuable source of competitive intelligence does not suggest that the distributor was acting against its own interest because manufacturers depend heavily on their purchasers to ascertain the appropriate parameters of their bids.  *See, e.g.*,

17

*id.* ¶¶ 298-303 (describing a round of bidding for Amikacin).  Purchasing Defendants have their own, independent incentive to share some of that data to encourage competitive bidding, as well as to cultivate trust with their suppliers, who are repeat players in the market.  Such information-sharing therefore does not "cross the line 'between the facially neutral and the factually suggestive'" of conspiracy.  *Ins. Brokerage*, 618 F.3d at 322 (quoting *Twombly*, 550 U.S. at 557 n.5).

<div style="text-align:center">(c)     Customer-supplier communications about market prices, market shares, and trends</div>

IRPs allege that Purchasing Defendants discussed market prices and price trends with their suppliers.  Compl. ¶¶ 165, 177.  It is well established that vertically situated market participants—particularly a manufacturer and distributor—are often in "constant communication" about market prices.  *Monsanto*, 465 U.S. at 762.  For example, IRPs allege that an individual from Sandoz sent an individual from a Purchasing Defendant ████████████████████████████

████████████████████████████████████████████████

████████████████████████ Compl. ¶ 308.  This is exactly the type of communication contemplated by *Monsanto*—a manufacturer and distributor discussing prices and how those prices might be received in the market.  *See Monsanto*, 465 U.S. at 762-63.  Such discussions are lawful, even when those discussions may result in higher prices.  *See id.*

Discussions involving upward price trends are likewise consistent with each firm's self-interest because both a manufacturer and reseller must determine the market-competitiveness of their own respective pricing.  A customer's willingness to accept a price increase for its own benefit is not suggestive of a conspiracy.  *See Brantley v. NBC Universal, Inc.*, 675 F.3d 1192, 1202 (9th Cir. 2012) (noting that "increasing prices" are "fully consistent with a free, competitive market").  Purchasing Defendants' role is to obtain needed supply at the best available price,

<div style="text-align:center">18</div>

whether for itself (for resale) or for specific customers for whom it acts as a purchasing agent. When facing one manufacturer's proposed price increase, it may be in the purchaser's best interest to seek better pricing elsewhere, which may simply confirm that the other manufacturers are planning similar price increases. This is not unusual, and it also would not be unusual for a Purchasing Defendant to tell one manufacturer that a price increase is acceptable because that Purchasing Defendant already had learned that another manufacturer also planned to increase prices for the same drug.

(d)     Customer-supplier communications about how the customer wants the supplier to bid

IRPs also purport to recast instances in which a Purchasing Defendant parroted Manufacturer Defendant language when discussing market conditions that Purchasing Defendant had no power to change or control. For example, IRPs allege that a Purchasing Defendant would discourage manufacturers from further bidding in certain circumstances because it would be ████ ████████ Compl. ¶ 248, or by serving a policing function for price competition seen as "'irresponsible,' 'irrational,' aggressive,' [or] 'not playing fair.'" *Id.* ¶ 163. Between competing manufacturers, such messages very well could be problematic, but the same is not true within a single distribution chain for two reasons.

First, stable sources of supply are critical to Purchasing Defendants' businesses. Purchasing Defendants have strong, independent incentives to support new supplier entry, as well as to commit volumes to reliable suppliers so they remain in the market. Otherwise, Purchasing Defendants risk supply shortages and their respective consumers turning elsewhere. A distributor that cannot obtain products from manufacturers risks "major economic injury." *Cosmetic Gallery, Inc. v. Schoeneman Corp.*, 495 F.3d 46, 55 (3d Cir. 2007).

19

Second, to the extent that IRPs allege that some Purchasing Defendants stood to legitimately profit from rising drug prices, Compl. ¶¶ 173-75, allegations that Purchasing Defendants discouraged further bids in certain instances do not suggest that Purchasing Defendants acted against their own interest. *See Marion*, 386 F. Supp. 3d at 485 ("Marion'[s] contention that McKesson acted against its own economic interest is contrary to the above-cited allegation that McKesson profited from the alleged increase in generic drug prices."). Instead, it reflects only that Purchasing Defendants had an understanding of when further bids likely would be successful. That is especially true where, as here, there is no allegation that Purchasing Defendants were engaged in any parallel coordination to deter entry, to agree on purchase prices, or to agree on resale prices. Absent any of those allegations, an instruction to a single potential bidder not to submit a further bid is not evidence of collusion.

<div align="center">iii.   <em>IRPs Fail to Allege Facts Implying a Traditional Conspiracy as to Purchasing Defendants.</em></div>

IRPs have not alleged any facts implying a traditional conspiracy. In its previous holding that the private plaintiffs plausibly alleged a conspiracy among the manufacturers, this Court focused largely on the plaintiffs' allegations that: (1) at least one manufacturer employee had already pleaded guilty in connection with a government investigation into the conduct, and (2) manufacturers had numerous opportunities to collude through various industry events and association meetings. *In re Generics*, 338 F. Supp. 3d at 449-53. IRPs have repeated many of the same allegations here, but tellingly, IRPs fail to tie those allegations to Purchasing Defendants.

For example, IRPs repeatedly cite DOJ's investigation related to this case, including the various manufacturer guilty pleas entered to date. *See, e.g.*, Compl. ¶¶ 41, 62, 65-67, 72-73, 126. But IRPs' Complaint does not mention any such government sanctions against Purchasing Defendants, because there are none. As this Court held in *Marion*, "[i]n the right circumstances,

<div align="center">20</div>

government investigations may be used to bolster the plausibility of § 1 claims, but those circumstances are not present where [the plaintiff] has alleged only that [the defendant] *could be* the subject of an investigation." *Marion*, 386 F. Supp. 3d at 486 (emphasis in original) (footnote omitted) (citation omitted) (internal quotation marks omitted).  The same principle applies here: guilty pleas from manufacturers do not suggest a conspiracy by their customers, including Purchasing Defendants.

IRPs' Complaint also describes at length a number of meetings and industry events attended by multiple Manufacturer Defendants as evidence of their frequent contacts and opportunities to collude.  *See, e.g.*, Compl. ¶¶ 213-14, 235, 600.  But there are simply no allegations that Purchasing Defendants were in any of the rooms where Manufacturer Defendants allegedly orchestrated or executed their conspiratorial activities.  As this Court explained in *Marion*, mere allegations that Purchasing Defendant McKesson participated in trade association activities and supported trade association initiatives were not enough because "'Marion's complaint does not actually put McKesson in the room where the encounters allegedly happened'" and accordingly was "nothing more than impermissible supposition." *Marion*, 386 F. Supp. 3d at 486 (citation omitted).  That same rationale applies here as to every Purchasing Defendant.

In the absence of any of these three potential plus factors, IRPs' allegations of parallel conduct—to the extent there are any—fail to establish any conspiracy involving Purchasing Defendants.

**C.     IRPs' Drug-Specific Allegations Against Purchasing Defendants Ignore the Distinct Treatment of Vertical Relationships in Antitrust Law.**

Just as IRPs' overarching conspiracy claims against Purchasing Defendants (Counts 1 and 2) fail, so too do their individual drug conspiracy claims (Counts 2(a)-(g)).  The factual predicate for each individual conspiracy claim is the same as for the overarching conspiracy claim—that a

21

Purchasing Defendant shared certain competitive information with a supplier during the course of bidding for a certain generic drug. As explained, such communications are normal and expected in the context of a customer-supplier relationship. They do not plausibly suggest any Purchasing Defendant joined any alleged individual drug conspiracies.

For each individual drug conspiracy alleged, IRPs' allegations merely illustrate how each Purchasing Defendant played manufacturers against each other to improve their supply terms. For example, ██████████████████████████████ for hydro valerate cream, but that it did not ████████████ Compl. ¶¶ 286-87. In response, McKesson allegedly told ████ ██████████████████████ of hydro valerate cream, thereby enticing Perrigo to submit a competing bid. *Id.* That is the exact opposite of conspiratorial conduct—because McKesson allegedly enticed a competing bid. The same is true for the IRPs' allegations with respect to raloxifene, where McKesson actively solicited a competing bid, *id.* ¶¶ 608-09, and tizanidine, where McKesson did a market check, attempting to leverage competing bids to avoid a price increase, *id.* ¶¶ 308-09. These allegations are all as one would expect from a purchaser.

Normal manufacturer-distributor negotiations are similarly reflected by the allegation that Cardinal Health approached an incumbent paricalcitol supplier, Teva, for a bid to retain the Cardinal Health business after a bid from Dr. Reddy's, but was told by Teva it was not going to bid to retain Cardinal Health's business. *Id.* ¶ 334. Clearly, Cardinal Health benefited from playing Dr. Reddy's and Teva against each other, going back-and-forth between them for the best price. Indeed, distributors regularly provide competing pricing for advancing negotiations, which is the "obvious alternative explanation" for why Cardinal Health allegedly tried to "warn" Teva that Cardinal Health had an alternative supply option for tobramycin inhalation products with Sandoz—and for Cardinal Health to let Teva know that Sandoz would ████████████ if

22

necessary to win the account from Teva. *Id.* ¶ 385. Distributors *promote* competition when they pit manufacturers like Teva and Sandoz against each other.

A Purchasing Defendant also acts in its own independent economic interest by providing market information to different manufacturers vying for its business. For example, IRPs allege that ABDC was "asking the various manufacturers about their share targets so that it could coordinate 'pre-commitments'" on a drug that was about to launch. *Id.* ¶ 267. Knowing a manufacturer's target market share for a drug is critical to large distributors so they can understand if the manufacturer was a potential supplier upon launch of the new product. *Id.* The same applies for McKesson allegedly sharing Dr. Reddy's target market share for lamotrigine with Par in 2013, *id.* ¶¶ 318-20, and similar allegations with respect to amikacin and Heritage, *id.* ¶¶ 300-02, capecitabine and Teva, *id.* ¶ 291, and paricalcitol and Teva, *id.* ¶¶ 337-40. For a Purchasing Defendant, these communications *encourage* competitive bidding.

None of these alleged manufacturer-distributor conversations support any Purchasing Defendants' participation in any alleged drug-specific conspiracy. For example, the IRPs also allege that ABDC and H.D. Smith were the recipients of "signaling language" from Manufacturer Defendants, and a manufacturer stated they were not ███████████ but were ███████████ ███████ Compl. ¶ 184; *see also id.* ¶ 183. But a customer is not responsible for, and cannot control, the language that its suppliers use or their speculation. *See, e.g.*, *id.* ¶¶ 184, 264, 276, 388 (similar); *see also id.* ¶¶ 214, 235 (speculation of manufacturer employees). To the contrary, a distributor must continue discussing supply information with manufacturers to determine its supply plan.

This basic fact of product distribution also explains why Cardinal Health allegedly discussed with several different eszopiclone manufacturers their "intentions regarding share, preferred account targets, and pricing," and a "likely allocation plan" for determining the

respective "pre-commitments" among the manufacturer base. *Id.* ¶¶ 348-49.  Assuring ongoing supply requires this planning.  Similarly, when Cardinal Health allegedly told Dr. Reddy's that Dr. Reddy's needed to be "done" taking share for fenofibrate from Mylan, *id.* ¶¶ 497-504, the obvious alternative explanation is that Cardinal Health needed to know the supply plans of its suppliers rapidly during an unpredictable period of supply.  A Purchasing Defendant's ability to obtain the right volume of products, especially at launch, is imperative to its business and its customers. Moreover, all of this alleged conduct was entirely unilateral.  Again, IRPs never allege any horizontal coordination between Purchasing Defendants.  As explained above, the plausibility of any Purchasing Defendant joining any of the individual drug conspiracies is fatally undermined by the absence of any allegation of agreement between the similarly situated Purchasing Defendants.  Accordingly, these claims should be dismissed as well.

> ### D.   *Illinois Brick* Bars IRPs' Antitrust Damages Claims Against Purchasing Defendants.

Apart from the inherent implausibility of IRPs' Complaint, IRPs' federal antitrust damages claims (Counts 2 and 2(a)-(g)) also should be dismissed as to Purchasing Defendants (who make the first purchase) pursuant to *Illinois Brick*.  *See generally Ill. Brick Co. v. Illinois*, 431 U.S. 720 (1977).  In that case, "the Supreme Court established the general rule that only direct purchasers from antitrust violators may recover damages" under the federal antitrust laws.  *Howard Hess Dental Labs. Inc. v. Dentsply Int'l, Inc.*, 424 F.3d 363, 369 (3d Cir. 2005) ("*Dentsply*").  By empowering direct purchasers exclusively, the Supreme Court sought to incentivize those best positioned to detect a conspiracy to stop it.  *See Mid-West Paper Prods. Co. v. Cont'l Grp., Inc.*, 596 F.2d 573, 585 (3d Cir. 1979) ("[B]y concentrating the entire award in the hands of the direct purchasers in all but unusual circumstances and thereby giving them an incentive to sue, effective and vigorous enforcement of the antitrust laws is, so far as the Supreme Court is concerned, for all

**FILED WITH REDACTIONS – PUBLIC VERSION**

practical purposes assured."). IRPs' Complaint highlights the importance of following this rule: as the companies that interact with the manufacturers every day, Purchasing Defendants are the ones best equipped to uncover a manufacturers' conspiracy, and as prospective plaintiffs (either on their own or as part of the DPP class), they have an incentive to do so. By transforming these plaintiffs into defendants, IRPs would remove that incentive and instead force Purchasing Defendants to *defend* the conspiracy—a clear perversion of federal antitrust policy.

IRPs allege that they purchased drugs from certain Purchasing Defendants[16]—the second transaction in the supply chain after Purchasing Defendants. *See, e.g.*, Compl. ¶¶ 9, 11-14, 162, 735. Accordingly, Purchasing Defendants—not IRPs—have the exclusive right under federal law to recover damages from Manufacturer Defendants for any overcharges on those drugs and are presently pursuing those claims as members of the Direct Purchaser Plaintiff class. *See In re Hypodermic Prods. Antitrust Litig.*, 484 F. App'x 669, 674-76 (3d Cir. 2012) (finding that distributors were direct purchasers, and that healthcare providers who purchased the products from the distributors were indirect purchasers barred from recovering by *Illinois Brick*); *Warren Gen. Hosp. v. Amgen Inc.*, 643 F.3d 77, 88 (3d Cir. 2011) (holding that a hospital that negotiated prices and rebates directly with manufacturer but remitted payment directly to the distributor and physically took delivery from the distributor was an indirect purchaser barred by *Illinois Brick*). Indeed, that was this Court's precise reasoning in *Marion*: "Under the allegations in the second amended complaint, Marion is 'the *second* purchaser in the chain of distribution' and is thus an indirect purchaser barred from seeking damages under the Clayton Act." *Marion*, 386 F. Supp. 3d at 487 (emphasis in original) (citation omitted).

---

[16] There are no such allegations for two Purchasing Defendants: Walgreens and Red Oak. Thus, for these two Purchasing Defendants, IRPs are neither direct purchasers nor indirect purchasers.

**FILED WITH REDACTIONS – PUBLIC VERSION**

The only conceivable exception to *Illinois Brick* in this case is the Third Circuit's narrow co-conspirator exception*, which requires that IRPs allege facts showing not only that Purchasing Defendants participated in the conspiracy, but also that they were "completely involved" in it— *i.e.*, that they were "so wrapped up in the conspiracy that [they] would be barred from seeking antitrust relief against the top-level supplier in a suit of [their] own."  *Wallach v. Eaton Corp.*, 837 F.3d 356, 362 n.3 (3d Cir. 2016); *see also Dentsply*, 424 F.3d at 378-79 (explaining that an indirect purchaser cannot sue for damages unless the direct purchaser itself "would be barred from bringing a claim against their former co-conspirator—the manufacturer—because their involvement in the conspiracy was 'truly complete' (*i.e.*, if the middlemen would be barred from suing by the 'complete involvement defense' of a manufacturer)"); *Marion*, 386 F. Supp. 3d at 487 (holding that Marion could not invoke the co-conspirator exception because it "[did] not allege[] that McKesson's involvement in the alleged conspiracy 'was so truly complete' that McKesson would be barred as a matter of law from bringing its own suit" (citation omitted)).[17]

As explained above, IRPs have not plausibly alleged Purchasing Defendants joined Manufacturer Defendants' overarching or drug-specific conspiracies, and they are even further from pleading Purchasing Defendants' "complete involvement" in any of the alleged conspiracies. To be "completely involved," a co-conspirator must have "'aggressively [supported] and [furthered] the monopolistic scheme as a necessary part and parcel of it.'"  *Bateman Eichler, Hill Richards, Inc. v. Berner*, 472 U.S. 299, 308 (1985) (alterations in original) (citation omitted). Purchasing Defendants are not alleged to have formulated *any part* of Manufacturer Defendants'

---

[17] *See also Am. Mot. Inns v. Holiday Inns*, 521 F.2d 1230, 1254-55 (3d Cir. 1975) (allowing alleged co-conspirator to sue where it had not "actively supported the entire restrictive program, participated in its formulation and encouraged its continuation"); *Wallach v. Eaton Corp.*, 814 F. Supp. 2d 428, 437 (D. Del. 2011) (noting circuit courts "generally agree that 'complete, voluntary and substantially equal participation in an illegal practice' must be shown" for the requirement of complete involvement to be met (citation omitted)).

26

alleged price-fixing or market-allocation schemes. Accordingly, IRPs cannot allege that Purchasing Defendants are as equally responsible as Manufacturer Defendants for any of the alleged conspiracies. *See Royal Mile Co. v. UPMC*, No. 10-1609, 2013 U.S. Dist. LEXIS 138678, at *124 (W.D. Pa. Sept. 27, 2013) (requiring an indirect purchaser to show that the direct purchaser "'actively participated in the formulation and encouraged the continuation of an illegal scheme in substantially equal part with'" the upstream entity to meet the co-conspirator exception (citation omitted)).

### E.   IRPs' Pendent State Law Claims Should Be Dismissed.

IRPs' failure to state a claim under federal law also warrants dismissal of their state antitrust, consumer protection, and unjust enrichment claims. All of those claims are derivative of IRPs' federal claims. *See, e.g.*, *St. Clair v. Citizens Fin. Grp.*, 340 F. App'x 62, 65 n.2 (3d Cir. 2009) (dismissing state antitrust claim, after dismissing federal claim, because "the state law antitrust claims are only viable if the corresponding federal claims are sufficient"). Specifically, IRPs' state law claims each depend on the same deficient conspiracy allegations as their Sherman Act claims. *See, e.g.*, Compl. ¶¶ 767-68 (Count 3, state antitrust statutes); *id.* ¶¶ 780-81 (Count 4, state consumer protection statutes); *id.* ¶¶ 791-804 (Count 5, unjust enrichment). IRPs' state law claims therefore must be dismissed for the same reasons as their Sherman Act claims. *See Rick-Mik Enters. Inc. v. Equilon Enters., LLC*, 532 F.3d 963, 976 n.5 (9th Cir. 2008) ("Because the federal claims fail, the state law claims fail.").

## VI.   IRPS' CLAIMS AS TO PURCHASING DEFENDANTS SHOULD BE DISMISSED WITH PREJUDICE.

The Court should dismiss IRPs' claims against Purchasing Defendants with prejudice because granting leave to file a fourth version of IRPs' Complaint would be inequitable and futile. *Connelly v. Steel Valley Sch. Dist.*, 706 F.3d 209, 217 (3d Cir. 2013) (affirming dismissal with

27

prejudice where amendment would be futile); *see also Dole v. Arco Chem. Co.*, 921 F.2d 484, 487 (3d Cir. 1990) (explaining that factors that weigh against amendment, including "'undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, [and] futility of amendment'" (quoting *Foman v. Davis*, 371 U.S. 178, 182 (1962)).

      In this case, where IRPs have already amended twice in this docket alone (*see* ECF Nos. 1, 3, 61), not to mention the countless iterations of their complaint in other dockets, further amendment against Purchasing Defendants would be both inequitable and futile.  It would be inequitable because yet another amended complaint would keep the structure of the litigation from crystallizing and keep Purchasing Defendants (which includes the largest members of the putative DPP class) in limbo about their role in the case, while IRPs free-ride on the work and discovery undertaken by the other plaintiffs.  Amendment would be futile because IRPs simply cannot plead around *Illinois Brick*.

      IRPs already have access to an enormous volume of discovery.  If Purchasing Defendants had participated in Manufacturer Defendants' alleged conspiracy, that participation would have been reflected in the documents produced to date, and IRPs undoubtedly would have cited those documents in their Complaint.  *See U.S. ex rel. Schumann v. AstraZeneca Pharms. L.P.*, 769 F.3d 837, 849 (3d Cir. 2014) (affirming dismissal with prejudice and denial of leave to amend because "if [the plaintiff] could plead such facts, [the plaintiff] would have already done so").  That IRPs have not done so confirms that Purchasing Defendants did not join any of the alleged conspiracies. The Court should dismiss IRPs' claims against Purchasing Defendants with prejudice.

**FILED WITH REDACTIONS – PUBLIC VERSION**

## VII.   CONCLUSION

Purchasing Defendants do not belong in this case as Defendants.   IRPs' reason for including them is clear: to sidestep *Illinois Brick*.   The Court should dismiss IRPs' Complaint as to Purchasing Defendants with prejudice.


Dated:  July 15, 2020

                              Respectfully submitted,


                              By:  */s/ Michelle A. Mantine*
                                   On Behalf of Purchasing Defendants

29

**FILED WITH REDACTIONS – PUBLIC VERSION**

| | |
|---|---|
| *Counsel for AmerisourceBergen Drug Corp. and H.D. Smith, LLC*<br><br>*/s/ Michelle A. Mantine*<br>*(PA Bar # 203102)*<br>Michelle A. Mantine<br>Christopher R. Brennan<br>Courtney B. Averbach<br>Danielle L. Stewart<br>**REED SMITH LLP**<br>225 Fifth Avenue<br>Pittsburgh, PA 15222<br>412-288-4268/4583<br>mmantine@reedsmith.com<br>cbrennan@reedsmith.com<br>caverbach@reedsmith.com<br>dstewart@reedsmith.com | *Counsel for McKesson Corporation*<br><br>*/s/ Abram J. Ellis (w/consent)*<br>*(D.C. Bar # 497634)*<br>Abram J. Ellis<br>Sara Y. Razi<br>Joshua G. Hazan<br>**SIMPSON THACHER & BARTLETT LLP**<br>900 G Street NW<br>Washington, DC 20001<br>202-636-5579<br>aellis@stblaw.com<br>sara.razi@stblaw.com<br>joshua.hazan@stblaw.com |
| *Counsel for Cardinal Health, Inc. and The Harvard Drug Group, LLC*<br><br>*/s/ Jason C. Murray (w/consent)*<br>*(CA Bar # 169806)*<br>Jason C. Murray<br>Robert B. McNary<br>Jordan Ludwig<br>**CROWELL & MORING LLP**<br>515 South Flower St. 40th Floor<br>Los Angeles, CA 90071<br>213-443-5590<br>jmurray@crowell.com<br>rmcnary@crowell.com<br>jludwig@crowell.com | *Counsel for Walgreens Boots Alliance, Inc.*<br><br>*/s/ Bryan Byrne (w/consent)*<br>*(D.C. Bar # 449881)*<br>Brian Byrne<br>Steven J. Kaiser<br>Carl Lawrence Malm<br>**CLEARY GOTTLIEB STEEN & HAMILTON LLP**<br>2112 Pennsylvania Avenue NW, Suite 1000<br>Washington, DC 20037<br>202-974-1500<br>bbyrne@cgsh.com<br>skaiser@cgsh.com<br>lmalm@cgsh.com |
| *Counsel for Red Oak Sourcing, LLC*<br><br>*/s/ John F. Zabriskie (w/consent)*<br>*(IL Bar # 6187887)*<br>John F. Zabriskie<br>Benjamin R. Dryden<br>**FOLEY & LARDNER LLP**<br>321 N. Clark Street, Suite 3000<br>Chicago, IL 60654-4762<br>312-832-5199<br>jzabriskie@foley.com<br>bdryden@foley.com | *Counsel for Morris & Dickson Co., LLC*<br><br>*/s/ Barry Barnett (w/consent)*<br>*(TX Bar # 01778700)*<br>Barry Barnett<br>Thomas W. Paterson<br>Drew Hansen<br>**SUSMAN GODFREY LLP**<br>8115 Preston Road, Suite 575<br>Dallas, Texas 75225<br>866-754-1900<br>bbarnett@susmangodfrey.com<br>tpaterson@susmangodfrey.com<br>dhansen@susmangodfrey.com |

**FILED WITH REDACTIONS – PUBLIC VERSION**