**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| *IN RE: GENERIC PHARMACEUTICALS PRICING ANTITRUST LITIGATION* | **MDL NO. 2724**<br>**16-MD-2724**<br><br>**HON. CYNTHIA M. RUFE** |
| THIS DOCUMENT RELATES TO:<br><br>*Reliable Pharmacy, et al.*,<br><br>v.<br><br>*Actavis Holdco US, Inc., et al.* | **19-cv-6044** |

**IRP Brief in Opposition to**
**Distributor Defendants' Joint Motion to Dismiss**
**the IRP Amended December 2019 Complaint**

## **TABLE OF CONTENTS**

**TABLE OF AUTHORITIES** ....................................................................................................... iii

**I.   INTRODUCTION** ............................................................................................................ 1

**II.  LEGAL STANDARD** ...................................................................................................... 3

**III. FACTS** ............................................................................................................................. 4

**IV. ARGUMENT** ................................................................................................................... 8

   A.  IRPs allege that the Distributor Defendants Joined an Uncontested Overarching Conspiracy to
       Allocate Share Between Manufacturers ....................................................................... 8

   B.  IRPs present Direct Evidence of Distributor Defendants' Participation in the Fair Share
       Conspiracy ................................................................................................................. 12

   C.  Although Not Required, IRPs Also Present More Than Sufficient Circumstantial Evidence To
       Infer that the Distributors Participated in the Conspiracy ......................................... 14

       1.   IRPs Sufficiently Allege Distributor Conduct in Parallel With the Manufacturers' Conduct .... 15

       2.   IRPs Sufficiently Allege Plus-Factors ............................................................... 16

   D.  IRPs Purchased Directly from the Distributor Defendants........................................ 19

   E.  IRPs Sufficiently Plead their Drug-Specific Claims in the Alternative........................ 22

   F.  IRPs Sufficiently Plead Their State Law Claims........................................................ 23

   G.  IRPs Continue to Find Further Evidence of the Distributors' Participation in the Overarching
       Conspiracy ................................................................................................................. 23

**V.   CONCLUSION** ............................................................................................................ 25

FILED WITH REDACTIONS – PUBLIC VERSION

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Apple Inc. v. Pepper*, 139 S. Ct. 1514, 1520, 203 L. Ed. 2d 802 (2019)......................................20

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) ...............................................................3, 17

*DelRio–Mocci v. Connolly Props. Inc.*, 672 F.3d 241 (3d Cir. 2012) ..................................23

*Foman v. Davis*, 371 U.S. 178 (1962) .......................................................................................24

*Hinds Cty., Miss. v. Wachovia Bank* N.A., 700 F. Supp. 2d 378 (S.D.N.Y. 2010) ................12

*Howard Hess Dental Labs. Inc. v. Dentsply Int'l, Inc.*, 602 F.3d 237 (3d Cir. 2010)............9, 20

*Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977) ....................................................................20

*In re Broiler Chicken Antitrust Litig.*, 290 F. Supp. 3d 772 (N.D. Ill. 2017)...........................22

*In re Generic Pharm. Pricing Antitrust Litig.*, 394 F. Supp. 3d 509 (E.D. Pa. 2019) ................1

*In re High Fructose Corn Syrup Antitrust Litig.*, 295 F.3d 651 (7th Cir. 2002).......................13

*In re Ins. Brokerage Antitrust Litig.,* 618 F.3d 300 (3d Cir. 2010)...........................3, 10, 11, 16

*In re K-Dur Antitrust Litig.*, 338 F. Supp. 2d 517 (D.N.J. 2004)........................................22, 23

*In re Musical Instruments & Equip. Antitrust Litig.*, 798 F.3d 1186 (9th Cir. 2015) ..........12, 13

*In re Niaspan Antitrust Litig.*, 42 F. Supp. 3d 735 (E.D. Pa. 2014)..........................................22

*In re Packaged Ice Antitrust Litig.*, 779 F. Supp. 2d 642 (E.D. Mich. 2011) ...........................13

*In re Polypropylene Carpet Antitrust Litig.*, 178 F.R.D. 603 (N.D. Ga. 1997) .........................13

*In re Processed Egg Prods. Antitrust Litig.*, 821 F. Supp. 2d 709 (E.D. Pa. 2011)...................15

*In re Ry. Indus. Employee No-Poach Antitrust Litig.*, 395 F. Supp. 3d 464 (W.D. Pa. 2019)...................11

*In re Vitamins Antitrust Litig.*, No. MISC 99-197 (TFH), 2000 WL 1475705 (D.D.C. May 9, 2000).......13

*Interstate Circuit v. United States*, 306 U.S. 208 (1939) ......................................................9, 10

*Kansas v. UtiliCorp United Inc.*, 497 U.S. 199, 110 S.Ct. 2807, 111 L.Ed.2d 169 (1990) .......................20

*Marion Healthcare, LLC v. Becton Dickinson & Co.,* 952 F.3d 832 (7th Cir. 2020)................................20

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986) ................................15

*Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752 (1984) ................................................19

*Rossi v. Standard Roofing, Inc.*, 156 F.3d 452 (3d Cir. 1998)...........................................15, 16

*Shane v. Fauver*, 213 F.3d 113 (3d Cir. 2000)..........................................................................23

*United States v. Fattah*, 914 F.3d 112, 168 (3d Cir. 2019).........................................4, 10, 11, 16

*Weiss v. Bank of Am. Corp.*, 153 F. Supp. 3d 831 (W.D. Pa. 2015) ........................................11

FILED WITH REDACTIONS – PUBLIC VERSION

# I.   INTRODUCTION

The IRP Amended December 2019 Complaint ("the Complaint"), brought by a class of independent pharmacies and hospitals, (the "IRPs") alleges that the Distributor Defendants joined an overarching conspiracy to fix the prices of generic drugs.[1] The Complaint alleges that the conspiracy existed, that the Distributor Defendants were aware of its goal and its rules, and that they each acted affirmatively, on multiple occasions, to further its goal of allocating a "fair share" of the market between manufacturers.

The existence of a multi-drug conspiracy is a plausible allegation. It is approaching the status of an accepted fact.  Three individuals and the manufacturers Apotex, Heritage, Rising, Sandoz, and Taro have each signed admissions that they conspired to fix prices and allocate share during the same time period.[2] Together, these admissions involve at least 25 generic products. Months before these facts were admitted, this Court upheld all of the plaintiffs' earlier complaints alleging that a "fair share arrangement necessarily extended beyond any individual drug." Opinion on Defendants' Joint Motion to Dismiss Plaintiffs' Overarching Conspiracy Claims, 16-md-2724-CMR, Dkt. 1070 (August, 15, 2019) ("Overarching Conspiracy Opinion"), at 7.[3]  The IRPs' current Complaint alleges more conduct, and includes more drugs and

---

[1] The public, redacted version of the operative Complaint is at 19-cv-6044, Dkt. 61.

[2] *See* Compl. ¶127 and chart. After the filing of the Complaint, manufacturer Defendant Glenmark was indicted on June 30, 2020, Taro admitted its participation in the conspiracy as part of a deferred prosecution agreement with the Department of Justice on July 23, 2020, and Teva was indicted on August 25, 2020.

[3] Also available as *In re Generic Pharm. Pricing Antitrust Litig.*, 394 F. Supp. 3d 509 (E.D. Pa. 2019), but cited as "Overarching Conspiracy Opinion" in this brief to avoid confusion with citations to other decisions in this MDL.

1

defendants, but the overarching conspiracy it describes is based on the same "fair share" arrangement as the earlier, upheld complaints.

The Distributor Defendants have moved to dismiss the Complaint, but they do not challenge the existence of the overarching conspiracy, do not deny that they benefit from market-wide increases in drug prices resulting from such a conspiracy, and do not question that all of their co-defendant manufacturers were participants in the conspiracy. The only thing they challenge is their connection to it, but the principle remains true that "certain types of circumstantial evidence become substantially more probative if it can be established that a conspiracy existed and the only remaining question is whether the defendant was a part of it." *United States v. Williams*, No. 17-2111, 2020 WL 5422788, at *31 (3d Cir. Sept. 10, 2020) (quoting *United States v. Pressler*, 256 F.3d 144, 151 (3d Cir. 2001)).[4]

The many collusive discussions detailed in the IRPs' complaint—when the Distributor Defendants are seen to be working to allocate market share among the manufacturer Defendants, acting as "market share police," and building consensus for coordinated price increases—speak for themselves. This direct evidence implicates the Distributor Defendants in the overarching fair share agreement and, even if analyzed as if it were merely circumstantial, is more than enough to "plausibly suggest," that they knowingly and actively furthered the overarching fair share conspiracy, and thereby became members.

---

[4] *See Pressler*, 256 F.3d at 151 ("[I]magine a situation where the defendant is a street-level drug dealer. If it is shown that an organized gang controls drug distribution in the defendant's neighborhood and that the gang has divided the neighborhood into zones in which only a single dealer may operate, then the fact that the defendant consistently sells his or her drugs only within certain geographical parameters would provide evidence that the defendant both knew of the existence of the conspiracy and was a participant in it.").

FILED WITH REDACTIONS – PUBLIC VERSION

## II.      LEGAL STANDARD

"To state a claim for a Sherman Act conspiracy, Plaintiffs must allege enough factual matter (taken as true) to suggest that an agreement was made." Overarching Conspiracy Opinion Dkt. 1070, at 21 (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). This can be done by alleging either (a), direct evidence of an agreement or (b), circumstantial evidence of parallel conduct from which a court can plausibly infer an agreement. *See, e.g.*, *Twombly*, 550 U.S. at 564 (noting at outset that the "plaintiffs rest their [antitrust] claim on descriptions of parallel conduct" instead of "independent allegation[s] of actual agreement").

"Allegations of direct evidence of an agreement, if sufficiently detailed, are independently adequate." *In re Ins. Brokerage Antitrust Litig.,* 618 F.3d 300, 323-24 (3d Cir. 2010) (citing *Twombly*, 550 U.S. at 564). Upon presenting direct evidence of defendants' collusion, plaintiffs satisfy the *Twombly* standard and may defeat a motion to dismiss without pleading any further facts or arguing for any inferences.

If the evidence that plaintiffs allege is instead analyzed as circumstantial, it must provide "enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal agreement." *Twombly,* 550 U.S. at 556. In antitrust cases, plaintiffs sufficiently "nudge their claims across the line from conceivable to plausible" if they allege background facts showing that the questionable conduct took place "in a context that raises a suggestion of a preceding agreement." *Twombly,* 550 U.S. at 557, 570.

When analyzing whether plaintiffs have sufficient direct evidence or sufficient circumstantial evidence to infer the plausibility of a conspiracy, a few considerations apply. First, "'[T]he conspiracy must not be compartmentalized. The character and effect of [the]

FILED WITH REDACTIONS – PUBLIC VERSION

conspiracy are not to be judged by dismembering it and viewing its separate parts, but only by looking at it as a whole." Overarching Conspiracy Opinion at 21.

Second, any "arguments that there are plausible alternative explanations for" the Defendants' conduct "should be tested by discovery" and "are not a matter for decision at this stage of the proceedings." *Id.* at 23-24.

Third, "a common goal may exist even when conspirators individually or in groups perform different tasks in pursuing the common goal, and a single conspiracy may attract different members at different times or involve different sub-groups committing acts in furtherance of the overall plan." *Id.* at 27 (quoting *United States v. Fattah*, 914 F.3d 112, 168 (3d Cir. 2019)).

## III.    FACTS

On August 15, 2019, this Court upheld the overarching conspiracy claims in IRPs' earlier complaint, which "alleged that Defendants pursued a common goal – to achieve artificially-inflated generic drug prices through the allocation of markets and through price-fixing agreements – and that they did so through a wide-ranging 'fair share' arrangement." Overarching Conspiracy Opinion, Dkt. 1070 at 5.  The Court upheld IRPs' and other plaintiffs' allegations that the "fair share arrangement necessarily extended beyond any individual drug." *Id.* at 7. The Court cited the Humana complaint's allegation that "Defendants understood that to effectuate a successful price-fixing and market allocation agreement on one drug, they would need to effectuate an agreement across each Defendant's portfolio of drugs" and also the IRP complaint's allegation that the Defendants worked to make sure that "fair shares could be allocated across the industry as a whole." *Id.*

FILED WITH REDACTIONS – PUBLIC VERSION

The instant Complaint involves many of the same defendants, alleges the same type of collusive conduct, and follows the same legal structure as the earlier complaint. It provides dozens of examples of Defendants' anticompetitive discussions and alleges that each of these episodes could be considered a 'contract, combination or conspiracy' in violation of the antitrust laws, but it also explains why the "subsidiary schemes were part of an overarching conspiracy based on the principles of fair share." Compl. ¶128. The Complaint explains the core principle and the corollary rules of the fair share understanding, and the terms of art that conspirators have developed to refer to the understanding. *Id.* ¶131. The Distributor Defendants do not challenge the sufficiency of any of these allegations, either in their Joint Brief or in their individual briefs.

The instant complaint explores an additional dimension of the conspiracy, at issue here, by describing how the Distributor Defendants worked to sustain the conspiracy. The Distributors' role, as described in the complaint, was to help coordinate the manufacturers' allocations of market share, particularly by passing anticompetitive messages at the behest of their manufacturer co-conspirators. The distributors knowingly served as conduits of fair share intentions so that the manufacturers could verify adherence to their overarching understanding, troubleshoot misperceptions of the fair share status, and to confirm and re-confirm their intentions to seek only limited share in each market. *See* Complaint, ¶162 (alleging the Distributor Defendants "understood, agreed with, and did their part to achieve the common goals of the fair share conspiracy: to prevent price erosion by "stabilizing" and "settling" the market, and to encourage coordinated price increases.").

The complaint provides evidence that the Distributor Defendants understood the principles of the conspiracy and that the manufacturers spoke frankly to them about the concept of fair share and their desires to allocate share and to let other manufacturers know when they

FILED WITH REDACTIONS – PUBLIC VERSION

would be "done" or wanted to "play fair." Distributors requested information regarding the fair share balance of the market as a whole in order to circulate this information to manufacturer co-conspirators. Thus, the complaint adequately alleges that the Distributors were aware of the goal of the conspiracy.

The complaint also shows that the Distributors became actively involved in brokering allocations of fair share with an eye towards the overall market share balance. A few examples of the Distributor Defendants' work in this regard, as stated in the complaint, are:

- Amerisource Bergen ("ABC") sending emails to Teva, on behalf of Sandoz, to arrange ██████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ██████████████████████████████████

- Marc Kikuchi, of ABC and Dave Rekenthaler of Teva organizing for Teva and other manufacturers ████████████████████████████████ ███████████████████████████████████  ████  ████ ███████████████████████

- Cardinal conveying a message that a manufacturer was ███████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ██████████████

- H.D. Smith agreeing to ██████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████

- Harvard confirming with Dr. Reddy's, Actavis, and Par that █████████ ████████████████████████████████████████████████ ██████████████

---

[5] The complaint also notes that some of the conspiracy's key players, such as Nisha Patel, worked at ABC earlier in their careers. ¶215.



- McKesson conveying "share intentions" ████████ ████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
██████████████████████████████

- Morris & Dickson ████████████████████████████████
████████████████████████████████████████

- Walgreens / WBAD ██████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
██████████████████████████████████████

These and numerous other allegations provide examples of distributors'—the manufacturers' customers—discouraging the manufacturers from competing for market share overall and instead pushing them to increase and charge them non-competitive prices.

Although motive is not an element of conspiracy, the complaint alleges that Distributors engaged in this conduct to prevent price erosion because higher manufacturers' prices to them resulted in increased profits on their sales of the price-fixed drugs to their customers, including pharmacies and hospitals, like the IRPs. *See e.g.* Compl. ¶173 (wholesalers quoted as saying that "████████████████████████████" when the manufacturers increase prices to them); ¶175 (ABC stated during the conspiracy period that it would be "adversely affected" if manufacturer "price deflation accelerates" or if "the frequency or rate of … generic pharmaceutical price increases slows.").

# IV.    ARGUMENT

## A.  IRPs Allege that the Distributor Defendants Joined an Uncontested Overarching Conspiracy to Allocate Share Between Manufacturers

IRPs allege that the Distributor Defendants knowingly played a role in fixing the manufacturer prices and allocating market share between manufacturers. *See e.g.* Compl. ¶ 163 (Distributor Defendants "arranged the manufacturers' collusive price increases by confirming that the manufacturers would not undercut one another's price increases and would work in concert to drive prices up." They also "served a crucial policing function in the tight-knit industry by criticizing employees at manufacturers who sought to lower prices to compete legitimately . . . ."). The structure of this restraint of trade can be depicted as a single horizontal line, because the essence of the agreement is to allocate market share fairly between drug manufacturers, all at the same economic level.

The Distributor Defendants appear to misconstrue the Complaint as one alleging a complex hub-and-spoke conspiracy with an additional required element of horizontal collusion among the distributors. *See* Distributor Defendants' Joint Brief, Dkt. 72-1 ("Def. Br.") at 9.  IRPs do not allege that there was an agreement between one distributor and another to allocate share of the drug-distribution market between distributors. IRPs continue to allege the same basic manufacturer fair share conspiracy as alleged in earlier complaints, with the addition of the Distributor Defendants as knowing aiders and abetters of that same illegal agreement. Alleging that additional participants joined a conspiracy does not require plaintiffs to allege a change in the conspiracy's illegal objective and does not subject plaintiffs to a higher or different plausibility standard than has already been applied in this MDL.

The concept of a conspirator helping to facilitate a restraint of trade between co-conspirators at a different level of distribution is familiar: The Supreme Court's classic antitrust

8

decision in *Interstate Circuit v. United States* involved a movie theater that wrote letters to various feature film sellers, such as Paramount Pictures, asking each to impose unfavorable terms on second-run discount theaters. 306 U.S. 208, 232 (1939). The defendant theater was held liable for having facilitated a horizontal agreement between the competitor film companies, even without any evidence of horizontal communication between those competitors. *Id.*

The Distributor Defendants' brief asserts that IRPs' claims must match a specific type of hub-and-spoke conspiracy because the complaint involves claims against "vertically related parties." Not so. IRPs are not alleging "a hybrid of both vertical and horizontal conspiracies." *Howard Hess Dental Labs. Inc. v. Dentsply Int'l, Inc.*, 602 F.3d 237, 254 (3d Cir. 2010) (internal citation omitted). IRPs do not seek damages for any vertical restraints, such as resale price maintenance or product tying. Although the ability to profit from market-wide price increases does provide a motive, no part of the IRPs' theory of the case requires that the Distributor Defendants be in any supplier relationship with the manufacturer Defendants—a consulting firm could have just as easily served the role of go-between, and become a conspirator.

IRPs continue to allege, as they did in the previously upheld overarching conspiracy complaint and single-drug complaints, that the Defendants were involved in one horizontal conspiracy, where prices were fixed and market share was allocated at one level of distribution— the manufacturer level. *See* Compl. ¶1 (alleging a conspiracy "to allocate customers and drug markets between manufacturers in order to assign each Defendant manufacturer its "fair share" of business while keeping prices high.").

The Distributor Defendants claim, in reliance on an opinion in the *Insurance Brokerage Antitrust Litigation*[6] that the Third Circuit requires communications or "agreement among all

---

[6] *In re Ins. Brokerage Antitrust Litig.,* 618 F.3d 300 (3d Cir. 2010).

FILED WITH REDACTIONS – PUBLIC VERSION

similarly situated members" for a holding that they all participated in one conspiracy. But as this Court has already held, based on Third Circuit law, "a common goal may exist even when conspirators individually or in groups perform different tasks in pursuing the common goal, and a single conspiracy may attract different members at different times or involve different sub-groups committing acts in furtherance of the overall plan." Overarching Conspiracy Opinion at 27 (quoting *Fattah*, 914 F.3d at 168). The IRP Complaint demonstrates that each of the Distributor Defendants was aware of the fair share principles. When a defendant speaks with the members of the conspiracy, in the lingo of the conspiracy, to pass messages between members of the conspiracy regarding the fundamental premise of the conspiracy, it has become a member of the conspiracy. "They knew that the plan, if carried out, would result in a restraint of commerce … and, knowing it, all participated in the plan." *Interstate Circuit*, 306 U.S. at 226-27.

*Insurance Brokerage* involved different facts than those here. In that case, "plaintiffs allege[d] the existence of a number of broker-centered antitrust conspiracies … at the center of each alleged conspiracy was a defendant broker, who colluded with its defendant insurer-partners to steer its clients, purchasers of insurance, to particular insurers . . . ." *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d at 311. The only alleged horizontal conspiracy was "to maintain a mutually beneficial silence." *Id.* at 313. The court held, in absence of allegations showing the existence of a horizontal agreement that "one cannot plausibly infer a horizontal agreement among a broker's insurer-partners from the mere fact that each insurer entered into a similar contingent commission agreement with the broker." *Id.* at 327.

IRPs, on the other hand, do not allege a series of individual conspiracies with distributors at the center funneling clients vertically to manufacturers at the spokes. Indeed, the Complaint makes clear that the manufacturers also communicated with one another. Nor does IRPs'

FILED WITH REDACTIONS – PUBLIC VERSION

Complaint ask the court to "infer" the horizontal agreement. This Court has already upheld the plausibility of a horizontal conspiracy to maintain the fair share agreement. *See* Overarching Conspiracy Opinion at 33.

The Third Circuit's opinion in *United States v. Fattah*, decided last year and relied upon by this Court throughout the Overarching Conspiracy Opinion, clarified *Insurance Brokerage*. *See Fattah*, 914 F.3d at 165. Like the Distributor Defendants, the defendants in that case argued, that "the evidence fails to show that the various schemes alleged" were "connected." *Fattah*, 914 F.3d at 165. The Third Circuit rejected this argument and stated that what was important was that the conspirators "acted for the common purpose of furthering," the conspiracy's interests—here the implementation and maintenance of the fair share agreement. *Id.* What mattered was that the conspirators "engaged in concerted activity and functioned as a unit." *Id.*

Pennsylvania district courts have also distinguished *Insurance Brokerage*. For instance, in the *Railway Industry Employees No-Poach* litigation, the court held that case was unlike *Insurance Brokerage* because the plaintiffs there alleged the defendants "were members of one overarching horizontal agreement," as IRPs do here. *In re Ry. Indus. Employee No-Poach Antitrust Litig.*, 395 F. Supp. 3d 464, 490 (W.D. Pa. 2019); *see also Weiss v. Bank of Am. Corp.*, 153 F. Supp. 3d 831, 847 (W.D. Pa. 2015) (distinguishing the case from *Insurance Brokerage* because "Plaintiffs allege more than bilateral agreements between lenders and private mortgage insurers," as IRPs do here).

This case is more similar to *Hinds County v. Wachovia* than to *Insurance Brokerage*. *See Hinds Cty., Miss. v. Wachovia Bank* N.A., 700 F. Supp. 2d 378 (S.D.N.Y. 2010). In *Hinds County*, the court upheld allegations against numerous brokers who facilitated bid-rigging and price-fixing among banks—similarly to the way the distributors facilitated price-

FILED WITH REDACTIONS – PUBLIC VERSION

fixing and market allocation by the manufacturers here. The complaint in that case "described numerous collusive transactions that were allegedly brokered through" the broker defendants and instances where, as here, the brokers told certain banks they "should back down from a trade because it was slated to go to" their competitor. *Hinds Cty.*, 700 F. Supp. 2d at 396-97. Distributor Defendants performed similar functions and should similarly be held liable for their conduct.

### B. IRPs present Direct Evidence of Distributor Defendants' Participation in the Fair Share Conspiracy

Distributor Defendants ignore paragraphs 162 to 390 of the Complaint when they assert that IRPs "offer no direct evidence" to connect them to the overarching conspiracy.  Def. Br. at 10. They then cite to *Musical Instruments*, a case in which the plaintiffs asked the court to infer an agreement from "similar advertising policies." *In re Musical Instruments & Equip. Antitrust Litig.*, 798 F.3d 1186, 1189 (9th Cir. 2015). But IRPs have shown much more than this.

As detailed above in the Facts section, the Complaint quotes specific communications between distributors and manufacturers that clearly meet the criteria in *Musical Instruments* for showing direct agreement. Specifically, IRPs identify the distributors and their manufacturer co-conspirators involved in each episode (the "who"), identify the statements that the distributors agreed to, and did, pass along, e.g., to confirm that competitors would be content with a certain percentage fair share, ("what exactly they agreed to") and identify the jargon and shorthand they used to discuss the fair share understanding over email, text and in-person meetings at conferences ("how the alleged conspiracy was organized and carried out"). *Musical Instruments*, 798 F.3d at 1189.

FILED WITH REDACTIONS – PUBLIC VERSION

Next, Distributor Defendants mention that they have not been indicted. Def. Br. at 10. Courts have consistently held that civil antitrust suits cannot "be circumscribed or defined by the boundaries of the criminal investigations or plea agreements." *In re Packaged Ice Antitrust Litig.*, 779 F. Supp. 2d 642, 1011 (E.D. Mich. 2011); *see also In re High Fructose Corn Syrup Antitrust Litig.*, 295 F.3d 651, 664-65 (7th Cir. 2002) (setting forth reasons why the DOJ may decide to limit criminal charges); *In re Polypropylene Carpet Antitrust Litig.*, 178 F.R.D. 603, 619-20 (N.D. Ga. 1997) (holding that "no authority . . . requires a civil antitrust plaintiff to plead only the facts of a prior criminal indictment.  To the contrary, several cases flatly reject this theory."); *In re Vitamins Antitrust Litig.*, No. 99-misc-0197, 2000 WL 1475705, at *11 (D.D.C. May 9, 2000) (rejecting "the notion that the guilty pleas, and cooperation agreements and the class settlements foreclose a broader conspiracy.").

Finally, throughout their Joint Brief, the Distributor Defendants argue that "these types of communications" are proper and could even be "procompetitive." Def. Br. at 5. These are interesting disputes of fact but not suited to a motion to dismiss where the legal standard is whether it is plausible that they were improper.  For example, the credibility of the Distributors' excuse that they happened to have used "some of the same buzzwords" about playing fair and fair share as the manufacturers, but they did not "carry the same meaning," (*id.*) is a question for the jury.

Regarding direct evidence, the IRP Complaint is quite different from the *Marion Diagnostic* complaint,[7] filed by another group earlier in the MDL, which accused one distributor, McKesson, and based its claims solely on the allegations that McKesson profited from the

---

[7] *See* Marion Diagnostic Center Amended Complaint, 18-cv-4137, Dkt. 22 ("Marion Diagnostic Complaint").

FILED WITH REDACTIONS – PUBLIC VERSION

conspiracy, had a business partnership with Heritage, and supported certain trade association activities. Def. Br., at 1-2. The Court dismissed that complaint without prejudice because it did "not rest on direct evidence of an agreement" and, even circumstantially, as a matter of law, a claim based on "acquiescence" was questionable.[8] Unlike the *Marion Diagnostic* complaint, the IRP Complaint and the evidence adduced therein is not premised on speculation about "the dog that does not bark" or a theory of mere "tacit cooperation" or "acquiescence in the conspiracy."[9] It explains and quotes how the Distributor Defendants transmitted market allocation messages between the manufacturers to further the conspiracy.

Apart from these points, the Distributor Defendants do not contest that the IRP Complaint provides direct evidence of instances where the Distributor Defendants agreed to pass messages between manufacturers for the purpose of establishing fair share. The direct evidence cited on pages 6-7 above is all that is necessary to deny their Joint Motion.

### C. Although Not Required, IRPs Also Present More Than Sufficient Circumstantial Evidence to Infer that the Distributors Participated in the Conspiracy

Defendants also accuse IRPs of failing to point to sufficient circumstantial evidence to make out their case. However, "in direct evidence cases, the plaintiff need not adduce circumstantial evidence 'that tends to exclude the possibility' that the alleged conspirators acted independently.'" *Rossi v. Standard Roofing, Inc.*, 156 F.3d 452, 466 (3d Cir. 1998) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 588 (1986)). Nevertheless, if

---

[8] *See* Opinion on Motion to Dismiss Marion Diagnostic Complaint ("Marion MTD Opinion"), 18-cv-04137, Dkt. 112, at 13.

[9] *See* Marion Diagnostic's Opposition to McKesson's Motion to Dismiss, 18-cv-4137, Dkt. 81, at 9-10, describing the theory of that complaint.

FILED WITH REDACTIONS – PUBLIC VERSION

analyzed as circumstantial evidence, the allegations in the IRP complaint are sufficient to permit the Court to draw the inference that the Distributors Defendants participated in the conspiracy.

1. IRPs Sufficiently Allege Distributor Conduct in Parallel with the Manufacturers' Conduct

'"Plaintiffs are not required to plead simultaneous price increases – or that the price increases were identical – in order to demonstrate parallel conduct."' Overarching Conspiracy Opinion at 20-21 (quoting *In re Processed Egg Prods. Antitrust Litig.*, 821 F. Supp. 2d 709, 718 (E.D. Pa. 2011)).  In this case, the conduct that is parallel between the manufacturers and the distributors—conduct from which one could infer that they shared an understanding—is the Distributors' consistent facility with the terms of the fair share conspiracy and their willingness to coordinate the allocation of market share alongside their manufacturer co-conspirators.

Defendants cite *Insurance Brokerage*, but that opinion does not "require[] the plaintiff to come forward with some specialized form of parallel conduct," as Distributor Defendants claim. Def. Br. at 12. Defendants quote a portion of the opinion where the court refused to infer a conspiracy among the insurers—the spokes in that conspiracy who Defendants say are in the same position as the manufacturers here—based on parallel decisions to work with certain brokers (who Defendants say are similar to the distributors). *Id.* (quoting *Ins. Brokerage Antitrust Litig.*, 618 F.3d at 328).

 This is irrelevant, because IRPs are not asking this Court to infer a conspiracy among the manufacturers based solely on their actions vis-à-vis the distributors. *Insurance Brokerage* is not analogous because the dispute in that case was whether a series of pleaded conspiracies involving single brokers and multiple insurers were connected to each other—indeed the court stated that "there are no allegations that any insurer ever horizontally disclosed to its competitors the details of its vertical agreement with a broker." *Id.* at 329. The issue here is whether the

distributors each connected themselves to the uncontested, horizontal conspiracy to allocate manufacturer market share by willingly participating in the manufacturers' anticompetitive conversations.  This conduct, even if it involved different drugs at different times, makes clear that the Distributor Defendants "acted for the common purpose of furthering," the fair share conspiracy. *Fattah*, 914 F.3d at 165.

2.   <u>IRPs Sufficiently Allege Plus-Factors</u>

a.   *Evidence Implying a Traditional Conspiracy*

This Court has already held that the IRPs' earlier complaint "alleged facts implying the existence of a traditional conspiracy: inter-defendant communications, trade association leadership, membership, and meeting attendance, and ongoing state and federal investigations into generic drug pricing." Overarching Conspiracy Opinion, at 21. IRPs supply the same types of facts in the current Complaint and, apart from referring to it as an "alleged conspiracy," the Distributor Defendants do not contest the existence of a conspiracy among the manufacturers.

Given the enormity of the phone and email evidence and the admissions of conspiracy by multiple manufacturers, it is clear that the Distributors' conduct, as alleged, took place "in a context that raises a suggestion of a preceding agreement." *Twombly,* 550 U.S. at 557. In typical antitrust cases the "context" is much thinner, and may include nothing more than allegations that the conspirators attended similar conferences, but here the context is so well-established that this should be considered a dispositive plus-factor.

In arguing against the plus-factors, the Distributor Defendants once again misconstrue the gravamen of the IRP Complaint by pointing out that it does not include sufficient allegations

FILED WITH REDACTIONS – PUBLIC VERSION

concerning their opportunities to collude with one another.[10] What connects the Distributor Defendants to one another is the same thing that connects them to the manufacturers: a common commitment to establishing fair share at the manufacturer level in order to maintain inflated prices market-wide and a repetitive pattern of anticompetitive messages willingly transmitted in service of that agreement.

### b. Motive to Conspire and Actions Against Self-Interest

Distributor Defendants argue it is implausible that they had motive to support the fair share conspiracy because competitors could have come in and undercut their inflated prices to their customers, causing them to get stuck with overpriced shipments, or sell smaller quantities of their overpriced drugs. But, as IRPs allege, the Distributor Defendants had the vast majority of the market share, meaning that their competitors for the majority of their business were other colluding distributors. Compl. ¶162 (Distributor Defendants "controlled over 81% of the total purchasing volume of generic drugs in the United States.").

Contrary to their assertions, Defendants did not need to coordinate resale prices at the distributor level to enjoy the benefits of the fair share understanding. The whole point of the conspiracy was to concede share to new entrants and allocate share among existing manufacturers so that rounds of bidding would not lower market prices overall.  So long as the resulting inflated prices were not in danger of being eroded by true competition, each Distributor would not have to worry about being significantly undercut by another. *See, e.g;*  ▇▇▇▇▇▇

---

[10] Although the IRPs' claims in no way rest on these allegations, the Complaint does explain, for the sake of accurately describing the flow of anticompetitive communications, that some of the Distributors blended their operations. *See, e.g.*, ¶216 (After the ABC and Walgreens agreement, "▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇").

FILED WITH REDACTIONS – PUBLIC VERSION

[REDACTED]

As Distributor Defendants say themselves, signing on "to spend more" on generic drugs "make[s] no economic sense" unless there is a conspiratorial agreement underway that will raise prices across the board. Def. Br., at 15. Yet, agreeing to pay more for generic drugs is exactly what Distributor Defendants are alleged to have done. *See* [REDACTED]

[REDACTED]

Distributors Defendants cherry-pick several communications and offer purportedly procompetitive explanations for them. First, such arguments miss the point. The Distributors were not coincidentally mentioning stray pieces of information about new entrants, share balance, competitors' intentions, and the status of bids. If the Distributors' story were consistent with reality, the IRPs would never have found evidence of their encouraging price increases or encouraging manufacturers to walk away from business. Second, and more importantly, "arguments that there are plausible alternative explanations for" the Defendants' conduct "should be tested by discovery." Overarching Conspiracy Opinion at 23-24.

Defendants repeatedly rely on *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 763 (1984), but that case is inapposite. It involved resale price maintenance, a vertical restraint not at issue here. This case does not involve termination of a distributor, but a horizontal price-fixing and market allocation conspiracy. *Monsanto* held that certain communications between a distributor and a manufacturer do not necessarily constitute an illegal vertical resale price maintenance scheme. *Monsanto*, 465 U.S. at 762 (continuous manufacturer and distributor communication do "not alone show that the *distributors* are not making independent pricing decisions.") (emphasis added). It did *not* hold that distributors may legally pass pricing and market share information between manufacturers participating in a horizontal conspiracy.

### D. IRPs Purchased Directly from the Distributor Defendants

Towards the end of their joint brief, the Distributor Defendants begin to argue that IRPs should be barred from bringing claims under the federal law as direct purchasers from members of the conspiracy because IRPs did not purchase directly from the manufacturers. But the IRPs are not suing the manufacturers via federal law. They seek relief under federal law only for purchases they made directly from the Distributor Defendants.  As the Supreme Court held last year in rejecting the argument that a group of consumers were not direct purchasers under *Illinois Brick*, "we have consistently stated that 'the immediate buyers from the alleged antitrust violators' may maintain a suit against the antitrust violators." *Apple Inc. v. Pepper*, 139 S. Ct. 1514, 1520 (2019) (quoting *Kansas v. UtiliCorp United Inc.*, 497 U.S. 199, 207 (1990) and citing *Illinois Brick Co. v. Illinois*, 431 U.S. 720, 745–46 (1977)). The Third Circuit has also held that "direct purchasers from antitrust violators may recover damages in antitrust suits" under federal law. *Howard Hess Dental Labs.*, 424 F.3d at 369. The Seventh Circuit has similarly held that

"*Illinois Brick* is not a barrier to suit on behalf of a purchaser who dealt with a member of the conspiracy." *Marion Healthcare, LLC v. Becton Dickinson & Co.,* 952 F.3d 832, 839 (7th Cir. 2020).

IRPs made purchases directly from the Distributor Defendants and are therefore "direct purchasers from antitrust violators" who "may recover damages in antitrust suits." *Howard Hess Dental Labs*., 424 F.3d at 369.

Distributor Defendants claim that IRPs must invoke the "completely involved" co-conspirator exception to *Illinois Brick*, because otherwise the Distributor Defendants—the ones in privity with the manufacturers—"have the exclusive right under federal law to recover damages from manufacturer Defendants." Def. Br., at 25. This is a misunderstanding. IRPs are *not* making any federal law claims against the manufacturers. IRPs are *only* making federal law claims against the Distributor Defendants from whom they directly purchased overpriced drugs, and seek federal relief only for those purchases. IRPs thus do not need to invoke any exception to *Illinois Brick*. This is consistent with Third Circuit law. For instance, in *Dental Labs*, one of the first Third Circuit opinions to tackle the exception, the court determined that the exception applied and was needed, to allow indirect purchasers "to recover damages from Dentsply," the manufacturer from whom they had only indirectly purchased their products. *Dental Labs. Inc. v. Dentsply Int'l, Inc.*, 424 F.3d 363, 378 (3d Cir. 2005). *See also Wallach v. Eaton Corp*., 837 F.3d 356, 362 (3d Cir. 2016) (the "co-conspirator exception to the direct purchaser rule" is invoked when an "entity [seeks] to sue its supplier *and* its supplier's supplier.") (emphasis in original). Thus, with no federal claim against the Manufacturers from whom the hospitals and pharmacies indirectly purchased their products, there is no need for the co-conspirator exception.

FILED WITH REDACTIONS – PUBLIC VERSION

The Court's decision in *Marion Diagnostic* is inapplicable for the same reason. Unlike Marion Diagnostic, IRPs are not seeking to collect damages from the manufacturers under federal antitrust laws, based on purchases "through" the Distributor Defendants. *See Marion Diagnostic* MTD Opinion, 18-cv-4137, Dkt. 112, at 13. Also, unlike in *Marion Diagnostic,* IRPs are not basing their direct purchaser claims against the Distributor Defendants on an allegation that the Distributors only "tacitly" participated by not disclosing to the public what they '"must have known"' about the conspiracy. Marion MTD Opinion, at 14, quoting Marion Complaint, at ¶123.  Instead, IRPs have provided texts, emails and various discussions showing that the Distributor Defendants not only knew about the conspiracy, but were intimately involved in carrying it out and enforcing it, even when certain manufacturers wavered.

In any event, even if the completely involved co-conspirator exception were necessary here, Distributor Defendants would find it difficult to argue that they had not "actively participated in the formulation" of agreements to divide drug markets and "encouraged the continuation of an illegal scheme" or "approached" the manufacturers and "suggested they enter into mutually beneficial" fair share agreements, as is quite clear, even from the examples set forth *supra. Wallach v. Eaton Corp.*, 814 F. Supp. 2d 428, 438 (D. Del. 2011). And they certainly could not claim that their participation in the conspiracy was not "voluntary." *Dental Labs.*, 424 F.3d at 383. Thus, even if claims giving rise to the completely involved co-conspirator exception had to be proven here, there is little doubt that they could be.[11]

---

[11] Distributor Defendants also state that IRPs did not make direct purchases from Red Oak or WBAD. However, Red Oak arranges purchases for Cardinal, and acts as its agent, and WBAD arranges purchases for ABC, as its agent. *See* Compl. ¶¶89, 92-95, 216-217,357. IRPs made direct purchases from both ABC and Cardinal. *Id.* ¶9,12.

FILED WITH REDACTIONS – PUBLIC VERSION

Finally, in what is perhaps most charitably considered an attempt at levity, the Distributor Defendants' argue that, in theory, they are the ones "best equipped" to uncover the manufacturers' conspiracy. Def. Br. 25. This leads them to the conclusion that the claims of the plaintiffs who have been actively investigating all aspects of the conspiracy should be dismissed with prejudice. Although this policy argument is mostly beside the point—because the Distributors certainly are not inclined to uncover any aspect of the conspiracy where they played a role—it is also proven false by the Distributor Defendants' own briefs, where their collective impulse is to ignore, downplay, and normalize the exchange of anticompetitive messages.

### E.  IRPs Sufficiently Plead their Drug-Specific Claims in the Alternative

IRPs plead their "subsidiary scheme" claims in the alternative to their overarching conspiracy claims. Such pleading is fully permissible. *In re K-Dur Antitrust Litig.*, 338 F. Supp. 2d 517, 544 (D.N.J. 2004) ("Plaintiffs, however, are clearly permitted to plead alternative theories of recovery."). On page 269, the Complaint summarizes the structure of the claims.

Defendants do not provide bases for dismissal that are different from the arguments they claim form the basis for dismissal of the overarching conspiracy claim. Instead they continue to argue that there exist procompetitive justifications for their conduct furthering the fair share conspiracy. Distributor Defendants select examples of each Distributor's acts in furtherance of the conspiracy and attempt to explain them away. But, as this Court has held, "Plaintiffs are not required to plead facts that, if true, definitively rule out all possible innocent explanations. It is improper at this stage of the proceedings to weigh alternatives and [decide] which is more plausible." Overarching Conspiracy Opinion, at 19 (quoting *In re Niaspan Antitrust Litig.*, 42 F. Supp. 3d 735, 753 (E.D. Pa. 2014) *and In re Broiler Chicken Antitrust Litig.*, 290 F. Supp. 3d

FILED WITH REDACTIONS – PUBLIC VERSION

772, 788 (N.D. Ill. 2017)) (internal footnotes and quotations omitted). This Court has explained

that any "arguments that there are plausible alternative explanations for" the Defendants'

conduct "should be tested by discovery. They are not a matter for decision at this stage of the

proceedings." Overarching Conspiracy Opinion at 23-24. Defendants' explanations, while

perhaps permissible on summary judgment are not appropriate in considering a motion to

dismiss.

### F.  IRPs Sufficiently Plead Their State Law Claims

This Court has already upheld IRPs' state law claims in earlier complaints, and the claims

in this Complaint were drafted in accordance with those earlier decisions.  *See* Opinion on EPPs'

and IRPs' Group 1 State Law Claims, 16-md-2724-CMR, Dkt. 857 (February 15, 2019), at 48

("Group 1 EPPs' and IRPs' state law claims are sufficient to withstand dismissal"). The

Distributor Defendants do not attack any of the reasoning in that Opinion, nor do they challenge

Plaintiffs' state law claims on any state law-related basis. Plaintiffs are permitted to plead such

state law claims with respect to purchases they made from entities other than the Distributor

Defendants and as an alternative to their federal law claims. *K-Dur.*, 338 F. Supp. 2d at 544.

Such claims should be upheld as they have been before.

### G.  IRPs Continue to Find Further Evidence of the Distributors' Participation in the Overarching Conspiracy

Defendants ask the Court to dismiss the IRP Complaint with prejudice—an extraordinary

remedy.  *See DelRio–Mocci v. Connolly Props. Inc.*, 672 F.3d 241, 251 (3d Cir. 2012) (courts

freely grant leave to amend a deficient pleading); *Shane v. Fauver*, 213 F.3d 113, 115 (3d Cir.

2000).  Although IRPs have agreed, in the interests of MDL coordination, not to seek party

FILED WITH REDACTIONS – PUBLIC VERSION

discovery from the Distributor Defendants until the resolution of this motion, IRPs continue to receive and investigate files from the manufacturer Defendants and to accumulate additional evidence of the Distributor Defendants' conduct in furtherance of the overarching conspiracy.

The fact that IRPs have previously amended this complaint—without briefing or obtaining any ruling on the prior version—does not support a dismissal with prejudice. "If the underlying facts or circumstances relied upon by a plaintiff may be a proper subject of relief, he ought to be afforded an opportunity to test his claim on the merits." *Foman v. Davis*, 371 U.S. 178, 182 (1962).

However, if the Court determines that the complaint is insufficient and grants or partially grants the motion to dismiss, IRPs respectfully request leave to amend to supply additional evidence that would demonstrate the plausibility of the claim that the Distributors Defendants participated in an overarching conspiracy.

FILED WITH REDACTIONS – PUBLIC VERSION

## V.  CONCLUSION

For all of the reasons set forth above, the Plaintiff pharmacies and hospitals respectfully request that this Court wholly deny the Distributor Defendants' Joint Motion to Dismiss their Complaint.

Dated: September 28, 2020                    Respectfully submitted,

                                             */s/  Jonathan W. Cuneo*

Peter Gil-Montllor                           Jonathan W. Cuneo
Christian Hudson                             Joel Davidow
**CUNEO GILBERT & LADUCA LLP**               Victoria Sims
16 Court Street, Suite 1012                  Blaine Finley
Brooklyn, NY 11241                           **CUNEO GILBERT & LADUCA LLP**
202-789-3960                                 4725 Wisconsin Ave., NW Suite 200
pgil-montllor@cuneolaw.com                   Washington, DC 20016
                                             202-789-3960
                                             jonc@cuneolaw.com

                                             *Lead Counsel for the Indirect Reseller Plaintiffs*

25