# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE: GENERIC PHARMACEUTICALS PRICING ANTITRUST LITIGATION | **MDL NO. 2724**<br>**16-MD-2724** |
| | **HON. CYNTHIA M. RUFE** |
| **THIS DOCUMENT RELATES TO:** | |
| Reliable Pharmacy, et al., | **19-cv-6044** |
| *v.* | |
| Actavis Holdco US, Inc., et al. | |

**IRP Brief in Opposition to Individual Memoranda of Law of Red Oak Sourcing, LLC; Morris & Dickson; and Walgreens Boots Alliance, Inc. in Support of Distributor Defendants' Joint Motion to Dismiss the IRP Amended December 2019 Complaint**

## TABLE OF CONTENTS

I.  INTRODUCTION ......................................................................................... 1

II.  LEGAL STANDARD ................................................................................... 2

III.  FACTS ......................................................................................................... 3

IV.  ARGUMENT ................................................................................................ 5

A.  IRPs Sufficiently Allege the Existence of an Overarching Conspiracy. ..................... 5

B.  IRPs Sufficiently Allege Red Oak's Participation in the Overarching Conspiracy. ... 6

1.  IRPs Have Pled Facts That Raise The Inference That Red Oak Joined An Overarching Conspiracy. .................................................................. 6

2.  Red Oak is Properly Named as a Defendant in the Overarching Conspiracy. ........ 8

3.  Red Oak is Involved in the Purchase and Sale of Generic Drugs. ......................... 10

C.  IRPs Sufficiently Allege M&D's Participation in the Overarching Conspiracy ....... 12

D.  IRPs Sufficiently Allege Walgreens's Participation in the Overarching Conspiracy. 16

E.  IRPs' Unjust Enrichment Claim Should Not Be Dismissed ...................................... 22

V.  CONCLUSION ........................................................................................... 22

FILED WITH REDACTIONS – PUBLIC VERSION

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) ........................................................ 2, 6

*Finkelman v. Nat'l Football League*, 810 F.3d 187 (3d Cir. 2016) ................................... 2

*Hinds Cty. v. Wachovia Bank N.A.*, 620 F. Supp. 2d 499 (S.D.N.Y. 2009) ................................. 10

*In re Baby Foods Antitrust Litig.*, 166 F.3d 112 (3d Cir. 1999) .................................... 19

*In re Broiler Chicken Antitrust Litig.*, 290 F. Supp. 3d 772 (N.D. Ill. 2017) ................................ 2

*In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300 (3d Cir. 2010)................................ 14

*In re Niaspan Antitrust Litig.*, 42 F. Supp. 3d 735 (E.D. Pa. 2014)................................. 2

*InterVest, Inc. v. Bloomberg, L.P.*, 340 F.3d 144 (3rd Cir. 2003) ................................ 13

*Phillips v. Cty. of Allegheny*, 515 F.3d 224 (3d Cir. 2008).......................................... 7

*Precision Assocs., Inc. v. Panalpina World Transp. (Holding) Ltd.*, No. 08-CV-42 JG VVP, 2011 WL 7053807 (E.D.N.Y. Jan. 4, 2011) ......................................................................... 9

*Rigaud v. Garofalo*, Civ. No. 04-1866, 2005 WL 1124269 (E.D. Pa. May 9, 2005) ................ 8, 9

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308 (2007) ................................ 6

*U.S. v. Pressler*, 256 F.3d 144 (3d Cir. 2001)................................................................. 2

*U.S. v. Williams*, No. 17-2111, 2020 WL 5422788 (3d Cir. Sept. 10, 2020) ................................ 2

*Valspar Corp. v. E.I. Du Pont De Nemours and Co.*, 873 F.3d 185 (3d Cir. 2017).................... 19

FILED WITH REDACTIONS – PUBLIC VERSION

# I.     INTRODUCTION

The Indirect Reseller Plaintiffs ("IRPs") have plausibly alleged in their Amended Class Action Complaint (Doc. 61) ("Complaint") that Defendants Red Oak Sourcing, LLC ("Red Oak"); Morris & Dickson ("M&D"); Walgreens Boots Alliance, Inc., and Walgreens Boots Alliance Development ("Walgreens") participated in a conspiracy to increase prices for some generic pharmaceutical products.[1]

These and other Distributor Defendants have jointly moved to dismiss.  In addition to joint briefing in support of a motion to dismiss, defendants Red Oak, M&D, and Walgreens have individually moved to dismiss the IRP Complaint. This opposition responds to the three briefs submitted by these three defendants in their individual capacity. The other Distributor Defendants—Cardinal, Harvard, AmerisourceBergen (ABC), H.D. Smith, and McKesson—have not filed individual briefs.

---

[1] Red Oak filed its Individual Memorandum of Law in Support of Its Motion to Dismiss the Indirect Reseller Plaintiffs' (the "IRPs'") Amended Class Action Complaint (Doc. 61) (the "Complaint" of "Compl.") ("Red Oak Memorandum" or "Red Oak Mem.") pursuant to Fed. R. Civ. P. 12(b)(6) on July 15, 2020.  M&D filed its Individual Memorandum of Law in Support of Its Motion to Dismiss the Indirect Reseller Plaintiffs' (the "IRPs'") Amended Class Action Complaint (Doc. 61) (the "Complaint" of "Compl.") ("M&D Memorandum" or "M&D Mem.") pursuant to Fed. R. Civ. P. 12(b)(6) on July 15, 2020.  Walgreens filed its Individual Memorandum of Law in Support of Its Motion to Dismiss the Indirect Reseller Plaintiffs' (the "IRPs'") Amended Class Action Complaint (Doc. 61) (the "Complaint" of "Compl.") ("Walgreens Memorandum" or "Walgreens Mem.") pursuant to Fed. R. Civ. P. 12(b)(6) on July 15, 2020. In response, IRPs file this Memorandum of Law in Opposition to Defendants' Motion to Dismiss the Indirect Reseller Plaintiffs' (the "IRPs'") Amended Class Action Complaint.  For elimination of doubt, the IRPs incorporate by reference all arguments made in their memorandum in opposition to the Distributor Defendants' Memorandum of Law In Support Of Their Joint Motion To Dismiss Indirect Reseller Plaintiffs' Amended Class Action Complaint.

FILED WITH REDACTIONS – PUBLIC VERSION

## II.   <u>LEGAL STANDARD</u>

"To state a claim for a Sherman Act conspiracy, Plaintiffs must allege 'enough factual matter (taken as true) to suggest that an agreement was made.'" Overarching Conspiracy Opinion, Dkt. 1070, at 21 (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). This can be done by alleging either (a) direct evidence of an agreement or (b) circumstantial evidence of parallel conduct from which a court can plausibly infer an agreement.

Plaintiffs must allege "enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal agreement." *See* Overarching Conspiracy Opinion at 19 (citing *Twombly*, 550 U.S. at 556). "Speculative or conjectural assertions are not sufficient." *See id.* (citing *Finkelman v. Nat'l Football League*, 810 F.3d 187, 194 (3d Cir. 2016)). However, Plaintiffs are not required "to plead facts that, if true, definitively rule out all possible innocent explanations." *See id.* (citing *In re Niaspan Antitrust Litig.*, 42 F. Supp. 3d 735, 753 (E.D. Pa. 2014)). "[I]t is improper at this stage of the proceedings to weigh alternatives and [decide] which is more plausible." *See id.* (citing *In re Broiler Chicken Antitrust Litig.*, 290 F. Supp. 3d 772, 788 (N.D. Ill. 2017)). "[C]ertain types of circumstantial evidence become substantially more probative if it can be established that a conspiracy existed and the only remaining question is whether the defendant was a part of it." *U.S. v. Williams*, No. 17-2111, 2020 WL 5422788, at *31 (3d Cir. Sept. 10, 2020) (quoting *U.S. v. Pressler*, 256 F.3d 144, 151 (3d Cir. 2001)).[2]

---

[2] *See Pressler*, 256 F.3d at 151 ("[I]magine a situation where the defendant is a street-level drug dealer. If it is shown that an organized gang controls drug distribution in the defendant's neighborhood and that the gang has divided the neighborhood into zones in which only a single dealer may operate, then the fact that the defendant consistently sells his or her drugs only within certain geographical parameters would provide evidence that the defendant both knew of the existence of the conspiracy and was a participant in it.").

FILED WITH REDACTIONS – PUBLIC VERSION

### III.   FACTS

The IRP Complaint provides dozens of examples of allocation of market share and coordinated price increases between generic drug manufacturers. As in the earlier complaint filed by the IRPs in this MDL (18-cv-2533), the Complaint alleges that these acts were all part of an overarching conspiracy based on the core principle of "fair share" that the manufacturers mutually obey in order to prevent price erosion and protect price increases. Compl. ¶¶130-56. None of the Distributor Defendants challenge the existence of the overarching conspiracy between the manufacturers.

The Complaint alleges that certain distributors, named as Defendants, were aware of the overarching agreement. Compl. ¶¶ 162-167. The Complaint further alleges that these Distributor Defendants knowingly facilitated many instances of the "fair share" market allocations and coordinated price increases, typically by conveying anticompetitive messages at the behest of the manufacturers. Compl. ¶ 172; *see, e.g.*, Compl. ¶ 271 (█████████████████████████ █████████████████████████████████████); Compl. ¶ 280 (██████████ ███████████████████████████████████████████████ and believes █████████████████████████████████████████████ ████████████

For example, the distributors often notified a manufacturer that its co-conspirator manufacturer was adhering to the overarching agreement by seeking only a limited share, or that it would compete no further if given a certain customer account. *See, e.g.*, Compl. ¶ 260 ██████ █████████████████████████); Compl. ¶ 263 ████████████████████ █████████); Compl. ¶ 291 ████████████████████████████████); Compl. ¶ 301 ████████████████████████████████████

FILED WITH REDACTIONS – PUBLIC VERSION

The Complaint alleges that Red Oak, M&D, and Walgreens each took these types of actions to knowingly facilitate the conspiracy and thereby became members of the conspiracy alongside their co-conspirator manufacturers.

**Red Oak**. Red Oak arranges purchases from generic drug manufacturers on behalf of its owner, Distributor Defendant Cardinal. Cardinal then sells those drugs to pharmacies and hospitals such as the Plaintiffs. The Complaint alleges several anticompetitive episodes involving Cardinal and notes that when Red Oak was created in 2014 "some of the same employees who participated in the overarching conspiracy while at Cardinal accepted new positions at Red Oak." Compl. ¶ 357. This continuity in function and personnel between Cardinal and Red Oak is why Red Oak was named as a Defendant and is grouped with Cardinal in the Complaint.

The Complaint alleges that Red Oak maintained the awareness of the conspiracy that its employees had developed while at Cardinal. They remained in contact with the same generic drug manufacturers and did not forget about the principles of the fair share understanding. For example, Red Oak often requested that the manufacturers "provide comparative market share charts showing which customers had been allocated to which manufacturers." Compl. ¶ 358.  The Complaint also cites an episode where ████████████████████████████████████████████ ███████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████ ████████████████████████████████████ Compl. ¶ 385.

**M&D.** The Complaint alleges several facts to show that M&D was aware of the fair share principles and that the manufacturers expected that they could send allocation messages via M&D. *See, e.g.*, Compl. ¶ 345 ████████████████████████████████████████████

4



Compl. ¶ 211

The Complaint also includes allegations that M&D did in fact pass such price-fixing messages from manufacturer to manufacturer, *e.g.*, Compl. ¶ 351 and also that M&D

Compl. ¶ 180

. Internal discussions at the manufacturers confirm that M&D was

Compl. ¶ 346, and

Compl. ¶ 347.

**Walgreens Boots Alliance & Walgreens Boots Alliance Development.** The IRP Complaint alleges that employees of the Walgreens entities have been aware of the principles of fair share for years, and, in the words of admitted conspirator Heritage,

Compl. ¶ 165. The Walgreens conspirators are a particularly useful conduit because they are in constant communication not only with the manufacturers, but also with individuals at Distributor Defendant AmerisourceBergen ("ABC"), who themselves also collaborate with manufacturers to arrange fair share allocations. Examples are Walgreens's conducted are cited above.

## IV.   ARGUMENT

### A.   IRPs Sufficiently Allege the Existence of an Overarching Conspiracy.

IRPs advance a theory of overarching conspiracy and have presented evidence of Defendants' participation in it.  The existence of an overarching conspiracy between manufacturers has been plausibly pled and is not contested by any of the Distributor Defendants. Just like the earlier IRP complaint focused on episodes involving Defendant Heritage, this Complaint—

5

focused on activity by Defendant Teva—provides a "connective tissue" that "gives credence to a claim that Defendants engaged in 'behavior that would probably not result from chance, coincidence, independent response to common stimuli, or mere interdependence unaided by an advance understanding among the parties.' *See* Overarching Conspiracy Opinion at 23 (citing *Twombly*, 550 U.S. at 556 n.4). All of the allegations concerning the Distributor Defendants must be viewed against the backdrop of this overarching conspiracy. "The court's job is not to scrutinize each allegation in isolation but to assess all the allegations holistically." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 326 (2007).

**B.**     **IRPs Sufficiently Allege Red Oak's Participation in the Overarching Conspiracy.**

    **1.**     **IRPs Have Pled Facts That Raise The Inference That Red Oak Joined An Overarching Conspiracy.**

When considered together, several paragraphs in the IRP Complaint plausibly allege Red Oak's participation in the alleged overarching conspiracy.

Paragraph 358 alleges that Red Oak repeatedly requested charts from Manufacturer Defendants showing the current allocation of market share among the Manufacturer Defendants. Compl. ¶ 358. Red Oak repeatedly attempts to recast its conduct as an innocent "vertical" exchange of information and cites an opinion already found in the joint briefing, but this does not match the facts. Red Oak Mem. at 7. Red Oak is perhaps correct that under different circumstances, were there no evidence of a market allocation conspiracy, such actions might not be so suspect. But here, the nature of the information that is shared—market share among the Manufacturer Defendants—is quintessentially horizontal, and the distribution of this kind of information is precisely how the fair share conspiracy was planned and maintained. Red Oak's argument leads to the intolerable conclusion that any exchange of information—even smoking-gun confirmation of

6

an allocation scheme—is permissible so long as the communication is routed through an intermediary, rather than passed directly between horizontal competitors.

Red Oak next argues that a competitive market might naturally lead to a "fair share" balance and so "the allegation that Red Oak asked a manufacturer for market share information shows that Red Oak was seeking to promote competition among the Manufacturer Defendants, not subvert it." Red Oak Mem. at 7. This argument goes nowhere because, as Red Oak acknowledges, it is possible that the end-states of a rigged market and a free and fair market could look the same. In any event, Red Oak is asking the Court to trust that it was collecting market-wide share and allocation information for some benevolent oversight purpose and not because such information is the bread and butter of the fair share conspiracy. Red Oak's demand that the Court "weigh alternatives and decide which is more plausible," Overarching Conspiracy Opinion at 19, is precisely the kind of analysis that is improper on a motion to dismiss, where the Court must "draw all inferences from the facts alleged in the light most favorable" to the plaintiffs. *Phillips v. Cty. of Allegheny*, 515 F.3d 224, 228 (3d Cir. 2008).

Red Oak next challenges the Complaint's allegation that it participated in the fair share conspiracy by engaging in policing. ███████████████████████████████

████████████████████████████████████████████████████

██████████████████ Compl. ¶ 385. This evidence that Red Oak engaged in policing as part of an effort to prevent prices from falling also serves to show, contrary to Red Oak's brief, that it was not necessarily interested in paying lower prices. Red Oak's first argument is that it is not mentioned as a co-conspirator in Sandoz's deferred prosecution agreement, but this Court is well aware that the Department of Justice has pursued a much narrower version of the case than the States, the IRPs, and the other plaintiffs in the MDL.

7

Next, Red Oak suggests that it would be unnecessary for it to intervene if there were already an agreement between Teva and Sandoz, such that IRPs' allegations are illogical. The IRP Complaint explains that the conspiracy did not always operate smoothly, and provides many examples. *See* Compl. ¶ 135 ("[M]iscalculations and inconsistencies in perception of share status were a source of friction among the conspirators. Much of the evidence in this case comes from these moments of friction when Defendants had to troubleshoot their conspiracy and get each other back on track towards fair share."). The fact remains that Red Oak did involve itself in these discussions and was concerned that a refusal to accommodate a new entrant would result in ████ prices.

Red Oak rehashes arguments about horizontality from its joint briefing and then suggests that, since there is no allegation that Red Oak ever communicated with Sandoz about the conspiracy, there is no basis for inferring that Red Oak even knew about the conspiracy. Red Oak Mem. at 9. But a reasonable inference from the language quoted in the Complaint is that Red Oak was able to communicate ██████████████████████████████ precisely because Red Oak was in contact with Sandoz and was echoing its frustration at not being quickly accommodated.

### 2. <u>Red Oak is Properly Named as a Defendant in the Overarching Conspiracy</u>.

Because IRPs' action against Red Oak is based on allegations of an overarching conspiracy, Red Oak is not listed as a defendant and/or co-conspirator in all claims in the Complaint. Red Oak Mem. at 3. However, Red Oak is, in fact, clearly named as a defendant and co-conspirator in numerous portions of the Complaint. Red Oak cites *Rigaud v. Garofalo*, Civ. No. 04-1866, 2005 WL 1124269, at *2 (E.D. Pa. May 9, 2005) for the proposition that the IRP Complaint should be dismissed based on insufficient pleading, but the opinion is clearly

inapposite.  In *Garofalo*, the plaintiff's pleading contained numerous deficiencies in terms of pleading factual predicates, including that it failed to include the proposition "Defendant Brandywine was [plaintiff's] employer" in a wrongful termination action and that "[plaintiff] engaged in a protected activity or that Defendant Brandywine took action against her" in regards to a claim of retaliation.  *Garofalo*, 2005 WL 1124269, at *2.  By contrast, IRPs have made specific allegations of actions of Red Oak that joined an overarching price-fixing conspiracy.  Compl. ¶¶ 281, 358, 385.

After suggesting that IRPs' claims should be dismissed on the basis that IRPs have not adequately pled the involvement of Red Oak in the entirety of the conspiracy, Red Oak incorrectly argues that IRPs' claims should also be dismissed on the basis that IRPs do not allege Red Oak's involvement in *any* conspiracy.  Red Oak Mem. at 4.  However, acknowledgment that IRPs have alleged discrete instances of conspiratorial conduct on the part of Red Oak is found in its own brief, which spends four pages analyzing paragraphs in the IRP Complaint pertaining to conspiratorial conduct by Red Oak.  Red Oak Mem. 5-9.

Red Oak cites *Precision Assocs., Inc. v. Panalpina World Transp. (Holding) Ltd.*, No. 08-CV-42 JG VVP, 2011 WL 7053807, at *27 (E.D.N.Y. Jan. 4, 2011), *report and recommendation adopted*, No. 08-CV-00042 JG VVP, 2012 WL 3307486 (E.D.N.Y. Aug. 13, 2012) for the proposition that that IRPs have not adequately alleged the participation of Red Oak in an overarching conspiracy. However, *Precision Associates* treats the threshold question of whether a plaintiff has sufficiently pled the existence of an overarching conspiracy, which this Court has already decided. *See Precision Associates*, 2011 WL 7053807, at *27 ("The Complaint is silent as to how, when, or where these sixty-five defendants or the conduct identified in the 10 local conspiracy claims became connected to each other into one global conspiracy connected by

common actors, methods and goals."). In the instant litigation, the Court has already performed the kind of analysis called for in *Precision Associates*. *See* Overarching Conspiracy Opinion at 20-33.

Red Oak also cites *Hinds Cty. v. Wachovia Bank N.A.*, 620 F. Supp. 2d 499, 515 (S.D.N.Y. 2009) and suggests that it provides a basis on which to dismiss IRPs' claims. But the court in *Wachovia Bank* explicitly explained that it was concerned with the general sufficiency of the allegations against the defendants, not the issue of whether the conspiracy was sufficiently pled as an overarching conspiracy, instead of as smaller individual conspiracies. *See Wachovia Bank* N.A., 620 F. Supp. 2d at 515 ("The Court finds that the issue of single or multiple conspiracies is irrelevant because, as discussed above, the claim that the Joint Defendants who are not implicated in the CAC's specific allegations of wrongdoing were involved in an industry-wide conspiracy, or even in multiple, smaller conspiracies, is based entirely on the happenstance that those Joint Defendants were involved in the sale of municipal derivatives."). IRPs have sufficiently pled their claims against Red Oak.

### 3.     Red Oak is Involved in the Purchase and Sale of Generic Drugs.

Red Oak suggests that it is "neither a 'purchaser' nor a seller of drugs," but provides no evidence for this proposition, which is not properly before the Court during this motion to dismiss stage of this litigation. Red Oak Mem. at 1. Defendant suggests that "Red Oak acts solely as a negotiating agent for Cardinal and CVS," citing to the Complaint apparently on the basis that a quote from the Complaint is included later in the same sentence. *Id.* at 2. Red Oak is engaged in sleight of hand because the allegation that it acted solely as the negotiating agent for Cardinal and CVS is not found in the Complaint, which instead alleges that "[d]uring the Class Period, Red Oak marketed and sold generic pharmaceuticals in this District and throughout the United States."

Compl. ¶ 89. For the sake of deciding the instant motion, the Court should disregard Red Oak's assertion that "Red Oak acts solely as a negotiating agent for Cardinal and CVS," since when deciding a motion to dismiss under Rule 12, the Court assumes all factual allegations contained in the complaint to be true.

Red Oak's concession that it negotiated contracts on behalf of Cardinal Health Inc. and CVS Health Corporation is in and of itself inculpatory, if misleading. Red Oak suggests that it "just negotiates the contracts." Red Oak Mem. at 2. This admission implies that Red Oak had privity to the allegedly price-fixed commerce at stake in this case. However, one industry participant's gloss on Red Oak's role in the purchase and sale of price-fixed generic pharmaceuticals as part of the overarching conspiracy was that it was the relevant entity for the sake of price-fixing. ████████████████████████████████████ ████████████████████████████████████

Red Oak suggest that IRPs have not alleged that Red Oak sold drugs to them. Red Oak Mem. at 2. The IRP Complaint clearly alleges that IRPs purchased generic pharmaceuticals in transactions in which Red Oak was involved. Compl. ¶ 281. IRPs' claims are predicated on Red Oak having acted as a conspirator in a price-fixing conspiracy, not on Red Oak meeting some idiosyncratic definition of "seller."

Red Oak also claims that Red Oak is not alleged to be the alter ego of Cardinal or CVS. Red Oak Mem. at 2. However, this assertion is an irrelevance, since it would go to the issue of whether a parent entity of Red Oak is properly maintained as a defendant in this matter based on the conduct of Red Oak. The issue before the Court is distinct and more straightforward: whether Red Oak is properly a defendant in this matter in light of its own conduct.

FILED WITH REDACTIONS – PUBLIC VERSION

**C.**   **IRPs Sufficiently Allege M&D's Participation in the Overarching Conspiracy.**

Like Red Oak, M&D argues that that the IRP Complaint does not provide sufficient evidence of M&D's participation in the overarching conspiracy.

M&D concedes IRPs' allegation that "[a]s a smaller wholesaler, Morris & Dickson had a strategy of offering competitive intelligence and coordinating fair share in exchange for preferable treatment from the manufacturers," but claims that this is somehow exculpatory. M&D Mem. at 5. In effect, it argues that passing messages such as ██████████████████████████ ███████████████ is simply a "tool" that distributors should be permitted to use if it helps its business. This is not and cannot be the law. Against the backdrop of an overarching conspiracy, it is at least plausible that IRPs will be able to prove that a company that is known for being helpful in passing such messages was aware of the common goal of allocating fair share and did indeed act towards that goal in collaboration with the manufacturers. M&D reverses this logic by arguing that, even if it did in fact pass such anticompetitive messages, it did so unknowingly. M&D Mem. at 2. But the inference to be drawn from the fact that multiple manufacturers speak frankly and simply to M&D using the terms of art of the conspiracy is that M&D entirely understood why Sandoz would provide assurances that it was ████████████████████████████ ███████ or why a manufacturer would tell it about its <u>overall</u> market share goals and state which other competitor was expected to give up business to the new entrant. Compl. ¶ 211 ███████ ████████████████████████████████████████

In and of itself, that Manufacturer Defendants were willing to share the existence of their fair share conspiracy with M&D in hopes of procuring action suggests that M&D was involved in the fair share conspiracy on a serial basis since the very nature of a price-fixing cartel is that it is most effective when kept secret.

M&D cites the Model Federal Jury Instructions in suggesting that IRPs have not pled a knowing violation of antitrust law. The Model Federal Jury Instructions are fundamentally different from and reflect different concerns than do the pleading standard required to maintain a lawsuit in federal court. The Model Federal Jury Instructions reflect concerns relating to the summary judgment standard and also the rules of evidence, both of which are sets of standards imposed once evidence in a matter has been developed through discovery and not at the initial pleading stage of a case.

M&D argues that allegations that several different manufacturers each sought pre-commitments from customers for a newly launched drug does not state a Sherman Act § 1 claim. M&D Mem. at 4.  M&D cites *InterVest, Inc. v. Bloomberg, L.P.*, 340 F.3d 144, 159 (3rd Cir. 2003) for the proposition that unilateral activity cannot give rise to a Section 1 claim. However, what is at stake here cannot be said to be probative merely of unilateral action.  Plaintiff specifically pleads actual evidence that shows M&D coordinating activity by Manufacturer Defendants to increase the price upon launch of a drug. The only inference plausible from the IRP Complaint is that M&D sought to facilitate coordination among Manufacturer Defendants as part of the overarching fair share agreement.

M&D argues that IRPs do not allege that the manufacturers then acted on the information provided to them by it or allege the Manufacturer Defendants conspired to divide the market or stabilize Eszopiclone prices. M&D Mem. at 5. However, IRPs do allege the existence of a fair share conspiracy with regard to Eszopiclone, and this Court has already found that a fair share conspiracy among Manufacturer Defendants has been plausibly pled. Compl. ¶ 768.

M&D contends that IRPs allege nothing about Eszopiclone prices, i.e., that prices moved in parallel or stabilized. M&D Mem. at 5. However, M&D misses that parallel pricing is merely

one type of horizontal parallelism that might be alleged by a plaintiff in plausibly alleging an antitrust violation by looking at circumstantial evidence. Here, IRPs repeatedly allege parallel conduct by alleging that Manufacturer Defendants allocated similar shares of market across defendants, including in the case of Eszopiclone. That M&D is specifically alleged to have coordinated market share among defendants is an exceedingly strong plus factor, at the least.

M&D cites *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 327 (3d Cir. 2010) for the proposition that alleging information sharing between a broker and customer is insufficient to sustain an antitrust claim. However, *Insurance Brokerage* is an opinion in which the court rejected wholesale that plaintiffs had pled the existence of any price-fixing conspiracy. *See id.* By contrast, this Court has accepted the general sufficiency of IRPs' allegations concerning the existence of an overarching conspiracy. The only issue before the Court is whether M&D joined that conspiracy.

M&D concedes that "[a]s a smaller wholesaler, [it] had a strategy of offering competitive intelligence and coordinating fair share in exchange for preferable treatment from the manufacturers," an allegation found in the IRP Complaint. M&D Mem. at 7. M&D takes the position that its desire as a "smaller wholesaler" to offer manufacturers market information to secure discounts for itself is a perfect example of "independent self-interest." M&D Mem. at 7. However, the Complaint makes clear that this reward of a discount to M&D was transitory and sporadic. Compl. ¶ 346 ███████████████████████████████████
████████████████████████

M&D reviews a variety of arguments regarding the verticality of the information exchange found in the parties' joint briefing. M&D repeatedly attempts to recast its conduct as a fundamentally vertical exchange of information with a citation to an opinion already found in the joint briefing, but this is completely illogical. M&D Mem. at 7-8. That the market share

information is communicated from a manufacturer to its distributor customer cannot be said to exculpate this conduct or even bring into question whether it constitutes evidence that M&D was aware of and joined the Manufacturer Defendants' fair share conspiracy. The nature of the information that is shared—market share among the Manufacturer Defendants—is quintessentially horizontal, and the distribution of this kind of information is precisely how the alleged fair share conspiracy would have been planned and maintained. As a result, M&D is in the position of contending that not only possessing, but also repeatedly trafficking in, smoking gun evidence that is specific to a price-fixing conspiracy that has already been found to have been plausibly alleged to exist is exculpated on the basis that the exchange of information is vertical.

M&D cannot distinguish its argument from total exculpation of participation in a price-fixing conspiracy whenever a defendant is alleged to be in anything other than a horizontal relationship with the defendants manufacturing the price-fixed product. This is an unreasonable position and one that is not in line with current conspiracy or antitrust law. Put slightly differently, M&D's position is indistinguishable from a doctrine under which price-fixing is de facto legal, as long as distributors or other vertical intermediaries are used as conduits to coordinate the Manufacturer Defendants' price-fixing.

M&D asserts that that IRPs have not adequately pled that M&D conspired to raise prices for Eplerenone. As noted above, the inference that M&D took action on the request to have Greenstone give up market share is the most plausible one. This is particularly true since M&D is alleged elsewhere in the IRP Complaint to have taken action to effect the fair share conspiracy among Manufacturer Defendants. Compl. ¶¶ 348-51.

15

D.   **IRPs Sufficiently Allege Walgreens's Participation in the Overarching Conspiracy.**

The Walgreens brief is focused on who the companies are rather than what they are alleged to have done. First, it argues that a corporate cluster of its type would never conspire with the manufacturers, because it is essentially a pharmacy. But this is, at best, half the story. As explained in the Complaint, since 2013 Walgreens has combined its efforts with Distributor Defendant ABC. Information flows freely between ABC, Walgreens, and the employees who nominally work only for the "Walgreens side" of the Walgreens Boots Alliance. As a massive chain pharmacy strapped to a massive distributor, Walgreens is able to influence prices and has financial incentives that are not so simply reduced to the idea that it is a pharmacy like the IRP named plaintiffs. The IRPs are not in daily communication with the manufacturers, and no one has ever accused Falconer Pharmacy, Reliable Pharmacy, or any other independent pharmacy of being "market share police."

Walgreens's next identity-based argument is that its long history of lawsuits suggests that it is a natural enemy of the manufacturers and would tend not to conspire with them. This is irrelevant first because the manufacturers themselves were certainly in a conspiracy, *see* Compl. ¶ 127, despite the fact that they consistently sue one another over patent and other business issues, and, second, because the Complaint does not allege that Walgreens's lawyers were the ones engaging in price-fixing. Warring general counsel office do not prevent amicable relations between sales and marketing executives whose job is to constantly form deals with one another and who attend the same circuit of industry conference with the attendant golf outings and happy hours. *See* Compl. ¶ 123.

Next, Walgreens seeks to downplay its involvement in the overarching fair share conspiracy, but ends up describing a course of conduct that is quintessentially anticompetitive. Walgreens admits that "[t]here are a few alleged instances where a manufacturer asked Walgreens

to try to ascertain another manufacturers' plans as to a particular drug." Walgreens Mem. at 3. Walgreens fails to make clear how this messengering conduct helped it to procure lower prices for generic pharmaceuticals. "There are also one or two instances, involving discrete drugs in particular situations, where Plaintiffs allege that Walgreens carried messages between manufacturers as part of Walgreens's own negotiations with the manufacturers for a few specific drugs." Walgreens Mem. at 3. This language correctly implies is that Walgreens was carrying messages between Manufacturer Defendants with regard to sales to Walgreens at Manufacturer Defendants' request, rather than for the benefit of Walgreens. Walgreens admits that it was engaged in the fundamental function of a conduit through which the Manufacturer Defendants conducted their fair share conspiracy and fails to paint the picture of how this conduct was in service of procuring lower prices. Walgreens even admits that any "discounts" that were achieved would have been overwhelmed in magnitude by the overcharges resulting from the conspiracy: "And, of course, whatever reduction in prices that Walgreens was able to achieve may have been dwarfed by the higher prices presumably achieved by the allegedly conspiring manufacturers." Walgreens Mem. at 3.

Walgreens suggests that, because it has brought antitrust actions relating to certain pharmaceutical products, it is a good corporate citizen that is a victim of Manufacturer Defendants' overarching price-fixing conspiracy. That Walgreens has been allowed to extract money from pharmaceutical manufacturers in the past does not alter the IRPs' specific allegations against in Walgreens in this matter. But Walgreens glosses over the nature of the allegations in the matters it cites. The considerable majority of the cited actions brought by Walgreens are "pay-for-delay" matters in which the issue was whether the manufacturer of an on-patent drug induced a would-be generic market entrant to delay production of a much cheaper generic version of the drug. The

involvement of Walgreens in these matters would not touch on the anticompetitive conduct of Walgreens in coordinating market share among multiple manufacturers in the market for generic drugs.

Last, Walgreens seeks to bolster its victimhood narrative by suggesting that it has been "gerrymandered out of the proposed [DPP] class." Walgreens Mem. at 5. Walgreens is correct that its exclusion is telling.  As the largest retail pharmacy, Walgreens represents a significant volume of commerce on which damages might be asserted, so there is an immense financial incentive to include it in a class definition. If the DPP class lawyers chose to exclude Walgreens, as Walgreens suggests, then the most logical conclusion is that the DPP lawyers have made a strategic judgment that Walgreens is somehow worse than dead weight as a class member in spite of the massive amount of commerce that flowed through it. The most obvious strategic disadvantage of including Walgreens in a class definition is that Manufacturer Defendants would seek to argue lack of predominance at class certification on the basis that one of the DPPs' largest class members was subject to a unique defense under the doctrine of unclean hands.

Walgreens takes the view that IRPs do not allege any motive for it to join the fair share conspiracy, going as far as to suggest that it was the victim of the conspiracy. Walgreens Mem. at 9. Walgreens makes much of it having been lied to by Sandoz in one episode, but this ultimately does nothing to undermine IRPs' other specifically pled allegations of conspiratorial conduct on the part of Walgreens. Walgreens Mem. at 9.

Walgreens asks that the Court overlook an episode in which a Dr. Reddy's representative ███████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████ ██████████ Walgreens Mem. at 11. Walgreens's reasoning is that negotiating with alternative

suppliers is the essence of procompetitive behavior. Walgreens Mem. at 11. What this logic fails to account for is that there is no pro-competitive rationale for Walgreens coordinating the market share of the Manufacturer Defendants. Even to the extent that Walgreens is not indifferent to its upstream price, the relative market shares of the Manufacturer Defendants still is not something that touches on the self-interest of Walgreens. The only remaining plausible inference is that this episode is conspiratorial in nature on the part of Walgreens.

"Sympathetic" is how Walgreens characterizes one of its executive's responses to Sandoz that "employees at another manufacturer were ▮▮▮▮▮▮▮▮ for not following a price increase, further noting ▮▮▮▮▮▮▮ Walgreens Mem. at 11. This strains credulity, particularly in the context of Walgreens coordinating the market shares of the Manufacturer Defendants.  Walgreens cites *In re Baby Foods Antitrust Litig.*, 166 F.3d 112, 125 (3d Cir. 1999) and later *Valspar Corp. v. E.I. Du Pont De Nemours and Co.*, 873 F.3d 185, 199 (3d Cir. 2017), but both of these opinions are inapt because they interpret the summary judgment standard, which is inapplicable at the motion to dismiss stage.

Walgreens contends that the IRP Complaint puts a wholly implausible spin on communications in which Walgreens suggested to one manufacturer that it should seek business because it did not have its "fair share" of a particular drug or asked manufacturers to compile a "wish list" of multiple additional drugs they hoped to sell to Walgreens. Walgreens Mem. at 12. Walgreens explains that these communications simply encouraged as many suppliers as possible to bid on its business, which is consistent with its independent and legitimate efforts to obtain supply at lower prices. Walgreens Mem. at 13. Once again, Walgreens fails to make clear how changing the relative market shares among the Manufacturer Defendants would help it to procure a lower price, or why an agreed upon fair share equilibrium would be expected to result in lower

19

prices for Walgreens. The straightforward way to procure a lower price would have been to stimulate competitive bidding on price with regard to specific drugs.

Walgreens claims that the plausibility of IRPs' allegations is undermined by many of the communications involving Walgreens having occurred in the midst of direct communications between the Manufacturer Defendants. Walgreens Mem. at 13. Walgreens claims that colluding manufacturers who are already speaking directly with each other would not take the risk of redundant, indirect communications going through one of the conspiracy's largest victims. Walgreens Mem. at 13. That Manufacturer Defendants were willing to share communications implying the existence of their fair share conspiracy with Walgreens in hopes of procuring action suggests that Walgreens was involved in the fair share conspiracy on a serial basis because the very nature of a price-fixing cartel is that it is most effective when kept secret. Walgreens must concede that the communications at issue could have alerted Walgreens to the conspiracy's existence. What Walgreens's reasoning fails to explain is why the Manufacturer Defendants would attempt to use Walgreens as an unwitting conduit, when the Manufacturer Defendants could have just reached out to one another directly with no risk of discovery of the fair share conspiracy by such a large customer. What Walgreens asks us to believe is that information that was facially in the service of allocating market share was being transmitted through it for years without anyone at Walgreens realizing that this was having the effect of increasing prices to Walgreens. The most plausible inference is that using Walgreens as a conduit was convenient, effective, and riskless because Walgreens was in on the scheme.

Walgreens argues that, when the IRP Complaint alleges that Walgreens "sought to facilitate a customer allocation between Greenstone and Teva" regarding Cabergoline, IRPs failed to implicate Walgreens in Plaintiffs' conspiracy. Walgreens Mem. at 15. Walgreens attempts to

explain that because it ██████████████████████████████████████████████

████████████████████████ Walgreens Mem. at 15. Walgreens's interpretation is that returning a favor to Greenstone was in Walgreens's independent interest. Walgreens Mem. at 15. This interpretation cuts against the very notion of what it means to do a favor. By recording that it was returning a favor, Walgreens acknowledged that it was doing something that it would not otherwise do (i.e., that it was doing something not in its self-interest) in order to preserve some type of supplier relationship. Walgreens therefore acknowledged, according to IRPs' allegations, that it acted against its own self-interest.

Walgreens asserts that it had no motive to enter into the conspiracy IRPs allege because it is a purchaser of drugs. What this assertion misses is that there are myriad ways in which Walgreens stood to be paid back for its participation in the conspiracy, since Walgreens has an ongoing business relationship with the Manufacturer Defendants.

Finally, motive is not a required element of participation in an antitrust conspiracy, and, on a human level, motives are not always financial. It is plausible that the Walgreens buyers who interacted may have been motivated by friendship and a desire for status as "market share police." The manufacturer conspirators themselves often declare that they are acting ███████████████

████████████████ and do not want to be known as the ones ███████████████████ Discovery will reveal the motives of the individuals involved, but is simply not a required part of the analysis of the motion for dismiss. For example, Walgreens's profitability is determined in part on the prices that it pays upstream, but also on volume. Walgreens could be allowed to conduct more business overall with Manufacturer Defendants if it helped to coordinate the overarching conspiracy that the Court has found was properly alleged. Conversely, the Manufacturer Defendants could punish Walgreens for not participating in the conspiracy, such as by cutting off Walgreens as a distributor

in whole or in part or by making clear to downstream competitors that Walgreens was not the preferred purvey of the Manufacturing Defendants' products.

Last, Walgreens ignores that paying a higher price, while valuable to the Manufacturer Defendants, ultimately did not necessarily harm Walgreens. Intermediaries like Walgreens are in the business of both buying and selling (or being reimbursed for the sale of) generic pharmaceutical products. To have suffered a loss by having paid a higher price for a product as the result of having joined a price-fixing conspiracy than it would have otherwise paid, Walgreens would need to have been unable raise its prices downstream. If anything, it stands to reason that, in instituting a coordinated a "fair share" arrangement, Distributor Defendants enabled themselves to lock in competitive profits across the industry to the extent that they could all ask for increased sales prices or reimbursement in light of increased purchase prices.

**E.    IRPs' Unjust Enrichment Claim Should Not Be Dismissed.**

Defendants assert that IRPs' unjust enrichment claim should be dismissed because IRPs do not allege that they or the class they seek to represent made purchases of drugs from Defendants. What this ignores is the multiplicity of ways in which Defendants stood to benefit from joining the alleged conspiracy by bolstering its relationship with its supplier, as discussed above.

## V.    CONCLUSION

For the foregoing reasons, IRPs respectfully request that the Court deny Defendants' individual motions to dismiss the Complaint in their entirety.

FILED WITH REDACTIONS – PUBLIC VERSION

Case 2:19-cv-06044-CMR   Document 85   Filed 09/28/20   Page 26 of 26

Dated: September 28, 2020

Respectfully submitted,

 /s/ Jonathan W. Cuneo
Jonathan W. Cuneo
Joel Davidow
Victoria Sims
Blaine Finley

Peter Gil-Montllor
Christian Hudson
**CUNEO GILBERT & LADUCA, LLP**
16 Court Street, Suite 1012
Brooklyn, NY 11241
202-789-3960
pgil-montllor@cuneolaw.com
christian@cuneolaw.com

**CUNEO GILBERT & LADUCA, LLP**
4725 Wisconsin Ave., NW Suite 200
Washington, DC 20016
202-789-3960
jonc@cuneolaw.com
joel@cuneolaw.com
vicky@cuneolaw.com
bfinley@cuneolaw.com

*Lead Counsel for the Indirect Reseller Plaintiffs*

FILED WITH REDACTIONS – PUBLIC VERSION