IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE: GENERIC PHARMACEUTICALS PRICING ANTITRUST LITIGATION | MDL 2724<br>16-MD-2724 |
| THIS DOCUMENT RELATES TO<br><br>RELIABLE PHARMACY et al. v ACTAVIS HOLDCO US, INC., et al. | HON. CYNTHIA M. RUFE<br><br><br>CIVIL ACTION NO. 19-cv-6044<br><br>**ORAL ARGUMENT REQUESTED** |

**MORRIS & DICKSON'S REPLY MEMORANDUM IN SUPPORT OF
PURCHASING DEFENDANTS' JOINT MOTION TO DISMISS**

**FILED WITH REDACTIONS – PUBLIC VERSION**

## I.     INTRODUCTION

IRPs broadly claim Morris & Dickson's involvement in an "overarching" conspiracy involving over 150 drugs, even though IRPs only specifically allege Morris & Dickson joined conspiracies for *two* drugs (Eszopiclone and Eplerenone (*see* Amended December 2019 Complaint ("Compl.") App. A (table of drugs and defendants))—and even that theory is based solely on the allegation that Morris & Dickson once shared Eszopiclone market information with a manufacturer. (For Eplerenone, IRPs do not allege Morris & Dickson did anything at all.)

IRPs' opposition brief confirms that its Complaint does not plausibly plead Morris & Dickson's involvement in any conspiracy. *See* IRP Brief in Opposition to Individual Memoranda of Law of Red Oak Sourcing, LLC; Morris & Dickson; and Walgreens Boots Alliance, Inc. in Support of Distributor Defendants' Joint Motion to Dismiss the IRP Amended December 2019 Complaint ("IRP Ind. Opp.") at 12-15. First, IRPs have no basis to claim Morris & Dickson joined an "overarching" conspiracy involving all drugs and defendants. IRPs do not contest that they failed to allege Morris & Dickson ever communicated with—much less entered into an agreement with—any other distributor. *See* Morris & Dickson's Memorandum In Support of Joint Motion to Dismiss ("M&D Br.") at 11-12. Nor do IRPs point to anything else in their Complaint to suggest Morris & Dickson joined an "overarching" conspiracy. This means that IRPs' claim against Morris & Dickson is limited to two alleged single-drug conspiracies for Eplerenone and Eszopiclone.

Second, IRPs do not contest that they failed to allege Morris & Dickson ever did anything with respect to Eplerenone, resting their entire Eplerenone theory on the allegation that a *manufacturer* once made a statement to Morris & Dickson. IRP Ind. Opp. at 15. IRPs then ask the Court to infer that Morris & Dickson took some type of action after receiving the manufacturer's statement. *Id.* But this is a remarkable theory: IRPs ask the Court to infer something IRPs

**FILED WITH REDACTIONS – PUBLIC VERSION**

themselves cannot allege consistent with Rule 11. Not surprisingly, IRPs fail to cite any precedent permitting an antitrust complaint to proceed to discovery where the complaint does not plead that the alleged participant actually did anything. The rest of IRPs' Morris & Dickson allegations relate to drugs where not even IRPs claim Morris & Dickson joined a conspiracy.

Third, the single Eszopiclone communication IRPs cite does not raise a plausible inference of conspiracy. Although it is true that "[i]t is improper at this stage of the proceedings to weigh alternatives and [decide] which is more plausible" (*In re Generic Pharm. Pricing Antitrust Litig.*, 394 F. Supp. 3d 509, 524 (E.D. Pa. 2019) ("*In re Generics*")), this rule applies only when the conspiracy inference is "plausible" in the first place, and "plausibility" has a very specific meaning in antitrust law. As Morris & Dickson explained in its initial brief, the Third Circuit has held that even a conspiracy claim based on parallel conduct (absent here) does not "plausibly" suggest conspiracy where "common economic experience" or "the facts alleged in the complaint itself" show why "independent self-interest is an obvious alternative explanation"—that is, an explanation other than conspiracy—for the alleged conduct. *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 326 (3rd Cir. 2010) (internal quotation marks omitted) ("*Insurance Brokerage*"); *see* M&D Br. at 5-7. The Third Circuit limits the range of "plausible" inferences because of concerns about false positives and chilling commercial conduct (*id.* at 321)—which are particularly pronounced when plaintiffs seek (as here) to allege a conspiracy based on communications between a customer such as Morris & Dickson and its supplier. Here, the single factual allegation that Morris & Dickson once sent a supplier information about other suppliers' price and volume targets for Eszopiclone does not permit a plausible conspiracy inference because *both* "common economic experience" and the "facts alleged in the complaint" explain why Morris

& Dickson's "independent self-interest is an obvious alternative explanation" for sharing such information. *Id.* at 326 (internal quotation marks omitted); *see* M&D Br. at 5-7.

## II.     ARGUMENT

### A. IRPs Effectively Concede They Do Not Allege Morris & Dickson's Participation in Any "Overarching" Conspiracy.

IRPs do not contest that they failed to allege Morris & Dickson *ever even communicated with* any other Purchasing Defendant. *See* M&D Br. at 11-12. In fact, IRPs now concede they do not allege that Morris & Dickson (or any other distributor) ever entered into an agreement with other distributors. *See* IRP Brief in Opposition to Distributor Defendants' Joint Motion to Dismiss the IRP Amended December 2019 Complaint ("IRP Joint Opp.") at 8 ("IRPs do not allege that there was an agreement between one distributor and another to allocate share of the drug-distribution market between distributors."). As Purchasing Defendants' Reply Memorandum of Law in Support of Their Joint Motion to Dismiss Indirect Reseller Plaintiffs' Amended December 2019 Class Action Complaint ("Joint Reply")—which Morris & Dickson joins and incorporates here—demonstrates, the absence of this allegation is fatal to a theory of an overarching conspiracy involving Purchasing Defendants such as Morris & Dickson. *See* Joint Reply Section II.A.

IRPs' Morris & Dickson allegations are very limited: they allege only that Morris & Dickson conspired with respect to *two* of the over 150 drugs in the Complaint. *See* Compl. App. A (table of drugs and defendants). IRPs provide no basis for asserting Morris & Dickson's broader involvement. Unlike the allegations of an "overarching" manufacturer conspiracy that this Court found sufficient, IRPs do *not* allege Morris & Dickson engaged in "conduct that reached beyond [its] individual drugs,"—that is, no "trade association events that were not partitioned into drug-specific enclaves," or anything similar. *In re Generics*, 394 F. Supp. 3d at 526 (internal quotation marks omitted). Without any allegations to support the claim that Morris & Dickson joined an

FILED WITH REDACTIONS – PUBLIC VERSION

"overarching" conspiracy, IRPs' only possible claims against Morris & Dickson are for the single-drug Eplerenone and Eszopiclone conspiracies.

### B. IRPs' Complaint Only Alleges Morris & Dickson's Conduct Regarding A Single Drug: Eszopiclone.

For one of the two drugs—Eplerenone—IRPs do not plead Morris & Dickson did anything. IRPs allege only that a *manufacturer* said to Morris & Dickson that it was ███████████ ████████████████████████████████ Compl. ¶ 211. IRPs do not contest that they failed to allege Morris & Dickson did anything after receiving this communication. Instead, they claim, "[T]he inference that M&D took action on the request to have Greenstone give up market share is the most plausible one." IRP Ind. Opp. at 15. But this is a remarkable argument: rather than actually *plead* that Morris & Dickson did something—which apparently, consistent with Rule 11, IRPs cannot do—IRPs seek to have the Court *infer* that it did so. The typical question for inference on antitrust pleadings is whether an agreement exists: specifically, plaintiffs allege parallel conduct and ask the court to permit the inference that the conduct reflects agreement rather than independent action. *See generally Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007). IRPs cite no authority for the proposition that a court can infer the *conduct* in addition to the agreement. Nor do IRPs cite any case where a court has permitted an antitrust complaint to proceed when the complaint did not plead that the alleged conspirator actually took any action.

Most of the rest of the factual allegations IRPs cite in their brief related to drugs where *not even IRPs* allege that Morris & Dickson joined any specific conspiracy. *See* IRP Ind. Opp. at 4-5 (summarizing Morris & Dickson allegations). IRPs highlight allegations related to ████ and ████████ (Compl. ¶ 345; cited in IRP Ind. Opp. at 4-5), Oxycodone (Compl. ¶ 180; cited in IRP. Ind. Opp. at 5), ████████████████ (Compl. ¶ 347; cited in IRP Ind. Opp. at 5)—but again, these are drugs where even IRPs apparently do not believe they have a sufficient reason

to allege Morris & Dickson joined conspiracies. *See* Compl. App. A (table of drugs and defendants). Even if they had, these allegations would not plausibly plead conspiracy for the reasons Morris & Dickson explained in its initial brief. *See* M&D Br. at 9-11.

   **C. The Single Eszopiclone Communication IRPs Cite Does Not Give Rise to A Plausible Inference that Morris & Dickson Joined a Conspiracy.**

This means that IRPs' entire claim against Morris & Dickson rests on one communication related to the drug Eszopiclone. Morris & Dickson allegedly once ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ *Id.* ¶ 351.

IRPs appear to believe this statement is direct evidence of Morris & Dickson's participation in a conspiracy. *See* IRP Joint Opp. at 7, 12-13. However, direct evidence is "explicit and requires no inferences," such as "a document or conversation explicitly manifesting the existence of the agreement in question." (*In re Generic Pharm. Pricing Antitrust Litig.*, 338 F. Supp. 3d 404, 439 (E.D. Pa. 2018) (internal quotation marks omitted))—such as the felony guilty pleas that supported this Court's finding that certain plaintiffs plausibly alleged direct evidence of a Doxy DR conspiracy. *Id.* at 439-40. Here, IRPs' allegation is at best circumstantial because it requires inference: IRPs must take a statement that is on its face a communication from a customer to a supplier about other suppliers' price and volume targets—the type of communication that happens many times each day in a market economy—and draw the inference that it suggests conspiracy.

This is precisely IRPs' argument. IRPs claim this is "actual evidence that shows M&D coordinating activity by Manufacturer Defendants to increase the price upon launch of a drug. The only inference plausible from the IRP Complaint is that M&D sought to facilitate coordination

among Manufacturer Defendants as part of the overarching fair share agreement." IRP Ind. Opp. at 13. However, "plausible" has a specific meaning in antitrust law. It does not mean, as IRPs apparently believe, "one of many possible inferences that might be drawn from a statement." To the contrary, as Morris & Dickson explained in its initial brief, the Third Circuit has explicitly held a conspiracy inference is *not* plausible where "common economic experience" or the "facts alleged in the complaint itself" explain why "independent self-interest" rather than conspiracy explain the conduct. *Insurance Brokerage*, 618 F.3d at 326 (internal quotation marks omitted).

Here, as Morris & Dickson outlined in its initial brief (M&D Br. at 6-7), both explanations are clearly present. First, it is "common economic experience" that customers share market information with suppliers—especially here, where sharing suppliers' price and volume proposals for a newly launched drug such as Eszopiclone could be a "powerful tool" for a distributor like Morris & Dickson in negotiations. *Insurance Brokerage*, 618 F.3d at 329; M&D Br. at 6-7. Second, the "facts alleged in the complaint itself" plead that Morris & Dickson commonly shared market information in exchange for discounts—in IRPs' words, "in exchange for preferable treatment from the manufacturers" Compl. ¶ 346—because Morris & Dickson was a "smaller wholesaler" (*id.*) that needed to scrap for any business it could get. *See* M&D Br. at 7. (Recall that Morris & Dickson is, according to the Complaint's annual revenue estimates, approximately *one-fiftieth* the size of Amerisource Bergen, Cardinal, or McKesson. *See id.* at 3.)

IRPs have several responses. First, IRPs seek to distinguish *Insurance Brokerage* because, they assert, "*Insurance Brokerage* is an opinion in which the court rejected wholesale that plaintiffs had pled the existence of any price-fixing conspiracy." IRPs Ind. Opp. at 14. But this is both wrong and irrelevant. IRPs are wrong because the Third Circuit held in *Insurance Brokerage* that the plaintiffs *had* plausibly pled a "Marsh-centered commercial conspiracy" (*Insurance Brokerage*,

618 F.3d at 346) in which insurance broker Marsh "masterminded and directed" a conspiracy among insurance companies not to compete for each other's business. *Id.*, 618 F.3d at 336-48. IRPs' argument is irrelevant because nothing in *Insurance Brokerage* suggests its pleading requirements evaporate once plaintiffs plausibly allege *some* conspiracy, as IRPs argue. *Insurance Brokerage* is a straightforward application of *Twombly*. *See id.* at 319-26 (discussing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007)). IRPs cite no authority suggesting a court can relax *Twombly* pleading standards for allegations that, as here, claim a vertically-situated party such as Morris & Dickson joined a horizontal conspiracy among manufacturers. If anything, the opposite is true. As the Third Circuit recognized, *Twombly* rested on concerns that courts could create false positives and chill ordinary commercial conduct by falsely reading such conduct as indicative of conspiracy. *See Insurance Brokerage*, 618 F. 3d at 321. Specifically, the Third Circuit cited the Supreme Court's "warning that mistaken inferences of conspiracy from ambiguous circumstantial evidence may chill the very conduct the antitrust laws are designed to protect" (*see id.* (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 594 (1986) (internal quotation marks omitted)), and its own caution that courts should "avoid deterring innocent conduct that reflects enhanced, rather than restrained, competition." *See id.* (quoting *In re Flat Glass Antitrust Litig.*, 385 F.3d 350, 357 (3rd Cir. 2004)).

These chilling and false positive concerns are more rather than less present here, where an antitrust plaintiff claims a customer joined a conspiracy among its suppliers. Morris & Dickson's initial brief cited Supreme Court and leading treatise authority emphasizing the importance of customer-supplier communications in a market economy. *See* M&D Br. at 7-9. For example, Morris & Dickson cited the Supreme Court's statement that it "eschewed adoption of an evidentiary standard that could deter or penalize perfectly legitimate conduct or would create an

irrational dislocation in the market by preventing legitimate communication between a manufacturer and its distributors." *Business Electronics Corp. v. Sharp Electronics Corp.*, 485 U.S. 717, 726 (1988); *see* M&D Br. at 8. IRPs do not even mention, much less attempt to distinguish, this authority, which provides ample reason why this single alleged Eszopiclone communication cannot give rise to a plausible conspiracy inference.

IRPs' Complaint demonstrates why these false-positive and chilling concerns are especially present here. *IRPs' own Complaint* asserts facts that directly contradict the theory that Morris & Dickson joined a conspiracy. As Morris & Dickson noted in its initial brief (M&D Br. at 3-4) and IRPs do not contest, IRPs explicitly identify Morris & Dickson as one of the conspiracy's victims: the manufacturers traded Morris & Dickson's business between themselves. *See* Compl. ¶ 583 ("M.C. (Wockhardt) called Aprahamian on New Year's Eve 2013 and they agreed that so long as Wockhardt was able to retain McKesson as a customer, it would concede the distributor Morris & Dickson to Taro."). Morris & Dickson cannot simultaneously be an active participant in a conspiracy (as IRPs theorize) and also a victim of the same conspiracy (as IRPs themselves allege). Further, as M&D highlighted (M&D Br. at 10) and IRPs do not contest, IRPs plead Morris & Dickson sought a *lower* rather than higher price from manufacturers (Compl. ¶ 346), which is completely inconsistent with a claim that Morris & Dickson conspired to "maintain and raise prices." Compl. ¶ 1. Morris & Dickson outlined these contradictions in its initial brief (M&D Br. at 3-4, 10) and IRPs simply ignore them, wishing to pretend their own allegations do not exist. IRPs' own Complaint contradicts the theory that Morris & Dickson joined a conspiracy and demonstrates why it would be a false positive to permit this claim to proceed to discovery.

Second, perhaps realizing they have pled themselves out of court, IRPs attempt to backtrack on *their own allegation* that Morris & Dickson offered market information to

manufacturers not to further a conspiracy but in exchange for discounts. Compl. ¶ 346. IRPs now say: "[T]he Complaint makes clear that this reward of a discount to M&D was transitory and sporadic." IRP Ind. Opp. at 14. But no matter how frequently *manufacturers* responded with a discount, IRPs' current spin on the allegations does not address the crucial point: whether *Morris & Dickson* provided market information in a unilateral attempt to get discounts (as the Complaint alleges; ¶ 346), or as part of a conspiracy. Now that IRPs themselves have alleged the former, the Court may not, consistent with *Twombly* and *Insurance Brokerage*, draw the latter conspiracy inference. *See Insurance Brokerage*, 618 F.3d at 326 (conspiracy inference implausible where the "facts alleged in the complaint itself . . . show that independent self-interest is an obvious alternative explanation for defendants' common behavior.") (internal quotation marks omitted).

Third, IRPs assert broadly that "M&D cannot distinguish its argument from total exculpation of participation in a price-fixing conspiracy whenever a defendant is alleged to be in anything other than a horizontal relationship with the defendants manufacturing the price-fixed product," and they claim Morris & Dickson is arguing that "price-fixing is de facto legal, as long as distributors or other vertical intermediaries are used as conduits . . . ." IRP Ind. Opp. at 15. But Morris & Dickson does not contest that some allegations might plausibly plead that a vertically-oriented party joined a horizontal conspiracy. *Insurance Brokerage* provided one example with the "Marsh-centered commercial conspiracy," where the plaintiffs alleged Marsh "pulled most of the strings and called most of the shots" in a broad "customer allocation scheme instigated by Marsh." *Insurance Brokerage*, 618 F.3d at 340. The *Insurance Brokerage* complaint quoted an alleged statement from a high-ranking Marsh executive explaining how it policed the conspiracy: if an insurance company broke the conspiracy by competing for one of the allocated accounts, then the executive promised "we will put this guy in open competition on every acct. and CRUCIFY him."

*Id.* at 344. Permitting a conspiracy inference from such a statement does not raise the Third Circuit's false-positive or chilling considerations: "common economic experience" (*id.*at 326) does not suggest Marsh was acting independently (the whole point of this threat was that Marsh could orchestrate collective punishment from other insurers) and the "complaint itself" (*id.*) also did not suggest some obvious reason why Marsh was acting independently.

However, this Court need not determine exactly how a plaintiff might plausibly allege that a customer joined a conspiracy among its suppliers. For purposes of this Motion, it is sufficient to acknowledge that Third Circuit precedent forbids such an inference from the Morris & Dickson Eszopiclone allegation: where both "common economic experience" and the "facts alleged in the complaint itself" demonstrate that Morris & Dickson's "independent self-interest is an obvious alternative explanation" for it to share Eszopiclone market information with a supplier. *Id.*

### III. CONCLUSION

"[I]t is one thing to be cautious before dismissing an antitrust complaint in advance of discovery, but quite another to forget that proceeding to antitrust discovery can be expensive." *Twombly*, 550 U.S. at 558 (citations omitted). IRPs provide no basis for forcing a small distributor like Morris & Dickson into this massive, 150+ drug MDL—certainly not with a single communication for a single drug that does not even plausibly suggest conspiracy. For the foregoing reasons, the Court should dismiss Morris & Dickson from this action.

Dated: November 12, 2020

        Respectfully submitted,

        SUSMAN GODFREY L.L.P.

        */s/* Barry Barnett
        Barry Barnett
        State Bar No. 01778700
        S.D. Adm. No. 02607

**FILED WITH REDACTIONS – PUBLIC VERSION**

                                                                 8115 Preston Road, Suite 575
                                                                 Dallas, Texas 75225
                                                                 Phone: 866-754-1900
                                                                 Fax: 713-654-6666
                                                                 bbarnett@susmangodfrey.com

                                                                 *Attorney-in-Charge for*
                                                                 *Morris & Dickson Co., LLC*

OF COUNSEL:

Drew D. Hansen
State Bar No. 30467
dhansen@susmangodfrey.com
SUSMAN GODFREY L.L.P.
1201 Third Avenue, Suite 3800
Seattle, Washington 98101
Phone: (206) 516-3880
Fax: (206) 516-3883

Thomas W. Paterson
State Bar No. 15571500
S.D. Adm. No. 07078
tpaterson@susmangodfrey.com
SUSMAN GODFREY L.L.P.
1000 Louisiana Street, Suite 5100
Houston, Texas 77002-5096
Phone: (713) 651-9366
Fax: (713) 654-6666

**FILED WITH REDACTIONS – PUBLIC VERSION**
11

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the foregoing was served via the Court's CM/ECF system on all counsel registered with that system, and via email, on November 12, 2020.

/s/ Barry Barnett
Barry Barnett